# IN THE UNITED STATES DISTRICT COURT FOR TENNESSEE
# FOR THE MIDDLE DISTRICT
# NASHVILLE DIVISION

| | |
|---|---|
| JANE DOE ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. _____ |
| ) | **JURY DEMAND (6)** |
| THE METROPOLITAN ) | |
| GOVERNMENT OF NASHVILLE AND ) | |
| DAVIDSON COUNTY, TENNESSEE ) | |
| and DR. ADRIENNE BATTLE ) | |
| ) | |
| Defendants. ) | |

## COMPLAINT

## CAUSES OF ACTION AND VENUE

1. Plaintiff brings this action against Defendants under 42 U.S.C. §1983 for violations of the First Amendment and the Due Process Clause of the Fourteenth Amendment to the Constitution of the United States of America. Plaintiff also sues The Metropolitan Government of Nashville and Davidson County, Tennessee, for retaliation under Title VI, 42 U.S.C. 2000(d) *et. seq.*, for violations of the Tennessee Teacher Tenure Act, §49-5-501 *et. seq.,* and for violations of the Tennessee Human Rights Act, Tenn. Code Ann §4-21-101 *et. seq.* Jurisdiction is conferred upon the Court by 28 U.S.C. §1331 and the Court has pendant jurisdiction over the state law claims.

## PARTIES

2. Plaintiff, Jane Doe, is a citizen and resident of Davidson County, Tennessee.

3. Defendant, The Metropolitan Government of Nashville and Davidson County, Tennessee, is a governmental entity operating a public school system (hereinafter MNPS) in

Nashville, Davidson County, Tennessee. Defendant is a recipient of federal financial assistance and as such, must comply with Title VI, 42 USC 2000(d) *et. seq*.

4. Defendant, Dr. Adrienne Battle, is the Director of Schools for the Defendant, MNPS.

5. The cause of action alleged in this Complaint arose in Davidson County, Tennessee.

## FACTS

6. Plaintiff, Jane Doe, is a teacher. She is African American.

7. Plaintiff obtained her Bachelor of Science from the University of Tennessee in 1998, a Master of Science in Curriculum Instruction in 1999 and an EDS in Instructional Leadership from Tennessee Tech University in 2010.

8. Plaintiff was hired by MNPS in August 1999 as a teacher and was then promoted up through the ranks. Plaintiff was a coordinator, an administrative position, from August 2009 until the 2019-2020 school year. For the 2019-2020 school year, Plaintiff was promoted to a Director for Defendant, MNPS.

9. Plaintiff is tenured and certificated and has been at all times relevant to this Complaint.

10. Plaintiff is the mother of an African American child who has a medically diagnosed disability. Plaintiff's child was enrolled in an elementary school in Defendant's school district and was in the fourth grade.

11. On February 3, 2020, a student teacher assigned to the child's class taught a lesson plan that dealt with slavery and the children were instructed on the philosophy of breaking up families and corporally punishing slaves. The student teacher incorporated the infamous Willie Lynch letter known as "How To Make A Slave" into the lesson plan. This plan was shown to and

approved by the supervising teachers in advance and then delivered in the presence of the supervising teacher.

12. This letter is a racially charged and inhumane speech given by Willie Lynch in 1712 on the banks of the James River in the Colony of Virginia.

13. A printout of the speech was passed out to the class including Plaintiff's child. Plaintiff's child made notes on this handout.

14. The speech contains dehumanizing racial degradations, including but not limited to the following:

> I have a fool proof method for controlling your black slaves. I guarantee every one of you that, if installed correctly, it will control the slaves for at least 300 years.
>
> **LET'S MAKE A SLAVE**
>
> Let us make a slave. What do we need? First of all, we need a black man, a pregnant woman and her baby boy. Second, we will use the same basic principle that we use in breaking a horse, combined with some more sustaining facts. What we do with horses is that we break them from one form of lift to another; that is, we reduce them from their natural state in nature.
>
> For fear that our future generations may not understand the principles of breaking both of the beast together, the black and the horse…Accordingly, both a wild horse and a wild or natur[al] black is dangerous even if captured, for they will have the tendency to seek their customary freedom and, in doing so, might kill you in your sleep. You cannot rest. They sleep while you are awake, and are awake while you are asleep. They are **DANGEROUS** near the family house and it requires too much labor to watch them away from the house. Above all, you cannot get them to work in this natural state. Hence, both the horse and black must be broken; that is breaking them from one form of mental life to another. **KEEP THE BODY, TAKE THE MIND!** In other words, break the will to resist.
>
> Take the meanest and most restless black, strip him of his clothes in front of the others, the female, and the black infant, tar and feather him, and set him afire. The next step is to take a bullwhip and beat the remaining males to the point of death, in front of the female and the infant. Don't kill him, but **PUT THE FEAR OF GOD IN HIM**, for he can be useful for future breeding.

