# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

JANE DOE,                                              )
                                                       )
      Plaintiff,        )
                                                       )
v.                                                     )    Civil No. 3:20-cv-01023
                                                       )    Judge Trauger
THE METROPOLITAN GOVERNMENT OF                         )    **Lead Case**
NASHVILLE AND DAVIDSON COUNTY,                         )
TENNESSEE, ET AL.,                                     )
                                                       )
      Defendants.     )

_____

DR. LILY MORENO LEFFLER,                               )
                                                       )
      Plaintiff,        )
                                                       )
v.                                                     )    Civil No. 3:21-cv-00038
                                                       )    Judge Trauger
METROPOLITAN GOVERNMENT OF                             )    Member Case
NASHVILLE AND DAVIDSON COUNTY,                         )
TENNESSEE, ET AL.,                                     )
                                                       )
      Defendants.     )

_____

DR. JAMES BAILEY, ET AL.,                              )
                                                       )
      Plaintiffs,       )
                                                       )
v.                                                     )    Civil No. 3:21-cv-00122
                                                       )    Judge Trauger
THE METROPOLITAN GOVERNMENT OF                         )    Member Case
NASHVILLE AND DAVIDSON COUNTY,                         )
TENNESSEE, ET AL.,                                     )
                                                       )
      Defendants.     )

## <u>MEMORANDUM</u>

Before the court is the Motion to Dismiss filed by defendants the Metropolitan Government of Nashville and Davidson County, Tennessee ("Metro") and Dr. Adrienne Battle in the case of *Dr. James Bailey et al. v. Metropolitan Government et al.*, No. 3:21-cv-00122, seeking partial dismissal of those plaintiffs' claims against them. (Doc. No. 29.)[1] Specifically, the defendants move for the dismissal of the claims asserted against them under 42 U.S.C. § 1983 in the plaintiffs' Third Amended Complaint (Doc. No. 26). For the reasons set forth herein, the motion will be granted in part and denied in part.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The plaintiffs make the following allegations in their Third Amended Complaint, which are accepted as true for purposes of the defendants' Motion to Dismiss.

### A. The Parties

Metro is a governmental entity operating a public school system, the Metropolitan Nashville Public Schools ("MNPS"), in Nashville, Davidson County, Tennessee. Defendant Dr. Adrienne Battle is the Director of Schools for MNPS, having been appointed to that position in March 2020. In 2018, she was serving as Community Superintendent for the Southeast Quadrant.

Plaintiff Dr. James Bailey began working as an MNPS teacher in 2003. He was regularly promoted up through the school system and, by 2012, had been promoted to the position of Executive Principal of Whites Creek High School. He remained in that position until June 30, 2020. That position is a "certificated position," and Bailey is certificated and had been certificated

---

[1] After the defendants filed their Motion to Dismiss, the *Bailey* case was consolidated for all purposes with two other related cases, as indicated by the case caption, above. The references to the parties' filings and the docket numbers herein are from the docket in *Bailey*, No. 3:21-cv-00122, and the reference to "plaintiffs" means the plaintiffs in that case, as identified herein.

since at least 2008. (Doc. No. 26 ¶ 14.) In addition, he was tenured at MNPS at all times relevant to the Third Amended Complaint. He is forty-eight years old.

Plaintiff Dr. Pippa Meriwether has been tenured at MNPS since 2002. Over the years, she has served as a classroom teacher, behavior specialist, and Executive Principal. In 2010, she was promoted to the position of Executive Director, a position she held until 2017. In 2017, she was promoted to Community Superintendent for the Northwest Quadrant. In 2019, she was promoted to the position of Associate Superintendent; she remained in this position until June 30, 2020. She is fifty-eight years old. Meriwether is certificated and has been certificated since 1998. The Associate Superintendent position is a certificated position.

Plaintiff Dr. Damon Cathey is tenured and has been tenured at MNPS at all relevant times. He is certificated and has been certificated since 1997. He has twenty-seven years' experience in public education, twenty of those spent working for MNPS. He has held many positions, including teacher, Assistant Principal, Principal, Executive Principal, and Executive Lead Principal. In 2017, he was promoted to the role of Community Superintendent for the Northeast Quadrant. In 2019, he was promoted to the position of Associate Superintendent, and he remained in that position until June 30, 2020. He is fifty-five years old.

## B. The Fight

Prior to February 2018, Meriwether and Bailey were colleagues and friends with Battle. On February 16, 2018, while Battle was still Community Superintendent for the Southeast Quadrant, the basketball coach ("Coach") at Whites Creek High School got into a fight with the parent of one of his team members. The Coach beat up the parent. The Coach was a relative of Battle's. After the fight, Bailey, as Principal of Whites Creek High School, was contacted by Whites Creek Assistant Principal Danette Warren, who told Bailey that the Coach had badly beaten up a parent.

The next day, Battle called Meriwether, who was then Community Superintendent for the Northwest Quadrant (an equivalent position to the position Battle held at the time), to inform her about the fight. Battle appeared to defend and take the side of the Coach in the incident, stating that the Coach had a right to defend himself against the parent. Meriwether felt that Battle expected her to accept Battle's account of the incident and to quash the matter. However, after getting off the phone with Battle, Meriwether immediately called Bailey to get his view of what had happened and to ask why he had not immediately informed her about the incident, since Whites Creek High School is in the Northwest Quadrant and under her supervision. Bailey told her that Battle had been at the game and told him that she had taken care of the situation and would notify Meriwether.

Meriwether then called her boss, the Chief of Schools, Dr. Sito Narcisse, to inform him of the situation. Narcisse stated that Battle should not have inserted herself into the situation and that he would call her to tell her to stay out of the matter going forward. He did so, and Battle was upset, both about Meriwether's reporting the matter to Narcisse and about Narcisse's telling her to stay out of it. She repeatedly insisted that the Coach had the right to defend himself.

