```
 1   IN THE UNITED STATES DISTRICT COURT FOR TENNESSEE
                    FOR THE MIDDLE DISTRICT
 2                    NASHVILLE DIVISION
     _____
 3   JANE DOE,                          )
                                        )
 4          Plaintiff,                  )
                                        )
 5   v.                                 )   No. 3:20-CV-01023
                                        )   Jury Demand
 6   THE METROPOLITAN                   )   Judge Trauger
     GOVERNMENT OF NASHVILLE AND        )   Magistrate Judge
 7   DAVIDSON COUNTY, TENNESSEE         )   Holmes
     AND DR. ADRIENNE BATTLE            )   Lead Case
 8                                      )
            Defendants.                 )
 9   _____)
     DR. LILY MORENO LEFFLER,           )
10                                      )
            Plaintiff,                  )
11   v.                                 )
                                        )
12   THE METROPOLITAN                   )
     GOVERNMENT OF NASHVILLE AND        )
13   DAVIDSON COUNTY, TENNESSEE,        )
     AND DR. ADRIENNE BATTLE            )
14                                      )
            Defendants.                 )
15   _____)
                                        )
16   DR. JAMES BAILEY,                  )
     DR. PIPPA MERIWETHER, and          )
17   DR. DAMON CATHEY,                  )
                                        )
18          Plaintiffs,                 )
     v.                                 )
19                                      )
     METROPOLITAN GOVERNMENT            )
20   OF NASHVILLE AND DAVIDSON          )
     COUNTY, TENNESSEE and              )
21   DR. ADRIENNE BATTLE,               )
                                        )
22          Defendants.                 )

23   _____

24   The Deposition of:   MARY ELLEN ZANDER
                          May 4, 2022
25
```

1

2

3

4

5

6

7

_____

8                      JANIE W. GARLAND
                     Briggs & Associates
9          222 Second Avenue North, Suite 340M
                 Nashville, Tennessee 37201
10                     (615)714-5350

11 _____

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1          The deposition of Mary Ellen Zander was
   taken by counsel for the Plaintiffs, by notice, in
2  Nashville, Tennessee, on May 4, 2022, pursuant to the
   provisions of the Federal Rules of Civil Procedure.
3          All formalities as to notice, caption,
   certificate, reading and signing of the deposition
4  are not waived.  All objections, except as to the
   form of the questions, are reserved to the hearing.
5  _____

6  APPEARANCES:

7  For the Plaintiffs:

8     Dr. James Bailey
      Dr. Lily Leffler
9     Dr. Pippa Meriwether
      Jane Doe
10
                       Ann Buntin Steiner
11                     Attorney at Law
                       Steiner & Steiner, LLC
12                     613 Woodland Street
                       Nashville, TN 37206
13                     asteiner@steinerandsteiner.com

14 For the Plaintiff:

15    Dr. Damon Cathey

16
                       Jesse Ford Harbison
17                     Attorney at Law
                       Jesse Harbison Law, PLLC
18                     P.O. Box 68251
                       Nashville, TN 37206
19                     jesse@jesseharbisonlaw.com

20

21 For the Defendants:
                       J. Brooks Fox
22                     Department of Law
                       Metropolitan Courthouse, Suite 108
23                     P.O. Box 196300
                       Nashville, TN 37219
24                     brooks.fox@nashville.gov

25
```

1                          INDEX

2    Examination by Ms. Steiner  . . . . . . . .   Page   5
     Examination by Ms. Harbison . . . . . . . .   Page  95
3    Redirect Examination by Ms. Steiner . . . .   Page 125

4

5                         EXHIBITS

6    No. 1 (Late-filed) All e-mail correspondence
              between Kevin Klein and Ms. Zander  .  Page  43
7

8    No. 2 E-mail  6/24/20 from Ms. Zander to
              Dr. Bailey  . . . . . . . . . . . .   Page  48
9

10   No. 3 (Two Pages) from Support Employee
              Handbook  . . . . . . . . . . . . .   Page  74
11

12   No. 4 5/4/20 letter to Dr. Bailey from
              Dr. Battle  . . . . . . . . . . . .   Page  84
13

14   No. 5 6/21/20 letter (ID only)  . . . . . .   Page  85

15   No. 6 Investigative Summary Form  . . . . .   Page 110

16

17

18

19

20

21

22

23

24

25

<u>MARY ELLEN ZANDER,</u>

called as a witness and, having been first duly

sworn, was deposed as follows:

<u>EXAMINATION BY MS. STEINER</u>:

    Q.    Could you please state your full name for the record?

    A.    Mary Ellen Zander, is my maiden name.  I just recently got married, so it's Mary Ellen Munoz. I'm just in the process of getting it all changed.

    Q.    And how do you spell your last name?

    A.    The new last name?

    Q.    Yes.

    A.    M-U-N-O-Z.

    Q.    Congratulations.

    A.    Thank you.

    Q.    And what is your home address?

    A.    ██████ ██████ ██████ ██████ Nashville.

    Q.    How long have you lived there?

    A.    Not quite a year yet.

    Q.    Are you buying?

    A.    Say that again.

    Q.    Are you leasing or are you buying?

    A.    No.  We own.

    Q.    Own it?  Do you have any plans of moving in the near future?

     A.   Not that I'm aware of.

     Q.   Do you have any plans of leaving your job
at Metro Schools in the near future?

     A.   No.

     Q.   So when we try this case on December 6th,
if I issue a subpoena, I can find you either at
Metro schools or at ███████ ███████ ███████, correct?

     A.   Yes.

     Q.   Okay.  Now, have you ever given a
deposition before?

     A.   Yes.

     Q.   How many times?

     A.   Half dozen at least.

     Q.   Were they in discrimination cases?

     A.   I can't remember if all of them were
discrimination cases.  No.  They were not all
discrimination cases.

     Q.   Were they cases that involved Metro
schools?

     A.   No, not all of them.  I've only been to
one deposition involving Metro schools.

     Q.   Which one was that?

     A.   Last week.

     Q.   What was the name of the case?

     A.   George Brooks.

1    Q.    Okay.  With an S on the end of Brooks?

2    A.    Yes.

3    Q.    And what was that case about?

4    A.    He -- I believe he is filing a claim

5    against the district, some kind of timing issue with

6    employment action.

7    Q.    Is it a discrimination case?

8    A.    I don't believe so.

9    Q.    Did he have a contract with the district?

10   A.    He was a teacher in the district.

11   Q.    Was he nonrenewed?

12   A.    He was terminated or he resigned in lieu

13   of being terminated.

14   Q.    Did he sue saying that it was a wrongful

15   resignation -- termination?

16   A.    He resigned, so I can't tell you exactly

17   what the suit was for.

18   Q.    Is it in federal court?

19   A.    I don't know.

20   Q.    Is it in state court?

21   A.    I did a local deposition last week.  I

22   don't believe I understand whether it's in federal

23   or state at this point.

24   Q.    What were you questioned about?

25   A.    I am the employee relations director, and

1    I was asked about documents and basically the

2    letters recommending his termination, so it was

3    regarding his termination from the district.

4        Q.   And did he claim he was terminated

5    wrongfully?

6        A.   Not that I'm aware of.

7        Q.   So he filed a lawsuit and you're the

8    employee relations director and you testified last

9    week, you don't know what it was about?

10       A.   I'm not sure exactly what it was about.  I

11   just --

12       Q.   What do you think it was about?

13       A.   I knew it had to do with his separation

14   from the district, but I started in 2018, his case

15   originated in 2017, I was just at the tail end of

16   the situation with Mr. Brooks.

17       Q.   So when did you start with the district in

18   2018?

19       A.   June 22nd, 2018.

20       Q.   Okay.  Tell me a little bit about

21   yourself.  Are you from Davidson County?

22       A.   I was born and raised in Torrington,

23   Connecticut, moved to Tennessee in 2000 with my

24   husband.  He passed away.

25       Q.   Okay.

1      A.    I moved out to South Carolina in 2008,

2    returned to Tennessee in 2018.

3      Q.    Did you have any HR experience before you

4    went to work for Metro schools?

5      A.    Yes.

6      Q.    How?

7      A.    I was -- worked for Walmart prior to

8    coming to Metro schools.  I was a market human

9    resource manager for Walmart.  I handled the

10   Charleston market, basically it was about 16 stores

11   that I was the market HR manager for, for Walmart.

12           Prior to that, I worked for a Tennessee

13   organization, SMS Holdings.

14     Q.    How did you spell that?

15     A.    SMS Holdings.

16     Q.    Okay.

17     A.    I was director of HR services.

18     Q.    And what before that?

19     A.    I was a personnel and payroll manager for

20   Larc, L-A-R-C.  It was a not-for-profit organization

21   that supported people with disabilities in

22   Connecticut.  That was prior to moving down here.

23     Q.    What is your educational background?

24     A.    I have a bachelor's of science in early

25   childhood education and family studies.

1        Q.    Were you going to be a teacher?

2        A.    I actually did teach a couple of years

3   after college.

4        Q.    Did you teach in Connecticut?

5        A.    Yes.

6        Q.    Okay.  Did you have a license to teach in

7   Connecticut?

8        A.    I was not certified.  I did preschool.

9        Q.    Did you need a license to do preschool

10  then in Connecticut?

11       A.    No.

12       Q.    Did you try to get a license in

13  Connecticut?

14       A.    No.

15       Q.    You just wanted to teach preschool?

16       A.    That's what I went to school for and

17  that's what I did for about two years.

18       Q.    Two years.  Okay.  Are you certified by

19  any agencies like SHRM?

20       A.    I had a senior HR professional

21  certification, but it lapsed.  I got it in 2006, and

22  I think in 2018, I did not renew it.

23       Q.    Do you have any other certifications?

24       A.    No.

25       Q.    Did you receive any training on HR?

1     A.    On-the-job training.

2     Q.    Did you receive any specialized training

3 when you went to work for Metro schools?

4     A.    The training that they put you through in

5 terms of sexual harassment and policies and that

6 kind of stuff.  Some one-on-one training with the

7 interim director.

8     Q.    And who was the interim direct?

9     A.    When I took over, it was Frank Young.

10     Q.    What month did you go to work for Metro

11 schools in 2018?

12     A.    June.

13     Q.    Who was the HR director before you?

14     A.    The interim director was Mr. Young.  Prior

15 to that was Scott Lindsay.

16     Q.    Who was the employee relations director

17 before you; was that Mo Carrasco?

18     A.    No.  I never met Mo, so I don't know what

19 his role -- but Scott Lindsay was the prior -- I

20 think his title was executive director at the time.

21     Q.    Did you have any discussions with Mr.

22 Lindsay about your job?

23     A.    No.  He wasn't there when I got there.

24     Q.    Did you know -- when you got there, did

25 anyone at Metro schools tell you about the working

1  environment that you were going into?

2       A.   I think that in the interview process I

3  was told that there were issues ongoing, but I don't

4  know that anybody could have prepared me for

5  everything that was going on at the time I arrived.

6       Q.   Did anyone tell you there were multiple

7  discrimination claims against the district and

8  that -- did anyone tell you that?

9       A.   I don't remember anybody telling me that.

10      Q.   Did anyone tell you that there was an

11  atmosphere of fear of retaliation that existed?

12      A.   I don't know that anybody told me that.

13      Q.   Did you know that Scott Lindsay believed

14  that the employees at Metro schools were petrified

15  for their jobs if they had to come in and testify or

16  were questioned about discrimination or retaliation

17  claims?

18      A.   I don't know what Scott Lindsay thought.

19      Q.   Did anyone at Metro schools ever tell you

20  that a fear of that nature existed?

21      A.   I don't know that anybody ever told me

22  that.

23      Q.   So then my next question is this.  Do you

24  know of anything that was done by Metro schools to

25  correct any sort of fear?

1      A.    I can't speak to what others have done
2   regarding that here.
3      Q.    I want to know what you know have done --
4   has occurred.  What do you have knowledge of in
5   terms of Metro schools doing anything to correct
6   this fear of retaliation that existed down there
7   when you became the employee relations director?
8           MR. FOX:  Objection to the form.
9           THE WITNESS:  The only thing that we do is
10  on a case-by-case basis.  If people have concerns,
11  then we ensure them that we will do everything that
12  we can to prevent retaliation, and if retaliation
13  occurs, it's subject to corrective or disciplinary
14  action.
15  BY MS. STEINER:
16     Q.    When you came in as an employee relations
17  director for Metro schools, if there was this fear
18  out there that was so prevalent that Scott Lindsay
19  even swore under oath that people were scared for
20  their jobs if they gave evidence or gave statements
21  in a case, should that have been brought to your
22  attention?
23          MR. FOX:  Objection to the form.
24          THE WITNESS:  I don't know.  I don't know
25  that people would share preconceived perceptions.  I

1    don't know.  I think you have a misunderstanding of

2    my role.  Employee relations isn't -- I oversee

3    harassment, discrimination, any protected class

4    issues, but we don't always get involved in the

5    day-to-day cultural issues.

6    BY MS. STEINER:

7        Q.    Do you not agree that if the employees --

8    do you investigate harassment and discrimination

9    claims?

10       A.    Yes.

11       Q.    Would you not agree that if the employees

12   you were questioning about whether or not there's

13   been harassment or discrimination have a fear of

14   retaliation, it would affect your investigation?

15       A.    Do I believe it would affect my

16   investigation?  I would assure them that I would do

17   my best to protect them from retaliation.

18       Q.    And what would that be?

19       A.    Well, when we do reporting, we report to

20   the level up over, so like the leadership is aware

21   of the situation, the individual is given our

22   contact information and they can contact us if

23   anything happens so that we can address it as it

24   occurs.

25       Q.    Do you ever do anything pre-protection?

1   If someone comes to you, for instance, Dr. Battle,

2   and says, I think I'm going to be retaliated against

3   by Dr. Battle because of what I did to her brother,

4   having to discipline her brother, what would you do

5   to set up as a precautionary measure to make sure

6   that doesn't occur?

7       A.   Well, that's a -- Dr. Bailey never came to

8   me and said that, so I was not aware of anything

9   like that.  It depends on the situation.  If

10   somebody files a complaint and they work closely

11   with that individual on a daily basis, we might find

12   it appropriate to put somebody on an administrative

13   leave until the situation can be thoroughly

14   investigated and work towards a resolution.

15       Q.   Any other options that you would have out

16   there to protect someone from retaliation?

17       A.   At times, I think it's been known to

18   separate the individual.  Even if they return to

19   work, we can restrict interaction between

20   individuals.  If there was an issue involving Dr.

21   Battle, it would not be my department that would

22   handle that.  That would be outsourced to a

23   third-party investigator.

24       Q.   And in your time at Metro schools, do you

25   know of any outsourcing of any complaints of

1    retaliation by Dr. Battle that were outsourced?

2         A.    I don't know for certain.  I can't

3    remember.

4         Q.    When you say administrative leave or

5    separate the individual, who was placed on

6    administrative leave, the harasser or the person who

7    is claiming harassment?

8         A.    The person who the claim is made against.

9         Q.    Okay.  And when you separate the people,

10   how do you do that, who do you move, do you move

11   one, do you move both or what?

12        A.    It depends on the circumstances.  If the

13   person that files the complaint is requesting to be

14   moved to somewhere else or reassigned, then

15   otherwise we would move the person the claim was

16   filed against.  It might be temporary.  It might be

17   a permanent reassignment, depending on the

18   circumstances or situation.

19        Q.    Can you tell me how many employees you've

20   actually placed on administrative leave due to a

21   complaint being filed against them, since you've

22   been the employee relations director?

23        A.    I can't give you a number exactly.  It's

24   been many.

25        Q.    Meaning it's over like 20?

1      A.    Yes.

2      Q.    Okay.

3      A.    But people go on administrative leave for

4  more than harassment or discrimination claims.  If

5  there is an allegation of abuse or neglect of a

6  child, that would warrant administrative leave, so

7  there's a lot of different things that would warrant

8  administrative leave.

9      Q.    I wanted to limit it to discrimination

10 claims, retaliation claims.  How many individuals

11 have you placed on administrative leave due to an

12 administrative -- due to a discrimination or

13 retaliation claim?

14     A.    I cannot recall that number.  I mean, I've

15 been there since 2018, so I can't --

16     Q.    Have you placed anyone on administrative

17 leave due to a harassment complaint?

18     A.    Yes.  I can remember at least one.

19     Q.    And who was that?

20     A.    It was just recently.  A teacher was

21 alleged to have sexually harassed another teacher.

22     Q.    Okay.  Besides that one, can you remember

23 or recall any time that you have actually placed an

24 employee on administrative leave due to a

25 discrimination or retaliation claim?

1     A.   I can't remember.  Somebody -- that was

2  the most recent.

3     Q.   Now, if a -- how many employees report to

4  you?

5     A.   How many employees in my department report

6  to me?  Four.

7     Q.   And who are they?

8     A.   Denetra Batey.  (Court reporter asks for

9  clarification) D-E-N-E-T-R-A, B-A-T-E-Y.  Wyntress,

10 W-Y-N-T-R-E-S-S Patterson.  Frank Young and Barbara

11 Biggers-Matthews, Biggers, hyphen, Matthews.

12    Q.   And what are they positions?

13    A.   Denetra and Wyntress are employee

14 relations managers.  Mr. Young is the legal liaison.

15 He is an attorney.  And Ms. Biggers-Matthews is the

16 admin assistant for a department.

17    Q.   Okay.  So if someone brings a complaint of

18 retaliation or fear of retaliation to either Ms.

19 Batey or Ms. Patterson, should they bring that to

20 your attention?

21    A.   We discuss our cases weekly.  So I might

22 be aware, depending on if it's a regular teacher or

23 a paraprofessional, maybe not, but if it's somebody

24 like a principal or higher, I would be made aware.

25    Q.   Okay.  Were you made aware of the fact

1    that Mr. James Bailey made a complaint of fear of

2    retaliation to Ms. Batey in, I believe April of

3    2018 -- of 2020?

4        A.    I don't remember that specifically.

5        Q.    If Dr. Bailey had gone to Ms. Batey and

6    said, I'm petrified that I'm going to be retaliated

7    against by Dr. Battle because she is now the

8    director of schools and I think she is out to get me

9    because of my discipline of her brother, what should

10   Ms. Batey should have done?

11       A.    She would have raised the concern to me

12   and we would have raised it to the chief human

13   resources office on guidance how to handle it.

14       Q.    And was that ever raised with you?

15       A.    I think I was aware of it, I just don't

16   remember specifically the timing of any of that.

17       Q.    You were aware of the fact that Dr. Bailey

18   had a fear of retaliation when Dr. Battle became

19   director of schools?

20       A.    I don't know exactly what Dr. Bailey was

21   afraid of.

22       Q.    But you had knowledge of something going

23   on, correct?

24       A.    Yes.  That might be more accurate.  I knew

25   something was going on, but I didn't know

1  specifically what was going on.

2       Q.   And when you knew something was going on,

3  did you have a job duty for inquiring as to what was

4  going on?

5       A.   Like I said, if the allegation was made

6  against Dr. Battle, it would had to have been

7  outsourced to a third party.

8       Q.   And would it have been outsourced

9  immediately to the third party?

10      A.   Depending on the statement.  If something

11 had occurred or if it was in anticipation that

12 something would occur.

13      Q.   If it's an anticipation that something

14 would occur, what happens?

15      A.   I can't speak to that.  It depends on the

16 circumstances or situation.

17      Q.   Okay.  Here's the circumstance.

18 Dr. Bailey is principal at White's Creek, he has a

19 fear that Dr. Battle is going to retaliate against

20 him because of his discipline of her brother and he

21 brings that to your department, what happens?

22      A.   We have to ask for specifics on what

23 grounds and whatever, but then again, if it was

24 against Dr. Battle, it would have to be looked into

25 by somebody outside of our organization.

```
 1        Q.    Would you agree that if -- your department
 2   does have the ability to protect employees from
 3   retaliation, correct?
 4        A.    What do you mean, protect?
 5        Q.    Stop retaliation.
 6        A.    If it's within the school or within the
 7   work environment, yes.  We would be able to work
 8   with leadership to restrict interaction and take
 9   appropriate action against somebody who is found to
10   have retaliated.  If it's something that happens
11   outside of the school boundaries, we have very
12   limited ability to -- we would recommend that they
13   go to the authorities if there was a situation
14   outside of the school environment.
15        Q.    Can you tell me everything that Metro
16   schools did to protect Dr. Bailey from retaliation
17   by Dr. Battle?
18        A.    I have -- I can't speak to that.
19              MR. FOX:  Objection to the form.
20   BY MS. STEINER:
21        Q.    Can you tell me anything Metro schools did
22   to protect Dr. Bailey from retaliation from Dr.
23   Battle?
24              MR. FOX:  Objection to the form.
25              THE WITNESS:  I can't answer that
```

1   question.  I don't know.

2   BY MS. STEINER:

3       Q.   Now, when you came here for your

4   deposition today, did you know it was for a lawsuit

5   where Dr. Bailey's claiming he lost his job or he

6   was retaliated against because of his actions

7   against Dr. Battle's brother; did you know that?

8       A.   I knew that you were the attorney for

9   multiple individuals.  I didn't realize it was going

10   to be regarding Dr. Bailey.

11       Q.   Did you know Dr. Bailey was one of the

12   individuals?

13       A.   Yes, I did.

14       Q.   Well, when you knew that, did you go back

15   to look to see whether or not he had filed any

16   charge of retaliation?

17       A.   No, I did not.

18       Q.   Okay.  Besides Dr. Bailey, can you tell me

19   anyone else who has made any sort of charge of

20   retaliation against Adrienne Battle?

21       MR. FOX:  Objection to the form.

22       THE WITNESS:  Can you ask that question

23   again?

24   BY MS. STEINER:

25       Q.   Who else has made a charge of retaliation

1  or discrimination against Adrienne Battle that you

2  know of?

3      A.   I'm not certain.

4      Q.   Who do you think may have made a charge of

5  retaliation or discrimination against Adrienne

6  Battle?

7      A.   I don't know that I'm comfortable

8  answering that question, I don't know that I know.

9      Q.   If you have any idea you need to answer my

10  question today.

11          MR. FOX:  Objection to the form.

12          THE WITNESS:  I believe that there is

13  other named people and -- that I was made aware of

14  that this might be regarding, involved Pippa

15  Meriwether, Damon Cathey, Lily Leffler.  Other than

16  that, I don't know if they specifically had claimed

17  discrimination against Dr. Battle or not.  I just

18  knew that those were also other folks that you

19  represented.

20  BY MS. STEINER:

21      Q.   Anyone else?

22      A.   Not that I can think of.

23      Q.   Now, if someone comes in to the employee

24  relations department and says I think I'm going to

25  be retaliated against, does your department have a

1  job duty, an obligation to question them about why?

2       A.   Yes.

3       Q.   And do you keep notes of that?

4       A.   Yes, we would.

5       Q.   So if Dr. Bailey were to go to Ms. Batey

6  and say I think I'm being retaliated against, she

7  would have a job duty for keeping notes and asking

8  him why, correct?

9       A.   Yes.

10      Q.   Okay.  And she would have a job duty and

11 an obligation to report that to you in your weekly

12 meeting, correct?

13      A.   She would raise that, yes.

14      Q.   And when that's reported to you, do you

15 also question Ms. Batey about what's been done with

16 regard to his fear of retaliation?

17      A.   Can you ask that again?

18      Q.   When that is brought to your knowledge,

19 brought to you that Dr. Bailey is in fear of

20 retaliation, what do you do?

21           MR. FOX:  Objection to the form.

22           THE WITNESS:  I think we would raise that

23 concern and raise that concern with the chief human

24 resource officer at that time.

25      Q.   And who was that?

1     A.   We've had several.  I believe it was

2  Dr. Barnes.

3     Q.   Did you raise that with Dr. Barnes?

4         MR. FOX:  Objection to the form.

5         THE WITNESS:  I believe we did.

6  BY MS. STEINER:

7     Q.   And do you keep notes of raising these

8  issues, what you've raised with Dr. Barnes?

9         THE WITNESS:  Not necessarily, unless we

10  were discussing next steps or whatever, I would take

11  notes.

12     Q.   So then you did not -- did you discuss

13  next steps with regard to Dr. Bailey and his fear of

14  retaliation?

15     A.   I don't remember having that discussion.

16     Q.   Can you tell me anything that was done to

17  protect Dr. Bailey from retaliation?

18         MR. FOX:  Objection to the form.

19         THE WITNESS:  I cannot recall what steps

20  were taken with Dr. Bailey.

21  BY MS. STEINER:

22     Q.   Okay.  And I assume you have no

23  investigative notes or no file open on Dr. Bailey's

24  fear of retaliation?

25     A.   I don't have anything that I can remember.

         Q.   Okay.  So is it correct then that a file
was not even opened on Dr. Bailey's statements that
he had a fear of retaliation?

         A.   I don't know that that would be true.  I
don't know what Ms. Batey kept.

         Q.   Okay.  Do you know what a nonrenewal is?

         A.   Yes.

         Q.   What is it?

         A.   It would be a nonrenewal -- are you
talking in terms of a teacher or are you talking in
terms of a principal?

         Q.   Principal.

         A.   So principals have a contract that is an
annual contract, and it's up for renewal every year,
so if they choose not to renew a principal contract,
that's at the discretion of the director of schools.

         Q.   Is a nonrenewal different than a transfer?

         A.   Yes.

         Q.   Okay.  Do you know what a transfer is?

         A.   Yes.  It's a very broad term.  Transfer
would mean, you could transfer to another position
at another school, you transfer to a position of
equal stature at another location.  People transfer
and get promotions, people transfer and take
demotions.

1      Q.   If it's to a lower position with lower

2   pay, is that considered a demotion?

3      A.   It would be.  But the -- if the principal

4   is a tenured teacher, the position that they are

5   guaranteed within the district would be that of a

6   tenured teacher.  There is no guarantee of placement

7   as a principal if the contract is nonrenewed.

8      Q.   Now, if a contract is not renewed, that

9   means that they don't have the position with Metro

10  schools, correct?  That's different than a transfer?

11     A.   The -- if the principal position was

12  nonrenewed, they would not have a principal

13  position, but if they were tenured, they would be

14  guaranteed no less than a teaching position within

15  the district.

16     Q.   And when they are told that their contract

17  is being nonrenewed or they're not going to be in

18  that position again, does the person telling them

19  that have a duty for telling them whether or not

20  they're tenured or not tenured and whether or not

21  they're going to be transferred into another

22  position?

23     A.   I don't have those conversations.  I don't

24  know what goes on in those conversations.  I mean,

25  if you want me to speculate, I can speculate on what

1  would take place in those conversations.

2          MR. FOX:  Objection to the form.

3  BY MS. STEINER:

4      Q.   What would you expect?  You're the

5  employee relations director, what would you -- how

6  do you train the individuals who are engaging in

7  these nonrenewals and terminations, how do you -- do

8  you train them to tell the employees what's going

9  on?

10     A.   I don't train those individuals.  I'm not

11 party to that process.  That is handled by a

12 different leg of HR.

13     Q.   Okay.  So then do you have a job duty for

14 understanding and administering nonrenewals and

15 transfers and demotions?

16     A.   That is not -- that does not fall under my

17 job duties.

18     Q.   Okay.  Did you know that Dr. Battle did

19 nonrenew Dr. Bailey's contract?

20     A.   I understood that it was Dr. Sharon

21 Griffin that made the recommendation to nonrenew

22 Dr. Bailey's contract.  Like I said, I wasn't party

23 to those conversations.  And then I believe it was

24 supported by Dr. Battle.

25     Q.   Did you know that within weeks of coming

1  in your office and claiming he had a fear of

2  retaliation, that he had lost his job as principal?

3      A.   Say that again.

4      Q.   Did you know that within weeks of coming

5  into your office to complain and to alert your

6  office of his fear of retaliation, he lost his job

7  as principal?

8      A.   I don't know the timeline.  Like I said, I

9  wasn't personally involved in that situation, but it

10 could have been weeks.  I don't know.  You're asking

11 me to speculate.

12     Q.   Actually, I'm not.  As the head of

13 employee relations, you're the one who is

14 responsible for the department investigating

15 complaints of retaliation, correct?

16     A.   If they are based on a protected class,

17 yes.

18     Q.   What about based on whistleblower

19 activity?

20     A.   We've been asked to look into some of

21 those situations.

22     Q.   And who asked you to look into those?

23     A.   My boss.

24     Q.   Who --

25     A.   It depends.  I have four different chief

1    human resources officers, so it could have been --

2    or Sharon Pertiller was my boss at one point.  So if

3    I had been asked to look into something that

4    normally wouldn't fall into our realm, then I would

5    do that.

6         Q.   So whistleblower retaliation normally does

7    not fall within your realm?

8         A.   I can't recall, other than one case that I

9    looked into, that they alleged retaliation due to

10   them raising concerns or sharing information, that I

11   looked into.

12        Q.   So then, in general, retaliation for

13   whistleblower activity is not typically handled by

14   your department?

15        A.   Harassment, discrimination, retaliation

16   for protected class issues would be covered under

17   our department.  If that was raised to us -- but,

18   again, it depends on who the subject is.  If the

19   subject is someone within the HR department or the

20   director of schools, would have to outsource that.

21        Q.   Let's go back.  My question to you is a

22   little different.  Does your department -- is your

23   department responsible for complaints of retaliation

24   for whistleblower activity?

25        A.   I would say yes.

1    Q.   So it doesn't have to be referred to you

2    for -- from Chris Barnes or someone else, your

3    department is responsible for that when an employee

4    walks in and tells you they are being retaliated

5    against for whistleblower, correct?

6    A.   I don't know that any employee that walks

7    in and says they're being retaliated says it's for a

8    whistleblower.  They would give us other reasons.  I

9    think the only people that use the whistleblower

10   terms are people like yourself.  So I don't know

11   that an employee would come in and say that because

12   I blew a whistle, they would raise concerns.  We

13   would know the specifics of why they felt they were

14   being retaliated against.

15   Q.   Do you understand what a whistleblower

16   claim is?

17   A.   I do.

18   Q.   Okay.  And do you know that that includes

19   such things as what Dr. Bailey did when he

20   disciplined Coach Battle for beating up a parent and

21   mishandling funds?

22        MR. FOX:  Objection to --

23   BY MS. STEINER:

24   Q.   Do you understand that a whistleblower

25   claim would protect Dr. Bailey from retaliation for

1 doing that?

2          MR. FOX:  Objection to the form.

3          THE WITNESS:  I believe that if that was

4 the purpose or the -- if the person was being

5 disciplined based solely on that, then it would be

6 supported as a whistleblower, but if there are other

7 factors involved that resulted in an employment

8 action, it would be considered, but they would still

9 be subject to the same terms and conditions of

10 employment if say their performance wasn't where it

11 was supposed to be.  Say the school wasn't

12 performing the way it was supposed to be, et cetera,

13 et cetera.  It doesn't protect them from not doing

14 the things they are supposed to do in their role or

15 capacity.

16 BY MS. STEINER:

17      Q.   Okay.  But you do agree that it would

18 protect them from retaliation?

19      A.   If the reason for the action was solely

20 retaliation, then that could be supported.

21      Q.   Okay.  Now, did Metro schools investigate

22 Dr. Bailey's complaint of retaliation?

23      A.   I do not have a file from an attorney that

24 investigated a retaliation claim from Dr. Bailey.

25      Q.   Do you know today whether or not

1  Dr. Bailey made a claim of retaliation?

2      A.   I would have to go back and look and

3  research.

4      Q.   Okay.  So you're here today for your

5  deposition, you have no knowledge about whether or

6  not he even made a complaint of retaliation?

7      A.   Correct.

8      Q.   Now, Dr. Pippa Meriwether, do you know

9  whether or not she made a complaint of retaliation?

10     A.   The only complaint that I'm aware of from

11 Dr. Meriwether was in the process of selection or

12 not being selected as an executive director.  She

13 sent me a complaint, but basically said she didn't

14 want to investigate the complaint, she just didn't

15 want those things to happen to anyone else, and she

16 basically identified flaws in the process, whether

17 it was in her selection or not in her selection as

18 an executive director or in the selection of

19 principalship for the school she was applying for.

20     Q.   Let me ask you a question.  Did you know

21 that Dr. Lily Leffler was kin to Vanessa Garcia?

22     A.   No, I did not.

23     Q.   Okay.  If you discovered that officials

24 were questioning an employee's loyalty to the

25 district because of her association with someone who

1    had sued the district for sexually hostile work

2    environment, what would you have done as the

3    director of employee relations?

4            MR. FOX:  Objection to the form.

5            THE WITNESS:  You're asking for

6    hypotheticals.

7    BY MS. STEINER:

8        Q.  Yes, I am.  I want to know what your

9    department, in its policies and procedures that it

10    has set up, would do in that situation.

11        A.  So ask the question again, please.

12        Q.  If you were to discover that officials at

13    Metro schools were questioning the loyalty of an

14    employee, based upon her relationship to someone who

15    has sued the employee for a sexually hostile work

16    environment, what would you do as an employee

17    relations director?

18        A.  It would depend on who the official was

19    that was questioning the loyalty.  I would have to

20    raise the concern to my boss, raise the concern to

21    the boss of the individual that was questioning the

22    loyalty, understanding the purpose of the

23    questioning or necessity of the questioning, but,

24    again, it all depends on who was involved, whether

25    or not I would be intimately involved or not.

1        Q.    Okay.  If you found out the official was

2   Dr. Battle, would you be involved in that?

3        A.    Anything that has to do with Dr. Battle, I

4   would share it with the chair of the board and they

5   would address it.  And they don't even respond back

6   to me if I raise a concern that's been shared to us

7   regarding Dr. Battle.

8        Q.    When you say chairman of the board, what

9   board are you referring to?

10        A.    The board of the Nashville -- Metro

11   Nashville Public School Board of Education.

12        Q.    And who is the current chair?

13        A.    I don't know.

14        Q.    Is that the school board, is that what

15   you're referring to?

16        A.    Yes.

17        Q.    Okay.  That Amy Frogge and -- that school

18   board?

19        A.    Yes.

20              MR. FOX:  Objection to the form.

21   BY MS. STEINER:

22        Q.    Have you raised any concerns with anyone

23   on the school board about retaliation being

24   conducted by Dr. Battle?

25        A.    I'm trying to remember the last concern I

```
 1    had to raise to someone on the board, and it was
 2    years ago, and to be honest with you, I don't
 3    remember what the premise was.  It involved Dr.
 4    Battle, but it also involved someone else, so it was
 5    raised with the school board.
 6         Q.   Who else did it involve?
 7         A.   I can't remember.
 8         Q.   Do you recall a principal that was let go
 9    for sexual harassment?
10         A.   I don't know what are you referring to.
11         Q.   Sam Braden.
12         A.   That happened -- he actually retired in
13    lieu of any recommendation going to the board for
14    his separation, based on the findings of an
15    investigation.
16         Q.   Did you raise the -- were you there when
17    the Braden issue was going on?
18         A.   I came in right about the same time that
19    was all happening.  I was involved in an
20    investigation, but Dr. Braden was -- he had resigned
21    prior to us, I think even finishing the
22    investigation.
23         Q.   Dr. Braden had engaged in very gross
24    actions of sexual harassment against individuals,
25    correct?
```

```
1              MR. FOX:  Objection to the form.
2              THE WITNESS:  There were some significant
3    allegations that were substantiated against him, but
4    I can't speak to them specifically.
5    BY MS. STEINER:
6         Q.    That's what I mean, significant.  And is
7    it a fair statement, too, that many of the people
8    who had complained of Dr. Braden's treatment, sexual
9    harassment of them, lost their jobs or were demoted
10   and filed lawsuits against Metro schools?
11        A.    I don't know.  I don't know that the folks
12   that filed complaints that I'm aware of have lost
13   their jobs.  I believe one has been promoted, one is
14   still with the district.  If they've left, they left
15   on their own accord or for another reason, but I'm
16   not aware of people that have left because they
17   filed a complaint.  Like I said, it all started
18   happening when I first got here, so it was very --
19        Q.    Were you aware that many of those who
20   people claimed retaliation, that they were demoted
21   or lost their jobs because they had complained about
22   Braden's treatment of them?
23        A.    Was I aware?
24        Q.    Yes.
25        A.    No.  Like I said, I came in on the tail
```

1  end of it when he was actually resigning.

2      Q.   Okay.  A lot occurred after he resigned,

3  though, correct?

4      A.   There was a lot of press, media, you know,

5  interest.

6      Q.   And when you came in on the tail end of

7  it, did you have any job duties for dealing or

8  investigating with the Braden situation?

9      A.   I investigated one case with the Braden

10 situation.

11     Q.   Who was that?

12     A.   Stefan Williams.

13     Q.   And what was his position with Metro

14 schools?

15     A.   I believe at the time, he was a teacher.

16 I believe now he is an assistant principal.

17     Q.   And did Mr. Williams claim he was

18 retaliated against?

19     A.   Yes, but not by Dr. Sam Braden.

20     Q.   Did he claim he was retaliated against by

21 the administration at Metro schools?

22     A.   I think his allegation was that he was

23 retaliated against by Dr. Braden's wife, Sharon

24 Braden, who also no longer works for the district.

25 Resigned.

1    Q.    Okay.  Now, my understanding is that the

2   assistant principal there claimed he was demoted

3   because of his bringing forth to HR the complaints

4   against Braden?

5    A.    I don't know who that is.

6    Q.    In your investigation, did you ever come

7   across any allegations that the complaints against

8   Dr. Braden were brought to Dr. Battle?

9    A.    Do I know they were brought to Dr. Battle?

10  I believe when the findings were reached, they were

11  shared with the hierarchy of HR who would share them

12  with Dr. Battle.

13   Q.    Were you aware that Dr. Battle actually

14  was told early on about the complaints against Sam

15  Braden, and she said, he can't be guilty of that

16  because he taught me in grade school or high school?

17       MR. FOX:  Objection to the form.

18       THE WITNESS:  I don't know that she ever

19  said that.

20  BY MS. STEINER:

21   Q.    Okay.  Let me hand you this document, and

22  I only brought two.  Can I show it to you and --

23       MR. FOX:  We can share.

24       MS. STEINER:  Thank you.

25  BY MS. STEINER:

1    Q.    And this was sent to me.

2    A.    Okay.

3          MR. FOX:  Can we take a break so she can

4    look at this off the record?

5          MS. STEINER:  Yes, that's fine.

6          (Brief break observed.)

7    BY MS. STEINER:

8    Q.    Now, do you know whether or not other

9    individuals who have testified in this matter in a

10   deposition were in fear for their jobs?

11         MR. FOX:  Objection to the form.

12         THE WITNESS:  I'm not even sure what you

13   just asked.

14   BY MS. STEINER:

15   Q.    Were you aware that some of the

16   individuals that came in to give depositions in this

17   case were in fear of their jobs?

18         MR. FOX:  Objection to the form.

19   BY MS. STEINER:

20   Q.    They thought they would be retaliated

21   against by Metro schools for their testimony?

22   A.    I didn't know anybody else that's being

23   deposed for this.

24   Q.    Are you in fear of retaliation?

25   A.    No.

1          Q.    Now, for this e-mail that was sent to you,

2    do you recognize this on the second page?

3          A.    Yes.

4          Q.    Second and third page.  It's an e-mail

5    that was sent to you from Dr. Bailey on June 15,

6    2020; is that correct?

7          A.    That's what it says, yes.

8          Q.    Okay.  And Dr. Bailey tells you in his

9    formal complaint of retaliation, age and race

10   discrimination against Dr. Battle; is that correct?

11         A.    Yes.

12         Q.    He tells you why the retaliation occurred;

13   is that correct?  And it's based on his

14   participation in her brother's disciplinary action,

15   correct?

16         A.    It says -- it's detailing why he believes

17   he was retaliated against.

18         Q.    Do you see here where it says, Dr. Battle

19   alleges that my removal was due to the district's

20   reorg and budget impact; do you see that?

21              MR. FOX:  I'm sorry, Ms. Steiner, which --

22   BY MS. STEINER:

23         Q.    It's the fourth sentence in the e-mail.

24   Says, Although Dr. Battle alleges that my removal

25   was due to the district's reorg and budget impact,

1   she is replacing me with someone that's not in a

2   protected age group for the same role; do you see

3   that?

4       A.   Yes.

5       Q.   Did your department ask any questions to

6   find out what was the reason given by Dr. Battle for

7   the removal of Dr. Bailey?

8       A.   Was I involved in that?  No.

9       Q.   Did your department do any questioning to

10  find out why Dr. Bailey was removed?

11      A.   It was outsourced to Mr. Klein. (Court

12  reporter asks for clarification.)  Mr. Klein, Kevin

13  Klein.

14      Q.   Do you know what the results of that

15  investigation was?

16      A.   No.

17      Q.   Did you have any contact with Mr. Klein to

18  find out what had happened with that investigation?

19      A.   I would follow up, I would tell him who he

20  would converse with, and I would give him contact

21  information because if it had to do with Dr. Battle,

22  the findings would go to the chairman of the board.

23      Q.   How did you tell him this?

24      A.   E-mail.

25      Q.   Do you still have those e-mails?