3

15. The advanced readers in the class were instructed to read out loud paragraphs 1-2 above while the less advanced readers were instructed to read the last paragraph listed above.

16. Plaintiff's child had to read the last paragraph out loud to the class.

17. As one news article stated "[a]fter reading the material in which Lynch purportedly advocated for physical and psychological torture of slaves, students were asked, "To keep their slaves subservient, plantation owners should" with a series of blank bullet points for youngsters to fill in.

18. Plaintiff picked her child up from school this day and the whole way home her child talked about how the child did not want to be black anymore. Her child asked her, "Do I have to be afraid or am I safe because I am brown?" The child also asked, "Is it safer to play on the playground if I'm not black?"

19. Plaintiff had no idea what was going on and later that night, Plaintiff looked in her child's backpack. There she found a packet about Black History Month containing multiple assignments. She did not have a chance to read any that night and took pictures of many of the assignments to look at the next day.

20. On February 4th, the next morning, Plaintiff's child was so afraid that the child did not want to go back to school. Her child kept on asking if she was going to pick the child up from school. She had to walk the child into school.

21. Later that morning, Plaintiff looked at the photographs of the first assignment and saw the assignment was called "Let's Make a Slave" and dealt with the infamous Willie Lynch letter.

22. Plaintiff immediately sent a text message with photos of the assignment to the principal at the school. Plaintiff told the principal this material was not appropriate for high school

4

students much less the 4th grade and that this can cause psychological damage to children. Plaintiff told the principal, "[i]f I am a parent who wants to bring awareness to ineffective approaches to teaching slavery to young children, I am going to the news today".

23. The principal then texted Plaintiff and stated she agreed with Plaintiff. The Principal later stated the lesson packet was being collected from the students and that the first three pages were primary sources that the student teacher decided to incorporate which was not appropriate and that other parents had not seen it. The principal told Plaintiff that the lesson was shut down.

24. That same day, the same student teacher taught the class from a book called Henry's Freedom Box, where Henry the slave married a fellow slave and had two children. Henry's family, wife and two children, were sold at the slave market. Henry ran to the market to see both his children sold and screaming "Father, Father" as they were taken away. Henry then decided he would go where there were no slaves and hid himself in a box to be mailed to Philadelphia by a member of the underground railroad. In this class, Plaintiff's child was instructed to get under a desk and act as if the child were in a box being shipped as was Henry.

25. Plaintiff's child became hysterical and had to be removed from the class.

26. No one from the school notified Plaintiff of this incident when this occurred. An official from the university where the student teacher was enrolled later told Plaintiff that this occurred. No one could inform Plaintiff who removed her child from this class, except that it was a female aide.

27. During the time period of these lessons, on the playground and in the cafeteria, the white children teased the black children, including Plaintiff's child about being a slave.

28. Thereafter, on numerous occasions, Plaintiff's child stated he was scared of being sent to a slave house. The child became scared to sleep in the child's own bed. The child kept telling the family that the child might get separated from them and get too big to fit in a box to make it home.

29. Plaintiff made numerous complaints to the administration at MNPS about this lesson, including but not limited to on the same day, Plaintiff sent an e-mail to the principal, assistant principal, the teacher, the special education teacher and the special education case manager for Plaintiff's child's class complaining of this lesson and stated:

> Black History is about celebrating the accomplishments, untold and unknown made by African Americans and the contributions made in the United States despite obstacles placed in front of them. Black History month in NOT about talking about how slaves were made and set afire and beaten with whips.
>
> I am beyond upset that it was "thought" to be okay for 4th grade students to Read .. "Take the meanest and most restless black, strip him of his clothes in front of the others, the female and the black infant, tar and feather him, and then set him afire. The next step in to take the bullwhip and beat the remaining males to the point of death….."

30. That same day, Plaintiff spoke by telephone with the Assistant Principal and then with the Principal and once again voiced her objections to the lesson plan, "How to Make a Slave".