Dr. Cathey, then Community Superintendent for the Northeast Quadrant, was also disturbed about the entire incident and called Battle as a peer to explain his perception of the gravity and seriousness of the incident. Battle, again, kept reiterating that the Coach had the right to defend himself. Cathey was shocked by her reaction to the situation.

The Coach was placed on administrative leave while an investigation ensued. Around the same time, Bailey discovered and reported to Metro auditors that "an employee may have mishandled funds from a basketball team fundraiser." (Doc. No. 26 ¶ 51.) The audit concluded in

March 2018 and recommended that "the employee" not be in a position to handle money for MNPS.[2] Battle became cold and distant toward both Meriwether and Bailey.

Ultimately, after the investigation into the fight concluded, Bailey recommended that the Coach be terminated, and Meriwether supported this recommendation. The recommendation resulted in the non-hire of the Coach for the subsequent year, as he was not a certified teacher and did not have tenure. The Coach appealed the decision.

In August 2018, Bailey was subpoenaed to testify under oath in the administrative hearing on the Coach's appeal.[3] Bailey also testified about the Coach's actions in the fight and about the missing funds.[4] Bailey states that testifying at an administrative hearing was outside the scope of his ordinary job duties; in his twelve years as Assistant Principal or Executive Principal, he only testified at one other administrative hearing.

### C. The Falsifying of Grades

In the Spring of 2019, while Cathey was Community Superintendent over the Northeast Quadrant, he learned that the principal at one of the high schools within his quadrant was falsifying student grades. Cathey began an investigation into the principal's actions in May 2019 and ultimately concluded that the principal's actions violated MNPS's grading policies and constituted a misdemeanor violation of Tennessee law, under Tenn. Code Ann. § 39-14-136.

In June 2019, when Cathey concluded his investigation, Battle was serving as MNPS Interim Director of Schools, so Cathey reported his findings to Battle. He recommended that the

---

[2] The Third Amended Complaint does not identify this "employee."

[3] The Third Amended Complaint does not state who issued the subpoena.

[4] The Third Amended Complaint implies but does not actually state that Bailey testified that the Coach was responsible for the missing funds. In their Response memorandum, the plaintiffs state that Bailey testified that the "same Coach [was] misusing funds." (Doc. No. 34, at 15.)

principal be terminated and that his actions be reported to the Tennessee Department of Education, since they potentially gave rise to misdemeanor charges under Tennessee law. Battle rejected Cathey's recommendations, stating that the principal's actions did not warrant termination and that she had seen worse. Cathey asked Battle when MNPS would start addressing serious issues such as grade inflation and forgery. Battle took offense and responded by implying that Cathey was at fault for the grade falsifications.

### D.      The Leffler Situation

Plaintiffs Meriwether and Cathey were both promoted to be two of four Associate Superintendents of MNPS for the 2019–2020 school year.

During a meeting in February 2020, Battle discussed with Cathey another MNPS employee, Dr. Lily Leffler. Leffler was an MNPS Executive Director who reported directly to Cathey. Leffler was related to another former MNPS employee who had been fired by MNPS and who later sued, alleging that she had been terminated in violation of Title VII. In this meeting, Battle questioned Leffler's "loyalty" to MNPS, and Cathey defended Leffler as a professional who was doing an exceptional job. This was not the first time that Battle discussed her concern about Leffler's lack of loyalty and that Cathey advocated for Leffler.

### E.      Adverse Employment Actions Against the Plaintiffs

In March 2020, Battle was appointed Director of Schools for MNPS. Within less than two months after her appointment, all three plaintiffs were fired or demoted from their positions.

#### 1.      Bailey's Termination

In May 2018, Bailey won the Governor's Environmental Stewardship Award. In February 2020, Bailey was named Principal of the Year for Middle Tennessee by the Tennessee Association of Secondary School Principals and was praised on MNPS's website for Whites Creek High School's tremendous academic gains, his work on improving the school's culture and climate, and

his promoting a positive work environment for faculty and staff. However, in May 2020, Bailey was allegedly "fired from his position as principal at Whites Creek High School." (Doc. No. 26 ¶ 81.) He was told that he was being let go, because MNPS was "looking . . . to make a change at Whites Creek for the upcoming school year." (*Id.*) Bailey was also told that MNPS was "putting off hiring for principals" but that he could apply for other jobs and open principal positions at MNPS. Bailey does not identify what other jobs he applied for, but he alleges that he "was not able to find another position with MNPS." (*Id.* ¶ 80.)

The plaintiffs allege that Bailey's termination was confirmed by a letter dated May 4, 2020, which stated:

> This letter confirms the conversation on May 1, 2020 that due to the district's reorganization and budget impact, your appointment as Principal (White's Creek High School) with the Metropolitan Nashville Public Schools will end effective June 30, 2020. You are eligible for rehire into any other open position with the district for which you apply and are selected. . . . If you have not secured another position for which you have applied prior to June 15, 2020 you will be administratively transferred by the Director of Schools, pursuant to Tenn. Code Ann. 49-5-510, for the efficient operation of the school system, into a classroom teaching position.

(*Id.* ¶ 83.) At this time, Bailey had an administrative license but not a teaching license and, therefore, was not licensed to be transferred to a teaching position. As a result, Bailey claims that he was "fired" when he was "removed from his principal's position," effective June 30, 2020. (*Id.* ¶ 86.)

MNPS did not close or merge any traditional high schools for the 2020–2021 school year or eliminate any high school principal jobs, including the position of principal at Whites Creek High School. Bailey was replaced by the principal of Madison Middle School, Dr. Brian Mells, who is 36 years old. Bailey was the only principal of an MNPS school not to be offered either a principal or assistant principal job and the only high school principal to lose his job as a result of the purported reorganization.