```
 1       A.   I have no idea.  I would imagine I do.

 2       Q.   Could you please provide those e-mails to

 3  your counsel?

 4       A.   If I still have them, yes.

 5                      (WHEREUPON, the

 6                      previously-mentioned documents

 7                      were to be marked Late-filed

 8                      Exhibit Number 1.)

 9  BY MS. STEINER:

10       Q.   And in those e-mails to Mr. Klein, did you

11  tell him who you thought he should interview?

12       A.   No.

13       Q.   What was stated in these e-mails going

14  back and forth to Mr. Klein?

15       A.   I don't remember.

16       Q.   Because I thought you just testified that

17  there was -- you had information going back and

18  forth with him, conversations going back and forth,

19  asking him who he had interviewed?

20       A.   No, I didn't say that.

21       Q.   Okay.

22            MS. STEINER:  Could the court reporter

23  read back that response.  That was probably about

24  two minutes ago.  Let's see what that was.

25            (Requested portion of record read.)
```

BY MS. STEINER:

    Q.   Ms. Zander, when you said, I would tell him who he would converse with, what did you mean by that?

    A.   I meant that he would share his results with the chair, board chair, because that was the person who ultimately was over Dr. Battle, or the board is actually over Dr. Battle, so the results would go to the chair, and that would be the contact information that I would provide to him.

    Q.   And so then was a written report provided to the chair?

    A.   I have no idea.

    Q.   Did he ask you for contact information for any employees?

    A.   He may have. Like I said, I don't remember specifically.

    Q.   Do you have -- that's something else, too. Any e-mails that you had going back and forth with Kevin Klein, I'd like that marked as an exhibit, if that was not part of 1. I may have already asked for that. All e-mails going back and forth with Kevin Klein, Exhibit Number 1.

    A.   Around this time frame?

    Q.   Around this complaint of retaliation, I

1    don't care if it was six months later or a year

2    later, if it has anything to do with my client's

3    complaint of retaliation, I want a copy of it, okay?

4        A.   Okay.

5        Q.   So when you got this e-mail, June 15,

6    2020, besides talking to Kevin Klein, did you do

7    anything else about this e-mail?

8        A.   I don't remember.

9        Q.   Did you read the e-mail?

10       A.   Yes.

11       Q.   Now, when employees are placed in teaching

12   positions, do you know when the notices go out for

13   that?

14       A.   No.

15       Q.   Do you know if there is a particular

16   cut-off date, such as June 15th?

17       A.   Because the next school year starts in

18   July, I believe they want to have all placements

19   done by June 15th.  That sounds like a logical,

20   normal thing.

21       Q.   If you're not placed by June 15th, is it

22   logical that you're not going to be placed?

23       A.   No, not necessarily.  It depends on what's

24   open, what's available, maybe something just opened

25   up.

1    Q.   And if nothing opens up, then that teacher

2    does not have a job, correct?

3    A.   I don't handle that piece of the

4    situation, so I don't understand the placement

5    pieces.

6    Q.   Now, did Metro schools do anything at all

7    as a result of this June 15th, 2020 e-mail from Dr.

8    Bailey to protect him in his position as principal

9    at White's Creek?

10   A.   Well, if he wrote this to me June 15th, he

11   was already nonrenewed, so at that point, I don't

12   know that there was -- that was already an action

13   that was taken.  June 15th is when he sent it to me.

14   June 15th, that decision would have already been

15   made, so...

16   Q.   If someone is nonrenewed for job

17   performance, are they typically let go of Metro

18   schools?

19   A.   It's not typical.  There isn't anything --

20   everything is valued on a case-by-case.  If it's

21   performance because of the level, maybe they

22   wouldn't be good at a high school, but they'd be

23   okay at middle school or elementary school,

24   depending on what the situation is exactly.

25   Q.   Do you know whether or not Metro schools

1    has access to know whether or not an employee has a

2    teaching certificate?

3        A.    Yes.

4        Q.    Okay.  Is that true then that Metro

5    schools does have access to find out whether or not

6    its employees have teaching certificates?

7        A.    I mean, it's available on TN Compass, so

8    they should be able to see if they have an active

9    license.

10       Q.    Okay.  And if someone does not have a

11   teaching license, can they be transferred into a

12   teaching position?

13       A.    No.

14       Q.    Now, so then after getting this complaint

15   from Dr. Bailey, this date of June 15, 2020, as you

16   sit here today, you have no idea whether or not it

17   was investigated or what was the result of the

18   investigation?

19       A.    If it was outsourced to Mr. Klein, I'm

20   pretty confident that he investigated it.  As to the

21   findings of that investigation, I don't remember if

22   I received them.  I believe my recommendation was to

23   send them to the chair, board chair.  I want to say

24   that might have been Anna Shepherd at the time,

25   but -- because I remember conversing with

1    Ms. Shepherd, telling her that this would be coming,

2    but if it went to Ms. Shepherd, I never got any

3    follow-up.

4        Q.   Okay.  Could we have this marked Exhibit

5    Number 2 to your deposition?

6                        (WHEREUPON, the

7                        previously-mentioned document was

8                        marked as Exhibit Number 2.)

9    BY MS. STEINER:

10       Q.   Did you hear about this Let's Make a Slave

11   lesson that was taught at Waverly Belmont?

12       A.   I recall something about that, yes.

13       Q.   Did you know that one of the children who

14   was in the classroom that was taught that lesson

15   worked for Metro schools, one of the parents of the

16   child?

17            MR. FOX:  Objection to the form.

18            THE WITNESS:  I think I later learned that

19   one of the student's parents worked for Metro

20   schools.

21   BY MS. STEINER:

22       Q.   Did you learn the name of the parent?

23       A.   Only because of the complaint that was

24   filed with Ms. Batey.

25       Q.   What was the name of the parent?

1        A.    I believe it was (name spoken off record).

2        Q.    When she filed the complaint with

3    Ms. Batey, what did it state?

4        A.    I don't know specifically.

5        Q.    Did she claim that the lesson was racial?

6        A.    I believe that there was some racial

7    inferences.  I believe that was her concern with the

8    student being subjected to the class.

9        Q.    Okay.  So that came to Ms. Batey and she

10   investigated it?

11       A.    I believe she worked with school

12   leadership to investigate it.

13       Q.    And that's because you do not want

14   discriminatory lessons taught to the students,

15   correct?

16       A.    I think that discrimination and harassment

17   are a real part of the world.  I think there is a

18   time and place where there is an education that

19   needs to take place of lessons that are

20   discriminatory.  I believe -- or can be viewed as or

21   perceived as, they should be well vetted before they

22   ever go in front of a student.

23       Q.    And so did the complaint that Ms. -- and

24   I'm going to call her Jane Doe for the rest of this

25   deposition; is that okay with you?  When I say Jane

1    Doe, you know I'm referring to (name spoken off

2    record)?

3        A.   Okay.

4        Q.   So then Jane Doe brought it to Ms. Batey's

5    attention that she felt that the lesson plan, Let's

6    Make a Slave, was discriminatory?

7        A.   I'm not sure exactly what (name spoken off

8    record) bought to Ms. Batey.

9         MR. FOX:  Objection.  I think we're saying

10   Jane Doe.

11   BY MS. STEINER:

12       Q.   I'm sorry.  Was it your understanding that

13   Jane Doe brought to Ms. Batey's attention that she

14   thought the lesson that was taught to her son was

15   discriminatory?

16       A.   I don't know what Ms. Doe told Ms. Batey

17   regarding her claim.  I don't know if what Ms. Doe

18   reported to Ms. Batey was the situation involving

19   the student or the action taken with her alleging

20   that it might have been retaliation for her concern

21   about raising her concern about her student.  Again,

22   I'm not intimately familiar with that.

23       Q.   So then it's your understanding that Ms.

24   Doe brought to Ms. Batey's attention that she

25   thought she was being retaliated against because of

1  her complaints of Let's Make a Slave lesson,

2  correct?

3       A.   I don't know exactly what the name of the

4  lesson was, I know that the complaint had something

5  to do with her and I believe she felt it was as a

6  result of her speaking up about the lesson with her

7  son.

8       Q.   And did Ms. Batey bring that to your

9  attention in these weekly meetings that you would

10  have with her?

11      A.   Probably.

12      Q.   In these weekly meetings, do you keep

13  notes of what's said to you?

14      A.   They have notes on their files.  I would

15  just ask for updates on their investigation, where

16  they were.

17      Q.   When you say you asked for updates, are

18  those oral or written?

19      A.   Yes.  We sit around a table and we discuss

20  open cases.

21      Q.   Did you discuss Jane Doe's complaint of

22  retaliation?

23      A.   Possibly.  I don't remember specifically.

24      Q.   Who was on the table with you?

25      A.   If I'm having a conversation about that,

1  it would have to have been with Ms. Batey.  I don't

2  know who else would have been there at the time.

3       Q.   And do you know whether or not an

4  investigation was conducted to see if it was

5  retaliation?

6       A.   If I came to Ms. Batey, I believe Ms.

7  Batey did do the investigation.

8       Q.   Did she go out then to -- when you do an

9  investigation, are your employees trained to go out

10 and interview witnesses?

11      A.   Yes.  We interview witnesses.

12      Q.   Do you keep notes on what's said in the

13 interviews?

14      A.   Yes.

15      Q.   And do you then come to some conclusion

16 that's written?

17      A.   If we're handling the investigation, yes,

18 we would come up with a summary.

19      Q.   Have you come up with any summary that

20 you've seen on Jane Doe's complaint of retaliation?

21      A.   I don't -- I don't remember, but -- and I

22 hate to assume, but if Ms. Batey handled the

23 investigation, there is a summary.

24      Q.   And do you recall any outsourcing of this

25 claim by Jane Doe to any other individuals, such as

1  Kevin Klein to investigate?

2       A.   I don't believe so.

3       Q.   Is it the standard protocol and policy of

4  your office that when a complaint of retaliation

5  comes in, it is investigated, the witnesses are

6  interviewed and documentation is kept?

7       A.   Yes.

8       Q.   And when the witnesses are interviewed, do

9  you typically try to keep statements that the

10 witnesses actually will sign?

11      A.   It it's a face-to-face interview, we give

12 them an opportunity to review the notes.  If it's a

13 Teams, and they request to review the notes, we

14 share them with them.

15      Q.   Can you tell me anyone who was interviewed

16 by Metro schools concerning Jane Doe's complaint of

17 retaliation?

18      A.   I don't know.

19      Q.   Did anyone tell you not to investigate

20 that claim or that that complaint -- that claim of

21 retaliation should not be investigated or was not

22 valid?

23      A.   I am not aware of that.

24      Q.   Did Dr. Battle at any point contact you

25 about any of these claims or did you contact Dr.

1    Battle?

2         A.   I would not speak directly with Dr.

3    Battle, Dr. Battle would speak through my boss.

4         Q.   Can you tell me any reason why Jane Doe's

5    complaint of retaliation was not investigated?

6         A.   Can I think of any reason?

7         Q.   Yes.

8         A.   I don't know.  I cannot -- unless it

9    wasn't for a protected class issue, but...

10        Q.   Okay.

11        A.   It doesn't mean it wasn't investigated, it

12   may not have been investigated by our office.

13        Q.   Do you know of any other office at Metro

14   schools investigating Jane Doe's complaint of

15   retaliation?

16        A.   I am not aware of...

17        Q.   If someone brings a complaint of

18   retaliation like Jane Doe to your department and

19   it's not investigated properly, do you have a job

20   duty for counseling or disciplining Ms. Batey or

21   whoever else took in the complaint for not

22   investigating it?

23        A.   It would be my responsibility to address

24   issues if they were identified in the process, yes.

25        Q.   Have you, at any point, counseled with or

1    disciplined any employee in your office for not

2    properly investigating Jane Doe's complaint of

3    retaliation?

4         A.   I have not.

5              MR. FOX:   Objection to the form.

6    BY MS. STEINER:

7         Q.   Do you know why Jane Doe's job as director

8    of school choice was eliminated in 2020?

9         A.   I do not.

10        Q.   Tell me a bit about if someone is

11   transferred to another position and their support

12   staff, are you aware about a 10 percent reduction in

13   salary being the limit?

14        A.   I believe our procedures have something to

15   do with a 10 percent, but it's not something that I

16   am involved in frequently unless there is some type

17   of a wage grievance filed.

18        Q.   Were you aware that Ms. Doe not only lost

19   her position as director of school choice, but when

20   she was transferred, she lost almost 40 percent of

21   her salary?

22        A.   I was not aware of that.

23        Q.   Were you aware that she filed a complaint

24   with your department claiming that she had lost over

25   40 percent and it should have been capped at

1   10 percent?

2       A.   I don't remember that complaint being

3   filed, but, again, I believe Ms. Batey handled the

4   issues with Ms. Doe.

5       Q.   If my client had complained about being

6   reduced -- if my client was considered -- if her

7   position was considered support and she's moved from

8   that position, do you know whether or not the

9   policies at Metro schools allow her -- limit the

10   reduction of her salary to 10 percent?

11       A.   I think that that's inaccurate.  I believe

12   it's 10 percent or the top of the pay grade,

13   whichever.  You have to stay within the pay grades,

14   so depending on the position that person accepted or

15   was placed in, it would be 10 percent or the top of

16   the pay grade.  I don't believe it's restricted to

17   10 percent, because if somebody dropped several pay

18   grades, it would be greater than 10 percent.

19       Q.   And that's in the support handbook,

20   correct?

21       A.   It could be in a procedural book.

22       Q.   I'm going to try to pull that up the next

23   time we break, and if you could, too, if you could

24   try to pull it up, because we're going to see

25   whether or not it has this top of the pay grade on

1   that policy, okay?

2          If Ms. Doe -- if Jane Doe complained that

3   she was reduced more than 10 percent of her salary,

4   is that something that your department should

5   handle?

6       A.   If it came to me as a level two grievance,

7   I would handle it, but I did not handle a level two

8   grievance on Ms. Doe.

9       Q.   Where is the level one grievance filed?

10       A.   It would be with the supervisor, the next

11   level supervisor.

12       Q.   And for Ms. Doe, who was that?

13       A.   I cannot tell you.

14       Q.   If it is brought to your department, does

15   your department have a duty for telling the

16   employee, you need to take it back to the

17   supervisor?

18       A.   We have.  I don't know what was said to a

19   specific employee.

20       Q.   Do you know whether or not your department

21   told Ms. Doe, hey, you need to take this complaint

22   about the 10 percent decrease in pay to your

23   supervisor?

24       A.   I don't know.

25       Q.   If this is taken to Bridget Jones, does

1    she have a job duty for telling Ms. Doe, you need to

2    take this complaint to your next level supervisor?

3         A.    She is HR hiring manager, so they do

4    position movements and all that.  Again, I don't

5    handle that piece, so I don't know what their

6    instruction is.  I would think that they would help

7    them understand what the pay difference would be.

8         Q.    Okay.

9         A.    Again, that's me speculating.  I don't

10   know for sure so...

11        Q.    Do you know what happened to Ms. Doe's

12   complaint that she was not -- she was decreased more

13   than 10 percent?

14        A.    No, I do not.

15        Q.    Okay.  Do you know whether or not her

16   longevity pay was reduced or cut out?

17        A.    I do not.

18        Q.    Did you know that Ms. Doe applied for

19   other positions at Metro schools?

20        A.    I do not.

21        Q.    Did you know that one of the supervisors

22   where she applied was informed -- one of the

23   individuals in HR was informed that they could not

24   hire Ms. Doe into a position because she had a

25   lawsuit against the district?

1          MR. FOX:  Objection to the form.

2          THE WITNESS:  I do not know that.

3    BY MS. STEINER:

4          Q.   If an individual was informed of that,

5    someone in central office was informed, you cannot

6    hire Jane Doe because she has a lawsuit against the

7    district, does that employee have a job duty for

8    reporting it to your department?

9          A.   I believe that they would probably discuss

10   it with their boss, and if it needed to come to us,

11   it would come to us.

12         Q.   Okay.  Do you mind if we break for about

13   five or ten minutes?

14         MR. FOX:  That's fine.

15         (Brief break observed.)

16   BY MS. STEINER:

17         Q.   We are going -- Ms. Harbison is going to

18   put a document up on the screen and it's the

19   promotions, demotions, transfers, reorganizations

20   and displacements policy.

21         MS. HARBISON:  Can you see what's on my

22   screen?

23         THE WITNESS:  Yes.

24         MS. HARBISON:  Let me go to the first

25   page.  This is what is being shown on the screen.

BY MS. STEINER:

     Q.    Is this the handbook?

     A.    That's the support handbook.

          MR. FOX:  What's the date?

          THE WITNESS:  That's an old support
handbook.  That's not the most current.

BY MS. STEINER:

     Q.    Sure.  Do you know if this is the one that
was in existence in the year 2020?

     A.    I can't remember the last time we updated
it.  It was updated in 2020, but I'm not exactly
sure exactly when.

     Q.    If Ms. Doe were to testify this is the one
that she had that was in effect when she was
director of school choice, would you have any reason
to dispute that?

     A.    No.  It all depends on the timing of when
it was, because the new handbook is now digital,
electronic, it's available on MyMNPS page, like each
one of us can access it at any time through that
page, so when it was updated, it was updated to an
electronic version.  It all depends on the timing of
when that all transpired and when the book was
updated.

     Q.    Okay.  We're going to take you to

1    Promotions.  Do you see this that's entitled Job

2    Promotions, Demotions, Transfers, Reorganizations

3    and Displacements?

4         A.    Yes.

5         Q.    And is that the policy at Metro schools

6    for Promotions, demotions, and transfers for

7    support?

8         A.    Yes.

9         Q.    Okay.  And for demotions, do you see where

10   it says demotion procedures, number (1) In the case

11   of a demotion resulting from poor performance or

12   employee choice, the employee's current salary shall

13   be reduced by 10 percent; and (2) In the case of a

14   demotion resulting from an organizational change or

15   development assignment, all attempts will be made to

16   keep the individual at the current salary; is that

17   correct?

18        A.    That's what it says.

19        Q.    Can you tell me -- when Ms. Doe made this

20   complaint that she had had a massive reduction in

21   salary, can you tell me what attempts were made by

22   Metro schools to keep her at her current salary?

23        A.    I have no idea.

24        Q.    Did anyone in your department question

25   anyone to find out what attempts were made to keep

1  her at her current salary?

2     A.   If it was Ms. Batey, I would have thought

3  she would have conversed with the HR hiring manager

4  to see what had been done.

5     Q.   If Ms. Doe was director of school choice,

6  can you tell me who her direct supervisor would have

7  been?

8     A.   I have no idea.

9     Q.   Do you know whether or not anyone from

10  Metro schools -- do you know why Ms. Doe was put in

11  a position that was at 40 percent lower than what

12  her salary was?

13     A.   No, I do not.

14     Q.   Would you agree that if you look at this

15  policy, if someone suffers a demotion because of an

16  organizational change or development assignment,

17  that in all likelihood, they're going to end up at

18  the same rate of pay, correct?

19     A.   I don't make assumptions.  I think it's on

20  a case-by-case.  It says all attempts will be made

21  to keep them at their current salary.

22     Q.   Now, assuming that the complaint -- Ms.

23  Doe takes a complaint to your department that she

24  suffered a demotion because of an organizational

25  change, and that she was put in a position that the

salary was almost 40 percent or over 40 percent
lower than what it had been before, would your
department have a duty for investigating that?

     A.   We'd have a duty for making sure somebody
looked into it from the compensation side.

     Q.   Do you know who would have been -- what
department you would have contacted for the
compensation side?

     A.   It would probably start with the HR hiring
manager, but it may go into the executive director
over employee services, because they were over
compensation.

     Q.   And who was that?

     A.   Well, at the time, it was the executive
director, and I think it was Lisa Spencer.  Her
position is different now.

     Q.   Was Lisa Spencer recently promoted?

     A.   Yeah.  Her title is different now.

     Q.   And that was a promotion, correct?

     A.   Yeah, I believe so.

     Q.   Okay.  And if Ms. Doe makes a complaint to
your department that she was demoted due to an
organizational change due to the budget and your
department doesn't investigate that or doesn't send
it to the compensation side, should someone in your

1    department be disciplined or reprimanded or

2    counseled with that they didn't follow your policy?

3         A.   We would address whatever we didn't do

4    that we should have done, but if it was shared with

5    somebody that was in a position to look into it, we

6    don't look into the wage pieces.  Like I said, I

7    will look into wage pieces only if it comes to me as

8    a step two grievance, but I have to rely on other

9    people because I'm not intimately involved in the

10   whole wage complaint.

11        Q.   Do you know whether or not anyone in your

12   department or the compensation department was ever

13   counseled with, disciplined or reprimanded for not

14   investigating Ms. Doe's complaint that she did not

15   receive the proper pay?

16        A.   I do not know that anybody was addressed.

17        Q.   Can you see how Jane Doe -- can you see

18   how Jane Doe, after she complains of the Let's Make

19   a Slave lesson taught to her son, within weeks has

20   her position as director of school choice,

21   eliminated, and then she is transferred into a

22   position where the pay cut is almost 40 percent, can

23   you see how she would think that's retaliation?

24             MR. FOX:  Objection to the form.

25             THE WITNESS:  I don't know all the

circumstances that surrounded all of that and the
timing when the decision was made to eliminate her
position.  She is entitled to feel the way she wants
to feel or believe it's for reasons of her own
accord.  It's hard enough for me to stay objective.
I don't always -- I try to empathize, but I don't
know what is on people's minds.

BY MS. STEINER:

Q.   What did you do to empathize with Ms. Doe?

A.   I didn't, because I didn't intimately get
involved with her situation.

Q.   Now, in Ms. Doe's situation, do you know
who Gloria Hill or Angela Johnson -- do you know
either one of those two individuals?

A.   Yes.

Q.   Who are they?

A.   Gloria Hill was a former HR manager, no
longer works with the district.  Angela Johnson was
a former HR manager that handled central office
employees, and she is no longer with the district.

Q.   As an HR manager, what do they do?

A.   I can only speak generally.  They handle a
lot of the hiring, opening up requisitions for new
positions who are assigned specific areas of the
school district.  They took people from -- you know,

1  through the requisitions, through the hiring

2  process, did that, all the administrative

3  background, followed through the systems and brought

4  people on board.  Then if there were transfers or

5  other status changes with employees, they would also

6  facilitate that.

7      Q.   So then if an employee is applying for a

8  job at Metro schools and the department head wants

9  to hire them, do they have to get that approved by

10 the hiring manager?

11     A.   They make the recommendations to the

12 hiring manager.  I'm not exactly sure what the

13 approval process is, if it involves the executive

14 directors.  Like I said, it's not something that I

15 interact with on a daily basis, but it's processed

16 through the HR hiring manager.

17     Q.   Do you know why Ms. Johnson is no longer

18 with the district?

19     A.   I understood that she resigned her

20 position.

21     Q.   Do you know why she resigned?

22     A.   I do not.

23     Q.   Do you know why Gloria Hill is no longer

24 with the district?

25     A.   Ms. Hill, I believe, accepted a position

1    where she could work remotely.

2        Q.   Were you aware that -- I don't know if it

3    was Ms. Hill or Ms. Johnson, but I think it was Ms.

4    Johnson, were you aware that one of these

5    individuals was informed that they could not hire

6    Jane Doe into a position because of her lawsuit

7    against the district?

8            MR. FOX:  Objection to the form.

9            THE WITNESS:  I have no knowledge of that.

10   BY MS. STEINER:

11       Q.   If that is known at Metro central office,

12   should it be brought to your attention?

13       A.   It should have been brought to somebody's

14   attention.  I don't know that it would have been

15   mine.  I think it would go to the chief human

16   resource officer.

17       Q.   If something like that was bought to your

18   attention, but the employee said, I don't want to

19   bring this to your attention because I fear

20   retaliation, what would you have done?

21       A.   My response is that if you're telling me

22   something, I'm obligated to look into it and to see

23   if any wrongdoing has occurred and remedy it.  I

24   cannot not do something with it.

25       Q.   I want to talk to you a little bit about

1   this concept of fear and retaliation.  If somebody

2   says, I have a fear of retaliation, it's my

3   understanding from your testimony today, that what

4   your office typically does is you tell them, well,

5   if you think you're retaliated against, come and

6   tell us?

7            MR. FOX:  Objection to the form.

8            THE WITNESS:  Yes.  We ask them to file a

9   report.

10   BY MS. STEINER:

11       Q.  After the retaliation happens, correct?

12       A.  Well, it depends on when it comes.  I

13   mean, if they're just expecting it or whatever, they

14   put it on the record.  There is not anything to

15   investigate because something didn't happen yet.

16   Once it's happened, we can look into it.

17       Q.  Okay.  Now, when Dr. Bailey told you that

18   something's happened and I've been retaliated

19   against, he had already lost his position as

20   principal at White's Creek, correct?

21       A.  Based on the timing of his complaint, yes.

22       Q.  And did you have the ability to put him

23   back in his position at White's Creek?

24       A.  I do not.

25       Q.  So then if you wait until after the

1  retaliation occurs, the employees have been

2  retaliated against and you have no ability to

3  correct it, correct?

4      A.   I think that if they substantiate that

5  retaliation occurred, then the recommendation would

6  be to remedy that situation.

7      Q.   In Dr. Bailey's case, there was no

8  investigation so there was no recommendation,

9  correct?

10         MR. FOX:  Objection to the form.

11         THE WITNESS:  I don't know that there was

12  no investigation.

13  BY MS. STEINER:

14     Q.   If someone says they have a fear of

15  retaliation, do you separate the individuals, or do

16  you have to have actual retaliation occur?

17     A.   We have to assess whether or not -- what

18  the risk is.

19     Q.   Did you ever assess the risk of

20  retaliation when Dr. Bailey complained to Ms. Batey

21  about retaliation?

22     A.   I don't know when he reported it to

23  Ms. Batey, so I only know of what he sent me.

24     Q.   Assuming that he reported to Ms. Batey

25  that he had a fear of retaliation in April, before

1    he lost his job, April of 2020, do you know what the

2    assessment of retaliation was at that point?

3              MR. FOX:  Objection to the form.

4              THE WITNESS:  I do not.

5    BY MS. STEINER:

6         Q.   Do you know what -- how do you calculate

7    an assessment of retaliation?

8         A.   You assess the risk to the individual,

9    interaction, et cetera, et cetera.  Like I said,

10   everything is on a case-by-case situation.  We try

11   to evaluate and try to put safeguards in place, but,

12   again, we are a small department and we rely upon

13   the assistance from the relevant leaders.

14        Q.   Okay.  Dr. Bailey, when he complained of

15   retaliation, he had a fear of retaliation in, I

16   believe it was April of 2020, before he lost his

17   job, how would you assess the risk involved in that?

18        A.   I don't know.

19        Q.   Do you know whether or not the risk of

20   retaliation was ever assessed by your department?

21        A.   I don't know.  But if it was April of

22   2020, the end of the school year was in May of 2020,

23   I would think that the timing of that would have --

24   I believe the notification to those being impacted

25   by nonrenewals is usually a month out from the end

1  of the year, so it may have already been something

2  that he was aware of when he brought it to Ms. Batey

3  if it was in April, depending on when he was

4  notified by a supervisor.

5        Q.   Okay.  What was my question?

6             (Requested portion of record read.)

7             THE WITNESS:  I don't know.

8  BY MS. STEINER:

9        Q.   Now, as you sit here today, do you have

10  any plans of going back to your department to find

11  out whether or not the risk was ever assessed and

12  counseling or reprimanding any employees for not

13  assessing that risk?

14             MR. FOX:  Objection to the form.

15             THE WITNESS:  I would be concerned whether

16  or not I would be doing something that would

17  obstruct your case at this point.

18  BY MS. STEINER:

19        Q.   And so do you mean something that would

20  either support or not support Metro schools'

21  position in this matter?

22        A.   No, that's not what I meant.

23        Q.   What do you mean?

24        A.   I mean, if you're deposing somebody else

25  in my department, I don't want to interfere with

1    that situation, because all the information related

2    to this situation would be in that person's office.

3    And if I were to investigate it, I would have

4    to involve that individual.

5        Q.   And why can't you do that if I'm going to

6    take their deposition?

7        A.   I don't know.  I don't want to interfere.

8    I would want -- not want to interfere.

9        Q.   So you would not do anything?

10       A.   No, that's not what I said.

11       Q.   Will you do something?

12       A.   Eventually, yes.

13       Q.   What will you do?

14       A.   I don't know.  Depends on what I find.

15           MR. FOX:  Objection to the form.

16   BY MS. STEINER:

17       Q.   Okay.  When you're investigating

18   complaints of retaliation, do you look at things

19   like termination notices, letters?

20       A.   We would look at whatever documentation

21   was available surrounding the situation.

22       Q.   Did you know -- if the director of schools

23   says they nonrenewed someone for job performance, is

24   that decision by the director set in stone, meaning

25   nobody else is going to come in and alter that and

1  say, no, you can't do that?

2      A.    Ultimately, it's the director of schools'

3  decision, but prior to those recommendations for

4  nonrenewals being presented, I am aware that there

5  is a process to ensure that there's adequate

6  documentation to support a nonrenewal for

7  performance.

8      Q.    Okay.  And when you say adequate

9  documentation, what do you mean?

10      A.    That they have taken progressive steps to

11  either support the employee and success in their

12  role or they've initiated the corrective action

13  process.

14      Q.    If there's no documentation to support the

15  removal of Dr. Bailey as principal, would your

16  department tell whoever wants to remove him, you

17  can't do this because there's no documentation?

18      A.    It's not my place.  My department doesn't

19  evaluate the nonrenewals.  We're not involved.  We

20  just find out who it has been so...

21      Q.    It it's for job performance, does your

22  department have the ability to go in and say, you

23  need to document problems with job performance

24  before you can nonrenew for job performance?

25      A.    We encourage our leaders to document

1  performance issues.

2       Q.   Do you know whether or not Dr. Bailey had

3  any performance issues documented with him?

4       A.   I do not know that.

5       Q.   Let me hand you this real quick.  And I'm

6  going to get another copy for the court reporter

7  because this has something on the back that I do

8  not -- it's not necessary to make an exhibit here.

9            If you could read this May 4, 2020 letter,

10 then I'll question you just a bit about it.

11           MS. STEINER:  I would like to make the --

12 what we've got on the board right now, the Support

13 Handbook, the first page and then the page that we

14 discussed dealing with promotions and demotions, so

15 it's going to be two pages, the next-numbered

16 exhibit and I think it's Exhibit 3.

17                        (WHEREUPON, the

18                        previously-mentioned document was

19                        marked as Exhibit Number 3.)

20 BY MS. STEINER:

21      Q.   Now, Ms. Zander, have you ever seen this

22 before?

23      A.   Have I ever seen this particular letter

24 before?

25      Q.   Yes.

1      A.    No.

2      Q.    Is this addressed to Dr. Bailey?

3      A.    It appears to be.

4      Q.    Does this state that Dr. Bailey has lost

5  his position due to the district's organization and

6  budget impact?

7      A.    That's what it says.

8      Q.    Does that mean because the job has been

9  eliminated; is that what that means?

10     A.    I don't know that the job was eliminated.

11     Q.    Will you agree this does not say for job

12  performance?

13     A.    It does not say that it was for job

14  performance.

15     Q.    And if someone has their position

16  eliminated for job performance, should the

17  supervisor be honest with them and tell them that's

18  why their position is being eliminated?

19     A.    In a perfect world, yes.

20     Q.    Okay.  Do you know today why Dr. Bailey

21  lost his job as principal at White's Creek?

22     A.    I understand that there were school

23  statistics and school data information that

24  continued to decline under his leadership, and --

25  which is what prompted the change, but specifically,

1    I do not know.

2        Q.   And who told you that?

3        A.   I think it's just an understanding that

4    was shared.  I don't know if it was by Dr. Griffin

5    or whether it was because I was collecting

6    information related to a public records request that

7    I learned of it.  I can't tell you where I came to

8    know that or learned of that.

9        Q.   Can you tell me what documents you looked

10   at?

11       A.   No, I can't tell you.

12       Q.   Now, do you know where -- do you know --

13   it's my understanding Dr. Griffin has left the

14   district; is that correct?

15       A.   Yes, I believe she retired.

16       Q.   Do you know if she has any health issues?

17       A.   I wouldn't be at liberty to discuss those

18   if I did.

19       Q.   Do you know if she has any health issues?

20            MR. FOX:  You can tell her, if you know.

21            THE WITNESS:  I don't know, if she has

22   health issues, what they are.  I believe it was due

23   to her health.

24   BY MS. STEINER:

25       Q.   Do you have -- so you have no idea whether

1  or not she may have cancer or if she may have had a

2  heart attack or something else may have been going

3  on with her?

4      A.   I have no idea what the health issues are.

5      Q.   And so it was only after you got a record

6  request that you looked into why Dr. Bailey was no

7  longer there?

8      A.   I don't know that I actively researched

9  it.  I don't know exactly when I became aware of --

10 it could have been interaction with Dr. Mells.  I

11 can't specifically say when I became aware of

12 possible reasons for the change.

13     Q.   Do you tell the people who work -- do you

14 tell the staff at MNPS that they need to keep their

15 documentation of things?

16     A.   That would be my guidance, to maintain

17 documentation.

18     Q.   If documents are missing, what do you do,

19 do you do an investigation to find out why?

20     A.   It depends on if it's something that would

21 come into our realm of responsibility, but people

22 don't preserve documents -- I mean, like I said,

23 there is three investigators in my office, I don't

24 know that we have the resources to investigate

25 missing documentation throughout a district the size

1    we are.

2         Q.   Did you know that the executive directors

3    were told they were going to have to reapply for

4    their positions?

5         A.   I am aware of that, yes.

6         Q.   Did you know that the scores -- that the

7    applicants were scored, did you know that?

8         A.   Did I what?

9         Q.   Know that the applicants were interviewed

10   and scored?

11        A.   I wasn't part of that process, so -- but

12   interviews, they do score on a scale.  Each person

13   on the panel scores on a scale and then they put it

14   all together and come up with the highest scoring or

15   whatever, but I don't know, I didn't partake in that

16   process.

17        Q.   Is it the procedure of Metro schools that

18   when the interviews occur, that you should have the

19   same interviewers and interview the person at the

20   same time?

21        A.   When possible.

22        Q.   Okay.  Because if you have different

23   interviewers, you could have people who score

24   differently affecting the score, correct?

25        A.   Yes.

1      Q.   Okay.  So then is it the procedure at

2   Metro schools, and the procedure that I assume your

3   department tells Metro schools, if you interview,

4   make sure you use the same interviewers and have

5   them interview the candidate at the same time so

6   they can hear the same questions?

7      A.   Again, this is not a process I oversee.  I

8   am guided by somebody to -- when I hired, and I only

9   hired one individual in the time I've been with the

10  district, I know that I want a consistent panel.  I

11  want the same parties to be available for all the

12  interviews that I'm going to conduct so that I don't

13  run into trouble with inconsistencies with scoring.

14     Q.   Would it be inconsistent if you used

15  different interviewers?

16     A.   It's possible that it's inconsistent with

17  different interviewers.

18     Q.   Did you know that for the executive

19  director's position, that some of the scores were

20  missing?

21     A.   No, I did not.

22     Q.   Okay.  Did you know that after the

23  interviews were supposed to be concluded, that

24  individuals were told they did not have the job and

25  that interviews continued thereafter with Brian

1    Mells; did you know that?

2         A.    No.

3         Q.    Did you know Brian Mells' scores ended up

4    missing?

5         A.    I would not know that information.

6         Q.    Excuse me, I made a mistake.

7              MR. FOX:  Objection to the form.

8    BY MS. STEINER:

9         Q.    Chad High.  Did you know Chad High's

10   scores ended up missing?

11        A.    I would not know that information.

12        Q.    Did you know that Chad High was hired as

13   an executive director and his scores were missing?

14        A.    I know that Chad High is an executive

15   director, I have no idea about the other part of

16   your question.  I would not have knowledge of any of

17   that.

18        Q.    If there is a claim of retaliation by, for

19   instance, Pippa Meriwether, Lily Leffler, Dr. Damon

20   Cathey, and anyone else that may have interviewed

21   for that executive director's position, if there is

22   a claim that they were retaliated against, should

23   that have been brought to the attention of your

24   department?

25        A.    If the retaliation claim was against

1   someone like the chief HR, again that would have

2   been farmed out to a different investigator.

3        Q.   Do you know whether or not any of these

4   complaints of retaliation that Dr. Meriwether, Dr.

5   Leffler, Dr. Cathey, Dr. -- made with regard to the

6   executive director positions, do you know whether or

7   not they were ever investigated?

8             MR. FOX:  Objection to the form.

9             THE WITNESS:  The only complaint I saw

10  from those three individuals you're naming

11  specifically was a complaint that was addressed to

12  me by Dr. Meriwether.  It was not a complaint of

13  discrimination.  It was more a complaint of

14  inconsistency with the processes around the

15  selection process.

16  BY MS. STEINER:

17       Q.   So her letter to you did not mention

18  retaliation or discrimination?

19       A.   I don't recall it saying it anything

20  having to do with retaliation or discrimination.

21  She even said, this doesn't have to be looked into,

22  I just didn't want other people subjected to this.

23       Q.   If she had claimed retaliation, would your

24  department have assigned it to someone to

25  investigate it?

1      A.    It would have gone outside the

2  organization.

3      Q.    Did her complaint of retaliation go

4  outside the organization?

5      A.    I did not outsource a complaint from Dr.

6  Meriwether to another investigator outside.  If she

7  filed an EEOC charge, that would be handled

8  differently through our legal department.

9      Q.    Can you tell me why you did not outsource

10  Dr. Meriwether's claim of -- that she brought to

11  you?

12      A.    I didn't consider it a claim of

13  discrimination or harassment.  She was talking about

14  the processes and the individuals.

15      Q.    Okay.

16      A.    It's my understanding, there was a

17  response given to her.

18      Q.    What did the response --

19      A.    Even though she did not ask for a response

20  or an investigation.  I don't know.  Dr. Barnes sent

21  the response.

22      Q.    If someone asked you not to investigate do

23  you still have a duty to investigate once it's

24  brought to your attention?

25      A.    If the employee says, I don't want you to

1  do anything about it because, I still have a duty to

2  investigate it.

3      Q.    Okay.

4      A.    Which is why that was raised.  I shared

5  that information with my boss at the time.

6      Q.    Who was your boss at the time?

7      A.    Mr. Barnes or Dr. Barnes.

8      Q.    So you shared Dr. Meriwether's complaint

9  that she brought to you with to Dr. Barnes?

10      A.    I did.

11      Q.    And why -- when you shared it with him,

12  did you ask him what you should do?

13      A.    I may have.  I don't remember exactly what

14  we discussed.

15      Q.    Do you know what he told you?

16      A.    No.

17      Q.    Do you know what Metro schools did as a

18  result of Dr. Meriwether's complaint?

19      A.    Like I said, I was aware that there was a

20  response from Dr. Barnes, other than that, I do not

21  know.

22      Q.    You were aware there was a response from

23  Dr. Barnes?

24      A.    Yes.

25      Q.    But you don't know what was in that

1    response?

2         A.    I can't remember it.

3         Q.    Was it by e-mail, was it oral?

4         A.    I believe there was a letter.

5         Q.    A letter from Dr. Barnes to you about what

6    --

7         A.    To Dr. Meriwether.  No.

8         Q.    From Dr. Barnes to Dr. Meriwether?

9         A.    Yes.

10        Q.    And do you know what it said?

11        A.    I don't remember exactly what it said.  It

12   was responding to some of the things that she had

13   raised in her concern.

14        Q.    And did Dr. Barnes investigate it?

15        A.    I don't know what Dr. Barnes did.

16        Q.    Okay.  Let me hand you this that's dated

17   June 21st, 2020, do you recognize this document?

18   (Court reporter asks for clarification.)

19             MS. STEINER:  I'd like to offer as an

20   Exhibit 4, Dr. Bailey's termination -- or the May

21   4th, 2020 letter to Dr. Bailey.

22                          (WHEREUPON, the

23                          previously-mentioned document was

24                          marked as Exhibit Number 4.)

25             MR. FOX:  No objection.