31. Plaintiff also complained to Antoinette Williams, the Executive Officer of Middle Schools, as Plaintiff wanted her to know what had happened in the district. Plaintiff also brought up and complained of the Willie Lynch lesson and the other lessons to the Community Superintendent.

32. On February 6, 2020, Antionette Williams told Plaintiff that she had notified Adrienne Battle, who at the time was the Interim Director of Schools, of Plaintiff's complaints.

33. On the same date, February 6, 2020, Plaintiff went back to Waverly Belmont to inform the school officials that her child was now even more frightened. On this date, Principal Blakenship was very short and dismissive.

34. The lesson about slavery continued through the week and the following week and Plaintiff continued to complain to the administration and to request to meet with the teachers of this class to no avail.

35. The media then picked up on the incident and it aired nationwide. (See https://www.nbcnews.com/news/us-news/student-teacher-tennessee-fired-over-black-history-month-assignment-slavery-n1131606 and https://www.cnn.com/2020/02/07/us/nashville-student-teacher-dismissed-black-history-month-slavery-lesson/index.html). On February 12, 2020, the Tennessean ran an article about the incident called "Nashville parents, community express outrage after student-teachers lesson on slavery", while network news also ran stories on the event.

36. The teacher was placed on administrative leave and when he returned from this leave, he gave a lesson called "Freedom Over Me" discussing the sale of slaves and their prices.

37. On February 27, 2020, Defendant sent Plaintiff a truancy notification for her child, who had only missed approximately two days the entire school year. One was for Plaintiff's father-in-law's funeral and the other to see Plaintiff's mother-in-law when she was sick and later diagnosed with cancer.

38. Plaintiff's child was not truant.

39. In early April 2020, Barry Booker, Director of Budget and Financial Recording, told Plaintiff and other officials that there was the same money in the budget as in the following year and that the only employees who would need to worry about their jobs were secretaries, but

that they planned on hiring the secretaries back right away. Booker stated the secretaries could be furloughed and would make more money on furlough.

40. Thereafter, on April 24, 2020, Plaintiff called the principal and complained about the use of her child in a video posted on a teacher's personal YouTube and Twitter account without Plaintiff's permission. However, the teacher posting the video did not even teach Plaintiff's child. Plaintiff complained that this video was a violation of her child's FERPA rights. The video highlighted that her child was different. The theme song was the same as the theme song to the Greatest Showman, which is about a man who takes misfits and gives them a purpose.

41. On April 29, 2020, Defendant fired Plaintiff, effective the end of the school year.

42. On this date, Chris Barnes, MNPS's Chief of Human Resources, and Lisa Spencer, Director of HR Strategy and Employee Services, called Plaintiff. Chris Barnes told Plaintiff that as of June 30, 2020, her job was being eliminated and she would no longer have a job, i.e. no longer be an employee of MNPS, if she did not secure another position at MNPS.

43. Barnes emphasized this elimination of Plaintiff's job was due to the budget and then later in the conversation added it was also due to a "reorg".

44. In this call, Chris Barnes asked Plaintiff if she heard the State of the Mayor's Address the day before and stated Metro was looking at an unprecedented budget crisis and that the best MNPS could hope for is the same budget as last year.

45. Barnes told Plaintiff that there was a $17-$20 million dollar difference between last year's budget and what was needed for the 2020-2021 school year. Barnes implied this shortage was what was causing his call to her and the elimination of her position. He stated a "new org chart" would be coming out on Friday (May 1, 2020).

46. Plaintiff asked, "Do I have a job?" Barnes gave no response to that question and instead stated her job was being repurposed into something different. Barnes told Plaintiff her job as a director was going to go away.

47. Barnes made no mention of transferring her to a new position but rather told Plaintiff she would have to apply for other positions and made no statements about Plaintiff being placed in a teacher's position.

48. Defendant did not need to eliminate Plaintiff's position due to the budget.

49. Defendant had a budget of $914,475,600 for the 2019-2020 school year.

50. Defendant's Budget was actually increased $19,176,500 to $933,652,100 for the 2020-2021 school year.

51. At the same time Defendant fired Plaintiff, MNPS was adding jobs and hiring from the outside. Defendant created two new executive director positions and filled positions, which either did not exist or were unfilled in the 2019-2020 school year. Defendant also created a new position and hired an outside person to be the Executive Officer of Diversity and Inclusion.