### 2. *Meriwether's and Cathey's Demotions*

On April 29, 2020, MNPS informed both Meriwether and Cathey that their positions as Associate Superintendent were being eliminated. Meriwether and Cathey each received a letter dated May 4, 2020 confirming this action, which stated:

> This letter confirms the conversation on April 29, 2020 that due to the district's reorganization and budget impact, your position as Associate Superintendent with the Metropolitan Nashville Public Schools will be eliminated effective June 30, 2020. You are eligible for rehire into any other open position with the district for which you apply and are selected. . . . If you have not secured another position for which you have applied prior to June 15, 2020 you will be administratively transferred by the Director of Schools, pursuant to Tenn. Code Ann. 49-5-510, for the efficient operation of the school system, into a classroom teaching position.

(*Id.* ¶ 96.)

Meriwether was subsequently hired into a position as elementary school principal for the 2020–2021 school year. Her transfer to this position was at a lower level of pay and benefits and constituted a demotion from the position of Associate Superintendent.

Cathey applied for an Executive Director position, which was one step below the position of Associate Superintendent. He was not selected for an Executive Director position, even though he had the fifth-highest panel review scores of all interviewees for the position.[5] He was hired into an elementary school principal position, which was a substantial demotion.

Of the four Associate Superintendents whose positions were eliminated, the youngest was promoted; the second youngest was transferred to an Executive Director position; and the two oldest, Cathey and Meriwether, were demoted to positions as elementary school principals. In addition, Battle selected five new individuals to serve as Executive Directors, all of whom had less experience and were younger than Meriwether and some of whom had less education. All of them

---

[5] The Third Amended Complaint does not state the number of Executive Director positions that were being filled.

but one were younger than Cathey. Two additional individuals were recruited for the Executive Director position after MNPS had completed the application and interview process. Both are much younger than Cathey and Meriwether; neither has a doctoral degree, unlike Cathey and Meriwether; and neither originally applied for the position.

The plaintiffs allege that, although Metro characterized the elimination of the Associate Superintendent positions (and other positions) as a reduction in force due to budgetary constraints, it was a "sham reduction in force" (*id.* ¶ 108), as there were no budgetary reasons to eliminate the positions and MNPS was, while firing or demoting the plaintiffs, creating other jobs and hiring "outside" candidates (*id.* ¶ 112). MNPS also gave all employees two 3% raises during the 2020–2021 school year. In January 2021, the Tennessee Department of Education notified MNPS that it had accumulated over $110,000,000 in unspent federal funds.

### F.      The Legal Claims and Partial Motion to Dismiss

Based on these allegations, plaintiffs Bailey, Meriwether, and Cathey bring claims against Metro for age discrimination, in violation of the Tennessee Human Rights Act and the Age Discrimination in Employment Act, and for violations of the Tennessee Teacher Tenure Act. In addition, all three plaintiffs sue both Metro and Dr. Adrienne Battle under 42 U.S.C. § 1983 for violations of the Due Process Clause of the Fourteenth Amendment to the United States Constitution, and plaintiff Bailey brings an additional § 1983 claim against both defendants based on the alleged violation of his First Amendment rights. Bailey separately asserts a claim against Metro for violation of the Tennessee Public Protection Act.

Bailey's First Amendment claim is premised upon allegations that: (1) his statements and testimony against the Coach and his statements and testimony about the mishandling of funds constituted "speech" protected by the First Amendment; and (2) he was terminated by Battle and MNPS in retaliation for having engaged in this protected speech. (Doc. No. 26 ¶¶ 115–19.)

The plaintiffs' due process claims are premised upon allegations that: (1) the plaintiffs had a protected property interest in their tenured positions with MNPS, granted by state law, Tenn. Code Ann. §§ 49-5-511(b) and -510; (2) the plaintiffs had a constitutional right not to be deprived of these positions without due process, including both pre-deprivation notice and an opportunity to be heard; and (3) the plaintiffs were deprived of their positions without due process, insofar as the termination of their positions and their transfers to other positions were not made in good faith, were the result of "sham" reductions in force, and were actually effected by Battle in retaliation for the plaintiffs' having previously challenged Battle's authority and decisions or, alternatively, because of their age. Bailey's claim is also premised upon allegations that his due process rights were violated when he was "transferred" to a position for which he was not licensed, when he had a property interest and legitimate expectation to be transferred only to a job for which he was licensed.

The defendants have filed their Motion to Dismiss and supporting Memorandum of Law (Doc. Nos. 29, 30), seeking dismissal of the plaintiff's § 1983 claims under Rule 12(b)(6) of the Federal Rules of Civil Procedure. The plaintiffs have filed a Response in opposition (Doc. No. 34), and the defendants have filed a Reply (Doc. No. 38).

## II.     STANDARD OF REVIEW

In deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court will "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007); *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002). "Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)

(quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). The court must determine only whether "the claimant is entitled to offer evidence to support the claims," not whether the plaintiff can ultimately prove the facts alleged. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

The complaint's allegations, however, "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. To establish the "facial plausibility" required to "unlock the doors of discovery," the plaintiff cannot rely on "legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action," but, instead, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679; *Twombly*, 550 U.S. at 556. According to the Supreme Court, "plausibility" occupies that wide space between "possibility" and "probability." *Iqbal*, 556 U.S. at 678. If a reasonable court can draw the necessary inference from the factual material stated in the complaint, the plausibility standard has been satisfied.

## III.   DISCUSSION

### A.   Due Process Claims

The defendants seek dismissal of the plaintiffs' due process claims under § 1983 on the grounds that the plaintiffs did not have a protected property interest in their specific positions based on Tenn. Code Ann. § 49-5-510, as a result of which they had no right to any particular form of process prior to being transferred to different positions, even though the transfers constituted demotions and even assuming the transfers were not made in good faith. In addition, the defendants argue that Bailey has not alleged facts sufficient to show that any other provision of the Tennessee Teacher Tenure Act applies or gives rise to a protected property interest for purposes of a due

process claim. The defendants argue in the alternative that Battle in entitled to dismissal of the claims against her based on the doctrine of qualified immunity.