```
 1              THE WITNESS:  I've never seen this before.

 2              MS. STEINER:  Let's have that marked the

 3  next-numbered exhibit for identification purposes.

 4                        (WHEREUPON, the

 5                        previously-mentioned document was

 6                        marked for identification as

 7                        Exhibit Number 5.)

 8  BY MS. STEINER:

 9       Q.   Were you aware that in 2018 that there was

10  a complaint of retaliation, fear of retaliation, or

11  retaliation that was brought to your department by

12  Dr. Meriwether and on behalf of Dr. Bailey?

13       A.   In 2018?

14              MS. STEINER:  Yes.

15              MR. FOX:  Objection to the form.

16              THE WITNESS:  I don't know of anything

17  like that.

18  BY MS. STEINER:

19       Q.   Were you aware that a complaint was -- a

20  complaint that there was a fear of retaliation was

21  brought to your department by Dr. Meriwether or by

22  anyone else on behalf of Dr. Bailey because he

23  feared retaliation because of having to deal with

24  the Coach Battle situation?

25              MR. FOX:  Objection to the form.
```

```
1            THE WITNESS:  Again, I wasn't involved in
2     the Coach Battle situation, so I don't know that I
3     knew that.
4     BY MS. STEINER:
5          Q.   In August of 2018, you were already at
6     Metro schools, correct?
7          A.   Yes.
8          Q.   Were you the director of employee
9     relations then?
10         A.   Yes.
11         Q.   Did you know then that as the
12    administrative hearing was being conducted about
13    Coach Battle and whether or not he kept his job or
14    didn't keep his job, did you know that Dr. Bailey
15    was in fear for his job and actually in fear for his
16    safety?
17         A.   No, I did not know that.
18         Q.   Should that have been brought to your
19    attention when you came in as the director of
20    employee relations?
21         A.   I don't -- (Court reporter asks for
22    clarification)  I don't know.
23         Q.   Do you have any job duty for investigating
24    complaints of retaliation or discrimination filed
25    with the EEOC?
```

1    A.    Those are handled through Metro legal.

2    Q.    Okay.

3    A.    And they work closely with Mr. Young.

4    Q.    Do you know what the term "protected

5    activity" means?

6    A.    Yes.

7    Q.    Okay.  And do you understand that that

8    means you cannot be retaliated against for engaging

9    in a complaint of discrimination, retaliation or

10    whistleblower activity?

11         MR. FOX:  Objection to the form.

12         THE WITNESS:  Do I know that that's what

13    it means?

14    BY MS. STEINER:

15    Q.    Yes.

16    A.    I know that that's part of the definition.

17    Q.    In the school year, from the time you got

18    there, say August or would it have been July of 2018

19    through the end of the 2020 school year, can you

20    tell me any school principals who engaged in any

21    activity you would have considered protected?

22    A.    I don't know.  I don't know.  I mean,

23    principals make recommendations to us for actions

24    again employees.  Principals have the right to raise

25    concerns.  But I don't recall.

1    Q.    Meaning do you know of any principal who

2    said there's discrimination or retaliation going on

3    at Metro schools from the date you got there through

4    the end of the 2020 school year?

5    A.    The ones that came into our department to

6    investigate, but if you're asking me to list them, I

7    can't list them.

8    Q.    Who came in your department to

9    investigate?

10    A.    No, if they came in to our department to

11    file a complaint, we would look into them and

12    investigate.

13    Q.    Can you tell me the names of anyone who

14    came into your department who was a principal, from

15    the time you got there until the end of the 2020

16    school year to file a complaint?

17    A.    The only one I can recall I believe is the

18    Pippa Meriwether, but I can't recall if there were

19    others.

20    Q.    Do you recall any assistant principals

21    making any complaint of discrimination from the time

22    you got there until the end of the 2020 school year?

23    A.    Yes.

24    Q.    Who?

25    A.    It was somebody that was filing a

1    complaint against Dr. Sharon Braden, but I can't

2    remember the name of the individual.

3         Q.   Okay.  Other than that, can you think of

4    anyone else?

5         A.   Not off the top of my head.

6         Q.   Okay.  Now, can you think of anyone from

7    the end of the 2020 school year, the spring 2020

8    school year through today's date that was either a

9    principal or assistant principal who filed a

10   complaint of discrimination or retaliation against

11   Metro schools?

12        A.   Nothing is -- I can't recall.

13        Q.   Do you know of any principal whose

14   contract has been nonrenewed by Metro schools since

15   you've been there, other than Dr. Bailey?

16        A.   No, but that doesn't mean it hasn't

17   occurred.

18        Q.   Okay.  If there is an atmosphere of fear

19   of retaliation at Metro schools, should that be --

20   should that be brought to your attention?

21        A.   I would say depending on the type of fear

22   of retaliation, for what purpose, yes.

23        Q.   Did you know that in the prior

24   administration at Metro schools, for instance,

25   Dr. Joseph, did you know that there was an actual

1   fear of retaliation if someone should make a

2   complaint of retaliation?

3           MR. FOX:  Objection to the form.  2.

4           THE WITNESS:  So you're asking if I had

5   knowledge of?

6   BY MS. STEINER:

7       Q.   Yes.

8       A.   You know, knowledge of factual

9   information, no.  Knowledge of scuttlebutt,

10  knowledge of people saying things, I mean, I'm

11  always an advocate that I would ensure that I did

12  what I could to protect the confidentiality of all

13  parties.  I would give them notice that if

14  retaliation occurred to please let me know and that

15  I would make sure that we would address it and

16  correct the situation.  You know, I would like to

17  think that we support the school system to foster an

18  environment that's not -- that's free of all forms

19  of harassment, discrimination, retaliation, but like

20  I said, we are a small group of people, we focus on

21  protected class issues.  I don't know that all of

22  those situations make it to us.

23      Q.   Okay.  When you say, "scuttlebutt," was

24  there common knowledge around central office -- and

25  I assume you're in central office, correct?

1     A.   It's called the support hub now, yes.

2     Q.   And when you're in the support hub or

3 central office, was it common knowledge around there

4 that there was a fear of retaliation if you report

5 something?

6     A.   I don't know that common knowledge is an

7 adequate term.

8     Q.   Was there knowledge that if you report

9 something, you will be retaliated against?

10    A.   So there is rumors, there's speculation, I

11 don't know if what I was hearing was factual,

12 truthful or if it was speculative or rumors.

13    Q.   But you did hear rumors that there was a

14 fear of retaliation, correct?

15    A.   What I would base my opinion on was if

16 people came to me and said they feared retaliation.

17    Q.   You heard that there were rumors of

18 retaliation, correct?

19    A.   I heard that people felt there were people

20 that were untouchable, but I didn't witness or

21 experience any of that.

22    Q.   Did you hear that there was a fear by some

23 of the workers that there was retaliation, if you

24 said something, you would be retaliated against?

25    A.   I did not know that to be a fact.

1    Q.   Did you hear that?  I'm not asking you if
2  you knew it to be a fact.  I'm asking you under
3  oath, did you hear that there was a fear of
4  retaliation if somebody complained of discrimination
5  or hostile work environment?
6    A.   I don't know.  Like I said, if I heard
7  something, it would be from somebody I was
8  interacting with in an investigation.
9    Q.   Did you hear, did you hear from anybody,
10  any statement that implied to you that there was
11  fear of retaliation at Metro schools?
12    A.   Like I said, I heard, but I didn't know
13  whether it was rumor.
14    Q.   Okay.  So you did hear that there was --
15    A.   Right.
16    Q.   Is that correct?
17    A.   It's possible that I heard it in the
18  course of an investigation.
19    Q.   You did hear that there was a fear of
20  retaliation at Metro schools, correct?  Yes or no?
21    A.   You're putting words into my mouth.  I
22  think I'm telling you that if somebody came to me
23  during the course of the investigation I was
24  involved in and they feared retaliation, I would
25  understand and note that.  I heard that frequently

1    when I interviewed people.  Did I hear it generally

2    or speculatively?  I don't listen to that stuff, so

3    I can't tell you whether or not I heard it from

4    that.

5         Q.   Okay.  I don't care if you don't listen to

6    it, my issue is this.  Can you tell me today under

7    oath, and it sounds like you did, it sounds like you

8    heard scuttlebutt out there that if you complained

9    of retaliation or discrimination, you will be

10   retaliated against at Metro schools?

11        A.   I think that there were people that feared

12   retaliation, but don't ask me where I heard it from.

13        Q.   Did you know that the administration --

14   who was in charge of Metro schools when you came in

15   there?

16        A.   Dr. Shawn Joseph.

17        Q.   Did you know that Dr. Joseph recognized

18   this fear and was trying to correct it?

19        A.   No, I did not.

20             MR. FOX:  Objection to the form.

21   BY MS. STEINER:

22        Q.   Did you hear any statements from anyone at

23   Metro schools that there is a fear by our workers

24   that they will be retaliated against and we need to

25   stop this?

1   A.  I don't remember hearing that.

2   Q.  Do you know of Metro schools, at any point

3 in time, doing anything to assure its workers that

4 they would not be retaliated against?

5   A.  Other than us saying that to them when

6 they came to us with their concerns, having it in

7 policy, having board policies that, you know, we try

8 to foster environment free of all forms of

9 harassment, discrimination and retaliation, other

10 than that, I know that different departments have

11 done cultural assessments to try to understand the

12 concerns of the employees, but I don't know anything

13 specifically to address that because it's very

14 broad.

15   Q.  Do you think it's a good environment for

16 an organization for its employee to have a fear of

17 retaliation?

18   A.  Do I believe it's a healthy environment

19 for --

20   Q.  Yes.

21   A.  -- employees?  I don't think it's a

22 healthy environment for one employee to fear

23 retaliation, but that's -- I can't make the general

24 assessment for the entire district.

25   Q.  When Metro schools went through the

1  reorganization in 2020, did you realize that a high

2  percentage of the employees who were affected had

3  engaged in protective activity?

4          MR. FOX:  Objection to the form.

5          THE WITNESS:  No.  I would not know that.

6  BY MS. STEINER:

7      Q.  Did you know that a statistician hired in

8  this matter said that it was very, very high

9  probability that protected activity entered into the

10  decision just because of the statistics?

11          MR. FOX:  Objection to the form.

12          THE WITNESS:  I did not know that.  I did

13  not know that there was a statistician.

14          MS. STEINER:  Okay.  I think that is it.

15          MS. HARBISON:  I just have a couple of

16  questions.

17          MR. FOX:  Two questions?

18  EXAMINATION BY MS. HARBISON:

19      Q.  Ms. Zander, remind me of your new last

20  name.

21      A.  Munoz.

22      Q.  Munoz.  Congratulations.  I represent Dr.

23  Damon Cathey in this case, so there's five

24  plaintiffs in this case, okay, and I represent Dr.

25  Cathey.

1              My name is Jesse Harbison.

2              At the very beginning of your deposition,

3    you said that in your interview that you were

4    apprised or told that there were some things that

5    were ongoing in the district; is that correct?

6              MR. FOX:  Objection to the form.

7              THE WITNESS:  I don't know if it was in

8    the interview process or in, you know, when I was --

9    before I got here, but it was very general, mostly,

10   nothing specific.

11   BY MS. HARBISON:

12        Q.   What do you remember being told?

13        A.   I don't remember what I was told.  I just

14   remember that when I got here, what was told to me

15   didn't adequately prepare me for what I encountered.

16        Q.   Tell me what you encountered.

17        A.   It was just -- there was a lot of stuff

18   going on in the district at the time.  There were

19   issues raised about principals, there was a lot of

20   press involvement.  It was just a very hectic time

21   and for me to be trying to learn my job while

22   dealing with a hectic environment was just very

23   stressful.

24        Q.   What caused the hectic environment, what

25   are you specifically talking about?

1      A.    I think the fact that there was transition

2   in my department.    There was me and one other person

3   and we were responsible for investigating

4   harassment, discrimination issues throughout the

5   district.    At the time, it was just me and one other

6   person.    We had an assistant.    Mr. Young was there,

7   as well, but basically it was two investigators.

8   And like I said, I learned under fire.    You know,

9   you just get inundated and you learned as you went.

10             I came in with knowledge of

11   investigations, I came in with experience of

12   employee relations and different facets of employee

13   relations, but not what was -- just -- I didn't -- I

14   was not familiar with the school district and the

15   publicness of everything in a school district.    So

16   that was just something I had to acclimate to.

17      Q.    Okay.    Let's unpack that a little bit.

18   You had two investigators when you started with

19   Metro, did you include you?

20      A.    Yes.

21      Q.    And there's three now?

22      A.    Correct.

23      Q.    Does that include you?

24      A.    Yes.

25      Q.    Do you have the resources that you need to

1    be able to adequately do your job?

2         A.    I would say it's feast or famine for us.

3    We either get a high level of incidents and we're

4    dealing with multiple cases, or there aren't a lot

5    of issues.  It ebbs and flows.

6              At times, it seems overwhelming, an

7    overload, but we've gotten additional resources

8    since I've been there, so I'm grateful for that, and

9    that's why we try to restrict it to just protected

10   class issues, because -- and help, enable or

11   basically impower the leaders to work through other

12   employee issues; although, we help and guide and

13   talk through different scenarios with leaders.

14        Q.    Let me tell you why I'm asking this

15   question.  Seems to me, I'm on the outside, right,

16   that three investigators for 12,000-plus employees,

17   possibly is not enough investigators for y'all to

18   feel like you can actually investigate every claim

19   that comes to you; is that accurate?

20        A.    Like I said, if we restrict it to just the

21   protected class issues, we're in a better place.

22   Does it mean that at times there's multiple things

23   going on at the same time?  Yes.  But now we also

24   have the Title IV division, and there are multiple

25   investigators there, and so we have additional

1    resources with that group, but that's just recently

2    formed.

3        Q.   Who made the decision to restrict your

4    investigations to issues regarding protected

5    classes?

6        A.   I have no idea, it was that way when I got

7    there.

8        Q.   What is your understanding about what

9    protected classes are?

10       A.   Anything that's in violation of Title VI,

11   Title VII, Title IV, you know, and then our policies

12   are actually a lot more -- anything having to do

13   with race, ethnicity, sex, sexual harassment,

14   harassment, based on any of those protected classes,

15   ADA, religious.  I mean, the list goes on.  Sexual

16   orientation, gender identity, et cetera.  There's a

17   multitude of protected classes.

18       Q.   You may have answered this already, so

19   forgive me if you have.  But if someone comes to you

20   and they've got an issue and it doesn't relate to a

21   protected class, where do you send them?

22       A.   I review the concern.  I may interview

23   them to find out what the basis is of the complaint,

24   and then I would work with the leadership, whether

25   it's the principal at a school, the leader over the

1   principal of the school or the leader of the

2   department where the incident is occurring to make

3   sure that the issue is reviewed and resolved.

4       Q.   Okay.  I want to go back to something that

5   you said when I first asked you a question, which

6   was, there was a lot going on, it was very hectic

7   when you first started, there was only two

8   investigators, which isn't very many.  What

9   specifically can you remember, as far as specific

10  situations, that were happening when you first

11  started at MNPS, meaning do you specifically recall

12  that there was an investigation about a person whose

13  name you can remember, and, if so, do you remember

14  what their name is?  Like tell me specifically what

15  was happening that made it hectic.

16      A.   I think the stuff going on with Mr. Sam

17  Braden.  I believe that was -- I think the -- a lot

18  of things happening with the press, public records

19  requests that came into our department as well, we

20  had to respond to those things.  It was a very

21  tumultuous few months, so to be honest with you, I

22  can't recall everything that was going on in that

23  timeframe.  But it just seemed like a lot that I had

24  not encountered in my prior HR career.

25      Q.   Do you remember the Sam Braden issue, do

1    you remember anything else specifically that was

2    going on during that time that made it hectic?

3         A.    Well, like I said, every time they did a

4    public records request and somebody's information

5    got shared, that would come to us, too.  People

6    would be upset that their information was out there.

7    You know, we say we try to keep it confidential but

8    we also say that we do the best we can, but we can't

9    always guarantee it.

10            So working in a public environment, like I

11   said, that was a transition for me.  I've not worked

12   in a public environment before.

13        Q.    Does your office handle public records

14   requests?

15        A.    The -- we get requests for investigative

16   information or personnel files.  My admin will

17   respond to personnel file or investigative file,

18   stuff that we have.

19        Q.    Who asks you for those, is it someone

20   within the district?

21        A.    Yeah, the communications department field

22   all public records requests.

23        Q.    Has anyone ever told you that it's a

24   concern when a matter becomes fodder for the press?

25        A.    I am concerned when a matter becomes

1    fodder for the press, because in my heart and

2    instinctually, you want to protect the people that

3    have filed complaints or concerns, but, yet, in some

4    regards, we don't have the ability to protect

5    anyone, the public has access to all that kind of

6    stuff.

7        Q.    If someone came to you -- well, let me ask

8    it this way.  If an employee came to you or

9    something in your office and said that they feared

10   they were being retaliated against or thought they

11   were being retaliated against because they refused

12   to remain silent about something that was happening

13   that was illegal, and the illegal activity didn't

14   have to do with a protected class, okay, would that

15   be something that your office would investigate?

16       A.    You have to give me an example.

17       Q.    Okay.  Someone is falsifying student

18   grades, someone is refusing to remain silent about a

19   principal's falsification of grades and they fear

20   they're being retaliated against or think they're

21   being retaliated against, who would investigate

22   that?

23       A.    That would be somebody -- you know, I

24   would probably bring somebody in over -- actually, I

25   did get involved in a situation with Dr. Cathey

1    regarding -- you know, it had to do with the online

2    training system that they had for students, so Dr.

3    Cathey and I worked together at a school to try to

4    get to the bottom and resolve the issues, who was at

5    fault, who -- you know, if the grades were falsified

6    or if the grades were inaccurately inflated or

7    deflated, and it was really -- it was something that

8    was out of my realm.  I did assist him in that type

9    of situation, but normally grades are handled at the

10   executive director level or -- he was a community

11   superintendent I think at the time, and we

12   definitely would involve the testing group that

13   oversees the testing.  That's not my area of

14   expertise.

15        Q.    Okay.  But is there a policy that if

16   someone comes to you and complains about something

17   that's illegal but it's not related to protected

18   activity and they're scared they're going to be

19   retaliated against or have been retaliated against

20   because they're refusing to remain silent about

21   something that's illegal, is there a policy written

22   anywhere saying that you'll refer that person to

23   someone else because that's outside of your

24   department?

25        A.    I usually have to collaborate.  Those

```
1   aren't frequent occurrences.  I would collaborate
2   with my boss and say, how do we handle this.
3   Because any claim that comes in or somebody has any
4   kind of fear, and, of course, anything that
5   compromises somebody's integrity or unlawful
6   behavior, you know, that's of concern to me.  I
7   don't want to represent an organization that stands
8   for that.
9          So I would do what I could to support it.
10  I don't know who I would -- it depends on what it
11  is, testing -- you know, if a principal is doing it,
12  then we bring it to the executive director to look
13  into.
14       Q.   The grade falsification, I'm going to
15  share my screen with you, was the grade
16  falsification that you were describing at Stratford
17  High School?
18       A.   Yes.
19       Q.   And did it involve Dr. Michael Steel?
20       A.   Yes.
21       Q.   Okay.  Can you see my screen right now?
22       A.   Yes.
23       Q.   This says Investigative Summary Form at
24  the top, correct?
25       A.   Yes.
```

1     Q.   And it also says at the top right corner,

2  Submitted by Mary Ellen Zander, which was your

3  previous name, correct?

4     A.   Yes.

5     Q.   Does this look familiar to you, this

6  investigative summary form?

7     A.   Yes.

8     Q.   Did you draft this document?

9     A.   I did.

10    Q.   How did you get pulled into this

11  particular case, or this particular issue, rather,

12  because it seems a little outside your normal --

13    A.   I think it was -- I don't know how I got

14  pulled into it.  I don't know if I was directed to

15  support it.  I don't know if Dr. Cathey asked for

16  help and I assisted, because it was a pretty complex

17  situation.  I don't know how I got pulled into it, I

18  just ended up being pulled into it.

19    Q.   Sure.  This form, is this something that's

20  used in all investigations, this investigative

21  summary form?

22    A.   It was a template that was created by my

23  former boss that was utilized, but now we don't

24  utilize this form.

25    Q.   Why not?

1    A.   Because it was hard to follow, sometimes

2 it was more information than was necessary, so we

3 kind of tried to streamline our process and it's

4 more of a fact-finding summary.  It's hopefully

5 fewer pages than eight.

6    Q.   Did you conduct the actual investigation

7 into the allegations of grade falsification by

8 Michael Steele?

9    A.   I interviewed individuals with Dr. Cathey.

10 We both interviewed people together.  I think he led

11 them, I might have taken the notes.

12    Q.   At the top where it says, submitted by,

13 who did you submit this to?

14    A.   It would have been -- well, Dr. Cathey was

15 part of the investigation, but the recommendations

16 and everything would have gone to leadership over

17 Dr. Cathey, I think, or my boss.

18    Q.   Do you recall who that was at that time?

19    A.   No.

20    Q.   Okay.  I'm going to scroll down and show

21 you past the timeline.

22    A.   Yeah, that's my favorite part.

23    Q.   Are you -- sometimes it doesn't read on

24 the record, are you being sarcastic when you --

25    A.   Yes, I am.

1          Q.   I'm in control of the -- there you go.
2     When you say it's my favorite part, is it just
3     because it's long?
4          A.   Yes.  And detailed, and you're trying to
5     put things into perspective, like when things
6     occurred.
7          Q.   But you're making a joke?
8          A.   I was, I was.
9          Q.   So we've got a court reporter here and so
10    sometimes it's hard to tell.
11              Do you recall that the outcome of this
12    investigation was that Dr. Steele had a contract
13    with students that they would get certain grades
14    based on their effort as opposed to the actual
15    mastering of material?
16         A.   I recall something about something that
17    was signed.  I don't know that it definitively
18    substantiated Dr. Steele's direction to that nature.
19    I think it might have been one of the assistant
20    principals that was trying to organize something or
21    put things into some kind of sense or -- I don't
22    know if it led directly back to Dr. Steele or if it
23    led to an assistant principal.
24         Q.   Well, let me show you something on here.
25    Can you read this paragraph that I have highlighted

1    just to yourself and let me know when you've had a

2    chance to read it.

3         A.    Okay.

4         Q.    Does this help refresh your memory about

5    what happened?

6         A.    Yes.

7         Q.    Okay.  So what do you remember about this

8    situation regarding the contract?

9         A.    I remember seeing the contract.

10        Q.    Okay.

11        A.    Or seeing something that resembled a

12   contract.  I think when Dr. Steele asked that they

13   be approved to continue with the grading model, he

14   was denied.

15        Q.    Okay.  He called an edgenuity employee and

16   it said attempted to intimidate them into going

17   along with his scheme, correct?

18        A.    That's what it says.

19        Q.    Okay.  Under recommendations and

20   violations that occurred, it cites Tennessee Code

21   Annotated 39-14-136, correct?

22        A.    Yes.

23        Q.    Are you the person that determined that

24   this was a violation of this statute?

25        A.    I'm not sure.  I'm not intimately familiar

 1    with all the statutes, but I used that book as a

 2    reference and may have had some guidance from

 3    somebody in that arena.

 4         Q.   Okay.  And the recommendation was to

 5    follow the legal and policy requirements and

 6    misdemeanor up to and including reporting to the

 7    Tennessee Department of Education and termination,

 8    correct?

 9         A.   Yes.

10         Q.   Did you collaborate with Dr. Cathey on

11    this recommendation?

12         A.   I believe so.

13         Q.   And because you're the person that wrote

14    this, if -- do you have any reason to believe that

15    this is not accurate, this document?

16         A.   I believe it was accurate to the best of

17    our ability at the time.

18         Q.   If it's in this document, that would be

19    something that was the result of your investigation,

20    correct?

21         A.   Yes.

22         Q.   Okay.

23              MS. HARBISON:  I'd like to make this the

24    next-numbered exhibit.

25              MR. FOX:  No objection.

1                              (WHEREUPON, the

2                              previously-mentioned document was

3                              marked as Exhibit Number 6.)

4    BY MS. HARBISON:

5        Q.   Do you recall a law firm conducting an

6    investigation into human resources policies sometime

7    in late 2018, early 2019?

8        A.   Yes.

9        Q.   Do you recall that the outcome of that

10   investigation was that there were some human

11   resources practices, specifically regarding

12   investigations that were not adequate?

13       A.   I don't remember specifically the

14   findings.

15       Q.   Do you remember if anything was done after

16   that investigation concluded to change anything

17   within your department?

18       A.   I don't know.  I can't remember.  I know

19   that there was some adjustments staffing-wise, may

20   have supported the addition of somebody else in our

21   department, but I can't remember exactly all the

22   things.  I can't even remember the name of the

23   organization that did it.

24       Q.   Could it have been Bone McAllester?

25       A.   Yes, that's the name.

1      Q.   What staffing changes?

2      A.   I -- it impacted the structure of my

3 reporting, because they eliminated the person above

4 me, and I reported directly to the chief after that.

5 But that didn't happen right away, but it did happen

6 like within months of that reporting.

7      Q.   Who was eliminated?

8      A.   Sharon Pertiller.  She was executive

9 officer of HR.

10      Q.   Any other changes that you can think of

11 that happened as a result of that investigation?

12      A.   I don't remember.

13      Q.   Do you know if anyone was disciplined as a

14 result of that investigation?

15      A.   I don't know.  Like I said, I know that

16 Sharon's position was eliminated, I know that

17 Deborah Story retired around the same time.  She was

18 the chief HR officer.  Tony Majors came in as the

19 chief human resources officer, so there were some

20 adjustments, but specifically I can't remember, you

21 know, exactly what happened.

22      Q.   Going back to the doctor -- well, actually

23 let me ask this question first.  Was there any

24 training that you or anyone in your department

25 underwent after that investigation concluded?

1    A.   I can't think of any specific training

2  that we underwent.  It might have encouraged us to

3  do some professional development, but I can't

4  remember specifically.

5    Q.   Going back to the Dr. Steele issue, was

6  your role with regard to that issue simply as an

7  investigator?

8    A.   No, unfortunately not.  I was over the

9  high school, and so when there was a recommendation

10  for discipline, I also handled that.  I also had to

11  handle the reporting to the State, so I had multiple

12  pieces that I was responsible for.

13    Q.   How were you involved in the discipline?

14    A.   The recommendation comes to our department

15  for the discipline by the executive director or

16  maybe it was Dr. Cathey at the time, I can't

17  remember who made the recommendation for discipline,

18  and then we review the information to see if it's

19  adequate for the level of discipline requested.

20  Then I would bring that to my boss, which would be

21  at the time, either Ms. Pertiller or Mr. Majors --

22  Dr. Majors, and we would evaluate what would happen

23  based on the recommendation, and then it would go to

24  Dr. Battle to review, or whoever the director of

25  schools was at the time.

1    Q.   Do you remember what recommendation came

2  out of your office?

3    A.   No, not specifically.  I mean, we

4  recommend that it be addressed, whether it's

5  corrective or disciplinary action, the level, you

6  know.  At that time, I don't remember specifically

7  what was recommended.

8    Q.   Okay.  Do you know that Dr. Cathey

9  recommended that he be terminated due to the

10  seriousness of the violation?

11    A.   Actually I -- when you say that, I think I

12  recall him originally requesting termination.

13    Q.   Did he request that to your office?

14    A.   The letter would come to us, his

15  recommendation would come to us, but then ultimately

16  the director of schools makes the decision.

17    Q.   Were you present at the meeting between

18  Dr. Cathey and Dr. Battle where they discussed how

19  Dr. Steele would be disciplined?

20    A.   I don't remember if I was or wasn't.

21    Q.   Is that something that you would remember

22  because Dr. Battle was there?

23    A.   Well, part of our process back then was to

24  meet with Dr. Battle with the executive directors

25  and the principals if the principals were making the

1   recommendation, but that process has involved over

2   the years.  I'm not exactly sure when it changed.

3   So we don't directly interact with Dr. Battle.  It

4   pretty much goes through the chief, although, we

5   will draft documents and she'll review them, and if

6   she still has questions, then, you know, kind of

7   goes back and forth.

8         But I don't remember being in a meeting,

9   it doesn't mean I wasn't.

10     Q.   Okay.  Do you know that Dr. Battle did not

11   take Dr. Cathey's recommendation to terminate Dr.

12   Steele?

13     A.   Yes, because Dr. Steele is still working

14   for us.

15     Q.   Do you know that information from any

16   other source other than the fact that Dr. Steele is

17   still working for Metro?

18     A.   I think I might have had to been party to

19   the drafting of the sending of the documents related

20   to the discipline action, but I also was responsible

21   for reporting it to the State, too, yes, I would

22   know it through that process.

23     Q.   Okay.  And were you told what kind of

24   discipline he would have after Dr. Battle decided

25   not to terminate him?  Let me ask a better question.

1    Did you have any -- after Dr. Battle made the

2    decision not to terminate him, did you have any

3    input into how he would be disciplined in the

4    alternative?

5         A.    No.

6         Q.    Have you ever had to report someone to

7    the -- or have you ever had to report another

8    employee other than Dr. Steele for grade

9    falsification?

10        A.    No.  Other types of testing infractions,

11   yes.

12        Q.    Who does it get reported to?

13        A.    It's the State Board of Education

14   Licensure Division.

15        Q.    Do you recall who else you had to report

16   to the Board of Education for testing infractions?

17        A.    There was a teacher and -- not a proctor,

18   but the coordinator, the testing coordinator at a

19   school that was reported.  I believe it was last

20   year, but I can't remember the names.

21        Q.    Do you remember what the substance of the

22   infractions were?

23        A.    They allowed students to test remotely

24   when they weren't supposed to.  They went beyond the

25   limit of timeframes allotted for testing, and it

1    ended up being like 20 students' grades were voided,

2    so that resulted in discipline for two individuals

3    that I'm aware of.

4         Q.   But that wasn't related to falsification

5    of grades, correct?  It was --

6         A.   No.

7         Q.   Okay.  Are you aware of anyone else that

8    has had substantiated allegations of grade

9    falsifications other than Dr. Steele?

10        A.   No.

11        Q.   Okay.  Why did it fall to you to report

12   Dr. Steele to the Department of Education?

13        A.   It's our department's responsibility to

14   file the reports with the State.  We initiate the

15   reporting.  They're actually submitted by a director

16   of schools executive assistant, but we create the

17   document because we deal with the discipline, so

18   it's logical that they go hand in hand.

19        Q.   But that doesn't have to do with protected

20   classes?

21        A.   No, it doesn't, but it's part of our

22   function.

23        Q.   What other functions do you have that are

24   outside of investigating allegations related to

25   discrimination, harassment or retaliation related to

1     protected classes?

2         A.    So we -- we process admin leaves, which is

3     any time somebody is put on administrative leave, to

4     investigate whether it's a school level

5     investigation or our level of investigation, or, you

6     know, if it's an investigation that they're

7     conducting up in Dr. Changas' office, which has to

8     do with testing.

9             So we place them on administrative leave,

10    we move them from administrative leave for

11    certificated.  For support, we do the same, but the

12    supervisors for support employees can place them on

13    administrative leave for up to three days' leave.

14    We are the only ones who can extend it.  So we do

15    that.

16            We facilitate the discipline process, so

17    if somebody is recommending suspension, demotion or

18    termination, those come through our office.  We

19    review the documents to see if it's adequate to

20    support that level of discipline or if the offense

21    is egregious enough to warrant a level of

22    discipline.  We have interactive conversations with

23    our leadership, and then ultimately it's the leader

24    that determines the level they're going to

25    recommend, but if it's a certificated employee, it's

1    the director of schools that has to support those

2    decisions.

3        Q.   Okay.  Anything else?

4        A.   So discipline, investigations, I handled

5    second level grievance -- second level grievance,

6    and then I do some -- like if somebody has an injury

7    on duty and they appeal it, they appeal it to me.

8    Those aren't as frequent.  Grievances aren't as

9    frequent.

10            State board reporting, discipline, admin

11   leave.  We also facilitate training in our -- I

12   don't want to be sarcastic here, but like when we

13   can or when there's an opportunity, we like to take

14   advantage of and facilitate training to leaders,

15   whether it's regarding our processes, the

16   administrative leave process, the discipline

17   process, what we look for in terms of documentation

18   to support actions that we promote in a

19   developmental environment so that it's not a gotcha

20   environment.

21            You know, we try to help leaders support

22   the employees they have and develop the employees

23   they have versus just look to terminate.

24       Q.   You said a comment that you don't want to

25   be sarcastic, is what you were going to say is that

1  you really don't have time to do that type of

2  training?

3       A.   No.  I think we have to make time to do

4  that, because it's important and it's important that

5  we get in front of the leadership and have those

6  conversations, because that's the only time that

7  they really open up and ask questions that they

8  might be afraid to ask otherwise.

9            I think knowledge is power.  I think if

10  you give them knowledge, then they are better

11  equipped to handle situations that they're being

12  asked to handle at their level.

13       Q.   And that's to keep them from just

14  terminating someone, for example?

15       A.   We want to encourage people to retain

16  individuals that are obviously worthy of being

17  retained and develop people.  It's just a good

18  practice.  I mean, if you're in a developmental mode

19  and you develop people and you support people,

20  they'll be more successful, you'll be more

21  successful versus the other alternative.

22       Q.   You said earlier that there were rumors

23  that there were certain people that were

24  untouchable.  Who is rumored to be untouchable,

25  whether you have personal knowledge about the truth