52. For the 2020-2021 school year, Defendant MNPS also gave all its employees a 3% pay raise.

53. Plaintiff was very upset and told both Barnes and Spencer that this was done in retaliation for her complaints.

54. Approximately two hours after the call ended, Lisa Spencer called Plaintiff and Plaintiff told Spencer she was being retaliated against. Spencer told Plaintiff, "If you say that, I can't help you. If you continue to state you are being retaliated against, that will get out and in places where you don't want it to."

55. On May 4, 2020, Lisa Spencer called Plaintiff again and told her, "I didn't realize you were tenured, or we would have had a different conversation." Spencer then stated Plaintiff could apply for open positions, but that in the worst case scenario, she would be moved to a teaching position.

56. Defendant, Dr. Adrienne Battle, mailed a letter to Plaintiff dated May 4, 2020, informing Plaintiff that "due to the district's reorganization and budget impact, your position as Director … with Metropolitan Nashville Public Schools will be eliminated effective June 30, 2020". Plaintiff was told she was "eligible for rehire into any other open position with the district for which you apply and are selected." "If you have not secured another position for which you have applied prior to June 15, 2020, you will be administratively transferred by the Director of Schools, pursuant to Tenn. Code Ann. §49-5-510, for the efficient operation of the school system, into a classroom teaching position."

57. Defendant moved Plaintiff's job duties to the job title of Executive Office of Diversity, Equity & Inclusion.

58. Plaintiff was highly qualified for this position and applied for this position.

59. Another candidate, a male candidate, less qualified, was hired and was paid more.

60. Plaintiff earned $115,000.00 per year. As a teacher, she will earn only approximately $75,000.00 per year.

61. On September 15, 2020, Plaintiff was offered a position, higher than that of a teacher in both responsibility and pay, by the supervisor over this position.

62. On November 3, 2020, Plaintiff filed a lawsuit against Defendant on behalf of her child and the lawsuit immediately made the news.

63. On November 5, 2020, Plaintiff was sent a letter by e-mail from MNPS human resources that notified her that she had not been selected for this position.

## CAUSES OF ACTION

### I. VIOLATION OF 42 U.S.C. §1983 AND THE FIRST AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES OF AMERICA

64. Plaintiff's statements made to the MNPS administration about the violations of Title VI due to the inappropriate and racially charged course instruction, including but not limited to the "How to Make a Slave" lesson, and making her son act as if he were in a box being shipped to escape being a slave, were constitutionally protected speeches. Further, Plaintiff's complaint of the filming of her child in violation of FERPA was also a constitutionally protected speech.

65. Plaintiff's filing of the lawsuit on behalf of her minor son is also protected activity.

66. Defendants took adverse actions against Plaintiff, including but not limited to first firing Plaintiff, and then when Defendants realized she was tenured, demoting her into a position where her salary was approximately cut by 30%. Defendants also took an adverse action against Plaintiff when it failed to hire her as the Executive Office of Diversity, Equity & Inclusion, and again in September 2020 when it offered her another position but then withdrew the offer.

67. Each of these adverse actions would deter a person of ordinary firmness from continuing to engage in making this protected speech.

68. Defendant, Dr. Adrienne Battle, acted under color of state law when Plaintiff was first fired, and then when it was realized Plaintiff was tenured, demoted into a position where her salary was approximately cut by 30%. Defendant, Dr. Adrienne Battle, also acted under color of state law when Plaintiff was not hired as the Executive Office of Diversity, Equity & Inclusion, and again in September 2020 when MNPS offered her another position but then withdrew the offer.

69. There is a causal connection between the Plaintiff's protected speeches and the adverse actions.

## II. VIOLATIONS OF THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT TO THE CONSTITUTION OF THE UNITES STATES OF AMERICA, 42 U.S.C. §1983, AND THE TENNESSEE TEACHER TENURE ACT

70. Both Defendants violated Plaintiff's constitutional right to due process when Battle fired Plaintiff in violation of Plaintiff's statutory tenure rights and in violation of the Tennessee Teacher's Tenure Act.

71. Under Tennessee law, only the School Board can dismiss a tenured teacher. Pursuant to Tenn. Code Ann. §49-5-511, "[t]he causes for which a teacher may be dismissed or suspended are: incompetence, inefficiency, neglect of duty, unprofessional conduct, and insubordination, as defined in §49-5-501."

72. Plaintiff was not charged with any of the statutory reasons that justify firing a tenured teacher.

73. Further, Tennessee law provides procedural safeguards that the charges against a teacher "shall be made in writing, specifically stating the offenses that are charged, and shall be signed by the party or parties making the charges".