### 1. The Existence of a Protected Property Interest

In general, "[f]or a procedural due process claim, a plaintiff must establish a constitutionally protected liberty or property interest and show that such an interest was deprived without appropriate process." *Midkiff v. Adams Cty. Reg'l Water Dist.*, 409 F.3d 758, 762 (6th Cir. 2005) (citing *Board of Regents v. Roth*, 408 U.S. 564, 569–70 (1972)). Courts assessing such a claim apply a two-part analysis: "First, the court must determine whether the interest at stake is a protected liberty or property right under the Fourteenth Amendment." *Id.* at 762–73 (quoting *Thomas v. Cohen*, 304 F.3d 563, 576 (6th Cir. 2002)). And second, assuming the plaintiff succeeds in identifying such a right, the court considers "whether the deprivation of that interest contravened notions of due process." *Id.* at 763.

Regarding the first element, "[t]o establish a protected property interest in a government service, a plaintiff must show a 'legitimate claim of entitlement' to that service; an 'abstract need or desire' or a 'unilateral expectation' is insufficient." *Id.* (quoting *Roth*, 408 U.S. at 577). Property interests typically "are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." *Roth*, 408 U.S. at 577.

All three plaintiffs assert that, under the Tennessee Teacher Tenure Act ("TTA"), specifically Tenn. Code Ann. § 49-5-510, they had a legitimate expectation that they would be transferred from their positions "only in good faith and for the efficient operation of the school system." (Doc. No. 26 ¶ 150.) Bailey further asserts that he had a legitimate expectation that he would "only be transferred to a type of work for which he was licensed." (*Id.*) He claims that his rights under § 49-5-510 were violated because he was "transferred into a type of work he was not

licensed to perform." (*Id.* ¶ 149.) The plaintiffs allege that the defendants deprived them of protected property interests when they "fired" Bailey and transferred Meriwether and Cathey "in a sham reduction in force to deprive them of their due process rights under § 49-5-511(b) [and] § 49-5-510. (*Id.* ¶¶ 147–48.) Meriwether's and Cathey's transfers purportedly violated the TTA, because these plaintiffs were not afforded any of the procedural safeguards provided for in the TTA and because the transfers were not in good faith as required by § 49-5-510. Bailey further alleges that the defendants violated §§ 49-5-512 and -513 when they "ended [his] appointment without complying with the procedural safeguards" set forth in those provisions and "without proper cause under the law." (*Id.* ¶ 147.)

### 2. The Tennessee Teacher Tenure Act

Under the TTA, the term "teacher" is defined to include "teachers, supervisors, principals, director of schools and all other certificated personnel employed by any local board of education." Tenn. Code Ann § 49-5-501(10). "Tenure" is the "employment status other than probation that a teacher may be under while teaching in the public schools." *Id.* § 49-5-501(11)(A). "No teacher, including administrative and supervisory personnel, who has acquired tenure status is entitled to any specific position." *Id.* § 49-5-501(11)(B)(ii).

Any "teacher" who meets certain qualifications is eligible for "tenure." Tenn. Code Ann. § 49-5-503. Among these requirements are that the person have a degree from an approved four-year college or equivalent training, "hold[] a valid teacher license," complete a five-year probationary period, receive satisfactory evaluations, and be reemployed by the director of schools for service after the probationary period. *Id.* Once a teacher achieves tenure status, he does not have a property right in that status and must "sustain a specified performance effectiveness level on evaluations . . . to achieve and maintain tenure status." *Id.* § 49-5-501(11)(B)(i). Otherwise,

once tenure status is acquired, "the teacher shall remain under that status" until he "resigns, retires, is dismissed or . . . is returned to probationary status." *Id.*

No teacher may be suspended or dismissed except in compliance with the procedures set forth in Tenn. Code Ann. § 49-5-511. A *tenured* teacher who receives notice of a suspension or dismissal for cause is entitled to demand certain additional process, including a "full and complete hearing on the charges before an impartial hearing officer," an appeal to the board of education, followed, if necessary, by an appeal to, and *de novo* review by, the chancery court in the county where the school system is located. Tenn. Code Ann. §§ 49-5-512, -513.

A teacher may be transferred "from one location to another within the school system, or from one type of work to another for which the teacher is qualified and licensed," when such transfers are "necessary to the efficient operation of the school system." Tenn. Code Ann. § 49-5-510. It is well established that a transfer under § 49-5-510 "need not necessarily be preceded by formal written notice and a hearing, so long as it is made in good faith" and for the "efficient operation of the school system." *McKenna v. Sumner Cty. Bd. of Educ.*, 574 S.W.2d 527, 534 (Tenn. 1978). However, an employee who is transferred under § 49-5-510 "is entitled to be protected from arbitrary and capricious action, or from transfers actuated by political or other improper motives." *Id.* Transfers that are *not* made for the betterment of the school system may give rise to a cause of action under the TTA. *Id.*; *see also State v. Yoakum*, 297 S.W.2d 635, 641 (Tenn. 1956).