```
 1   or the falsity of that or not?

 2              MR. FOX:  Objection to the form.

 3              THE WITNESS:  The only person that I heard

 4   that about was Dr. Braden.  Both Dr. Bradens,

 5   because they had been with the district for so long

 6   that they felt that their claims would not be looked

 7   into because they knew people, but that didn't

 8   necessarily protect them, because we still had to

 9   look into it.  I was not going to be deflected

10   because somebody said that they were protected

11   people.

12   BY MS. STEINER:

13        Q.   Is one of the people that was alleged to

14   have protected Dr. Braden, Dr. Battle?

15        A.   I don't know who they protected.  It was

16   just -- whether it was somebody on the board.  I

17   don't know.  I don't know.  I don't think Dr. Battle

18   was -- I don't remember what her role was at the

19   time that was all going on.

20        Q.   I want to make sure I'm clear on

21   something.  You testified earlier about scuttlebutt

22   or rumors about fear of retaliation.  My

23   understanding about your testimony was that you were

24   saying, if it's not in front of me, there is nothing

25   I can do about it; is that correct?
```

1     A.   If facts aren't presented that give me

2  some substance to look into, it's hard to just go

3  after a general feeling about something substantive

4  to go after.

5     Q.   Is it possible that people might be scared

6  to come and complain if the fear is that they're

7  going to be retaliated against if they do so?

8     A.   I believe that it creates an environment

9  of a cycle, cyclical thing where people are afraid

10  to talk, they don't talk.  It's not an environment

11  that I promote.  I'm always going to encourage

12  people to talk, because we can't fix anything if we

13  don't know about it.  I've never been deferred or

14  discouraged from looking into something because it

15  involved somebody that they felt might be, you know,

16  whatever.  I try to be as objective, fair-minded,

17  and to keep the static out when I'm looking into

18  things.

19     Q.   But it is possible that people may be

20  scared to complain because of this environment,

21  whether perceived or real, that they may be

22  retaliated against, correct?

23     A.   If people perceive that, if their fear is

24  real, then it probably does discourage them from

25  doing things, but I can't speak to how everybody

1    processes that.  If I were to tell you how many --

2    and I don't even know how many, but there is plenty

3    of people that come to us and complain and I

4    would -- I don't know, I mean, they say they fear

5    retaliation because they complain, so it's our job

6    from that point forward to ensure that they're not,

7    based on that situation.  But people complain.  I

8    don't know how real that is.  I haven't seen it of

9    late, let's put it that way.

10        Q.   Okay.  Let's narrow in a little bit, okay?

11   It is possible, based on your years of experience,

12   that if there is a culture that people are scared,

13   that if they complain they'll be retaliated against,

14   that there may be things that you don't know about

15   that is going on because they might be scared to

16   come to you to complain, right?

17        A.   That's probably a decent, speculative

18   assumption --

19        Q.   Okay.

20        A.   -- that I try not to make.

21        Q.   Whose job would it be within Metro to

22   investigate whether that is true or not?

23        A.   I don't know.  I mean, I don't know how --

24   I mean, I know that they've instituted some surveys,

25   anonymous surveys that have given avenue to some of

1   that.  I mean, I participated in some cultural

2   assessments of departments, but overall is there a

3   single unit that's responsible for that?  I don't

4   know.  I think that logically they would say it

5   resided in HR, but we aren't really structured so

6   that we have that kind of capability to do cultural

7   assessments of the population.

8       Q.   Do you even have the capacity to

9   investigate things like that, meaning things that

10  are not in front of you, based on facts coming from

11  a person that has come to complain?

12           MR. FOX:  Objection to the form.

13           THE WITNESS:  I think we would do our best

14  to investigate it, but I don't know.  Depends on

15  what is needed.  We have partnerships with the

16  different departments that help provide us with

17  data.  We don't do that ourselves.  There's an audit

18  department, so if there's financial things, there's

19  a testing department.  So if there's testing things,

20  we have relationships with different organizational

21  parts of the organization, so we would try to make

22  sure it resides in the right place if something is

23  addressing their concerns, but culturally when it's

24  something broad like that, I don't know where that

25  would reside.

1    BY MS. HARBISON:

2         Q.    Okay.  And to go back to my question, your

3    department probably would not have the capacity to

4    do anything about that because you only have three

5    investigators, correct?

6         A.    It would be very hard for us to.

7         Q.    Okay.  If someone complains about

8    retaliation, how do you determine whether or not

9    they've been retaliated against?

10        A.    Well, it depends on if it's lawful

11   retaliation or unlawful retaliation.  Like people

12   say they're retaliated against by being disciplined

13   or held accountable, but they're being held

14   accountable for a legitimate business reason.

15   That's not retaliation if there's a legitimate

16   business reason for the action taken.

17              Retaliation in terms of them participating

18   in an investigation and then all of a sudden there's

19   been some extra dose of correction or whatever, we

20   would look into that.

21              But if it's -- you know, they're saying,

22   I'm being harassed and they're saying they're being

23   harassed, but in actuality they're being held

24   accountable because they're not showing up to work

25   on time.  They say it's harassment, I say it's --

1    we're addressing your performance issues.  So we

2    have to make a determination when things come to us.

3        Q.   Okay.

4            MS. HARBISON:  I don't have any other

5    questions.

6            MS. STEINER:  Did you have something?

7            MR. FOX:  No.

8    REDIRECT EXAMINATION BY MS. STEINER:

9        Q.   When you said that you investigate the

10   discipline that's given to the principals, does that

11   include discipline for performance reasons?

12       A.   I process the discipline, I look over

13   documentation, I present that information to Dr.

14   Battle.  Ultimately, she decides what she can

15   support and what she can't.  She does expect us to

16   kind of look at consistency factors across the

17   district, so I think she processes things based on

18   things that we present to her, but we coordinate and

19   we administrate -- or coordinate is more likely an

20   accurate terminology.  We coordinate the gathering

21   of the evidence and we present it.

22       Q.   Okay.  So then if there is an issue with

23   the performance of a principal, your department

24   gathers the information and you coordinate and you

25   present it to Dr. Battle?

1     A.   Well, if it's for a principal, their

2  supervisor, their direct supervisor would be

3  presenting that case.  We're just the facilitator of

4  the processes in that regard.

5     Q.   Okay.  And as the facilitator, what do you

6  do?

7     A.   We pull the data, the documentation

8  together, the -- so say there's an executive

9  director that's making a recommendation for a

10  suspension, we ask them what levels of corrective

11  action or disciplinary action occurred prior, if

12  there's any other documents that they addressed for

13  performance issues, we'd ask for all the

14  documentation leading up to the point.  Or if they

15  did an investigation and their findings were such

16  that warranted significant action, we would just

17  pretty much pull all that stuff together, you know,

18  kind of coordinate whether or not there's a open DCS

19  case, whether or not law enforcement is

20  investigating, to just understand all the aspects of

21  it before it's presented to Dr. Battle.

22     Q.   And that includes job performance of

23  principals, correct?

24     A.   Yes.

25     Q.   Did you do that for Dr. Bailey's case?

1    A.    I did not.

2    Q.    Do you know of anyone in your department

3    who did an investigation, pulled everything together

4    and coordinated it for presentation to Dr. Battle?

5    A.    Well, that -- my understanding was that it

6    was a nonrenewal, so we're not involved in that.

7    That's handled by the HR manager hiring managers.

8    Q.    Okay.  And who is the hiring manager for

9    Dr. Bailey?

10    A.    I don't know who handled that.

11    Q.    So if you're recommending someone for

12    discipline, and that includes job performance, would

13    that be a nonrenewal for job performance?

14    A.    Yes.

15    Q.    Okay.  So then if someone is being

16    nonrenewed and it's job performance related, it

17    needs to go through your department?

18    A.    No. I'm sorry.  You misunderstood that.

19    If they're nonrenewals for job performance, those

20    are evaluated through the budgeting process.  You

21    know, they're suggesting somebody for nonrenewal.

22    They will ask if there are folks that have issues or

23    they'll ask us if we have documentation supporting a

24    nonrenewal for individuals, but other than that,

25    we're not involved in that process, the nonrenewal

1   process.

2          Eligibility, non-eligibility, usually if

3   it's a budget restructure, or say a closing of a

4   school, they would be eligible for rehire.  If it

5   was performance based, it's possible they would be

6   non-eligible for rehire.

7          Q.   If it's performance based and not eligible

8   for rehire, they've lost their job, correct?

9          A.   Correct.

10         Q.   Now, did anyone ask you for documentation

11  about Dr. Bailey?

12         A.   No.

13         Q.   Okay.  Have you looked in his employee

14  file by any chance?

15         A.   I have not.

16         Q.   Should documentation such as -- what

17  documentation would be available for a principal; do

18  you know?

19         A.   Well, I think their contracts, their

20  annual contracts, if there were performance issues

21  addressed, they should be there.  If there were --

22  what do they call it, individual IPPs, which are

23  individual performance plans, those would be there.

24  If they were involved in an investigation that

25  might -- like any kind of response letter might be

1　　there, or an admin leave, written reprimands, but

2　　all their hiring documents, all that kind of stuff

3　　is in there, too.

4　　　　Q.　So any written reprimand, any IPP, any

5　　oral counseling, any performance issues should be

6　　noted in their employee file?

7　　　　A.　Oral counselings may not reside in their

8　　employee personnel file.　They might just be in what

9　　we call a site file.　So they don't make it to the

10　　personnel file until it's a written reprimand or

11　　above.

12　　　　Q.　Okay.　But all these, the oral counseling

13　　actually is put into some sort of a written document

14　　form where you can add it to the file if it

15　　continues?

16　　　　A.　Yes.

17　　　　Q.　And all of these things that we've

18　　discussed, the IPP, the investigation, should all be

19　　put in the employee file?

20　　　　A.　Yes, in different sections.

21　　　　Q.　Okay.　And should an investigation of

22　　discrimination or harassment be put in the employee

23　　file?

24　　　　A.　The investigation itself would be in an

25　　investigative file.　It doesn't necessarily go in

1  the person's employee file.

2      Q.    Okay.

3      A.    Unless there's a response that goes in

4  their file.

5      Q.    Okay.  Now, when you're in one of those

6  time periods where you're getting a lot of different

7  complaints coming in, such as in the Braden matter,

8  do you feel a bit overwhelmed in your department?

9      A.    I think it's tense.  I think when there's

10  a lot of demands, anything that involves people and

11  knowing that when they're doing public records

12  request that people's lives will be impacted by

13  publication of information.  I think that's

14  stressful to me personally.

15      Q.    When you said in the Braden matter there

16  were -- it was expressed to you that some of the

17  employees thought Dr. Braden knew people and so they

18  couldn't complain against him, was that because they

19  felt they would be retaliated against?

20      A.    I think that people inferred that that's

21  what Dr. Braden would say to them to keep them from

22  complaining on him.  I don't know that -- I never

23  knew who he knew that would protect him.

24      Q.    Did you know that he was pretty close with

25  Dr. Battle?

1           MR. FOX:  Objection to the form.

2           THE WITNESS:  I don't know their history.

3  I believe they may have worked together.  She's been

4  with the district a long time, he was with the

5  district a long time, but I don't know that

6  relationship at all.

7  BY MS. STEINER:

8      Q.   Did you know that he taught her?

9      A.   No, I did not.

10     Q.   Did you know she had made statements that

11 he was not guilty of anything he was accused of?

12          MR. FOX:  Objection to the form.

13          THE WITNESS:  I would not know.

14 BY MS. STEINER:

15     Q.   Did your department do any sort of

16 investigation about whether or not the individuals

17 who complained about Braden had been retaliated

18 against?

19     A.   I believe that there were a multitude of

20 complaints regarding Dr. Braden.  And I'm not sure

21 if it went to retaliation or not.  I think it

22 possibly did, but I can't remember specifically.

23     Q.   Okay.

24          MS. STEINER:  That's all.

25           FURTHER THIS DEPONENT SAITH NOT

```
1                    REPORTER'S CERTIFICATION

2

3    STATE OF TENNESSEE      )
     COUNTY OF DAVIDSON      )
4

5

6        I, Janie W. Garland, LCR#111, licensed court

7    reporter, in and for the State of Tennessee do hereby

8    certify that the above deposition was reported by me

9    and that the foregoing pages of the transcript is a

10   true and accurate record to the best of my knowledge,

11   skills, and ability.

12

13       I further certify that I am not related to nor

14   an employee of counsel or any of the parties to the

15   action, nor am I in any way financially interested in

16   the outcome of this case.

17

18       I further certify that I am duly licensed by the

19   Tennessee Board of Court Reporting as a Licensed

20   Court Reporter as evidenced by the LCR number

21   following my name below.