74. Defendants never provided Plaintiff with any charge letter.

75. Defendant violated §49-5-511(b), in that Defendant's School Board did not make the decision to fire Plaintiff nor did it give Plaintiff written notice of dismissal explaining fully the circumstances or conditions making the dismissal necessary.

76. Further, Plaintiff, tenured, had her position eliminated not due to the budget, but due to retaliation for reporting the violations of Title VI and FERPA.

77. Plaintiff was not accorded any of the procedural safeguards of the Tennessee Teacher Tenure Act.

78. Plaintiff was never offered, nor did she accept any bona fide offer of reemployment for a comparable position within the LEA.

79. Defendant, MNPS, engages in a custom or tolerance or acquiescence of violating its employees' rights under the Tennessee Teacher Tenure Act, and the Fourteenth Amendment to the Constitution of the United States of America, because employees will have their positions eliminated allegedly due to the budget, while in reality, Defendant has money in the budget for the position, and is hiring for other positions and adding new positions, as well as giving raises.

80. Defendant, Dr. Adrienne Battle, acted under color of state law in engaging in these tenure act violations.

81. Defendants' actions in subsequently contacting Plaintiff and informing her that MNPS did not realize she was tenured and that she would in the worst case scenario be placed in a teaching position, only mitigates damages from this statutory violation.

82. Defendant MNPS's action in demoting Plaintiff from her Director's position to a teaching position with a substantial reduction in salary violates the Tennessee Teacher Tenure Act and was improperly motivated by Plaintiff's complaints of violations to Title VI and FERPA.

### III. VIOLATION OF TITLE VI OF THE CIVIL RIGHTS ACT AGAINST MNPS

83. Plaintiff engaged in activity that was protected under Title VI, including, but not limited to, when she complained of the use of the racially charged Willie Lynch letter in a 4th Grade Classroom, and of her child being placed under a desk and told the child was in a box to be shipped to escape the slave trade.

84. Plaintiff also engaged in protected activity when she filed the lawsuit on behalf of her child for violations of Title VI.

85. The exercise of these protected activities was known to Defendant, MNPS.

86. Defendant MNPS took an adverse action against Plaintiff when Defendant first fired Plaintiff, and then when Defendant realized she was tenured, moved her into a position where her salary was cut by approximately 30%.

87. Defendant also took an adverse action against Plaintiff when it failed to hire her as the Executive Office of Diversity, Equity & Inclusion.

88. Defendant MNPS further took an adverse action against Plaintiff when in September 2020 it offered her another position higher than that of a teacher but then told her two days after she filed the lawsuit on behalf on her child that she was not selected for this position. Any of these adverse actions would deter a person of ordinary firmness from continuing to engage in making this protected activity.

89. A causal connection existed between the protected activity and the adverse actions.

90. Defendant engaged in intentional retaliation against Plaintiff for exercising her rights to complain under Title VI about Defendants' racial discrimination of her child.

### IV. VIOLATION OF THE TENNESSEE HUMAN RIGHTS ACT AGAINST MNPS

91. Plaintiff was qualified for and applied for the position of Executive Office of Diversity, Equity & Inclusion.

92. Another candidate, a male candidate, less qualified was hired and was paid more.

93. Defendant, MNPS, discriminated against Plaintiff based upon her sex when it did not hire her for this position and hired a less qualified male.

**WHEREFORE, PLAINTIFF PRAYS:**

1. That Plaintiff be granted a judgment against the Defendants for compensatory and other damages suffered by her, including but not limited to, damages for pain and suffering, humiliation and embarrassment, anxiety, loss of enjoyment of life, injury to character and personal injury, back pay, interest on back pay, and lost benefits, including pension and longevity pay.

2. That the Plaintiff be ordered reinstated to her prior position or front pay in lieu thereof, with all accumulated salary rights and benefits as if continuously employed in this position.

3. For full salary for the tenure act violation.

4. Plaintiff further prays for both liquidated and punitive damages and for pre-judgment interest, attorney's fees, litigation costs, and the cost of this cause.

5. Plaintiff prays for a jury of six to try this cause.

6. Plaintiff prays for such other further relief as may be necessary or appropriate.

Respectfully Submitted,

s/Ann Buntin Steiner
Ann Buntin Steiner    #11697
Steiner & Steiner, LLC
613 Woodland Street
Nashville, TN 37206
(615) 244-5063
*Attorney for Plaintiff, Jane Doe*