Just because a transfer may violate state law, however, does not necessarily mean that it also violates the United States Constitution. As the Sixth Circuit and the Tennessee state courts have acknowledged, teachers, including principals and supervisors, have a "constitutionally protected property interest in continued employment," but they do not have a protected property

interest in any particular position. *Finney v. Franklin Spec. Sch. Dist. Bd. of Educ.*, 576 S.W.3d 663, 682 (Tenn. Ct. App. 2018) (quoting *Thompson v. Memphis City Schs. Bd. of Educ.*, 395 S.W.2d 616, 627 (Tenn. 2012)); *see also Sharp v. Lindsey*, 285 F.3d 479, 487 (6th Cir. 2002) (finding that a school principal who was demoted in the middle of the school year did not have a protected property interest created by statute in his position as principal under the TTA,[6] as the statute provided that a supervisor had tenure *as a teacher* but not "necessarily in the specific type of position in which [he] may be employed"); *Guster v. Hamilton Cty. Dep't of Educ.*, No. 1:02-CV-145, 2004 WL 1854181, at *16 (E.D. Tenn. 2004) ("Once [the plaintiff's] contract of employment as school principal . . . expired . . . , [the plaintiff] did not have a protected property interest in his principal's post under either Tennessee statutes or the contract." (citing *Sharpe*, 285 F.3d at 477)).[7]

### 3. *Meriwether's and Cathey's Due Process Claims*

As set forth above, Meriwether and Cathey were employed in supervisory administrative positions—both as Associate Superintendent. Upon the expiration of their employment contracts for the 2019–2020 academic year, they were reassigned as elementary school principals for the

---

[6] The court did find that Sharp's year-long employment *contract* created a protected property interest that was violated when Sharp was terminated mid-year, prior to the expiration of the contract term. *Sharp*, 285 F.3d at 487 (finding that the plaintiff had "a protected property interest in his position as principal by reason of his principal employment contract"). However, the court also found that no due process protections attached to the plaintiff's right not to be terminated under that contract except for cause, aside from those provided by his ability to bring suit for breach of contract. *Id.* at 488–89 (citing *Ramsey v. Bd. of Educ.*, 844 F.2d 1268, 1273–74 (6th Cir. 1988)).

[7] As set forth above, the TTA now provides that "[n]o teacher, including administrative and supervisory personnel, who has acquired tenure status is entitled to any specific position." Tenn. Code Ann. § 49-5-501(11)(B)(ii) (2011). At the time both *Sharp* and *Guster* were issued, the statute stated: "Administrative and supervisory personnel shall have tenure as teachers and not necessarily tenure in the specific type of position in which they may be employed." Tenn. Code Ann. § 49-5-501(11)(A) (1975). This change effectively clarified that neither teachers nor supervisory personnel have a protected property interest in their specific positions.

2020–2021 year, which constituted demotions. For purposes of this ruling, the court accepts as true the plaintiffs' allegations that the transfers were not in good faith and not for the betterment of the school system and, as such, violated the TTA. Those conclusions are not dispositive of the question of whether the transfers violated their rights under the Due Process Clause, however. Rather, the question is whether they had a constitutionally protected property interest in their positions as Associate Superintendents.

The plaintiffs do not claim to have a contractually created property right. Instead, their claims are based entirely on the TTA. The defendants argue, based on both Tennessee caselaw and Sixth Circuit precedent, that the TTA does not create a protected property interest in a specific position, such that Bailey's transfer to a classroom teaching position and Meriwether's and Cathey's reassignments as elementary school principals did not implicate the Fourteenth Amendment.

In response, the plaintiffs argue that they clearly set forth facts that, if true, would establish that their transfers and reassignments were not in good faith and for the betterment of the school system and were, instead, retaliatory or discriminatory and that "[t]he provisions in Section [49-5]-510 and the case law interpreting transfers under Section 510 created a 'legitimate expectation' that Plaintiffs would only be transferred in good faith and for the efficient operation of the school system, thus creating a constitutionally protected property interest under the Due Process Clause." (Doc. No. 34, at 9 (citing *Williams v. Shelby Cty. Bd. of Educ.*, No. 2:17-cv-02050-TLP-egb, 2018 WL 6626528, at *7 (W.D. Tenn. Dec. 18, 2018), *modified in part upon reconsideration*, No. 2:17-cv-02050-TLP-jay, 2020 WL 3816234 (W.D. Tenn. July 7, 2020); *McKenna*, 574 S.W.2d at 534).)

Neither of the cases the plaintiffs cite supports the proposition that they had a protected property interest in their specific positions. In *Williams*, the plaintiff teacher was actually

terminated when the State of Tennessee terminated a grant that funded the Adult Education Program to which she was assigned and that paid her salary (and the salaries of almost forty-five other full-time and part-time employees, who also lost their jobs). *Williams*, 2018 WL 6626528, at *2. The plaintiff brought a § 1983 claim, alleging a violation of her due process rights. In considering that claim, the court observed that "[t]enured teachers have a constitutionally protected property interest in continued employment and the school board must afford due process before the teacher is terminated." *Id.* at *7. *Williams* says nothing about transfers from one position within the system to another.

In *McKenna*, the Tennessee Supreme Court held that transfers must be made in good faith and for the betterment of the school system and must not be made arbitrarily and capriciously or for political or other improper motives. 574 S.W.32d at 534. There, however, the court determined that transfers that are not made in good faith and in accordance with the statutory criterion of promoting "efficient operation of the school system" give rise to a cause of action for violation of the TTA. The court was not called upon to determine—and did not determine—that a teacher has a constitutionally protected property interest in a particular position or that transfers in violation of the statute also violate due process.