22                                   Janie W. Garland

23                          _____

24                          Janie W. Garland, LCR#111

25
```

1

2                    **E R R A T A   P A G E**

3


4          I, Mary Ellen Zander, having read the
    foregoing deposition, Pages 1 through 132, do hereby
5   certify said testimony is a true and accurate
    transcript, with the following changes (if any):

6

7   PAGE    LINE            SHOULD HAVE BEEN

8   _____   _____    _____

9   _____   _____    _____

10  _____   _____    _____

11  _____   _____    _____

12  _____   _____    _____

13  _____   _____    _____

14  _____   _____    _____

15  _____   _____    _____

16  _____   _____    _____

17  _____   _____    _____

18  _____   _____    _____

19  _____   _____    _____

20

21                   _____

22                        Mary Ellen Zander

23

24

25

BY MS. HARBISON: [3] 96/11 110/4 124/1

BY MS. STEINER: [52] 13/15 14/6 21/20 22/2 22/24 23/20 25/6 25/21 28/3 31/23 32/16 34/7 35/21 37/5 39/20 39/25 40/7 40/14 40/19 41/22 43/9 44/1 48/9 48/21 50/11 55/6 59/3 59/16 60/1 60/7 65/8 67/10 68/10 69/13 70/5 71/8 71/18 72/16 74/20 76/24 80/8 81/16 85/8 85/18 86/4 87/14 90/6 93/21 95/6 120/12 131/7 131/14

MR. FOX: [53] 13/8 13/23 21/19 21/24 22/21 23/11 24/21 25/4 25/18 28/2 31/22 32/2 34/4 35/20 37/1 39/17 39/23 40/3 40/11 40/18 41/21 48/17 50/9 55/5 59/1 59/14 60/4 64/24 67/8 68/7 69/10 70/3 71/14 72/15 76/20 80/7 81/8 84/25 85/15 85/25 87/11 90/3 93/20 95/4 95/11 95/17 96/6 109/25 120/2 123/12 125/7 131/1 131/12

MS. HARBISON: [5] 59/21 59/24 95/15 109/23 125/4

MS. STEINER: [10] 39/24 40/5 43/22 74/11 84/19 85/23 85/14 95/14 125/6 131/24

THE WITNESS: [39] 13/9 13/24 21/25 22/22 23/12 24/22 25/5 25/9 25/19 32/3 34/5 37/2 39/18 40/12 48/18 59/2 59/23 60/5 64/25 67/9 68/8 69/11 70/4 71/7 71/15 76/21 81/9 85/1 85/16 86/1 87/12 90/4 95/5 95/12 96/7 120/3 123/13 131/2 131/13

## 0

01023 [1] 1/5

## 1

10 [3] 55/12 55/15 56/17
10 percent [9] 56/1 56/10 56/12 56/15 56/18 57/3 57/22 58/13 61/13
108 [1] 3/22
110 [1] 4/15
111 [2] 132/6 132/24
12,000-plus [1] 98/16
125 [1] 4/3
132 [1] 133/4
136 [1] 108/21
15 [3] 41/5 45/5 47/15
15th [7] 45/16 45/19 45/21 46/7 46/10 46/13 46/14
16 [1] 9/10
196300 [1] 3/23

## 2

20 [5] 4/8 4/12 4/14 16/25 116/1
2000 [1] 8/23
2006 [1] 10/21
2008 [1] 9/1
2017 [1] 8/15
2018 [13] 8/14 8/18 8/19 9/2 10/22 11/11 17/15 19/3 85/9 85/13 86/5 87/18 110/7
2019 [1] 110/7
2020 [22] 19/3 41/6 45/6 46/7 47/15 55/8 60/9 60/11 70/1 70/16 70/22 70/22 74/9 84/17 84/21 87/19 88/4 88/15 88/22 89/7 89/7 95/1

## 2022

2022 [2] 1/24 3/2
21st [1] 84/17
222 [1] 2/9
22nd [1] 8/19
2931 [1] 5/17

## 3

340M [1] 2/9
37201 [1] 2/9
37206 [2] 3/12 3/18
37219 [1] 3/23
39-14-136 [1] 108/21
3:20-CV-01023 [1] 1/5

## 4

40 [1] 62/11
40 percent [5] 55/20 55/25 63/1 63/1 64/22
43 [1] 4/6
48 [1] 4/8
4th [1] 84/21

## 5

5/4/20 [1] 4/12
5350 [1] 2/10

## 6

6/21/20 [1] 4/14
6/24/20 [1] 4/8
613 [1] 3/12
615 [1] 2/10
68251 [1] 3/18
6th [1] 6/5

## 7

714-5350 [1] 2/10
74 [1] 4/10

## 8

84 [1] 4/12
85 [1] 4/14

## 9

95 [1] 4/2

## A

ability [8] 21/2 21/12 68/22 69/2 73/22 102/4 109/17 132/11
able [3] 21/7 47/8 98/1
about [68] 7/3 7/24 8/1 8/9 8/10 8/12 8/20 9/10 10/17 11/22 11/25 12/16 14/12 24/1 24/15 29/18 33/5 35/23 36/18 37/21 39/14 43/23 45/7 48/10 48/12 50/21 50/21 51/6 51/25 53/25 55/10 55/12 56/5 57/22 59/12 67/25 69/21 74/10 80/15 82/13 83/1 84/5 86/12 96/19 96/25 99/8 100/12 102/12 102/18 103/16 103/20 107/16 108/4 108/7 119/25 120/4 120/21 120/22 120/23 120/25 121/3 121/13 122/14 124/4 124/7 128/11 131/16 131/17
above [3] 111/3 129/11 132/8
abuse [1] 17/5
accepted [2] 56/14 66/25
access [4] 47/1 47/5 60/20 102/5
acclimate [1] 97/16
accord [2] 37/15 65/5
accountable [3] 124/13 124/14 124/24
accurate [7] 19/24 98/19 109/15 109/16 125/20 132/10 133/5

accused [1] 131/11
across [2] 39/7 125/16
action [16] 7/6 13/14 21/9 32/8 32/19 41/14 46/12 50/19 73/12 113/5 114/20 124/16 126/11 126/11 126/16 132/15
actions [4] 22/6 36/24 87/23 118/18
active [1] 47/8
actively [1] 77/8
activity [10] 29/19 30/13 30/24 87/5 87/10 87/21 95/3 95/9 102/13 103/18
actual [4] 69/16 89/25 106/6 107/14
actuality [1] 124/23
actually [17] 10/2 16/20 17/23 29/12 36/12 38/1 39/13 44/8 53/10 86/15 98/18 99/12 102/24 111/22 113/11 116/15 129/13
ADA [1] 99/15
add [1] 129/14
addition [1] 110/20
additional [2] 98/7 98/25
address [7] 5/16 14/23 35/5 54/23 64/3 90/15 94/13
addressed [6] 64/16 75/2 81/11 113/4 126/12 128/21
addressing [2] 123/23 125/1
adequate [6] 73/5 73/8 91/7 110/12 112/19 117/19
adequately [2] 96/15 98/1
adjustments [2] 110/19 111/20
admin [5] 18/16 101/16 117/2 118/10 129/1
administering [1] 28/14
administrate [1] 125/19
administration [3] 38/21 89/24 93/13
administrative [18] 15/12 16/4 16/6 16/20 17/3 17/6 17/8 17/11 17/12 17/16 17/24 66/2 86/12 117/3 117/9 117/10 117/13 118/16
ADRIENNE [6] 1/7 1/13 1/21 22/20 23/1 23/5
advantage [1] 118/14
advocate [1] 90/11
affect [2] 14/14 14/15
affected [1] 95/2
affecting [1] 78/24
afraid [3] 19/21 119/8 121/9
after [15] 10/3 38/2 47/14 64/18 68/11 68/25 77/5 79/22 110/15 111/4 111/25 114/24 115/1 121/3 121/4
again [18] 5/21 20/23 22/23 24/17 27/18 29/3 30/18 34/11 34/24 50/21 56/3 58/4 58/9 70/12 79/7 81/1 86/1 87/24
against [64] 7/5 12/7 15/2 16/8 16/16 16/21 19/7 20/6 20/19 20/24 21/9 22/6 22/7 22/20 23/1 23/5 23/17 23/25 24/6 31/5 31/14 36/24 37/3 37/10 38/18 38/20 38/23 39/4 39/7 39/14 40/21 41/10 41/17 50/25 58/25 59/6 67/7 68/5 68/19 69/2 80/22 80/25 87/8 89/1 89/10 91/9 91/24 93/10 93/24 94/4 102/10 102/11 102/20 102/21 103/19 103/19 121/7 121/22 122/13 124/9 124/12 130/18 130/19 131/18
age [2] 41/9 42/2
agencies [1] 10/19
ago [2] 36/2 43/24
agree [6] 14/7 14/11 21/1 32/17 62/14 75/11
alert [1] 29/5

## A

all [47]  3/3 3/4 4/6 5/9 6/15 6/16 6/20 34/24 36/19 37/17 44/22 45/18 46/6 58/4 60/17 60/22 60/23 61/15 62/17 62/20 64/25 65/1 66/2 72/1 78/14 79/11 90/12 90/18 90/21 94/8 101/22 102/5 105/20 109/1 110/21 120/19 124/18 126/13 126/17 126/20 129/2 129/2 129/12 129/17 129/18 131/6 131/24
allegation [3]  17/5 20/5 38/22
allegations [5]  37/3 39/7 106/7 116/8 116/24
alleged [3]  17/21 30/9 120/13
alleges [2]  41/19 41/24
alleging [1]  50/19
allotted [1]  115/25
allow [1]  56/9
allowed [1]  115/23
almost [3]  55/20 63/1 64/22
along [1]  108/17
already [8]  44/21 46/11 46/12 46/14 68/19 71/1 86/5 99/18
also [12]  23/18 24/15 36/4 38/24 66/5 98/23 101/8 105/1 112/10 112/10 114/20 118/11
alter [1]  72/25
alternative [2]  115/4 119/21
although [3]  41/24 98/12 114/4
always [5]  14/4 65/6 90/11 101/9 121/11
am [13]  7/25 34/8 53/23 54/16 55/16 73/4 78/5 79/8 101/25 106/25 132/13 132/15 132/18
Amy [1]  35/17
Angela [2]  65/13 65/18
Ann [1]  3/10
Anna [1]  47/24
Annotated [1]  108/21
annual [2]  26/14 128/20
anonymous [1]  122/25
another [10]  17/21 26/21 26/22 26/23 27/21 37/15 55/11 74/6 82/6 115/7
answer [2]  21/25 23/9
answered [1]  99/18
answering [1]  23/8
anticipation [2]  20/11 20/13
any [83]  5/24 6/2 9/3 10/19 10/23 10/25 11/2 11/21 12/25 14/3 15/15 15/25 15/25 17/23 19/16 22/15 22/19 23/9 31/6 35/22 36/13 38/7 39/7 42/5 42/9 42/17 44/15 44/19 48/2 52/19 52/24 52/25 53/24 53/25 54/4 54/6 54/13 54/25 55/1 60/15 60/20 67/23 71/10 71/12 74/3 76/16 76/19 80/16 81/3 86/23 87/20 87/20 88/1 88/20 88/21 89/13 91/21 92/10 93/22 94/2 99/14 104/3 104/3 109/14 111/10 111/23 112/1 114/15 115/1 115/2 117/3 125/4 126/12 128/14 128/25 129/4 129/4 129/4 129/5 131/15 132/14 132/15 133/5
anybody [7]  12/4 12/9 12/12 12/21 40/22 64/16 92/9
anyone [29]  11/25 12/6 12/8 12/10 12/19 17/16 22/19 23/21 33/15 35/22 53/15 53/19 61/24 61/25 62/9 64/11 80/20 85/22 88/13 89/4 89/6 93/22 101/23 102/5 111/13 111/24 116/7 127/2 128/10

anything [31]  12/24 13/5 14/23 14/25 15/8 21/21 25/16 25/25 35/3 45/2 45/7 46/6 46/19 68/14 72/9 81/19 83/1 85/16 94/3 94/12 99/10 99/12 101/1 104/4 110/15 110/16 118/3 121/12 124/4 130/10 131/11
anywhere [1]  103/22
appeal [2]  118/7 118/7
APPEARANCES [1]  3/6
appears [1]  75/3
applicants [2]  78/7 78/9
applied [2]  58/18 58/22
applying [2]  33/19 66/7
apprised [1]  96/4
appropriate [2]  15/12 21/9
approval [1]  66/13
approved [2]  66/9 108/13
April [6]  19/2 69/25 70/1 70/16 70/21 71/3
are [61]  3/4 3/4 5/20 5/22 5/22 8/21 10/18 18/17 18/12 18/13 26/9 26/10 27/4 27/16 28/6 29/16 31/4 31/10 32/6 32/14 35/9 36/10 40/24 45/11 46/17 49/17 49/19 51/17 52/9 53/5 53/8 55/12 59/17 65/16 65/24 70/12 76/22 77/4 77/18 78/1 87/1 90/20 96/25 98/24 99/9 99/12 103/9 106/23 106/24 108/23 116/7 116/23 117/14 119/10 119/16 121/9 121/22 123/10 127/20 127/22 128/22
area [1]  103/13
areas [1]  65/24
aren't [6]  98/4 104/1 118/8 118/8 121/1 123/5
arena [1]  109/3
around [7]  44/24 44/25 51/19 81/14 90/24 91/3 111/17
arrived [1]  12/5
as [67]  3/3 3/4 5/2 5/3 13/16 14/23 15/5 20/3 27/7 29/2 29/7 29/12 31/19 32/6 33/12 33/17 34/2 34/16 44/20 45/16 46/7 46/8 47/15 47/20 48/8 49/20 49/21 51/5 52/25 55/7 55/19 57/6 64/7 64/20 65/21 68/19 71/9 73/15 74/19 75/21 80/12 83/17 84/19 84/24 85/6 86/11 86/19 97/7 97/9 100/9 100/9 100/19 107/14 109/1 110/3 111/11 111/13 111/18 112/6 118/8 118/8 121/16 126/5 128/16 130/7 132/19 132/20
ask [22]  20/22 22/22 24/17 33/20 34/11 42/5 44/14 51/15 68/8 82/19 83/12 93/12 102/7 111/23 114/25 119/7 119/8 126/10 126/13 127/22 127/23 128/10
asked [12]  8/1 29/20 29/22 30/3 40/13 44/21 51/17 82/22 100/5 105/15 108/12 119/12
asking [9]  24/7 29/10 34/5 43/19 88/6 90/4 92/1 92/2 98/14
asks [5]  18/8 42/12 84/18 86/21 101/19
aspects [1]  126/20
assess [4]  69/17 69/19 70/8 70/17
assessed [2]  70/20 71/11
assessing [1]  71/13
assessment [3]  70/2 70/7 94/24
assessments [3]  94/11 123/2 123/7
assigned [2]  65/24 81/24
assignment [2]  61/15 62/16
assist [1]  103/8

assistance [1]  70/13
assistant [9]  18/16 38/16 39/2 88/20 89/9 97/6 107/19 107/23 116/16
assisted [1]  105/16
Associates [1]  2/8
association [1]  33/25
assume [4]  25/22 52/22 79/2 90/25
assuming [2]  62/22 69/24
assumption [1]  122/18
assumptions [1]  62/19
assure [2]  14/16 94/3
asteiner [1]  3/13
atmosphere [2]  12/11 89/18
attack [1]  77/2
attempted [1]  108/16
attempts [4]  61/15 61/21 61/25 62/20
attention [14]  13/22 18/20 50/5 50/13 50/24 51/9 67/12 67/14 67/18 67/19 80/23 82/24 86/19 89/20
attorney [5]  3/11 3/17 18/15 22/8 32/23
audit [1]  123/17
August [2]  86/5 87/18
authorities [1]  21/13
available [6]  45/24 47/7 60/19 72/21 79/11 128/17
avenue [2]  2/9 122/25
aware [36]  6/1 8/6 14/20 15/8 18/22 18/24 18/25 19/15 19/17 23/13 33/10 37/12 37/16 37/19 37/23 39/13 40/15 53/23 54/16 55/12 55/18 55/22 55/23 67/2 67/4 71/2 73/4 77/9 77/11 78/5 83/19 83/22 85/9 85/19 116/3 116/7
away [2]  8/24 111/5

---

## B

B-A-T-E-Y [1]  18/9
bachelor's [1]  9/24
back [21]  22/14 30/21 33/2 35/5 43/14 43/17 43/18 43/23 44/19 44/22 57/16 68/23 71/10 74/7 100/4 107/22 111/22 112/5 113/23 114/7 124/2
background [2]  9/23 66/3
BAILEY [46]  1/16 3/8 4/8 4/12 15/7 19/1 19/5 19/17 19/20 20/18 21/16 21/22 22/10 22/11 22/18 24/5 24/19 25/13 25/17 25/20 31/19 31/25 32/24 33/1 41/5 41/8 42/7 42/10 46/8 47/15 68/17 69/20 70/14 73/15 74/2 75/2 75/4 75/20 77/6 84/21 85/12 85/22 86/14 89/15 127/9 128/11
Bailey's [9]  22/5 25/23 26/2 28/19 28/22 32/22 69/7 84/20 126/25
Barbara [1]  18/10
Barnes [14]  25/2 25/3 25/8 31/2 82/20 83/7 83/7 83/9 83/20 83/23 84/5 84/8 84/14 84/15
base [1]  91/15
based [16]  29/16 29/18 32/5 34/14 36/14 41/13 68/21 99/14 107/14 112/23 122/7 122/11 123/10 125/17 128/5 128/7
basically [6]  8/1 9/10 33/13 33/16 97/7 98/11
basis [4]  13/10 15/11 66/15 99/23
Batey [26]  18/8 18/19 19/2 19/5 19/10 24/5 24/15 26/5 48/24 49/3 49/9 50/8 50/16 50/18 51/8 52/1 52/6 52/7 52/22 54/20 56/3 62/2 69/20 69/23 69/24 71/2
Batey's [3]  50/4 50/13 50/24

**B**

BATTLE [60] 1/7 1/13 1/21 4/12 15/1 15/3 15/21 16/1 19/7 19/18 20/6 20/19 20/24 21/17 21/23 22/20 23/1 23/6 23/17 28/18 28/24 31/20 35/2 35/3 35/7 35/24 36/4 39/8 39/9 39/12 39/13 41/10 41/18 41/24 42/6 42/21 44/7 44/8 53/24 54/1 54/3 54/3 85/24 86/2 86/13 112/24 113/18 113/22 113/24 114/3 114/10 114/24 115/1 120/14 120/17 125/14 125/25 126/21 127/4 130/25
Battle's [1] 22/7
be [133] 10/1 14/18 15/2 15/13 15/21 15/22 16/13 16/16 16/16 18/22 18/24 19/6 19/24 20/24 21/7 22/10 23/14 23/25 26/4 26/9 27/3 27/5 27/13 27/17 27/21 30/16 31/1 32/5 32/8 32/9 32/11 32/12 32/20 34/25 35/2 36/2 39/15 40/20 43/7 44/9 45/22 46/22 46/22 47/8 47/11 48/1 49/20 49/21 53/21 54/23 56/15 56/18 56/21 57/10 58/7 61/13 61/15 62/20 64/1 67/12 69/6 71/15 71/16 72/2 74/15 75/3 75/17 76/17 77/16 79/11 79/14 79/23 81/21 82/7 87/8 89/19 89/20 91/9 91/24 91/25 92/2 92/7 93/9 93/24 94/4 96/21 98/1 100/21 101/6 102/15 102/23 103/18 108/13 109/18 112/20 113/4 113/9 113/19 115/3 118/12 118/25 119/8 119/20 119/20 119/24 120/6 120/9 121/5 121/7 121/15 121/16 121/19 121/21 122/13 122/14 122/15 122/21 124/6 126/2 127/13 128/4 128/5 128/17 128/21 128/23 128/25 129/5 129/8 129/18 129/22 129/24 130/12 130/19
beating [1] 31/20
became [4] 13/7 19/18 77/9 77/11
because [73] 15/3 19/7 19/9 20/20 22/6 31/11 33/25 37/16 37/21 39/3 39/16 42/21 43/16 44/6 45/17 46/21 47/25 48/23 49/13 50/25 56/17 56/24 58/24 59/6 60/18 62/15 62/24 63/11 64/9 65/10 67/6 67/19 68/15 72/1 73/17 74/7 75/8 76/5 78/22 83/1 85/22 85/23 94/13 95/10 98/10 102/1 102/11 103/20 103/23 104/3 105/12 105/16 106/1 107/3 109/13 111/3 113/22 114/13 116/17 119/4 119/6 120/5 120/7 120/18 121/10 121/12 121/14 121/20 122/5 122/15 124/4 124/24 130/18
becomes [2] 101/24 101/25
been [57] 15/7 5/25 8/20 13/21 14/13 15/17 16/22 16/24 17/15 20/6 20/8 24/15 29/10 29/20 30/1 30/3 35/6 37/13 46/14 47/24 50/20 52/1 52/2 54/12 55/25 62/4 62/7 63/2 63/6 67/13 67/14 68/18 69/1 71/1 73/20 75/8 77/2 77/10 79/9 80/23 81/2 86/18 87/18 89/14 89/15 98/8 103/19 106/14 107/19 110/24 114/18 120/5 121/13 124/9 124/19 131/3 131/17 133/7
before [16] 6/10 9/3 9/18 11/13 11/17 49/21 63/2 69/25 70/16 73/24 74/22 74/24 85/1 96/9 101/12 126/21
beginning [1] 96/2
behalf [2] 85/12 85/22
behavior [1] 104/6

being [38] 7/13 16/21 24/6 27/17 31/4 31/7 31/14 32/4 33/12 35/23 40/22 49/8 50/25 55/13 56/2 56/5 59/25 70/24 73/4 75/18 86/12 96/12 102/10 102/11 102/20 102/21 105/18 106/24 114/8 116/1 119/11 119/16 124/12 124/13 124/22 124/22 124/23 127/15
believe [47] 7/4 7/8 7/22 14/15 19/2 23/12 25/1 25/5 28/23 32/3 37/13 38/15 38/16 39/10 45/18 47/22 49/1 49/6 49/7 49/11 49/20 51/5 52/6 53/2 55/14 56/3 56/11 56/16 59/9 63/20 65/4 66/25 70/16 70/24 76/15 76/22 84/4 88/17 94/18 100/17 109/12 109/14 109/16 115/19 121/8 131/3 131/19
believed [1] 12/13
believes [1] 41/16
Belmont [1] 48/11
below [1] 132/21
besides [3] 17/22 22/18 45/6
best [5] 14/17 101/8 109/16 123/13 132/10
better [3] 98/21 114/25 119/10
between [3] 4/6 15/19 113/17
beyond [1] 115/24
Biggers [3] 18/11 18/11 18/15
Biggers-Matthews [1] 18/11
bit [7] 8/20 55/10 67/25 74/10 97/17 122/10 130/8
blew [1] 31/12
board [23] 35/4 35/8 35/9 35/10 35/11 35/14 35/18 35/23 36/1 36/5 36/13 42/22 44/6 44/8 47/23 66/4 74/12 94/7 115/13 115/16 118/10 120/16 132/19
Bone [1] 110/24
book [3] 56/21 60/23 109/1
born [1] 8/22
boss [12] 29/23 30/2 34/20 34/21 54/3 59/10 83/5 83/6 104/2 105/23 106/17 112/20
both [3] 16/11 106/10 120/4
bottom [1] 103/4
bought [2] 50/8 67/17
boundaries [1] 21/11
Box [2] 3/18 3/23
Braden [22] 36/11 36/17 36/20 36/23 38/8 38/9 38/19 38/24 39/4 39/8 39/15 89/1 100/17 100/25 120/4 120/14 130/7 130/15 130/17 130/21 131/17 131/20
Braden's [3] 37/8 37/22 38/23
Bradens [1] 120/4
break [5] 40/3 40/6 56/23 59/12 59/15
Brian [2] 79/25 80/3
Bridget [1] 57/25
Brief [2] 40/6 59/15
Briggs [1] 2/8
bring [6] 18/19 51/8 67/19 102/24 104/12 112/20
bringing [1] 39/3
brings [3] 18/17 20/21 54/17
broad [3] 26/20 94/14 123/24
Brooks [4] 3/21 6/25 7/1 8/16
brooks.fox [1] 3/24
brother [5] 15/3 15/4 19/9 20/20 22/7
brother's [1] 41/14
brought [22] 13/21 24/18 24/19 39/8 39/9 39/22 50/4 50/13 50/24 57/14 66/3 67/12 67/13 71/2 80/23 82/10

82/24 83/9 85/11 85/21 86/18 89/20
budget [5] 41/20 41/25 63/23 75/6 128/3
budgeting [1] 127/20
Buntin [1] 3/10
business [2] 124/14 124/16
buying [2] 5/20 5/22

**C**

calculate [1] 70/6
call [3] 49/24 128/22 129/9
called [3] 5/2 91/1 108/15
came [27] 13/16 15/7 22/3 36/18 37/25 38/6 40/16 49/9 52/6 57/6 76/7 86/19 88/5 88/8 88/10 88/14 91/16 92/22 93/14 94/6 97/10 97/11 100/19 102/7 102/8 111/18 113/1
can [61] 6/6 13/12 14/22 14/23 15/13 15/19 16/19 17/18 17/22 21/15 21/21 22/18 22/22 23/22 24/17 25/16 25/25 27/25 39/22 39/23 40/3 40/3 47/1 49/20 53/15 54/4 54/6 59/21 60/20 61/19 61/21 62/6 64/17 64/17 64/22 65/22 68/16 73/24 76/19 76/20 79/6 82/9 87/19 88/13 88/17 89/3 89/6 93/6 98/18 100/9 100/13 101/8 104/21 107/25 111/10 117/12 117/14 118/13 120/25 125/14 129/14
can't [42] 6/15 7/16 13/1 16/2 16/23 17/15 18/1 20/15 21/18 21/25 30/8 36/7 37/4 39/15 60/10 72/5 73/1 73/17 76/7 76/11 77/11 84/2 88/7 88/18 89/1 89/12 93/3 94/23 100/22 101/8 110/18 110/21 110/22 111/20 112/1 112/3 112/16 115/20 121/12 121/25 125/15 131/22
cancer [1] 77/1
candidate [1] 79/5
cannot [7] 17/14 25/19 54/8 57/13 59/5 67/24 87/8
capability [1] 123/6
capacity [3] 32/15 123/8 124/3
capped [1] 55/25
caption [1] 3/3
care [2] 45/1 93/5
career [1] 100/24
Carolina [1] 9/1
Carrasco [1] 11/17
case [29] 1/7 6/5 6/24 7/3 7/7 8/14 13/10 13/10 13/21 30/8 38/9 40/17 46/20 46/20 61/10 61/13 62/20 62/20 69/7 70/10 70/10 71/17 95/23 95/24 105/11 126/3 126/19 126/25 132/16
cases [7] 6/14 6/16 6/17 6/18 18/21 51/20 98/4
CATHEY [17] 1/17 3/15 23/15 80/20 81/5 95/23 95/25 102/25 103/3 105/15 106/9 106/14 106/17 109/10 112/16 113/8 113/18
Cathey's [1] 114/11
caused [1] 96/24
central [6] 59/5 65/19 67/11 90/24 90/25 91/3
certain [4] 16/2 23/3 107/13 119/23
certificate [2] 3/3 47/2
certificated [2] 117/11 117/25
certificates [1] 47/6
certification [2] 10/21 132/1
certifications [1] 10/23
certified [2] 10/8 10/18

## C

certify [4]  132/8 132/13 132/18 133/5
cetera [5]  32/12 32/13 70/9 70/9 99/16
Chad [4]  80/9 80/9 80/12 80/14
chair [8]  35/4 35/12 44/6 44/6 44/9
44/12 47/23 47/23
chairman [2]  35/8 42/22
chance [2]  108/2 128/14
Changas' [1]  117/7
change [7]  61/14 62/16 62/25 63/23
75/25 77/12 110/16
changed [2]  5/9 114/2
changes [4]  66/5 111/1 111/10 133/5
charge [6]  22/16 22/19 22/25 23/4 82/7
93/14
Charleston [1]  9/10
chief [9]  19/12 24/23 29/25 67/15 81/1
111/4 111/18 111/19 114/4
child [2]  17/6 48/16
childhood [1]  9/25
children [1]  48/13
choice [6]  55/8 55/19 60/15 61/12 62/5
64/20
choose [1]  26/15
Chris [1]  31/2
circumstance [1]  20/17
circumstances [4]  16/12 16/18 20/16
65/1
cites [1]  108/20
Civil [1]  3/2
claim [24]  7/4 8/4 16/8 16/15 17/13
17/25 31/16 31/25 32/24 33/1 38/17
38/20 49/5 50/17 52/25 53/20 53/20
80/18 80/22 80/25 82/10 82/12 98/18
104/3
claimed [4]  23/16 37/20 39/2 81/23
claiming [4]  16/7 22/5 29/1 55/24
claims [8]  12/7 12/17 14/9 17/4 17/10
17/10 53/25 120/6
clarification [4]  18/9 42/12 84/18 86/22
class [10]  14/3 29/16 30/16 49/8 54/9
90/21 98/10 98/21 99/21 102/14
classes [6]  99/5 99/9 99/14 99/17
116/20 117/1
classroom [1]  48/14
clear [1]  120/20
client [2]  56/5 56/6
client's [1]  45/2
close [1]  130/24
closely [2]  15/10 87/3
closing [1]  128/3
Coach [4]  31/20 85/24 86/2 86/13
Code [1]  108/20
collaborate [3]  103/25 104/1 109/10
collecting [1]  76/5
college [1]  10/3
come [21]  12/15 31/11 39/6 52/15
52/18 52/19 59/10 59/11 68/5 72/25
77/21 78/14 101/5 113/14 113/15
117/18 121/6 122/3 122/16 123/11
125/2
comes [10]  15/1 23/23 53/5 64/7 68/12
98/19 99/19 103/16 104/3 112/14
comfortable [1]  23/7
coming [6]  9/8 28/25 29/4 48/1 123/10
130/7
comment [1]  118/24
common [3]  90/24 91/3 91/6
communications [1]  101/21
community [1]  103/10

Compass [1]  47/7
compensation [5]  63/5 63/8 63/12
63/25 64/12
complain [10]  29/5 121/6 121/20 122/3
122/5 122/7 122/13 122/16 123/11
130/18
complained [9]  37/8 37/21 56/5 57/2
69/20 70/14 92/4 93/8 131/17
complaining [1]  130/22
complains [3]  64/18 103/16 124/7
complaint [62]  15/10 16/13 16/21 17/17
18/17 19/1 32/22 33/6 33/9 33/10
33/13 33/14 37/17 41/9 44/25 45/3
47/14 48/23 49/2 49/23 51/4 51/21
52/20 53/4 53/16 54/23 54/5 54/14
54/17 54/21 55/2 55/23 56/2 57/21
58/2 58/12 61/20 62/22 62/23 63/21
64/10 64/14 68/21 81/9 81/11 81/12
81/13 82/3 82/5 83/8 83/18 85/10
85/19 85/20 87/9 88/11 88/16 88/21
89/1 89/10 90/2 99/23
complaints [14]  15/25 29/15 30/23
37/12 39/3 39/7 39/14 51/1 72/18 81/4
86/24 102/3 130/7 131/20
complex [1]  105/16
compromises [1]  104/5
concept [1]  68/1
concern [14]  9/11 24/23 24/23 34/20
34/20 35/6 35/25 49/7 50/20 50/21
84/13 99/22 101/24 104/6
concerned [2]  71/15 101/25
concerning [1]  53/16
concerns [9]  13/10 30/10 31/12 35/22
87/25 94/6 94/12 102/3 123/23
concluded [3]  79/23 110/16 111/25
conclusion [1]  52/9
conditions [1]  32/9
conduct [2]  79/12 106/6
conducted [3]  35/24 52/4 86/12
conducting [2]  110/5 117/7
confident [1]  47/20
confidential [1]  101/7
confidentiality [1]  90/12
Congratulations [2]  5/14 95/22
Connecticut [6]  8/23 9/22 10/4 10/7
10/10 10/13
consider [1]  82/12
considered [5]  27/2 32/8 56/6 56/7
87/21
consistency [1]  125/16
consistent [1]  79/10
contact [8]  14/22 14/22 42/17 42/20
44/9 44/14 53/24 53/25
contacted [1]  63/7
continue [1]  108/13
continued [5]  75/24 79/25
continues [1]  129/15
contract [14]  7/9 26/13 26/14 26/15
27/7 27/8 27/16 28/19 28/22 89/14
107/12 108/8 108/9 108/12
contracts [2]  128/19 128/20
control [1]  107/1
conversation [1]  51/25
conversations [7]  27/23 27/24 28/1
28/23 43/18 117/22 119/6
converse [2]  42/20 44/3
conversed [1]  42/25
conversing [1]  47/25
coordinate [5]  125/18 125/19 125/20
125/24 126/18

coordinated [1]  127/4
coordinator [2]  115/18 115/18
copy [2]  45/3 74/6
corner [1]  105/1
correct [55]  6/7 12/25 13/5 19/23 21/3
24/8 24/12 26/1 27/10 29/15 31/5 33/7
36/25 38/3 41/6 41/10 41/13 41/15
46/2 49/15 51/2 56/20 61/17 62/18
63/19 68/11 68/20 69/3 69/3 69/9
76/14 78/24 86/6 90/16 90/25 91/14
91/18 92/16 92/20 93/18 96/5 97/22
104/24 105/3 108/17 108/21 109/8
109/20 116/5 120/25 121/22 124/5
126/23 128/8 128/9
correction [1]  124/19
corrective [4]  13/13 73/12 113/5 126/10
correspondence [1]  4/6
could [21]  5/5 12/4 26/21 29/10 30/1
32/20 43/2 43/22 48/4 56/21 56/23
56/23 58/23 67/1 67/5 74/9 77/10
78/23 90/12 104/9 110/24
couldn't [1]  130/18
counsel [3]  3/1 43/3 132/14
counseled [3]  54/25 64/2 64/13
counseling [4]  54/20 71/12 129/5
129/12
counselings [1]  129/7
COUNTY [5]  1/7 1/13 1/20 8/21 132/3
couple [2]  10/2 95/15
course [3]  92/18 92/23 104/4
court [13]  1/1 7/18 7/20 18/8 42/11
43/22 74/6 84/18 86/21 107/9 132/6
132/19 132/20
Courthouse [1]  3/22
covered [1]  30/16
create [1]  116/16
created [1]  105/22
creates [1]  121/8
Creek [5]  20/18 46/9 68/20 68/23 75/21
cultural [4]  14/5 94/11 123/1 123/6
culturally [1]  123/23
culture [1]  122/12
current [7]  35/12 60/6 61/12 61/16
61/22 62/1 62/21
cut [3]  45/16 58/16 64/22
cut-off [1]  45/16
CV [1]  1/5
cycle [1]  121/9
cyclical [1]  121/9

## D

D-E-N-E-T-R-A [1]  18/9
daily [2]  15/11 66/15
DAMON [5]  1/17 3/15 23/15 80/19
95/23
data [3]  75/23 123/17 126/7
date [5]  45/16 47/15 60/4 88/3 89/8
dated [1]  84/16
DAVIDSON [5]  1/7 1/13 1/20 8/21
132/3
day [2]  14/5 14/5
days' [1]  117/13
DCS [1]  126/18
deal [2]  85/23 116/17
dealing [4]  38/7 74/14 96/22 98/4
Deborah [1]  111/17
December [1]  6/5
December 6th [1]  6/5
decent [1]  122/17
decided [1]  114/24

**D**

decides [1] 125/14
decision [8] 46/14 65/2 72/24 73/3 95/10 99/3 113/16 115/2
decisions [1] 118/2
decline [1] 75/24
decrease [1] 57/22
decreased [1] 58/12
Defendants [4] 1/8 1/14 1/22 3/21
deferred [1] 121/13
definitely [1] 103/12
definition [1] 87/16
definitively [1] 107/17
deflated [1] 103/7
deflected [1] 120/9
Demand [1] 1/5
demands [1] 130/10
demoted [4] 37/9 37/20 39/2 63/22
demotion [7] 27/2 61/10 61/11 61/14 62/15 62/24 117/17
demotions [7] 26/25 28/15 59/19 61/2 61/6 61/9 74/14
Denetra [2] 18/8 18/13
denied [1] 108/14
department [71] 3/22 15/21 18/5 18/16 20/21 21/1 23/24 23/25 29/14 30/14 30/17 30/19 30/22 30/23 31/3 34/9 42/5 42/9 54/18 55/24 57/4 57/14 57/15 57/20 59/8 61/24 62/23 63/3 63/7 63/22 63/24 64/1 64/12 64/12 66/8 70/12 70/20 71/10 71/25 73/16 73/18 73/22 79/3 80/24 81/24 82/8 85/11 85/21 88/5 88/8 88/10 88/14 97/2 100/2 100/19 101/21 103/24 109/7 110/17 110/21 111/24 112/14 116/12 123/18 123/19 124/3 125/23 127/2 127/17 130/8 131/15
department's [1] 116/13
departments [3] 94/10 123/2 123/16
depend [1] 34/18
depending [7] 16/17 18/22 20/10 46/24 56/14 71/3 89/21
depends [15] 15/9 16/12 20/15 29/25 30/18 34/24 45/23 60/17 60/22 68/12 72/14 77/20 104/10 123/14 124/10
DEPONENT [1] 131/25
deposed [2] 5/3 40/23
deposing [1] 71/24
deposition [15] 1/24 3/1 3/3 6/10 6/21 7/21 22/4 33/5 40/10 48/5 49/25 72/6 96/2 132/8 133/4
depositions [1] 40/16
describing [1] 104/16
detailed [1] 107/4
detailing [1] 41/16
determination [1] 125/2
determine [1] 124/8
determined [1] 108/23
determines [1] 117/24
develop [3] 118/22 119/17 119/19
development [3] 61/15 62/16 112/3
developmental [2] 118/19 119/18
did [166]
didn't [22] 19/25 22/9 33/13 33/14 40/22 43/20 64/2 64/3 65/10 65/10 68/15 78/15 81/22 82/12 86/14 91/20 92/12 96/15 97/13 102/13 111/5 120/7
difference [1] 58/7
different [19] 17/7 26/17 27/10 28/12 29/25 30/22 63/16 63/18 78/22 79/15

79/17 81/2 94/10 97/12 98/13 123/16 123/20 129/20 130/6
differently [2] 78/24 82/8
digital [1] 60/18
direct [3] 11/8 62/6 126/2
directed [1] 105/14
direction [1] 107/18
directly [4] 54/2 107/22 111/4 114/3
director [43] 7/25 8/9 9/17 11/7 11/13 11/14 11/16 11/20 13/7 13/17 16/22 19/8 19/19 26/16 28/5 30/20 33/12 33/18 34/3 34/17 57/5 57/19 60/15 62/5 63/10 63/15 64/20 72/22 72/24 73/2 80/13 80/15 81/6 86/8 86/19 103/10 104/12 112/15 112/24 113/16 116/15 118/11 126/19
director's [2] 79/19 80/21
directors [3] 66/14 78/2 113/24
disabilities [1] 9/21
disciplinary [4] 13/13 41/14 113/5 126/11
discipline [22] 15/4 19/9 20/20 112/10 112/13 112/15 112/17 112/19 114/20 114/24 116/2 116/17 117/16 117/20 117/22 118/4 118/10 118/16 125/10 125/11 125/12 127/12
disciplined [9] 31/20 32/5 55/1 64/1 64/13 111/13 113/19 115/3 124/12
disciplining [1] 54/20
discourage [1] 121/24
discouraged [1] 121/14
discover [1] 34/12
discovered [1] 33/23
discretion [1] 26/16
discrimination [35] 6/14 6/16 6/17 7/7 12/7 12/16 14/3 14/8 14/13 17/4 17/9 17/12 17/25 23/1 23/5 23/17 30/15 41/10 49/16 81/13 81/18 81/20 82/13 86/24 87/9 88/2 88/21 89/10 90/19 92/4 93/9 94/9 97/4 116/25 129/22
discriminatory [4] 49/14 49/20 50/6 50/15
discuss [6] 18/21 25/12 51/19 51/21 59/9 76/17
discussed [4] 74/14 83/14 113/18 129/18
discussing [1] 25/10
discussion [1] 25/15
discussions [1] 11/21
displacements [2] 59/20 61/3
dispute [1] 60/16
district [37] 1/1 1/1 7/5 7/9 7/10 8/3 8/14 8/17 12/7 27/5 27/15 33/25 34/1 37/14 38/24 58/25 59/7 65/18 65/20 65/25 66/18 66/24 67/7 76/14 77/25 79/10 94/24 96/5 96/18 97/5 97/14 97/15 101/20 120/5 125/17 131/4 131/5
district's [3] 41/19 41/25 75/5
division [1] 1/2 98/24 115/14
do [228]
doctor [1] 111/22
document [15] 39/21 48/7 59/18 73/23 73/25 74/18 84/17 84/23 85/5 105/8 109/15 109/18 110/2 116/17 129/13