In contrast, as set forth above, those courts expressly confronted with the question have held that teachers and supervisors do not have a protected property interest in a particular position, such that transfers, even those made in bad faith or for retaliatory reasons, do not violate the Due Process Clause. In *Sharp*, the Sixth Circuit noted that, although a public employee can often "point to a statute as giving him a protected property interest in the job he holds," this was "not the case as far as Mr. Sharp's principalship is concerned." 285 F.3d at 487. Instead, the TTA expressly provided that principals did not have "tenure in the specific type of position in which they may be

employed," which clearly signaled that the "Tennessee legislature did not intend that a principal should have a statutory entitlement to his principalship." *Id.* (citing Tenn. Code Ann. § 49-5-501 (11)(A) (1974)); *accord Coe v. Bogart*, 519 F.2d 10, 12–13 (6th Cir. 1975) ("The above-cited statutes make it manifestly clear that the Tennessee legislature, in enacting the Teacher Tenure Act, did not intend that a teacher or principal have an entitlement to the specific job to which he is assigned. In such circumstances we would be loath to hold that Coe had a constitutional 'property' right in his position since, as noted earlier, we do not believe that plaintiff's federal constitutional rights are necessarily co-extensive with his rights under the Act." (internal citation omitted)); *Guster*, 2004 WL 1854181, at *13, 16 (finding that the plaintiff's bad faith, retaliatory demotion from principal to assistant principal was not actionable as a due process violation, since he did not have a protected property interest in his position as principal under Tennessee statute).

Meriwether and Cathey do not allege that their employment with the MNPS was terminated; rather, they were transferred to different positions. Irrespective of whether these transfers, allegedly made in bad faith, may be actionable under other federal and/or state laws, they do not give rise to a claim for a violation of these plaintiffs' rights to due process under the Fourteenth Amendment. Meriwether's and Cathey's claims under § 1983, based on their transfers, is subject to dismissal. To the extent that Bailey's Due Process claim is also based on an assertion that Tenn. Code Ann. § 49-5-510 created a protected property interest, it, too, must be dismissed.

### 4. *Bailey's Due Process Claim Based on His Termination*

Section 49-5-510 authorizes the director of schools to transfer personnel "from one type of work to another *for which the teacher is qualified and licensed*." Tenn. Code Ann. § 49-5-510 (emphasis added). Bailey alleges that, unlike Meriwether and Cathey, he was transferred to a position for which he was no longer licensed. His position appears to be that § 49-5-510 created a property interest and a legitimate expectation that he would "be transferred only to a job for which

he was licensed" (*see* Doc. No. 34, at 10) and, therefore, that his transfer to a job for which he was not licensed effectively resulted in his dismissal rather than mere transfer and, as such, violated § 49-5-510 and his due process rights. (*See* Doc. No. 26 ¶¶ 131, 149–50.)

As set forth above, § 49-5-510 does not create a protected property interest. Nonetheless, the law is also clear that public school teachers in Tennessee, including principals and supervisors, have a "constitutionally protected property interest in continued employment." *Finney*, 576 S.W.3d at 682 (quoting *Thompson*, 395 S.W.2d at 627). While the defendants argue that Bailey's factual allegations show that he resigned rather than actually being fired and, therefore, cannot bring a claim under the TTA or the Due Process Clause, Bailey refutes that assertion, pointing to specific paragraphs of the Third Amended Complaint in which he affirmatively alleges that he was "fired." (*See, e.g.*, Doc. No. 26 ¶¶ 77, 81, 86, 116, 147.) Accordingly, insofar as the plaintiff alleges that his transfer to a position for which he was not licensed actually constituted a termination of his employment with MNPS without cause and without adequate process, the court finds that Bailey has stated a colorable claim under 42 U.S.C. § 1983.

The factual allegations supporting this claim are admittedly somewhat vague. For instance, Bailey does not allege that the defendants actually knew that he had not maintained his teaching license, that he was ineligible to be relicensed, or that, as a tenured employee, he would have been unable to obtain a waiver of the licensure requirement, at least for the length of time required to reinstate his license.[8] He also does not affirmatively describe the defendants' actions in terminating

---

[8] One of the requirements for teacher tenure is that the teacher "hold[] a valid teacher license." Tenn. Code Ann. § 49-5-503. Once tenure status is achieved, and assuming performance evaluations are satisfactory, the teacher must "sustain a specified performance effectiveness level on evaluations . . . to achieve and maintain tenure status." *Id.* § 49-5-501(11)(B)(i). Otherwise, assuming performance is satisfactory, "the teacher shall remain under that status" until the teacher "resigns, retires, is dismissed or . . . is returned to probationary status." *Id.* Bailey alleges that he was employed by MNPS as a teacher from 2003 through 2008 and that he was, at all relevant

him or how they responded when they learned (assuming they learned) that he was not licensed as a classroom teacher. Development of the factual record in this case may well reveal that Bailey resigned from his position rather than being "fired." Regardless, at this juncture, the court accepts as true Bailey's allegations that he was fired and declines to dismiss his due process claim.

        5.      *The Plaintiffs' Additional Due Process Claims Based on Tenn. Code Ann. §§ 49-5-511, -512, and -513*

The referenced provisions of the TTA provide that no teacher can be dismissed or suspended for cause except in accordance with the procedures described in § 49-5-511(a) or dismissed as part of a reduction in force unless the procedures described in § 49-5-511(b) are followed. Section 49-5-512, pertaining to administrative hearings, only comes into play once a teacher is dismissed for cause under § 49-5-511(a). Section 49-5-513, providing for chancery court review of administrative decisions, becomes relevant only after a teacher dismissed for cause exhausts the administrative remedies described in the preceding provision. The plaintiffs do not allege that they were suspended or dismissed for cause, as a result of which they clearly do not state a due process claim based on §§ 49-5-511(a), -512, or -513, even if the court presumes that these provisions create protected property interests.

Section 49-5-511(b) pertains to teachers who are actually dismissed as the result of a reduction in force, their eligibility for reemployment, and the attendant notice and procedural requirements. It states, in relevant part:

> When it becomes necessary to reduce the number of teaching positions or nonlicensed positions in the system because of a decrease in enrollment or for other good reasons, the board shall be empowered to dismiss such teachers or nonlicensed employees based on their level of effectiveness determined by the evaluation

---

times, a tenured employee. (Doc. No. 26 ¶¶ 9, 11.) Clearly, he was at one time licensed as a teacher, and he maintained his tenured status at the time of his transfer.

pursuant to § 49-1-302 for licensed employees and an evaluation of work performance for nonlicensed employees.