documentation [17] 53/6 72/20 73/6 73/9 73/14 73/17 77/15 77/17 77/25 118/17 125/13 126/7 126/14 127/23 128/10 128/16 128/17
documented [1] 74/3

documents [10] 8/1 43/6 76/9 77/18 77/22 114/5 114/19 117/19 126/12 129/2
DOE [33] 1/3 3/9 49/24 50/1 50/4 50/10 50/13 50/16 50/17 50/24 52/25 54/18 55/18 56/4 57/2 57/2 57/8 57/12 57/21 58/1 58/18 60/9 60/13 61/19 62/5 62/10 62/23 63/21 64/17 64/18 65/9 67/6
Doe's [10] 51/21 52/20 53/16 54/4 54/14 55/2 55/7 58/11 64/14 65/12
does [27] 21/2 23/25 27/18 28/16 30/6 30/22 46/2 47/5 47/10 57/14 57/25 59/7 68/4 73/21 75/4 75/8 75/11 75/13 97/23 98/22 101/13 105/5 108/4 115/12 121/24 125/10 125/15
doesn't [15] 15/6 31/1 32/13 54/11 63/24 63/24 73/18 81/21 89/16 99/20 106/23 114/9 116/19 116/21 129/25
doing [8] 13/5 32/1 32/13 71/16 94/3 104/11 121/25 130/11
don't [165]
done [13] 12/24 13/1 13/3 19/10 24/15 25/16 34/2 45/19 62/4 64/4 67/20 94/11 110/15
Donna [2] 5/17 6/7
dose [1] 124/19
down [3] 9/22 13/6 106/20
dozen [1] 6/13
DR [117] 1/7 1/9 1/13 1/16 1/16 1/17 1/21 3/8 3/8 3/9 3/15 4/8 4/12 4/12 15/1 15/3 15/20 16/1 19/7 19/17 19/18 20/6 20/19 20/24 21/16 21/17 21/22 22/7 23/17 25/3 28/18 28/19 28/24 31/25 33/8 33/11 33/21 35/2 35/3 35/7 35/24 36/3 39/8 39/9 39/12 39/13 41/8 41/10 41/18 41/24 42/6 42/21 44/7 44/8 46/7 53/24 53/25 54/2 54/3 74/2 76/4 76/13 80/19 81/4 81/4 81/5 81/12 82/5 82/10 83/8 83/18 84/7 84/8 85/12 85/21 86/14 93/16 95/22 95/24 102/25 103/2 105/15 106/9 106/14 106/17 107/12 107/22 108/12 109/10 112/16 112/24 113/8 113/18 113/18 113/22 113/24 114/4 114/10 114/11 114/11 114/13 114/16 114/24 115/1 115/8 116/9 116/12 120/14 120/14 120/17 125/13 125/25 126/21 127/4 127/19 130/25
Dr. [74] 15/7 19/5 19/20 20/18 21/22 22/5 22/10 22/11 22/18 24/5 24/19 25/2 25/8 25/13 25/17 25/20 25/23 26/2 28/20 28/22 31/19 32/22 32/24 33/1 36/20 36/23 37/8 38/19 38/23 39/8 41/5 42/7 42/10 47/15 68/17 69/7 69/20 70/14 73/15 75/2 75/4 75/20 77/6 77/10 82/20 83/7 83/9 83/20 83/23 84/5 84/8 84/14 84/15 84/20 84/21 85/12 85/22 89/1 89/15 89/25 93/17 104/19 107/18 112/5 112/22 113/19 117/7 120/4 120/4 126/25 128/1 130/17 130/21 131/10
Dr. Bailey [33] 15/7 19/5 19/20 20/18 21/22 22/10 22/11 22/18 24/5 24/19 25/13 25/17 25/20 31/19 32/24 33/1 41/5 42/7 42/10 47/15 68/17 69/20 70/14 73/15 75/2 75/4 75/20 77/6 84/21 85/12 85/22 89/15 128/11
Dr. Bailey's [8] 22/5 25/23 26/2 28/22 32/22 69/7 84/20 126/25

**D**

Dr. Barnes [11]  25/2 25/8 82/20 83/7
83/9 83/20 83/23 84/5 84/8 84/14
84/15
Dr. Braden [7]  36/20 36/23 39/8 120/4
130/17 130/21 131/20
Dr. Braden's [2]  37/8 38/23
Dr. Bradens [1]  120/4
Dr. Changas' [1]  117/7
Dr. Joseph [2]  89/25 93/17
Dr. Majors [1]  112/22
Dr. Mells [1]  77/10
Dr. Michael [1]  104/19
Dr. Sam [1]  38/19
Dr. Sharon [2]  28/20 89/1
Dr. Steele [2]  112/5 113/19
Dr. Steele's [1]  107/18
draft [2]  105/8 114/5
drafting [1]  114/19
Drive [2]  5/17 6/7
dropped [1]  56/17
due [13]  16/20 17/11 17/12 17/17
17/24 30/9 41/19 41/25 63/22 63/23
75/5 76/22 113/9
duly [2]  5/2 132/18
during [2]  92/23 101/2
duties [2]  28/17 38/7
duty [16]  20/3 24/1 24/7 24/10 27/19
28/13 54/20 57/15 58/1 59/7 63/3 63/4
82/23 83/1 86/23 118/7

**E**

e-mail [11]  4/6 4/8 41/1 41/4 41/23
42/24 45/5 45/7 45/9 46/7 84/3
e-mails [6]  42/25 43/2 43/10 43/13
44/19 44/22
each [2]  60/19 78/12
earlier [2]  119/22 120/21
early [3]  9/24 39/14 110/7
ebbs [1]  98/5
edgenuity [1]  108/15
education [7]  9/25 35/11 49/18 109/7
115/13 115/16 116/12
educational [1]  9/23
EEOC [2]  82/7 86/25
effect [1]  60/14
effort [1]  107/14
egregious [1]  117/21
eight [1]  106/5
either [8]  6/6 18/18 65/14 71/20 73/11
89/8 98/3 112/21
electronic [2]  60/19 60/22
elementary [1]  46/23
eligibility [2]  128/2 128/2
eligible [3]  128/4 128/6 128/7
eliminate [1]  65/2
eliminated [9]  55/8 64/21 75/9 75/10
75/16 75/18 111/3 111/7 111/16
ELLEN [8]  1/24 3/1 5/1 5/7 5/8 105/2
133/4 133/22
else [25]  16/14 22/19 22/25 23/21 31/2
33/15 36/4 36/6 40/22 44/18 45/7 52/2
54/21 71/24 72/25 77/2 80/20 85/22
89/4 101/1 103/23 110/20 115/15
116/7 118/3
empathize [2]  65/6 65/9
employee [49]  4/10 7/25 8/8 11/16 13/7
13/16 14/2 16/22 17/24 18/13 23/23
28/5 29/13 31/3 31/6 31/11 34/3 34/14
34/15 34/16 47/1 55/1 57/16 57/19
59/7 61/12 63/11 66/7 67/18 73/11
82/25 86/8 86/20 94/16 94/22 97/12
97/12 98/12 102/8 108/15 115/8
117/25 128/13 129/6 129/8 129/19
129/22 130/1 132/14
employee's [2]  33/24 61/12
employees [25]  12/14 14/7 14/11 16/19
18/3 18/5 21/2 28/8 44/15 45/11 47/6
52/9 65/20 66/5 69/1 71/12 87/24
94/12 94/21 95/2 98/16 117/12 118/22
118/22 130/17
employment [7]  7/6 32/7 32/10
enable [1]  98/10
encountered [3]  96/15 96/16 100/24
encourage [3]  73/25 119/15 121/11
encouraged [1]  112/2
end [12]  7/1 8/15 38/1 38/6 62/17
70/22 70/25 87/19 88/4 88/15 88/22
89/7
ended [4]  80/3 80/10 105/18 116/1
enforcement [1]  126/19
engaged [3]  36/23 87/20 95/3
engaging [2]  28/6 87/8
enough [3]  65/5 98/17 117/21
ensure [4]  13/11 73/5 90/11 122/6
entered [1]  99/13
entire [1]  94/24
entitled [2]  61/1 65/3
environment [20]  12/1 21/7 21/14 34/2
34/16 90/18 92/5 94/8 94/15 94/18
94/22 96/22 96/24 101/10 101/12
118/19 118/20 121/8 121/10 121/20
equal [1]  26/23
equipped [1]  119/11
et [5]  32/12 32/13 70/9 70/9 99/16
ethnicity [1]  99/13
evaluate [3]  70/11 73/19 112/22
evaluated [1]  127/20
even [12]  13/19 15/18 26/2 33/6 35/5
36/21 40/12 81/21 82/19 110/22 122/2
123/8
Eventually [1]  72/12
ever [18]  6/9 12/19 12/21 14/25 19/14
39/6 39/18 49/22 64/12 69/19 70/20
71/11 74/21 74/23 81/7 101/23 115/6
115/7
every [3]  26/14 98/18 101/3
everybody [1]  121/25
everything [9]  12/5 13/11 21/15 46/20
70/10 97/15 100/22 106/16 127/3
evidence [3]  13/20 125/21
evidenced [1]  132/20
exactly [16]  7/16 8/10 16/23 19/20
46/24 50/7 51/3 60/11 60/12 66/12
77/9 83/13 84/11 110/21 111/21 114/2
Examination [6]  4/2 4/2 4/3 5/4 95/18
125/8
example [2]  102/16 119/14
except [1]  3/4
Excuse [1]  80/6
executive [19]  11/20 33/12 33/18 63/10
63/14 66/13 78/2 79/18 80/13 80/14
80/21 81/6 103/10 104/12 111/8
112/15 113/24 116/16 126/8
exhibit [15]  43/8 44/20 44/23 48/4 48/8
74/8 74/16 74/16 74/19 84/20 84/24
85/3 85/7 109/24 110/3
EXHIBITS [1]  4/5
existed [3]  12/11 12/20 13/6
existence [1]  60/9

**F**

expect [2]  28/4 125/15
expecting [1]  68/13
experience [4]  9/3 91/21 97/11 122/11
expertise [1]  103/14
expressed [1]  130/16
extend [1]  117/14
extra [1]  124/19

**F**

face [2]  53/11 53/11
facets [1]  97/12
facilitate [4]  66/6 117/16 118/11 118/14
facilitator [2]  126/3 126/5
fact [7]  18/25 19/17 91/25 92/2 97/1
106/4 114/16
fact-finding [1]  106/4
factors [2]  32/7 125/16
facts [2]  121/1 123/10
factual [2]  90/8 91/11
fair [2]  37/7 121/16
fair-minded [1]  121/16
fall [4]  28/16 30/4 30/7 116/11
falsification [6]  102/19 104/14 104/16
106/7 115/9 116/4
falsifications [1]  116/9
falsified [1]  103/5
falsifying [1]  102/17
falsity [1]  120/1
familiar [4]  50/22 97/14 105/5 108/25
family [1]  9/25
famine [1]  98/2
far [1]  100/9
farmed [1]  81/2
fault [1]  103/5
favorite [2]  106/22 107/2
fear [49]  12/11 12/20 12/25 13/6 13/17
14/13 18/18 19/1 19/18 20/19 24/16
24/19 25/13 25/24 26/3 29/1 29/6
40/10 40/17 40/24 67/19 68/1 68/2
69/14 69/25 70/15 85/10 85/20 86/15
86/15 89/18 89/21 90/1 91/4 91/14
91/22 92/3 92/11 92/19 93/18 93/23
94/16 94/22 102/19 104/4 120/22
121/6 121/23 122/4
feared [5]  85/23 91/16 92/24 93/11
102/9
feast [1]  98/2
federal [3]  3/2 7/18 7/22
feel [4]  65/3 65/4 98/18 130/8
feeling [1]  121/3
felt [7]  31/13 50/5 51/5 91/19 120/6
121/15 130/19
few [1]  100/21
fewer [1]  106/5
field [1]  101/21
file [20]  25/23 26/1 32/23 68/8 88/11
88/16 101/17 101/17 116/14 128/14
129/6 129/8 129/9 129/10 129/14
129/19 129/23 129/25 130/1 130/4
filed [19]  4/6 8/7 16/16 16/21 22/15
37/10 37/12 37/17 43/7 48/24 49/2
55/17 55/23 56/3 57/9 82/7 86/24 89/9
102/3
files [4]  15/10 16/13 51/14 101/16
filing [2]  7/4 88/25
financial [1]  123/18
financially [1]  132/15
find [12]  6/6 15/11 42/6 42/10 42/18
47/5 61/25 71/10 72/14 73/20 77/19
99/23

**F**

finding [1]  106/4
findings [6]  36/14 39/10 42/22 47/21
  110/14 126/15
fine [2]  40/5 59/14
finishing [1]  36/21
fire [1]  97/8
firm [1]  110/5
first [8]  5/2 37/18 59/24 74/13 100/5
  100/7 100/10 111/23
five [2]  59/13 95/23
fix [1]  121/12
flaws [1]  33/16
flows [1]  98/5
focus [1]  90/20
fodder [2]  101/24 102/1
folks [5]  23/18 37/11 127/22
follow [5]  42/19 48/3 64/2 106/1 109/5
follow-up [1]  48/3
followed [1]  66/3
following [2]  132/21 133/5
follows [1]  5/3
Ford [1]  3/16
foregoing [2]  132/9 133/4
forgive [1]  99/19
form [49]  3/4 4/15 13/8 13/23 21/19
  21/24 22/21 23/11 24/21 25/4 25/18
  28/2 32/2 34/4 35/20 37/1 39/17 40/11
  40/18 48/17 55/5 59/1 64/24 67/8 68/7
  69/10 70/3 71/14 72/15 80/7 81/8
  85/15 85/25 87/11 90/3 93/20 95/4
  95/11 96/6 104/23 105/6 105/19
  105/21 105/24 120/2 123/12 129/14
  131/1 131/12
formal [1]  41/9
formalities [1]  3/3
formed [1]  99/2
former [3]  65/17 65/19 105/23
forms [2]  90/18 94/8
forth [7]  39/3 43/14 43/18 43/18 44/19
  44/22 114/7
forward [1]  122/6
foster [2]  90/17 94/8
found [2]  21/9 35/1
four [2]  18/6 29/25
fourth [1]  41/23
Fox [1]  3/21
frame [1]  44/24
Frank [2]  11/9 18/10
free [2]  90/18 94/8
frequent [3]  104/1 118/8 118/9
frequently [2]  55/16 92/25
Frogge [1]  35/17
front [4]  49/22 119/5 120/24 123/10
full [1]  5/5
function [1]  116/22
functions [1]  116/23
funds [1]  31/21
further [3]  131/25 132/13 132/18
future [2]  5/25 6/3

**G**

Garcia [1]  33/21
GARLAND [3]  2/8 132/6 132/24
gathering [1]  125/20
gathers [1]  125/24
gave [2]  13/20 13/20
gender [1]  99/16
general [4]  30/12 94/23 96/9 121/3
generally [2]  65/22 93/1

George [1]  6/25
get [16]  10/12 14/4 19/8 26/24 65/10
  66/9 74/6 97/9 98/3 101/15 102/25
  103/4 105/10 107/13 115/12 119/5
getting [5]  5/9 47/14 130/6
give [9]  16/23 31/8 40/16 42/20 53/11
  90/13 102/16 119/10 121/1
given [6]  6/9 14/21 42/6 82/17 122/25
  122/25
Gloria [3]  65/13 65/17 66/23
go [29]  11/10 17/3 21/13 22/14 24/5
  30/21 33/2 36/8 42/22 44/9 45/12
  46/17 49/22 52/8 52/9 59/24 63/10
  67/15 73/22 82/3 100/4 107/1 112/23
  116/18 121/2 121/4 124/2 127/17
  129/25
goes [5]  27/24 99/15 114/4 114/7 130/3
going [59]  10/1 12/1 12/5 15/2 19/6
  19/22 19/25 20/1 20/2 20/4 20/19 22/9
  23/24 27/17 27/21 28/8 36/13 36/17
  43/13 43/17 43/18 44/19 44/22 45/22
  49/24 56/22 56/24 59/17 59/17 60/25
  62/17 71/10 72/5 72/25 74/6 74/15
  77/2 78/3 79/12 88/2 96/18 98/23
  100/6 100/16 100/22 101/2 103/18
  104/14 106/20 108/16 111/22 112/5
  117/24 118/25 120/9 120/19 121/7
  121/11 122/15
gone [3]  19/5 82/1 106/16
good [3]  46/22 94/15 119/17
got [21]  5/8 10/21 11/23 11/24 37/18
  45/5 48/2 74/12 77/5 87/17 88/3 88/15
  88/22 96/9 96/14 99/6 99/20 101/5
  105/13 105/17 107/9
gotcha [1]  118/19
gotten [1]  98/7
GOVERNMENT [3]  1/6 1/12 1/19
grade [9]  39/16 56/12 56/16 56/25
  104/14 104/15 106/7 115/8 116/8
grades [10]  56/13 56/18 102/18 102/19
  103/5 103/6 103/9 107/13 116/1 116/5
grading [1]  108/13
grateful [1]  98/8
greater [1]  56/18
grievance [7]  55/17 57/6 57/8 57/9 64/8
  118/5 118/5
Grievances [1]  118/8
Griffin [3]  28/21 76/4 76/13
gross [1]  36/23
grounds [1]  20/23
group [4]  42/2 90/20 99/1 103/12
guarantee [2]  27/6 101/9
guaranteed [2]  27/5 27/14
guidance [3]  19/13 77/16 109/2
guide [1]  98/12
guided [1]  79/8
guilty [2]  39/15 131/11

**H**

had [65]  8/13 10/20 12/15 19/5 19/18
  19/22 20/6 20/11 22/15 23/16 25/1
  26/3 29/1 29/2 30/3 34/1 36/1 36/20
  36/23 37/8 37/21 42/18 42/21 43/17
  43/19 44/19 51/4 55/24 56/5 58/24
  60/14 61/20 61/20 62/4 63/2 68/19
  69/25 70/15 74/2 77/1 81/23 84/12
  90/4 95/2 97/6 97/16 97/18 100/20
  100/23 103/1 103/2 107/12 108/1
  109/2 112/10 112/11 114/18 115/6
  115/7 115/15 116/8 120/5 120/8

131/10 131/17
Half [1]  6/13
hand [5]  39/21 74/5 84/16 116/18
  116/18
handbook [7]  4/10 56/19 60/2 60/3
  60/6 60/18 74/13
handle [13]  15/22 19/13 46/3 57/5 57/7
  57/7 58/5 65/22 101/13 104/2 112/11
  119/11 119/12
handled [13]  9/9 28/11 30/13 52/22
  56/3 65/19 82/7 87/1 103/9 112/10
  118/4 127/7 127/10
handling [1]  52/17
happen [5]  33/15 68/15 111/5 111/5
  112/22
happened [8]  36/12 42/18 58/11 68/16
  68/18 108/5 111/11 111/21
happening [6]  36/19 37/18 100/10
  100/15 100/18 102/12
happens [5]  14/23 20/14 20/21 21/10
  68/11
harassed [3]  17/21 124/22 124/23
harasser [1]  16/6
harassment [21]  11/5 14/3 14/8 14/13
  16/7 17/4 17/17 30/15 36/9 36/24 37/9
  49/16 82/13 90/19 94/9 97/4 99/13
  99/14 116/25 124/25 129/22
Harbison [6]  3/16 3/17 4/2 59/17 95/18
  96/1
hard [5]  65/5 106/1 107/10 121/2 124/6
has [35]  13/24 20/18 22/19 22/25 34/10
  34/15 35/3 37/13 45/2 47/1 47/1 56/25
  59/6 64/19 67/23 73/20 74/7 75/4 75/8
  75/15 76/13 76/16 76/19 76/21 89/14
  101/23 102/5 104/3 114/1 114/6 116/8
  117/7 118/1 118/6 123/11
hasn't [1]  89/16
hate [1]  52/22
have [221]
haven't [1]  122/8
having [10]  5/2 15/4 25/15 51/25 81/20
  85/23 94/6 94/7 99/12 133/4
he [82]  7/4 7/4 7/9 7/10 7/11 7/12 7/12
  7/14 7/16 8/4 8/4 8/7 8/24 11/23 18/15
  20/18 20/20 22/5 22/5 22/15 26/3 29/1
  29/2 29/6 31/19 33/6 36/12 36/20 38/1
  38/2 38/15 38/16 38/17 38/20 38/20
  38/22 39/2 39/15 39/16 41/12 41/16
  41/17 42/19 43/11 43/19 44/3 44/5
  44/14 44/16 46/10 46/10 46/13 47/20
  68/19 69/22 69/23 69/24 69/25 70/1
  70/14 70/15 70/16 71/2 71/2 71/3
  83/15 85/22 86/13 103/10 106/10
  108/13 108/15 113/9 113/13 114/24
  115/3 130/23 130/24 131/4 131/8
  131/11 131/11
head [3]  29/12 66/8 89/5
health [5]  76/16 76/19 76/22 76/23 77/4
healthy [2]  94/18 94/22
hear [12]  48/10 79/6 91/13 91/22 92/1
  92/3 92/9 92/9 92/14 92/19 93/1 93/22
heard [10]  91/17 91/19 92/6 92/12
  92/17 92/25 93/3 93/8 93/12 120/3
hearing [4]  3/4 86/12 91/11 94/1
heart [2]  77/2 102/1
hectic [6]  96/20 96/22 96/24 100/6
  100/15 101/2
held [3]  124/13 124/13 124/23
help [7]  58/6 98/10 98/12 105/16 108/4
  118/21 123/16

**H**

her [55]  15/3 15/4 15/9 20/20 33/17 33/17 33/25 34/14 41/14 48/1 49/7 49/24 50/14 50/17 50/19 50/20 50/21 50/21 51/1 51/5 51/6 51/6 51/10 55/19 55/21 56/6 56/9 56/10 57/3 58/15 61/22 61/22 62/1 62/1 62/6 62/12 63/15 63/18 64/19 64/20 65/2 65/4 65/11 66/19 67/6 76/20 76/23 77/3 81/17 82/3 82/17 84/13 120/18 125/18 131/8

here [14]  9/22 13/2 22/3 33/4 37/18 41/18 47/16 71/9 74/8 96/9 96/14 107/9 107/24 118/12

Here's [1]  20/17

hereby [2]  132/7 133/4

hey [1]  57/21

hierarchy [1]  39/11

high [10]  19/16 46/22 80/9 80/12 80/14 95/1 95/8 98/3 104/17 112/9

High's [1]  80/9

higher [1]  18/24

highest [1]  78/14

highlighted [1]  107/25

Hill [7]  5/17 6/7 65/13 65/17 66/23 66/25 67/3

him [24]  20/20 24/8 37/3 42/19 42/20 42/23 43/11 43/18 43/19 44/3 44/10 46/8 68/22 73/16 74/3 83/11 83/12 103/8 113/12 114/25 115/2 130/18 130/22 130/23

hire [4]  58/24 59/6 66/9 67/5

hired [4]  79/8 79/9 80/12 95/7

hiring [11]  58/3 62/3 63/9 65/23 66/1 66/10 66/12 66/16 127/7 127/8 129/2

his [38]  8/2 8/3 8/13 8/14 11/19 11/20 20/20 22/5 22/6 24/16 25/13 29/2 29/6 29/6 36/14 38/13 38/22 39/3 41/8 41/13 44/5 46/8 68/19 68/21 68/23 70/1 70/16 75/5 75/21 75/24 80/13 86/13 86/14 86/15 86/15 108/17 113/14 128/13

history [1]  131/2

Holdings [2]  9/13 9/15

Holmes [1]  1/7

home [1]  5/16

honest [3]  36/2 75/17 100/21

hopefully [1]  106/4

hostile [3]  34/1 34/15 92/5

how [32]  5/10 5/18 6/12 9/6 9/14 16/10 16/19 17/10 18/3 18/5 19/13 28/5 28/7 42/23 64/17 64/18 64/23 70/6 70/17 104/2 105/10 105/13 105/17 112/13 113/18 115/3 121/25 122/1 122/2 122/8 122/23 124/8

HR [24]  9/3 9/11 9/17 10/20 10/25 11/13 28/12 30/19 39/3 39/11 58/3 58/23 62/3 63/9 65/17 65/19 65/21 66/16 81/1 100/24 111/9 111/18 123/5 127/7

hub [2]  91/1 91/2

human [8]  9/8 19/12 24/23 30/1 67/15 110/6 110/10 111/19

husband [1]  8/24

hyphen [1]  18/11

hypotheticals [1]  34/6

**I**

I'd [3]  44/20 84/19 109/23

I'll [1]  74/10

I'm [54]  5/9 6/1 8/6 8/10 15/2 19/6 19/6 23/3 23/7 23/24 24/6 28/10 29/12 33/10 35/25 37/12 37/15 40/12 41/21 47/19 49/24 50/1 50/7 50/12 50/22 51/25 56/22 60/11 64/9 66/12 67/22 72/5 74/5 79/12 90/10 92/1 92/2 92/22 98/8 98/14 98/15 104/14 106/20 107/1 108/25 108/25 114/2 116/3 120/20 121/11 121/17 124/22 127/18 131/20 131/21

I've [8]  6/20 17/14 68/18 79/9 85/1 98/8 101/11 121/13

ID [1]  4/14

idea [10]  23/9 43/1 44/13 47/16 61/23 62/8 76/25 77/4 80/15 99/6

identification [2]  85/3 85/6

identified [2]  33/16 54/24

identity [1]  99/16

illegal [4]  102/13 102/13 103/17 103/21

imagine [1]  43/1

immediately [1]  20/9

impact [3]  41/20 41/25 75/6

impacted [3]  70/24 111/2 130/12

implied [1]  92/10

important [2]  119/4 119/4

impower [1]  98/11

inaccurate [1]  56/11

inaccurately [1]  103/6

incident [1]  100/2

incidents [1]  98/3

include [3]  97/19 97/23 125/11

includes [3]  31/18 126/22 127/12

including [1]  109/6

inconsistencies [1]  79/13

inconsistency [1]  81/14

inconsistent [2]  79/14 79/16

INDEX [1]  3/25

individual [13]  14/21 15/11 15/18 16/5 34/21 59/4 61/16 70/8 72/4 79/9 89/2 128/22 128/23

individuals [22]  15/20 17/10 22/9 22/12 28/6 28/10 36/24 40/9 40/16 52/25 58/23 65/14 67/5 69/15 79/24 81/10 82/14 106/9 116/2 119/16 127/24 131/16

inferences [1]  49/7

inferred [1]  130/20

inflated [1]  103/6

information [22]  14/22 30/10 42/21 43/17 44/10 44/14 72/1 75/23 76/6 80/5 80/11 83/5 90/9 101/4 101/6 101/16 106/2 112/18 114/15 125/13 125/24 130/13

informed [5]  58/22 58/23 59/4 59/5 67/5

infractions [3]  115/10 115/16 115/22

initiate [1]  116/14

initiated [1]  73/12

injury [1]  118/6

input [1]  115/3

inquiring [1]  20/3

instance [3]  15/1 80/19 89/24

instinctually [1]  102/2

instituted [1]  122/24

instruction [1]  58/6

integrity [1]  104/5

interact [2]  66/15 114/3

interacting [1]  92/8

interaction [4]  15/19 21/8 70/9 77/10

interactive [1]  117/22

interest [1]  38/5

interested [1]  132/15

interfere [3]  71/25 72/7 72/8

interim [3]  11/7 11/8 11/14

interview [11]  12/2 43/11 52/10 52/11 53/11 78/19 79/3 79/5 96/3 96/8 99/22

interviewed [9]  43/19 53/6 53/8 53/15 78/9 80/20 93/1 106/9 106/10

interviewers [5]  78/19 78/23 79/4 79/15 79/17

interviews [6]  52/13 78/12 78/18 79/12 79/23 79/25

intimately [5]  34/25 50/22 64/9 65/10 108/25

intimidate [1]  108/16

inundated [1]  97/9

investigate [26]  14/8 32/21 33/14 49/12 53/1 53/19 63/24 68/15 72/3 77/24 81/25 82/22 82/23 83/2 84/14 88/6 88/9 88/12 98/18 102/15 102/21 117/4 122/22 123/9 123/14 125/9

investigated [13]  15/14 32/24 38/9 47/17 47/20 49/10 53/5 53/21 54/5 54/11 54/12 54/19 81/7

investigating [12]  29/14 38/8 54/14 54/22 55/2 63/3 64/14 72/17 86/23 97/3 116/24 126/20

investigation [45]  14/14 14/16 36/15 36/20 36/22 39/6 42/15 42/18 47/18 47/21 51/15 52/4 52/7 52/9 52/17 52/23 69/8 69/12 77/19 82/20 92/8 92/18 92/23 100/12 106/6 106/15 107/12 109/19 110/6 110/10 110/6 111/1 111/14 111/25 117/5 117/5 117/6 124/18 126/15 127/3 128/24 129/18 129/21 129/24 131/16

investigations [5]  97/11 99/4 105/20 110/12 118/4

investigative [8]  4/15 25/23 101/15 101/17 104/23 105/6 105/20 129/25

investigator [4]  15/23 81/2 82/6 112/7

investigators [8]  77/23 97/7 97/18 98/16 98/17 98/25 100/8 124/5

involve [4]  36/6 72/4 103/12 104/19

involved [26]  6/18 14/4 23/14 29/9 32/7 34/24 34/25 35/2 36/3 36/4 36/19 42/8 55/16 64/9 65/11 70/17 73/19 86/1 92/24 102/25 112/13 114/1 121/15 127/6 127/25 128/24

involved Dr [1]  36/3

involvement [1]  96/20

involves [2]  66/13 130/10

involving [3]  6/21 15/20 50/18

IPP [2]  129/4 129/18

IPPs [1]  128/22

is [190]

isn't [3]  14/2 46/19 100/8

issue [13]  6/6 7/5 15/20 36/17 54/9 93/6 99/20 100/3 100/25 105/11 112/5 112/6 125/22

issues [27]  12/3 14/4 14/5 25/8 30/16 54/24 56/4 74/1 74/3 76/16 76/19 76/22 77/4 90/21 96/19 97/4 98/5 98/10 98/12 98/21 99/4 103/4 125/1 126/13 127/22 128/20 129/5

it [339]

it's [101]  5/8 7/22 13/13 15/17 16/23 16/25 18/22 18/23 20/13 21/6 21/10 26/14 26/20 27/1 31/7 41/4 41/13 41/16 41/23 46/19 46/20 47/7 50/23 53/11 53/12 54/19 55/15 56/12 56/16

## I

it's... [72]  59/18 60/19 62/19 65/4 65/5
66/14 66/15 68/2 68/16 73/2 73/18
73/21 74/8 74/15 74/16 76/3 76/13
77/20 79/16 79/16 82/16 82/23 91/1
92/17 94/13 94/15 94/18 94/21 98/2
99/25 101/23 103/17 106/3 106/4
107/2 107/3 107/10 109/18 112/18
113/4 115/13 116/13 116/18 116/21
117/4 117/6 117/19 117/23 117/25
117/25 118/15 118/19 119/4 119/4
119/17 120/24 121/2 121/10 122/5
123/23 124/10 124/21 124/25 124/25
126/1 126/21 127/16 128/3 128/5
128/7 129/10 130/9
its [4]  34/9 47/6 94/3 94/16
itself [1]  129/24
IV [2]  98/24 99/11

## J

JAMES [3]  1/16 3/8 19/1
JANE [21]  1/3 3/9 49/24 49/25 50/4
50/10 50/13 51/21 52/20 52/25 53/16
54/4 54/14 54/18 55/2 55/7 57/2 59/6
64/17 64/18 67/6
JANIE [3]  2/8 132/6 132/24
jesse [4]  3/18 3/19 96/1
jesseharbisonlaw.com [1]  3/19
job [48]  6/2 11/1 11/22 20/3 22/5 24/1
24/7 24/10 28/13 28/17 29/2 29/6 38/7
46/2 46/16 54/19 55/7 58/1 59/7 61/1
66/8 70/1 70/17 72/23 73/21 73/23
73/24 75/8 75/10 75/11 75/13 75/16
75/21 79/24 86/13 86/14 86/15 86/23
96/21 98/1 122/5 122/21 126/22
127/12 127/13 127/16 127/19 128/8
jobs [7]  12/15 13/20 37/9 37/13 37/21
40/10 40/17
Johnson [5]  65/13 65/18 66/17 67/3
67/4
joke [1]  107/7
Jones [1]  57/25
Joseph [3]  89/25 93/16 93/17
Judge [2]  1/6 1/6
July [2]  45/18 87/18
June [13]  8/19 11/12 41/5 45/5 45/16
45/19 45/21 46/7 46/10 46/13 46/14
47/15 84/17
June 15 [3]  41/5 45/5 47/15
June 15th [6]  45/16 45/19 45/21 46/7
46/10 46/13
June 21st [1]  84/17
June 22nd [1]  8/19
Jury [1]  1/5
just [44]  5/8 5/9 8/11 8/15 10/15 17/20
19/15 23/17 33/14 40/13 43/16 45/24
51/15 68/13 73/20 74/10 76/3 81/22
95/10 95/15 96/13 96/17 96/20 96/22
97/5 97/9 97/13 97/16 98/9 98/20 99/1
100/23 105/18 107/2 108/1 118/23
119/13 119/17 120/16 121/2 126/3
126/16 126/20 129/8

## K

keep [15]  24/3 25/7 51/12 52/12 53/9
61/16 61/22 61/25 62/21 77/14 86/14
101/7 119/13 121/17 130/21
keeping [1]  24/7
kept [3]  26/5 53/6 86/13
Kevin [6]  4/6 42/12 44/20 44/23 45/6

53/1
kin [1]  33/21
kind [13]  7/5 11/6 102/5 104/4 106/3
107/21 114/6 114/23 123/6 125/16
126/18 128/25 129/2
Klein [12]  4/6 42/11 42/12 42/13 42/17
43/10 43/14 44/20 44/23 45/6 47/19
53/1
knew [12]  8/13 19/24 20/2 22/8 22/14
23/18 86/3 92/2 120/7 130/17 130/23
130/23
know [249]
knowing [1]  130/11
knowledge [19]  13/4 19/22 24/18 33/5
67/9 80/16 90/5 90/8 90/9 90/10 90/24
91/3 91/6 91/8 97/10 119/9 119/10
119/25 132/10
known [2]  15/17 67/11

## L

L-A-R-C [1]  9/20
lapsed [1]  10/21
Larc [1]  9/20
last [9]  5/10 5/11 6/23 7/21 8/8 35/25
60/10 95/19 115/19
late [4]  4/6 43/7 110/7 122/9
Late-filed [2]  4/6 43/7
later [3]  35/1 45/2 48/18
law [6]  3/11 3/17 3/17 3/22 110/5
126/19
lawful [1]  124/10
lawsuit [5]  8/7 22/4 58/25 59/6 67/6
lawsuits [1]  37/10
LCR [3]  132/6 132/20 132/24
Lead [1]  1/7
leader [1]  99/25 100/1 117/23
leaders [6]  70/13 73/25 98/11 98/13
118/14 118/21
leadership [8]  14/20 21/8 49/12 75/24
99/24 106/16 117/23 119/5
leading [1]  126/14
learn [2]  48/22 96/21
learned [4]  48/18 76/7 76/8 97/8 97/9
leasing [1]  5/22
least [2]  6/13 17/18
leave [18]  15/13 16/4 16/6 16/20 17/3
17/6 17/8 17/11 17/17 17/24 117/3
117/9 117/10 117/13 117/13 118/11
118/16 129/1
leaves [1]  117/2
leaving [1]  6/2
led [3]  106/10 107/22 107/23
LEFFLER [6]  1/9 3/8 23/15 33/21
80/19 81/5
left [37]  34/14 37/14 37/16 76/13
leg [1]  28/12
legal [4]  18/14 82/8 87/1 109/5
legitimate [2]  124/14 124/15
less [1]  27/14
lesson [9]  48/11 48/14 49/5 50/5 50/14
51/1 51/4 51/6 64/19
lessons [2]  49/14 49/19
let [14]  33/20 36/8 39/21 46/17 59/24
74/5 84/16 90/14 98/14 102/7 107/24
108/1 111/23 114/25
let's [10]  30/21 43/24 48/10 50/5 51/1
64/18 85/2 97/17 122/9 122/10
letter [10]  4/12 4/14 74/9 74/23 81/17
84/4 84/5 84/21 113/14 128/25
letters [2]  8/2 72/19

level [19]  14/20 46/21 57/6 57/7 57/9
57/11 58/2 98/3 103/10 112/19 113/5
117/4 117/5 117/20 117/21 117/24
118/5 118/5 119/12
levels [1]  126/10
liaison [1]  18/14
liberty [1]  76/17
license [5]  10/6 10/9 10/12 47/9 47/11
licensed [3]  132/6 132/18 132/19
Licensure [1]  115/14
lieu [2]  7/12 36/13
like [52]  10/19 14/20 15/9 16/25 18/24
20/5 28/22 29/8 31/10 37/17 37/25
44/16 44/20 45/19 54/18 60/19 64/6
66/14 67/17 70/9 72/19 74/11 77/22
81/1 83/19 84/19 85/17 90/16 90/19
92/6 92/12 93/7 93/7 97/8 98/18 98/20
100/14 100/23 101/3 101/10 107/5
109/23 111/6 111/15 116/1 118/6
118/12 118/13 123/9 123/24 124/11
128/25
likelihood [1]  62/17
likely [1]  125/19
LILY [5]  1/9 3/8 23/15 33/21 80/19
limit [4]  17/9 55/13 56/9 115/25
limited [1]  21/12
Lindsay [6]  11/15 11/19 11/22 12/13
12/18 13/18
LINE [1]  133/7
Lisa [2]  63/15 63/17
list [3]  88/6 88/7 99/15
listen [2]  93/2 93/5
little [6]  8/20 30/22 67/25 97/17 105/12
122/10
lived [1]  5/18
lives [1]  130/12
LLC [1]  3/11
local [1]  7/21
location [1]  26/23
logical [3]  45/19 45/22 116/18
logically [1]  123/4
long [5]  5/18 107/3 120/5 131/4 131/5
longer [6]  38/24 65/18 65/20 66/17
66/23 77/7
longevity [1]  58/16
look [24]  22/15 29/20 29/22 30/3 33/2
40/4 62/14 64/5 64/6 64/7 67/22 68/16
72/18 72/20 88/11 104/12 105/5
118/17 118/23 120/9 121/2 124/20
125/12 125/16
looked [9]  20/24 30/9 30/11 63/5 76/9
77/6 81/21 120/6 128/13
looking [2]  121/14 121/17
lost [15]  22/5 29/2 29/6 37/9 37/12
37/21 55/18 55/20 55/24 68/19 70/1
70/16 75/4 75/21 128/8
lot [13]  17/7 38/2 38/4 65/23 96/17
96/19 98/4 99/12 100/6 100/7 100/23
130/6 130/10
lower [4]  27/1 27/1 62/11 63/2
loyalty [4]  33/24 34/13 34/19 34/22

## M

M-U-N-O-Z [1]  5/13
made [28]  16/8 18/24 18/25 19/1 20/5
22/19 22/25 23/4 23/13 28/21 33/1
33/6 33/9 46/15 61/15 61/19 61/21
61/25 62/20 65/2 80/6 81/5 99/3
100/15 101/2 112/17 115/1 131/10
Magistrate [1]  1/6

# M

maiden [1]  5/7
mail [11]  4/6 4/8 41/1 41/4 41/23 42/24 45/5 45/7 45/9 46/7 84/3
mails [6]  42/25 43/2 43/10 43/13 44/19 44/22
maintain [1]  77/16
Majors [3]  111/18 112/21 112/22
make [23]  15/5 48/10 50/6 51/1 62/19 64/18 66/11 74/8 74/11 79/4 87/23 90/1 90/15 90/22 94/23 100/2 109/23 119/3 120/20 122/20 123/21 125/2 129/9
makes [2]  63/21 113/16
making [5]  63/4 88/21 107/7 113/25 126/9
manager [14]  9/9 9/11 9/19 58/3 62/3 63/10 65/17 65/19 65/21 66/10 66/12 66/16 127/7 127/8
managers [2]  18/14 127/7
many [11]  6/12 16/19 16/24 17/10 18/3 18/5 37/7 37/19 100/8 122/1 122/2
marked [9]  43/7 44/20 48/4 48/8 74/19 84/24 85/2 85/6 110/3
market [3]  9/8 9/10 9/11
married [1]  5/8
MARY [8]  1/24 3/1 5/1 5/7 5/8 105/2 133/4 133/22
massive [1]  61/20
mastering [1]  107/15
material [1]  107/15
matter [7]  40/9 71/21 95/8 101/24 101/25 130/7 130/15
Matthews [3]  18/11 18/11 18/15
may [25]  1/24 3/2 23/4 44/16 44/21 54/12 63/10 70/22 71/1 74/9 77/1 77/1 77/2 80/20 83/13 84/20 99/18 99/22 109/2 110/19 121/19 121/21 122/14 129/7 131/3
maybe [4]  18/23 45/24 46/21 112/16
McAllester [1]  110/24
me [77]  8/20 12/4 12/9 12/12 12/21 15/8 16/19 18/6 19/8 19/11 21/15 21/21 22/18 25/16 27/25 29/11 33/13 33/20 35/6 39/16 39/21 40/1 42/1 46/10 46/13 53/15 54/4 55/10 57/6 58/9 59/24 61/19 61/21 62/6 64/7 65/5 67/21 69/23 74/5 76/9 80/6 81/12 82/9 84/16 87/20 88/6 88/13 90/14 91/16 92/22 93/6 93/12 95/19 96/14 96/15 96/16 96/21 97/2 97/5 98/14 98/15 99/19 100/14 101/11 102/7 102/16 104/6 107/24 108/1 111/4 111/23 114/25 118/7 120/24 121/1 130/14 132/8