*Id.* § 49-5-511(b)(1).

The parties quibble about whether the plaintiffs have adequately alleged a sham reduction in force, but most of the argument is beside the point. What is clear is that, while Meriwether's and Cathey's jobs were eliminated as part of a reorganization, these plaintiffs were not *dismissed*; instead, they were transferred. Accordingly, § 49-5-511(b), which pertains only to dismissal, is simply irrelevant as to them, and they cannot state a due process claim based on its violation, again assuming the provision creates protected property interests in the first place.

And, while Bailey was transferred from his position as principal and allegedly fired, he does not claim that the actual position he held—that of principal of Whites Creek High School— was eliminated or that his transfer was *per se* the result of any reduction in force. In fact, by referring to the reduction in force as a sham reduction in force, Bailey implicitly alleges that there was no actual reduction in force and he was not subject to dismissal under § 49-5-511(b). Thus, Bailey's due process claim is based on his being terminated without cause and without due process by being transferred to a position for which he was not licensed. Moreover, if the defendants, as the plaintiffs claim, had engaged in a sham reduction in force and, in so doing, attempted to force Bailey through the procedures outlined in § 49-5-511(b), he would at that point have argued that the procedures were insufficient and that he was actually terminated without cause, because there was no true reduction in force under that provision. The plaintiff's invocation of § 49-5-511(b) is internally contradictory and adds nothing to his claim.

To be clear, the defendants have not moved for dismissal of any part of the plaintiffs' state law claims for violation of the TTA, and the court expresses no opinion in that regard. However, insofar as the plaintiffs attempt to base their due process claims on purported violations of Tenn.

Code Ann. §§ 49-5-511, -512, or -513, the claims are subject to dismissal for failure to state a claim for which relief may be granted.

### B. Bailey's First Amendment Retaliation Claim

In order to establish a First Amendment retaliation claim under § 1983, a plaintiff must show that: "(1) he engaged in constitutionally protected speech, (2) defendant's adverse action caused an injury that would chill a person of ordinary firmness from continuing the activity, and (3) that action was motivated at least in part by the plaintiff's exercise of his constitutional rights." *Ryan v. Blackwell*, 979 F.3d 519, 526 (6th Cir. 2020) (citing *Dye v. Office of the Racing Comm'n*, 702 F.3d 286, 294 (6th Cir. 2012)). If, as here, the plaintiff is a public employee, to determine whether a First Amendment violation has occurred, the court applies the two-step analysis laid out in *Connick v. Myers*, 461 U.S. 138 (1983). First, the court asks "whether the employee was speaking as a government employee (rather than in his capacity as a private citizen) and whether the statement constitutes speech on a matter of public concern." *Ryan*, 702 F.3d at 294 (citing *Connick*, 461 U.S. at 140). If so, the court then applies "a balancing test to determine whether the interest in protecting speech on issues of public concern outweighs the interest of the government as an employer 'in promoting the efficiency of the public services it performs through its employees.'" *Id.* (quoting *Bennett v. Metro. Gov't*, 977 F.3d 530, 537 (6th Cir. 2020), *cert. denied*, 141 S. Ct. 2795 (2021). "These two steps are sub-elements of the first element of the First Amendment retaliation framework." *Id.* The defendants here argue only that Bailey did not speak as a private citizen when he engaged in the subject speech. (Doc. No. 30, at 12.)

Although the plaintiffs reference other speech in the Third Amended Complaint, in response to the Motion to Dismiss, Bailey contends that he engaged in protected speech when he testified under oath, pursuant to a subpoena, at the administrative hearing on the Coach's termination about "the actions of the Coach dealing with the fight" and about the "missing funds."

(Doc. No. 26 ¶ 56). Bailey alleges that he has only been called upon to testify at a hearing one other time during his twelve years as an Assistant Principal or Executive Principal. (*Id.*) He contends that this testimony was not within the ordinary scope of his job duties. The defendants argue that, in testifying at the administrative hearing, Bailey was "speaking as an Executive Principal (rather than a private citizen) and acting pursuant to his official duties as a principal," because he testified "regarding an internal employment matter," and, as such, his testimony "'owes its existence to [Plaintiff Bailey's] professional responsibilities.'" (Doc. No. 30, at 12 (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006)).) The defendants assert, in a wholly conclusory fashion, that it was "part of [Bailey's] responsibilities as an Executive Principal to . . . provide testimony on such matters" as a subordinate's dismissal. (*Id.*)

The defendants are correct only insofar as *Garcetti*, indeed, held that a public employee does not speak "as a citizen" when he "make[s] statements pursuant to [his] official duties." *Garcetti*, 547 U.S. at 421. The Court explained that "[r]estricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen. It simply reflects the exercise of employer control over what the employer itself has commissioned or created." *Id.* at 421–22. In *Garcetti*, there was no dispute that the memorandum prepared by the employee and upon which his retaliation claim was premised was prepared in the ordinary course of his job responsibilities. In contrast, in *Lane v. Franks*, 573 U.S. 228 (2014), the plaintiff employee alleged that he was fired in retaliation for having given sworn, subpoenaed testimony at the federal criminal trial of a former subordinate. It was undisputed that testifying in a court proceeding was not within the plaintiff's ordinary job duties. *Id.* at 238 n.4.

Moreover, in *Lane*, the Court rejected an expansive reading of *Garcetti*:

*Garcetti* said nothing about speech that relates to public employment or concerns information learned in the course of public employment. . . . In other words, the mere fact that a citizen's speech *concerns information acquired by virtue of his public employment does not transform that speech into employee—rather than citizen—speech*. The critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties.