mean [27]  17/14 21/4 26/21 27/24 37/6 44/3 47/7 54/11 68/13 71/19 71/23 71/24 73/9 75/8 77/22 87/22 89/16 90/10 98/22 99/15 113/3 114/9 119/18 122/4 122/23 122/24 123/1
meaning [5]  16/25 72/24 88/1 100/11 123/9
means [5]  27/9 75/9 87/5 87/8 87/13
meant [2]  44/5 71/22
measure [1]  15/5
media [1]  38/4
meet [1]  113/24
meeting [3]  24/12 113/17 114/8
meetings [2]  51/9 51/12
Mells [2]  77/10 80/1

Mells' [1]  80/3
memory [1]  108/4
mention [1]  81/17
mentioned [6]  43/6 48/7 74/18 84/23 85/5 110/2
MERIWETHER [14]  1/16 3/9 23/15 33/8 33/11 80/19 81/4 81/12 82/6 84/7 84/8 85/12 85/21 88/18
Meriwether's [3]  82/10 83/8 83/18
met [1]  11/18
Metro [62]  6/3 6/7 6/18 6/21 9/4 9/8 11/3 11/10 11/25 12/14 12/19 12/24 13/5 13/17 15/24 21/15 21/21 27/9 32/21 34/13 35/10 37/10 38/13 38/21 40/21 46/6 46/17 46/25 47/4 48/15 48/19 53/16 54/3 56/9 58/19 61/5 61/22 62/10 66/8 67/11 71/20 78/17 79/2 79/3 83/17 86/6 87/1 88/3 89/11 89/14 89/19 89/24 92/11 92/20 93/10 93/14 93/23 94/2 94/25 97/19 114/17 122/21
METROPOLITAN [4]  1/6 1/12 1/19 3/22
Michael [2]  104/19 106/8
middle [2]  1/1 46/23
might [19]  15/11 16/16 16/16 18/21 19/24 23/14 47/24 50/20 106/11 107/19 112/2 114/18 119/8 121/5 121/15 122/15 128/25 128/25 129/8
mind [1]  59/12
minded [1]  121/16
minds [1]  65/7
mine [1]  67/15
minutes [2]  43/24 59/13
misdemeanor [1]  109/6
mishandling [1]  31/21
missing [6]  77/18 77/25 79/20 80/4 80/10 80/13
mistake [1]  80/6
misunderstanding [1]  14/1
misunderstood [1]  127/18
MNPS [2]  77/14 100/11
Mo [2]  11/17 11/18
mode [1]  119/18
model [1]  108/13
month [2]  11/10 70/25
months [3]  45/1 100/21 111/6
more [11]  17/4 19/24 57/3 58/12 81/13 99/12 106/2 106/4 119/20 119/20 125/19
MORENO [1]  1/9
most [2]  18/2 60/6
mostly [1]  96/9
mouth [1]  92/21
move [5]  16/10 16/10 16/11 16/15 117/10
moved [4]  8/23 9/1 16/14 56/7
movements [1]  58/4
moving [2]  5/24 9/22
Mr [6]  11/21 42/12 43/10 43/14 47/19 83/7
Mr. [11]  8/16 11/14 18/14 19/1 38/17 42/11 42/17 87/3 97/6 100/16 112/21
Mr. Brooks [1]  8/16
Mr. James [1]  19/1
Mr. Klein [2]  42/11 42/17
Mr. Majors [1]  112/21
Mr. Sam [1]  100/16
Mr. Williams [1]  38/17
Mr. Young [4]  11/14 18/14 87/3 97/6

Ms [51]  4/2 4/2 4/3 4/6 4/8 5/4 18/18 19/2 19/5 19/10 24/5 24/15 41/21 44/2 48/24 49/23 50/4 50/8 50/16 50/16 50/17 50/18 52/8 52/24 52/1 52/6 55/18 56/4 57/2 57/8 57/12 57/21 58/1 58/18 58/24 60/13 61/19 62/2 62/10 62/22 63/21 65/9 65/12 67/3 67/3 67/3 74/21 95/18 95/19 112/21 125/8
Ms. [23]  18/15 18/19 26/5 48/1 48/2 49/3 49/9 50/13 51/8 52/6 52/22 54/20 56/3 58/11 59/17 62/5 64/14 66/17 66/25 69/20 69/23 69/24 71/2
Ms. Batey [12]  26/5 49/3 49/9 51/8 52/6 52/22 54/20 56/3 69/20 69/23 69/24 71/2
Ms. Batey's [1]  50/13
Ms. Biggers-Matthews [1]  18/15
Ms. Doe [1]  62/5
Ms. Doe's [2]  58/11 64/14
Ms. Harbison [1]  59/17
Ms. Hill [1]  66/25
Ms. Johnson [1]  66/17
Ms. Patterson [1]  18/19
Ms. Shepherd [2]  48/1 48/2
much [2]  114/4 126/17
multiple [6]  12/6 22/9 98/4 98/22 98/24 112/11
multitude [2]  99/17 131/19
Munoz [3]  5/8 95/21 95/22
my [62]  5/7 8/23 12/23 14/2 14/15 14/17 15/21 18/5 19/9 23/9 28/16 29/23 30/2 30/21 34/20 39/1 41/19 41/24 45/2 47/22 54/3 54/23 56/5 56/6 59/21 67/21 68/2 71/5 71/25 73/18 73/18 76/13 77/16 77/23 82/16 83/5 89/5 91/15 92/21 93/6 96/1 96/21 97/2 100/24 101/16 102/1 103/8 103/13 104/2 104/15 104/21 105/22 106/17 106/22 107/2 111/2 112/20 120/22 124/2 127/5 132/10 132/21
MyMNPS [1]  60/19

# N

name [20]  5/5 5/7 5/10 5/11 6/24 48/22 48/25 49/1 50/1 50/7 50/1 53/3 89/2 95/20 96/1 100/13 100/14 105/3 110/22 110/25 132/21
named [1]  23/13
names [2]  88/13 115/20
naming [1]  81/10
narrow [1]  122/10
NASHVILLE [12]  1/2 1/6 1/12 1/20 2/9 3/2 3/12 3/18 3/23 5/17 35/10 35/11
nashville.gov [1]  3/24
nature [2]  12/20 107/18
near [2]  5/25 6/3
necessarily [4]  25/9 45/23 120/8 129/25
necessary [2]  74/8 106/2
necessity [1]  34/23
need [9]  10/9 23/9 57/16 57/21 58/1 73/23 77/14 93/24 97/25
needed [2]  59/10 123/15
needs [2]  49/19 127/17
neglect [1]  17/5
never [6]  11/18 15/7 48/2 85/1 121/13 130/22
new [4]  5/11 60/18 65/23 95/19
next [10]  12/23 25/10 25/13 45/17 56/22 57/10 58/2 74/15 85/3 109/24

**N**

next-numbered [3]  74/15 85/3 109/24
no [88]  1/5 4/6 4/8 4/10 4/12 4/14 4/15
5/23 6/4 6/16 6/20 10/11 10/14 10/24
11/18 11/23 22/17 25/22 25/23 27/6
27/14 33/5 33/22 37/25 38/24 40/25
42/8 42/16 43/1 43/12 43/20 44/13
45/14 45/23 47/13 47/16 58/14 60/17
61/23 62/8 62/13 65/17 65/20 66/17
66/23 67/9 69/2 69/7 69/8 69/12 71/22
72/10 73/1 73/14 73/17 75/1 76/11
76/25 77/4 77/6 79/21 80/2 80/15
83/16 84/7 84/25 86/17 88/10 89/16
90/9 92/20 93/19 95/5 99/6 106/19
109/25 112/8 113/3 115/5 115/10
116/6 116/10 116/21 119/3 125/7
127/18 128/12 131/9
nobody [1]  72/25
non [2]  128/2 128/6
non-eligibility [1]  128/2
non-eligible [1]  128/6
nonrenew [3]  28/19 28/21 73/24
nonrenewal [9]  26/6 26/9 26/17 73/6
127/6 127/13 127/21 127/24 127/25
nonrenewals [6]  28/7 28/14 70/25 73/4
73/19 127/19
nonrenewed [9]  7/11 27/7 27/12 27/17
46/11 46/16 72/23 89/14 127/16
normal [2]  45/20 105/12
normally [3]  30/4 30/6 103/9
North [1]  2/9
not [207]
note [1]  92/25
noted [1]  129/6
notes [11]  24/3 24/7 25/7 25/11 25/23
51/13 51/14 52/12 53/12 53/13 106/11
nothing [4]  46/1 89/12 96/10 120/24
notice [3]  3/1 3/3 90/13
notices [2]  45/12 72/19
notification [1]  70/24
notified [1]  71/4
now [33]  6/9 18/3 19/7 22/3 23/23 27/8
32/21 33/8 38/16 39/1 40/8 41/1 45/11
46/6 47/14 60/18 62/22 63/16 63/18
65/12 68/17 71/9 74/12 74/21 76/12
89/6 91/1 97/21 98/23 104/21 105/23
128/10 130/5
number [12]  16/23 17/14 43/8 44/23
48/5 48/8 61/10 74/19 84/24 85/7
110/3 132/20
numbered [3]  74/15 85/3 109/24

**O**

oath [3]  13/19 92/3 93/7
objection [45]  13/8 13/23 21/19 21/24
22/21 23/11 24/21 25/4 25/18 28/2
31/22 32/2 34/4 35/20 37/1 39/17
40/11 40/18 48/17 50/9 55/5 59/1
64/24 67/8 68/7 69/10 70/3 71/14
72/15 80/7 81/8 84/25 85/15 85/25
87/11 90/3 93/20 95/4 95/11 96/6
109/25 120/2 123/12 131/1 131/12
objections [1]  3/4
objective [2]  65/5 121/16
obligated [1]  67/22
obligation [2]  24/1 24/11
observed [2]  40/6 59/15
obstruct [1]  71/17
obviously [1]  119/16
occur [5]  15/6 20/12 20/14 69/16 78/18

occurred [11]  13/4 20/11 38/2 41/12
67/23 69/5 89/17 90/14 107/6 108/20
126/11
occurrences [1]  104/1
occurring [1]  100/2
occurs [3]  13/13 14/24 69/1
off [6]  40/4 45/16 49/1 50/1 50/7 89/5
offense [1]  117/20
offer [1]  84/19
office [24]  19/13 29/1 29/5 29/6 53/4
54/12 54/13 55/1 59/5 65/19 67/11
68/4 72/2 77/23 90/24 90/25 91/3
101/13 102/9 102/15 113/2 113/13
117/7 117/18
officer [5]  24/24 67/16 111/9 111/18
111/19
officers [1]  30/1
official [2]  34/18 35/1
officials [2]  33/23 34/12
okay [109]  6/9 7/1 8/20 8/25 9/16 10/6
10/18 16/9 17/2 17/22 18/17 18/25
20/17 22/18 24/10 25/22 26/1 26/6
26/19 28/13 28/18 31/18 32/17 32/21
33/4 33/23 35/1 35/17 38/2 39/1 39/21
40/2 41/8 43/21 45/3 45/4 46/23 47/4
47/10 48/4 49/9 49/25 50/3 54/10 57/1
58/8 58/15 59/12 60/25 61/9 63/21
68/17 70/14 71/5 72/17 73/8 75/20
78/22 79/1 79/22 82/15 83/3 84/16
87/2 87/7 89/3 89/6 89/18 90/23 92/14
93/5 95/14 95/24 97/17 100/4 102/14
102/17 103/15 104/21 106/20 108/3
108/7 108/10 108/15 108/19 109/4
109/22 113/8 114/10 114/23 116/7
116/11 118/3 122/10 122/10 122/19
124/2 124/7 125/3 125/22 126/5 127/8
127/15 128/13 129/12 129/21 130/2
130/5 131/23
old [1]  60/5
once [2]  68/16 82/23
one [33]  6/21 6/22 11/6 11/6 16/11
17/18 17/22 22/11 29/13 30/2 30/8
37/13 37/13 38/9 48/13 48/15 48/19
57/9 58/21 58/22 60/8 60/13 60/20
65/14 67/4 79/9 88/17 94/22 97/2 97/5
107/19 120/13 130/5
ones [2]  88/5 117/14
ongoing [2]  12/3 96/5
online [1]  103/1
only [20]  4/14 6/20 13/9 31/9 33/10
39/22 48/23 55/18 64/7 65/22 69/23
77/5 79/8 81/9 88/17 100/7 117/14
119/6 120/3 124/4
open [5]  25/23 45/24 51/20 119/7
126/18
opened [2]  26/2 45/24
opening [1]  65/23
opens [1]  46/1
opinion [1]  91/15
opportunity [2]  53/12 118/13
opposed [1]  107/14
options [1]  15/15
oral [5]  51/18 84/3 129/5 129/7 129/12
organization [10]  9/13 9/20 20/25 75/5
82/2 82/4 94/16 104/7 110/23 123/21
organizational [5]  61/14 62/16 62/24
63/23 123/20
organize [1]  107/20
orientation [1]  99/16
originally [1]  113/12

originated [1]  8/15
other [35]  10/23 15/15 23/13 23/15
23/18 30/8 31/8 32/6 40/8 52/25 54/13
58/19 64/8 66/5 80/15 82/12 82/20
89/3 89/15 94/5 94/9 97/2 97/5 98/11
111/10 114/16 114/16 115/8 115/10
116/9 116/23 119/21 125/4 126/12
127/24
others [2]  13/1 88/19
otherwise [2]  16/15 119/8
our [29]  14/21 18/21 20/25 30/4 30/17
54/12 55/14 73/25 77/21 82/8 88/5
88/10 93/23 99/11 100/19 106/3
109/17 110/20 112/14 113/23 116/13
116/21 117/5 117/18 117/23 118/11
118/15 122/5 123/13
ourselves [1]  123/17
out [25]  9/1 13/18 15/15 19/8 35/1 42/6
42/10 42/18 45/12 47/5 52/8 52/9
58/16 61/25 70/25 71/11 73/20 77/19
81/2 93/8 99/23 101/6 103/8 113/2
121/17
outcome [3]  107/11 110/9 132/16
outside [10]  20/25 21/11 21/14 82/1
82/4 82/6 98/15 103/23 105/12 116/24
outsource [3]  30/20 82/5 82/9
outsourced [6]  15/22 16/1 20/7 20/8
42/11 47/19
outsourcing [2]  15/25 52/24
over [15]  11/9 14/20 16/25 44/7 44/8
55/24 63/1 63/11 63/11 99/25 102/24
106/16 112/8 114/1 125/12
overall [1]  123/2
overload [1]  98/7
oversee [2]  14/2 79/7
oversees [1]  103/13
overwhelmed [1]  130/8
overwhelming [1]  98/6
own [4]  5/23 5/24 37/15 65/4

**P**

P.O [2]  3/18 3/23
page [17]  4/2 4/2 4/3 4/6 4/8 4/10 4/12
4/14 4/15 41/2 41/4 59/25 60/19 60/21
74/13 74/13 133/7
pages [5]  4/10 74/15 106/5 132/9 133/4
panel [2]  78/13 79/10
paragraph [1]  107/25
paraprofessional [1]  18/23
parent [3]  31/20 48/22 48/25
parents [2]  48/15 48/19
part [10]  44/21 49/17 78/11 80/15
87/16 106/15 106/22 107/2 113/23
116/21
partake [1]  78/15
participated [1]  123/1
participating [1]  124/17
participation [1]  41/14
particular [4]  45/15 74/23 105/11
105/11
parties [3]  79/11 90/13 132/14
partnerships [1]  123/15
parts [1]  123/21
party [6]  15/23 20/7 20/9 28/11 28/22
114/18
passed [1]  8/24
past [1]  106/21
Patterson [2]  18/10 18/19
pay [12]  27/2 56/12 56/13 56/16 56/17
56/25 57/22 58/7 58/16 62/18 64/15

**P**

pay... [1] 64/22
payroll [1] 9/19
people [51] 9/21 13/10 13/19 13/25
16/9 17/3 23/13 26/23 26/24 31/9
31/10 37/7 37/16 37/20 64/9 65/25
66/4 77/13 77/21 78/23 81/22 90/10
90/20 91/16 91/19 91/19 93/1 93/11
101/5 102/2 106/10 119/15 119/17
119/19 119/19 119/23 120/7 120/11
120/13 121/5 121/9 121/12 121/19
121/23 122/3 122/7 122/12 124/11
130/10 130/17 130/20
people's [2] 65/7 130/12
perceive [1] 121/23
perceived [2] 49/21 121/21
percent [18] 55/12 55/15 55/20 55/25
56/1 56/10 56/12 56/15 56/17 56/18
57/3 57/22 58/13 61/13 62/11 63/1
63/1 64/22
percentage [1] 95/2
perceptions [1] 13/25
perfect [1] 75/19
performance [28] 32/10 46/17 46/21
61/11 72/23 73/7 73/21 73/23 73/24
74/1 74/3 75/12 75/14 75/16 125/1
125/11 125/23 126/13 126/22 127/12
127/13 127/16 127/19 128/5 128/7
128/20 128/23 129/5
performing [1] 32/12
periods [1] 130/6
permanent [1] 16/17
person [19] 16/6 16/8 16/13 16/15
27/18 32/4 44/7 76/14 78/12 78/19
97/2 97/6 100/12 103/22 108/23
109/13 111/3 120/3 123/11
person's [2] 72/2 119/25
personal [1] 119/25
personally [2] 29/9 130/14
personnel [5] 9/19 101/16 101/17 129/8
129/10
perspective [1] 107/5
Pertiller [3] 30/2 111/8 112/21
petrified [2] 12/14 19/6
piece [2] 46/3 58/5
pieces [4] 46/5 64/6 64/7 112/12
PIPPA [6] 1/16 3/9 23/14 33/8 80/19
88/18
place [9] 28/1 49/18 49/19 70/11 73/18
98/21 117/9 117/12 123/22
placed [9] 16/5 16/20 17/11 17/16
17/23 45/11 45/21 45/22 56/15
placement [2] 27/6 46/4
placements [1] 45/18
Plaintiff [3] 1/4 1/10 3/14
plaintiffs [4] 1/18 3/1 3/7 95/24
plan [1] 50/5
plans [4] 5/24 6/2 71/10 128/23
please [4] 5/5 34/11 43/2 90/14
plenty [1] 122/2
PLLC [1] 3/17
plus [1] 98/16
point [10] 7/23 30/2 46/11 53/24 54/25
70/2 71/17 94/2 122/6 126/14
policies [6] 11/5 34/9 56/9 94/7 99/11
110/6
policy [10] 53/3 57/1 59/20 61/5 62/15
64/2 94/7 103/15 103/21 109/5
poor [1] 61/11
population [1] 123/7

portion [2] 43/25 71/6
position [39] 26/21 26/22 27/1 27/4
27/9 27/11 27/13 27/14 27/18 27/22
38/13 46/8 47/12 55/11 55/19 56/7
56/8 56/14 58/4 58/24 62/11 62/25
63/16 64/5 64/20 64/22 65/3 66/20
66/25 67/6 68/19 68/23 71/21 75/5
75/15 75/18 79/19 80/21 111/16
positions [6] 18/12 45/12 58/19 65/24
78/4 81/6
possible [8] 77/12 78/21 79/16 92/17
121/5 121/19 122/11 128/5
possibly [3] 51/23 98/17 131/22
power [1] 119/9
practice [1] 119/18
practices [1] 110/11
pre [1] 14/25
pre-protection [1] 14/25
precautionary [1] 15/5
preconceived [1] 13/25
premise [1] 36/3
prepare [1] 96/15
prepared [1] 12/4
preschool [3] 10/8 10/9 10/15
present [5] 113/17 125/13 125/18
125/21 125/25
presentation [1] 127/4
presented [3] 73/4 121/1 126/21
presenting [1] 126/3
preserve [1] 77/22
press [5] 38/4 96/20 100/18 101/24
102/1
pretty [5] 47/20 105/16 114/4 126/17
130/24
prevalent [1] 13/18
prevent [1] 13/12
previous [1] 105/3
previously [6] 43/6 48/7 74/18 84/23
85/5 110/2
previously-mentioned [6] 43/6 48/7
74/18 84/23 85/5 110/2
principal [30] 18/24 20/18 26/11 26/12
26/15 27/3 27/7 27/11 27/12 29/2 29/7
36/8 38/16 39/2 46/8 68/20 73/15
75/21 88/1 88/14 89/9 89/9 89/13
99/25 100/1 104/11 107/23 125/23
126/1 128/17
principal's [1] 102/19
principals [11] 26/13 87/20 87/23 87/24
88/20 96/19 107/20 113/25 113/25
125/10 126/23
principalship [1] 33/19
prior [10] 9/7 9/12 9/22 11/14 11/19
36/21 73/3 89/23 100/24 126/11
probability [1] 95/9
probably [8] 43/23 51/11 59/9 63/9
102/24 121/24 122/17 124/3
problems [1] 73/23
procedural [1] 56/21
procedure [4] 3/2 78/17 79/1 79/2
procedures [3] 34/9 55/14 61/10
process [27] 5/9 12/2 28/11 33/11
33/16 54/24 66/2 66/13 73/5 73/13
78/11 78/16 79/7 81/15 96/8 106/3
113/23 114/1 114/22 117/2 117/16
118/16 118/17 125/12 127/20 127/25
128/1
processed [1] 66/15
processes [6] 81/14 82/14 118/15
122/1 125/17 126/4

proctor [1] 115/17
professional [2] 10/20 112/3
profit [1] 9/20
progressive [1] 73/10
promote [2] 118/18 121/11
promotion [1] 63/19
promotions [6] 26/24 59/19 61/1 61/2
61/6 74/14
prompted [1] 75/25
proper [1] 64/15
properly [2] 54/19 55/2
protect [16] 14/17 15/16 21/2 21/4
21/16 21/22 25/17 31/25 32/13 32/18
46/8 90/12 102/2 102/4 120/8 130/23
protected [23] 14/3 29/16 30/16 42/2
54/9 87/4 87/21 90/21 95/9 98/9 98/21
99/4 99/9 99/14 99/17 99/21 102/14
103/17 116/19 117/1 120/10 120/14
120/15
protection [1] 14/25
protective [1] 95/3
protocol [1] 53/3
provide [3] 43/2 44/10 123/16
provided [1] 44/11
provisions [1] 3/2
public [10] 35/11 76/6 100/18 101/4
101/10 101/12 101/13 101/22 102/5
130/11
publication [1] 130/13
publicness [1] 97/15
pull [4] 56/22 56/24 126/7 126/17
pulled [5] 105/10 105/14 105/17 105/18
127/3
purpose [3] 32/4 34/22 89/22
purposes [1] 85/3
pursuant [1] 3/2
put [16] 11/4 15/12 59/18 62/10 62/25
68/14 68/22 70/1 78/13 107/5 107/21
117/3 122/9 129/13 129/19 129/22
putting [1] 92/21

**Q**

question [19] 12/23 22/1 22/22 23/8
23/10 24/1 24/15 30/21 33/20 34/11
61/24 71/5 74/10 80/16 98/15 100/5
111/23 114/25 124/2
questioned [2] 7/24 12/16
questioning [8] 14/12 33/24 34/13
34/19 34/21 34/23 34/23 42/9
questions [8] 3/4 42/5 79/6 95/16 95/17
114/6 119/7 125/5
quick [1] 74/5
quite [1] 5/19

**R**

race [2] 41/9 99/13
racial [2] 49/5 49/6
raise [11] 24/13 24/22 24/23 25/3 31/12
34/20 34/20 35/6 36/1 36/16 87/24
raised [11] 8/22 19/11 19/12 19/14 25/8
30/17 35/22 36/5 83/4 84/13 96/19
raising [3] 25/7 30/10 50/21
rate [1] 62/18
rather [1] 105/11
reached [1] 39/10
read [9] 43/23 43/25 45/9 71/6 74/9
106/23 107/25 108/2 133/4
reading [1] 1/21
real [5] 49/17 74/5 121/21 121/24

## R

real... [1] 122/8
realize [2] 22/9 95/1
really [4] 103/7 119/1 119/7 123/5
realm [4] 30/4 30/7 77/21 103/8
reapply [1] 78/3
reason [9] 32/19 37/15 42/6 54/4 54/6
60/15 109/14 124/14 124/16
reassigned [1] 16/14
reassignment [1] 16/17
recall [22] 17/14 17/23 25/19 30/8 36/8
48/12 52/24 81/19 87/25 88/17 88/18
88/20 89/12 100/11 100/22 106/18
107/11 107/16 110/5 110/9 113/12
115/15
receive [3] 10/25 11/2 64/15
received [1] 47/22
recent [1] 18/2
recently [4] 5/8 17/20 63/17 99/1
recognize [2] 41/2 84/17
recognized [1] 93/17
recommend [3] 21/12 113/4 117/25
recommendation [16] 28/21 36/13
47/22 69/5 69/8 109/4 109/11 112/9
112/14 112/17 112/23 113/1 113/15
114/1 114/11 126/9
recommendations [5] 66/11 73/3 87/23
106/15 108/19
recommended [2] 113/7 113/9
recommending [3] 8/2 117/17 127/11
record [11] 5/6 40/4 43/25 49/1 50/2
50/8 68/14 71/6 77/5 106/24 132/10
records [6] 76/6 100/18 101/4 101/13
101/22 130/11
Redirect [2] 4/3 125/8
reduced [4] 56/6 57/3 58/16 61/13
reduction [3] 55/12 56/10 61/20
refer [1] 103/22
reference [1] 109/2
referred [1] 31/1
referring [4] 35/9 35/15 36/10 50/1
refresh [1] 108/4
refused [1] 102/11
refusing [2] 102/18 103/20
regard [5] 24/16 25/13 81/5 112/6
126/4
regarding [12] 8/3 13/2 22/10 23/14
35/7 50/17 99/4 103/1 108/8 110/11
118/15 131/20
regards [1] 102/4
regular [1] 18/22
rehire [3] 128/4 128/6 128/8
relate [1] 99/20
related [9] 72/1 76/6 103/17 114/19
116/4 116/24 116/25 127/16 132/13
relations [17] 7/25 8/8 11/16 13/7 13/16
14/2 16/22 18/14 23/24 28/5 29/13
34/3 34/17 86/9 86/20 97/12 97/13
relationship [2] 34/14 131/6
relationships [1] 123/20
relevant [1] 70/13
religious [1] 99/15
rely [2] 64/8 70/12
remain [3] 102/12 102/18 103/20
remedy [2] 67/23 69/6
remember [55] 6/15 12/9 16/3 17/18
17/22 18/1 19/4 19/16 25/15 25/25
35/25 36/3 36/7 43/15 44/17 45/8
47/21 47/25 51/23 52/21 56/2 60/10

83/13 84/2 84/11 89/2 94/1 96/12
96/13 96/14 100/9 100/13 100/13
100/25 101/1 108/7 108/9 110/13
110/15 110/18 110/21 110/22 111/12
111/20 112/4 112/17 113/1 113/6
113/20 113/21 114/8 115/20 115/21
120/18 131/22
remind [1] 95/19
remotely [1] 67/1 115/23
removal [4] 41/19 41/24 42/7 73/15
remove [1] 73/16
removed [1] 42/10
renew [2] 10/22 26/15
renewal [1] 26/14
renewed [1] 27/8
reorg [2] 41/20 41/25
reorganization [1] 95/1
reorganizations [2] 59/19 61/2
replacing [1] 42/1
report [12] 14/19 18/3 18/5 24/11 44/11
68/9 91/4 91/8 115/6 115/7 115/15
116/11
reported [8] 24/14 50/18 69/22 69/24
111/4 115/12 115/19 132/8
reporter [9] 18/8 42/12 43/22 74/6
84/18 86/21 107/9 132/7 132/20
REPORTER'S [1] 132/1
reporting [10] 14/19 59/8 109/6 111/3
111/6 112/11 114/21 116/15 118/10
132/19
reports [1] 116/14
represent [3] 95/22 95/24 104/7
represented [1] 23/19
reprimand [2] 129/4 129/10
reprimanded [2] 64/1 64/13
reprimanding [1] 71/12
reprimands [1] 129/1
request [6] 53/13 76/6 77/6 101/4
113/13 130/12
requested [3] 43/25 71/6 112/19
requesting [2] 16/13 113/12
requests [4] 100/19 101/14 101/15
101/22
requirements [1] 109/5
requisitions [2] 65/23 66/1
research [1] 33/3
researched [1] 107/8
resembled [1] 108/11
reserved [1] 3/4
reside [2] 123/25 129/7
resided [1] 123/5
resides [1] 123/22
resignation [1] 7/15
resigned [7] 7/12 7/16 36/20 38/2 38/25
66/19 66/21
resigning [1] 38/1
resolution [1] 15/14
resolve [1] 103/4
resolved [1] 100/3
resource [3] 9/9 24/24 67/16
resources [9] 19/13 30/1 77/24 97/25
98/7 99/1 110/6 110/11 111/19
respond [3] 35/5 100/20 101/17
responding [1] 84/12
response [11] 43/23 67/21 82/17 82/18
82/19 82/21 83/20 83/22 84/1 128/25
130/3
responsibility [3] 54/23 77/21 116/13
responsible [7] 29/14 30/23 31/3 97/3
112/12 114/20 123/3

rest [1] 49/24
restrict [5] 15/19 21/8 98/9 98/20 99/3
restricted [1] 56/16
restructure [1] 128/3
result [7] 46/7 47/17 51/6 83/18 109/19
111/11 111/14
resulted [2] 32/7 116/2
resulting [2] 61/11 61/14
results [3] 42/14 44/5 44/8
retain [1] 119/15
retained [1] 119/17
retaliate [1] 20/19
retaliated [38] 15/2 19/6 21/10 22/6
23/25 24/6 31/4 31/7 31/14 38/18
38/20 38/23 40/20 41/17 50/25 68/5
68/18 69/2 80/22 87/8 91/9 91/24
93/10 93/24 94/4 102/10 102/11
102/20 102/21 103/19 103/19 121/7
121/22 122/13 124/9 124/12 130/19
131/17
retaliation [127] 12/11 12/16 13/6 13/12
13/12 14/14 14/17 15/16 16/1 17/10
17/13 17/25 18/18 18/18 19/2 19/18
21/3 21/5 21/16 21/22 22/16 22/20
22/25 23/5 24/16 24/20 25/14 25/17
25/24 26/3 29/2 29/6 29/15 30/6 30/9
30/12 30/15 30/23 31/25 32/18 32/20
32/22 32/24 33/1 33/6 33/9 35/23
37/20 40/24 41/9 41/12 44/25 45/3
50/20 51/22 52/5 52/20 53/4 53/17
53/21 54/5 54/15 54/18 55/3 64/23
67/20 68/1 68/2 68/11 69/1 69/5 69/15
69/16 69/20 69/21 69/25 70/2 70/7
70/15 70/15 70/20 72/18 80/18 80/25
81/4 81/18 81/20 81/23 82/3 85/10
85/10 85/11 85/20 85/23 86/24 87/9
88/2 89/10 89/19 89/22 90/1 90/2
90/14 90/19 91/4 91/14 91/16 91/18
91/23 92/4 92/11 92/20 92/24 93/9
93/12 94/9 94/17 94/23 116/25 120/22
122/5 124/8 124/11 124/11 124/15
124/17 131/21
retired [3] 36/12 76/15 111/17
return [1] 15/18
returned [1] 9/2
review [7] 53/12 53/13 99/22 112/18
112/24 114/5 117/19
reviewed [1] 100/3
right [10] 36/18 74/12 87/24 92/15
98/15 104/21 105/1 111/5 122/16
123/22
risk [7] 69/18 69/19 70/8 70/17 70/19
71/11 71/13
role [7] 11/19 14/2 32/14 42/2 73/12
112/6 120/18
Rules [1] 3/2
rumor [1] 92/13
rumored [1] 119/24
rumors [6] 91/10 91/12 91/13 91/17
119/22 120/22
run [1] 79/13

## S

safeguards [1] 70/11
safety [1] 86/16
said [47] 15/8 19/6 20/5 28/22 29/8
33/13 37/17 37/25 39/15 39/19 44/2
44/16 51/13 52/12 57/18 64/6 66/14
67/18 70/9 72/10 77/22 81/21 83/19
84/10 84/11 88/2 90/20 91/16 91/24

S

said... [18]  92/6 92/12 95/8 96/3 97/8
98/20 100/5 101/3 101/11 102/9
108/16 111/15 118/24 119/22 120/10
125/9 130/15 133/5
SAITH [1]  131/25
salary [12]  55/13 55/21 56/10 57/3
61/12 61/16 61/21 61/22 62/1 62/12
62/21 63/1
Sam [5]  36/11 38/19 39/14 100/16
100/25
same [13]  32/9 36/18 42/2 62/18 78/19
78/20 79/4 79/5 79/6 79/11 98/23
111/17 117/11
sarcastic [3]  106/24 118/12 118/25
saw [1]  81/9
say [37]  5/21 16/4 24/6 29/3 30/25
31/11 32/10 32/11 35/8 43/20 47/23
49/25 51/17 73/1 73/8 73/22 75/11
75/13 77/11 87/18 89/21 90/23 98/2
101/7 101/8 104/2 107/2 113/11
118/25 122/4 123/4 124/12 124/25
124/25 126/8 128/3 130/21
say it [1]  123/4
saying [9]  7/14 50/9 81/19 90/10 94/5
103/22 120/24 124/21 124/22
says [20]  15/2 23/24 31/7 31/7 41/7
41/16 41/18 41/24 61/10 61/18 62/20
68/2 69/14 72/23 75/7 82/25 104/23
105/1 106/12 108/18
scale [1]  78/12 78/13
scared [6]  13/19 103/18 121/5 121/20
122/12 122/15
scenarios [1]  98/13
scheme [1]  108/17
school [47]  10/16 21/6 21/11 21/14
26/22 32/11 33/19 35/11 35/14 35/17
35/23 36/5 39/16 39/16 45/17 46/22
46/23 46/23 49/11 55/8 55/19 60/15
62/5 64/20 65/25 70/22 75/22 75/23
87/17 87/19 87/20 88/4 88/16 88/22
89/7 89/8 90/17 97/14 97/15 99/25
100/1 103/3 104/17 112/9 115/19
117/4 128/4
schools [64]  6/3 6/7 6/19 6/21 9/4 9/8
11/3 11/11 11/25 12/14 12/19 12/24
13/5 13/17 15/24 19/8 19/19 21/16
21/21 26/16 27/10 30/20 32/21 34/13
37/10 38/14 38/21 40/21 46/6 46/18
46/25 47/5 48/15 48/20 53/16 54/14
56/9 58/19 61/5 61/22 62/10 66/8
72/22 78/17 79/2 79/3 83/17 86/6 88/3
89/11 89/14 89/19 89/24 92/11 92/20
93/10 93/14 93/23 94/2 94/25 112/25
113/16 116/16 118/1
schools' [2]  71/20 73/2
science [1]  9/24
score [3]  78/12 78/23 78/24
scored [2]  78/7 78/10
scores [6]  78/6 78/13 79/19 80/3 80/10
80/13
scoring [2]  78/14 79/13
Scott [5]  11/15 11/19 12/13 12/18
13/18
screen [4]  59/18 59/22 59/25 104/15
104/21
scroll [1]  106/20
scuttlebutt [4]  90/9 90/23 93/8 120/21
second [5]  2/9 41/2 41/4 118/5 118/5
sections [1]  129/20

see [19]  22/15 41/18 41/20 42/2 43/24
47/8 52/4 56/24 59/21 61/1 61/9 62/4
64/17 64/17 64/23 67/22 104/21
112/18 117/19
seeing [2]  108/9 108/11
seemed [1]  100/23
seems [8]  96/8 98/15 105/12
seen [5]  52/20 74/21 74/23 85/1 122/8
selected [1]  33/12
selection [5]  33/11 33/17 33/17 33/18
81/15
send [3]  47/23 63/24 99/21
sending [1]  114/19
senior [1]  10/20
sense [1]  107/21
sense or [1]  107/21
sent [7]  33/13 40/1 41/1 41/5 46/13
69/23 82/20
sentence [1]  41/23
separate [4]  15/18 16/5 16/9 69/15
separation [2]  8/13 36/14
seriousness [1]  113/10
services [2]  9/17 63/11
set [3]  15/5 34/10 72/24
several [2]  25/1 56/17
sex [1]  99/13
sexual [6]  11/5 36/9 36/24 37/8 99/13
99/15
sexually [3]  17/21 34/1 34/15
shall [1]  61/12
share [7]  13/25 35/4 39/11 39/23 44/5
53/14 104/15
shared [8]  35/6 39/11 64/4 76/4 83/4
83/8 83/11 101/5
sharing [1]  40/15
Sharon [5]  28/20 30/2 38/23 89/1 111/8
Sharon's [1]  111/16
Shawn [1]  93/16
she [78]  19/7 19/8 19/11 24/6 24/10
24/13 33/9 33/12 33/13 33/14 33/15
33/19 39/15 39/18 40/3 42/1 49/2 49/5
49/9 49/11 50/5 50/13 50/24 50/25
51/5 52/8 55/20 55/20 55/23 55/24
57/3 58/1 58/3 58/12 58/12 58/22
58/24 59/6 60/14 60/14 61/20 62/3
62/23 62/25 63/22 64/14 64/18 64/21
64/23 65/3 65/3 65/20 66/19 66/21
67/1 76/15 76/16 76/19 76/21 77/1
77/1 81/21 81/23 82/6 82/10 82/13
82/19 83/9 84/12 111/8 111/17 114/6
125/14 125/14 125/15 125/15 125/17
131/10
she'll [1]  114/5
she's [2]  56/7 131/3
Shepherd [3]  47/24 48/1 48/2
should [28]  13/21 18/19 19/9 19/10
43/11 47/8 49/21 53/21 55/25 57/4
63/25 64/4 67/12 67/13 75/16 78/18
80/22 83/12 86/18 89/19 89/20 90/1
128/16 128/21 129/5 129/18 129/21
133/7
show [3]  39/22 106/20 107/24
showing [1]  124/24
shown [1]  59/25
SHRM [1]  10/19
side [3]  63/5 63/8 63/25
sign [1]  53/10
signed [1]  107/17
significant [3]  37/2 37/6 126/16
signing [1]  3/3

silent [3]  102/12 102/18 103/20
simply [1]  112/6
since [4]  16/21 17/15 89/14 98/8
single [1]  123/3
sit [3]  47/16 51/19 71/9
site [1]  129/9
situation [29]  8/16 14/21 15/9 15/13
16/18 20/16 21/13 29/9 34/10 38/8
38/10 46/4 46/24 50/8 65/11 65/12
69/6 70/10 72/1 72/2 72/21 85/24 86/2
90/16 102/25 103/9 105/17 108/8
122/7
situations [4]  29/21 90/22 100/10
119/11
six [1]  45/1
size [1]  77/25
skills [1]  132/11
Slave [4]  48/10 50/6 51/1 64/19
small [2]  70/12 90/20
SMS [2]  9/13 9/15
so [119]  5/8 6/5 7/8 7/16 8/2 8/7 8/17
11/18 12/23 13/18 14/20 14/23 15/8
17/6 17/15 18/17 18/21 24/5 25/12
26/1 26/13 26/15 28/13 30/1 30/2 30/6
30/12 31/1 31/10 33/4 34/11 36/4
37/18 40/3 44/8 44/11 45/5 46/4 46/11
46/15 47/7 47/14 49/9 49/23 50/4
50/23 53/2 56/14 58/3 58/5 58/10
60/21 63/20 66/7 68/25 69/8 69/23
71/1 71/19 72/9 73/20 74/14 76/25
77/5 78/11 79/1 79/5 79/12 81/17 83/8
86/2 90/4 91/10 92/14 93/2 95/23
97/15 98/8 98/25 99/18 100/13 100/21
101/10 103/2 104/9 106/2 107/9 107/9
108/7 109/12 111/19 112/9 112/11
114/3 116/2 116/17 117/2 117/9
117/14 117/16 118/4 118/19 120/5
121/7 122/5 123/5 123/18 123/19
123/21 125/1 125/17 125/22 126/8
127/6 127/11 127/15 129/4 129/9
130/17
solely [2]  32/5 32/19
some [27]  7/5 11/6 29/20 37/2 40/15
49/6 52/15 55/16 79/19 84/12 91/22
96/4 102/3 107/21 109/2 110/10
110/19 111/19 112/3 118/6 121/2
122/24 122/25 123/1 124/19 129/13
130/16
somebody [28]  15/10 15/12 18/1 18/23
20/25 21/9 56/17 63/4 64/5 68/1 71/24
79/8 88/25 92/4 92/7 92/22 102/23
102/24 104/3 109/3 110/20 117/3
117/17 118/6 120/10 120/16 121/15
127/21
somebody's [3]  67/13 101/4 104/5
someone [37]  15/1 15/16 18/17 23/23
30/19 31/2 33/25 34/14 36/1 36/4 42/1
46/16 47/10 54/17 55/10 59/5 62/15
63/25 69/14 72/23 75/15 81/1 81/24
82/22 90/1 99/19 101/19 102/7 102/17
102/18 103/16 103/23 115/6 119/14
124/7 127/11 127/15
something [53]  19/22 19/25 20/2 20/10
20/12 20/13 21/10 30/3 44/18 45/24
48/12 51/4 55/14 55/15 57/4 66/14