*Lane*, 573 U.S. at 240 (emphasis added). Following *Lane*, the Sixth Circuit has recognized that "the *Garcetti* exception to First Amendment protection for speech [that] 'owes its existence to a public employee's professional responsibilities' must be read narrowly as speech that an employee made in furtherance of the ordinary responsibilities of his employment." *Boulton v. Swanson*, 795 F.3d 526, 534 (6th Cir. 2015). Thus, in *Boulton*, for example, it was "axiomatic that an employee's job responsibilities do not include acting in the capacity of a union member, leader, or official" and, therefore, that "speech in connection with union activities is speech 'as a citizen' for the purposes of the First Amendment." *Id.* at 534. The Sixth Circuit has stressed that the inquiry into whether an individual spoke as a public employee or as a private citizen "is a practical one," requiring consideration of both the "content and context" of the speech. *Mayhew v. Town of Smyrna*, 856 F.3d 456, 464 (6th Cir. 2017) (quoting *Garcetti*, 547 U.S. at 424; *Fox v. Traverse City Area Pub. Sch. Bd. of Educ.*, 605 F.3d 345, 348 (6th Cir. 2010)).

Under *Lane*, the mere fact that Bailey was called to testify at the hearing because of information learned during the course of his employment does not establish that he spoke as an employee. Moreover, the motion now before the court is a Motion to Dismiss, and the court must accept as true the well pleaded factual allegations in the Third Amended Complaint. *Iqbal*, 556 U.S. at 679. Bailey alleges, as a factual matter, that giving sworn testimony, under oath and pursuant to a subpoena, at an administrative hearing is not within the ordinary scope of his job duties and that he has been called upon to testify thus only one other time in the course of his career. *Lane* expressly recognized that it did not "address . . . whether truthful sworn testimony

would constitute citizen speech under *Garcetti* when given as part of a public employee's ordinary job duties," *Lane*, 573 U.S. at 238 n.4. This court is not called upon to address that question either. At this juncture, the court accepts as true Bailey's contention that providing sworn testimony under subpoena at an administrative hearing was outside the scope of his ordinary job duties. Indeed, the very fact that he was *subpoenaed* to testify, whether by MNPS or by the Coach, adds weight to the conclusion that this was not a part of his normal job duties.

Because the only basis for the defendants' motion to dismiss Bailey's First Amendment claim is that he spoke as a public employee rather than as a private citizen when giving hearing testimony, the defendants are not entitled to dismissal of this claim under Rule 12(b)(6).

### C. Whether Defendant Battle Is Entitled to Qualified Immunity

Defendant Battle, in the alternative, asserts that she is entitled to qualified immunity from the § 1983 claims against her in her individual capacity.

"Section 1983 provides a cause of action against any person who deprives an individual of federally guaranteed rights 'under color' of state law." *United Pet Supply, Inc. v. City of Chattanooga*, 768 F.3d 464, 478, (6th Cir. 2014). However, "[a] government official performing a discretionary function is entitled to qualified immunity from a suit for civil damages unless his actions have violated a clearly established statutory or constitutional right." *LeMarbe v. Wisneski*, 266 F.3d 429, 434 (6th Cir. 2001). "A right is clearly established when it is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 7–8 (2021) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (per curiam)). Although the Supreme Court's rulings "do[] not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* (quoting *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (per curiam)).

"Although a defendant ordinarily bears the burden of proof for an affirmative defense, a plaintiff bears the burden of overcoming qualified immunity." *Crawford v. Tilley*, 15 F.4th 752, 760 (6th Cir. 2021) (citing *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)). Thus, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery, "unless the plaintiff's allegations state a claim of violation of clearly established law." *Id.* At the same time, however, the Sixth Circuit has recognized that it is "generally inappropriate for a district court to grant a 12(b)(6) motion to dismiss on the basis of qualified immunity." *Wesley v. Campbell*, 779 F.3d 421, 433 (6th Cir. 2015). While qualified immunity is "'a threshold question to be resolved at the earliest possible point,' that point is usually summary judgment and not dismissal under Rule 12." *Id.* at 433–34 (quoting *Vakilian v. Shaw*, 335 F.3d 509, 516 (6th Cir. 2003)).

The defendants argue both that the plaintiffs have not alleged facts sufficient to show that defendant Battle violated Bailey's due process or First Amendment rights and that "there is no clearly established law that the employment actions taken by Dr. Battle . . . deprived [Bailey] of any federally guaranteed rights." (Doc. No. 30, at 13.) In support of the latter argument, they argue only that tenured teachers are on year-to-year contracts and have no protected property interest in a specific position. (*Id.* at 13–14.)

For purposes of the Motion to Dismiss, the court has found that Bailey has articulated a colorable claim that he was terminated without cause in violation of a protected property interest in continued employment. It is well established under Tennessee law that the termination without cause of a tenured teacher violates his right to due process. The court finds that "the plaintiff's allegations state a claim of violation of clearly established law," *Crawford*, 15 F.4th at 760, as a

result of which Battle is not entitled to dismissal of Bailey's due process claim based on qualified immunity.

The defendants' qualified immunity argument does not address Bailey's First Amendment claim, but, under *Lane*, it is clearly established that "[t]ruthful testimony under oath by a public employee outside the scope of his ordinary job duties is speech as a citizen for First Amendment purposes . . . even when the testimony relates to his public employment or concerns information learned during that employment." *Lane*, 573 U.S. at 238. The court, accordingly, will deny Battle's motion to dismiss this claim on qualified immunity grounds as well.

## IV.    CONCLUSION

For the reasons set forth herein, the defendants' Motion to Dismiss the § 1983 claims against them will be granted in part and denied in part.

An appropriate Order is filed herewith.

_____

ALETA A. TRAUGER
United States District Judge