67/17 67/22 67/24 68/15 71/1 71/16
71/19 72/11 74/7 77/2 77/20 91/5 91/9
91/24 92/7 97/16 100/4 102/9 102/12
102/15 103/7 103/16 103/21 105/19
107/16 107/16 107/20 107/24 108/11

## S

something... [8]  109/19 113/21 120/21 121/3 121/14 123/22 123/24 125/6
something's [1]  68/18
sometime [1]  110/6
sometimes [3]  106/1 106/23 107/10
somewhere [1]  16/14
son [3]  50/14 51/7 64/19
sorry [3]  41/21 50/12 127/18
sort [4]  12/25 22/19 129/13 131/15
sounds [3]  45/19 93/7 93/7
source [1]  114/16
South [1]  9/1
speak [8]  13/1 20/15 21/18 37/4 54/2 54/3 65/22 121/25
speaking [1]  51/6
specialized [1]  11/2
specific [5]  57/19 65/24 96/10 100/9 112/1
specifically [24]  19/4 19/16 20/1 23/16 37/4 44/17 49/4 51/23 75/25 77/11 81/11 94/13 96/25 100/9 100/11 100/14 101/1 110/11 110/13 111/20 112/4 113/3 113/6 131/22
specifics [2]  20/22 31/13
speculate [3]  27/25 27/25 29/11
speculating [1]  58/9
speculation [1]  91/10
speculative [2]  91/12 122/17
speculatively [1]  93/2
spell [2]  5/10 9/14
Spencer [2]  63/15 63/17
spoken [3]  49/1 50/1 50/7
spring [1]  89/7
staff [2]  55/12 77/14
staffing [2]  110/19 111/1
staffing-wise [1]  110/19
standard [1]  53/3
stands [1]  104/7
start [2]  8/17 63/9
started [8]  8/14 37/17 97/18 100/7 100/11
starts [1]  45/17
state [12]  5/5 7/20 7/23 49/3 75/4 112/11 114/21 115/13 116/14 118/10 132/3 132/7
stated [1]  43/13
statement [3]  20/10 37/7 92/10
statements [5]  13/20 26/2 53/9 93/22 131/10
STATES [1]  1/1
static [1]  121/17
statistician [2]  95/7 95/13
statistics [2]  75/23 95/10
stature [1]  26/23
status [1]  66/5
statute [1]  108/24
statutes [1]  109/1
stay [2]  56/13 65/5
Steel [1]  104/19
Steele [12]  106/8 107/12 107/22 108/12 112/5 113/19 114/12 114/13 114/16 115/8 116/9 116/12
Steele's [1]  107/18
Stefan [1]  38/12
Steiner [8]  3/10 3/11 3/11 4/2 4/3 5/4 41/21 125/8
steinerandsteiner.com [1]  3/13
step [1]  64/8
steps [4]  25/10 25/13 25/19 73/10

## still

still [10]  32/8 37/14 42/25 43/4 82/23 83/1 114/6 114/13 114/17 120/8
stone [1]  72/24
stop [2]  21/5 93/25
stores [1]  9/10
Story [1]  111/17
Stratford [1]  104/16
streamline [1]  106/3
Street [1]  3/12
stressful [2]  96/23 130/14
structure [1]  111/2
structured [1]  123/5
student [5]  49/8 49/22 50/19 50/21 102/17
student's [1]  48/19
students [4]  49/14 103/2 107/13 115/23
students' [1]  116/1
studies [1]  9/25
stuff [8]  11/6 93/2 96/17 100/16 101/18 102/6 126/17 129/2
subject [4]  13/13 30/18 30/19 32/9
submit [1]  106/13
submitted [3]  105/2 106/12 116/15
subpoena [1]  6/6
substance [2]  115/21 121/2
substantiate [1]  69/4
substantiated [3]  37/3 107/18 116/8
substantive [1]  121/3
success [1]  73/11
successful [2]  119/20 119/21
such [6]  31/19 45/16 52/25 126/15 128/16 130/7
sudden [1]  124/18
sue [1]  7/14
sued [2]  34/1 34/15
suffered [1]  62/24
suffers [1]  62/15
suggesting [1]  127/21
suit [1]  7/17
Suite [1]  2/9 3/22
summary [8]  4/15 52/18 52/19 52/23 104/23 105/6 105/21 106/4
superintendent [1]  103/11
supervisor [10]  57/10 57/11 57/17 57/23 58/2 62/6 71/4 75/17 126/2 126/2
supervisors [2]  58/21 117/12
support [26]  4/10 55/11 56/7 56/19 60/3 60/5 61/7 71/20 71/20 73/6 73/11 73/14 74/12 90/17 91/1 91/2 104/9 105/15 117/11 117/12 117/20 118/1 118/18 118/21 119/19 125/15
supported [5]  9/21 28/24 32/6 32/20 110/20
supporting [1]  127/23
supposed [5]  32/11 32/12 32/14 79/23 115/24
sure [18]  8/10 15/5 40/12 50/7 58/10 60/8 60/12 63/4 66/12 79/4 90/15 100/3 105/19 108/25 114/2 120/20 123/22 131/20
surrounded [1]  65/1
surrounding [1]  72/21
surveys [2]  122/24 122/25
suspension [2]  117/17 126/10
swore [1]  13/19
sworn [1]  5/3
system [2]  90/17 103/2
systems [1]  66/3

## T

table [2]  51/19 51/24
tail [3]  8/15 37/25 38/6
take [13]  21/8 25/10 26/24 28/1 40/3 49/19 57/16 57/21 58/2 60/25 72/6 114/11 118/13
taken [8]  3/1 25/20 46/13 50/19 57/25 73/10 106/11 124/16
takes [1]  62/23
talk [5]  67/25 98/13 121/10 121/10 121/12
talking [5]  26/10 26/10 45/6 82/13 96/25
taught [7]  39/16 48/11 48/14 49/14 50/14 64/19 131/8
teach [4]  10/2 10/4 10/6 10/15
teacher [11]  7/10 10/1 17/21 17/21 18/22 26/10 27/4 27/6 38/15 46/1 115/17
teaching [6]  27/14 45/11 47/2 47/6 47/11 47/12
Teams [1]  53/13
tell [45]  7/16 8/20 11/25 12/6 12/8 12/10 12/19 16/19 21/15 21/21 22/18 25/16 28/8 42/19 42/23 43/11 44/2 53/15 53/19 54/4 55/10 57/13 61/19 61/21 62/6 68/4 68/6 73/16 75/17 76/7 76/9 76/11 76/20 77/13 77/14 82/9 87/20 88/13 93/3 93/6 96/16 98/14 100/14 107/10 122/1
telling [8]  12/9 27/18 27/19 48/1 57/15 58/1 67/21 92/22
tells [4]  31/4 41/8 41/12 79/3
template [1]  105/22
temporary [1]  16/16
ten [1]  59/13
TENNESSEE [14]  1/1 1/7 1/13 1/20 2/9 3/2 8/23 9/2 9/12 108/20 109/7 132/3 132/7 132/19
tense [1]  130/9
tenured [5]  27/4 27/6 27/13 27/20 27/20
term [3]  26/20 87/4 91/7
terminate [4]  114/11 114/25 115/2 118/23
terminated [4]  7/12 7/13 8/4 113/9
terminating [1]  119/14
termination [8]  7/15 8/2 8/3 72/19 84/20 109/7 113/12 117/18
terminations [1]  28/7
terminology [1]  125/20
terms [8]  11/5 13/5 26/10 26/11 31/10 32/9 118/17 124/17
test [1]  115/23
testified [4]  8/8 40/9 43/16 120/21
testify [2]  12/15 60/13
testimony [4]  40/21 68/3 120/23 133/5
testing [10]  103/12 103/13 104/11 115/10 115/16 115/18 115/25 117/8 123/19 123/19
than [22]  17/4 23/15 26/17 27/10 27/14 30/8 56/18 57/3 58/13 62/11 63/2 83/20 83/9 89/15 94/5 94/10 106/2 106/5 114/16 115/8 116/9 127/24
Thank [2]  5/15 39/24
that [757]
that's [58]  10/16 10/17 15/7 24/14 26/16 27/10 35/6 37/6 40/5 40/22 41/7 42/1 44/18 49/13 52/16 56/11 56/19 58/9 59/14 60/3 60/5 60/6 61/1 61/18

**T**

that's... [34]  64/23 71/22 72/10 75/7
75/17 84/16 87/12 87/16 90/18 90/18
94/23 98/9 99/1 99/10 103/13 103/17
103/21 103/23 104/6 105/19 106/22
108/18 110/25 119/6 119/13 122/17
123/3 124/15 125/10 126/9 127/7
130/13 130/20 131/24
their [43]  12/15 13/20 27/16 32/10
32/14 37/9 37/13 37/15 37/21 40/10
40/17 40/21 51/14 51/15 55/11 58/5
59/10 62/21 72/6 73/11 75/15 75/18
77/14 78/4 94/6 100/14 101/6 107/14
119/12 120/6 121/23 123/23 126/1
126/2 126/15 128/8 128/19 128/19
129/2 129/6 129/7 130/4 131/2
them [52]  6/15 6/20 13/11 14/16 14/17
16/21 24/1 27/18 27/19 28/8 30/10
32/13 32/18 37/4 37/9 37/22 39/11
43/4 47/22 47/23 53/12 53/14 53/14
58/7 62/21 66/9 68/4 68/8 75/17 75/17
79/5 88/6 88/7 88/11 90/13 94/5 99/21
99/23 106/11 108/16 114/5 117/9
117/10 117/12 119/10 119/13 120/8
121/24 124/17 126/10 130/21 130/21
then [48]  10/10 12/23 13/11 16/14
20/23 25/12 26/1 28/13 28/23 30/4
30/12 32/5 32/20 44/11 46/1 47/4
47/14 50/4 50/23 52/8 52/15 64/21
66/4 66/7 68/25 69/5 74/10 74/13
78/13 79/1 86/9 86/11 99/11 99/24
104/12 112/18 112/20 112/23 113/15
113/23 114/6 117/23 118/6 119/10
121/24 124/18 125/22 127/15
there [119]  5/18 11/23 11/23 11/24
12/3 12/6 12/10 13/6 13/17 13/18
15/16 15/20 17/5 17/15 21/13 23/12
27/6 32/6 36/16 37/2 38/4 39/2 43/17
45/15 46/12 46/19 49/6 49/17 49/18
52/2 52/23 55/16 66/4 68/14 69/7 69/8
69/11 73/4 75/22 77/7 77/23 80/18
80/21 82/16 83/19 83/22 84/4 85/9
85/20 87/18 88/3 88/15 88/18 88/22
89/15 89/18 89/25 90/24 91/3 91/4
91/8 91/10 91/13 91/17 91/19 91/22
91/23 92/3 92/10 92/14 92/19 93/8
93/11 93/15 93/23 95/13 96/4 96/17
96/18 96/19 97/1 97/2 97/6 98/4 98/8
98/24 98/25 99/7 100/6 100/7 100/12
101/6 103/15 103/21 107/1 110/10
110/19 111/19 111/23 112/9 113/22
115/17 119/22 119/23 120/24 122/2
122/12 122/14 123/2 125/22 127/22
128/20 128/21 128/21 128/23 129/1
129/3 130/15 131/19
there's [23]  14/12 17/7 73/5 73/14
73/17 88/2 91/10 95/23 97/21 98/22
99/16 118/13 123/17 123/18 123/18
123/19 124/15 124/18 126/8 126/12
126/18 130/3 130/9
thereafter [1]  79/25
these [10]  25/7 28/7 43/13 51/9 51/12
53/25 67/4 81/3 129/12 129/17
they [139]
they'd [1]  46/22
they'll [3]  119/20 122/13 127/23
they're [27]  27/17 27/20 27/21 31/7
62/17 68/13 102/20 102/20 103/18
103/18 103/20 116/15 117/6 117/24
119/11 121/6 122/6 124/12 124/13
124/21 124/22 124/22 124/23 124/24
127/19 127/21 130/11
they've [6]  37/14 73/12 99/20 122/24
124/9 128/8
thing [3]  13/9 45/20 121/9
things [27]  17/7 31/19 32/14 33/15
72/18 77/15 84/12 90/10 96/4 98/22
100/18 100/20 107/5 107/5 107/21
110/22 121/18 121/25 122/14 123/9
123/9 123/18 123/19 125/2 125/17
125/18 129/17
think [69]  8/12 10/22 11/20 12/2 14/1
15/2 15/17 19/8 19/15 23/4 23/22
23/24 24/6 24/22 31/9 36/21 38/22
48/18 49/16 49/17 50/9 54/6 56/11
58/6 62/19 63/15 64/23 67/3 67/15
68/5 69/4 70/23 74/16 76/3 89/3 89/6
90/17 92/22 93/11 94/15 94/21 95/14
97/1 100/16 100/17 102/20 103/11
105/13 106/10 106/17 107/19 108/12
111/10 112/1 113/11 114/18 119/3
119/9 119/9 120/17 123/4 123/13
125/17 128/19 130/9 130/9 130/13
130/20 131/21
third [4]  15/23 20/7 20/9 41/4
third-party [1]  15/23
this [96]  6/5 7/23 12/23 13/6 13/17
23/14 39/21 40/1 40/4 40/9 40/16
40/23 41/1 41/2 42/23 44/24 44/25
45/5 45/7 46/7 46/10 47/14 47/15 48/1
48/4 48/10 49/24 52/24 56/25 57/21
57/25 58/2 59/25 60/2 60/8 60/13 61/1
61/19 62/14 67/19 68/1 71/17 71/21
72/2 73/17 74/5 74/7 74/9 74/21 74/23
75/2 75/4 75/11 79/7 81/21 81/22
84/16 84/17 85/1 93/6 93/18 93/25
95/8 95/23 95/24 98/14 99/18 102/8
104/2 104/23 105/5 105/5 105/8
105/10 105/11 105/19 105/19 105/20
105/24 106/13 107/11 107/25 108/4
108/7 108/24 108/24 109/11 109/14
109/15 109/15 109/18 109/23 111/23
121/20 131/25 132/16
thoroughly [1]  15/13
those [32]  23/18 27/23 27/24 28/1
28/10 28/23 29/21 29/22 33/15 37/19
42/25 43/2 43/10 51/18 65/14 70/24
73/3 76/17 81/10 87/1 90/22 99/14
100/20 101/19 103/25 117/18 118/1
118/8 119/5 127/19 128/23 130/5
though [2]  38/3 82/19
thought [9]  12/18 40/20 43/11 43/16
50/14 50/25 62/2 102/10 130/17
three [6]  77/23 81/10 97/21 98/16
117/13 124/4
through [21]  11/4 54/3 60/20 66/1 66/1
66/3 66/16 82/8 87/1 87/19 88/3 89/8
94/25 98/11 98/13 114/4 114/22
117/18 127/17 127/20 133/4
throughout [2]  77/25 97/4
time [47]  11/20 12/5 15/24 17/23 24/24
36/18 38/15 44/24 47/24 49/18 52/2
56/23 60/10 60/20 63/14 78/20 79/5
79/9 83/5 83/6 87/17 88/15 88/21 94/3
96/18 96/20 97/5 98/23 101/2 101/3
103/11 106/18 109/17 111/17 112/16
112/21 112/25 113/6 117/3 119/1
119/3 119/6 120/19 124/25 130/6
131/4 131/5
timeframe [1]  100/23

timeframes [1]  115/25
timeline [2]  29/8 106/21
times [4]  6/12 15/17 98/6 98/22
timing [7]  7/5 19/16 60/17 60/22 65/2
68/21 70/23
title [6]  11/20 63/18 98/24 99/10 99/11
99/11
TN [4]  3/12 3/18 3/23 47/7
today [9]  22/4 23/10 32/25 33/4 47/16
68/3 71/9 75/20 93/6
today's [1]  89/8
together [7]  78/14 103/3 106/10 126/8
126/17 127/3 131/3
told [18]  12/3 12/12 12/21 27/16 39/14
50/16 57/21 68/17 76/2 78/3 79/24
83/15 96/4 96/12 96/13 96/14 101/23
114/23
Tony [1]  111/18
too [6]  37/7 44/18 56/23 101/5 114/21
129/3
took [3]  11/9 54/21 65/25
top [7]  56/12 56/15 56/25 89/5 104/24
105/1 106/12
Torrington [1]  8/22
towards [1]  15/14
train [3]  28/6 28/8 28/10
trained [1]  52/9
training [11]  10/25 11/1 11/2 11/4 11/6
103/2 111/24 112/1 118/11 118/14
119/2
transcript [2]  132/9 133/5
transfer [8]  26/17 26/19 26/20 26/21
26/22 26/23 26/24 27/10
transferred [5]  27/21 47/11 55/11 55/20
64/21
transfers [5]  28/15 59/19 61/2 61/6
66/4
transition [2]  97/1 101/11
transpired [1]  60/23
Trauger [1]  1/6
treatment [2]  37/8 37/22
tried [1]  106/3
trouble [1]  79/13
true [5]  26/4 47/4 122/22 132/10 133/5
truth [1]  119/25
truthful [1]  91/12
try [17]  6/5 10/12 53/9 56/22 56/24
65/6 70/10 70/11 94/7 94/11 98/9
101/7 103/3 118/21 121/16 122/20
123/21
trying [5]  35/25 93/18 96/21 107/4
107/20
tumultuous [1]  100/21
two [15]  4/10 10/17 10/18 39/22 43/24
57/6 57/7 64/8 65/14 74/15 95/17 97/7
97/18 100/7 116/2
type [4]  55/16 89/21 103/8 119/1
types [1]  115/10
typical [1]  46/19
typically [4]  30/13 46/17 53/9 68/4

**U**

ultimately [5]  44/7 73/2 113/15 117/23
125/14
under [8]  13/19 28/16 30/16 75/24 92/2
93/6 97/8 108/19
understand [10]  7/22 31/15 31/24 46/4
58/7 75/22 87/7 92/25 94/11 126/20
understanding [12]  28/14 34/22 39/1
50/12 50/23 68/3 76/3 76/13 82/16

**U**

understanding... [3]  99/8 120/23 127/5
understood [2]  28/20 66/19
underwent [2]  111/25 112/2
unfortunately [1]  112/8
unit [1]  123/3
UNITED [1]  1/1
unlawful [2]  104/5 124/11
unless [4]  25/9 54/8 55/16 130/3
unpack [1]  97/17
until [5]  15/13 68/25 88/15 88/22
129/10
untouchable [3]  91/20 119/24 119/24
up [28]  14/20 15/5 26/14 31/20 34/10
42/19 45/25 46/1 48/3 51/6 52/18
52/19 56/22 56/24 59/18 62/17 65/23
78/14 80/3 80/10 105/18 109/6 116/1
117/7 117/13 119/7 124/24 126/14
updated [5]  60/10 60/11 60/21 60/21
60/24
updates [2]  51/15 51/17
upon [2]  34/14 70/12
upset [1]  101/6
us [25]  14/22 30/17 31/8 35/6 36/21
59/10 59/11 60/20 68/6 87/23 90/22
94/5 94/6 98/2 101/5 112/2 113/14
113/15 114/2 123/2 123/16 124/6
125/2 125/15 127/23
use [2]  31/9 79/4
used [3]  79/14 105/20 109/1
usually [3]  70/25 103/25 128/2
utilize [1]  105/24
utilized [1]  105/23

**V**

valid [1]  53/22
valued [1]  46/20
Vanessa [1]  33/21
version [1]  60/22
versus [2]  118/23 119/21
very [15]  21/11 26/20 36/23 37/18
94/13 95/8 95/8 96/2 96/9 96/20 96/22
100/6 100/8 100/20 124/6
vetted [1]  49/21
VI [1]  99/10
viewed [1]  49/20
VII [1]  99/11
violation [3]  99/10 108/24 113/10
violations [1]  108/20
voided [1]  116/1

**W**

W-Y-N-T-R-E-S-S [1]  18/10
wage [4]  55/17 64/6 64/7 64/10
wait [1]  68/25
waived [1]  3/4
walks [2]  31/4 31/6
Walmart [3]  9/7 9/9 9/11
want [26]  13/3 27/25 33/14 33/15 34/8
45/3 45/18 47/23 49/13 67/18 67/25
71/25 72/7 72/8 72/8 79/10 79/11
81/22 82/25 100/4 102/2 104/7 118/12
118/24 119/15 120/20
wanted [2]  10/15 17/9
wants [3]  65/3 66/8 73/16
warrant [3]  17/6 17/7 117/21
warranted [1]  126/16
was [393]
wasn't [12]  11/23 28/22 29/9 32/10
32/11 54/9 54/11 78/11 86/1 113/20

114/9 116/4
Waverly [1]  48/11
way [6]  32/12 65/3 99/6 102/8 122/9
132/15
we [136]
we'd [2]  63/4 126/13
we're [11]  50/9 52/17 56/24 60/25
73/19 98/3 98/21 125/1 126/3 127/6
127/25
we've [6]  25/1 29/20 74/12 98/7 107/9
129/17
week [3]  6/23 7/21 8/9
weekly [4]  18/21 24/11 51/9 51/12
weeks [4]  25/25 29/4 29/10 64/19
well [20]  14/19 15/7 22/14 46/10 49/21
63/14 68/4 68/12 97/7 100/19 101/3
102/7 106/14 107/24 111/22 113/23
124/10 126/1 127/5 128/19
went [8]  9/4 10/16 11/3 48/2 94/25 97/9
115/24 131/21
were [108]  6/14 6/15 6/16 6/18 7/24
10/1 12/1 12/3 12/6 12/14 12/16 13/19
14/12 16/1 18/25 19/17 22/8 23/18
24/5 25/10 25/20 27/13 31/13 33/24
34/12 34/13 36/16 37/2 37/3 37/9
37/19 37/20 39/8 39/9 39/10 39/10
39/13 40/10 40/15 40/17 43/7 51/16
54/24 55/18 55/23 60/13 61/21 65/25
63/11 66/4 67/2 67/4 72/3 75/22 78/3
78/3 78/7 78/9 79/19 79/23 79/24
80/13 80/22 81/7 83/22 85/9 85/19
86/5 86/8 88/18 91/17 91/19 91/20
93/11 95/2 96/3 96/4 96/5 96/18 97/3
100/10 102/10 102/11 103/5 103/6
104/16 110/10 110/12 111/19 112/13
113/17 113/25 114/23 115/22 116/1
118/25 119/22 119/23 119/23 120/10
120/23 122/1 126/15 128/20 128/21
128/24 130/16 131/19
weren't [1]  115/24
what [163]
what's [8]  24/15 28/8 45/23 45/24
51/13 52/12 59/21 60/4
whatever [8]  20/23 25/10 64/3 68/13
72/20 78/15 121/16 124/19
when [96]  6/5 8/17 11/3 11/9 11/23
11/24 13/7 13/16 14/19 16/4 16/9
19/18 20/2 22/3 22/14 24/14 24/18
27/16 31/3 31/19 35/8 36/16 37/18
38/1 38/6 39/10 44/2 45/5 45/11 45/12
46/13 49/2 49/25 51/17 52/8 53/4 53/8
55/19 60/12 60/14 60/17 60/21 60/23
60/23 61/19 65/2 68/12 68/17 69/20
69/22 70/14 71/2 71/3 72/17 73/8 77/9
77/11 78/18 78/21 79/8 83/11 86/19
90/23 91/2 93/1 93/14 94/5 94/25 96/8
96/14 97/18 99/6 100/5 100/7 100/10
101/24 101/25 106/24 107/2 107/5
108/1 108/12 112/9 113/11 114/2
115/24 118/12 118/13 121/17 123/23
125/2 125/9 130/5 130/9 130/11
130/15
where [21]  22/5 32/10 41/18 49/18
51/15 57/9 58/22 61/9 64/22 67/1 76/7
76/12 93/12 99/21 100/2 106/12
113/18 121/9 123/24 129/14 130/6
WHEREUPON [6]  43/5 48/6 74/17
84/22 85/4 110/1
whether [46]  7/22 14/12 22/15 27/19
27/20 32/25 33/5 33/9 33/16 34/24

40/8 46/25 47/1 47/5 47/16 52/3 56/8
56/25 57/20 58/15 62/9 64/11 69/17
70/19 71/11 71/15 74/2 76/5 76/25
81/3 81/6 86/13 92/13 93/3 99/24
113/4 117/4 118/15 119/25 120/16
121/21 122/22 124/8 126/18 126/19
131/16
which [11]  6/22 41/21 75/25 83/4 100/5
100/8 105/2 112/20 117/2 117/7
128/22
whichever [1]  56/13
while [1]  96/21
whistle [1]  31/12
whistleblower [11]  29/18 30/6 30/13
30/24 31/5 31/8 31/9 31/15 31/24 32/6
87/10
White's [5]  20/18 46/9 68/20 68/23
75/21
who [82]  11/8 11/13 11/16 16/5 16/6
16/8 16/10 17/19 18/7 21/9 22/19
22/25 23/4 24/25 28/6 29/13 29/22
29/24 30/18 33/25 34/14 34/18 34/24
35/12 36/6 37/8 37/19 38/11 38/24
39/5 39/11 40/9 42/19 43/11 43/19
44/3 44/7 48/13 51/24 52/2 53/15
57/12 62/6 63/6 63/13 65/13 65/16
65/24 73/20 76/2 77/13 78/23 83/6
87/20 88/1 88/8 88/13 88/14 88/24
89/9 93/14 95/2 99/3 101/19 102/21
103/4 103/5 104/10 106/13 106/18
111/7 112/17 115/12 115/15 117/14
119/24 120/15 127/3 127/8 127/10
130/23 131/17
whoever [3]  54/21 73/16 112/24
whole [1]  64/10
whose [3]  89/13 100/12 122/21
why [24]  24/1 24/8 31/13 41/12 41/16
42/10 54/4 55/7 62/10 66/17 66/21
66/23 72/5 75/18 75/20 77/6 77/19
82/9 83/4 83/11 98/9 98/14 105/25
116/11
wife [1]  38/23
will [15]  13/11 53/10 61/15 62/20 64/7
72/11 72/13 75/11 91/9 93/9 93/24
101/16 114/5 127/22 130/12
Williams [2]  38/12 38/17
wise [1]  110/19
within [14]  21/6 21/6 27/5 27/14 28/25
29/4 30/7 30/19 56/13 64/19 101/20
110/17 111/6 122/21
witness [2]  5/2 91/20
witnesses [5]  52/10 52/11 53/5 53/8
53/10
Woodland [1]  3/12
words [1]  92/21
work [17]  9/4 11/3 11/10 15/10 15/14
15/19 21/7 21/7 34/1 34/15 67/1 77/13
87/3 92/5 98/11 99/24 124/24
worked [8]  9/7 9/12 48/15 48/19 49/11
101/11 103/3 131/3
workers [3]  91/23 93/23 94/3
working [4]  11/25 101/10 114/13
114/17
works [2]  38/24 65/18
world [2]  49/17 75/19
worthy [1]  119/16
would [204]
wouldn't [3]  30/4 46/22 76/17
written [8]  44/11 51/18 52/16 103/21
129/1 129/4 129/10 129/13

# W

wrongdoing [1]  67/23
wrongful [1]  7/14
wrongfully [1]  8/5
wrote [2]  46/10 109/13
Wyntress [2]  18/9 18/13

# Y

y'all [1]  98/17
Yeah [4]  63/18 63/20 101/21 106/22
year [15]  5/19 26/14 45/1 45/17 60/9
70/22 71/1 87/17 87/19 88/4 88/16
88/22 89/7 89/8 115/20
years [6]  10/2 10/17 10/18 36/2 114/2
122/11
yes [91]  5/12 6/8 6/11 7/2 9/5 10/5
14/10 17/1 17/18 19/24 21/7 22/13
24/2 24/4 24/9 24/13 26/7 26/18 26/20
29/17 30/25 34/8 35/16 35/19 37/24
38/19 40/5 41/3 41/7 41/11 42/4 43/4
45/10 47/3 48/12 51/19 52/11 52/14
52/17 53/7 54/7 54/24 59/23 61/4 61/8
65/15 68/8 68/21 72/12 74/25 75/19
76/15 78/5 78/25 83/24 84/9 85/14
86/7 86/10 87/6 87/15 88/23 89/22
90/7 91/1 92/20 94/20 97/20 97/24
98/23 104/18 104/20 104/22 104/25
105/4 105/7 106/25 107/4 108/6
108/22 109/9 109/21 110/8 110/25
114/13 114/21 115/11 126/24 127/14
129/16 129/20
yet [3]  5/19 68/15 102/3
you [574]
you'll [2]  103/22 119/20
you're [26]  8/7 28/4 29/10 29/13 33/4
34/5 35/15 45/21 45/22 67/21 68/5
71/24 72/17 81/10 88/6 90/4 90/25
91/2 92/21 107/4 107/7 109/13 119/18
127/11 130/5 130/6
you've [6]  16/19 16/21 25/8 52/20
89/15 108/1
Young [6]  11/9 11/14 18/10 18/14 87/3
97/6
your [104]  5/5 5/10 5/16 6/2 9/23 11/22
13/21 14/14 15/24 18/20 20/21 21/1
22/3 23/25 24/11 24/18 29/1 29/5 29/5
30/7 30/14 30/22 30/22 31/2 33/4 34/8
39/6 42/5 42/9 43/3 48/5 50/12 50/23
51/8 52/9 53/4 54/18 55/1 55/24 57/4
57/14 57/15 57/20 57/22 58/2 59/8
61/24 62/23 63/2 63/22 63/23 63/25
64/2 64/11 67/12 67/17 67/19 68/3
68/4 70/20 71/10 71/17 73/15 73/21
79/2 80/16 80/23 81/23 82/24 83/6
85/11 85/21 86/18 88/8 88/14 89/20
95/19 96/2 96/3 98/1 99/3 99/8 101/13
102/9 102/15 103/23 105/2 105/12
108/4 109/19 110/17 111/24 112/6
113/2 113/13 120/23 122/11 124/2
125/1 125/23 127/2 127/17 130/8
131/15
yourself [3]  8/21 31/10 108/1

# Z

ZANDER [12]  1/24 3/1 4/6 4/8 5/1 5/7
44/2 74/21 95/19 105/2 133/4 133/22

EXHIBIT
Zander
2
5-4-22
PENGAD 800-631-6989

| | |
|---|---|
| **From:** | Bailey, James K <James.Bailey@mnps.org> |
| **Sent:** | Wednesday, June 24, 2020 3:41 PM |
| **To:** | Ann Steiner- Attorney |
| **Subject:** | Fwd: Formal Complaint |

Please see below!

Sent from my iPhone

Begin forwarded message:

> **From:** "Zander, Mary Ellen" <MaryEllen.Zander@mnps.org>
> **Date:** June 24, 2020 at 3:14:19 PM CDT
> **To:** "Bailey, James K" <James.Bailey@mnps.org>
> **Cc:** "j_kbaily@comcast.net" <j_kbaily@comcast.net>
> **Subject: RE:  Formal Complaint**

*Dr. Bailey,*
*Attorney, Kevin Klein is an outside investigator that will be investigating your concerns.  He will likely be reaching out to you once he initiates his investigation.*

*Thank you,*

**Mary Ellen Zander**
*Director of Employee Relations*
Metro Nashville Public Schools
2601 Bransford Ave
Nashville, TN 37204
Office: 615.259.8440 Ext. 858440
MaryEllen.Zander@mnps.org

Leadership Employee Relations Docs



METRO
PUBLIC
SCHOOLS

Belief|Arranger|Responsibility|Relator|Individualization

Note: This e-mail may contain privileged and confidential information and is intended only for the use of the specific individual(s) to whom it is addressed. Your receipt of this e-mail is not intended to waive any applicable privilege. If you are not an intended recipient of this e-mail, you are hereby notified that any unauthorized use, dissemination or copying of this e-mail or the information contained in it or attached to it is strictly prohibited. If you have received this e-mail in error, please delete it and immediately notify the person named above by telephone.

**From:** Zander, Mary Ellen
**Sent:** Tuesday, June 16, 2020 4:29 PM
**To:** Bailey, James K <James.Bailey@mnps.org>
**Subject:** RE: Formal Complaint
**Importance:** High

1

*Good afternoon Dr. Bailey,*
*Thank you for sharing your concerns. MNPS takes all concerns of this nature very seriously and will be*
*looking to conduct a formal investigation. Because of the nature of your complaint, it will be handled*
*outside of MNPS HR department. I am still working to identify the investigator. As soon as that*
*individual is identified, I will let you know.*

**Thank you,**

**Mary Ellen Zander**
*Director of Employee Relations*
Metro Nashville Public Schools
2601 Bransford Ave
Nashville, TN 37204
Office: 615.259.8440 Ext. 858440
MaryEllen.Zander@mnps.org

Leadership Employee Relations Docs



Belief | Arranger | Responsibility | Relator | Individualization

Note: This e-mail may contain privileged and confidential information and is intended only for the use of the specific individual(s) to whom it is addressed. Your receipt of this e-mail is not intended to waive any applicable privilege. If you are not an intended recipient of this e-mail, you are hereby notified that any unauthorized use, dissemination or copying of this e-mail or the information contained in it or attached to it is strictly prohibited. If you have received this e-mail in error, please delete it and immediately notify the person named above by telephone.

**From:** Bailey, James K <James.Bailey@mnps.org>
**Sent:** Monday, June 15, 2020 9:58 PM
**To:** Zander, Mary Ellen <MaryEllen.Zander@mnps.org>
**Cc:** j_kbaily@comcast.net
**Subject:** Formal Complaint

June 15, 2020

Mary Ellen Zander, Director of Employee Relations:

Please accept this written notice as my formal complaint of retaliation, age and race discrimination against Dr. Adrienne Battle. The retaliation is based upon my participation in the Director of Schools', Dr. Adrienne Battle's, brother's disciplinary disposition. The age discrimination is based on me being removed from my position as Principal at Whites Creek High School. Although Dr. Battle alleges that my removal was due to the district's reorganization and budget impact, she is replacing me with someone that is not in a protected age group for my same role. On May 1, 2020, in my meeting with Dr. Chris Barnes, Chief Human Resources Officer, he stated that because I had been at Whites Creek High School for several years they were making a change, yet there are other white high school principals that have been at their schools even longer that were not removed.

Additionally, rumors have been swirling around that I got her brother fired. However, any disciplinary action at that level comes at the recommendation of the Director of Schools. It is my understanding that those allegations against me were also included in Scott Lindsey's complaint and open records request. Keep in mind that Scott Lindsey, former Executive Director of Employee Relations, was the one that was having conversations with Dr. Adrienne Battle's husband, Dr. Darren Kennedy, when the

Carlton Battle investigation was active. Although Scott Lindsey was not assigned to the investigation, Dr. Darren Kennedy was calling me and telling me that Scott Lindsey told him that I had requested an audit of her brother and was trying to get him, Carlton Battle, fired. Although I did not realize that Scott Lindsey was friends with Dr. Battle or Dr. Kennedy, I knew the information regarding the audit and other aspects regarding the investigation Dr. Kennedy was sharing with me was accurate; however, Scott Lindsey should not have been discussing an active case with him per MNPS policy. Shortly after Dr. Battle was officially appointed as the Director of Schools on March 13, 2020, my fear of retaliation became a reality. As a result of the harassment from Dr. Battle's husband and repeated threats from one of the Battle family friend, I had to seek medical attention. Obviously, that fear of retribution and retaliation was real and I am still under a physician's care to this day.

Last, in a letter signed by Dr. Battle states that if I had not secured another position by June 15, 2020, that I would be placed in a classroom teaching position for the 2020/2021 school year. Although I was encouraged to apply for other positions, I never received a call until I sought legal counsel. I did not even get a courtesy call or any type of response for my application for the EDSSI position. Nor had I received any type of response for my Assistant Principal or Principal application for McGavock High School until I sought legal representation. While out on bereavement leave, this past Saturday, June 13, 2020, I received the first response from HR, Lisa Spencer-- Executive Director of HR-- via email. Ms. Spencer was attempting to schedule me for an interview for today, June 15, and I am still out on bereavement leave. Although that communication was not timely, how would anyone expect me to be at my best? How could I be my best self after what Dr. Battle has taken me through, along with the lack of professional courtesy regarding the scheduling of the interview? Again, as soon as Adrienne was appointed as the Director of Schools on March 13, 2020, she wasted no time in retaliating against me for my involvement in her brother's investigation, and the district HR team allowed her to discriminate against me based on my age and race by appointing someone younger with less experience and not subjecting the white principals to the same humiliation because of the length of their assignments. As result of these actions, my last day with the district will be June 30, 2020.

Respectfully,

Dr. James K. Bailey