**In the Matter Of:**

DR. JAMES BAILEY, ET AL.

vs

METROPOLITAN GOVERNMENT OF NASHVILLE, ET AL.

---

**CHRISTOPHER BARNES**

*December 09, 2021*

---



```
 1              IN THE UNITED STATES DISTRICT COURT
                   FOR THE MIDDLE DISTRICT
 2                    NASHVILLE DIVISION

 3                        - - -

 4   DR. JAMES BAILEY, DR. PIPPA        :
     MERIWETHER, and DR. DAMON CATHEY,  :
 5                                      :
              Plaintiffs,               :
 6                                      :
                                        :    Case No.
 7          vs.                         :    3:21-CV-0122
                                        :
 8   THE METROPOLITAN GOVERNMENT OF     :
     NASHVILLE AND DAVIDSON COUNTY,     :
 9   TENNESSEE and DR. ADRIENNE         :
     BATTLE,                            :
10                                      :
              Defendants.               :
11   (captions continue on page 2)
     _____
12
     VIDEOTAPED DEPOSITION OF CHRISTOPHER BARNES, Ph.D.
13   _____

14   DATE TAKEN:        Thursday, December 9, 2021

15   TIME BEGAN:        9:25 a.m.

16   TIME ENDED:        5:00 p.m.

17   LOCATION:          Landfall Executive Suites
                        1213 Culbreth Drive
18                      Wilmington, North Carolina

19

20

21   REPORTED BY:       Cherie J. Anderson, RMR, RPR, CRR
                         Legal Media Experts
22                       1-800-446-1387
                         www.legalmediaexperts.com
23

24

25
```

Page 2

```
 1   DR. LILY MORENO LEFFLER,        :
 2          Plaintiff,              :
 3    vs.                           :   Case No.
                                    :   3:21-CV-0038
 4                                  :
     THE METROPOLITAN GOVERNMENT OF :
 5   NASHVILLE AND DAVIDSON COUNTY, :
     TENNESSEE and DR. ADRIENNE     :
 6   BATTLE,                        :
                                    :
 7          Defendants.             :
                                    :
 8   _____
     JANE DOE,                      :
 9                                  :
            Plaintiff,              :
10                                  :
                                    :   Case No.
11    vs.                           :   3:20-CV-01023
                                    :
12   THE METROPOLITAN GOVERNMENT OF :
     NASHVILLE AND DAVIDSON COUNTY, :
13   TENNESSEE and DR. ADRIENNE     :
     BATTLE,                        :
14                                  :
            Defendants.             :
15   _____
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1   APPEARANCES:
 2
           STEINER & STEINER, LLC
 3         BY:  ANN BUNTIN STEINER, ESQUIRE
           613 Woodland Street
 4         Nashville, Tennessee  37206
           (615) 244-5063
 5         asteiner@steinerandsteiner.com
           (Appearing via videoconference)
 6         Representing the Plaintiffs Bailey,
            Meriwether, Leffler, and Doe
 7
 8
           JESSE HARBISON LAW, PLLC
 9         BY:  JESSE FORD HARBISON, ESQUIRE
           P.O. Box 68251
10         Nashville, Tennessee  37206
           (615) 415-3285
11         jesse@jesseharbisonlaw.com
           (Appearing via videoconference)
12         Representing the Plaintiff, Dr. Damon Cathey
13
14         METROPOLITAN GOVERNMENT AND DAVIDSON COUNTY,
            TENNESSEE
15         BY:  J. BROOK FOX, ESQUIRE
           One Public Square, Suite 204
16         Nashville, Tennessee  37201
           (615) 862-6780
17         (Appearing via videoconference)
           Representing the Defendants
18
19
20
21   ALSO PRESENT:      Karl Starkweather, Videographer
22
23
24
25
```

Page 4

```
 1               I N D E X
 2   EXAMINATION                            PAGE
 3    By Ms. Steiner                          8
 4    By Ms. Harbison                       167
 5    By Mr. Fox                            238
 6    By Ms. Steiner                        240
 7
 8             E X H I B I T S
 9   EXHIBITS      DESCRIPTION             MARKED
10   Exhibit 1   Barnes Resume               18
11   Exhibit 2   1/15/16 Letter to McGruder from  34
                  Henson
12
     Exhibit 3   Tennessee Code Ann. 49-5-501   37
13
     Exhibit 4   Tennessee Code Ann. 49-5-511   44
14
     Exhibit 5   Fiscal Year '20-'21 Budget,   61
15                MG000694
16   Exhibit 6   Interview Scores            90
17   Exhibit 7   Central Office Reorg. Plan, MG181  145
18   Exhibit 8   Vacancy by Function        149
19   Exhibit 9   5/4/20 Letter to Bailey from Battle  154
20   Exhibit 10  5/4/20 Letter to Hayes from Battle  154
21   Exhibit 11  5/4/20 Letter to Leffler f Battle  158
22   Exhibit 12  Interview Questions, MG1503  169
23   Exhibit 13  SchoolsEmails 0069116-69124  180
24   Exhibit 14  SchoolsEmails 0013262      181
25   Exhibit 15  Candidate List, MG001478   186
```

Page 5

```
 1           E X H I B I T S (cont.)
 2   EXHIBITS      DESCRIPTION             MARKED
 3   Exhibit 16  Candidate List, MG001479   188
 4   Exhibit 17  Emails, Plaintiff 000459-468  202
 5   Exhibit 18  SchoolsEmails 0011111      203
 6   Exhibit 19  Emails, Plaintiff 000470-484  210
 7   Exhibit 20  SchoolsEmails 0069436      214
 8   Exhibit 21  SchoolsEmails 0068165      218
 9   Exhibit 22  SchoolsEmails 0013286      221
10   Exhibit 23  7/15/20 Letter to Meriwether from  232
                  Barnes, SchoolsEmails 0069073
11
     Exhibit 24  6/3/20 Email to Stark from Spencer  242
12                SchoolsEmails 0013303
13   Exhibit 25  Video Recording            243
14       (Exhibits provided and marked at the
         conclusion of the deposition.)
15
16
17
18
19
20
21
22
23
24
25
```

1    THE VIDEOGRAPHER:  All right.  We are now on
2  the record.  The time is approximately 9:25 a.m.
3    This is the deposition of Dr. Chris Barnes
4  taken in the matter of Jane Doe v. The Metropolitan
5  Government of Nashville, et al.  The case number is
6  3:20-CV-01023.  This is also the case of -- for the
7  case of Dr. Lily Morena Leffler v. The Metropolitan
8  Government of Nashville, et al.  The case number
9  for that is 3:21-CV-0122.  The next case is
10  Dr. James Bailey, Dr. Pippa Meriwether, and
11  Dr. Damon Cathey v. The Metropolitan Government of
12  Nashville.  The case number for that is
13  3:21-CV-00038.  This is -- all three cases were
14  filed in the United States District Court for
15  Tennessee for the Middle District of Nashville
16  Division.
17    The deposition is being held at Landfall
18  Executive Suites, 1123 Culbreth Drive, Wilmington,
19  North Carolina.  This is a deposition with
20  participants from multiple locations.  It's being
21  held on December 9th, 2021.
22    My name is Karl Starkweather.  I'm the legal
23  video specialist.  The court reporter today is
24  Cherie J. Anderson, and we are representing Legal
25  Media Experts.

1    Please note that audio and video recording
2  will take place unless all parties agree to go off
3  the record.
4    Counsel and all present will now state their
5  appearance and affiliation for the record, after
6  which the court reporter will swear in the witness.
7    MS. STEINER:  My name is Ann Steiner.  I
8  represent Jane Doe, Dr. Lily Leffler, Dr. James
9  Bailey, and Dr. Pippa Meriwether.
10    MS. HARBISON:  Jesse Harbison.  I represent
11  Dr. Damon Cathey.
12    MR. FOX:  And I'm Brook Fox, and I'm -- I
13  represent the defendants.
14    THE COURT REPORTER:  Doctor, please raise
15  your right hand.  Do you swear or affirm to tell
16  the truth, the whole truth, and nothing but the
17  truth, please?
18    THE WITNESS:  I do.
19    THE COURT REPORTER:  Thank you.
20    - - -
21    - - -
22    - - -
23    - - -
24    - - -
25    - - -

1    CHRISTOPHER R. BARNES, Ph.D.
2  having been first duly sworn, was examined and
3  testified as follows:
4    - - -
5    EXAMINATION
6    - - -
7  BY MS. STEINER:
8    Q   Could you please state your full name for the
9  record.
10    A   Sure.  Dr. Christopher R. Barnes.
11    Q   And what does the R. stand for?
12    A   Oh, sorry.  Rawson, R-A-W-S-O-N.
13    Q   And Dr. Barnes, what is your date of birth?
14    A   April 21st, 1970.
15    Q   Okay.  And have you spoken with anyone about
16  being here for a deposition today?
17    A   I spoke with Dr. -- with Mr. Brook Fox
18  yesterday with just questions of a legal nature about
19  the deposition.
20    Q   Okay.  And does Mr. Fox -- he does not
21  represent you, correct?
22    A   No.
23    Q   What's -- I didn't hear the answer.
24    A   No -- or yes.
25    MR. FOX:  Right.  I don't represent him.  No.

1    THE WITNESS:  No.
2    Q   Okay.  And how long did you talk to Mr. Fox
3  yesterday?
4    A   About 20 minutes.
5    Q   Okay.  Have you spoken with anyone at Metro
6  Schools about giving a deposition today?
7    A   I called the current HR chief, Melissa
8  Roberge, and asked her to contact Brook Fox to call
9  me when I received the summons or the deposition
10  request.
11    Q   Okay.  And did you have any discussions with
12  Ms. Roberge about what would be asked for the --
13    A   No.
14    Q   -- issues here?
15    Okay.  So the only person that you've spoken
16  with from Metro Schools was Mr. Fox, and that was for
17  about 20 minutes yesterday?
18    A   Correct.
19    Q   Okay.  And have you spoken with anyone from
20  Metro Schools since you left there?
21    A   Just personal calls checking in on staff and
22  natures --
23    Q   Okay.
24    A   Nothing to do with this situation.
25    Q   What was the date that you left Metro Schools?

1   A  My official end date was October 4th, 2021.

2   Q  What was your start date at Metro Schools?

3   A  February 7th, 2020.  Correct.

4   Q  Okay.  So you worked there just a little bit

5 under two years; is that correct?

6   A  Correct.

7   Q  Okay.  And what was your position when you

8 were there?

9   A  Chief of human resources.

10   Q  Okay.  Now, where do you currently live?

11   A  ████████████  Little River,

12 South Carolina, 29566.

13   Q  And where are you currently employed?

14   A  New Hanover County Schools.

15   Q  And where is that located?

16   A  It is in Wilmington, North Carolina.

17 6410 Carolina Beach Road.

18   Q  And do you live close enough that you can

19 commute to work each day?

20   A  Yes.

21   Q  Okay.  And are you married?

22   A  Yes -- well --

23   Q  What is --

24   A  Go ahead.

25   Q  What is your spouse's name?

1   A  Brenda Barnes.

2   Q  Okay.  And when you hesitated there, are you

3 going through a divorce, sir, do you think?

4   A  No.  No.  There's a common joke I make saying,

5 "When I left the house this morning, I was."  But no,

6 I'm fully married.

7   Q  Okay.  Where does your wife work?

8   A  She does not.  She's disabled.

9   Q  Okay.  And if -- do you have any plans of

10 leaving your job at New Hanover County Schools?

11   A  No.

12   Q  What do you do for them?

13   A  I'm the assistant superintendent of human

14 resources.

15   Q  And did you go from your job at Metro Schools

16 to the job at New Hanover?

17   A  Correct.

18   Q  Was there a time period -- okay.

19   A  No.

20   Q  Did you have a contract with Metro Schools?

21   A  No.  Metro Schools does not contract with the

22 chief of human resources.  That job is

23 non-contracted.

24   Q  Okay.  Because I notice it looks like you left

25 in the middle of the school year.  Is that correct?

1   A  Correct.

2   Q  Okay.  Why did you leave your job at

3 Metro Schools?

4   A  My wife's illness is beginning to progress,

5 and she needs daily care, so I moved back home to be

6 able to perform that.

7   Q  Okay.  And what is your wife's illness?

8   A  She has Huntington's disease.

9   Q  Okay.  Now, should you leave your job at --

10 forget that.

11      When you left Metro Schools, had anyone at

12 Metro asked you to leave or asked you to resign?

13   A  No.  I brought my concern about my wife's

14 illness up with the director of schools back in May.

15 She asked me whether we could work out some kind of

16 agreement to have me be allowed to stay there and

17 continue to work at Metro and take care of my wife's

18 health at the same time.  My wife then did have a car

19 accident which fractured her ankle and caused some

20 other health issues, and that precipitated the move a

21 little sooner than not, and so I transitioned --

22 looked for positions and transitioned back in

23 October.

24   Q  Okay.  Now, when you were here working in

25 Nashville, your wife was in South Carolina, correct?

1   A  Yes.  We had children in both college and

2 element- -- high school, and so it was a better move,

3 with COVID and everything, to have me travel rather

4 than them move.

5   Q  Okay.  And when you were working for

6 Metro Schools, were you located primarily in

7 Nashville or --

8   A  Yes.

9   Q  -- were you working remotely from

10 South Carolina?

11   A  Yes.  I had an address in Nashville.

12   Q  Okay.  Now, have you ever given a deposition

13 before?

14   A  Yes.  Once in the matter of Metro Schools and

15 Shelby County Schools versus the State.

16   Q  And does that have to do with the BEP funding?

17   A  Correct.

18   Q  Okay.  And so then were you being questioned

19 about the funding for Metro Schools and what was

20 needed?

21   A  Yeah.  The question was about whether the

22 allotments -- whether or not the BEP formula provided

23 enough staff to appropriately staff the schools.

24 There were questions about whether or not teachers

25 were required to use personal funding to offset the

1  cost of supplies and materials, whether or not the
2  allotment formula provided the necessary amount of
3  staff for the needs of a district like Metro
4  Nashville.
5     Q   Okay.  Besides this deposition, have you ever
6  given another deposition?
7     A   No, ma'am.
8     Q   Okay.  Have you ever testified in court?
9     A   No.  I had a speeding ticket, but that was it.
10    Q   Okay.  Have you ever been involved in a
11 lawsuit before?
12    A   No.
13    Q   Was that no?
14    A   No.
15    Q   Okay.  Good.  That's the only thing I'm going
16 to stop you, because sometimes people will nod their
17 heads.  I could tell you said no; I just couldn't
18 pick it up.  So if there's an issue with that, I'm
19 going to ask you to repeat yourself just to make sure
20 it's correct on the record.  Okay?
21    A   Yes, ma'am.
22    Q   Okay.  Now, have there ever been any
23 grievances filed against you at Metro Schools?
24    A   There were grievances filed that I was a part
25 of and named in in regards to salary and salary

1  adjustments, but nothing against me personally.
2     Q   Did anything have anything to do with any
3  grievance about discrimination or retaliation?
4     A   There were several grievances that were filed
5  as a part of the Metro Nashville Public Schools
6  security department.  They had made the claim that
7  their salaries were discriminatory, but nothing in
8  regards to my personal interactions.
9     Q   And what department was this?
10    A   The Metro Nashville Public Schools security
11 department.
12    Q   Okay.  And if they were discriminatory, what
13 was it based on?
14    A   They made a claim of race; they made a claim
15 of gender and age, I believe.
16    Q   Do you set those salaries in HR?
17    A   We use a formula and a rubric to set salaries.
18 Most of their complaints had arisen out of a salary
19 shift in 2016 and then again in 2019, prior to my
20 arrival.
21    Q   Okay.  When you were at HR -- when you were
22 the chief of HR for Metro, did you have a job duty
23 for setting the salaries?
24    A   It was our job to set salaries when people
25 arrived at the job and set their beginning salary.

1  We were also -- our office did make recommendations
2  to the board and to the city council for step and
3  cost-of-living adjustments.
4     Q   Okay.
5     A   Their claim arose out of a shift in 2016 and
6  again in 2019 where, prior to which, we had not
7  awarded outside external experience; however, in 2016
8  and again in 2019, they implemented an approval of
9  prior experience into the job, and so that created a
10 situation where several people entering into the job
11 started at the same salaries as someone who had
12 already been working in the job, due to the lack of
13 the city council and the board approving step
14 increases every year.
15    Q   Okay.  Any other grievance filed against you
16 that was based on a discriminatory reason?
17    A   Not to my recollection, no.
18    Q   Okay.  Now, I want to show you something
19 and -- let me see if I can find it here.  Hang on one
20 second.  Okay.  Can you see this?
21    A   Yes.  That is my resume.
22    Q   Okay.  And does this have on here your job
23 experience before you took your job at Hanover?
24    A   Yes, ma'am.
25    Q   Okay.  And I want to ask you just very

1  briefly.  It looks like you went to school and got
2  your -- where did you get your undergraduate?
3     A   Saint Michael's College in Burlington,
4  Vermont.
5     Q   Okay.  And what was the name of the college?
6     A   Saint Michael's College.
7     Q   And what type degree did you get?
8     A   A bachelor's of arts in English with a minor
9  in classics.
10    Q   And what year did you graduate?
11    A   1992.
12    Q   Okay.  And then it looks like you got your
13 master's in school administration --
14    A   Yes, ma'am.
15    Q   -- in Greensboro --
16    A   Uh-huh.
17    Q   -- correct?
18        University of North Carolina?
19    A   UNC Greensboro, yes, ma'am.
20    Q   Okay.  And then you got your -- a specialist
21 degree from Appalachian State?
22    A   Yes, it's called an EDS.  It's a mid-step
23 between a master's and a doctorate.
24    Q   Okay.  And then you got your doctorate
25 degree --

1    A    Correct.  In --
2    Q    -- from Western Carolina, correct?
3    A    In 2016.  Yes, ma'am.
4    Q    Okay.  Is this resume true and accurate?
5    A    Yes.
6         MS. STEINER:  Okay.  Could we have this
7    marked Exhibit Number 1, and I will provide you
8    with a copy later for the court reporter.
9         THE COURT REPORTER:  Yes, ma'am.
10        MS. STEINER:  This is Dr. Barnes' resume.
11   Q    Dr. Barnes, do you have a license in
12   North -- South Carolina now -- or North Carolina?
13   Excuse me.
14   A    North Carolina.  Correct.
15   Q    And what's your license?
16   A    It is a superintendent and administrator
17   license.
18   Q    And do you need an administrator's license to
19   be -- to work in HR in North Carolina?
20   A    A license is not required in that position.
21   However, it's recommended.
22   Q    Okay.  Now, when you were here in Tennessee,
23   did you have a license?
24   A    I never got my North Carolina -- my
25   North Carolina license, I did not transfer to

1    Tennessee because the license is not required for
2    that position in Tennessee.
3    Q    Okay.  So at Metro Schools, to be the chief of
4    human resources, a license is not required?
5    A    No, it is not.
6    Q    I couldn't hear you.  I'm sorry.
7    A    No, it is not.
8    Q    Okay.  Is it recommended?
9    A    There are very -- Metro Nashville does --
10   Tennessee does things different than North Carolina.
11   I do not recall whether it's recommended or required.
12   Q    Do you recall having discussions with
13   Dr. Battle or anyone else about whether or not you
14   had the proper license to work here?
15   A    I don't recall.  I must have researched it and
16   found that it was not required and then rolled on.  I
17   probably -- I would have found that information out
18   myself, quite frankly.
19   Q    Okay.  How many employees did Metro Nashville
20   have when you worked there?
21   A    I am going to have to give you a ballpark
22   figure; I don't have the exact numbers since I left,
23   but it was around 11- to 12,000.
24   Q    And how many worked in central office?
25   A    Now, central office is a broad term.  It does

1    encompass other offices that aren't on the same site
2    as I was at.  I would say approximately 6- to 800 if
3    you include all satellite offices and other
4    associated positions.
5    Q    600?
6    A    That would be my guess, yes.
7    Q    Okay.  Now, are you familiar with the term
8    certificated?
9    A    Certificated versus support.  Yes, ma'am.
10   Q    What does that mean to you?
11   A    Certificated is a term that's used for people
12   who require a license to do their job.  Support are
13   for anybody else.
14   Q    Okay.
15   A    In other words, a teacher would need to be --
16   a teacher, a counselor, they would be considered
17   certificated employees.
18   Q    Okay.  Now, was my client, Dr. Leffler,
19   certificated?
20   A    Correct.  Yes.
21   Q    Okay.  And was Jane Doe certificated?
22   A    I'm sorry.  I'm going to have to have you tell
23   me what her name is.
24   Q    Okay.  Her name was Jenai Hayes.
25   A    I don't recall enough of Jenai Hayes' past

1    before that job to know whether she was listed as
2    certificated or support.  I just don't know.
3    Q    Okay.  Dr. Bailey, who was the principal at
4    Whites Creek, was he certificated?
5    A    As a principal, yes, he would have been.
6    Q    And Dr. Meriwether, was she certificated?
7    A    I did not receive a summons for her
8    specifically.  Is that okay to respond to that
9    without that being one of the requests for -- that
10   you sent?
11   Q    Okay.  We have sued on behalf of Dr. Bailey
12   and Dr. Meriwether.  She's here, too.  So you need to
13   answer all questions concerning Dr. Meriwether.
14        MR. FOX:  Well, yeah.  For the record, Ann,
15   let's -- Ms. Steiner, let's make sure it's clear
16   that the Bailey case is three plaintiffs, correct?
17   It's Bailey and Cathey and Meriwether?
18        MS. STEINER:  Yes.
19        THE WITNESS:  Okay.  I'm sorry.  That --
20        MR. FOX:  So Dr. Barnes, it says Bailey,
21   et al., on the caption, but it's --
22        THE WITNESS:  Okay.
23        MR. FOX:  -- just an abbreviated way of
24   saying Bailey, Cathey, Meriwether.
25        THE WITNESS:  Okay.  Okay.

1    A  Can you ask your question again, please?

2    Q  Was Dr. Meriwether certificated?

3    A  Yes, she would have been.

4    Q  Okay.  Now, when you worked as the chief of
5 human resources, did you have access to the licenses
6 of the different workers?

7    A  Yes.  I didn't usually access that directly,
8 but I had people in my office who could access that
9 if needed.

10    Q  Okay.  So if you wanted to know what license a
11 particular teacher or someone who worked in central
12 office had, you could have one of your associates
13 look it up.  Correct?

14    A  Correct.

15    Q  Okay.  Is that -- do you go into the website
16 for State of Tennessee or do you have a separate one
17 for Metro Schools?

18    A  What did they call that site?  I can't recall
19 the name of the site.  Back in North Carolina -- it's
20 called LICSAL here.  I don't remember the term of the
21 site there in Nash- -- in Tennessee.

22    Q  Was Dr. Cathey certificated?

23    A  Yes, he would have been as well.

24    Q  Okay.  But was the site that you were looking
25 on to see the licenses -- is it something that's

1 maintained by the Metro Schools --

2    A  No.

3    Q  -- or is it maintained by the State?

4    A  It's maintained by the State.

5    Q  By the State.  Okay.

6    And so then were you -- did you train your
7 office to know that if you need to look up the
8 license, you could go to the State of Tennessee's
9 website, put in the worker's name, and it pulls up
10 their license?

11    A  Yes.  They did that as a normal run of course
12 for applications or for hiring.  They would verify
13 licensure.

14    Q  Okay.  Do they also do that for transfers?

15    A  I don't recall.  I would have assumed that
16 they would if they were moving into a new position,
17 but I can't speak to that specifically.

18    Q  Okay.  In HR, did you have any job duties for
19 handling transfers?

20    A  Yes.  We did have a transfer window for normal
21 transfers, teacher wanting to move from school A to
22 school B.  For other transfers, they were sort of
23 dealt with on an individual basis as needed.

24    Q  Okay.  If someone was applying for a job at
25 Metro from one position to another, supposing they

1 already work at Metro and they're applying for a new
2 job that's completely different, would HR pull the
3 licenses to check the license?

4    A  Again, I would have to say yes, that that's a
5 part of the process.  I don't remember specifically
6 detailing that they do that.  That was sort of --
7 that's sort of a generally accepted practice.

8    Q  Okay.  Meaning you're not going to let
9 somebody be transferred into a position that they're
10 not licensed for, correct?

11    A  Correct.  Correct.

12    Q  Okay.  And that's a yes, correct?

13    A  Correct.

14    Q  Okay.  Good.  You went out again.

15    A  No.  I'm --

16    Q  Then I could hear the yes.

17    A  Sorry.

18    Q  As -- in human resources, was your department
19 responsible for making decisions about hiring and
20 firing and moving or was your department more
21 approving the decisions that were made by higher-ups?

22    A  Generally, I would work with the person who
23 that -- who supervised that person.  I would -- if
24 you're asking me for what I would call it, I would
25 say we make recommendations, not decisions.

1    Q  Okay.  So then if there's an issue with a
2 worker, whether it be a teacher or someone in central
3 office, is it brought to your attention?

4    A  Generally, yes.  I can't say that that
5 happened in every case, however.  That was
6 recommended that before you make an employment
7 decision, you contact HR, and you work with us
8 collaboratively.

9    Q  Okay.  And that's the policy when you were
10 there at Metro Schools, correct?

11    A  Policy is a strong word.  I would say that was
12 the recommended procedure.

13    Q  Okay.  And so then would they provide you with
14 information about why the particular supervisor or
15 supervisors want to make the decision?

16    A  That would be the general practice, yes.  Our
17 goal was to have folks dialogue with us, use our
18 expert advice and feedback before making decisions.

19    Q  And would you make sure that the data that
20 they're providing you is accurate?

21    A  Generally, yes.

22    Q  Did you do that or would you pass it on to
23 someone that worked under you?

24    A  Quite frankly, sometimes it would depend on
25 the level and the job.

1    Q   Uh-huh.

2    A   Some things, I would assign to different

3 people; some things I would deal with myself.

4    **Q   Okay. Who -- in the HR department, how many**

5 **employees did you have at Metro?**

6    A   63.

7    **Q   How many?**

8    A   63.

9    **Q   63 in HR?**

10    A   And that encompassed several different

11 departments, including human relations, workplace

12 safety, benefits, hiring, payroll.

13    **Q   Which department would handle problems with**

14 **job performance?**

15    A   Generally, that would be employee relations.

16    **Q   Okay.**

17    A   But it would also --

18    **Q   Who else would handle problems with --**

19    A   Sorry. There's a little more to that.

20    **Q   I'm sorry.**

21    A   Normally employee relations would deal with

22 incidents of behavior. Generally, the supervisor of

23 the employee would deal with issues of performance.

24 Those sort of are in two different buckets.

25    **Q   Okay. So the supervisor does performance, and**

1 employee relations does -- what was that?

2    A   Incidents of behavior, policy violation, that

3 sort of thing.

4    **Q   Who handles discrimination claims?**

5    A   That would be the employee relations

6 department.

7    **Q   And how many employees were in that**

8 **department?**

9    A   Five.

10    **Q   And who were they when you were there?**

11    A   Okay. Mary Ellen Zander was the director of

12 employee relations. There was Denetra Batey. And I

13 can't remember the other name who were sort of --

14 assisted in employee relations issues. They were

15 sort of farmed out to different schools and had

16 different catchment areas.

17     And I'm sorry; I can't remember the other

18 person's name.

19     And there was a secretary, administrative

20 assistant, and I can't recall her name, either.

21    **Q   Okay. So that's four. Are you sure there**

22 **were five?**

23    A   One, two, three -- sorry. Four.

24    **Q   Okay. So if someone makes a complaint of**

25 **Title VI discrimination, who at HR would have handled**

1 that?

2    A   That would have been -- that would have been

3 Mary Ellen Zander.

4    **Q   Okay.**

5    A   Now, I'm familiar with Title VII. I'm sorry.

6 I don't recall Title VI.

7    **Q   Discrimination against a child in school.**

8    A   Okay. That --

9    **Q   If an employee makes that.**

10    A   Okay. Yes, that would be employee relations.

11    **Q   Okay. And that would have been Ms. Zander?**

12    A   Yes.

13    **Q   Okay. And when -- who handles disciplinary**

14 **issues then, if someone's not performing well?**

15    A   If it was an issue of performance, our

16 recommendation was that be dealt with through the

17 evaluation process and addressing that with the

18 supervisor and then the supervisor's supervisor.

19    **Q   So then if there's a performance issue with a**

20 **principal or a teacher, it is the supervisor of the**

21 **principal or the teacher that needs to handle it?**

22    A   Correct.

23    **Q   Okay. And then if it leads to some**

24 **disciplinary action, should that be brought to your**

25 **attention ahead of time?**

1    A   That should have been, yes. Or that should --

2 that's the general practice.

3    **Q   Okay. And when you make a recommendation, the**

4 **supervisor does not have to go along with it,**

5 **correct?**

6    A   That is our recommendation, yes. We discussed

7 whether or not that needed to be a requirement or

8 not, but at that point in time or at the point in

9 time now, we make our recommendations to the

10 supervisor; supervisor makes the appropriate action.

11    **Q   Okay. Now, if a supervisor wants to non-renew**

12 **a contract, should that be brought to your attention?**

13    A   We did track nonrenewals and -- for each year;

14 correct.

15    **Q   Okay. And are you familiar with a letter**

16 **being sent to the employee stating that their**

17 **contract was being non-renewed?**

18    A   We dealt with all of those in Tennessee. I've

19 had to sort of purge my brain of Tennessee and get it

20 back to North Carolina, so I am recalling backwards.

21 But in Tennessee, we allowed for a straight

22 non-renewal, which means your contract is not being

23 renewed. There were issues of employees who were not

24 returning to their current school due to enrollment

25 or due to -- not performance -- program changes at

DR. JAMES BAILEY, ET AL. vs METROPOLITAN GOVERNMENT OF NASHVILLE, ET AL.
BARNES, CHRISTOPHER on 12/09/2021

Page 30

1  the school.  So you were not being renewed at your
2  specific school, but you know, there was no employee
3  issue.  And then there were obviously people who
4  stayed at their current school.
5       And we would send letters to all those
6  employees who were not going to return to their
7  current school the next year based on either a strict
8  non-renewal or removal from your school due to a
9  program change, enrollment shift, budgetary shift.
10      Q   Okay.  Now, should the employee be told
11 exactly why they're not going to be at Metro Schools?
12 For instance, you're not -- your contract is not
13 being renewed?  Correct?
14      A   If there was a contract not being renewed, my
15 understanding of Tennessee law was that it was not
16 required to provide them a reason.
17      Q   Okay.  But as a matter of policy, were you --
18 did you know whether or not Metro Schools' team lead
19 would send a letter to them telling them that their
20 contract was being not renewed?
21      A   We had several different letters.  I remember
22 writing -- you know, looking at the one that was
23 going to non- -- to each group of employees.  I don't
24 recall it saying a specific reason.  It just laid out
25 the terms of the policy and the requirements.

Page 31

1       Q   Okay.  Let me show you this.  Can you see
2  this --
3       A   I can.  I just have to get a little closer.
4  Yes.
5       Q   -- that I've pulled up?
6       Okay.  And this is a letter that's dated
7  January 15th, 2016, and it's to Dr. Euna McGruder?
8       A   Okay.
9       Q   It's from Chris Henson.
10      A   Correct.
11      Q   And can you read the very first paragraph,
12 where it says, this letter constitutes official
13 notification under Tennessee Code Annotated
14 49-2-301(b)(e) -- (b)(1)(EE), your employment will be
15 non-renewed for the 2016-2017 school year.
16      A   Yes, I can read that.
17      Q   Is that -- is that the standard letter that
18 would be sent if a contract is being not renewed?
19      A   It looks to be a similar format.  I can't
20 speak to the exact verbiage that I used, but that
21 would have been the base that I would have looked at
22 when I arrived.
23      Q   Okay.  And did you change this letter, this
24 format, at all?
25      A   Again, I hesitate to say exactly the changes

Page 32

1  that I made.  Some of them were just grammatical sort
2  of changes, but that's a similar letter that was sent
3  out.
4       Q   Okay.  As -- do you have a duty to be honest
5  with the employees that you're dealing with?
6       A   Of course.
7       Q   Do you have a duty to be honest with the
8  school board?
9       A   Yes.
10      Q   Do the other officials at Metro Schools, from
11 Dr. Battle to Chris Henson -- do they have a duty for
12 being honest with what they state to the school
13 board?
14      A   I would assume so, yes.
15      Q   Do they have to be honest with what they tell
16 the workers?
17      A   Again, I assume so, yes.
18      Q   Okay.  Do you think it is best policy to let a
19 worker know exactly why their employment with
20 Metro Schools has ended?
21      A   I don't see that as being a legal requirement.
22 Contracts are year to year.  My understanding of the
23 policy and the statutes is that it's not required to
24 inform the employee why.
25      Q   Do you think that Metro Schools has a duty for

Page 33

1  being honest with the employee if they tell them why
2  they have lost their job?
3       A   That's a complex question.  If you're asking
4  me if I generally choose to be honest with my
5  behavior, yes.  If you're asking me if in every case
6  the letter should detail exact reasons why, I can't
7  speak to that.
8       Q   Okay.  If a letter details the reason why an
9  employee has lost their job, do you expect it to be
10 accurate and honest?
11      A   Yes.
12      Q   Okay.  If a supervisor tells an employee the
13 wrong reason for why they have lost their job, would
14 you counsel with that supervisor?
15      A   You mean if we sent -- if we told somebody
16 something that wasn't true?
17      Q   Yes.
18      A   Would we counsel them?
19      Q   Yes.
20      A   If I knew about it, I would have a
21 conversation about that, yes.
22      Q   Okay.  Because when you were there as the
23 chief of human resources, is it correct that the
24 policy was you had to be honest with your workers in
25 what you tell them with regard to why they were no

*Legal Media Experts*
809-446-1387
Case 3:20-cv-01023   Document 149-7   Filed 07/27/22   Page 10 of 93 PageID #: 2704

1  longer there, why they were losing their job?
2  A  There are policies in place that speak to an
3  employee's ethical and moral obligation.  If that's
4  your question, then yes, I believe that is in our
5  policy.
6  MS. STEINER:  Okay.  Could we have this
7  January 15th, 2016 letter from Mr. Henson marked
8  Exhibit Number 2 to the deposition today?
9  THE COURT REPORTER:  Yes, ma'am.
10  MS. STEINER:  Thank you.
11  MR. FOX:  Well, I object only just to the
12  extent I don't think he has ever seen this before.
13  So with that caveat, it can come in.
14  Dr. Barnes, have you seen that before?
15  THE WITNESS:  No.  That was three years
16  before my time.
17  MS. STEINER:  Okay.
18  BY MS. STEINER:
19  Q  Dr. Barnes, were you familiar with various
20  Tennessee statutes that deal with the teachers and
21  eliminating positions or transferring students -- or
22  transferring teachers or certificated workers or
23  non-renewing contracts?  Were you familiar with those
24  laws?
25  A  Yes.  Yes.

1  Q  Okay.  And were you trained on those laws
2  before you came to work at Metro Schools?
3  A  No, I would not say that I was.
4  Q  Were you trained on those laws after you
5  arrived at Metro Schools?
6  A  I was responsible for learning those myself.
7  There was no specific training that was undergone,
8  no.
9  Q  Did you read those laws?
10  A  I would say that anything in regards to a
11  Tennessee code annotated law, I would look at as I
12  needed them or as situations come up.  I did not
13  wholesale read them prior to issues arising, no.
14  Q  Okay.  Okay.  I'd like to show you one of the
15  laws.  Let me see if I can open this for you.  Can
16  you see this?  It has Tennessee Code on there.
17  A  I'm going to have to --
18  Q  49-5-511.  Do you see that?
19  THE VIDEOGRAPHER:  We should go off the
20  record, and we'll get it closer to him, and I'll
21  move my camera.  The attorney name, do you know?
22  THE COURT REPORTER:  Ann Steiner.
23  THE VIDEOGRAPHER:  Ms. Steiner?
24  MS. STEINER:  Yes.
25  THE VIDEOGRAPHER:  Can you hear me?  This is

1  the videographer.  Can we go off the record?  We're
2  going to move the thing the witness, Dr. Barnes, is
3  looking at closer to him so he can see the evidence
4  better.
5  MS. STEINER:  Thank you.
6  THE VIDEOGRAPHER:  Yeah.  One moment, please.
7  We are going off the record.  The time is
8  10:05 p.m. [sic].
9  (A recess was taken.)
10  THE VIDEOGRAPHER:  We are now on the record.
11  The time is 10:10.  Please continue.
12  BY MS. STEINER:
13  Q  Dr. Barnes, can you see this document that
14  I've put on the screen that's Tennessee Code
15  Annotated Section 49-5-501?
16  A  Yes.
17  Q  Okay.  And this is the definitions that's used
18  in Tennessee law, and I wanted to go down and ask you
19  for this Part 10 that says Teachers.
20  Do you see where it says teacher includes
21  teachers, supervisors, principals, director of
22  schools, and all other certificated personnel
23  employed by any local board of education?
24  A  Yes.
25  Q  Okay.  And I believe we tested -- I asked you

1  earlier about Dr. Leffler and Dr. Cathey, Dr. Bailey,
2  and Dr. Meriwether.  And I believe you confirmed that
3  they were all certificated, correct?
4  A  Yes.
5  Q  Okay.  So under this definition of teacher,
6  they would be considered teachers, correct?
7  MR. FOX:  Objection to the extent it calls
8  for a legal analysis.
9  Q  Dr. Barnes?
10  A  In my estimation, I would say that -- that is
11  correct.
12  MS. STEINER:  Okay.  And I would like to
13  offer this as Exhibit Number 3.
14  THE COURT REPORTER:  Yes, ma'am.
15  MR. FOX:  Yeah.  No objection.  Just with the
16  caveat -- my only caveat is that it calls for a
17  legal analysis.
18  Q  And Dr. Barnes, you did read the laws when you
19  became the chief of human resources, correct?
20  A  Any ones that pertain to issues that I found
21  outstanding, yes.
22  Q  Okay.
23  A  I will say, I was more familiar with Nashville
24  Public Schools' board policies, which were built
25  using these laws.

1    Q   Okay.  Now let me show you another screen, and
2  this is Tennessee Code 49-5-511, and Part A says that
3  no teacher shall be dismissed or suspended except as
4  provided in this part and that the causes for which a
5  teacher may be dismissed or suspended are
6  incompetence, inefficiency, neglect of duty,
7  unprofessional conduct, and insubordination.
8        Were you familiar with that?
9    A   Yes.
10   Q   Okay.  And is that the policy, too, that
11 Metro Schools followed that the teacher cannot be
12 dismissed or suspended except for these areas listed
13 in this law?
14   A   Without having the policies in front of me, I
15 would say that that's correct.
16   Q   Okay.  And then if a teacher is -- if charges
17 are made against a teacher, the charge has to be made
18 in writing specifically stating the offense, and it
19 needs to be signed.
20       Is that the policy that Metro Schools followed
21 when you were there?  And that's Part 4.
22   A   Generally, our practice was, if a charge like
23 that was made, the employee was put on suspension
24 pending the investigation, the resolution of those
25 charges.  But in times that I remember having this

1  issue, we would provide a letter to the employee
2  stating as such.
3    Q   Okay.  And if you go to Part B of this law, it
4  says that if you reduce the number of teaching
5  positions or non-licensed positions in the system
6  because of a decrease in enrollment or any other good
7  reason, the board is empowered to do such based on
8  the level of effectiveness determined by the
9  evaluation.
10       Was that your understanding that it's the
11 school board who eliminates positions?
12   A   It was my understanding that the board charged
13 the superintendent with making -- or the director of
14 schools -- excuse me -- with making such decisions.
15   Q   Okay.  So when you worked as the chief of
16 human resources for Metro Schools, Dr. Battle is the
17 one who made the decision about eliminating a
18 position?
19   A   I'm speaking from memory now, so please
20 understand, but my understanding of the policy was
21 that the director of schools had the right to make
22 decisions of personnel based on the needs of the
23 district and that --
24   Q   And that included eliminating a position?
25   A   And that -- that the board had one employee,

1  which was the director of schools.  The director of
2  schools was charged with making those decisions.
3    Q   And did it have to be approved by the school
4  board?
5    A   And that -- to that extent, I'm sorry; I just
6  don't know the answer to that question.
7    Q   Okay.  So I just want to make sure I'm clear
8  on the record:  It's your testimony today that
9  Dr. Battle is the one that had the ability and the
10 power under Tennessee law to eliminate a position?
11       MR. FOX:  Objection.  It calls for a legal
12   analysis.
13   A   I will say decisions like that that I had,
14 that my recommendations and my communication, was
15 given to the director of schools.
16   Q   And did you ever give any recommendation or
17 any advice to the school board about eliminating a
18 position?
19   A   That, in my experience there and, quite
20 frankly, my experience everywhere, is not really that
21 purview.  I would make my recommendations and
22 approvals to the superintendent, who would
23 communicate with -- those to the board.
24   Q   Okay.  Now, in terms of eliminating a
25 position, were you the one who would make the initial

1  recommendation or did someone else bring it to your
2  attention that they were trying to eliminate
3  positions?
4    A   That depended a lot on circumstance and level.
5  If a school reduced enrollment and had to reduce
6  positions, I would -- I don't want to say oversee
7  that process, but I would review the decisions that
8  were made.  I didn't usually make recommendations,
9  having not worked with those employees.  At levels --
10 at different levels, it required a different level of
11 communication.
12   Q   Okay.  If it was -- let's kind of cut to the
13 chase here.
14       Okay.
15   Q   For Dr. -- Dr. Meriwether, Dr. Cathey, their
16 positions at Metro was what when you were there?
17   A   When I first arrived there, sort of
18 pre-pandemic, it was associate superintendent, I
19 think, is what their title was called.
20   Q   And were their positions eliminated?
21   A   Their positions were eliminated.  All four
22 positions were eliminated.  There were two
23 elementary, one middle, and one high.
24   Q   And who made the decision to eliminate those
25 positions?

1    A    That was a -- that's hard to speak to.  The
2  ultimate decision-maker was Dr. Battle.
3    Q    And did you have any recommendation?
4    A    I was part of the conversations about how to
5  reduce the cost of salaries at the central office.
6    Q    When did that discussion first begin?
7    A    So I arrived in February.  In early March,
8  there was the tornado, and the pandemic happened
9  after that.  So I can't speak to a specific date, but
10 I would say comfortably in early spring -- in the
11 spring of 2020.
12   Q    What other positions did you look at
13 eliminating other than the associate superintendent
14 position?
15   A    We talked about reducing -- or the level of
16 several positions.  I believe we reduced the chief of
17 curriculum and instruction.  We eliminated those four
18 positions.  From memory, those are -- those are the
19 only four that stand out as specific eliminations.
20   Q    Did you keep any notes as to why the associate
21 superintendent positions were eliminated?
22   A    I made a copy of everything that I had in my
23 hard drive when I left Metro Schools and provided it
24 to the new chief of human resources.
25   Q    Do you recall what documents were on that?

1    A    Ma'am, I'm sorry.  There were hundreds of
2  documents on there.  In a year and a half, there was
3  a lot that was generated.  I can't speak to one
4  individual document.
5    Q    Okay.  Because we have asked for documents
6  related to this, and I can't find anything that
7  specifically sets forth why the associate
8  superintendent positions were eliminated.  Do you
9  know of any?
10   A    I'm sorry.  All I have, I left.  I just don't
11 have access to look at every document that I
12 generated when I was there.
13   Q    When you were having this discussion, was
14 anything made -- any comments made -- who was -- who
15 was there, to begin with, about this discussion?  Who
16 was present?
17   A    Our board attorney, Melissa Roberge; Hank
18 Clay; Adrienne Battle; and myself.  And there were --
19 there may have been other people that sort of came in
20 for specific parts, but those are the ones that I
21 remember.
22   Q    Was it one discussion, one day, or was it
23 multiple?
24   A    No.  I believe we met several times about it.
25   Q    Okay.  And was any comments made about using

1  the funding to fund other positions, newer positions?
2    A    The overall conversation was about having a
3  net reduction in the central office budget.
4    Q    Did you look at the budget?
5    A    I -- I kept an overall view of all of the
6  budgets.  I can't speak to specifically looking at
7  the central office one because it's usually divided
8  by departments.  I had more intimate knowledge of my
9  department, obviously.
10   Q    And what was the number for your department?
11 Do you recall?
12   A    Oh, ma'am, I'm sorry.  I don't.
13        MS. STEINER:  Okay.  Can we have this
14   49-5-511 marked the next numbered exhibit.
15        THE COURT REPORTER:  Yes.  Exhibit 4?
16        MS. STEINER:  Yes.
17   Q    Now, when you were talking about cutting the
18 cost, besides cutting out jobs, did you look at
19 cutting cost anyplace else?
20   A    I wasn't privy to any other conversation
21 regarding additional ways to cut cost; I will tell
22 you, as a general rule in HR, generally, 85 to
23 90 percent of your budget is taken up in salaries.
24   Q    Okay.  Were you familiar with any typical --
25 typical procedure at Metro Schools where if there's

1  an issue with the budget that the Metro Schools will
2  first look at cutting out contracted services to see
3  what services they can cut out before they start
4  cutting staff?
5    A    Nothing springs to mind.  I can speak to my
6  department.  Obviously we looked at contracted
7  services in regards to things we had to have.  Our
8  personnel system, our hiring system, things like
9  that, that -- contracts that we had, we did not have
10 any contracts in my department that could be cut
11 because they were all specific to the practices we
12 needed to do.
13   Q    So besides talking to you about just the
14 positions, did anyone run it past you that there may
15 be other areas to cut, such as services?
16   A    No.  I don't -- and I don't know that I would
17 have been helpful in that regard because -- a couple
18 reasons:  One, I was fairly new to the district.  You
19 have to understand, this happened a couple months
20 after I arrived.  In addition to that -- so I didn't
21 have the historical context of the district.
22        In addition to that, that's not really my
23 expertise.
24        MS. STEINER:  Brook, do you need to stop now?
25        MR. FOX:  Yes.  Yeah.  I'm sorry to

1   interrupt, but if you're at any kind of natural
2   break, that would be good to take a break.
3        THE WITNESS: Hold on, please. Before we go
4   off --
5        MS. STEINER: Don't you have something now?
6   Do you --
7        MR. FOX: Yeah, I've got to break. I've got
8   a 9:30 or 10:30 Eastern time --
9        THE WITNESS: If we could please pause for a
10  second before you go off the record so that the
11  stenographer can catch up. Okay.
12       THE VIDEOGRAPHER: We are going off the
13  record. The time is 10:25.
14       (A recess was taken.)
15       THE VIDEOGRAPHER: All right. We are back on
16  the record. The time is 11:01. You're good to go.
17  Action.
18       MS. STEINER: Okay.
19  BY MS. STEINER:
20  Q    Dr. Barnes, I want -- I'm asking you still
21  about the elimination of the associate superintendent
22  positions and your discussions with Dr. Battle and, I
23  believe you said, Mr. Clay about the elimination of
24  those positions.
25       Who contacted you about that initially?

1   A    I'm sorry. I don't recall that answer.
2   Q    Who was the very first person who said we may
3   have to eliminate a position or positions?
4   A    To my recollection, I was invited to a meeting
5   to discuss it. I don't remember knowing what the
6   fabric of the meeting was before I arrived.
7   Q    Okay. And was that meeting with Mr. Clay and
8   Dr. Battle?
9   A    Yes. I believe Melissa Roberge as well.
10  Q    Okay. And who in the meeting told you that
11  they were going to have to eliminate a position or
12  positions?
13  A    I'm sorry. I don't recall that answer of the
14  first person who brought it up.
15  Q    Do you recall why they told you that they were
16  going to have to eliminate a position?
17  A    We talked about restructuring the central
18  office to try to lower the overhead and cost of the
19  central office salaries.
20  Q    Did anyone in the meeting make any statements
21  about any other method of lowering cost other than
22  getting rid of employees?
23  A    Other than salaries, no, not to my
24  recollection.
25  Q    Did anyone in that meeting say, hey, why don't

1   we look at the contracted -- excuse me -- why don't
2   we look at the contracted services instead?
3   A    No, not to my recollection.
4   Q    Did any --
5        Okay. Do you -- if you are making a
6   recommendation and the issue was whether or not
7   you're going to eliminate positions, would you want
8   to know whether or not there were contract services
9   out there that could just as easily be eliminated?
10  A    It is a generally understood fabric across all
11  the school systems I've been in that if you have to
12  reduce overhead to the extent -- to that extent, the
13  only place that there is is in salaries. That's such
14  a -- it is a common enough occurrence that it
15  didn't -- it's a generally accepted understanding.
16  Q    Okay. So then if a school system -- and I'm
17  going to give this as an example. If a school system
18  has to cut out $1 million -- okay -- and it's got
19  5 million in contracted services that it doesn't
20  really need, you would keep the 5 million in
21  contracted services and delete the 1 million in
22  salaries. Is that what you're saying?
23  A    No, that's not what I'm saying. What I'm
24  saying, in every school system that I've worked in, I
25  have never seen an overage in contracted services to

1   the extent that the contracted services that we have
2   that I've ever experienced were required or necessary
3   to do the job.
4        The only place that substantial money was in
5   evidence is in salaries.
6   Q    Okay. So then if -- so then at Metro Schools,
7   did you know that there was an overage, that there
8   was an ability to cut out about 5 million in
9   contracted services?
10  A    No.
11  Q    Is that something that you should have been
12  made aware of?
13  A    I can't speak to that. I would say that it
14  was not a part of my frame of understanding.
15  Q    If you had been told, rather than cutting out
16  1 million in salaries, we've got 5 million in
17  contracted services that we can cut out and that
18  we're going to cut out, should -- would you have
19  issued a different recommendation?
20  A    Well, again, recommendations, as we spoke
21  earlier, were to general run-of-the-mill things.
22  Positions of this nature, it wasn't necessarily my
23  place to make recommendations about reorganizing
24  departments. I made, generally, recommendations for
25  things such as schools that lost $50,000 in per-pupil

1　funding or those sorts of scenarios.  Not of this
2　nature.  That wouldn't have been my role.
3　　　Q　Okay.
4　　　　MR. FOX:  Let me -- this is -- let me just
5　note my objection to the form.
6　　　Q　So --
7　　　　MR. FOX:  These lines of -- these questions.
8　　　Q　So -- so, Dr. Barnes, when you went into the
9　meeting with Dr. Battle, Ms. Roberge, and Mr. Clay,
10　you were not there to make a recommendation or really
11　have any input in the decision of which position to
12　eliminate, correct?
13　　　A　My input was asked, but it wasn't a situation
14　where I was making a full recommendation.  It was a
15　conversation and discussion amongst us, not one where
16　I was called to make a recommendation.
17　　　Q　So when they asked you your opinion, is it a
18　fair statement then that you did not do any sort of
19　independent investigation on your own to find out
20　what was going on?
21　　　A　Yeah.  Yes.
22　　　Q　I'm -- could you repeat your response?
23　　　A　Yes.
24　　　Q　Yes what?
25　　　A　You asked me if I did an independent

1　investigation on my own for other recommendations.
2　My -- sorry.  I answered the question and repeated it
3　back differently.  No, I did not do an independent
4　investigation on other options or opportunities.
5　　　Q　Okay.  Can you hear me?
6　　　A　I can now.
7　　　Q　Okay.  Could you please repeat your response?
8　I'm sorry.
9　　　A　No, it's okay.  If your question is whether I
10　conducted an individual investigation as to what
11　other opportunities might be available, the answer to
12　that is, no, I did not.
13　　　Q　Okay.  And so you were given facts of the
14　situation from who in that meeting or meetings?  Who
15　had the facts?
16　　　A　It was a discussion.  I don't recall any one
17　person laying out specific facts of the situation.
18　I'm sorry.
19　　　Q　Besides cutting out jobs, eliminating
20　positions, did anyone in any of these meetings make
21　any statements about cutting any other area?
22　　　A　The conversation that I was a part of was to
23　talk about a reorganization, so I was not privy to
24　conversations may have occurred before that asking
25　what other opportunities there were.  The

1　conversation I was --
2　　　Q　Today in your --
3　　　A　Go ahead.
4　　　Q　Today in your deposition, can you tell me any
5　of the facts that you considered in this discussion
6　with Dr. Battle, Mr. Clay, and Ms. Roberge about
7　eliminating the associate superintendent positions?
8　　　A　The facts that I brought to the table were
9　salary numbers and benefit numbers.  So the total
10　compensation cost per employee.
11　　　Q　Okay.  And that would be the salary of the
12　associate superintendents, correct?
13　　　A　Correct, and their cost of benefits.
14　　　Q　Okay.  And did anyone in that meeting make a
15　statement to you that they were actually going to be
16　adding in jobs in central office?
17　　　A　There was conversation about positions such
18　as -- I'm trying to remember the exact one -- the
19　diversity, equity, and inclusion position, and a
20　position that I -- I'm sorry.  I can't recall the
21　name, but Carrie -- I think Carrie is currently in
22　that position.  It was philanthropic investments.
23　There was two positions that we talked about adding
24　that I recall.
25　　　Q　Okay.  And did you talk about the cost of

1　those positions?
2　　　A　Yes, I would have -- I would have driven up --
3　I would have written up or brought forth a salary
4　recommendation for those or a range of salaries.
5　　　Q　And do you recall what those were?
6　　　A　I'm sorry.  I do not.
7　　　Q　And did anyone in these meetings make a
8　comment to you that you were having to eliminate
9　positions because of the budget (internet glitch) --
10　　　A　I'm sorry, ma'am.  You cut out.
11　　　Q　Did anyone in the meeting make a comment to
12　you that they were having to eliminate positions due
13　to the budget?
14　　　A　We talked about the need to reorganize to
15　save -- to look for additional funding.
16　　　Q　And how much in additional funding were you
17　looking for?
18　　　A　I think at the end result, it was around
19　$1 million.  I can't speak to the exact number.
20　　　Q　Do you recall telling anybody that
21　Metro Schools was going to run short by about
22　20 million?
23　　　A　No.
24　　　Q　Okay.
25　　　A　And that number is not a number I've ever

1  heard before.
2      Q   Okay.  And so you were told that the (internet
3  glitch) --
4          THE VIDEOGRAPHER:  Is she gone?  Keep going?
5      A   I'm sorry, ma'am.  You are frozen.
6          THE VIDEOGRAPHER:  If she's gone another five
7  seconds, I should go off.
8          We are going off the record.  The time is
9  11:13.
10          (Off-the-record discussion.)
11          THE VIDEOGRAPHER:  All right.  We are back on
12  the record.  The time is 11:14.  You can proceed.
13      Q   Okay.  So Dr. Barnes, you were told that the
14  additional funding had to be $1 million, correct?
15      A   What I was told was we were going to look at
16  reorganizing the central office in order to save
17  money.  The number ended up being approximately
18  $1 million, but I don't remember that being the set
19  goal when we started.
20      Q   Okay.  Now, did they give you any other reason
21  for the reorg other than to save money?
22      A   No, not that I recall.  No.
23      Q   Okay.  And do you recall who made the
24  statement about the reorg to save money and that it
25  was going to need about $1 million?  Do you recall

1  who made that?
2      A   No.  And again, I don't remember them saying
3  our set goal is to save $1 million.  I want to make
4  sure I specify that.  The goal was to reorganize.  I
5  don't recall there being a set number we were looking
6  to reach.  However --
7      Q   Okay.  But --
8      A   -- in a meeting with several people in
9  attendance, I can't remember who first said that.
10  No.
11      Q   But what was said eventually in the meetings
12  is that you had to have a reorganization to save
13  $1 million?
14      A   There was not a set number we were looking to
15  reach when the meetings were in attendance.  We were
16  looking to reorganize to save money.  Once we
17  completed that, that number reached approximately
18  $1 million.
19      Q   Okay.  And is that what you needed to save to
20  make the budget work?
21      A   Our goal and Dr. Battle's stated goal is
22  always to push as much money to the schools as
23  possible.  That number -- I don't recall being needed
24  to make the budget.  That number was needed to
25  provide as much opportunity for the schools as

1  possible.
2      Q   Did -- okay.  So when you're meeting with
3  Dr. Battle, Henry Clay -- Hank Clay and Ms. Roberge
4  talking about saving money to begin with, it
5  ultimately ended up being $1 million that you were
6  saving from salaries, correct?
7      A   And benefits, correct.
8      Q   Okay.  Did you ever meet after that point to
9  say, we need to save more than 1 million?
10      A   No.  Not that I recall, no.
11      Q   Okay.  And the million was saved from the four
12  associate superintendents' positions, and then I
13  think the other one was the executive officer of
14  organizational development.  Is that correct?
15      A   That was another position.  There was -- there
16  were more positions than that; I just simply can't
17  remember all of them.  I do remember that there were
18  two executive officers that were shifted.  Gosh, I
19  want to say there were two of them:  the four
20  associate superintendents, and there were a couple
21  other positions as well.
22      Q   Okay.  Well, let's stop this then.  Do you --
23  let me show you the budget.  Have you ever seen the
24  budget?
25      A   The entire budget?  Yes.

1      Q   Okay.  Let me show you this, and let's see if
2  you recognize it.  Okay.  Can you see this document
3  here?
4      A   Yes.
5      Q   Okay.  Is this the budget that would have been
6  adopted by the school board?
7      A   From what you're showing me, it looks like it.
8      Q   And let's go down.  I want to show you some of
9  the pages on here.  Okay?
10          Are you familiar with this document number 2
11  that shows the positions reduced, the positions
12  added?
13      A   I can obviously see it.  I can't speak to this
14  is exactly the numbers that were on it when I saw it
15  last time, but that looks like what I've seen, yes.
16      Q   Okay.  Assuming this is the actual budget, can
17  you see up at the very top where it says positions
18  reduced?
19      A   Yes.
20      Q   Okay.  Do you see executive officer of
21  organizational development?
22      A   Correct.
23      Q   And it looks like it saved $165,000, 592 --
24  $165,592?
25      A   Correct.

1    Q    Okay.  And then right under that, you've got
2  the associate superintendents coming in, and that's
3  the four positions that saved $733,000, correct?
4    A    Correct.
5    Q    Okay.  Is that approximately the 1 million?
6    A    That's -- that obviously doesn't add up to
7  1 million, but that's a good -- that's a large chunk
8  of it, yes.
9    Q    Okay.  Now, can you see any other position
10  changes in the 2020-'21 budget on there that you
11  spoke of with Dr. Battle --
12    A    No.  There --
13    Q    -- and Mr. Clay?
14    A    There were several in there that weren't
15  discussed specifically.  Things like counselors,
16  librarians, and teachers would have been reduced by
17  either enrollment shifts from the State, or we did go
18  through a process of merging several schools in my
19  first year.  That would be one where I assume
20  positions like principals, secretary, clerks,
21  counselors, librarians and teachers and literacy
22  coaches -- sorry.  I'm going to repeat that slower.
23      The reduction in schools and the merging of
24  schools would have reduced the principal, payroll
25  clerk, counselor, librarian, teacher, literacy coach,

1  and para-pro positions.  When you merge a school,
2  several positions were eliminated because there
3  weren't two needed at one school versus two.
4    Q    Okay.  The eliminations for central office is
5  probably what I should have asked you instead.  You
6  had, on this budget, five eliminations from central
7  office.  Correct?
8    A    I think the executive director of charter
9  schools may also be considered in that.  I don't
10  recall.  I don't recall any others.
11    Q    Okay.  Well, let's go to the summary.  Are you
12  familiar with summaries?  And that's the first page
13  of the budget that's right here.
14    A    I'm familiar with --
15    Q    Can you see this?
16    A    I'm familiar with it.  I, of course, cannot
17  verify the numbers, having not seen -- you know,
18  certainly that wouldn't be something I remember.  But
19  yes, I remember seeing this page.
20    Q    Okay.  Do you see down where it says proposed
21  changes, and it says -- the second line from the
22  bottom, it looks like, says central office
23  reorganization.  Do you see that?
24    A    Yes, I can.
25    Q    Okay.  And do you see where five positions

1  were eliminated --
2    A    Yes.
3    Q    -- at the cost savings of 1 million?  Do you
4  see that?
5    A    Yes, ma'am.
6    Q    Is that what you were talking about that you
7  had a discussion with Dr. Battle and Mr. Clay and
8  Ms. Roberge about?
9    A    That would be -- yes.  That would be what that
10  is.
11    Q    Okay.  Now, let's go over to the positions
12  reduced page.  That's document number 2.  Do you see
13  that the five positions that we know are listed are
14  executive officer and associate superintendent?  And
15  that adds up to five, correct?
16    A    Correct.
17    Q    Okay.  So then if you added in the executive
18  director of charter schools, that would make it six,
19  correct?
20    A    Well, again, I can't -- I can't speak to how
21  this document was built.  This wasn't me.  But the
22  only question I would ask -- and not having a
23  calculator in front of me -- is whether those -- it
24  does say including benefits.  So it looks like the
25  five positions are what we're speaking of.

1    Q    Okay.  So the five positions that we're
2  talking about, just to make it clear for the record,
3  is executive officer of organizational development
4  and then associate superintendents jobs, correct?
5    A    Yes.
6    Q    And those were the five jobs that you
7  discussed with Ms. Battle about -- Dr. Battle about
8  eliminating, correct?
9    A    Yes.
10    Q    Okay.  And did you speak to her about the
11  elimination of any other positions --
12    A    Not that I recall.
13    Q    -- in central office?
14    A    Not that I recall.
15      MS. STEINER:  Okay.  Could we have this
16  fiscal year 2020-'21 budget marked Exhibit
17  Number 5?
18      THE COURT REPORTER:  Yes, ma'am.
19    Q    Do you know why you were called in to discuss
20  the elimination of these five positions?
21    A    I would have assumed that I would be the
22  normal person to have in that conversation.  I don't
23  know why, no.
24    Q    Is it -- is it correct that the main -- the
25  main contribution that you made to the discussion was

1  letting them know the salaries of these five
2  positions with the benefits?
3      A   I can't speak to what their mind was for what
4  they wanted me there for.
5      Q   The question was a little different.
6      A   Sorry.
7      Q   Is it true that -- and I believe you said this
8  earlier -- testified earlier -- at the time that you
9  were having this discussion with them about this --
10 Dr. Battle, Mr. Clay, and Ms. Roberge about these
11 five positions, you had just gotten to Metro Schools,
12 correct?
13     A   Correct.
14     Q   And you were not that familiar with these five
15 positions, correct?
16     A   No.
17     Q   You were familiar with them?
18     A   Sorry.  Yes, that is correct:  I was not
19 familiar with them.
20     Q   Okay.  And so then in terms of whether or not
21 the positions were needed or not needed, that was a
22 conversation that you really could not contribute to
23 an opinion one way or the other, correct?
24     A   Yes.  Correct.
25     Q   Okay.  And you were relying on what

1  Dr. Battle, Mr. Clay, and Ms. Roberge may have said
2  in the meetings, correct?
3      A   I did not have historical context to add.
4      Q   Okay.  And so what you added primarily was
5  letting them know the amount of the salaries and
6  benefits, correct?
7      A   Yes, that's fair.
8      Q   Okay.  At that point in time, could you
9  contribute anything in the meeting with regard to
10 telling them how they should go about eliminating a
11 position?
12     A   I think most of that concern was addressed by
13 Ms. Roberge being the attorney.
14     Q   Do you recall what she said about how a
15 position should be eliminated?
16         MR. FOX:  Objection.  I think that's
17 privileged information if she was serving as the
18 attorney at the time advising clients.
19         MS. STEINER:  Well, she's also listed as the
20 decision-maker in your discovery responses.
21         MR. FOX:  Yeah.  I mean, she was definitely
22 part of the process, as we learned, but I mean,
23 specific -- specific -- I guess you could ask if
24 there was advice she was giving versus more factual
25 matters, just as helping in decision-making.

1      But --
2          MS. STEINER:  Brook, you listed her as one of
3      the decision-makers.  And so if she's a
4      decision-maker, she's not really serving as truly
5      in a legal capacity; she is the decision-maker, and
6      so I would be entitled to ask him what was the
7      advice given on this.
8          THE WITNESS:  For the record, I will say that
9      it is difficult to recall the content of a
10     conversation from a year and a half ago.  I don't
11     remember what the advice was she specifically gave.
12     It would have been advice regarding our policy that
13     is listed in our policy manual.
14 BY MS. STEINER:
15     Q   Well, how do you know that if you can't
16 remember what she said?
17     A   I guess I'm going on most of her responses
18 normally referred us to policy.  You are correct
19 that -- then I retract that statement, but that's
20 generally what we -- what we did.
21     Q   Okay.  So then in terms of the decision of
22 which positions to eliminate, you really didn't have
23 any input into that decision, correct?
24     A   As to which positions would be eliminated, no,
25 not specifically.

1      Q   Okay.  And you're not the one that said
2  positions need to be eliminated, correct?
3      A   No.
4      Q   Okay.  And if someone had made a comment that
5  the deficit is 100 million, that would be false,
6  correct?
7      A   100 million?
8      Q   Yes.
9      A   No.  I never heard that number.
10     Q   Okay.  And you never even heard that the
11 deficit that you had to cover was somewhere around
12 18, 19, 20 million, correct?
13     A   No.
14     Q   Okay.  And from your understanding, the budget
15 was able to be balanced, correct?
16     A   We obviously presented a balanced budget.
17     Q   Okay.
18     A   We're required to.
19     Q   And that had the elimination of these five
20 positions in it, correct?
21     A   From the document you showed me, yes.
22     Q   Okay.  Now, I want to ask you questions about
23 the executive director's position.
24     A   Yes, ma'am.
25     Q   Was there any discussion about eliminating the

1   executive director's position?
2      A   The executive director of schools' positions?
3      Q   The -- yes.
4      A   No.  There was no discussion to eliminate
5   those positions.
6      Q   Okay.
7      A   And when I left, they were still there.
8      Q   Okay.  So then if anyone had said those
9   positions had been eliminated, that would have simply
10  been false, correct?
11     A   The executive director's of schools positions
12  were not eliminated.
13     Q   Okay.  And any statement made that they had
14  been eliminated would be false, correct?
15     A   They are still in our budget and still
16  working, so they are not eliminated.
17     Q   Okay.  My question to you is a little
18  different.  If someone were to say the executive
19  director positions are eliminated or are being
20  eliminated --
21     A   Right.
22     Q   -- that would have been a false statement,
23  correct?
24     A   Yes.  My only question is executive director
25  ranges a lot of different -- executive director is

1   the beginning of several different titles.  If you're
2   specifically asking about the executive director of
3   schools, then yes, that is false.
4      Q   Okay.  Now, what about Ms. Leffler's position?
5   What was her position, to the best of your
6   recollection?
7      A   She was an executive director of schools.
8      Q   Okay.  And there were several other executive
9   directors of schools, correct?
10     A   Correct.
11     Q   Okay.  And those are the positions that were
12  not eliminated, correct?
13     A   Correct.
14     Q   Okay.  Now, I'm going to refer to my other
15  client as "Ms. Doe."  Do you know who I'm talking
16  about?
17     A   Yes.  You referenced who that name is earlier.
18  Thank you.
19     Q   Okay.  Now, do you recall her position being
20  director of school choice?
21     A   I think so.
22     Q   Was her position eliminated?
23     A   There -- oh, gosh.  The hard thing is I'm
24  trying to make sure I -- I'm speaking to what I
25  actually remember versus what I think.  So I'm trying

1   to make sure I'm saying it correctly.  I know that
2   there was one position in the -- in that office that
3   was eliminated.
4      Q   Do you know why it was eliminated?
5      A   I don't think I can recollect exactly what the
6   reason was.  I apologize.
7      Q   Okay.  And this was not a position that was in
8   the discussion you had with Dr. Battle, Ms. Roberge,
9   or Mr. Clay, correct?
10     A   We discussed several different positions in
11  that reorganizing conversation.  I can't speak to
12  exactly -- those were the main ones that I remember.
13  I can't speak to any others.
14     Q   Can you give me any reason today why the
15  position of director of school choice may have been
16  eliminated?
17     A   Not any reason I can swear to.  I just don't
18  recall closely enough.
19     Q   And is it correct, too, that you did not do
20  any sort of independent investigation to see whether
21  or not this position, the executive director of
22  school choice, needed to be eliminated?
23     A   No.  I relied on the expertise of the other
24  people in the room.
25     Q   Okay.  Now, for Dr. Bailey, do you know why he

1   was removed as principal of Whites Creek?
2      A   That would have to be a question for his
3   supervisor.
4      Q   Did you have any input into the decision to
5   remove Mr. Bailey?
6      A   No.
7      Q   Dr. Bailey.
8          And would that decision have been made by his
9   supervisor?
10     A   That would have been a situation, I believe,
11  that the supervisor and that supervisor would be a
12  part of.
13     Q   And do you know that Dr. Bailey's supervisor
14  would have been Renita Perry?  Is that correct?
15     A   Any conversation I would have had with that
16  would have been with Sharon Griffin, who was the
17  chief of innovation.
18     Q   And do you know who Dr. Bailey's supervisor
19  was -- direct supervisor?
20     A   I'm sorry.  I don't -- no, I don't.
21     Q   Do you know Ms. Perry's position?
22     A   Renita Perry is an executive director of
23  schools, and she was in the school of innovation.
24     Q   And what was Ms. Griffin's --
25     A   She was the chief of innovation.

1    Q    -- position?
2    A    She was the chief of innovation, which
3  supervised the --
4    Q    And -- and --
5         THE COURT REPORTER:  May we go off the
6  record, please?
7         THE VIDEOGRAPHER:  We're going off the
8  record.  The time is 11:35.
9         (Off-the-record discussion.)
10        THE VIDEOGRAPHER:  We are back on the record.
11  The time is 11:36.  Please proceed.
12        THE WITNESS:  Ma'am, if you could state your
13  question again.
14  BY MS. STEINER:
15    Q    Dr. Barnes, who was Dr. Bailey's supervisor
16  supervisor?
17    A    That would have been Sharon Griffin, the chief
18  of innovation, and she worked with our priority
19  schools.
20    Q    And how did Dr. Perry fit into this?  Was she
21  the supervisor of Dr. Griffin?
22    A    Dr. Perry was one of the innovation schools'
23  or the priority schools' executive director of school
24  support.  Most of my work with her, she was working
25  with elementary schools.  She may have been working

1  with the high schools prior to that.  I just simply
2  don't remember.
3    Q    Okay.  And if she was working with the high
4  schools, would Dr. Griffin have reported to
5  Dr. Perry?
6    A    No.  Dr. Griffin would have reported to
7  Dr. Battle.  Dr. Perry would have reported to
8  Dr. Griffin.
9    Q    Okay.  Now, how were you contacted about
10  Dr. Bailey's position as principal at Whites Creek?
11  Who first contacted you about that?
12    A    That would have been a conversation with
13  Sharon Griffin.
14    Q    And what did she tell you?
15    A    The conversation was about removing him as
16  principal.  I don't recall the text or message of
17  what she said, but that was the gist of the message.
18    Q    And did she tell you why?
19    A    I'm sorry.  That's a question I'm going to
20  have to have you refer to her for.
21    Q    Okay.  Was she asking you for your input about
22  removing him?
23    A    In regards to the process, yes.  In regards to
24  my opinion as to whether he should, no.
25    Q    Okay.  And what conversation did you have with

1  her about the process?
2    A    Oh, gosh.  Again, I would have referred her to
3  the policy of steps we need to take.  I'm trying to
4  recall whether or not his contract was ending.  I
5  believe that it was.  I'm almost 95 percent sure that
6  he was coming to the end of his contract cycle.
7    Q    Okay.  Now, did Metro Schools have a
8  disciplinary policy?
9    A    Yes.
10    Q    And did that deal with job-performance issues?
11    A    Again, when we spoke earlier, issues of
12  incidence of behavior that would have violated policy
13  are over here; performance issues usually got dealt
14  with through observation and through dialogue with
15  their supervisor.
16    Q    That would have been Dr. Griffin, correct?
17    A    Correct.
18    Q    Okay.  Now -- but does Metro have a
19  disciplinary policy where if you're having issues
20  with a teacher or a principal that the supervisor
21  needs to inform the principal or the teacher about
22  the problem?
23    A    Yes.  We use a system of progressive
24  discipline which involved -- there's a whole series
25  of things with that.

1    Q    Okay.  And that is in the hopes that the
2  problem will correct itself, correct?
3    A    Yes.
4    Q    Okay.  And does it include oral counseling,
5  written counseling --
6    A    Yes.
7    Q    -- discussions about what's wrong?
8    A    Yes.  And quite frankly, that's best practice
9  that is normally used.
10    Q    Okay.  And that should have been used, too, if
11  Dr. Griffin had any problems with Dr. Bailey,
12  correct?
13    A    I would assume so, yes.
14    Q    Okay.  Do you know whether or not Dr. Griffin
15  had put Dr. Bailey through any progressive
16  disciplinary action?
17    A    No.  I'm sorry.  I don't.
18    Q    Do you know whether or not Dr. Bailey had
19  gotten awards for his work at Metro Schools?
20    A    No.
21    Q    Okay.  Now, for Ms. Doe -- and I'm sorry if
22  I've already asked these questions.  But it's my
23  understanding that you really had no input into the
24  decision to eliminate her position.  Correct?
25    A    Correct.

1    Q    Okay.  And you do not know why her position
2  was eliminated.  Correct?
3    A    No.
4    Q    Okay.  For the executive directors, did you
5  know that the executive directors were asked to
6  reapply for their jobs?
7    A    Yes.
8    Q    Do you know why?
9    A    Yes.  We changed portions of the jobs to an
10  extent that we wanted to reinterview everyone who was
11  currently in the position as an opportunity to -- for
12  reorganization.
13    Q    And who made that decision to do the
14  interviews?
15    A    I was part of that decision.
16    Q    Who, along with you, made that decision?
17    A    That would have been the same people in the
18  discussion about reorganization.
19    Q    That would have been Dr. Battle, Ms. Roberge,
20  and Hank Clay?
21    A    And I'm going to assume conversations about
22  executive directors would have also included Sharon
23  Griffin at that time since she supervised a small
24  number of those executive directors.
25    Q    Did you have any input -- did you have

1  available -- does Metro Schools have an evaluation
2  system there for their workers?
3    A    Yes.
4    Q    Okay.  And do they have supervisors that
5  evaluate them on an annual basis?
6    A    Yes.
7    Q    Okay.  And do you know whether or not there
8  have been any performance issues with Dr. Leffler?
9    A    No.
10    Q    Okay.  Can you tell me why interviews were
11  conducted for the executive director positions as
12  opposed to looking at the evaluations and past job
13  performance?
14    A    We did an interview process with all of them
15  to make sure it was an equitable process.
16    Q    Why did you not take the executive directors
17  that you had -- and I believe you had 13.  Is that
18  correct?
19    A    I'll have to trust your number on that.
20    Q    Why did you not take those executive directors
21  and say, you are going to stay as executive
22  directors?  Did you not think that would be
23  equitable?
24    A    Well, since the job changed to an extent to
25  provide more training and more professional

1  development, those kinds of activities, we thought
2  the best solution would be to reinterview all
3  candidates.
4    Q    And how did the job change?
5    A    Again, you're speaking a year and a half ago.
6  I -- I know there were changes involving more
7  involvement in professional development of leaders
8  more than just supervision, but the specific
9  examples, I'm sorry; I can't speak to without having
10  the job descriptions in front of me.
11    Q    When you say professional development of
12  leaders, does that mean helping the teachers who work
13  under these executive directors develop or does that
14  mean having the executive directors develop more?
15    A    Having the principals develop more.
16    Q    Principals.  Okay.  And can you tell me any
17  reason why you think or do not think Dr. Leffler
18  would be capable of doing that?
19    A    Again, you stated earlier, I was fairly new to
20  that job.  I didn't have historical context.
21    Q    So you really had no opinion one way or the
22  other about whether or not Dr. Leffler was able to
23  provide more involvement of professional development
24  of leaders?
25    A    I would speak that to all of them, but yes.

1  In that case specifically, yes.
2    Q    Okay.  And that's knowledge that you did not
3  really actually obtain one way or the other the whole
4  time you were at Metro Schools, correct?
5    A    Correct.
6    Q    Okay.  Now -- and I believe Ms. Harbison is
7  going to ask you questions about Dr. Cathey.  She
8  represents him.
9         Now, would you agree that at Metro Schools, if
10  you eliminate a position, that's not the same as
11  transferring a worker.  Correct?  Those are different
12  procedures, correct?
13    A    I would say they're different events, yes.
14    Q    Okay.  And a non-renewal is a different event
15  from an elimination of a position, correct?
16    A    Correct.
17    Q    Okay.  And a transfer is different than a
18  non-renewal, correct?
19    A    Correct.
20    Q    Okay.  Now, it looks like a lot of times --
21  and I may be wrong on this, so correct me if I'm
22  wrong, but nonrenewals are used when there's
23  performance issues?
24    A    At the school level, non-renewal is a term
25  that's used by the State, and it encompassed both

1  issues of performance and issues of a reduction in
2  staff, a reduction in budget, a reduction in
3  programming. So that non-renewal term is used sort
4  of broadly.
5       If you asked me if I think those are two
6  different things, if someone gets eliminated for
7  performance versus budget, I view those as different
8  things.
9    Q   Okay. And a person can have their contract
10 non-renewed, and it's not an elimination, correct?
11   A   Yes, because they can be non-renewed for
12 budgetary reasons, enrollment reasons, or
13 programmatic reasons.
14   Q   Okay. And is it correct that most of the time
15 when there's a non-renewal, there's not an
16 elimination of the position; the position continues?
17   A   If a position is reduced for a budgetary
18 reason or enrollment drop, you may still have
19 teachers in the building, but there may not be as
20 many teachers as there were before. So --
21   Q   Now, my question was different. Oftentimes
22 you can have a non-renewal that the position is not
23 eliminated?
24   A   Yes.
25   Q   Okay. And in fact, most of the nonrenewals

1  that Metro Schools had did not deal with an
2  elimination?
3    A   I can't speak to that number of which ones
4  more often.
5    Q   Do you know who has the authority to do a
6  non-renewal versus who has the authority to do an
7  elimination of a position?
8    A   In Metro Nashville, most of that was relied on
9  by the supervisor of that position.
10   Q   And that's for elimination of positions, too?
11   A   Correct.
12   Q   Okay. And you are not aware of a need for the
13 school board to approve the elimination, correct?
14   A   I would -- most of my conversations with that
15 occurred with Dr. Battle. My understanding of the
16 policy was that she had the authority to address
17 positions as her position as director of schools.
18   Q   Okay. Now, it's my understanding that the
19 executive directors were interviewed?
20   A   Correct.
21   Q   And were you on one of the panels to
22 interview?
23   A   Yes, I was on all the panels.
24   Q   And who else conducted the interviews?
25   A   Okay. I remember that Sharon Griffin was a

1  part of them; Ken Stark was a part of them. What is
2  her name? Those two. There was another one.
3    Q   Lisa Spencer?
4    A   Lisa -- yes. I was saving her. Lisa Spencer,
5  and there was one more besides me, and her name --
6  she was the executive -- she was executive director.
7  Now she's an executive officer. I'm sorry. I'm
8  blanking on her name.
9    Q   What about Mr. Williams? Do you recall if he
10 was on the panel?
11   A   Mr. Williams?
12   Q   Yes.
13   A   Oh. Dave, yeah. He's the academic officer.
14 So it was Ken Stark, Sharon Griffin, David Williams,
15 myself, Lisa Spencer. And there was one more, and
16 I'm sorry; I'm blanking on her name.
17   Q   Ms. Morris?
18   A   Elisa -- thank you. Elisa Morris.
19   Q   Okay. How long did the interviews last?
20   A   It took place over the course of a couple of
21 weeks. Each interview was, I believe, a half hour
22 long.
23   Q   And did all five of the interviewers
24 participate?
25   A   I can't recall if every single person was in

1  every single one, but that was the general -- general
2  process, yes.
3    Q   Okay. And when you would rate the applicants,
4  did you have any sort of a form to go by? It looks
5  like you ranked them from 1 to 5. Correct?
6    A   It was a 1 to 5 ranking. I built in an
7  anonymous form that as we went through the interview,
8  the panel would be able to rate on a form and submit
9  each one electronically.
10   Q   And when they submitted them electronically,
11 could you go back in and find out who submitted what?
12   A   No.
13   Q   Excuse me?
14   A   No.
15       THE COURT REPORTER: The answer was no.
16       MS. STEINER: Thank you.
17   A   Oh, I'm sorry. I'm trying to speak slowly.
18 That's not a skill of mine, so I apologize.
19   Q   Dr. Barnes, I could hear you. That was fine.
20 The court reporter was just being helpful. I'm
21 trying to think of the next question, so --
22   A   You could be done.
23   Q   So when -- when you -- did you develop the
24 questions?
25   A   Yes.

1    Q    Okay.  Hang on a second.  Can you hear me?
2    A    Yes.
3    Q    Good.  Because I think -- okay.  Hang on a
4  second.  Okay.  And -- hang on one second.
5         Did all the interviewers interview a candidate
6  at the same time?
7    A    Yes.
8    Q    Okay.  And you said that you did this to make
9  it fair.  Is that correct?
10   A    That's always my goal.
11   Q    Would it be fair to have interviewers
12 interview the candidates separately?
13   A    That's not generally accepted format.
14 Generally you bring a panel together to interview at
15 the same time.  Part of it is for convenience for the
16 panel, and part of it is for the interviewer not to
17 have to do that five times.
18   Q    Okay.  Is it also fair, though, to have the
19 interviewers hear all of the answers, the same
20 answers, as opposed to different answers?
21   A    I'm sorry.  I'm going to have to ask you to
22 reframe that.  I'm not sure I understand.
23   Q    Okay.  If you have one question that's being
24 asked and the candidate gives an answer back --
25   A    Yeah.

1    Q    -- is it fair -- more fair to have all of the
2  graders/scorers have the same information as opposed
3  to different information?
4    A    I would say that it's important for all of us
5  to ask the question in the same way and hear the same
6  answer.
7    Q    Okay.  And so then is it fair to have all of
8  the interviewers there together asking the questions
9  of the candidate as opposed to separately?
10   A    Yes.
11   Q    Okay.  Now, when you were giving the
12 interviews, did you have any problems with your
13 computer?
14   A    Not that I recall other than --
15   Q    Do you --
16   A    -- other than problems that we've experienced
17 today, you know, that are general Zoom-type-related
18 issues.  Nothing that I can remember.
19   Q    If Lily Leffler were to testify that when you
20 interviewed her, you were having computer problems
21 and your computer stopped working, would you agree or
22 disagree with that?
23   A    I would not recall that.  I just don't
24 remember.
25   Q    Okay.  Let me show you what was given to

1  Dr. Cathey by Metro Schools when he asked for the
2  scores.
3    A    Okay.
4    Q    Do you recognize this document?
5    A    It looks familiar, yes.
6    Q    Okay.  And does this appear to be the list of
7  the scoring for the executive director interviews?
8    A    That would appear what -- yes, that would
9  appear to be it.
10   Q    Now, hang on one second, because I think my
11 screen locked up.  I'm going to get out of this and
12 pull it back up again.  Okay?
13        Here we go.  And does this form have the date
14 and the time that the interviews were conducted?
15   A    That would be the date and the time that the
16 thing -- that the scorers submitted their score.
17 Generally it was accepted that it would be around the
18 same time as the interview, yes.
19   Q    Okay.  Hang on one second.  I'm locked up
20 again.  Okay.  I think I'm showing you now, with a
21 little bit of luck, a different -- the first two
22 columns.  Do you see where it says start time?
23   A    Yes.
24   Q    And then it says completion time?
25   A    Yes.

1    Q    Would the start time be the start time of the
2  interview?
3    A    The start time would most likely be the start
4  time of when they opened the form.
5    Q    And what does that mean?
6    A    That means that each of them had a -- the
7  online rubric.  So when they started the form, my
8  assumption would be that is the start time that they
9  started and opened the form.
10   Q    Okay.  And so then for the first one then,
11 they would have opened the form at 7:48, and they
12 would have closed it at 8:30.  Is that correct?
13   A    That's what that looks like.  Yes, ma'am.
14   Q    Okay.  Now, do you recall -- most of these
15 people, they scored them immediately after the
16 interview.  Is that correct?
17   A    Generally.  When I do the form, I usually
18 score each answer individually as they give it and
19 then submit the form at the end.
20   Q    Okay.  And that's at the end of the interview,
21 correct?
22   A    Correct.
23   Q    Okay.  Now, do you see Ms. Leffler, it looks
24 like she was interviewed, down here at the very
25 bottom, at 5/22 -- on May 22nd, 2020?

1   A   Yes.
2   Q   Do you see that?
3   A   Yes.
4   Q   And she was interviewed by four anonymous
5   scorers.
6   A   If you go down three more cells, there is a
7   fifth one there as well.
8   Q   Okay.  And do you see that occurred on
9   May 23rd, 2020?
10   A   Yes.
11   Q   Okay.  Do you know if that was yours because
12   you were having computer issues on May 22nd?
13   A   Well, I don't recall having computer issues,
14   but I can't speak to -- that being anonymous -- who
15   submitted that form.
16   Q   Okay.  Well, let me ask you this:  If
17   Ms. Leffler testifies that you could not sign in
18   because of your computer and so then she called you
19   on May 23rd to have you ask her her questions; that
20   you-all -- you and Ms. Leffler had -- Dr. Leffler had
21   a discussion that lasted about 20 minutes to
22   30 minutes and that you scored her based on that,
23   would you have any reason to differ?
24   A   I want to say I would remember something like
25   that, but I simply don't.

1   Q   Okay.  Well, if she says that's what happened,
2   will you say, no, it didn't?
3   A   I would have to say I don't recall.
4   Q   Okay.  Now, for Ms. Leffler, I'm going to ask
5   you a couple questions about how you scored her here.
6   Do you realize that your score, this May 23rd, 2020
7   score, was a very low score for Ms. Leffler and that
8   it pulled her score down to be a lower one, where, if
9   you took that one out, she was one of the highest
10   scoring ones?
11   A   Well, I can't testify that's my -- that is my
12   scoring, so I can't speak to that.  I can -- I can --
13       MR. FOX:  Objection.  Objection to the form.
14   I don't think that's been established yet.
15   Q   Assuming Dr. Leffler testifies that you talked
16   to her the next day and you scored her the next day,
17   would you have any reason to dispute that?
18   A   I can -- I can see the scores that you have
19   listed there, and I can see how those scores would
20   have brought her average down.  Correct.
21   Q   Okay.  Can you tell me any reason why -- why
22   you would have given her a 3 in terms of the first
23   question:  In order for us to get to know you, please
24   briefly tell us about yourself?  What part of your
25   experience question -- do you know why you would have

1   given her a 3 on that?
2   A   Again, I don't recall individual scores that I
3   gave to individual people.
4   Q   Okay.  So then can you tell me any reason why
5   you would have given her a 2 on student performance
6   and accountability or priorities, how -- what was the
7   rest of that question for that --
8   A   If you hover over it, you might see it easier.
9   Q   How would you assess the current level of
10   performance?
11   A   Again, I can't speak to how I gave individual
12   scores on individual people.  It's impossible to
13   remember that specific conversation.
14   Q   If Dr. Leffler were to testify that when she
15   had her discussion with you on May 23rd that you
16   didn't ask her any of these questions, talk to her
17   about the changes that would be made at
18   Metro Schools, would you have any reason to differ
19   from that?
20   A   I will say, I don't recall that conversation
21   outside of the millions of conversations I have.
22   Q   Did you have any discussions with anybody
23   where you were told to score Dr. Leffler low so that
24   she would not be an executive director?
25   A   No.

1   Q   Okay.  Did you -- who was the actual person
2   who said, rather than looking at evaluations, looking
3   at positions, talking to their supervisors, rather
4   than do that to see who's going to be best in this
5   position, let's give them this half-hour interview
6   instead -- who made that decision?
7   A   I don't recall who made the decision to do
8   this this way.
9   Q   When the scores were submitted, who had the
10   ultimate authority to pick who was the executive
11   director and who was not?
12   A   I provided the scores and recommendations to
13   Dr. Battle.
14   Q   Okay.  And did you make any recommendation
15   with regard to Dr. Leffler?
16   A   No.
17   Q   Did you make any recommendation with regard to
18   Dr. Cathey?
19   A   No.
20   Q   Do you know how high Dr. Cathey scored on the
21   executive director test or interviews?
22   A   I can see his scores right there, but not --
23   to my -- I mean, to my knowledge in my brain, no.
24   Q   Did anyone -- assuming Dr. Cathey was one of
25   the highest scoring individuals, can you give me any

1  reason why he was not hired as an executive director?
2      A  No, I can't speak to that.
3          MR. FOX:  Objection to the form.  I don't
4  know that that's been established that he was one
5  of the highest scoring.
6      Q  Did you make any recommendations that
7  Dr. Battle did not adopt?
8      A  I can't recall that.  I don't remember.
9      Q  Now, who made the decision to hire two
10 additional executive directors?
11     A  The creation of the positions would have been
12 Dr. Battle.
13     Q  Let's make -- and does this appear to be the
14 scoring chart that was developed for the executive
15 director interviews?
16     A  It appears to be.
17         MS. STEINER:  Okay.  Can we have this
18 marked -- and let's go all the way down to the
19 bottom -- can we have this marked Exhibit Number 6
20 to your deposition today?
21         THE COURT REPORTER:  Yes, ma'am.
22     Q  Now, with the system that you have set up to
23 do the scoring, it's impossible to lose a score,
24 correct?
25     A  The only way to -- for a score to be missing

1  was if I -- if I downloaded the sheet and then more
2  scores came in after that to the online system.
3      Q  So it would be an earlier score that would
4  have been lost, not a later score?
5      A  Generally, yeah.  I would say that's true.
6      Q  Were you aware of any scores that were lost?
7      A  I can't speak to the individuals, but I
8  remember going back afterwards for some reason and
9  not being able to find somebody's, but I don't recall
10 the specific instance.
11     Q  Did you interview Chad High?
12     A  Yes.  He was a current executive director, so
13 we would have interviewed him.
14     Q  And can you tell me why his scores are not
15 available on the chart?
16     A  I do not know why.
17     Q  Had -- did anyone tell you at any point in
18 time that Chad High's scores were missing from the
19 chart or weren't there, there weren't any scores?
20     A  I'm sorry.  I just don't recall.
21     Q  Did you actually interview Chad High?
22     A  Yes.
23     Q  Did anyone else interview Chad High?
24     A  It would have been the same group of people
25 that did the interview for these.  It would have been

1  the same panel.
2      Q  Do you recall whether or not Steve Balls'
3  grades or scores are missing from the panel?
4      A  Well, I think when you showed that score --
5      Q  Oh, yeah.  He's there.
6      A  Yeah.  You showed him to me earlier.
7      Q  Yeah.  There he is.  Okay.
8          Now, for Chad High, do you recall whether or
9  not he interviewed after the other executive
10 directors had been interviewed?
11     A  I know that my calendar is saved at
12 Metro Nashville.  You will have to get the calendar.
13 I just don't recall the dates and times of each
14 individual interview.
15     Q  Okay.  Do you recall -- do you know how Chad
16 High came about being interviewed for this position,
17 meaning did he contact and apply, or did someone from
18 your office or Metro Schools contact him and ask him
19 to apply?
20     A  I know that I did not, and I can't assume
21 anyone from my office did.  I remember other
22 instances of that occurrence where someone said that
23 and we should go ask that person.  Our general rule
24 of thumb was never to call and tell someone to apply.
25     Q  Why was that?

1      A  It's not necessarily my place to do that.
2      Q  Okay.  Did anyone show any favoritism for Chad
3  High to be appointed as an executive director?
4      A  Not to my recollection, no.
5      Q  Did you make any comments to anybody that if a
6  person did not take the position, you had someone
7  else in your back pocket you would put in the job --
8      A  No.
9      Q  -- as executive director?
10     A  No.  I don't recall saying that.
11     Q  Would you agree that that would be a very
12 unfair statement to make for the other candidates?
13     A  Yes.
14     Q  And if you or any of the other scorers were to
15 make that comment, would you agree then that the
16 testing given would have been biased?
17     A  I will say, I think it is difficult to have
18 people who have historical knowledge of the
19 individual -- you know, we spoke before the interview
20 panel for the importance of being objective, and I
21 remember asking and ensuring that the people doing
22 the scoring felt like they could be objective, but I
23 don't recall any specific conversations beyond that.
24     Q  My question to you was completely different.
25 Would you agree that if one of the scorers made the

1  comment to someone else that -- made the comment to
2  one of the applicants not to worry; that if they did
3  not take the job, the scorer had someone in their
4  back pocket, some other person in the back pocket
5  they would give the position to, do you not agree
6  that that would render the whole testing --
7      A  I mean, I would have to --
8          MR. FOX:  Objection to form.
9      Q  -- interview process biased?
10         MR. FOX:  Objection to form.
11     A  I would say that, taken out of context, I
12  would have to know more before I could make that
13  statement.
14     Q  Would you agree that it would be biased for a
15  scorer to say they had someone in their back pocket
16  for a position?
17     A  That would not be normal protocol, no.
18     Q  Would that be biased protocol?
19     A  Again, you're asking me to comment on
20  something out of context.  I would say that I think
21  that would not be an appropriate thing to say.
22     Q  And could that type attitude render the whole
23  testing invalid?
24     A  I think --
25         MR. FOX:  Objection to the form.

1      A  I think it would depend on how widespread that
2  opinion was.  I think that taking the average
3  aggregate score helps to eliminate some of those
4  issues, but I would hope that everyone that I had on
5  that panel was objective.
6      Q  If someone did make that comment that they had
7  somebody in their back pocket for the position, would
8  you agree that that scorer should not be a scorer and
9  that they're biased?
10         MR. FOX:  Objection to form.
11     A  I would need to know more information before I
12  could say that, but that would not be what I would
13  expect our panelist to say.
14     Q  Could that type attitude render the testing
15  invalid?
16     A  I think one individual's score in one case
17  wouldn't render the entire thing invalid.  I don't
18  know how widespread that opinion might have been.
19     Q  What about two scorers that render it invalid?
20     A  The best opportunity I had was to talk to the
21  panelists about scoring prior to the scoring
22  happening in the first interview and expect a level
23  of professionalism and expertise.
24     Q  What if two scorers made the comment that they
25  had a candidate in their back pockets?  Would that

1  render this testing invalid?
2          MR. FOX:  Objection to the form.
3      A  I just don't think I can answer it.  There's
4  not a specific number of people or times that I could
5  say that renders the entire process invalid.
6      Q  Okay.  What happens if all five
7  interviewers --
8      A  The point of having interviewers from
9  different departments and different groups do the
10  interview was to help ensure that that did not
11  happen.  If everyone had that opinion for a certain
12  applicant, I can't speak to how that would affect the
13  whole form.  However, it's hard to -- it's hard to do
14  that in a hypothetical sense.
15     Q  Okay.  So then even if every single scorer on
16  here said they had somebody in their back pocket to
17  put in the position, you still think that this
18  testing would have been valid?
19         MR. FOX:  Objection to form.
20     A  If I had known that, I would want to have done
21  that interview a different way, but not knowing that
22  information, I can't speak to the entire form being
23  invalid, no.
24     Q  Okay.  Okay.  Did you do any sort of
25  investigation to find out where Chad High's scores

1  were?
2      A  I looked back in my computer to see if I had a
3  newer collection of the form, but I could not -- I
4  didn't find anything more recent than the one that I
5  submitted.
6      Q  And when did you look for Chad High's scores?
7      A  I'm sorry.  I can't remember a specific date.
8      Q  Was it before he was hired into the position
9  or after?
10     A  Gosh, I'm sorry.  I just don't remember.
11     Q  Did you send the scores to Dr. Battle?
12     A  I think I would have discussed them with her.
13  I don't know if I -- I did not email the form to
14  anyone.
15     Q  Did you add up the scores and average them?
16     A  I averaged them, yes.
17     Q  And did you send that to Dr. Battle?
18     A  I would have brought it to her.  I would not
19  have emailed it.
20     Q  Was it a form, written document?
21     A  I don't know if I had it -- I usually use --
22  I'm a big fan of using large index cards, 5 by 7s.
23  Because of this, I may have written the name down,
24  written the number down, the average, as I was doing
25  it, because the form -- you have to use Excel and all

1 that. So I don't remember writing it -- I may have
2 written it down on a piece of paper. I don't
3 remember whether I wrote it down in a form or put it
4 in -- you know, in a document.
5 Q Would you have averaged all of the candidates'
6 scores on that index card?
7 A Yeah. That would -- that's -- I'm speaking in
8 generalizations. That's what I normally do.
9 Q Okay. Did you save that index card?
10 A I looked back over the course of time to see
11 if I could find that index card. I generally
12 would -- they were all in a stack on my desk of
13 things that I had done. And generally, over time, I
14 would winnow those out when problems were resolved or
15 solved. So I would imagine I threw that away at some
16 point in time.
17 Q Did you provide a copy of the index card to
18 Dr. Battle?
19 A I don't remember. Not that I recall.
20 Q And I believe you testified that it was
21 Dr. Battle that had the ultimate decision who to
22 hire/who not to hire in that position. Correct?
23 A That is our policy. Correct.
24 Q And the index card you handled, you took it
25 to -- did you take it to Dr. Battle or did you create

1 the card and then call her on the phone or did you
2 send her an email or did you do a Teams meeting?
3 A I want to say that that was during sort of the
4 height of the pandemic time. I would assume we had
5 done a Teams call.
6 Q Okay. And are those Teams calls recorded?
7 A I don't believe so, no.
8 Q Okay.
9 A Now, I'm just trying to remember -- I'm
10 trying --
11 Q In the Teams call, would you have read to her
12 all the scores or just the ones that you thought were
13 important?
14 A I would have gone over all the scores.
15 Q And did you have any discussion with
16 Dr. Battle about the executive directors' job
17 performance before they were interviewed?
18 A Not that I recall, no.
19 Q Do you know whether or not Dr. Battle
20 considered their job performance before these
21 20-minute interviews?
22 A I don't think they were 20 minutes, but no,
23 not that I -- I can't speak to what her opinion was,
24 no.
25 Q Did you -- how long were the interviews

1 typically?
2 A From the -- from the score and submit on the
3 screen there, I thought they were -- they looked like
4 they were about 45 minutes. I don't remember if I
5 just scheduled them 45 minutes apart. I think I may
6 have done that in case for overage time. I would say
7 they ranged between 30 and 45 minutes or between 25
8 and 45 minutes.
9 Q Okay. Now, besides this executive director
10 position, were there any other positions at
11 Metro Schools while you were there that the employees
12 were told that they were going to have to go back in
13 and reapply for their positions?
14 A Let me think. Unless there was a one-off
15 somewhere else, this was the big time I remember.
16 Q At any other place of employment, have you
17 ever had that happen --
18 A Yes.
19 Q -- where the employees were told they're going
20 to have to reapply for their position?
21 A Yes. In fact, I've had a situation where a
22 superintendent changed, and the entire cabinet had to
23 reinterview for their positions.
24 Q Okay. And that's because the superintendent
25 was picking the executive officers that

1 superintendent wanted, correct?
2 A Sort of, yeah.
3 Q Okay.
4 A It did not strike me as a completely, you
5 know, random thing. That -- that -- I don't want to
6 say it happens every day, but it's enough of a
7 general practice that that didn't strike me as
8 particularly odd.
9 Q Okay. And Dr. Battle had just come into this
10 director position, correct?
11 A So she had been an interim for a period of
12 time. I think she was named as actual -- the
13 superintendent fairly soon after I got there. I
14 think it was -- again, I started; there was a
15 tornado; there was a pandemic. I think it was
16 between the tornado and the pandemic that they named
17 her officially the director of schools.
18 Q Okay. And she was -- did you think she had
19 the right to pick her own executive directors?
20 A Yes.
21 Q Okay. Now --
22 THE VIDEOGRAPHER: I have to change my card.
23 THE WITNESS: Hey, guys. We have to pause
24 for one second. The videographer has to change the
25 card on his computer. If we can go off the record

1  for one second.
2          THE VIDEOGRAPHER:  We are going off the
3  record.  The time is 12:24.
4          (A recess was taken.)
5          THE VIDEOGRAPHER:  All right.  We are now
6  back on the record.  The time is 12:36.  Please
7  proceed.
8          Probably thumbs up.  Thank you.  Appreciate
9  it.
10         MS. STEINER:  Normal.  Not chicken.
11         THE VIDEOGRAPHER:  That's on the record.
12         MS. STEINER:  Make that off the record if you
13  don't mind.
14         MR. FOX:  No, we want that she's ordering
15  chicken.
16         THE COURT REPORTER:  It's on the videotape.
17         THE VIDEOGRAPHER:  Yeah.
18         MS. STEINER:  Oh, my.  Okay.
19         THE VIDEOGRAPHER:  Should I delete the file?
20  I don't know.
21         THE WITNESS:  We're not starting over.
22         THE VIDEOGRAPHER:  I don't think it picked
23  up, really, but --
24         THE WITNESS:  He doesn't think it was --
25

1  BY MS. STEINER:
2      Q   Dr. Barnes, are you ready?
3      A   Yes, ma'am.  Not chicken.
4      Q   Do -- is there any sort of a rule or a
5  standard that you applied in these interviews that
6  the interviewers were not to question or talk to the
7  applicants offline about the application?
8      A   I want to say that is generally standard
9  practice of what I say, that these interviews are
10  confidential.  If you're asking me if I remember
11  saying it specifically in this case, I would have
12  known about the complexity and variables that come
13  with interviewing current employees.  So I think I
14  would have said something of that nature, but I can't
15  recall exactly what I said.
16         But that is a -- but that is generally
17  accepted, yes.
18     Q   Okay.  And your standard procedure then is to
19  tell the interviewers, while this is going on, do not
20  contact the applicants away from the interview
21  process to discuss it?
22     A   That is my general practice, yes.
23     Q   Okay.  Did you speak with anyone or tell
24  somebody that you would speak with them offline?
25     A   I remember, during the course of the

1  interviews, we ended up taking longer than I
2  expected.  I remember calling every applicant with
3  Lisa Spencer and explaining the reason why it was
4  taking another week.
5      Q   Anything else that you [inaudible] --
6      A   Not that I recall, no.
7      Q   Why did the interviews take another week?
8      A   I'm sorry.  There was so many things happening
9  during that time with the pandemic and everything
10  else, I can't speak to a specific reason.
11     Q   Did you average the scores at any point in
12  time before you concluded the interviews?
13     A   No.  Generally I usually wait until after all
14  of the interviews are conducted before I average
15  things out, if I remember right.
16     Q   When did you realize Chad High's scores were
17  missing?
18     A   I don't --
19     Q   Meaning, was it before the applicants were
20  selected for the job or was it after?
21     A   I just don't remember, because the online
22  form, you can average there.  So I don't remember
23  which download or where it took.  I'm sorry.  I just
24  don't remember the date.
25     Q   I just want to make sure you understood my

1  question.  Approximately when did you understand that
2  Chad High's scores were missing?
3      A   Sorry.  I don't remember when I realized that.
4      Q   Okay.  Do you recall whether or not it was
5  before the applicant was chosen for the position or
6  was it some other time?
7      A   I would want --
8      Q   Meaning could it have been before?
9      A   No.  No.  It would have been after, because --
10  no.  It would have been after.
11     Q   So then at some point you did have Chad High's
12  average?
13     A   Correct.
14     Q   Okay.  So then the deletion of his scores was
15  not caused by some interview that occurred after his
16  interview.  Correct?
17     A   Oh, no.
18     Q   Okay.  Can you tell me what could have
19  possibly caused the deletion of Chad High's scores?
20     A   Office -- Microsoft Office has a forms sheet,
21  and you can do a download of an Excel spreadsheet
22  from that.  Inadvertently, I must have down- -- I
23  downloaded more than one at some point in the
24  process, and I must have deleted the newer one and
25  kept the older one.

1    Q   Did you -- when you found out that you were
2  missing his scores, did you go back into the recycle
3  bin or the trash to try to find it?
4    A   I looked throughout my documents. I looked
5  through -- I looked through -- yes, I did. And I was
6  unable to find it.
7    Q   Typically can you find those documents in the
8  recycle bin?
9    A   Normally. Generally I empty my recycle bin
10 every month or two. So it was no longer in my
11 recycle bin when I went looking for it.
12   Q   Are you positive he was actually scored?
13 Because we're going to take his deposition, too.
14   A   Yeah. I know we interviewed him; I know I had
15 a score for him. I don't -- I can't speak to why
16 it's not in the form -- or in the Excel download.
17   Q   Do you know how he scored then?
18   A   Without any access to looking at it, I can't
19 remember. I don't recall his score standing out one
20 way or the other necessarily.
21   Q   Now, the number of executive directors
22 increased, correct?
23   A   Correct.
24   Q   Okay. So that was not -- the elimination of
25 those positions had nothing -- well, the change of

1  the executive director positions had nothing to do
2  with the budget then, correct, because they actually
3  increased the number of executive directors?
4    A   Yeah, I guess that's true. Yeah.
5    Q   Okay. Now, I want to change areas just a
6  second.
7    A   Okay.
8    Q   Have you been trained in the discrimination
9  laws?
10   A   To the extent -- to some extent, yes. Have I
11 been --
12   Q   Which training?
13   A   Have I been trained in it? No. Did I become
14 familiar with it through the course of my work? Yes.
15   Q   I assume that you mean by that that you're
16 familiar with it from your own looking at the laws as
17 opposed to somebody sitting there and explaining it
18 to you?
19   A   Correct.
20   Q   Okay. So when you started at Metro Schools as
21 the chief of human resources, Metro Legal or HR did
22 not put on any sort of a training session for you
23 that dealt in any manner with the discrimination or
24 retaliation clause. Correct?
25   A   No, not an official training. No.

1    Q   Okay. Now, did -- did they do an unofficial
2  training?
3    A   No. No.
4    Q   Okay. Now, were you trained for your position
5  when you got at Metro Nashville?
6    A   I've had experience in HR departments for the
7  last seven, eight years. So in regards to specific
8  training in HR law, no, except for being -- I'm
9  certified in SHRM, which is the nationally
10 renowned -- national, you know, human resources
11 agency, and then through my work as a principal and
12 my degrees. But nothing specific in HR law. No.
13   Q   When you were certified through SHRM, was that
14 for discrimination and retaliation?
15   A   No. It was just their -- their level of
16 training.
17   Q   Okay. And that's more for dealing with
18 disciplinary issues and other HR issues that arise,
19 correct?
20   A   It's sort of -- it's sort of broad spectrum,
21 but nothing -- nothing specifically in law,
22 specifically.
23   Q   Okay. Did you know that you -- what was your
24 understanding of the discrimination laws -- what is
25 your understanding of the discrimination laws?

1    A   Can you be more specific? I mean, I
2  understand that, you know, the general rule of thumb
3  is that HR decisions can't be arbitrary, capricious,
4  judgmental, or discriminatory.
5    Q   Do you know what discriminatory means?
6    A   In regards to age, sex -- I mean, age, gender,
7  sexual orientation, ethnicity; that's what I would
8  consider broad strokes to be discriminatory.
9    Q   And what would you consider to be
10 discrimination?
11   A   I would say acting on those, using those as a
12 reason for making employment decisions.
13   Q   Do you know anything about Title VI?
14   A   Title VII and Title IX. I'm not as familiar
15 with Title VI, no.
16   Q   Okay. Have -- what do you know about
17 retaliation under these acts?
18   A   I know what our board policy says about
19 retaliation, and most school districts -- you know,
20 the school district that I have here has one as well.
21   Q   And do you -- when you worked for
22 Metro Nashville, if you had a -- a decision to make
23 with regard to disciplining a worker, did you have
24 any procedure set up or would you ask the supervisor
25 or would you check the records to see whether or not

1  the employee had engaged in any sort of protected
2  activity to make sure that there was no retaliation?
3        MR. FOX: Objection to the form. Objection
4  to the form.
5    A  Without knowing a specific instance, I would
6  say that that was generally how I would interact,
7  yes.
8    Q  Okay. So then if a teacher or -- a principal
9  came to you and said, I would like to fire the
10  third-grade teacher, you would have a procedure set
11  up where you would investigate it and you'd make sure
12  that that teacher had not engaged in any sort of
13  protected activity. Correct?
14    A  And I would generally want to see the
15  documentation as to why --
16    Q  Okay.
17    A  -- to look at reasons. I do want to say -- I
18  do I want to say, terminate and non-renew are sort of
19  two different thresholds of standards, though.
20    Q  Can -- did you check whether or not the
21  employee had engaged in protected activity if their
22  contract was being non-renewed?
23    A  I think that would depend on the individual
24  circumstance as to why. If -- if they were
25  non-renewing five teachers at their school because of

1  a budget change or something like that, I would want
2  to know the procedure for how those people were
3  chosen. If you ask -- if you're asking me if I
4  checked every single one of them as the course of the
5  process, not unless there was a red flag, no.
6    Q  But if they were non-renewing one individual,
7  would you check?
8    A  Generally, I would still want to know why.
9    Q  Okay. But would you ask somebody to check the
10  records to see if they had engaged in protected
11  activity?
12    A  We had a list of hiring managers who would
13  bring me the recommendations of people being
14  non-renewed. I want to say that was the general
15  practice that they would do is to ensure that had
16  been done before it reached my level.
17    Q  So then the hiring managers were responsible
18  for checking to see whether or not the person had
19  engaged in protected activity?
20    A  And generally, they were the main conduit to
21  schools, so they were discussing and looking at --
22  they were dialoguing with schools every day so they
23  would know about issues and things that had come up.
24    Q  And would they have access to the records to
25  check it as well?

1    A  They could communicate with the director of
2  employee relations if need be.
3    Q  Okay. And one of the questions that they
4  should have gotten to the bottom of is whether or not
5  this person had engaged in protected activity?
6    A  I would assume so --
7    Q  Correct?
8        MR. FOX: Objection to form.
9    A  -- yes.
10    Q  Yes?
11        MR. FOX: Objection to form.
12    Q  And for the record, that was a yes, correct,
13  Dr. --
14    A  Yes.
15    Q  -- Barnes?
16  Thank you. Now -- but once you start having
17  multiple positions eliminated, that's not done?
18    A  Again, I still think it was done -- you know,
19  my direction to the people working in my department
20  was to make sure that the reasons for non-renewal
21  were justified and reasonable.
22    Q  And that included whether or not they had
23  engaged in protected activity?
24    A  Correct.
25    Q  Okay. Now -- but if they were non-renewing up

1  to five, I believe you said you stopped checking that
2  then or do you continue to check whether or not they
3  had engaged in protected activities?
4    A  I didn't mean to specify a specific number
5  over which I didn't regard that as important. Excuse
6  me. Whenever we were non-renewing somebody, that was
7  the expectation. I looked a little more closely at
8  ones that were individual versus situations like
9  that. But it was the expectation that they always
10  did the same amount of due diligence before it
11  reached my desk.
12    Q  Okay. And that is -- for all of them then,
13  they needed to check to see whether or not they had
14  engaged in any protected activity?
15    A  That would have been my expectation.
16    Q  Okay. And what about for the elimination of a
17  position? Was that treated the same as a
18  non-renewal?
19    A  Not necessarily, because the triggering event
20  was a different reason.
21    Q  Is there any reason why someone who was of a
22  mind to discriminate may pick a non-renewal over an
23  elimination of a position?
24    A  I don't -- no, I don't see any reason why.
25    Q  Okay. So then would you agree that a position

1 can be eliminated for a discriminatory reason just as
2 readily as it can be non-renewed if a person was of
3 the mind to discriminate or retaliate?
4　　A　I don't see --
5　　　　MR. FOX:　Objection to the form.
6　　A　That's a -- I'm trying to make sure I'm
7 understanding your question, because it's been
8 several times you've had to restate.　I don't see how
9 anyone would have picked one over the other in order
10 to be able to discriminate, no.
11　　Q　Okay.　And would you agree that if someone was
12 of the mind to discriminate, they may take whatever
13 methods handy to do so?
14　　　　MR. FOX:　Objection to the form.
15　　A　I think, in that regard, you're questioning
16 the ethics of the supervisors and directors who
17 worked at Metro Nashville.　I don't have any cause to
18 think that that was going on.　But do I think that
19 someone could use different things available if they
20 chose to?　Yeah, I guess.
21　　Q　Okay.　If there is an allegation of
22 discrimination, I believe you said employee relations
23 investigates that?
24　　A　Correct.
25　　Q　Did your employee relations department

1 investigate any discrimination claim made by
2 Dr. Bailey?
3　　A　Not that I recall during my tenure, no.
4　　Q　Did you know that if a person makes a
5 statement that's protected by the First Amendment
6 that you cannot retaliate against that person?
7　　A　We have policies addressing employee conduct
8 in that regard, yes.
9　　Q　Okay.　And did anyone investigate any
10 complaint by Dr. Bailey that his First Amendment
11 rights had been violated?
12　　A　Not that I recall.
13　　Q　Do you recall in -- when you would have first
14 gotten to Metro Schools -- it may have been before
15 you got there.　Do you recall the press picking up on
16 the issue of How to Make a Slave, that lesson that
17 was taught at Waverly Belmont?
18　　A　That was before my time.　I did see the news
19 reports about it because I was tracking it, but it
20 happened before I arrived.
21　　Q　Do you know who was involved in that
22 complaint?
23　　A　Quite frankly, I remember being happy that I
24 hadn't gotten there yet.　I remember that it was a --
25 that a student was involved and that one of our

1 employees was the parent of that student.　So that --
2　　Q　And do you know who the employee was?
3　　A　Yes.　I do know that it was Jenai Hayes.
4　　Q　Okay.　And did you know that while you were at
5 Metro Schools?
6　　A　Did I know that after I arrived?　Yeah.　Yes.
7　　Q　Okay.　Okay.　And did you know that sometime
8 in early spring of 2020, the year you arrived?
9　　A　Did I know --
10　　Q　Because that's when it was all occurring?
11　　A　Yeah.　Yeah.　Yeah.　You know, I think -- and
12 there's not a good way to say this, but you sort of
13 pick some stuff up by osmosis.　I heard about that,
14 but I don't remember being deliberately sat down and
15 told that, if that makes sense.
16　　Q　Okay.　And so did you know Jenai Hayes was the
17 employee who had complained about that lesson being
18 taught to her son when you -- sometime in the spring
19 of 2020?
20　　A　I would say yes, I knew.　I hadn't made the
21 connection because I was there for a short amount of
22 time; we went remote.　So I don't think I had ever
23 met her physically in person, but I knew that, I
24 guess, cerebrally versus any other way.
25　　Q　Okay.　And so then you knew that when you were

1 meeting with Dr. Battle and the other individuals
2 about eliminating the positions, correct?
3　　A　I'll be honest.　It didn't really come up.
4　　Q　Uh-huh.
5　　A　But I guess, did I know it?　Yeah.
6　　Q　Did you know that Ms. Doe's complaints
7 about the violation of -- the lesson that was taught
8 to her son constitutes a protected activity under
9 Title VI?
10　　A　You know, we sort of call it the
11 whistleblower, sort of, is the way we term it.　Did I
12 know that she had made a complaint about it?　I think
13 so.　I knew about it.　It just wasn't part of the
14 conversation, so I don't remember it being -- it
15 wasn't a thing that was discussed.　I think I just
16 knew that that was true.
17　　Q　Did you know that Ms. Doe fell within a
18 protected category with regard to retaliation,
19 meaning you cannot retaliate against her for making
20 the complaints about the lesson being taught to her
21 son?
22　　A　Yes, I would assume that's true.
23　　Q　Okay.　And you thought that it was -- you
24 would agree that it was a whistleblower-type
25 complaint Ms. Doe made about her son?

1  A  I would agree that, as a parent, I would have
2  brought it up as well.
3  Q  Sure.  Did you read that lesson plan?
4  A  No.  No.  I didn't really feel like it was
5  part of what my role was, and I sort of had enough
6  going on.  So investigating what happened before my
7  time really wasn't something I engaged in very often.
8  Q  Did you have any discussions with Dr. Battle
9  or anyone else at Metro Schools about Ms. Doe and her
10  complaints of the Title VI violation with her son?
11  A  No.
12  Q  Did you know that Ms. Doe, who had complained
13  about her son, had had her position eliminated
14  within -- less than three months -- two to three
15  months from the date of her complaint?
16  A  I guess I made that connection.  It really
17  wasn't -- yes, I made that connection.
18  Q  Okay.  Did your department do any sort of
19  investigation to see whether or not Metro Schools was
20  retaliating against Ms. Doe for her protected
21  activity under Title VI?
22  A  Not to my knowledge, no.
23  Q  With Ms. -- Dr. Meriwether, did you know --
24  did you know that Dr. Bailey had the misfortune of
25  being the principal of Whites Creek when Dr. Battle's

1  brother was the basketball coach?
2      MR. FOX:  Objection to the form.
3  A  Did I know --
4  Q  Let me rephrase that.
5  A  Yeah.  Please.
6  Q  Did you know that Dr. Bailey was the principal
7  of Whites Creek at the same time that Dr. Bailey's
8  brother, Coach Battle, was the basketball coach?
9  A  Yeah.  Thank you.  I wasn't sure about
10  unfortunate, but -- I did not know about that, no.
11  At that time, I did not know that.  The only time --
12  Q  Did you at some --
13  A  You're --
14  Q  -- point thereafter discover that?
15  A  I found out about that when I was contacted
16  about -- by a board member about me releasing her
17  brother to be allowed to return to Metro Nashville.
18  So that's when I heard about it.  I had not known
19  that prior to.
20  Q  And who was the board member?
21  A  Gosh, I knew you were going to ask that.  I'm
22  sorry.  I don't remember.  One of the nine.
23  Q  And they contacted you about releasing the
24  brother to return -- was that to return to Nashville
25  to work?

1  A  To return to work, yes.  To return to work.
2  Q  Is that correct?
3  A  To return to work, yes.
4  Q  Okay.  And at that point, had he been fired
5  from Metro Schools?
6  A  Gosh, I don't remember what the disposition
7  was regarding him.  I encouraged the board member to
8  have that person contact me personally, because it's
9  not appropriate to work through a board member in
10  those regards.  And to my recollection, he never
11  contacted me.
12  Q  Can you give me any description of the board
13  member who contacted you?
14  A  Oh, gosh.  I can tell you I was in the airport
15  when they called.  I will -- it was not -- so we went
16  through a reelection.  It was not any of the three
17  new board members, and I would say it was female, but
18  that's the same thing, because it's only -- the only
19  male came on later.
20      Gosh, I'm sorry.  That's all I've got.  I just
21  don't remember.  And those conversations happen
22  periodically, so it didn't stand out as a "I need to
23  be aware of this one."  I don't even know if I made
24  the connection that they were siblings until after
25  even -- after even that.

1  Q  Was it Ms. Gentry that contacted you?
2  A  It may have been.  It may have been.
3  Q  Okay.
4  A  So it's sort of like I know who it wasn't, but
5  I don't remember who it was.
6  Q  And do you recall what they told you
7  specifically?
8  A  No, not to that extent.  I think they asked me
9  that someone had raised a question to them, what was
10  the process of removing.  And we got those
11  periodically.  Someone who was non-renewed and
12  non-eligible, would periodically contact me and ask
13  to be removed from the non-eligible part.  So that
14  was sort of the frame, but nothing stood out
15  necessarily.
16  Q  So what the board member requested -- and we
17  think it was Ms. Gentry -- was that you remove Dr. --
18  Coach Battle from the non-renew category --
19  A  I don't even think she went that far.  I think
20  she asked me what the process was of that, and I told
21  her what the process would be, would be to have that
22  person contact me directly.
23  Q  Okay.  And did you have the ability to change
24  someone from being non-renewed to eligible for
25  rehire?

1  A  Yes.

2  Q  What's the criteria for that?

3  A  That's, quite frankly, pretty vague.  There is
4  no written-down requirement one way or the other.
5  The best I could get was that it was my decision, and
6  I used my best judgment.  Normally I would look --

7  Q  Did --

8  A  Go ahead.

9  Q  I'm sorry.  Were you through?

10  A  Sure.  Yes, ma'am.

11  Q  Okay.

12  A  Yes, I was through.

13  Q  Okay.  And she told you that she was
14  contacting you about Coach Battle, correct?

15  A  Yeah.  I think during that time she named who
16  it was, yeah.  She didn't ask me just randomly, you
17  know.  And of course, when I heard the name, I made
18  the connection.

19  Q  Okay.  So you knew that Coach Battle was
20  somehow or another related to Director Battle?

21  A  When I -- yeah, when she asked me -- when she
22  said who it was, I assumed that they were connected.
23  That name is pretty rare.

24  Q  Okay.  And do you recall when this
25  conversation took place?  Were you still at

1  Metro Schools?

2  A  Oh, yes.  Obviously, I was still at
3  Metro Schools.  I would have said it would have been
4  last fall.

5  Q  Okay.

6  A  The other problem is, I was in the airport so
7  much, it's hard -- you know, I was always in the
8  airport, so you can't tell.  It was -- we were back
9  at work, so it wasn't -- because I was flying back
10  and home, so it wasn't pandemic time.  So I would
11  have said it was probably in the fall of last year.

12  Q  And do you know if it was right before
13  Dr. Bailey filed his lawsuit against Metro Schools?
14  Do you know?

15  A  I don't know when he filed it.

16  Q  Okay.  Now, did you know that Coach Battle had
17  been fired from Metro Schools for mishandling funds
18  and beating up a parent at a basketball game?

19  A  No, I was not aware of that.

20  Q  Okay.  Did the -- just for the record, so then
21  did the board member who contacted you, did she
22  inform you in any manner that this person, Coach
23  Battle, had been non-renewed because he had beat up a
24  parent, and he was also charged with and found guilty
25  of mishandling funds?

1  A  Not that I recall.  And again, those
2  conversations happened fairly frequently.  And with
3  all of the work that I had to do, the same answer I
4  gave everybody was, you have that person contact me
5  directly.  Because sometimes the person has to take
6  that onus on himself to contact me.

7  And he never did, so I never looked at it.

8  Q  Okay.  Did you have any discussions with
9  Dr. Battle about the phone call from Ms. Gentry?

10  MR. FOX:  Objection to form.  It hasn't been
11  established -- we don't know that it was
12  Ms. Gentry.

13  Q  Or -- or the unnamed board member?

14  A  I remember telling her that a board member had
15  called me, but that's not unreasonable, either,
16  because I always tell her when a board member calls
17  me.  I remember saying something to the extent that
18  this is something I can't have you be a part of the
19  decision.  But that was the extent that that
20  conversation was.

21  Q  Did you tell her it concerned her brother?

22  A  Well, that's because -- why I didn't want her
23  to be a part of the decision.

24  Q  Okay.  And did Dr. Battle, by any chance,
25  contact you about her brother?

1  A  Absolutely not.  The only time I remember even
2  that conversation happening was when I brought it to
3  her, she said, I can't be a part of that.  I said,
4  that's what I was going to say.  And that was it.

5  Q  Okay.  Now, should a board member contact you
6  about something that's related to the schools or
7  should that be done in open board member meetings?

8  A  It was expected that board members only
9  contact us through the superintendent or through
10  the -- David -- the school board liaison guy, David
11  something.

12  Q  Do you know whether or not it's ethical for a
13  school board member to contact you directly?

14  A  I will tell you, that is a gray area.
15  Typically the rule of thumb is, the school board has
16  one employee, which is the director of schools.  So
17  conversation with other people should go through that
18  person's supervisor, which would be Dr. Battle.

19  Will I tell you -- in actual practice, it's a
20  pretty general format that happens.  Yes, in my job
21  now, I get emails every week from board -- from the
22  school board members.  Ethical, unethical, it's sort
23  of a gray area.  If Ms. Gentry had tried to use her
24  influence to make me make a decision, then yes, I
25  would say that's unethical, but she did not in any

1  way.
2       And if I remember the conversation with any
3  extent, the feeling was, I can't touch this; what
4  should I do with it?  Not "I think you should do it."
5  You know what I mean?  It was -- she -- whoever it
6  was, I remember not being very -- owning that
7  decision one way or the other.
8       But generally, most board members are pretty
9  good.  I will tell you that it's pretty common to
10  have a board member call, especially in my position,
11  and say my cousins's brother's ex-wife's roommate is
12  looking for a job; you should really hire them.  And
13  we just do what we normally do anyway.
14      So I don't want to speak to the ethics of it,
15  but I remember that phone call not feeling pressured
16  afterwards one way or the other.
17  Q   Do you know whether or not Tennessee has some
18  sort of an open door, open -- open policy where
19  anything that the board members discuss needs to be
20  open to the public?
21  A   I remember -- because I know that there is a
22  re-stricture that board members can't meet in
23  private, so you have to meet with -- you can't be
24  with them in clumps.  You know what I mean?  But
25  speaking as an individual conversation basis, I don't

1  know that.
2  Q   Would you talk to a board member about
3  something that they may be considering passing --
4  A   I'm sorry?
5  Q   -- or not passing?  Would you -- is it -- when
6  you were here at Nashville, would it have been okay
7  for you to have spoken to a board member about
8  something that they were considering passing or not
9  passing --
10  A   Oh.  Oh.
11  Q   -- privately?
12  A   Thank you.  I know that when I was -- when I
13  was doing our budget and, you know, board members
14  would say, how's it going?  I would say, you know,
15  we're doing this or that; we're really looking
16  forward to the budget -- you know, the budget
17  passing, that sort of thing.
18      I can never remember going to a board member
19  or talking to a board member, vote this way or that
20  way.  I generally try to stay far away from that
21  because that implicates my integrity as well.
22  Q   Okay.
23  A   I thought you asked me if we spoke in passing.
24  I thought, oh, yeah, all the time.  But I see what
25  you're saying.  No.

1  Q   Now, did you know that Dr. Leffler was kin to
2  Vanessa Garcia?
3  A   I don't know who Vanessa Garcia is.
4  Q   Okay.  Were you aware that there was a lawsuit
5  against Metro Schools dealing with hostile work
6  environment, sexually hostile work environment, and
7  retaliation because her position was eliminated after
8  she complained of the retaliation that occurred
9  probably about a year before you got to the
10  Metro Schools?
11  A   Actually, I do know who Vanessa Garcia is.
12  She works with one of the universities now.  But no,
13  I didn't know they were kin or kinfolk, as they say
14  around here.
15  Q   Did you know that there's something called
16  associational retaliation where, under Title VII and
17  the Tennessee Human Rights Act, you cannot retaliate
18  against somebody because they have a relative who has
19  asserted their claim --
20  A   If you're asking me if I knew that, off the
21  top of my head, I can't --
22  Q   -- under Title VII?
23  A   I can't say that I knew that, no.  And again,
24  I do want to say that there was enough work on my
25  plate when I arrived that I didn't spend a lot of

1  time worrying about what had happened a year ago or a
2  year before I got there.
3  Q   Did you know that under Title VII, you cannot
4  retaliate against somebody who is close to someone
5  who's exercised their rights under Title VII?
6  A   No.  I would say I did not know that out of
7  hand.  No.
8  Q   Okay.
9       MR. FOX:  And let me -- I just want to note
10  my objection to the form.  It calls for a legal
11  analysis.
12  Q   Did you have any discussions with Dr. Battle
13  about whether or not Dr. Leffler was loyal to
14  Metro Schools?
15  A   Whether she was loyal?  No.
16  Q   Did you know that Dr. Battle had asked several
17  employees about whether or not they thought
18  Dr. Leffler was loyal to Metro Schools because of her
19  relative filing the lawsuit against Metro?
20      MR. FOX:  Objection to the form.
21  A   No.  And I can state that in the year and a
22  half I worked with Dr. Battle, I can't ever remember
23  her asking whether someone was loyal or not.
24  Q   Do you, as the chief of human resources, find
25  a question of that sort to be improper if they're

DR. JAMES BAILEY, ET AL. vs METROPOLITAN GOVERNMENT OF NASHVILLE, ET AL.
BARNES, CHRISTOPHER on 12/09/2021

...

1  discussing a relative of someone who's exercised
2  their rights under Title VII?
3      A   That's a hard question to answer. Do I --
4  because, again, it's out of context. Do I think that
5  that as a general form is appropriate? No. Can I
6  speak to that in this specific instance? Also no.
7      Q   Okay. Did you know that Dr. Bailey was the
8  person who was in charge of making a recommendation
9  about whether or not to keep, not to keep, or what to
10 do about Dr. -- about Coach Battle after the fight
11 and after the discovery of the mishandling of the
12 funds?
13     A   Obviously, that is before my time. As a
14 general rule, as the principal of the school, he
15 would have made that decision.
16     Q   Did you know whether or not Dr. Meriwether was
17 his direct supervisor who supported his decision
18 about Dr. Battle and firing him?
19     A   I don't -- I don't think that Pippa Meriwether
20 was -- ever supervised James Bailey unless there's
21 something I don't know before my time. I didn't
22 think that that -- I thought that Pippa Meriwether
23 was the associate superintendent of the elementary
24 school, so she would not have supervised James Bailey
25 either in the priority school or the other way, if

1  I'm remembering things correctly.
2      Q   Would you agree that if Dr. Bailey testified
3  under oath about what Coach Battle did that then he
4  could not be retaliated against under the First
5  Amendment by Metro Schools?
6          MR. FOX: Objection to the form.
7      Q   If you know.
8      A   Contextually, legally, I can't answer that
9  question. Do I think that people should be able to
10 exercise their First Amendment rights? Yes.
11     Q   Do you think Dr. Bailey should have been able
12 to testify truthfully about Coach Battle and what he
13 did in terms of beating up the student and
14 mishandling the funds?
15         MR. FOX: I think you froze up.
16         THE WITNESS: Actually, Brook, I think you
17 froze up, but --
18         MR. FOX: I froze up. Sorry.
19         MS. STEINER: Sorry about that.
20         THE WITNESS: Can you ask the question again,
21 please?
22         MR. FOX: I'm sorry, Ms. Steiner. Can you
23 repeat that?
24     Q   Do you think that Coach -- that -- excuse me.
25         Do you think that Dr. Battle's testimony under

1  the First Amendment -- or testimony -- excuse me.
2  Strike that.
3          Do you think Dr. Bailey --
4      A   Thank you --
5      Q   -- 's testimony about what Coach Battle did in
6  terms of mishandling the funds and beating up the
7  parent should be protected from retaliation by Metro?
8          MR. FOX: Objection to the form.
9      A   If it falls under Title VII, then yes --
10 Title VI. Sorry.
11     Q   What happens if it falls under the First
12 Amendment?
13         MR. FOX: Objection to the form.
14     A   You're asking --
15     Q   Or whistleblower.
16     A   You're asking a fairly broad question. I
17 mean, I think -- if it's a question of perjury, then,
18 no, Dr. Bailey should tell the truth. If it's a
19 question of whether or not -- districts have policies
20 about their employees' communication of their First
21 Amendment rights. However, the person is protected
22 from being able to state claims of public concern and
23 things like this.
24         So I would say should he be retaliated against
25 for using his First Amendment? No. Are there

1  policies in place about professionalism, about social
2  media, then yes, there are those as well.
3          And you're looking to a gray area that
4  sometimes I have to say it depends, and I know that's
5  a lawyer answer, but I am not a lawyer.
6      Q   Are you familiar with hearings in front of
7  administrative judges at Metro Schools to appeal a
8  termination?
9      A   I did not have that during my time there. I
10 know that there are policies and procedures about
11 termination of employees and rights and hearings and
12 to appeal to the board and those kind of things. We
13 just did not have any when I was there that I recall.
14     Q   Okay. Is that a rare type of event to occur?
15     A   Yes, ma'am.
16     Q   Is that a yes?
17     A   I'm sorry. Yes, ma'am. The court reporter
18 was going, say it out loud. Yes, ma'am.
19     Q   Okay. Do you know whether or not some of the
20 administrators let their teaching license expire?
21     A   I have heard that happened. That is not
22 something that generally happens in North Carolina.
23 That was new to me. In North Carolina, everything --
24 sort of everything on your license renews all
25 together. In Tennessee, there are different

1 portions.
2          So yes, I was made aware, after I got there,
3 that that was a specific case.
4      Q    Okay.  And were you aware that a lot of the
5 administrators, once they had become administrators,
6 they don't keep their teaching license?
7      A    I found that out, yes.
8      Q    Okay.  Now, with regard to transfers, do you
9 know whether or not -- if an employee is transferred,
10 whether or not they're supposed to be transferred
11 into a position for which they're licensed?
12     A    Yes.  We would obviously want them transferred
13 into a position that they're licensed for.
14     Q    And I believe we -- I questioned you about
15 this earlier, but let me just make it clear for the
16 record.  If somebody is transferred when you were at
17 Metro Schools, your department ensured that they
18 would check their license to make sure they're being
19 transferred into a position they can do, correct?
20     A    Or be licensable for.  So that's a little bit
21 of a caveat, but yes.
22     Q    Uh-huh.  Okay.  And do you know how much time
23 it would take to go back and get a teaching
24 license --
25     A    It depends.

1      Q    -- at Metro Schools?
2      A    It depends.  Sometimes, if you're
3 resurrecting, it doesn't take time at all.  Sometimes
4 you have to apply.  I'll be honest with you:  The
5 Tennessee licensure laws are very complex and
6 confusing.
7      Q    Okay.  So if I were to tell you that you have
8 to reapply and then it could take months to get a
9 teaching license if it's lapsed, you would not have
10 any reason to disagree with that.  Correct?
11     A    I would be surprised.  I did not think that
12 was the case, but it's possible.  Now, TN Compass is
13 the name you were asking about earlier and I forgot.
14 TN Compass is the licensure system.
15     Q    Okay.  Now, did you know that Dr. Bailey was
16 transferred into a teaching position?
17     A    I believe that's correct.
18     Q    Did you know he did not have a license for
19 being transferred into a teaching position?
20     A    I'm sorry.  If you're asking me to remember
21 that, I just don't.
22     Q    Is that something that your department should
23 have checked on whether or not he had that license
24 before he was transferred into a teaching position?
25     A    I would think that they would have either

1 provided an opportunity for how he can get
2 relicensed.  I just don't know the details.  It may
3 have had to be apply or it may have have been
4 resurrect.  I just don't know.  But yes, that would
5 have been something they would have discussed -- or
6 should have.
7      Q    Okay.  And that's the policy and procedure
8 that was there when you were there at Metro Schools,
9 correct?
10     A    I believe so, yes.
11     Q    Okay.  Now, if you go into a teaching position
12 and you don't have a license, do you know what can
13 happen to you?
14     A    There are different opportunities.  There are
15 ways to work against a license; there are ways to do
16 what North Carolina calls lateral entry.  There
17 are different proverbial opportunities, and I can't
18 explain the complexities of it, but there are --
19 there are ways to put someone in a position giving
20 them time to obtain a license as well.
21     Q    My question is a little different.  If someone
22 doesn't have a license and they go in to teach, do
23 you know whether or not that's a violation of
24 Tennessee law?
25          MR. FOX:  Objection to form.

1      A    I would say if you have not gone through the
2 process of getting them -- there is a process to have
3 a unlicensed teacher in a classroom with students.
4 You would have to have done the form for that to be
5 approved.  If not, then yes, that's a terminable
6 offense, I would think.  I can't speak to that.  I
7 would assume that that is not something that is --
8 the policy would allow.
9      Q    And if someone is terminated from
10 Metro Schools, can they lose their benefits, such as
11 their retirement?
12     A    I would have to look at -- I would have to
13 look it up to say exactly what happens.  It depends.
14 Non-renewal, termination, reason for termination, all
15 those things are factors.  I just don't have it in
16 front of me.
17     Q    Now, question for you:  Were you aware when
18 you started at Metro Schools that there was a group
19 of jobs that had not been filled that were vacant?
20     A    There were any number of vacancies when I got
21 there.
22     Q    Okay.  In fact, would you agree that there was
23 a large number of vacancies when you got there?
24     A    I would say there were enough vacancies when I
25 got there that I was concerned.  Large is -- I mean,

1  it's a relative number.
2      Q  Were the vacancies in central office as well
3  as teaching?
4      A  Yeah.  I would say so, yeah.  There were
5  vacancies all over.
6      Q  Okay.  And these were for jobs that would pay
7  anywhere from about 30,000 to about 100-and-some-odd-
8  thousand through the school system, correct?
9      A  Normal jobs, yes, they pay around that.
10     Q  And were these jobs funded through the budget?
11     A  They would have had to have been to be posted.
12 But there was the federal budget; there's a local
13 budget; there's a state budget.  So they would have
14 been budgeted for in some fashion, yes.
15     Q  Okay.  And supposing that they're through the
16 Metro budget that's approved by the school board and
17 approved by Metro council -- okay --
18     A  Uh-huh.
19     Q  -- if it's funded but not filled, the money is
20 still paid to Metro Schools, correct?
21     A  Yes, unless -- there were times that
22 enrollments changed and things like that.  But yeah,
23 if it was funded and unfilled, then the money was
24 still there.  Correct.
25     Q  Okay.  And so then if -- supposing there's a

1  position that pays 100,000 in central office that's
2  not filled or it's filled six months after the school
3  starts and it's a 100,000-dollar job, then the budget
4  that goes to Metro Schools has the 100,000 and the
5  benefits for that person in there, correct?
6      A  I want to say it's not that simple, and that
7  would be something to talk to the chief financial
8  officer about.  It doesn't -- but as a rule of thumb,
9  yes, that's correct.  The numbers don't always play
10 out that way.  There are different variables in key,
11 but yes.
12     Q  Okay.  The extra money that's used for the
13 vacant positions at Metro Schools, does that go into
14 a separate account or is that in the general -- is
15 that in with the account that pays the payrolls?
16     A  I don't want to speak to that answer because
17 I'm not sure I'm correct, but let me give you an
18 example.  If I have a vacant licensure position and I
19 contracted with a retired person to come back, some
20 of that salary that's designated for that position
21 may go to fill that -- you know, that contractor or
22 things like that.  But I don't know where that money
23 goes, per se.
24     Q  When you first got to Metro, is it a fair
25 statement that there was at least several million in

1  unused funds for positions that were not being
2  filled?
3      A  I can't speak to an exact number.  Do I think
4  that there were unfilled positions?  Yes.
5      Q  Do you think that there were at least 100
6  unfilled positions?
7      A  Yeah.  Yes.
8      Q  Okay.  And if the -- if these jobs -- a
9  teacher at the lowest of the pay rate, what would
10 they make at Metro?
11     A  I think Metro had it about 42,000.
12     Q  Okay.  Just using a teacher's position would
13 be way over 4 million, correct?
14     A  Okay.
15     Q  At the 42,000?
16     A  Okay.
17     Q  Does that sound about right, math-wise?
18     A  That math is correct.  Yeah.
19     Q  So then at any one point in time, Metro would
20 have a surplus over several million to fill these
21 positions that aren't being filled, correct?
22     A  I don't know if surplus -- and again, you're
23 going to have to get a financial expert to understand
24 that better than I can, but I don't think -- a
25 surplus may not be the right word, because we have to

1  pay a substitute to be in that room with those
2  students that the teacher isn't filling.  There may
3  be additional duties that other teachers are filling
4  for that.  I may be buying a teacher's planning
5  period.
6         So I don't think the number equates exactly
7  the way you're doing the math.
8      Q  Okay.  But it does equate to extra funds that
9  aren't being used to fund the permanent position that
10 has the benefits and the retirement, potential for
11 the retirement, correct?
12     A  I just don't understand budgets well enough to
13 speak to that with the standard of, you know,
14 truthful and, you know, the standard I'm using.
15 Sorry.
16     Q  Did you go to the school board meetings?
17     A  Yes, ma'am.
18     Q  So did you sit there when they would submit
19 the budgets to the school board?
20     A  Yes.
21     Q  Excuse me?
22     A  Yes.
23     Q  Do you recall something called a central
24 office reorg plan ever being submitted to the school
25 board?

1   A   I'm sorry.  Not specifically.
2   Q   Okay.  Do you know whether or not the school
3  board approved the elimination of the associate
4  superintendent positions?
5   A   I know they approved the budget, and from what
6  you showed me -- from what you showed me earlier,
7  that was in the budget.
8   Q   Okay.  Do you know whether or not there was
9  any discussion about removing or eliminating the
10  associate superintendent or the executive officer of
11  organizational development from the budget?
12   A   I don't remember the board specifically
13  discussing that, no.
14   Q   Do you know whether or not the school board --
15  did you hear the school board ever approve or discuss
16  the elimination of the executive director positions
17  like those that Lily Leffler held?
18   A   No.
19   Q   Is that no, you don't recall or no, they did
20  not?
21   A   No, I do not recall.
22   Q   Okay.  Do you know what -- do you recall
23  hearing the school board discuss the elimination of
24  the director of school choice?
25   A   No, I do not recall.

1   Q   Now I want to ask you a question about
2  something.  Let me pull it up.  Okay.  This is what
3  we've already marked Exhibit Number 5.
4       THE WITNESS:  You're at 14 percent.
5   Q   Can you see this --
6   A   Yes, ma'am.
7   Q   -- Dr. Barnes?
8       Okay.  I want to -- this is the budget that
9  was actually approved by the Metro school board.  Is
10  that correct?
11   A   What you're showing me is what it says, yes.
12   Q   Okay.  Now, if you look at document number 1,
13  which is the first page of this budget, the budget
14  balanced with the elimination of five positions from
15  central office; is that correct?
16   A   I'm sorry, ma'am.  You're going to have to
17  make that bigger.  If you go over to the right,
18  there's a triangle there.  If you can click that on
19  the right-hand side of the screen, midway down, that
20  should make it bigger.  Or you can obviously make it
21  bigger another way.
22   Q   Let me see.  Let me look for the triangle.
23  I'm going to do this.
24   A   Yes, ma'am.
25   Q   Does that help?

1   A   Very much so.  Thank you.
2   Q   You're welcome.  Now, for this second page --
3  and it's Bates-stamped MG000696 at the bottom of the
4  page.  The budget was able to be balanced with the
5  elimination of five positions from central office,
6  correct?
7   A   That is part of the overall plan, yes.  I can
8  see that.
9   Q   Okay.  And that was what we discussed earlier.
10  It was the elimination of the associate
11  superintendent and the executive officer of
12  organizational development from central office.
13  Correct?
14   A   Yes.
15   Q   Okay.  And so then once you eliminated these
16  five positions, there was no other elimination
17  necessary, correct, because the budget balanced?
18   A   That was the budget that they signed, so I
19  would assume that is the case.
20   Q   Okay.  And did you -- I want to show you one
21  other document.
22       Okay.  Now, this is a group of documents.  Can
23  you see them?
24   A   Yes, ma'am.
25   Q   Okay.  That's entitled the agenda for the

1  Metropolitan Board of Public Education for the board
2  meeting, regular meeting, on May 26, 2020, and it's
3  Bates-stamped MG000167, and it goes all the way
4  through -182, but there's only one page I'm going to
5  question you about, and it's this one right here.
6       Have you ever seen this document before?  This
7  is called central office reorganization plan.
8   A   I would have assumed I've been given a copy of
9  the board minutes.  I don't recall anything else
10  other than that.
11   Q   Do you see this document in a different type
12  than the rest of the board meeting?  Do you see that?
13   A   I can see that they are, yes.
14   Q   Do you know who typed that document?
15   A   I'm sorry.  I don't.
16   Q   Did you -- is it correct that you did not have
17  anything to do with putting this document together?
18   A   You mean the board agenda?  No.
19   Q   Okay.  And you had no -- nothing to do with
20  this page that is Bates-stamped MG000181, central
21  office reorg plan?
22   A   No.
23       MS. STEINER:  Okay.  I'd like to offer just
24  this reorg plan as the next numbered exhibit.
25       And I am almost to the end.  Could we break

1  for just about 20 minutes?  Would that be okay?
2  Let us grab something real quick to eat.
3        THE VIDEOGRAPHER:  We are going off the
4  record.  The time is 1:38.
5        (A recess was taken.)
6        THE VIDEOGRAPHER:  We are now on the record.
7  The time is 2:09 p.m.  Action.  Proceed.
8  BY MS. STEINER:
9     Q   Dr. Barnes, let me show you this document here
10 and ask you if you've ever seen this.  Can you see
11 this?
12    A   Yes.
13    Q   Okay.  This is something that was emailed to
14 one of my clients, and it was called vacancy by
15 function.
16    A   Uh-huh.
17    Q   Are you familiar with this document?
18    A   No, I'm not.  That looks to be like something
19 out of our finance department.  It may be something
20 of an automatic pull.  I've never seen a document
21 like this before.  I don't use it the same way.
22    Q   Is Lisa Spencer in your department?
23    A   Yes, ma'am.
24    Q   Okay.  Did she -- do you know whether or not
25 she was developing a list of all of the vacant

1  positions?
2     A   She may have been.  And this is a document --
3  I have documents about vacancies that I had used in
4  the past.  This one is different because it's
5  organized by financial budget code, which makes me
6  think it's out of our automatic system.  I think Lisa
7  would be someone who was able to do this, though.
8     Q   Okay.  Now, I want to ask you this about this:
9  We were talking about the value being somewhere
10 around 4 million.  Do you see where it does a grand
11 total at the tail end of the jobs that are vacant and
12 it says that there's about 1,000 jobs at
13 Metro Schools when this was done?
14        Does that sound about right?
15    A   Without seeing the document and holding it and
16 reviewing it, I think that sounds like a lot, because
17 that's up to 10 percent.  Let me -- 79 -- 60
18 positions in -- that seems like a high number, but I
19 just don't recognize this document.
20    Q   Okay.  Let's look at the cash amount.  It
21 looks like there's 65 million, almost 66 million, in
22 funds for vacant positions.
23    A   I see that's what it says.
24    Q   Does that sound right to you?
25    A   I would caution you that -- if the date is

1  correct, I would caution you to use June as an actual
2  vacancy amount of money because most of our jobs turn
3  over in that April/May/June/July/August territory,
4  and June is right square in the middle of that.  So
5  my concern would be a lot of these positions may have
6  been vacated, and someone has been hired for them;
7  and they just haven't started yet because the school
8  year doesn't start until August, if that makes sense.
9     Q   Okay.  So you're saying that they could be
10 jobs that someone's just been hired -- a person to
11 hire for them?
12    A   Right.  Certainly.  Like, if you go halfway
13 down, you see -- specifically jobs like teacher.  Or
14 look at principal there.
15    Q   Yeah.
16    A   It shows five principals or five assistant
17 principals being absent or being vacant, three
18 principal positions being vacant.  Those may have
19 been vacated in June because their contract was
20 ending and someone had resigned, but a new principal
21 would have been in play July 1.  So I can't speak --
22 obviously, that's not 1,000 people.  But a good
23 number of these jobs, I would caution you to use a
24 number like June, simply because that is the time of
25 the most flux.

1     Q   Okay.  So then if this is -- is dated more
2  July/August/September, then it's more a -- or
3  December, it's more of a clearer picture of what's
4  actually vacant?
5     A   Because -- yes.  That's a more accurate
6  statement.
7        MS. STEINER:  Okay.  And can we have this
8  marked Exhibit Number 8 for identification
9  purposes?
10       THE COURT REPORTER:  Yes, ma'am.
11       MS. STEINER:  Thank you.
12    Q   Now, Dr. Barnes -- let me stop the share real
13 quick.  Dr. Barnes, did you have any input into
14 creating the executive officer of diversity, equity
15 and inclusion position?
16    A   Someone in my office would have helped develop
17 the job description, and we would have participated
18 in the nuts and bolts of the hiring process.
19    Q   And when you say participated, would you have
20 gone in for any of the interviews?  Would you have
21 been present for those?
22    A   Generally, I would have been.  I just don't
23 remember whether I was in the diversity, equity,
24 inclusion interviews or not.  I just don't remember.
25    Q   Do you recall whether or not that position

1  required a master's degree?
2      A   You should be able to find the job
3  description, and that will have the requirements and
4  preferred characteristics.  If you wanted my
5  ballpark, I would imagine that a lot of jobs were
6  listed as bachelor's degree required; additional
7  schooling, master's or higher, preferred would be my
8  guess, but I can't speak to that without the job
9  description specifically.
10     Q   Okay.  Now, were you present when Jane Doe was
11 interviewed for that position?
12     A   I think that I was, yes.  I --
13     Q   Can you tell me why she did not get the
14 position?
15     A   Let me say this:  I remember Jenai applying
16 for a couple of different jobs during that time.  I
17 don't remember which interview I sat in with her in.
18 It may have been that one.
19     Q   Was the interview scored?
20     A   That interview wasn't handled by my office.  I
21 know that Hank Clay might be able to answer that
22 question.
23     Q   And why was it not handled by your office?
24     A   Generally, we offered support.  If the -- if
25 the supervisor or director wanted to do their own, I

1  didn't stop that process.
2      Q   Who made the decision to hire Ashford Hughes
3  instead of Jane Doe or anyone else that applied?
4      A   I think you would have to ask the director of
5  that -- the supervisor of that position.
6      Q   And that would have been Mr. Clay?
7      A   I believe so, yes.
8      Q   Okay.  So Mr. Clay was the one responsible for
9  making the decision as to who to hire into the
10 position of executive officer of diversity, equity,
11 and inclusion?
12     A   Generally what we do is, we call the -- we
13 have hiring managers that supervise the hiring, but
14 the person who employs them is the hiring manager.
15 So the hiring manager would have the final decision
16 on that.
17     Q   And that would have been Mr. Clay, correct?
18     A   Correct.
19     Q   Okay.  Now, did you know that Ashford Hughes
20 does not have a master's degree?
21     A   I believe you.  I just don't know -- I didn't
22 know that.
23     Q   Okay.  Do you know why he was hired in that
24 position instead of Jane Doe?
25     A   Again, I don't.

1      Q   Okay.  Now, did you know that Jane Doe applied
2  for numerous other jobs, such as coordinator, ready
3  graduate; specialist, early childhood; architect,
4  enterprise solutions?
5      A   No, I was not aware of that.
6      Q   Can you tell me why, of all she applied for,
7  numerous -- I think over almost 30 jobs -- can you
8  tell me why she was not hired into any of those
9  positions?
10     A   Those reasons --
11         MR. FOX:  Objection just to the -- objection
12     to the form.  Just that I don't know that that's
13     all been established.
14     Q   Dr. Barnes?
15     A   No, I can't speak to that.
16     Q   Okay.  Now, I'd like to show you just a few
17 more documents.  Can you see this document that's
18 dated May 4th, 2020?
19     A   No.
20     Q   Okay.  Hang on.  Now can you?
21     A   Yes.
22     Q   This document's dated May 4th, 2020, and it
23 is the -- a letter sent to Dr. Bailey by Dr. Battle.
24 I want to question you just a second about this.
25     A   Okay.  Are there -- are there two pages or one

1  page, ma'am?
2      Q   There is two pages here.  The second page is a
3  recommendation sent to Dr. Bailey or Dr. Bailey by
4  Renita Perry.
5      A   Okay.  I'm sorry.  Got it.  So the first page.
6      Q   I really just want to question you about the
7  first one.  It's only the first one that we're going
8  to make an exhibit to your deposition today.
9          Do you see where Dr. Bailey says that this
10 letter confirms the conversation on May 1st, 2020
11 that, due to the district's reorg and budget impact,
12 your appointment as principal will end effective
13 June 30th, 2020?
14         Did anyone tell you that Dr. Bailey was losing
15 his job as principal because of the reorg and budget?
16         MR. FOX:  Objection to the form.  I think you
17     meant Dr. Battle.  It's Dr. Battle's letter to
18     Dr. Bailey.
19     Q   To Dr. Bailey.  Did anyone tell you that
20 Dr. Bailey was losing his job as principal because of
21 the district's reorg and budget impact, as you
22 recall?
23     A   No.  No, because -- no.
24     Q   And is it true that that's not a correct
25 statement, that Dr. Bailey did not lose his job

1  because of the district's reorganization and budget
2  impact?
3      A  That is correct.
4          MS. STEINER:  Okay.  Can we have this letter
5  marked Exhibit Number 9 to the deposition?
6          THE COURT REPORTER:  Yes, ma'am.
7      Q  I want to show you another letter.  Okay.  Do
8  you see this letter that's dated May 4th, 2020, and
9  it is from Dr. Battle to Ms. Doe?
10     A  Yes.
11     Q  Okay.  And do you see this also says that that
12 confirms the conversation on May 29th, 2020 that
13 due to the district's reorg and budget impact, your
14 position as director of school choice will be
15 eliminated effective June 30th, 2020.
16         Once again, is it true that that director of
17 school choice was not eliminated with the school
18 board, correct?
19     A  That was not on the budget document that was
20 sent.
21     Q  Okay.
22     A  But that is what that says, yes.
23         MS. STEINER:  And can we have this marked
24 Exhibit Number 10 to the deposition?
25         THE COURT REPORTER:  Yes, ma'am.

1      Q  Okay.  Do you see this letter that is dated
2  May -- excuse me.  Can you see this letter?
3      A  If you go back -- yeah.  Please bring it a
4  little closer.  Yes, I can see it.
5      Q  Okay.  Do you see this dated May 4th, 2020?
6      A  Correct.
7      Q  Okay.  And do you see where this says that due
8  to a district reorg and budget impact, your position
9  as executive director of support with Metro Nashville
10 Public Schools will be eliminated?
11         Do you recall telling Lily Leffler that her
12 executive director position was being eliminated?
13     A  I don't recall saying that, no.
14     Q  If she says that you did tell her that, will
15 you dispute it?
16     A  Well, the thing was, that's not correct,
17 because they weren't being eliminated, so I don't
18 know why I would have said that, because then I have
19 her interview for the same job.  So I don't
20 remember -- I don't know why I would have said that,
21 because it's not accurate.
22     Q  Okay.  And it's not accurate because the
23 position was never eliminated by the school board.
24 Correct?
25     A  Well, the positions are still there, and there

1  are still people in them, so no, they were not
2  eliminated.
3      Q  Do you see where it says you are eligible for
4  rehire into any other position with the district for
5  which you apply and are selected?
6      A  Yes.
7      Q  Okay.  It also says that her position is going
8  to end effective June 30th, 2020?
9      A  Yes.
10     Q  Okay.  And it says in the second paragraph, if
11 you have not secured another position before
12 June 30th, you will be separated from employment
13 and will receive your last paycheck, which will
14 include any accrued vacation pay, by July 24th,
15 2020.
16         Do you see that?
17     A  Yes.
18     Q  Does that mean that Ms. Leffler has to apply
19 for a position and be selected for the position to
20 keep her job at Metro Schools?
21     A  The only thing that I would want to check and
22 make sure -- and I just don't know -- is if she had
23 tenure as a teacher, she would have been eligible for
24 a tenured position in the district as a teacher.  But
25 I don't see that being written there.

1      Q  Okay.  If she did not have tenure, does this
2  letter inform her that she's basically fired?
3      A  Well, what that letter says does not say
4  fired.
5      Q  Well, it doesn't -- but it means the same
6  thing, correct?
7      A  It means if she does not secure another
8  position, she's separated from employment.
9      Q  And when you say -- when you use the phrase
10 secured another position, that means that Dr. Leffler
11 has to apply for the other position and be selected
12 for the other position, much like a person who
13 doesn't even work for the Metro Schools applies for a
14 position.  Correct?
15     A  Correct.
16     Q  Okay.  So she's in no better position as -- as
17 somebody walking down the street applying for a job
18 at Metro Schools if they have the same education,
19 correct?
20     A  Correct.
21     Q  Okay.  And if she does not get another job, if
22 she doesn't apply there, then she is no longer an
23 employee of Metro Schools, correct?
24     A  Correct.
25         MS. STEINER:  Okay.  Could we have this

1    marked Exhibit Number 11?
2        THE COURT REPORTER:  Yes, ma'am.
3    Q    Now, do you recall having a conversation with
4    Dr. Bailey where you told him that his job was
5    eliminated due to the budget?
6    A    I do not remember having a conversation with
7    him about his job being removed due to budget.
8    Q    Okay.  And if that had been said, the same as
9    what I asked you earlier, that simply is not true.
10   Correct?
11   A    No.  Because the position remained at that
12   school.
13   Q    Okay.  Now, do you recall having a
14   conversation with Ms. Doe about her position being
15   eliminated due to the budget?
16   A    Yes.  I -- yes, I think so.
17   Q    And do you recall what you said, by any
18   chance?
19   A    I'm sorry.  I don't.
20   Q    Okay.  Let me -- I'm going to let you listen
21   to this, and then I'm going to ask you a couple of
22   questions.  And if you can't hear it, let me know.
23   Okay?
24   A    Okay.
25   Q    And you may not be able to hear it.  I may not

1    be able to hear it.  It's not working.  Okay.
2        Mr. Barnes?
3    A    Yes.
4    Q    Could you hear that?
5    A    (The witness motions.)
6    Q    Okay.  Tell you what I'm going to do, I'm
7    going to send it to -- I'm going to send it to
8    Ms. Harbison and see if she can pull it up on her
9    computer.
10       THE COURT REPORTER:  May we go off the
11   record, please?
12       MS. STEINER:  Yes.
13       THE VIDEOGRAPHER:  We are going off the
14   record.  The time on the video monitor is 2:31.
15       (A recess was taken.)
16       THE VIDEOGRAPHER:  We are back on the record.
17   The time is 2:32 p.m.  Proceed, please.
18       MS. STEINER:  Dr. Barnes, I'd like you to
19   listen to this recording --
20       THE COURT REPORTER:  I'm sorry.  I can hardly
21   hear.
22       MS. HARBISON:  You're muted.  You're muted.
23   BY MS. STEINER:
24   Q    Dr. Barnes?
25   A    Yes.

1    Q    I'd like for you to listen to this video --
2    this tape and let me know if this is your voice on
3    the tape.  Okay?
4        (An audio recording is played and stopped.)
5    BY MS. STEINER:
6    Q    Okay.  Dr. Barnes, was that your voice?
7    A    Yes.
8    Q    Okay.  And was that Jane Doe's voice?
9    A    Yes.
10   Q    Okay.  And is that what you told Jane Doe when
11   she was told that her job was eliminated in May of
12   2020?
13   A    That would have been the conversation from
14   what -- obviously.
15   Q    Okay.  And in that conversation, do you
16   remember hearing that you told her that the district
17   had 17 to 20 million it was going to have to come up
18   with over what they had the year before?
19   A    I didn't remember, but hearing the frame of
20   that conversation, I remember the concern about the
21   city council not providing more funding, but
22   everything we do costs more money the upcoming year.
23   So now that fits -- $20 million in isolation, I
24   didn't understand that, but that makes more sense,
25   now that I hear it.

1    Q    Okay.  Now, did anybody -- who told you that
2    you were the one who needed to talk to Ms. Hayes
3    about this?
4    A    That would have come out of that conversation
5    with Dr. Battle, Mr. Clay, and Ms. Roberge.
6    Q    And who would have told you what to say in
7    these conversations to Ms. Hayes or to Ms. Doe --
8    excuse me -- Ms. Doe?
9        Let me rephrase that.  Who would have told you
10   what to say in the conversation to Ms. Doe about why
11   she was losing her job?
12   A    I'm sure during that conversation we talked
13   about the fabric of the phone calls, but I don't
14   remember getting any specific guidance as to what to
15   say or not.
16   Q    Okay.  Now, I'd like to share a screen with
17   you again.  And this -- we're going to go back to
18   Exhibit 5 again, and this is the final budget that
19   was ultimately adopted.
20   A    Uh-huh.
21   Q    Do you see the -- at the very top of the page,
22   does it show the operating budget for the 2019-2020
23   school year?
24   A    Correct.
25   Q    Okay.  And that is the $914,475,600.  Correct?

1  A  I see that.
2  Q  Okay.  And then if you go to the very bottom
3  of the page, it shows you what you've actually got
4  that's been assigned to you for the next year.
5  Correct?
6  A  I just don't know, not being familiar enough
7  with this document.  I see the proposed total
8  operating budget being 933 million.
9  Q  Uh-huh.  And do you see the change being an
10  increase of about 19 million?
11  A  Yes, I see that.
12  Q  Okay.  And is this what we discussed earlier,
13  the operating budget for the 2020-2021 school year?
14  A  That looks to be the same document.  Yes.
15  Q  Okay.  So then Metro Schools got, I see, 19 --
16  over 19 million more for the '20-'21 school year over
17  the '19-'20 school year, correct?
18  A  If that's what that document says.
19  Q  Okay.  One -- and -- and so assuming that
20  Metro Schools got 19,000 in additional funds from
21  Metro -- 19 million -- excuse me.  Assuming that
22  Metro Schools received an additional 19 million from
23  the Metro Government to operate its school for the
24  next year, would you agree that, based on your
25  conversation with Ms. Doe, her job would not need to

1  be eliminated due to the budget?
2  A  I don't understand budgets enough with --
3  especially with numbers that large to speak to that
4  in any reliable account.
5  Q  Okay.  Now, in your conversation with Ms. Doe,
6  is it correct that you're telling her that she has
7  basically lost her job with Metro Schools if she
8  doesn't find another one?
9  A  Yes.
10  Q  Did you know she was tenured?
11  A  I don't think I did at that point.
12  Q  And would you agree that you cannot fire a
13  tenured teacher?
14  A  There are --
15  Q  Would you agree that you cannot fire --
16  A  There are obviously certain caveats to that
17  rule, but she -- offering her a teaching position,
18  yes, that's correct.
19  Q  Now --
20    MR. FOX:  Objection to the form.
21  Q  Is it true that Ms. Doe did not have any
22  disciplinary action against her and that she was --
23  do you know how well she was performing her job at
24  the time --
25  A  No.

1  Q  -- that you had this conversation with her?
2  A  No.  I'm sorry.  I do not.
3  Q  Do you know how well or what type of a job
4  performer Dr. Leffler was at the time you had the
5  conversation with her?
6  A  No.  I'm sorry.  I don't.
7  Q  Do you know what type of a job performer
8  Dr. Bailey was at the time you had your conversation
9  with him?
10  A  No, I do not.
11  Q  Do you remember speaking to Dr. Leffler and
12  Dr. Bailey about losing their jobs?
13  A  I remember that we did it.  I certainly don't
14  remember the context of the conversations.
15  Q  Okay.  Do you recall talking to Dr. Meriwether
16  about losing her job?
17  A  Yes.
18  Q  Okay.  And what did you tell Ms. Meriwether?
19  A  All those conversations were arguably the
20  same.  I sort of had a pattern of conversation that I
21  had.  I cannot remember exactly the text of my
22  conversation, though.
23  Q  Okay.  So then with Ms. Meriwether and with --
24  with Ms. Meriwether then, is it fair that you told
25  her that the Metro Schools was short somewhere from

1  17 to 20 million?
2  A  It -- when I -- when you said short 17 to
3  20 million, I think what you mean is there was a
4  potential budget deficit of 17 to $20 million in the
5  upcoming school year.  If -- obviously, the
6  conversation you have -- I would have followed a
7  similar pattern.  So I can see myself having said
8  that.
9  Q  Okay.  And so would you agree, from looking at
10  the document that's, I believe, marked Exhibit 5
11  that's the actual budget that was adopted by the
12  school board, that Metro Schools got an additional
13  19 million to operate its budget?
14  A  If -- that's the document that was signed by
15  the school board.
16  Q  Okay.  And would you agree that additional
17  19 million makes the -- would mean, based on your
18  conversation with my clients, that if you got the
19  actual 19 million that then the elimination of the
20  job due to the budget is not necessary?
21  A  I don't remember saying that explicitly, so I
22  don't know if I can answer that in that way.
23  Q  My question to you, I think -- I think you
24  misunderstood my question.  My question is that if
25  you told the plaintiffs that they were losing their

1  job -- and that includes Dr. Cathey -- that they're
2  losing their job because Metro Schools is short 17 to
3  20 million, if you ultimately find out that you're
4  not going to be short, you're actually going to get
5  19 million, that makes the whole premise behind why
6  they're losing their jobs not necessary.  Correct?
7      A   Well, I just can't speak to that.  The reorg
8  was not -- that wasn't my design, so I don't know if
9  I can speak to that.  But if what you're asking me is
10 does that reasonably apply, I can see that reasoning.
11     Q   Thank you.
12     A   But I don't think the budget is that simple to
13 parse out, but I don't understand budgets well enough
14 to answer that.
15         MS. STEINER:  Okay.  But based on just the
16     simple looking at the budget and what you told them
17     about being short 17 to 20 million -- strike that.
18         Dr. Barnes, thank you very much for your
19     time.  That's the end of my questions.  I believe
20     that Ms. Harbison has got some questions for you
21     now.
22                        - - -
23                        - - -
24                        - - -
25                        - - -

1                        - - -
2                    EXAMINATION
3                        - - -
4  BY MS. HARBISON:
5      Q   Hi, Dr. Barnes.
6      A   Good afternoon.
7      Q   My name is -- hi.  Siren going by.  Give me
8  just one second.
9          Okay.  My name is Jesse Harbison.  I represent
10 Dr. Damon Cathey in this case.
11         So before I get started, let me ask you, do
12 you need to take a break -- five minutes, something
13 like that -- before we get going or are you good for
14 me to ask you a couple questions?
15     A   Go ahead.
16     Q   Okay.  If you need to take a break -- I know
17 this has been a long day.  If you need to take a
18 break at any point, I would much rather you take a
19 break, take a minute, and then us get back to our
20 questioning.  Okay?  So you just tell me if you need
21 one.  Just the only thing I'd ask if I've asked a
22 question, just answer it, and then tell me that you
23 need a break.  Okay?
24     A   Fine.
25     Q   I'm going to share my screen with you

1  hopefully.  Dr. Barnes, can you see this document?
2      A   I'm sorry.  Not very well.  It looks like the
3  questions for the interview process.
4      Q   Uh-huh.  And are you -- when you say the
5  interview process, are you referring to the interview
6  process for the executive directors?
7      A   Yes.  Without having it in front of me, that
8  looks like the questions that we had.  Yes.
9      Q   Okay.  So if I scroll over here, do you see
10 where it ends there -- the last question ends, how
11 will you communicate an unpopular but necessary
12 decision to principals?
13     A   Yes.
14     Q   Okay.  And do you see where it looks like this
15 was an email that perhaps has been redacted up here
16 at the top, but your signature block is down below?
17     A   Correct.
18     Q   Do you see that?
19     A   Yes.
20     Q   Okay.  So does this appear to be an email that
21 you sent?
22     A   It appears to be, yes.
23     Q   Okay.  And does it appear to be the interview
24 questions for the executive director job?
25     A   Can you scroll over to the right for one

1  second, please?
2      Q   Yes.  Just let me know when you want me to
3  stop.
4      A   Okay.  Yes, that looks like those.
5      Q   Okay.  If we went back and we looked at the
6  executive director form that we looked at earlier --
7  I think it may be Exhibit 4 --
8      A   Yeah.
9      Q   -- or 5, and looked at the questions on there
10 and saw if they matched, would that help you --
11     A   No.
12     Q   -- remember [inaudible] --
13     A   Those would have been the -- those would have
14 been the ones across the top, yes.
15     Q   Okay.  So these are the questions for the
16 executive director job, correct?
17     A   Yes.  To the best of my recollection, yes.
18     Q   Who drafted these?
19     A   Those look like questions that I have
20 developed over the years for jobs like this, so they
21 were a group of questions that I had that I chose
22 from.
23         MS. HARBISON:  I'd like to make this the next
24     numbered exhibit, please.  I think we're on 12.
25         THE COURT REPORTER:  Yes, ma'am.

1    Q   All right.  And then I'm going to show you
2  another document, Dr. Barnes.  And this is in Excel,
3  so it will just take a second for it to load on my
4  computer.
5        Okay.  Dr. Barnes, I'm going to see -- pull
6  this down a little.  This is a document that was
7  produced to Dr. Cathey when he did an open records
8  request --
9    A   Okay.
10   Q   -- to Metro.
11       And let me ask it this way:  Do you recall
12 Dr. Cathey making an open records request to Metro at
13 some point?
14   A   Vaguely.  I certainly can't remember what it
15 entailed, but I remember -- I think I remember it
16 coming in.
17   Q   Okay.  Let's actually -- I'll come back to
18 this document.  I want to go -- skip around a little
19 bit since we're talking about the records request,
20 and I'm going to show you a different document.
21       You know what, I think -- let's take a
22 two-minute break, because I need to find it, and I
23 also need to run to the restroom.  So let me --
24       MS. HARBISON:  Let's go off the record for
25 two minutes, and then we'll come back.  Okay?

1        THE VIDEOGRAPHER:  We're going off the
2  record.  We're going off the record.  The time is
3  3:00 p.m.
4        (A recess was taken.)
5        THE VIDEOGRAPHER:  All right.  We are back on
6  the record.  The time on the video monitor is 3:06.
7  Proceed.
8  BY MS. HARBISON:
9    Q   Okay.  Okay.  We are back on the record.
10 Dr. Barnes, did you talk to anyone when we took a
11 break just now?
12   A   No.  I told the guy in the lobby that this was
13 a long day, but that is it.
14   Q   It is.  And we appreciate your patience.
15       I am going to share my screen with you once
16 more.  Okay.  So Dr. Barnes, what I'm showing you is
17 a string of emails.  Can you see my screen?
18   A   Yes.
19   Q   Okay.  This goes from approximately, what's
20 been Bates-stamped here at the bottom,
21 SchoolsEmails 69116, and I'm going to scroll fast --
22 I'm not expecting you to look right now -- to the
23 SchoolsEmails 69124.  Okay?
24   A   Okay.
25   Q   I'm going to show you the first email in this

1  stream, which does span two pages.
2    A   Uh-huh.
3    Q   So as you -- can you see this where it says
4  from Dr. Damon Cathey to Nicole Reid on Wednesday,
5  June 17th, 2020?
6    A   Yes.
7    Q   Who is Nicole Reid?
8    A   She worked in the communications department,
9  and she was in charge of public records requests and
10 some other things, I assume.
11   Q   Okay.  And this email from Dr. Cathey is
12 requesting what appears to be 11 categories of
13 documents.  When you scroll down, they're numbered by
14 paragraph, and they go 1 through 11.  Correct?
15   A   Yes.
16   Q   And it appears to be that these are all
17 related to -- from his introductory paragraph, it
18 says, executive director of school school [sic] and
19 the executive director principal support job.
20 Correct?
21   A   Correct.
22   Q   Do you recall ever reviewing or seeing this
23 email from Dr. Cathey?
24   A   I would have as a part of the records request,
25 yes.

1    Q   Okay.  Do you regularly handle records
2  requests or was this a one-off incident?
3    A   Normally I would have my executive -- my
4  executive director, Lisa Spencer, handled most of our
5  records requests.
6    Q   Lisa Spencer was your executive director?
7    A   Correct.  Her title was executive director of
8  human resources.
9    Q   She reported directly to you?
10   A   Correct.
11   Q   Okay.  So in the hierarchy of the HR
12 department, it goes you, then Lisa Spencer.  Correct?
13   A   (Motioning) Correct.
14   Q   Is that a yes?  Okay.
15   A   Sorry.
16   Q   So scrolling up here, it looks like -- and I'm
17 going to bypass some of these emails that are just
18 between Nicole Reid and Damon Cathey and go back up
19 to where you get involved.
20   A   Sure.
21   Q   It looks like here Dr. Cathey forwarded this
22 email or sent an email to Nicole Reid and cc'ed you
23 on July 1st, 2020.  If you scroll down, it looks
24 like he and Nicole Reid are talking about an update
25 on the records request.

1        Does that sound familiar to you?

2    A   It sounds like -- it looks familiar, yes.

3    Q   Okay.  So you do recall seeing this email,

4  correct?

5    A   I must have, because I responded to it further

6  along in the chain.

7    Q   Okay.  And when you say that you responded to

8  it, let's scroll up here.  On the 15th, you sent an

9  email to Nicole Reid, and you said, I went back and

10 checked, and I can't find any more applicants.  I was

11 out for part of that week with a serious illness, and

12 I'm not sure what happened.

13   A   Yes, I was hospitalized during that --

14   Q   Is that correct?

15   A   Yes, I was hospitalized during that time.

16   Q   And during what time period were you

17 hospitalized?

18   A   Oh, gosh.  I don't recall the exact -- it was

19 mid-June.  I'm sorry.  I don't recall the exact

20 dates.

21   Q   What were you hospitalized with, if you don't

22 mind me asking?

23   A   Infectious colitis.

24   Q   Were you hospitalized before or after the

25 decisions were made about the executive director --

1  who would get the executive director jobs, rather?

2    A   I'm trying to remember.  I think I was

3  hospitalized afterwards.

4    Q   Okay.  After the decision was made?

5    A   I believe so, yes.

6    Q   Okay.  And what makes you have that belief?

7  What makes you think that?

8    A   Just my recollection.

9    Q   Okay.  And just to give you a little context

10 of the email that was going back and forth between

11 Nicole Reid and Dr. Cathey that you were cc'ed on,

12 the more recent email, Nicole Reid told Dr. Cathey

13 that she was going to work with you to see if HR had

14 any additional information responsive to his request?

15   A   Uh-huh.

16   Q   And then you responded and said this -- is

17 that correct -- that you couldn't find any more

18 applicants?

19   A   That looks like what it says, yes.

20   Q   Okay.  Okay.  If you'd scroll back up, Nicole

21 tells you, would anyone else in your office know,

22 because if you keep asking for the list, it's

23 probably because he doesn't see someone that he knows

24 applied.

25   A   Correct.

1    Q   Do you see that?

2    A   I see that.

3    Q   Do you recall receiving that email from

4  Nicole?

5    A   I don't recall specifically receiving that

6  email, but I see that I responded to it.

7    Q   Yes.  And you said, I don't know if it's a

8  computer error.  I went and downloaded a copy of the

9  survey before it was deleted.

10   A   Correct.

11   Q   Okay.  And that's on July 16th, 2020.

12 Correct?

13   A   Uh-huh.  And that's --

14   Q   When did you download a copy of the survey?

15   A   I don't remember.

16   Q   Okay.  And when was it deleted?

17   A   I don't remember that, either.  I went back to

18 look for it again in Office after -- during this

19 period of time when I was looking for it and saw that

20 the form that I built for the interviews was gone.

21 The only copy I had left was the one that I had

22 downloaded.

23       So I looked for a more recent copy, and the

24 only one I could find was the one that I shared.

25   Q   Okay.  That leads me to my next question,

1  which is, what did you do to try to find any

2  information that may have been responsive to

3  Dr. Cathey's records request?

4    A   It looked like this was the one piece that was

5  missing, so I went and looked in my hard drive, I

6  went and looked in my deleted items, and I went and

7  looked in Office and tried to resurrect the original

8  form that I had built.

9    Q   Okay.  And did you get an IT person to help

10 you with that?

11   A   I don't know if I called Doug Renfro, who had

12 been the IT director, or not.  I just can't recall.

13   Q   If you had called him -- well, let me ask it

14 this way:  When you contact IT, does a ticket

15 normally get generated?  Do you know?

16   A   I mean, you can put in a ticket.  I normally

17 just called him because we had each other's cell

18 numbers, and we communicated about other things.  So

19 I don't -- no, I did not put a specific ticket in for

20 it.

21   Q   Okay.  And you said that the form was created

22 through Microsoft 360, correct?

23   A   Or it's called Microsoft Office Tools, I

24 guess.  It's a little orange O in my computer.

25   Q   Okay.  And is that a [inaudible] based

1  program?
2      A  I'm sorry?
3      Q  Is that a Cloud-based program?
4      A  I would assume so, yes.
5      Q  Okay.  How is it that the survey results came
6  to be deleted?
7      A  I don't know.
8      Q  Okay.  Did anyone have access to it other than
9  you?
10     A  I don't think so, because I didn't want -- I
11 was trying to keep things sort of confidential, and I
12 didn't want other people to see other people's
13 scores, so I don't think anyone else had access to
14 it.
15     Q  Okay.  And the copy that you downloaded, was
16 that before or after you interviewed Chad High?
17     A  Well, the one I downloaded must have been
18 before, because it doesn't have his score on it.
19     Q  And that is the document that we were looking
20 at earlier today --
21     A  Correct.
22     Q  -- the Excel spreadsheet with the scores,
23 correct?
24     A  Correct.
25     Q  Okay.  So the record is clear, that has

1  already been marked as Exhibit --
2          THE COURT REPORTER:  6.
3      Q  -- 6, and those are the interview scores,
4  correct?
5      A  That's what -- if that's what --
6          THE WITNESS:  What was it called?
7          THE COURT REPORTER:  Exhibit Number 6?
8          MS. HARBISON:  Uh-huh.
9      Q  After it looked like -- well, strike that.
10         Nicole responded and said, to be clear, is
11 MNPS saying, we do not have the information
12 Dr. Cathey is requesting?  And you responded and
13 said, let me look again, but what I'm saying is that,
14 so far, I can't find it, and it seems to be gone.
15         Do you recall that, sending that email?
16     A  I don't recall sending the email, but I see
17 the time and the date stamp.
18     Q  Okay.  And it's your testimony today that you
19 can't recall if you enlisted anyone else in, for
20 example, IT to assist you in looking for these
21 documents responsive to Mr. -- Dr. Cathey's open
22 records request, correct?
23     A  I did not make a ticket item.  I do not recall
24 if I contacted -- Doug Renfro would have been the
25 person I would have called.  I just do not remember

1  if I contacted him or not.
2      Q  Do you remember if you contacted anyone else
3  to assist you with looking for these records?
4      A  That would have been the only person I would
5  have called.
6          MS. HARBISON:  Okay.  All right.  I'd like to
7      make this Exhibit 13, please.
8          THE COURT REPORTER:  Yes, ma'am.  And this is
9      the SchoolEmails Bates-stamped 69116; is that
10     correct?
11         MS. HARBISON:  Yes, 69116 through 69124.
12         THE COURT REPORTER:  Thank you.
13 BY MS. HARBISON:  Thank you.
14     Q  Okay.  Now I'm going to show you another
15 document, Dr. Barnes.  Okay.  Let me know if you can
16 see this.
17     A  I can.
18     Q  Okay.  This is a document that is
19 Bates-labeled at the bottom SchoolsEmails 13262.
20     A  Uh-huh.
21     Q  And as you can see, this is Dr. Cathey's
22 original records request.
23     A  Correct.
24     Q  And it looks like you forwarded that to Lisa
25 Spencer.  Correct?

1      A  Correct.
2      Q  Why did you forward it to Ms. Spencer?
3      A  Normally she was the one who did our general
4  records requests, so I forwarded to her to ensure
5  that she had received it.
6      Q  Did she have your passwords for your
7  MNPS-related programs on your computer?
8      A  No.
9      Q  Okay.  Did she have access to the Microsoft
10 forms program that you used to capture the data for
11 the executive director interviews?
12     A  She received the link to put in her score, but
13 she did not receive the -- to build or edit the
14 survey.
15     Q  It looks like Lisa Spencer responded to your
16 email on June 17th, 2020, and she said, Mercy.
17         Do you see that?
18     A  I see that.
19     Q  Did you ever discuss with Lisa what she meant
20 by that email?
21     A  No.  I don't recall.
22         MS. HARBISON:  Okay.  I'm going to make this
23     Exhibit 14, please.  This is Bates-stamped 13262.
24         THE COURT REPORTER:  Yes, ma'am.
25     Q  Okay.  Do you recall interviewing Sean

1  Lawrence for the executive director position?
2      A  I remember interviewing him, yes.  I don't
3  remember specifics.
4      Q  Okay.  Do you have any recollection regarding
5  what his professional background is prior to being
6  interviewed for the executive director position?
7      A  I know that he had principal experience, but I
8  don't know anything beyond that -- or I don't
9  remember anything beyond that.
10     Q  Okay.  Were you ever told by anyone that you
11 must interview Sean Lawrence for the executive
12 director position?
13     A  No.
14     Q  Did anyone ever encourage you to interview
15 Sean Lawrence for an executive director position in
16 any way?
17     A  No.  And I'm pausing because I want to make
18 sure I'm being thoughtful with my answer.  So not
19 that I remember.
20     Q  Okay.  Not that you recall?
21     A  Yeah.
22     Q  I'm going to share my screen with you again,
23 but let me find the document that I want to show you.
24        Okay, Dr. Barnes.  Let me know if you can see
25 this document.

1      A  I can.
2      Q  Okay.  This is Bates-labeled MG1478, so this
3  is a document that was produced by Metro.  Okay?
4      A  Yeah.  Yes, ma'am.
5      Q  And the title of the document, when it was
6  produced, was Executive Director 2020 Candidate List.
7        Do you see that up at the top?
8      A  I cannot see that, no.
9      Q  Okay.  Well, it was titled Executive Director
10 2020 Candidate List.  But let me ask you this:  Does
11 this list of names look familiar to you?
12     A  I recognize a lot of names on the list.  That
13 does look like, when we pulled something out of our
14 hiring system, the same font.  That looks like what
15 the fonts look like when we pull out of that.  So I
16 would assume that's what that is.
17     Q  And if Metro produced this in a format such
18 that it was titled Executive Director 2020 Candidate
19 List, would you have any reason to believe that it
20 wasn't the candidate for the executive directors in
21 2020?
22     A  Gosh, I hope you understand what a difficult
23 question that is.  But I would have no reason to
24 believe it to be untrue.
25     Q  Okay.  Is there anyone on here that you see

1  that you know did not apply for the executive
2  director list?  And since this spans more than my
3  screen, what I can do is pause, let you review the
4  names, and then scroll to the bottom.
5      A  Okay.  Can you scroll, please?
6      Q  Yes, sir.
7      A  Okay.
8      Q  Okay.  After you've reviewed it, does it help
9  refresh your recollection about what this might be?
10     A  I mean, yes, ma'am.  As best as it can.
11     Q  Okay.  And what do you think that this is?
12     A  It looks like the candidate list for the
13 executive director of schools jobs.
14     Q  Okay.  Why are some of these names
15 highlighted?
16     A  I don't remember producing that document, so I
17 simply don't know.
18     Q  Okay.  Did you highlight any of the names?
19     A  No.  And I was looking at the names that were
20 highlighted to see if there was a pattern that came
21 out of my head, but I don't see one.
22     Q  Okay.  You answered the next question before I
23 had a chance to ask it.  So you don't see a
24 particular pattern among the names that are
25 highlighted in yellow?

1      A  No.  But I know this doesn't make any sense,
2  but when I highlight something, I usually highlight
3  all the way across because my brain works that way.
4      Q  Yeah.
5      A  So I don't think that that was something I
6  would have highlighted, because I usually highlight
7  the whole line when I highlight something.
8      Q  But even if you didn't highlight it --
9      A  Right.
10     Q  -- looking at it now --
11     A  Right.  Sorry.
12     Q  -- you're not seeing any pattern --
13     A  The only pattern --
14     Q  -- of things that are highlighted in yellow?
15     A  The only pattern that jumps out that I see is,
16 that looks like the pattern of the people that were
17 hired.  That looks --
18     Q  Ultimately?
19     A  Just looking at the -- at -- without having a
20 reference and guide in front of me, that's what it
21 looks like, because all the names that are in yellow
22 are people who were -- became executive directors.
23     Q  Uh-huh.
24     A  I'm trying to see --
25     Q  What about the green highlighting?

1   A   I don't see any pattern there because it's
2  a -- it's a -- I don't want to say it's a weird
3  collection, but there are names in there that
4  don't -- that aren't from the same jobs or -- no, I
5  don't see any pattern that I can think of.
6       Q   All right.  I'm going to show you a different
7  document now.  Let me know if you can see my screen.
8       A   I can see that.
9       Q   Okay.  Same thing:  Since this spans more
10 than, you know, one page and we need to scroll, I'll
11 pause, let you review the list here.  Let me know
12 when you've reviewed it, and then I'll scroll to the
13 bottom so you can see the whole thing.
14      A   Okay.  Okay.  Go ahead.
15      Q   Okay.
16      A   Okay.
17      Q   Okay.
18      A   Okay.  Is that -- oh, that's it?  Okay.
19      Q   Yes.  And actually, before we move on, the
20 document we were just looking at, I think I need to
21 make that Exhibit 15.  And that was Bates stamp 1478.
22          THE COURT REPORTER:  Yes, ma'am.
23          MS. HARBISON:  MG1478.
24      Q   And this one, Dr. Barnes, you can see is
25 Bates-stamped MG1479.  This was produced by Metro

1  Government.
2          Does this list of names look familiar to you
3  at all?
4       A   Again, those highlighted names look like the
5  names that were offered the executive director
6  positions.
7       Q   Well, let me ask a prefatory question.  Does
8  the entire list of names look familiar to you at all,
9  not just the highlighted ones?
10      A   If you showed me them -- if you showed either
11 one of them to me and told me that was the executive
12 director of schools interview list, I would probably
13 agree with either list.
14      Q   All right.
15      A   So if you told me this was the same list
16 organized differently, I would probably say yes,
17 simply because I can't reference back a year and a
18 half ago.
19      Q   Sure.  And do you know why some of the names
20 are highlighted?
21      A   No.  The only thing obviously I can see is
22 that these names look to be the names of the people
23 who were selected.
24      Q   But you do not recall being the person that
25 highlighted these names?

1       A   No.
2       Q   Correct?
3       A   No, I don't.
4          MS. HARBISON:  Okay.  I'd like to make this
5  Exhibit 16, please.  That's Bates stamp MG149 --
6  1479.
7          THE COURT REPORTER:  Yes, ma'am.
8       Q   In the conversation that we heard between you
9  and Jane Doe, the recorded conversation, you said
10 that there was going to be a new org chart.
11         Do you know if a new org chart was ever
12 released?
13      A   I know that we updated it, and that was sort
14 of a thing we did fairly often.  So I can't say the
15 date, but we would have put out new -- we should have
16 put out new org charts with that information.
17      Q   With what information?
18      A   Of the different jobs being posted and those
19 things.
20      Q   Okay.  Were you involved in drafting a new org
21 chart for Metro during the time period --
22      A   I did not do that --
23      Q   And let me --
24      A   Go ahead.  I'm sorry.
25      Q   Well, let me make sure the question is clear.

1  Were you involved in drafting a new org chart in or
2  around the time that the interviews were taking place
3  for the executive director position?
4       A   I don't know the dates well enough for the org
5  chart to say they happened at the same time.
6       Q   Okay.  How about anywhere from March through
7  August of 2020?  Do you involve -- do you recall
8  drafting a new org chart anywhere in that period of
9  time?
10      A   That would have been something that Lisa
11 Spencer did.  She was usually the one in charge of
12 the org charts.
13      Q   Okay.  So it's your understanding that if a
14 new org chart was drafted during that time, Lisa
15 Spencer would have been the one that drafted it?  Is
16 that correct?
17      A   I'm trying to think who she -- there was
18 somebody she worked with to do it, and I don't
19 remember who it was.  But yes, that would have been
20 the person that was tasked with doing it.
21      Q   Okay.  And where would Lisa have gotten the
22 information needed to draft the org chart?
23      A   From the chiefs of each of those departments.
24      Q   Okay.  The chief of each of which department?
25      A   The chief of the department for which the org

1 chart was.
2    Q  Okay. And what about the overall org chart
3 that shows the board members that --
4    A  Yeah. Yeah. Yeah.
5    Q  Yeah.
6    A  I'm sorry. Slow down.
7      THE COURT REPORTER: I can only take one
8 person at a time.
9      THE WITNESS: Oh. She was actually telling
10 me to be quiet. I'm sorry. Go ahead.
11    Q  What about the overall org chart, the summary
12 org chart? Where would she have gotten the
13 information from that or for that to draft that? Who
14 would she have gotten that information from?
15    A  We would have sat down and organized that
16 either as a cabinet or possibly in a smaller meeting
17 with Dr. Battle, myself, and Lisa. It would have
18 been sort of -- we would have gotten the information,
19 gone back and drafted it, sent it for review. It
20 would have been that sort of scenario. So in the
21 overall --
22    Q  Sent it for review to who?
23    A  Ultimately I would have had Dr. Battle see it
24 before it got posted.
25    Q  Okay. I'm going to share my screen with you

1 once again. Let me know if you can see this.
2    A  I can see that.
3    Q  Okay. I'm just going to scroll down and show
4 you that this is Bates-stamped SchoolsEmails -- angel
5 number -- 11111.
6    A  Yeah. Your head is in the way, but I assume
7 that's what you're -- I assume that.
8    Q  Can you see it now?
9    A  Yes.
10    Q  Okay. Let me know -- take a second and look
11 at that, and let me know when you've had a chance to
12 review it.
13    A  Okay. I see it.
14    Q  Okay. This appears to be an email from you to
15 Lisa Spencer on May 17th, 2021 at 7:43 p.m. Is
16 that correct?
17    A  Looks to be.
18    Q  Do you recall sending this email to
19 Ms. Spencer?
20    A  No, I don't.
21    Q  Okay. Do you have any reason to doubt that it
22 was you that sent this email to Ms. Spencer?
23    A  I mean, no.
24    Q  Okay. The email says, with all that we have
25 going on, I don't remember if we finished our

1 conversation about a budget -- quote -- task -- end
2 quote -- for the executive director interview.
3    A  Uh-huh.
4    Q  Come and talk to me when you can.
5    A  Uh-huh.
6    Q  Do you see that?
7    A  Yes.
8    Q  Do you know what this is referring to?
9    A  I think so.
10    Q  Okay.
11    A  Typically with -- periodically with
12 interviews -- and I'll just give an example. We did
13 an interview here last week for an executive director
14 of schools, and I gave them a task that they had to
15 respond to in writing so that that could be a part of
16 our process. Periodically we do that where we will
17 ask them to do some kind of performance-based task.
18 I think that is what that is about.
19    Q  And did that come to fruition for those
20 executive director interviews?
21    A  No, we elected not to do it in this case.
22    Q  Why not?
23    A  I don't remember why we said why not. I -- it
24 was a very busy time for us. That could be the only
25 argument I can think of as to why we may not have,

1 but I simply can't remember exactly the why.
2    Q  And who is we when you refer to we making the
3 decision or not making a decision?
4    A  Oh, I'm sorry. Ms. Spencer and myself.
5    Q  Okay. So were you and Ms. Spencer the
6 decision-makers regarding the content of the
7 interview for the executive director role?
8    A  If I remember correctly, I built the
9 questions. She and I looked at them together before
10 I sent them out to the staff -- the panel for review,
11 and then ultimately put those into the pattern to
12 use.
13    Q  Did the panel have any substantive feedback
14 regarding the questions that you sent to them for
15 review for the interviews for the executive director
16 job?
17    A  Not that I recall.
18    Q  Was anyone else involved in formulating the
19 interview process for the executive director
20 position?
21    A  No, not that I remember.
22    Q  Okay. Do you recall when the executive
23 director interviews took place?
24    A  You'll have to go back and look at my
25 calendar. They took place over a course of a couple

1 of weeks back in -- I want to say late May.
2     Q.   Okay.  I'm going to show you another document.
3 So I just shared my screen.  Let me know if you can
4 see this.
5     A.   Okay.
6     Q.   Okay.  This document appears to me to be some
7 calendar invites, but it's a collective document, so
8 I'm going to have us talk about each one.  Okay?
9     A.   Okay.
10     Q.   And as we talk about them, I'll note the Bates
11 stamp on each one.
12     A.   Okay.
13     Q.   So this first document is titled Executive
14 Director of Schools Interview, and it looks like the
15 date is June 4th, 2020 at 8:15.  The organizer is
16 Lisa Spencer, and the required attendees are you,
17 Christopher Stark, David Williams, Elisa Morris,
18 Sharon Griffin, and Chad High.  Correct?
19     A.   Correct.
20     Q.   So would this have been a calendar invite for
21 the executive director interview for one of the
22 interviewees?
23     A.   That's what it looks like, yes.
24     Q.   Okay.  Because it's called Executive Director
25 of Schools Interview is the subject, correct?

1     A.   Right.  Right.
2     Q.   Lisa Spencer is the organizer.  She also sat
3 on the interview panel; is that correct?
4     A.   Correct.
5     Q.   And then of the required attendees,
6 Christopher Barnes, that's you.  You also sat on the
7 interview panel, correct?
8     A.   Yes.
9     Q.   Did Kenneth Stark also sit on the interview
10 panel?
11     A.   Yes.
12     Q.   David Williams?
13     A.   Yes.
14     Q.   Did Elisa Morris?
15     A.   Yes.
16     Q.   What about Sharon Griffin?
17     A.   Yes.
18     Q.   And then Chad High would be interviewed; is
19 that correct?
20     A.   Correct.
21     Q.   So does that lead you to believe that Chad
22 High's interview took place on Thursday, June 4th,
23 beginning at 8:15 a.m.?
24     A.   I have no reason to doubt that.
25     Q.   Okay.  And this is Bates-stamped Plaintiff

1 459.
2          And the same thing:  These are all going to
3 look very similar, but they'll have different dates.
4 This is titled Executive Director of Schools
5 Interview.  The start date is Wednesday, May 20th
6 at 8:00 a.m.; end date, Wednesday, May 20th at
7 8:30.
8          And then it appears that the organizer and the
9 required attendees are all the same as the document
10 we just looked at with the exception that Carl
11 Carter's name is substituted for Chad High.
12          Does that look correct to you?
13     A.   Correct.
14     Q.   So does that lead you to believe that this was
15 an interview -- scheduled Teams interview for Carl
16 Carter's interview for the executive director
17 position?
18     A.   Yes.
19     Q.   Okay.  And based on this calendar invite, Carl
20 Carter was interviewed on May 20th at 8:00 a.m.?
21     A.   Yes.
22     Q.   Okay.  And this one is Bates-stamped Plaintiff
23 460.
24          And then same thing:  Does this look familiar
25 to you?

1     A.   Yes.
2     Q.   Okay.  And what does this look like?  Is this
3 a calendar invite?
4     A.   Yes.
5     Q.   Okay.  And same thing:  Subject is Executive
6 Director of Schools Interview?
7     A.   Yes.
8     Q.   And does this appear to be the interview for
9 Renita Perry?
10     A.   Yes.
11     Q.   Okay.  And it looks like this took place on
12 May 20th at 8:30?
13     A.   Yes.
14     Q.   Okay.  Same thing:  Does this appear to be a
15 calendar invite for the executive director interview
16 for Robin Shumate?
17     A.   Yes.
18     Q.   Are you a required attendee at this calendar
19 event?
20     A.   Yes.
21     Q.   Okay.  And does it look like her interview
22 took place on May 20th at 10:00 a.m.?
23     A.   Yes.
24     Q.   Okay.  Same thing:  Does this appear to be a
25 calendar invite for an executive director interview

1  for Schunn Turner?
2      A   Yes.
3      Q   Okay.  Are you a required attendee for this
4  calendar invitation?
5      A   Yes.  Yes.
6      Q   And does it look like Ms. Turner -- or
7  Dr. Turner's interview took place on May 20th at
8  3:00 p.m.?
9      A   Yes.
10     Q   Okay.  Same thing:  Executive director of
11 schools interview calendar invite, does this look
12 like the invite for David Kovach's interview?
13     A   Yes.
14     Q   Does it appear from this calendar invite that
15 it took place on May 20th at 4:30 p.m.?
16     A   Yes.
17     Q   And were you a required attendee at that
18 interview?
19     A   Yes.
20     Q   For this calendar invite, rather.  Yes?
21     A   Yes.
22     Q   The next page, does this appear to be a
23 calendar invite for the executive director of schools
24 interview for Sonia Stewart?
25         THE COURT REPORTER:  I'm sorry?

1          MS. HARBISON:  For Sonia Stewart.
2          THE WITNESS:  Sonia Stewart.
3      A   Yes.
4      Q   Does it appear that Ms. Stewart's interview
5  took place on May 20th at 5:00 p.m.?
6      A   Yes.
7      Q   And were you a required attendee for this
8  calendar invitation?
9      A   Yes.
10     Q   The next page, does this appear to be a
11 calendar invite for the executive director of schools
12 interview for Craig Hammond?
13     A   Yes.
14     Q   And were you a required attendee at this
15 event?
16     A   Yes.
17     Q   Does it appear that his interview took place
18 on May 21st at 8:00 a.m.?
19     A   Yes.
20     Q   Okay.  The next page, does this appear to be a
21 calendar invite for the executive director of schools
22 interview for -- well, this one, we don't know who
23 it's for.  This one doesn't have a name; is that
24 correct?
25         If we scroll down, it looks like -- a little

1  different than the last ones we looked at, but this
2  one looks like Dr. Cathey's.
3      A   Is that the -- okay.  That's not the beginning
4  of the next one; that's this one?
5      Q   Yeah.  No.  It's not the beginning.  Yeah.
6      A   Huh.
7      Q   It looks like this was the original
8  appointment, and then this may have been rescheduled.
9      A   (Reading to self).  Is 8:30 to 9:00 -- is
10 there a different time at the one at the top?
11     Q   8:30 to 9:00.
12     A   It looks like the same time.
13     Q   Okay.  But this is a calendar invite for
14 Dr. Cathey --
15     A   Yes, that's what it looks like.
16         THE COURT REPORTER:  I'm sorry.  I didn't
17 hear the last part of the question.
18         THE WITNESS:  I'm sorry, ma'am.
19         MS. HARBISON:  We're almost done.
20         THE COURT REPORTER:  I'm sorry.
21         (Simultaneous crosstalk.)
22         THE WITNESS:  Ma'am?
23         MS. HARBISON:  Yes.
24         THE WITNESS:  Can you please repeat your last
25 question?  The stenographer missed it.

1  BY MS. HARBISON:
2      Q   Yeah.  Does this appear to be a calendar
3  invite for Dr. Cathey's interview?
4      A   And my answer is yes.
5      Q   Is that the question that she needed?
6      A   Yes.
7      Q   Okay.  Next page, does this appear to be a
8  calendar invite for the executive director for
9  schools for Felicia Everson Tuggle?
10     A   Yes.
11     Q   And you were a required attendee?
12         THE WITNESS:  I'm sorry.  Felicia
13 Everson-Tuggle.
14         THE COURT REPORTER:  Thank you.
15     A   My answer is yes -- I'm sorry.  Can you ask
16 that question again, please?
17     Q   Were you a required attendee --
18     A   Yes.
19     Q   -- at this interview?
20         Okay.  The document has ended.  Are there any
21 of these interviews that you don't recall attending?
22     A   No, I don't.  Obviously there was a question
23 made earlier about me having a computer problem, but
24 I do not remember missing any of them.
25     Q   Okay.  So there's none of these that you don't

1  recall attending.  Correct?
2      A  No.
3      Q  So when you say that we would need to go back
4  and look at your calendar invitations, we've just
5  done that.  Does that help refresh your recollection
6  about when these interviews took place?
7      A  Yes.
8      Q  Okay.  I know this is a little tedious, but
9  there is one more document with the calendar invites,
10 so I think, because we've referenced it multiple
11 times, I want to go through those as well.
12     A  Okay.
13     Q  Just so that the record is clear.  Okay?
14     A  All right.
15     Q  And I'm going to make this the next numbered
16 exhibit, which is, I believe, Exhibit 17.  And this
17 is Bates-labeled Plaintiff 459 through 468.
18         THE COURT REPORTER:  Thank you.
19         MS. HARBISON:  I could be wrong.  Did we say
20 that that's Exhibit 17?  Was that correct?
21         THE COURT REPORTER:  You said Exhibit 17.
22 That's correct.
23         MS. HARBISON:  And is that also correct in
24 terms of our numbered exhibits?
25         THE COURT REPORTER:  May we go off the

1  record, please?
2          THE VIDEOGRAPHER:  Sure.  We're going off the
3  record.  The time on the video monitor is 3:45 p.m.
4          (Off-the-record discussion.)
5          THE VIDEOGRAPHER:  Okay.  We are back on the
6  record.  The time on the video monitor is 3:45 p.m.
7  BY MS. HARBISON:
8      Q  Okay.  I'm going to share my screen with you,
9  Dr. Barnes, and show you a document that we've
10 already looked at.  Can you see my screen?
11     A  Yes.
12     Q  Okay.  This is the document that we discussed
13 earlier about a budget passed that's labeled
14 SchoolsEmails 11111, and I'm going to make that
15 Exhibit 18.
16         THE COURT REPORTER:  Yes, ma'am.
17     Q  Okay.  Okay.  I'm going to share my screen
18 with you again.  And I think, since we're going at a
19 pretty good clip, we can move this a little faster,
20 Dr. Barnes, as it relates to these calendar invites.
21         I just shared my screen with you.  Can you see
22 what I shared?
23     A  Yes.
24     Q  Okay.  This is another collection of documents
25 beginning with what's been Bates-stamped as

1  Plaintiff 470.  The first page, does this appear to
2  be a calendar invite for the executive director
3  interview on May 21st, 2020 for Steve Ball?
4      A  No.  May 21st, yes.
5      Q  Okay.
6      A  May 21st, yes.
7      Q  May 21st.  Okay.  At 3:00 p.m.?
8      A  Yes.
9      Q  Okay.  And are you a required attendee?
10     A  Yes.
11     Q  Okay.  And as we go through all of these for
12 the next -- well, never mind.
13         So the next page, does this appear to be an
14 executive director calendar invite for an interview
15 for James Witty?
16     A  Yes.
17     Q  May 21st, 2020 at 3:00 p.m. -- or 3:30 p.m.,
18 rather?
19     A  Yes.
20     Q  Are you a required attendee?
21     A  Yes.
22     Q  Okay.  Next page, does this appear to be an
23 executive director interview for James Witty again,
24 May 21st at 3:30 p.m.?
25     A  Yes.

1      Q  Okay.  The next page, does this appear to be
2  an executive director interview calendar invite for
3  Brenda Diaz's interview?
4      A  Yes.
5      Q  Are you a required attendee?
6      A  Yes.
7      Q  Did that take place on May 22nd at
8  8:00 a.m.?
9      A  Yes.
10     Q  Okay.  The next page, does this appear to be a
11 calendar invite for an executive director of schools
12 interview for Barbara Maultsby-Springer?
13     A  Barbara Maultsby-Springer.  Yes.
14     Q  Are you a required attendee?
15     A  Yes.
16     Q  Does this -- did this interview take place on
17 May 22nd, 2020 at 8:30 a.m.?
18     A  Yes.
19     Q  Okay.  Same thing:  Is this a calendar invite
20 for an executive director of schools interview for
21 Lily Leffler?
22     A  Yes.
23     Q  Did this interview take place on May 22nd,
24 2020 at 3:30 p.m.?
25     A  Yes.

1    Q    Okay.  According to the calendar invite?
2    A    Correct.
3    Q    The next page, does this appear to be a
4    calendar invite for an executive director of schools
5    interview for Karen Desouza Gallman?
6    A    Karen Desouza Gallman, yes.
7    Q    Uh-huh.  And from this -- based on this
8    calendar invite, did it take place on May 22nd,
9    2020 at 4:00 p.m.?
10   A    Yes.
11   Q    Okay.  The next page, is this a calendar
12   invite for an executive director of schools interview
13   for Chaerea Snorten?
14   A    Chae Snorten, yes.
15   Q    Okay.  Chae is her nickname?
16   A    Yes.  Yeah.  Correct.  Thank you.
17   Q    Okay.  And were you a required attendee at
18   this interview?
19   A    Yes.
20   Q    And did it take place on May 26, 2020 at
21   8:00 a.m., according to the calendar invite?
22   A    Yes.
23   Q    The next page, is this a calendar invite for
24   an executive director of schools interview for
25   Lendozia Edwards?

1    A    Correct.
2    Q    Were you a required attendee?
3    A    Yes.
4    Q    According to the calendar invite, did this
5    take place on May 26, 2020 at 8:30 a.m.?
6    A    Yes.
7    Q    Okay.  The next page, is this a calendar
8    invite for an executive director interview for Pippa
9    Meriwether?
10   A    Yes.
11   Q    Were you a required attendee?
12   A    Yes.
13   Q    And according to this calendar invite, the
14   interview took place on May 26, 2020 at 12:15 p.m.?
15   A    Yes.
16   Q    The next page, is this a calendar invite for
17   an executive director of schools interview for Celia
18   Conley?
19   A    Yes.
20   Q    According to the calendar invite, this
21   interview took place on May 26, 2020 at 12:45 p.m.?
22   A    Yes.
23   Q    Are you a required attendee?
24   A    Yes.
25   Q    The next page is an executive director of

1    schools interview, MNPS, for Marie Feagins, I
2    believe, is how you say it.  Is that correct?
3    A    Marie Feagins.  Yes.
4    Q    Okay.  And are you a required attendee?
5    A    Yes.
6    Q    And according to the calendar invite, this
7    took place on May 27th, 2020 at 3:00 p.m.?
8    A    Yes.
9    Q    The next page, this appears to be an executive
10   director of schools interview for Martin McGreal.  Is
11   that correct?
12   A    Yes.
13   Q    And according to the calendar invite, this
14   took place on May 27th, 2020 at 3:30 p.m.?
15   A    Yes.
16   Q    And are you a required attendee?
17   A    Yes.
18   Q    The next page, this is a calendar invite for
19   an executive director of schools interview for Ron
20   Woodard.  Correct?
21   A    Yes.
22   Q    According to the calendar invite, this took
23   place on May 27th, 2020 at 4:15 p.m.?
24   A    Yes.
25   Q    Are you a required attendee?

1    A    Yes.
2    Q    The next page, is this a calendar invite for
3    an executive director of schools interview for Sean
4    Lawrence?
5    A    Yes.
6    Q    Okay.  And this took place on May 29th, 2020
7    at 8:30 a.m., according to the calendar invite?
8    A    Yes.
9    Q    Are you a required attendee?
10   A    Yes.
11   Q    We've reached the end.  Were there any of
12   those that we just discussed that you don't recall
13   attending?
14   A    Gosh, I'm sorry.  I don't.  I -- I think I
15   attended all of them.
16   Q    Okay.  So just to make sure we're clear, when
17   you say "I don't," you're not saying you -- that the
18   answer to my question is yes; you don't remember
19   attending some of them or --
20   A    I apologize.  Yes.  I don't remember missing
21   any of those.
22   Q    Okay.  Do you have any reason to believe that
23   these calendar invites might be inaccurate -- either
24   these or the ones that we discussed in Exhibit 17?
25   A    Not at -- glancing at it now.

1      MS. HARBISON:  I'm going to make this
2  Exhibit 19, please.  This is Plaintiffs
3  470 through 484.
4      THE COURT REPORTER:  Yes, ma'am.
5      Q   So according to the calendar invites that we
6  just looked at, the interviews began on May 20th,
7  2020.  Correct?
8      A   If that was the date of the first invite, yes.
9      Q   Okay.  I'm going to show you another document.
10  Okay.  Can you see my screen, Dr. Barnes?
11  Dr. Barnes, can you see my screen?
12      A   Yes, I can.
13      Q   Okay.  I'm going to scroll to the bottom.
14  This is a string of emails that -- let's start in
15  chronological order.  And these are Bates-stamped
16  beginning with SchoolsEmails 69436, and it goes
17  through 69437.
18      A   Okay.
19      Q   It looks like you were just reviewing the
20  first page of this email.  Do you recall this
21  correspondence with James Witty?
22      A   No.  I don't recall it, no.
23      Q   Who is James Witty?
24      A   He was someone who had applied for the
25  executive director of schools job, and I believe at

1  that same time, he was applying for another job as
2  well.
3      Q   What job did he have -- or did he hold before
4  he applied for the executive director of schools job
5  in 2020?
6      A   I think he was already a director of schools
7  [sic] job.
8      Q   So he was one of the individuals who had to
9  reapply?
10      A   Correct.
11      Q   Okay.  If we scroll down, it looks like this
12  email chain began with an email from Lisa Spencer to
13  herself, which there may have been some people bcc'ed
14  on there --
15      A   I think that she --
16      Q   -- I'm assuming?
17      A   I think that she had invited the -- that was
18  the invite to let them know that they would be
19  interviewed, and she blind-copied them so they
20  wouldn't know each other.
21      Q   Okay.  That makes sense.  So all the people
22  that we just went through, this was the email that
23  they received initially to let them know that they
24  would be interviewing for the job; is that correct?
25      A   Yes.

1      Q   Okay.  And then if we scroll up, it looks like
2  on May 18th, James Witty sent you, Hank Clay, and
3  Lisa Spencer an email stating, I hope you-all had a
4  wonderful weekend.  I failed to ask the timeline on
5  hiring the executive director post as well as how
6  information would be communicated post interview.
7  Does the below email indicate I'm no longer a
8  candidate for the EO post or interviews ran
9  currently?
10      Is that correct?
11      A   That's what that says.
12      Q   Do you recall receiving this email?
13      A   No.  I'm sorry.  I don't.
14      Q   Okay.  Do you have any reason to believe that
15  it might not be authentic?
16      A   No.  I don't have any reason to believe that.
17      Q   Okay.  What's EO post refer to?
18      A   It must be a posting for an executive officer
19  position.
20      Q   Okay.
21      A   But I don't know -- I don't remember which
22  exact executive officer they're speaking of.
23      Q   Okay.  And is that your email address,
24  christopher.barnes@mnps.org?
25      A   Correct.

1      Q   Okay.  And if you scroll up, it looks like
2  Hank Clay responded to Mr. Witty and said, thank you.
3  They are running concurrently.
4      And you are cc'ed on that email; is that
5  correct?
6      A   Correct.
7      Q   And then if you scroll up one more, from
8  christopher.barnes@mnps.org, which is what -- your
9  email address when you were at MNPS, correct?
10      A   Correct.
11      Q   -- on May 19th, 2020, you responded to
12  Mr. Witty, and you said, there are two or three balls
13  in the air at the same time.  It may come to pass
14  that one offer comes your way before another.  If the
15  ED jobs are offered first, I'm planning on having
16  some wiggle room whereby, if you take the ED job,
17  then get this offering, too, I'll have a spare ED in
18  my pocket to replace you, if that makes sense.
19      Is that what this email says?
20      A   That's what that email says.
21      THE COURT REPORTER:  Can you please read
22  slower?  Can you please read slower?  Thank you.
23      MS. HARBISON:  Yeah.  Sure.  Do you need me
24  to reread it?
25      THE COURT REPORTER:  No.  Thank you.

1        MS. HARBISON:  Okay.
2     Q   And this is an email from you to James Witty,
3   correct?
4     A   Apparently, yes.
5     Q   Sent on May 19th, 2020, correct?
6     A   Yes.
7        MS. HARBISON:  Okay.  I'd like to make that
8   Exhibit 20, please, and that's Bates stamp 69436
9   through 69437.
10       THE COURT REPORTER:  Yes, ma'am.
11    Q   I'm going to share my screen with you once
12  again.  Let me know when you can see my screen,
13  Dr. Barnes.
14    A   I can see it.
15    Q   Okay.  And just so that we're clear, this is
16  a PDF document that's Bates-labeled SchoolsEmails
17  68165 through 68166.  And this is an email chain; is
18  that correct?
19    A   It looks to be, yes.
20    Q   Okay.  And the first email begins with an
21  email from Madeline Gibbs, email address
22  madeline.gibbs@mnps.org.  Is that correct?
23    A   Yes.
24    Q   And it appears it was sent on May 21st, 2020
25  at 8:39 a.m.  Is that correct?

1     A   Yes, that's what it reads.
2     Q   And you were one of the recipients, correct?
3     A   Correct.
4     Q   And it appears that this email is an email
5   from Ms. Gibbs -- or Dr. Gibbs, perhaps -- thanking
6   them -- thanking you-all for extending an opportunity
7   to interview for the executive directors' position.
8        Is that correct?
9     A   Correct.
10    Q   Okay.  And who is Madeline Gibbs?
11    A   She is an executive director.
12    Q   Okay.  Currently?
13    A   Well, she was when I left.
14    Q   Was she hired as part of this executive
15  director interview cycle that we've been discussing
16  during the deposition?
17    A   Yes, I believe so.
18    Q   Yes?
19    A   Yes, I believe so.
20    Q   Okay.  If you scroll up, it says -- this
21  appears to be an email from Dr. Gibbs to you,
22  christopher.barnes@mnps.org.  Is that correct?
23    A   Uh-huh.
24    Q   So this is an email that Dr. Gibbs sent to
25  you, correct?

1     A   It looks to be, yes.
2     Q   On May 21st, 2020, correct?
3     A   Uh-huh.  Yes.
4     Q   And in the email, Dr. Gibbs says, I'm
5   following up, as you indicated.  Yesterday we talked
6   offline due to my interview having gone over the time
7   slot.  Please feel free to connect with me as you
8   have a few minutes to spare.  My contact number is --
9   and then she puts her contact number.  Look forward
10  to connecting soon.  Thanks in advance.
11       Is that what the email says?
12    A   That's what it reads, yes.
13    Q   Do you recall connecting with Dr. Gibbs
14  offline?
15    A   I'm sorry.  I don't.
16    Q   Okay.  If Dr. Gibbs says in this email that
17  you indicated that yesterday, meaning May 20th, you
18  and her would talk offline, do you have any reason to
19  believe that that's not true, that you didn't say
20  that?
21    A   No, I have no reason to believe that.  I -- I
22  can -- I have an idea of maybe why, but I don't --
23  no, I don't remember having the conversation with
24  her.
25    Q   Okay.  What's your idea of maybe why?

1     A   Typically if an interview is going over and we
2   have one right after that, I do know that Dr. Gibbs
3   sometimes has a lot of questions.  So if we were
4   running late on time, I could see myself having said
5   to her, why don't you call me; you can ask me your
6   question at another time.
7        If she had a structural or procedural question
8   about the interviews or whatever to move the needle
9   down -- move the ball down the field, I could see
10  myself saying, let's connect at another time, and I
11  can answer those questions, would be my guess.
12    Q   Were the other panelists present for that
13  second phone call with Dr. Gibbs?
14    A   No.  And I can't remember whether I had a
15  second phone call with her or not.
16    Q   Do you recall sending an email on May 29th
17  to the candidates saying that you were finalizing the
18  executive director decision?
19    A   I don't remember sending an interview -- I
20  mean, I don't remember sending an email, but that
21  doesn't mean that I may not have.
22    Q   Do you recall when you began to finalize the
23  executive director -- or the decisions about who was
24  going to be finalized as an executive director -- or
25  who was going to be offered the executive director

1  position, rather?
2      A  Right.  Right.  I understand the question.  As
3  I told Ms. Steiner earlier, I just don't remember an
4  exact day that that decision was finalized.
5      Q  Was it finalized over the course of one day or
6  multiple days?
7      A  I can't speak to that either.
8      Q  I'm going to share my screen with you again.
9          THE COURT REPORTER:  Are you going to mark
10  SchoolsEmails 68165 through -66?
11          MS. HARBISON:  I sure am.  We can make that
12  Exhibit 21.
13          THE COURT REPORTER:  Thank you.
14          MS. HARBISON:  Thank you very much.
15      Q  Okay.  Let me know when you can see my screen.
16      A  I can see it.
17      Q  Okay.  So Dr. Barnes, this is an email between
18  Lisa Spencer and Felicia Everson-Tuggle; is that
19  correct?
20      A  Looks to be, yes.
21      Q  Okay.  And it appears that Lisa Spencer sent
22  this on June 1st, 2020.  Correct?
23      A  That's what it says, yes.
24      Q  And in the email, Ms. Spencer says, I believe
25  that Dr. Barnes is finalizing the selection with the

1  director early this week.  Correct?
2      A  Yes.
3      Q  Does that help refresh your memory at all
4  about when these conversations may have taken place
5  and who was involved?
6      A  I mean, obviously it gives us a more -- a
7  closer date range, but I simply don't remember a
8  specific date that I had the conversation.
9      Q  Did you discuss with Lisa Spencer the status
10  of the discussions that you were having regarding
11  finalizing making the offers?
12      A  I would have, yes.
13      Q  Okay.  Was there a second round of interviews
14  for the executive director position?
15      A  I believe that we invited candidates back with
16  Dr. Battle for a final-round interview.
17      Q  Okay.  Was there anyone that was invited back
18  for a final-round interview that did not receive an
19  offer for an executive director job?
20      A  I don't remember.
21      Q  Okay.  Who made the decision about which --
22  which individuals were going to be invited back for a
23  second-round interview with Dr. Battle?
24      A  If I recollect correctly, I talked with
25  Dr. Battle, and we collaborated on who we would bring

1  back for a second interview round.
2      Q  And what criteria did you use when you
3  collaborated with Dr. Battle to decide who was going
4  to be invited back for a second-round interview?
5      A  I brought her the scores, shared with her
6  those, and she made her recommendations back to me
7  who she would want to see again.
8      Q  Okay.  Did that conversation take place via
9  Teams?
10      A  I remember that the interviews were on Teams,
11  and I remember that I was in -- at my home when we
12  did the interview round, but I don't remember if that
13  was on Teams or if that was done in person.  I don't
14  remember.
15      Q  Were you meeting with Dr. Battle in person
16  during the summer of 2020?
17      A  Yes.  During different times, we would.
18  Sometimes it would be virtual; sometimes it would be
19  in person.  If I -- if I had to guess, I'd want to
20  say that it was virtual because I think that's where
21  we mostly were during that time, but I just can't
22  speak to it accurately enough.
23      Q  Okay.  And you can't recall who got a
24  second-round interview; is that correct?
25      A  My calendar would show who we invited back,

1  but I can't speak to every name off the top of my
2  head right now.
3      Q  Okay.  And if there were no calendar invites
4  produced regarding the second-round interviews, is it
5  possible that they were scheduled in a different way
6  other than via a calendar invite?
7      A  I don't think so.
8      Q  Okay.  And did those second-round interviews
9  take place via Teams?
10      A  Yes, they must have.
11      Q  Why do you say that?
12      A  Because I don't remember being in an office
13  with her having those meetings.
14      Q  When you say her, are you referring to
15  Dr. Battle?
16      A  I'm sorry.  I don't remember being in an
17  office with Dr. Battle conducting those meetings.
18      Q  Okay.
19      A  But my school calendar -- my calendar would
20  say whether it was a Teams meeting or an in-person
21  meeting.
22          MS. HARBISON:  Okay.  I'm going to make that
23  document SchoolsEmails 13286 through 13287
24  Exhibit 22.
25          THE COURT REPORTER:  Yes, ma'am.

DR. JAMES BAILEY, ET AL. vs METROPOLITAN GOVERNMENT OF NASHVILLE, ET AL.
BARNES, CHRISTOPHER on 12/09/2021

1    Q   Dr. Barnes, I'm going to show you another
2 email -- another document, rather. Okay. Let me
3 know if you can see my screen.
4    A   I can see it.
5    Q   Is this an email from Lisa Spencer to Kenneth
6 Stark, Elisa Morris, Sharon Griffin, David Williams,
7 and you?
8    A   Yes, that looks to be there.
9    Q   Okay. And as we discussed before, those
10 individuals were the panelists for the executive
11 director interviews, correct?
12    A   Correct.
13    Q   And the subject is ED Interview. Correct?
14    A   Correct.
15    Q   And this email was sent on June 3rd, 2020.
16 Correct?
17    A   Yes.
18    Q   Okay. And this says -- in this email, Lisa
19 Spencer says, team, we are adding one more interview
20 to this group, Chad High, current principal at
21 Granbery ES. I'm setting it for 8:15 in the morning.
22 I think it will work for everyone except possibly
23 Dr. Barnes. If he can't join, I will take his place.
24 Thanks for being willing.
25      Is that correct?

1    A   That's what it reads, yes.
2    Q   Okay. Do you know why Chad High was added as
3 an interviewee for the executive director position?
4    A   I don't remember.
5    Q   Do you recall having a conversation with
6 anyone about adding Chad High to the pool of
7 candidates?
8    A   I mean, I must have had one with Lisa because
9 she wouldn't have done this unless I asked her to,
10 but I can't recall anything beyond that or the reason
11 why.
12    Q   Okay. And Lisa says that it looks like this
13 may not work for you, for your schedule. Correct?
14    A   That's what it says, yes.
15    Q   Do you recall whether or not you attended Chad
16 High's interview?
17    A   I just don't know.
18    Q   Okay. Is it possible that you didn't?
19    A   I just don't remember missing any of them, but
20 I just can't give you that answer. And I don't even
21 know what was happening at 8:15 in the morning on
22 June 3rd, 2020, either, about what reason I would
23 have had for not attending.
24    Q   If Dr. Battle had asked Ms. Spencer to add
25 Chad High to the pool of candidates, would Lisa

1 Spencer have done so?
2    A   I will -- I will say clearly that any time
3 that -- she would have talked to me before she did
4 it.
5    Q   Who is she?
6    A   She is Lisa Spencer.
7    Q   Dr. -- okay.
8    A   Quite frankly, both of them, but Lisa for
9 sure.
10    Q   Okay. But the question was, if Dr. Battle had
11 asked Lisa to add Chad High to the group of
12 interviewees, would Lisa have done so? Not whether
13 she would have talked to you about it, but would she
14 have done so?
15    A   Yes, she would have done so.
16    Q   Okay. Do you recall what Lisa Spencer's
17 salary was for MNPS?
18    A   I'm sorry. Can you say again, please?
19    Q   Yeah. Do you recall what salary Lisa Spencer
20 earned when you worked for MNPS?
21    A   I'm going to have to give you a range because
22 of course I'm not going to remember an exact number.
23    Q   Okay.
24    A   I want to say around 130. Around 130.
25    Q   And do you recall if she got a raise during

1 your time working for MNPS?
2    A   One of the questions we had always asked was
3 why most other departments had an executive officer
4 and HR did not. I know that after I left, they did
5 move her to an executive officer position, which
6 carries with it a salary change.
7    Q   Okay. So what position did she have -- remind
8 me again --
9    A   Executive director.
10    Q   -- when you were there?
11      Okay. What's the difference between executive
12 director and executive officer?
13    A   In our org chart, Metro Nashville has a chief
14 executive officer, executive director, director,
15 assistant director, supervisor, I think is the range
16 that it goes. So her title and her job was shifted
17 from executive director to executive officer.
18    Q   Before that, there was no executive officer in
19 HR; is that what you're saying?
20    A   Before that, there was -- correct. There
21 were -- there was an executive director of benefits;
22 there was an executive director of HR; there was a
23 director of employee relations, a director of
24 workplace safety, and I think I may -- and director
25 of employee services, I think. So there was no

1  executive -- there was no executive officer. She was
2  the executive director of human resources.
3      Q    Was --
4          THE COURT REPORTER: May we go off the
5  record, please?
6          MS. HARBISON: Yes.
7          THE VIDEOGRAPHER: We're going off the
8  record. The time on the video monitor is 4:16.
9          (A recess was taken.)
10         THE VIDEOGRAPHER: All right. We are back on
11  the record. The time on the video monitor is 4:29.
12  BY MS. HARBISON:
13     Q    All right. Dr. Barnes, we're returning from a
14  brief break. Did you talk to anyone during that
15  break?
16     A    No.
17     Q    Okay. Dr. Barnes, I'm going to share my
18  screen with you. Let me know when you can see my
19  screen.
20     A    I can see it.
21     Q    Okay. Based on just the first page that
22  you're looking at now, have you seen this document
23  before? Do you need to see more of it?
24     A    I need to see more.
25     Q    Just whether you've seen it before.

1      A    I don't recall.
2      Q    Okay. I'm going to keep scrolling. So this
3  is labeled SchoolsEmails 69073 on the first page, and
4  it is addressed to Pippa Meriwether, correct?
5      A    Correct.
6      Q    Okay. And if you continue scrolling, this is
7  signed by you, correct?
8      A    That's my signature, yes.
9      Q    Okay. So why don't we do this. Why don't I
10  scroll back up to the first page, give you a chance
11  to read this, and then let me know when you're ready
12  for me to keep scrolling.
13     A    Okay. Okay. I'm done with number 1.
14     Q    Okay.
15     A    I'm done with number 2.
16          I'm done with number 3.
17          Okay. I'm done -- let me read the first part
18  of number 5, please.
19          Okay. I'm done with number 5.
20          Okay. I'm done with number 6 and 7.
21          Okay. I'm done with number 8 and number 9 --
22  sorry. Go back up a little bit. I missed the last
23  part of 9. I'm sorry.
24          Okay. I'm done with number 9. Okay.
25     Q    After you've had a chance to review this

1  document, does it help you remember what this
2  document is?
3      A    If you had walked up to me on the street and
4  asked me if I had responded to an email with a three-
5  or four-page letter, I would say I didn't remember.
6  Obviously, that is my signature, so I remember -- I
7  remember the circumstances now that I reread them.
8      Q    And what were the circumstances?
9      A    It looks like she had sent an email to our
10  director of employee relations with several concerns
11  about the process for interviewing for the executive
12  director and principal jobs she now holds.
13     Q    Did you write this letter?
14     A    In looking at the verbiage and then looking at
15  the language, I think I coordinated with our attorney
16  to write it. I don't believe that I drafted it
17  myself.
18     Q    Okay. I'm scrolling back up to what's been
19  marked SchoolsEmails 69073, and I'm specifically
20  looking under paragraph 1.
21     A    Okay.
22     Q    You -- this email with your signature says --
23     A    Right.
24     Q    -- you are correct that Dr. Battle, in her
25  capacity as director of schools, retains ultimate

1  hiring authority. I disagree with your
2  unsubstantiated contention that, quote, personality
3  preference trumps performance, end quote. The
4  selection processes for executive directors and
5  principals have been established to result in hiring
6  the most qualified candidate.
7          So the first sentence, you are correct that
8  Dr. Battle in her capacity as director of schools
9  retains ultimate hiring authority, end quote, is that
10  referring to what we were talking about earlier
11  wherein you said that Dr. Battle has authority to
12  make those hiring decisions?
13     A    Correct.
14     Q    Okay. And then you say -- or this letter with
15  your signature says -- the selection process for
16  executive directors and principals have been
17  established to result in hiring the most qualified
18  candidates.
19          What are those selection processes, if you
20  know?
21     A    Well, the principal process is a whole 'nother
22  process. Okay. It's a three-phase --
23     Q    Sure.
24     A    At that time, four-phase process. But the
25  selection process for executive directors resulted in

1 the first interview panel, a second interview with
2 Dr. Battle, and then her appointment. So --
3   Q   Dr. Battle's appointment?
4   A   Correct.
5   Q   Okay. And according to you, Dr. Battle made
6 those decisions?
7   A   The ultimate hiring authority for executive
8 directors, yes.
9   Q   Okay. And are you -- do you know what
10 criteria -- well, did Dr. Battle tell you what
11 criteria she used to make those decisions?
12   A   Not that I can recall substantively, no.
13   Q   Okay. So you're not sure how MNPS chose the
14 most-qualified candidate because that decision was
15 ultimately made by Dr. Battle, and you're not sure
16 what criteria she used, correct?
17   A   I can't speak to the criteria she used.
18   Q   Okay.
19   A   It -- there's when I was hospitalized, though.
20 I forgot the date. So that helped. Thanks.
21   Q   So you were hospitalized -- let's go back to
22 this, actually, because I stopped sharing my screen.
23   A   June 2nd through 5th is what it looks
24 like.
25   Q   June 2nd through 5th. So is it possible

1 that you were not present for Chad High's interview
2 because you were in the hospital at that time?
3   A   I thought his interview was June 8th, but it
4 is possible. I fell off the end of the world on --
5 at sometime on Monday.
6   Q   If his interview was on June 4th, would you
7 have been there?
8   A   If his interview took place on June 4th,
9 then no, I wasn't.
10   Q   Because you were hospitalized?
11   A   Correct. Well, correct.
12   Q   With a very serious illness?
13   A   I can testify to that.
14   Q   Well, I'm glad you're better now, it looks
15 like.
16       I think that that may be all, but I do have
17 one other question. Were you aware of any
18 allegations or investigation into grade falsification
19 at Stratford High School?
20   A   Can you -- if you're done with that, can you
21 minimize that? I'm having a hard time seeing you.
22 I'm sorry.
23   Q   Yes.
24   A   Thank you.
25       MS. HARBISON: And I'm going to make that the

1 next numbered exhibit. I think that's Exhibit 23?
2       THE COURT REPORTER: Yes, ma'am.
3       MS. HARBISON: And that is Bates-labeled
4 69073 through -76.
5   Q   Were you aware of an investigation into grade
6 falsification at Stratford High School?
7   A   Only very much later, because an incident
8 happened in the spring of this past year -- or the
9 spring of this year -- I'm sorry -- with that
10 principal, and when I went to do the investigation, I
11 found out about the privacy issue, but not before
12 that.
13   Q   And that principal, is that Dr. Steel?
14       THE COURT REPORTER: I'm sorry. I didn't
15 understand the question.
16   Q   And that principal that you're referring to,
17 is that Dr. Steel?
18   A   Correct.
19   Q   Okay. Were you aware that Dr. Cathey was
20 involved in the investigation of the grade
21 falsification at Stratford High School?
22   A   No.
23   Q   Were you aware that Dr. Steel reported to
24 Dr. Cathey during the grade-falsification incident?
25   A   No. No, I did not.

1   Q   Okay.
2   A   Because when I -- when I arrived, Dr. Cathey
3 was one of the associate superintendents for
4 elementary schools, and Stratford obviously is a high
5 school.
6   Q   Right. So this grade falsification occurred
7 prior to your arriving at MNPS, correct?
8   A   Yes. Correct.
9   Q   Okay. Did you ever discuss Dr. Steel's
10 grade -- or the allegations of grade falsification
11 against Dr. Steel with Dr. Battle?
12   A   About the grade falsification, no. I
13 discussed the issue that happened during my time with
14 her, and I'm sure that we referenced that a previous
15 issue had happened, but no.
16   Q   What was the outcome of the incident that
17 occurred while you were there with Dr. Steel?
18   A   I'm trying to remember the exact tone -- the
19 exact tenor of that. I know that we -- it resulted
20 in an action plan and a letter of reprimand. I think
21 those were the extent of it.
22   Q   Dr. Steel was not terminated, correct?
23   A   No.
24   Q   When you spoke with Dr. Battle regarding
25 Dr. Steel, who made the ultimate decision regarding

Page 234

1    whether -- or what the outcome of the investigation
2    into Dr. Steel was going to be?
3        A    Of the one that I did or the one previous?
4        Q    The one that you did.
5        A    The one that I did, I made my recommendation
6    to her.
7        Q    And did Dr. Battle accept that recommendation?
8        A    Yes.
9        Q    Okay.  The recommendation did not involve
10   termination?
11       A    No.  Sorry.
12       Q    Did anyone else have any input into that
13   recommendation that you made to Dr. Battle regarding
14   Dr. Steel?
15       A    Yes.  I talked to the attorney that works with
16   the HR department, and his name is Frank Young.
17       Q    Anyone that's not an attorney have any input
18   into that recommendation that you made?
19       A    Yeah.  I would have discussed it with Schunn
20   Turner, who's the current executive director for high
21   schools.
22       Q    Okay.  Did Dr. Turner concur with your
23   recommendation that you made to Dr. Battle?
24       A    I don't really remember.  I remember -- I
25   mean, these things are a discussion.  Right?  So I

Page 235

1    can't remember -- in the end, we agreed with what we
2    brought to Dr. Battle.  I don't remember the tenor
3    before that, though.
4        Q    Okay.  I have one other -- I have one other
5    item to show you, which is actually a video, so
6    hopefully it works.  I'm not sure the screen sharing
7    will work, but we will try.  Can you see this video
8    that I just shared with you?
9        A    I can see your screen, yes.
10       Q    Okay.  I'm not sure -- I'm actually going to
11   take my headphones out, because I think if I leave
12   them in, it may not work.
13       A    Huh.  7/20/20.  I don't remember ever seeing
14   this.
15       Q    I'll press Play, and we'll see if you can hear
16   it.  Okay?
17       A    Okay.
18       Q    If not, we'll figure something out.
19            (A video is played and stopped.)
20       Q    Can you hear that?
21       A    I can.  Not very well, but I can.
22            (A video is played and stopped.)
23       Q    Is that better?
24       A    That's much better.
25       Q    Okay.  I'm going to start from the beginning,

Page 236

1    and then I'm going to pause after we get back past
2    the first part.
3            (A video is played and stopped.)
4        Q    Dr. Barnes, is that you in that video?
5        A    Yes, of course that's me.
6        Q    It's not a deep fake?  I'm just joking.
7        A    No.  I just don't remember this at all, but
8    yes, that's me.  That's my office.  That's my office
9    behind me.
10       Q    Okay.  That -- you answered my next question,
11   which is, do you recall this meeting?
12       A    I don't.  It looks like I'm talking to the
13   executive director group from the people I can see on
14   there.
15       Q    Who are those people?
16       A    The people on the screen, that's Steve Ball in
17   the lower left, Elisa Morris in the bottom right.  I
18   don't know who that is in the top right.  And --
19       Q    It looks like this is from Microsoft
20   Streaming, correct?
21       A    Yeah, I guess.  I --
22       Q    Okay.  Is that a program that you used at
23   MNPS?
24       A    We used -- it must be a recording of a meeting
25   I had with the executive directors, it looks like.

Page 237

1        Q    Maybe via Teams?
2        A    Possibly, yes.  That's probable, yes.
3        Q    And the title is HR Considerations, Putting
4    the Right Pieces in Place?
5        A    Apparently.  Yes, that's what it says.
6        Q    And it says it was published on July 13th,
7    2020, correct?
8        A    Yeah.
9        Q    Okay.  I'm just going to fast-forward a little
10   bit.  I'm not going to make you sit through all the
11   43 minutes of this.
12            (A video is played and stopped.)
13       Q    Is that your voice before we continue?
14       A    Yes, that's my voice.
15       Q    Okay.  I'm going to press Play again, and this
16   is at eight minutes and 39 seconds of the video.
17            (A video is played and stopped.)
18       Q    And I just stopped this video at nine minutes
19   and 45 seconds.
20            Was that your voice making that statement,
21   Dr. Barnes?
22       A    Yes.
23            MS. HARBISON:  Okay.  I don't think I have
24   any other questions, but Ann might.
25            MR. FOX:  I've got just a few questions.

1           - - -
2                EXAMINATION
3           - - -
4  BY MR. FOX:
5      Q   Dr. Barnes, can you hear me?  This is Brook
6  Fox for Defendants.
7      A   Yes, I can see you and hear you.
8      Q   Several hours ago, Ms. Steiner was asking you
9  some questions about your hiring managers, how they
10 may look into whether or not an employee had engaged
11 in a protected activity.
12         Do you remember those -- that line of
13 questioning?
14     A   Yes, sir.
15     Q   And do you know whether or not an employee can
16 engage in a protected activity under federal law,
17 something protected, but nevertheless have an adverse
18 employment action come down against them, just so
19 long as the action wasn't done because of the
20 protected activity?
21     A   That is correct.  I don't see those things
22 have to be inextricably linked.
23     Q   And I believe I heard your testimony that what
24 you observed, you didn't see anything in these cases
25 that we're talking about here today that led you to

1  believe that any employment action was taken because
2  of any protected activity, whether it's under --
3  protected activity under Title VI or Title VII or
4  Title IX or any other protected -- or First
5  Amendment.  Right?
6      A   No.  And none of that was ever communicated in
7  that manner to me.
8      Q   And then also Ms. Steiner asked you a few
9  questions about the letters that went to Dr. Bailey
10 and then Jane Doe and then also to Leffler, Plaintiff
11 Leffler, to bailiff -- Bailey, Doe, and Leffler that
12 were Exhibits 9, 10, and 11.  And somewhere in that
13 line of questioning, you were asked about whether
14 those positions are still there.  You said positions
15 are still there, still people in them.
16         Do you recall that?
17     A   I believe so, yes.
18     Q   Do you know whether or not the positions -- if
19 they're still there -- whether that just means the
20 title is still there and the position has been
21 re-purposed with new duties and responsibilities, or
22 do you know one way or the other?
23     A   That is possible.  The only one that I can
24 speak definitively on is there is still a principal
25 at Whites Creek High School.  But the others, yes,

1  you are correct in what you said.
2         MR. FOX:  Yeah.  All right.  Okay.  That's
3  all the questions I've got.
4         THE COURT REPORTER:  Can't hear you.
5         MR. FOX:  Ann, you're muted.
6           - - -
7                EXAMINATION
8           - - -
9  BY MS. STEINER:
10     Q   Okay.  I've got just one follow-up:  If you
11 were to know that of the associate superintendents,
12 the four positions eliminated, three had engaged in
13 protected activity and the one who had not was a good
14 friend of Dr. Battle, and three had their positions
15 eliminated and were moved to lower positions and only
16 one that stayed the same or higher was Dr. Battle's
17 friend, would that cause you to be concerned that
18 there may be retaliation?
19         MR. FOX:  Objection to the form.
20     A   In all my interactions with Dr. Battle in the
21 year and a half, I never saw anything that would
22 indicate that was something she would engage in.
23     Q   If you knew, though, that three of the people
24 had engaged in protected activity and the only one
25 that ended up better off was her good friend, would

1  you be concerned about how the decisions were being
2  made?
3         MR. FOX:  Objection to the form.
4      A   I will have to defer to Dr. Battle on -- in
5  that regard.
6      Q   If you knew that of the executive director
7  positions of the 13 that existed when Ms. Leffler had
8  that job, nine of those directors were placed back
9  into the director positions, two retired, and
10 Plaintiff was fired from that position, and she was
11 the one who had the relative who had sued Metro for
12 violations of Title VII, would you be concerned about
13 retaliation?
14         MR. FOX:  Objection to the form.
15     A   And I don't know if the word "fired" is the
16 right word in that regard, but the same answer still
17 exists:  that I would defer that to Dr. Battle.
18     Q   Okay.  Now, if you knew, on top of that, on
19 top of what happened at the associate superintendent
20 level, on top of what happened at the executive
21 director level, if you knew that, of the other
22 positions eliminated, the other five, I believe, that
23 were eliminated, three had engaged in protected
24 activity, would you not agree that that's a high
25 percentage of protected-activity employees who were

1  affected by this?

2      MR. FOX:  Objection to the form.

3      A   I think -- again, the answer remains the same:

4  That with Dr. Battle's authority as the director of

5  schools, she had the authority to make those

6  decisions.

7      Q   Now, do the discrimination and retaliation

8  laws apply to a director of schools?

9      A   I would assume they apply to everyone.

10      MS. STEINER:  That's all.  Thank you.

11      MS. HARBISON:  I think I just want to make

12  sure -- did we leave off with Exhibit 22?

13      THE COURT REPORTER:  Exhibit 23.

14      MS. HARBISON:  And was that 13303?

15      THE COURT REPORTER:  I'm sorry.  I don't know

16  what that is.

17      MS. HARBISON:  Okay.  Did you write down what

18  it was?

19      THE COURT REPORTER:  SchoolEmail

20  69073 through -76.

21      MS. HARBISON:  Okay.  So Exhibit 24 should be

22  13303.  Hold on.  I'm going to share my screen one

23  more time just so that we're all on the same page.

24      THE COURT REPORTER:  I think there might be

25  something going on with the audio and an echo.

1      MS. HARBISON:  Ann, can you mute?

2      THE WITNESS:  I'm going to turn my screen

3  around to let her see this.

4      MS. HARBISON:  So this document, the

5  June 3rd email from Lisa Spencer to Chris Barnes

6  marked 13303, I'll make Exhibit 24.

7      And then the video, I'll make Exhibit 25.

8  I think that's all I've got.

9      THE VIDEOGRAPHER:  Anyone else?

10      THE COURT REPORTER:  Counsel, if you need a

11  copy of the transcript and the video, can you just

12  indicate what type of format or delivery for the

13  record, please?

14      THE WITNESS:  Ms. Steiner, you're muted.

15      MS. STEINER:  May I let you know tomorrow?

16  Would that be okay?

17      THE COURT REPORTER:  Yes, ma'am.

18      MS. STEINER:  Okay.  That's what we'll do.

19  And Brook, can you contact me in just a second?  I

20  want to talk to you about something.  Is that okay?

21      MR. FOX:  Okay.  Also, while we're still on

22  the record, let's ask Dr. Barnes -- Dr. Barnes,

23  often the witness may want to review the transcript

24  and then sign -- sign it, just to take care of any

25  changes in substance or form.  You don't have to.

1  You can waive signature, but I just want to give

2  you that opportunity.

3      THE WITNESS:  All right.  Sir, I'll defer to

4  you on that.  If that would be what you'd

5  recommend, that's fine.

6      MR. FOX:  That's what I usually recommend for

7  all of our Metro employees is to have a chance to

8  review and sign.

9      THE WITNESS:  Okay.

10      THE COURT REPORTER:  I will do that.  Thank

11  you.

12      May we go off the record?

13      MR. FOX:  And then I would like just

14  etranscripts.  I don't need hard copies so long as

15  the exhibits are all electronic somehow, PDF or

16  whatnot.  You know, obviously, the audio/video,

17  we'll have to figure out another way to exhibit

18  that, but all of the other documents, typically

19  just PDF will be fine.

20      THE COURT REPORTER:  Thank you.

21      MR. FOX:  Thank you.

22      MS. STEINER:  Brook, what's your cell number?

23      MR. FOX:  [Redacted] --

24      THE WITNESS:  Please stop.

25      THE VIDEOGRAPHER:  Stop.  Stop.  I'm

1  recording that.  I don't --

2      THE COURT REPORTER:  Please stop talking, and

3  we'll have the videographer make his statement.

4      THE VIDEOGRAPHER:  Does anyone else have any

5  orders?  No.

6      Okay.  We're going off the record.  This is

7  the conclusion of the deposition of Dr. Chris

8  Barnes.  The time on the video monitor is

9  5 o'clock.

10              - - -

11          (Witness excused.)

12              - - -

13      (Deposition was concluded at 5:00 p.m.)

14              - - -

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE OF REPORTER

1
2
3          I, Cherie J. Anderson, Registered Merit
Reporter, Registered Professional Reporter, Certified
4  Realtime Reporter, and Notary Public for the State of
North Carolina at Large, do hereby certify:
5          That the foregoing deposition was taken
before me on the date and at the time and location
6  stated on page 1 of this transcript; that the deponent
was duly sworn to testify to the truth, the whole
7  truth, and nothing but the truth; that the testimony
of the deponent and all objections made at the time of
8  the examination were recorded stenographically by me
and were thereafter transcribed; that the foregoing
9  deposition as typed is a true, accurate, and complete
record of the testimony of the deponent and of all
10  objections made at the time of the examination to the
best of my ability.
11          I further certify that I am neither related
to nor counsel for any party to the cause pending or
12  interested in the events thereof.
         Witness my hand, I have hereunto affixed my
13  official seal on this 9th day of December 2021, at
Charlotte, Mecklenburg County, North Carolina.
14
15
16
17
18
19
20
21
22                    _____
                     Cherie J. Anderson, RMR, CRR
23                    My Commission expires
                     November 20th, 2024
24
25

SIGNATURE OF DEPONENT

1
2
3          I, the undersigned, CHRISTOPHER BARNES,
4  Ph.D., do hereby certify that I have read the
5  foregoing deposition and find it to be a true and
6  accurate transcription of my testimony, with the
7  following corrections, if any:
8  PAGE   LINE        CHANGE
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____   _____
24      CHRISTOPHER BARNES, Ph.D.       DATE
25

## Exhibits

**12-9 Barnes Exhibit 1** 4:10 18:7

**12-9 Barnes Exhibit 2** 4:11 34:8

**12-9 Barnes Exhibit 3** 4:12 37:13

**12-9 Barnes Exhibit 4** 4:13 44:15 169:7

**12-9 Barnes Exhibit 5** 4:14 61:16, 17 143:3 161:18 165:10

**12-9 Barnes Exhibit 7** 4:17

**12-9 Barnes Exhibit 9** 4:19 154:5

**12-9 Barnes Exhibit 10** 4:20 154:24

**12-9 Barnes Exhibit 12** 4:22

**12-9 Barnes Exhibit 13** 4:23 180:7

**12-9 Barnes Exhibit 14** 4:24 181:23

**12-9 Barnes Exhibit 15** 4:25 186:21

**12-9 Barnes Exhibit 16** 5:3 188:5

**12-9 Barnes Exhibit 17** 5:4 202:16, 20,21 209:24

**12-9 Barnes Exhibit 18** 5:5 203:15

**12-9 Barnes Exhibit 19** 5:6 210:2

**12-9 Barnes Exhibit 20** 5:7 214:8

**12-9 Barnes Exhibit 21** 5:8 218:12

**12-9 Barnes Exhibit 22** 5:9 221:24 242:12

**12-9 Barnes Exhibit 23** 5:10 232:1 242:13

**12-9 Barnes Exhibit 24** 5:11 242:21 243:6

## $

**$1** 48:18 53:19 54:14,18,25 55:3,13,18 56:5

**$165,000** 57:23

**$165,592** 57:24

**$20** 160:23 165:4

**$50,000** 49:25

**$733,000** 58:3

**$914,475,600** 161:25

## -

**-182** 145:4

**-66** 218:10

**-76** 232:4 242:20

## 1

**1** 18:7 48:21 49:16 56:9 58:5,7 60:3 81:5,6 143:12 148:21 172:14 227:13 228:20

**1,000** 147:12 148:22

**10** 36:19 147:17 154:24 239:12

**100** 65:5,7 140:5

**100,000** 139:1,4

**100,000-dollar** 139:3

**100-and-some-odd-** 138:7

**108** 10:11

**10:00** 197:22

**10:05** 36:8

**10:10** 36:11

**10:25** 46:13

**10:30** 46:8

**11** 158:1 172:12,14 239:12

**11-** 19:23

**11111** 191:5 203:14

**1123** 6:18

**11:01** 46:16

**11:13** 54:9

**11:14** 54:12

**11:35** 70:8

**11:36** 70:11

**12** 169:24

**12,000** 19:23

**12:15** 207:14

**12:24** 102:3

**12:36** 102:6

**12:45** 207:21

**13** 75:17 180:7 241:7

**130** 224:24

**13262** 180:19 181:23

**13286** 221:23

**13287** 221:23

**13303** 242:14,22 243:6

**13th** 237:6

**14** 143:4 181:23

**1478** 186:21

**1479** 188:6

**15** 186:21

**15th** 31:7 34:7 174:8

**16** 188:5

**16th** 176:11

**17** 160:17 165:1,2,4 166:2,17 202:16, 20,21 209:24

**17th** 172:5 181:16 191:15

**18** 65:12 203:15

**18th** 212:2

**19** 65:12 162:10,15,16,21,22 165:13, 17,19 166:5 210:2

**19,000** 162:20

**19-'20** 162:17

**1970** 8:14

**1992** 17:11

**19th** 213:11 214:5

**1:38** 146:4

**1st** 153:10 173:23 218:22

## 2

**2** 34:8 57:10 60:12 88:5 227:15

**20** 9:4,17 53:22 65:12 86:21 99:22 146:1 160:17 165:1,3 166:3,17 214:8

**20-'21** 162:16

**20-minute** 99:21

**2016** 15:19 16:5,7 18:3 31:7 34:7

**2016-2017** 31:15

**2019** 15:19 16:6,8

**2019-2020** 161:22

**2020** 10:3 42:11 85:25 86:9 87:6 116:8,19 145:2 152:18,22 153:10,13 154:8,12,15 155:5 156:8,15 160:12 172:5 173:23 176:11 181:16 183:6,10, 18,21 189:7 194:15 204:3,17 205:17, 24 206:9,20 207:5,14,21 208:7,14,23 209:6 210:7 211:5 213:11 214:5,24 216:2 218:22 220:16 222:15 223:22 237:7

**2020-'21** 58:10 61:16

**2020-2021** 162:13

**2021** 6:21 10:1 191:15

**20th** 196:5,6,20 197:12,22 198:7,15 199:5 210:6 216:17

**21** 218:12

**21st** 8:14 199:18 204:3,4,6,7,17,24 214:24 216:2

**22** 221:24 242:12

**22nd** 85:25 86:12 205:7,17,23 206:8

**23** 232:1 242:13

**23rd** 86:9,19 87:6 88:15

**24** 242:21 243:6

**24th** 156:14

**25** 100:7 243:7

**26** 145:2 206:20 207:5,14,21

**27th** 208:7,14,23

**29566** 10:12

**29th** 154:12 209:6 217:16

**2:09** 146:7

**2:31** 159:14

**2:32** 159:17

**2nd** 230:23,25

---

### 3

**3** 37:13 87:22 88:1 227:16

**30** 86:22 100:7 152:7

**30,000** 138:7

**30th** 153:13 154:15 156:8,12

**360** 177:22

**39** 237:16

**3:00** 171:3 198:8 204:7,17 208:7

**3:06** 171:6

**3:20-CV-01023** 6:6

**3:21-CV-00038** 6:13

**3:21-CV-0122** 6:9

**3:30** 204:17,24 205:24 208:14

**3:45** 203:3,6

**3rd** 222:15 223:22 243:5

---

### 4

**4** 38:21 44:15 140:13 147:10 169:7

**42,000** 140:11,15

**43** 237:11

**45** 100:4,5,7,8 237:19

**459** 196:1 202:17

**460** 196:23

**468** 202:17

**470** 204:1 210:3

**484** 210:3

**49-2-301(b)(e)** 31:14

**49-5-501** 36:15

**49-5-511** 35:18 38:2 44:14

**4:00** 206:9

**4:15** 208:23

**4:16** 226:8

**4:29** 226:11

**4:30** 198:15

**4th** 10:1 152:18,22 154:8 155:5 194:15 195:22 231:6,8

---

### 5

**5** 48:19,20 49:8,16 61:17 81:5,6 97:22 143:3 161:18 165:10 169:9 227:18,19 245:9

**5/22** 85:25

**592** 57:23

**5:00** 199:5 245:13

**5th** 230:23,25

---

### 6

**6** 90:19 179:2,3,7 227:20

**6-** 20:2

**60** 147:17

**600** 20:5

**63** 26:6,8,9

**6410** 10:17

**65** 147:21

**66** 147:21

**68165** 214:17 218:10

**68166** 214:17

**69073** 227:3 228:19 232:4 242:20

**69116** 171:21 180:9,11

**69124** 171:23 180:11

**69436** 210:16 214:8

**69437** 210:17 214:9

---

### 7

**7** 227:20

**7/20/20** 235:13

**79** 147:17

**7:43** 191:15

**7:48** 85:11

**7s** 97:22

**7th** 10:3

---

### 8

**8** 149:8 227:21

**800** 20:2

**85** 44:22

**8:00** 196:6,20 199:18 205:8 206:21

**8:15** 194:15 195:23 222:21 223:21

**8:30** 85:12 196:7 197:12 200:9,11 205:17 207:5 209:7

**8:39** 214:25

**8th** 231:3

---

**9**

**9** 154:5 227:21,23,24 239:12

**90** 44:23

**933** 162:8

**95** 72:5

**9:00** 200:9,11

**9:25** 6:2

**9:30** 46:8

**9th** 6:21

---

**A**

**a.m.** 6:2 195:23 196:6,20 197:22 199:18 205:8,17 206:21 207:5 209:7 214:25

**abbreviated** 21:23

**ability** 40:9 49:8 121:23

**absent** 148:17

**Absolutely** 125:1

**academic** 80:13

**accept** 234:7

**accepted** 24:7 48:15 82:13 84:17 103:17

**access** 22:5,7,8 43:11 106:18 111:24 178:8,13 181:9

**accident** 12:19

**account** 139:14,15 163:4

**accountability** 88:6

**accrued** 156:14

**accurate** 18:4 25:20 33:10 149:5 155:21,22

**accurately** 220:22

**Act** 128:17

**acting** 109:11

**action** 28:24 29:10 46:17 73:16 146:7 163:22 233:20 238:18,19 239:1

**activities** 76:1 113:3

**activity** 110:2,13,21 111:11,19 112:5, 23 113:14 117:8 118:21 238:11,16,20 239:2,3 240:13,24 241:24

**acts** 109:17

**actual** 57:16 89:1 101:12 125:19 148:1 165:11,19

**add** 58:6 63:3 97:15 223:24 224:11

**added** 57:12 60:17 63:4 223:2

**adding** 52:16,23 222:19 223:6

**addition** 45:20,22

**additional** 44:21 53:15,16 54:14 90:10 141:3 150:6 162:20,22 165:12, 16 175:14

**address** 13:11 79:16 212:23 213:9 214:21

**addressed** 63:12 227:4

**addressing** 28:17 115:7

**adds** 60:15

**adjustments** 15:1 16:3

**administration** 17:13

**administrative** 27:19 133:7

**administrator** 18:16

**administrator's** 18:18

**administrators** 133:20 134:5

**adopt** 90:7

**adopted** 57:6 161:19 165:11

**Adrienne** 43:18

**advance** 216:10

**adverse** 238:17

**advice** 25:18 40:17 63:24 64:7,11,12

**advising** 63:18

**affect** 96:12

**affected** 242:1

**affiliation** 7:5

**affirm** 7:15

**afternoon** 167:6

**age** 15:15 109:6

**agency** 108:11

**agenda** 144:25 145:18

**aggregate** 95:3

**agree** 7:2 77:9 83:21 93:11,15,25 94:5,14 95:8 113:25 114:11 117:24 118:1 131:2 137:22 162:24 163:12,15 165:9,16 187:13 241:24

**agreed** 235:1

**agreement** 12:16

**ahead** 10:24 28:25 52:3 122:8 167:15 186:14 188:24 190:10

**air** 213:13

**airport** 120:14 123:6,8

**allegation** 114:21

**allegations** 231:18 233:10

**allotment** 14:2

**allotments** 13:22

**allowed** 12:16 29:21 119:17

**Amendment** 115:5,10 131:5,10 132:1,12,21,25 239:5

**amount** 14:2 63:5 113:10 116:21 147:20 148:2

**analysis** 37:8,17 40:12 129:11

**Anderson** 6:24

**angel** 191:4

**ankle** 12:19

**Ann** 7:7 21:14 35:22 237:24 240:5 243:1

**annotated** 31:13 35:11 36:15

**annual** 75:5

**anonymous** 81:7 86:4,14

**answers** 82:19,20

**anyplace** 44:19

**apologize** 68:6 81:18 209:20

**Appalachian** 17:21

**Apparently** 214:4 237:5

**appeal** 133:7,12

**appearance** 7:5

**appears** 90:16 168:22 172:12,16 191:14 194:6 196:8 208:9 214:24 215:4,21 218:21

**applicant** 96:12 104:2 105:5

**applicants** 81:3 94:2 103:7,20 104:19 174:10 175:18

**application** 103:7

**applications** 23:12

**applied** 103:5 151:3 152:1,6 175:24 210:24 211:4

**applies** 157:13

**apply** 92:17,19,24 135:4 136:3 156:5, 18 157:11,22 166:10 184:1 242:8,9

**applying** 23:24 24:1 150:15 157:17 211:1

**appointed** 93:3

**appointment** 153:12 200:8 230:2,3

**appropriately** 13:23

**approval** 16:8

**approvals** 40:22

**approve** 79:13 142:15

**approved** 40:3 137:5 138:16,17 142:3,5 143:9

**approving** 16:13 24:21

**approximately** 6:2 20:2 54:17 55:17 58:5 105:1 171:19

**April** 8:14

**April/may/june/july/august** 148:3

**arbitrary** 109:3

**architect** 152:3

**area** 51:21 125:14,23 133:3

**areas** 27:16 38:12 45:15 107:5

**arguably** 164:19

**argument** 192:25

**arise** 108:18

**arisen** 15:18

**arising** 35:13

**arose** 16:5

**arrival** 15:20

**arrived** 15:25 31:22 35:5 41:17 42:7 45:20 47:6 115:20 116:6,8 128:25 233:2

**arriving** 233:7

**arts** 17:8

**Ashford** 151:2,19

**asserted** 128:19

**assess** 88:9

**assign** 26:2

**assigned** 162:4

**assist** 179:20 180:3

**assistant** 11:13 27:20 148:16 225:15

**assisted** 27:14

**associate** 41:18 42:13,20 43:7 46:21 52:7,12 56:12,20 58:2 60:14 61:4 130:23 142:3,10 144:10 233:3 240:11 241:19

**associates** 22:12

**associational** 128:16

**assume** 32:14,17 58:19 73:13 74:21 92:20 99:4 107:15 112:6 117:22 137:7 144:19 172:10 178:4 183:16 191:6,7 242:9

**assumed** 23:15 61:21 122:22 145:8

**assuming** 57:16 87:15 89:24 162:19, 21 211:16

**assumption** 85:8

**attendance** 55:9,15

**attended** 209:15 223:15

**attendee** 197:18 198:3,17 199:7,14 201:11,17 204:9,20 205:5,14 206:17 207:2,11,23 208:4,16,25 209:9

**attendees** 194:16 195:5 196:9

**attending** 201:21 202:1 209:13,19 223:23

**attention** 25:3 28:25 29:12 41:2

**attitude** 94:22 95:14

**attorney** 43:17 63:13,18 228:15 234:15,17

**attorney's** 35:21

**audio** 7:1 160:4 242:25

**audio/video** 244:16

**August** 148:8 189:7

**authentic** 212:15

**authority** 79:5,6,16 89:10 229:1,9,11 230:7 242:4,5

**automatic** 146:20 147:6

**average** 87:20 95:2 97:15,24 104:11, 14,22 105:12

**averaged** 97:16 98:5

**awarded** 16:7

**awards** 73:19

**aware** 49:12 79:12 91:6 120:23 123:19 128:4 134:2,4 137:17 152:5 231:17 232:5,19,23

**B**

**bachelor's** 17:8 150:6

**back** 12:5,14,22 22:19 29:20 46:15 51:3 54:11 70:10 81:11 82:24 84:12 91:8 93:7 94:4,15 95:7,25 96:16 97:2 98:10 100:12 102:6 106:2 123:8,9 134:23 139:19 155:3 159:16 161:17 167:19 169:5 170:17,25 171:5,9 173:18 174:9 175:10,20 176:17 187:17 190:19 193:24 194:1 202:3 203:5 219:15,17,22 220:1,4,6,25 226:10 227:10,22 228:18 230:21 236:1 241:8

**background** 182:5

**backwards** 29:20

**Bailey** 6:10 7:9 21:3,11,16,17,20,24 37:1 68:25 69:5,7 73:11,15,18 115:2, 10 118:24 119:6 123:13 130:7,20,24 131:2,11 132:3,18 135:15 152:23 153:3,9,14,18,19,20,25 158:4 164:8, 12 239:9,11

**Bailey's** 69:13,18 70:15 71:10 119:7

**bailiff** 239:11

**balanced** 65:15,16 143:14 144:4,17

**ball** 204:3 217:9 236:16

**ballpark** 19:21 150:5

**balls** 213:12

**Balls'** 92:2

**Barbara** 205:12,13

**Barnacle** 10:11

**Barnes** 6:3 8:1,10,13 11:1 18:11
21:20 34:14,19 36:2,13 37:9,18 46:20
50:8 54:13 70:15 81:19 103:2 112:15
143:7 146:9 149:12,13 152:14 159:2,
18,24 160:6 166:18 167:5 168:1
170:2,5 171:10,16 180:15 182:24
186:24 195:6 203:9,20 210:10,11
214:13 218:17,25 222:1,23 226:13,17
236:4 237:21 238:5 243:5,22 245:8

**Barnes'** 18:10

**base** 31:21

**based** 15:13 16:16 30:7 39:7,22 86:22
162:24 165:17 166:15 177:25 196:19
206:7 226:21

**basically** 157:2 163:7

**basis** 23:23 75:5 126:25

**basketball** 119:1,8 123:18

**Bates** 186:21 188:5 194:10 214:8

**Bates-labeled** 180:19 183:2 202:17
214:16 232:3

**Bates-stamped** 144:3 145:3,20
171:20 180:9 181:23 186:25 191:4
195:25 196:22 203:25 210:15

**Batey** 27:12

**Battle** 19:13 32:11 39:16 40:9 42:2
43:18 46:22 47:8 50:9 52:6 56:3 58:11
60:7 61:7 62:10 63:1 68:8 71:7 74:19
79:15 89:13 90:7,12 97:11,17 98:18,
21,25 99:16,19 101:9 117:1 118:8
119:8 121:18 122:14,19,20 123:16,23
124:9,24 125:18 129:12,16,22 130:10,
18 131:3,12 132:5 152:23 153:17
154:9 161:5 190:17,23 219:16,23,25
220:3,15 221:15,17 223:24 224:10
228:24 229:8,11 230:2,5,10,15
233:11,24 234:7,13,23 235:2 240:14,
20 241:4,17

**Battle's** 55:21 118:25 131:25 153:17
230:3 240:16 242:4

**bcc'ed** 211:13

**Beach** 10:17

**beat** 123:23

**beating** 123:18 131:13 132:6

**began** 210:6 211:12 217:22

**begin** 42:6 43:15 56:4

**beginning** 12:4 15:25 67:1 195:23

200:3,5 203:25 210:16 235:25

**begins** 214:20

**behalf** 21:11

**behavior** 26:22 27:2 33:5 72:12

**belief** 175:6

**Belmont** 115:17

**benefit** 52:9

**benefits** 26:12 52:13 56:7 60:24 62:2
63:6 137:10 139:5 141:10 225:21

**BEP** 13:16,22

**biased** 93:16 94:9,14,18 95:9

**big** 97:22 100:15

**bigger** 143:17,20,21

**bin** 106:3,8,9,11

**birth** 8:13

**bit** 10:4 84:21 134:20 170:19 227:22
237:10

**blanking** 80:8,16

**blind-copied** 211:19

**block** 168:16

**board** 16:2,13 32:8,13 36:23 37:24
39:7,11,12,25 40:4,17,23 43:17 57:6
79:13 109:18 119:16,20 120:7,9,12,17
121:16 123:21 124:13,14,16 125:5,7,
8,10,13,15,21,22 126:8,10,19,22
127:2,7,13,18,19 133:12 138:16
141:16,19,25 142:3,12,14,15,23 143:9
145:1,9,12,18 154:18 155:23 165:12,
15 190:3

**bolts** 149:18

**bottom** 59:22 85:25 90:19 112:4
144:3 162:2 171:20 180:19 184:4
186:13 210:13 236:17

**brain** 29:19 89:23 185:3

**break** 46:2,7 145:25 167:12,16,18,19,
23 170:22 171:11 226:14,15

**Brenda** 11:1 205:3

**briefly** 17:1 87:24

**bring** 41:1 82:14 111:13 155:3 219:25

**broad** 19:25 108:20 109:8 132:16

**broadly** 78:4

**Brook** 7:12 8:17 9:8 45:24 64:2
131:16 238:5 243:19 244:22

**brother** 119:1,8,17,24 124:21,25

**brother's** 126:11

**brought** 12:13 25:3 28:24 29:12
47:14 52:8 53:3 87:20 97:18 118:2
125:2 220:5 235:2

**buckets** 26:24

**budget** 44:3,4,23 45:1 53:9,13 55:20,
24 56:23,24,25 57:5,16 58:10 59:6,13
61:16 65:14,16 66:15 78:2,7 107:2
111:1 127:13,16 138:10,12,13,16
139:3 142:5,7,11 143:8,13 144:4,17,
18 147:5 153:11,15,21 154:1,13,19
155:8 158:5,7,15 161:18,22 162:8,13
163:1 165:4,11,13,20 166:12,16 192:1
203:13

**budgetary** 30:9 78:12,17

**budgeted** 138:14

**budgets** 44:6 141:12,19 163:2 166:13

**build** 181:13

**building** 78:19

**built** 37:24 60:21 81:6 176:20 177:8
193:8

**Burlington** 17:3

**busy** 192:24

**buying** 141:4

**bypass** 173:17

**C**

**cabinet** 100:22 190:16

**calculator** 60:23

**calendar** 92:11,12 193:25 194:7,20
196:19 197:3,15,18,25 198:4,11,14,
20,23 199:8,11,21 200:13 201:2,8
202:4,9 203:20 204:2,14 205:2,11,19
206:1,4,8,11,21,23 207:4,7,13,16,20
208:6,13,18,22 209:2,7,23 210:5
220:25 221:3,6,19

**call** 9:8 22:18 24:24 92:24 99:1,5,11
117:10 124:9 126:10,15 151:12 217:5,
13,15

**called** 9:7 17:22 22:20 41:19 50:16
61:19 86:18 120:15 124:15 128:15

141:23 145:7 146:14 177:11,13,17,23
179:6,25 180:5 194:24

**calling** 104:2

**calls** 9:21 37:7,16 40:11 99:6 124:16
129:10 136:16 161:13

**camera** 35:21

**candidate** 82:5,24 83:9 95:25 183:6,
10,18,20 184:12 212:8 229:6 230:14

**candidates** 76:3 82:12 93:12 217:17
219:15 223:7,25 229:18

**candidates'** 98:5

**capable** 76:18

**capacity** 64:5 228:25 229:8

**capricious** 109:3

**caption** 21:21

**capture** 181:10

**car** 12:18

**card** 98:6,9,11,17,24 99:1 101:22,25

**cards** 97:22

**care** 12:5,17 243:24

**Carl** 196:10,15,19

**Carolina** 6:19 10:12,16,17 12:25
13:10 17:18 18:2,12,14,19,24,25
19:10 22:19 29:20 133:22,23 136:16

**Carrie** 52:21

**carries** 225:6

**Carter** 196:20

**Carter's** 196:11,16

**case** 6:5,6,7,8,9,12 21:16 25:5 33:5
77:1 95:16 100:6 103:11 134:3 135:12
144:19 167:10 192:21

**cases** 6:13 238:24

**cash** 147:20

**catch** 46:11

**catchment** 27:16

**categories** 172:12

**category** 117:18 121:18

**Cathey** 6:11 7:11 21:17,24 22:22 37:1
41:15 77:7 84:1 89:18,20,24 166:1
167:10 170:7,12 172:4,11,23 173:18,
21 175:11,12 179:12 200:14 232:19,

24 233:2

**Cathey's** 177:3 179:21 180:21 200:2
201:3

**caused** 12:19 105:15,19

**caution** 147:25 148:1,23

**caveat** 34:13 37:16 134:21

**caveats** 163:16

**cc'ed** 173:22 175:11 213:4

**Celia** 207:17

**cell** 177:17 244:22

**cells** 86:6

**central** 19:24,25 22:11 25:2 42:5
44:3,7 47:17,19 52:16 54:16 59:4,6,22
61:13 138:2 139:1 141:23 143:15
144:5,12 145:7,20

**cerebrally** 116:24

**certificated** 20:8,9,11,17,19,21 21:2,
4,6 22:2,22 34:22 36:22 37:3

**certified** 108:9,13

**Chad** 91:11,18,21,23 92:8,15 93:2
96:25 97:6 104:16 105:2,11,19 178:16
194:18 195:18,21 196:11 222:20
223:2,6,15,25 224:11 231:1

**Chae** 206:14,15

**Chaerea** 206:13

**chain** 174:6 211:12 214:17

**chance** 124:24 158:18 184:23 191:11
227:10,25 244:7

**change** 30:9 31:23 76:4 101:22,24
106:25 107:5 111:1 121:23 162:9
225:6

**changed** 74:9 75:24 100:22 138:22

**characteristics** 150:4

**charge** 38:17,22 130:8 172:9 189:11

**charged** 39:12 40:2 123:24

**charges** 38:16,25

**chart** 90:14 91:15,19 188:10,11,21
189:1,5,8,14,22 190:1,2,11,12 225:13

**charter** 59:8 60:18

**charts** 188:16 189:12

**chase** 41:13

**check** 24:3 109:25 110:20 111:7,9,25
113:2,13 134:18 156:21

**checked** 111:4 135:23 174:10

**checking** 9:21 111:18 113:1

**Cherie** 6:24

**chicken** 102:10,15 103:3

**chief** 9:7 10:9 11:22 15:22 19:3 22:4
33:23 37:19 39:15 42:16,24 69:17,25
70:2,17 107:21 129:24 139:7 189:24,
25 225:13

**chiefs** 189:23

**child** 28:7

**childhood** 152:3

**children** 13:1

**choice** 67:20 68:15,22 142:24 154:14,
17

**choose** 33:4

**chose** 114:20 169:21 230:13

**chosen** 105:5 111:3

**Chris** 6:3 31:9 32:11 243:5 245:7

**Christopher** 8:1,10 194:17 195:6

**christopher.barnes@mnps.org**
212:24 213:8

**christopher.barnes@mnps.org.**
215:22

**chronological** 210:15

**chunk** 58:7

**circumstance** 41:4 110:24

**circumstances** 228:7,8

**city** 16:2,13 160:21

**claim** 15:6,14 16:5 115:1 128:19

**claims** 27:4 132:22

**classics** 17:9

**classroom** 137:3

**clause** 107:24

**Clay** 43:18 46:23 47:7 50:9 52:6 56:3
58:13 60:7 62:10 63:1 68:9 74:20
150:21 151:6,8,17 161:5 212:2 213:2

**clear** 21:15 40:7 61:2 134:15 178:25
179:10 188:25 202:13 209:16 214:15

**clearer** 149:3

**clerk** 58:25

**clerks** 58:20

**click** 143:18

**client** 20:18 67:15

**clients** 63:18 146:14 165:18

**clip** 203:19

**close** 10:18 129:4

**closed** 85:12

**closely** 68:18 113:7

**closer** 31:3 35:20 36:3 155:4 219:7

**Cloud-based** 178:3

**clumps** 126:24

**coach** 58:25 119:1,8 121:18 122:14,
19 123:16,22 130:10 131:3,12,24
132:5

**coaches** 58:22

**code** 31:13 35:11,16 36:14 38:2 147:5

**colitis** 174:23

**collaborated** 219:25 220:3

**collaboratively** 25:8

**collection** 97:3 186:3 203:24

**collective** 194:7

**college** 13:1 17:3,5,6

**columns** 84:22

**comfortably** 42:10

**comment** 53:8,11 65:4 93:15 94:1,19
95:6,24

**comments** 43:14,25 93:5

**common** 11:4 48:14 126:9

**communicate** 40:23 112:1 168:11

**communicated** 177:18 212:6 239:6

**communication** 40:14 41:11 132:20

**communications** 172:8

**commute** 10:19

**Compass** 135:12,14

**compensation** 52:10

**complained** 116:17 118:12 128:8

**complaint** 27:24 115:10,22 117:12,
25 118:15

**complaints** 15:18 117:6,20 118:10

**completed** 55:17

**completely** 24:2 93:24 101:4

**completion** 84:24

**complex** 33:3 135:5

**complexities** 136:18

**complexity** 103:12

**computer** 83:13,20,21 86:12,13,18
97:2 101:25 159:9 170:4 176:8 177:24
181:7 201:23

**concern** 12:13 63:12 132:22 148:5
160:20

**concerned** 124:21 137:25 240:17
241:1,12

**concerns** 228:10

**concluded** 104:12 245:13

**conclusion** 245:7

**concur** 234:22

**concurrently** 213:3

**conduct** 38:7 115:7

**conducted** 51:10 75:11 79:24 84:14
104:14

**conducting** 221:17

**conduit** 111:20

**confidential** 103:10 178:11

**confirmed** 37:2

**confirms** 153:10 154:12

**confusing** 135:6

**Conley** 207:18

**connect** 216:7 217:10

**connected** 122:22

**connecting** 216:10,13

**connection** 116:21 118:16,17 120:24
122:18

**Considerations** 237:3

**considered** 20:16 37:6 52:5 59:9
99:20

**constitutes** 31:12 117:8

**contact** 9:8 25:7 92:17,18 103:20
120:8 121:12,22 124:4,6,25 125:5,9,
13 177:14 216:8,9 243:19

**contacted** 46:25 71:9,11 119:15,23
120:11,13 121:1 123:21 179:24 180:1,
2

**contacting** 122:14

**content** 64:9 193:6

**contention** 229:2

**context** 45:21 63:3 76:20 94:11,20
130:4 164:14 175:9

**Contextually** 131:8

**continue** 12:17 36:11 113:2 227:6
237:13

**continues** 78:16

**contract** 11:20,21 29:12,17,22 30:12,
14,20 31:18 48:8 72:4,6 78:9 110:22
148:19

**contracted** 45:2,6 48:1,2,19,21,25
49:1,9,17 139:19

**contractor** 139:21

**contracts** 32:22 34:23 45:9,10

**contribute** 62:22 63:9

**contribution** 61:25

**convenience** 82:15

**conversation** 33:21 44:2,20 50:15
51:22 52:1,17 61:22 62:22 64:10
68:11 69:15 71:12,15,25 88:13,20
117:14 122:25 124:20 125:2,17 126:2,
25 153:10 154:12 158:3,6,14 160:13,
15,20 161:4,10,12 162:25 163:5
164:1,5,8,20,22 165:6,18 188:8,9
192:1 216:23 219:8 220:8 223:5

**conversations** 42:4 51:24 74:21
79:14 88:21 93:23 120:21 124:2 161:7
164:14,19 219:4

**coordinated** 228:15

**coordinator** 152:2

**copies** 244:14

**copy** 18:8 42:22 98:17 145:8 176:8,
14,21,23 178:15 243:11

**correct** 8:21 9:18 10:3,5,6 11:17,25
12:1,25 13:17 14:20 17:17 18:1,2,14

20:20 21:16 22:13,14 24:10,11,12,13
25:10 28:22 29:5,14 30:13 31:10
33:23 37:3,6,11,19 38:15 50:12 52:12,
13 54:14 56:6,7,14 57:22,25 58:3,4
59:7 60:15,16,19 61:4,8,24 62:12,13,
15,18,23,24 63:2,6 64:18,23 65:2,6,
12,15,20 66:10,14,23 67:9,10,12,13
68:9,19 69:14 72:16,17 73:2,12,24,25
74:2 75:18 77:4,5,11,12,15,16,18,19,
21 78:10,14 79:11,13,20 81:5 82:9
85:12,16,21,22 87:20 90:24 98:22,23
101:1,10 105:13,16 106:22,23 107:2,
19,24 108:19 110:13 112:7,12,24
114:24 117:2 120:2 122:14 134:19
135:10,17 136:9 138:8,20,24 139:5,9,
17 140:13,18,21 141:11 143:10,15
144:6,13,17 145:16 148:1 151:17,18
153:24 154:3,18 155:6,16,24 157:6,
14,15,19,20,23,24 158:10 161:24,25
162:5,17 163:6,18 166:6 168:17
169:16 172:14,20,21 173:7,10,12,13
174:4,14 175:17,25 176:10,12 177:22
178:21,23,24 179:4,22 180:10,23,25
181:1 188:2 189:16 191:16 194:18,19,
25 195:3,4,7,19,20 196:12,13 199:24
202:1,20,22,23 206:2,16 207:1 208:2,
11,20 210:7 211:10,24 212:10,25
213:5,6,9,10 214:3,5,18,22,25 215:2,
3,8,9,22,25 216:2 218:19,22 219:1
220:24 222:11,12,13,14,16,25 223:13
225:20 227:4,5,7 228:24 229:7,13
230:4,16 231:11 232:18 233:7,8,22
236:20 237:7 238:21 240:1

**correctly** 68:1 131:1 193:8 219:24

**correspondence** 210:21

**cost** 14:1 42:5 44:18,19,21 47:18,21
52:10,13,25 60:3

**cost-of-living** 16:3

**costs** 160:22

**council** 16:2,13 138:17 160:21

**counsel** 7:4 33:14,18 243:10

**counseling** 73:4,5

**counselor** 20:16 58:25

**counselors** 58:15,21

**County** 10:14 11:10 13:15

**couple** 45:17,19 56:20 80:20 87:5
150:16 158:21 167:14 193:25

**court** 6:14,23 7:6,14,19 14:8 18:8,9
34:9 35:22 37:14 44:15 61:18 70:5

81:15,20 90:21 102:16 133:17 149:10
154:6,25 158:2 159:10,20 169:25
179:2,7 180:8,12 181:24 186:22 188:7
190:7 198:25 200:16,20 201:14
202:18,21,25 203:16 210:4 213:21,25
214:10 218:9,13,21,25 226:4 232:2,
14 240:4 242:13,15,19,24 243:10,17
244:10,20 245:2

**cousins's** 126:11

**cover** 65:11

**COVID** 13:3

**Craig** 199:12

**create** 98:25

**created** 16:9 177:21

**creating** 149:14

**creation** 90:11

**Creek** 21:4 69:1 71:10 118:25 119:7
239:25

**criteria** 122:2 220:2 230:10,11,16,17

**crosstalk** 200:21

**Culbreth** 6:18

**current** 9:7 29:24 30:4,7 88:9 91:12
103:13 222:20 234:20

**curriculum** 42:17

**cut** 41:12 44:21 45:3,10,15 48:18
49:8,17,18 53:10

**cutting** 44:17,18,19 45:2,4 49:15
51:19,21

**cycle** 72:6 215:15

---

**D**

**daily** 12:5

**Damon** 6:11 7:11 167:10 172:4
173:18

**data** 25:19 181:10

**date** 8:13 9:25 10:1,2 42:9 84:13,15
97:7 104:24 118:15 147:25 179:17
188:15 194:15 196:5,6 210:8 219:7,8
230:20

**dated** 31:6 149:1 152:18,22 154:8
155:1,5

**dates** 92:13 174:20 189:4 196:3

**Dave** 80:13

**David** 80:14 125:10 194:17 195:12
198:12 222:6

**day** 10:19 43:22 87:16 101:6 111:22
167:17 171:13 218:4,5

**days** 218:6

**deal** 26:3,21,23 34:20 72:10 79:1

**dealing** 32:5 108:17 128:5

**dealt** 23:23 28:16 29:18 72:13 107:23

**December** 6:21 149:3

**decide** 220:3

**decision** 25:7,15 39:17 41:24 50:11
64:21,23 69:4,8 73:24 74:13,15,16
89:6,7 90:9 98:21 109:22 122:5
124:19,23 125:24 126:7 130:15,17
151:2,9,15 168:12 175:4 193:3 217:18
218:4 219:21 230:14 233:25

**decision-maker** 42:2 63:20 64:4,5

**decision-makers** 64:3 193:6

**decision-making** 63:25

**decisions** 24:19,21,25 25:18 39:14,
22 40:2,13 41:7 109:3,12 174:25
217:23 229:12 230:6,11 241:1 242:6

**decrease** 39:6

**deep** 236:6

**defendants** 7:13 238:6

**defer** 241:4,17 244:3

**deficit** 65:5,11 165:4

**definition** 37:5

**definitions** 36:17

**definitively** 239:24

**degree** 17:7,21,25 150:1,6 151:20

**degrees** 108:12

**delete** 48:21 102:19

**deleted** 105:24 176:9,16 177:6 178:6

**deletion** 105:14,19

**deliberately** 116:14

**delivery** 243:12

**Denetra** 27:12

**department** 15:6,9,11 24:18,20 26:4,

13 27:6,8 44:9,10 45:6,10 112:19
114:25 118:18 134:17 135:22 146:19,
22 172:8 173:12 189:24,25 234:16

**departments** 26:11 44:8 49:24 96:9
108:6 189:23 225:3

**depend** 25:24 95:1 110:23

**depended** 41:4

**depends** 133:4 134:25 135:2 137:13

**deposition** 6:3,17,19 8:16,19 9:6,9
13:12 14:5,6 34:8 52:4 90:20 106:13
153:8 154:5,24 215:16 245:7,13

**description** 120:12 149:17 150:3,9

**descriptions** 76:10

**design** 166:8

**designated** 139:20

**desk** 98:12 113:11

**Desouza** 206:5,6

**detail** 33:6

**detailing** 24:6

**details** 33:8 136:2

**determined** 39:8

**develop** 76:13,14,15 81:23 149:16

**developed** 90:14 169:20

**developing** 146:25

**development** 56:14 57:21 61:3 76:1,
7,11,23 142:11 144:12

**dialogue** 25:17 72:14

**dialoguing** 111:22

**Diaz's** 205:3

**differ** 86:23 88:18

**difference** 225:11

**differently** 51:3 187:16

**difficult** 64:9 93:17 183:22

**diligence** 113:10

**direct** 69:19 130:17

**direction** 112:19

**directly** 22:7 121:22 124:5 125:13
173:9

**director** 12:14 27:11 36:21 39:13,21
40:1,15 59:8 60:18 66:2,19,24,25

67:2,7,20 68:15,21 69:22 70:23 75:11
79:17 80:6 84:7 88:24 89:11,21 90:1,
15 91:12 93:3,9 100:9 101:10,17
107:1 112:1 122:20 125:16 142:16,24
150:25 151:4 154:14,16 155:9,12
168:24 169:6,16 172:18,19 173:4,6,7
174:25 175:1 177:12 181:11 182:1,6,
12,15 183:6,9,18 184:2,13 187:5,12
189:3 192:2,13,20 193:7,15,19,23
194:14,21,24 196:4,16 197:6,15,25
198:10,23 199:11,21 201:8 204:2,14,
23 205:2,11,20 206:4,12,24 207:8,17,
25 208:10,19 209:3 210:25 211:4,6
212:5 215:11,15 217:18,23,24,25
219:1,14,19 222:11 223:3 225:9,12,
14,15,17,21,22,23,24 226:2 228:10,
12,25 229:8 234:20 236:13 241:6,9,21
242:4,8

**director's** 65:23 66:1,11

**directors** 67:9 74:4,5,22,24 75:16,20,
22 76:13,14 79:19 90:10 92:10 101:19
106:21 107:3 114:16 168:6 183:20
185:22 229:4,16,25 230:8 236:25
241:8

**directors'** 99:16 215:7

**disabled** 11:8

**disagree** 83:22 135:10 229:1

**disciplinary** 28:13,24 72:8,19 73:16
108:18 163:22

**discipline** 72:24

**disciplining** 109:23

**discover** 119:14

**discovery** 63:20 130:11

**discriminate** 113:22 114:3,10,12

**discrimination** 15:3 27:4,25 28:7
107:8,23 108:14,24,25 109:10 114:22
115:1 242:7

**discriminatory** 15:7,12 16:16 109:4,
5,8 114:1

**discuss** 47:5 61:19 103:21 126:19
142:15,23 181:19 219:9 233:9

**discussed** 29:6 58:15 61:7 68:10
97:12 117:15 136:5 144:9 162:12
203:12 209:12,24 222:9 233:13
234:19

**discussing** 111:21 130:1 142:13
215:15

**discussion** 42:6 43:13,15,22 50:15
51:16 52:5 54:10 60:7 61:25 62:9
65:25 66:4 68:8 70:9 74:18 86:21
88:15 99:15 142:9 203:4 234:25

**discussions** 9:11 19:12 46:22 73:7
88:22 118:8 124:8 129:12 219:10

**disease** 12:8

**dismissed** 38:3,5,12

**disposition** 120:6

**dispute** 87:17 155:15

**district** 6:14,15 14:3 39:23 45:18,21
109:20 155:8 156:4,24 160:16

**district's** 153:11,21 154:1,13

**districts** 109:19 132:19

**diversity** 52:19 149:14,23 151:10

**divided** 44:7

**Division** 6:16

**divorce** 11:3

**Doctor** 7:14

**doctorate** 17:23,24

**document** 36:13 43:4,11 57:2,10
60:12,21 65:21 84:4 97:20 98:4
143:12 144:21 145:6,11,14,17 146:9,
17,20 147:2,15,19 152:17 154:19
162:7,14,18 165:10,14 168:1 170:2,6,
18,20 178:19 180:15,18 182:23,25
183:3,5 184:16 186:7,20 194:2,6,7,13
196:9 201:20 202:9 203:9,12 210:9
214:16 221:23 222:2 226:22 228:1,2
243:4

**document's** 152:22

**documentation** 110:15

**documents** 42:25 43:2,5 106:4,7
144:22 147:3 152:17 172:13 179:21
203:24 244:18

**Doe** 6:4 7:8 20:21 67:15 73:21 117:6,
17,25 118:9,12,20 150:10 151:3,24
152:1 154:9 158:14 160:10 161:7,8,10
162:25 163:5,21 188:9 239:10,11

**Doe's** 117:6 160:8

**door** 126:18

**doubt** 191:21 195:24

**Doug** 177:11 179:24

**down-** 105:22

**download** 104:23 105:21 106:16
176:14

**downloaded** 91:1 105:23 176:8,22
178:15,17

**draft** 189:22 190:13

**drafted** 169:18 189:14,15 190:19
228:16

**drafting** 188:20 189:1,8

**drive** 6:18 42:23 177:5

**driven** 53:2

**drop** 78:18

**due** 16:12 29:24,25 30:8 53:12 113:10
153:11 154:13 155:7 158:5,7,15 163:1
165:20 216:6

**duly** 8:2

**duties** 23:18 141:3 239:21

**duty** 15:22 32:4,7,11,25 38:6

E

**earlier** 37:1 49:21 62:8 67:17 72:11
76:19 91:3 92:6 134:15 135:13 142:6
144:9 158:9 162:12 169:6 178:20
201:23 203:13 218:3 229:10

**early** 42:7,10 116:8 152:3 219:1

**earned** 224:20

**easier** 88:8

**easily** 48:9

**Eastern** 46:8

**eat** 146:2

**echo** 242:25

**ED** 213:15,16,17 222:13

**edit** 181:13

**EDS** 17:22

**education** 36:23 145:1 157:18

**Edwards** 206:25

**effective** 153:12 154:15 156:8

**effectiveness** 39:8

**elected** 192:21

**electronic** 244:15

**electronically** 81:9,10

**element-** 13:2

**elementary** 41:23 70:25 130:23
233:4

**eligible** 121:24 156:3,23

**eliminate** 40:10 41:2,24 47:3,11,16
48:7 50:12 53:8,12 64:22 66:4 73:24
77:10 95:3

**eliminated** 41:20,21,22 42:17,21
43:8 48:9 59:2 60:1 63:15 64:24 65:2
66:9,12,14,16,19,20 67:12,22 68:3,4,
16,22 74:2 78:6,23 112:17 114:1
118:13 128:7 144:15 154:15,17
155:10,12,17,23 156:2 158:5,15
160:11 163:1 240:12,15 241:22,23

**eliminates** 39:11

**eliminating** 34:21 39:17,24 40:17,24
42:13 51:19 52:7 61:8 63:10 65:25
117:2 142:9

**elimination** 46:21,23 61:11,20 65:19
77:15 78:10,16 79:2,7,10,13 106:24
113:16,23 142:3,16,23 143:14 144:5,
10,16 165:19

**eliminations** 42:19 59:4,6

**Elisa** 80:18 194:17 195:14 222:6
236:17

**Ellen** 27:11 28:3

**email** 97:13 99:2 168:15,20 171:25
172:11,23 173:22 174:3,9 175:10,12
176:3,6 179:15,16 181:16,20 191:14,
18,22,24 210:20 211:12,22 212:3,7,
12,23 213:4,9,19,20 214:2,17,20,21
215:4,21,24 216:4,11,16 217:16,20
218:17,24 222:2,5,15,18 228:4,9,22
243:5

**emailed** 97:19 146:13

**emails** 125:21 171:17 173:17 210:14

**employed** 10:13 36:23

**employee** 26:15,21,23 27:1,5,12,14
28:9,10 29:16 30:2,10 32:24 33:1,9,12
38:23 39:1,25 52:10 110:1,21 112:2
114:22,25 115:7 116:2,17 125:16
134:9 157:23 225:23,25 228:10
238:10,15

**employee's** 34:3

**employees** 19:19 20:17 26:5 27:7
29:23 30:6,23 32:5 41:9 47:22 100:11,
19 103:13 116:1 129:17 133:11
241:25 244:7

**employees'** 132:20

**employment** 25:6 31:14 32:19
100:16 109:12 156:12 157:8 238:18
239:1

**employs** 151:14

**empowered** 39:7

**empty** 106:9

**encompass** 20:1

**encompassed** 26:10 77:25

**encourage** 182:14

**encouraged** 120:7

**end** 10:1 53:18 72:6 85:19,20 145:25
147:11 153:12 156:8 166:19 192:1
196:6 209:11 229:3,9 231:4 235:1

**ended** 32:20 54:17 56:5 104:1 201:20
240:25

**ending** 72:4 148:20

**ends** 168:10

**engage** 238:16 240:22

**engaged** 110:1,12,21 111:10,19
112:5,23 113:3,14 118:7 238:10
240:12,24 241:23

**English** 17:8

**enlisted** 179:19

**enrollment** 29:24 30:9 39:6 41:5
58:17 78:12,18

**enrollments** 138:22

**ensure** 96:10 111:15 181:4

**ensured** 134:17

**ensuring** 93:21

**entailed** 170:15

**entering** 16:10

**enterprise** 152:4

**entire** 56:25 95:17 96:5,22 100:22
187:8

**entitled** 64:6 144:25

**entry** 136:16

**environment** 128:6

**EO** 212:8,17

**equate** 141:8

**equates** 141:6

**equitable** 75:15,23

**equity** 52:19 149:14,23 151:10

**error** 176:8

**ES** 222:21

**established** 87:14 90:4 124:11
152:13 229:5,17

**estimation** 37:10

**et al** 6:5,8 21:21

**ethical** 34:3 125:12,22

**ethics** 114:16 126:14

**ethnicity** 109:7

**etranscripts** 244:14

**Euna** 31:7

**evaluate** 75:5

**evaluation** 28:17 39:9 75:1

**evaluations** 75:12 89:2

**event** 77:14 113:19 133:14 197:19
199:15

**events** 77:13

**eventually** 55:11

**Everson** 201:9

**Everson-tuggle** 201:13 218:18

**evidence** 36:3 49:5

**ex-wife's** 126:11

**exact** 19:22 31:20 33:6 52:18 53:19
140:3 174:18,19 212:22 218:4 224:22
233:18,19

**EXAMINATION** 8:5 167:2 238:2
240:7

**examined** 8:2

**examples** 76:9

**Excel** 97:25 105:21 106:16 170:2
178:22

**exception** 196:10

**excuse** 18:13 39:14 48:1 81:13 113:5

**excused** 245:11

**executive** 6:18 56:13,18 57:20 59:8
60:14,17 61:3 65:23 66:1,2,11,18,24,
25 67:2,7,8 68:21 69:22 70:23 74:4,5,
22,24 75:11,16,20,21 76:13,14 79:19
80:6,7 84:7 88:24 89:10,21 90:1,10,14
91:12 92:9 93:3,9 99:16 100:9,25
101:19 106:21 107:1,3 142:10,16
144:11 149:14 151:10 155:9,12 168:6,
24 169:6,16 172:18,19 173:3,4,6,7
174:25 175:1 181:11 182:1,6,11,15
183:6,9,18,20 184:1,13 185:22 187:5,
11 189:3 192:2,13,20 193:7,15,19,22
194:13,21,24 196:4,16 197:5,15,25
198:10,23 199:11,21 201:8 204:2,14,
23 205:2,11,20 206:4,12,24 207:8,17,
25 208:9,19 209:3 210:25 211:4
212:5,18,22 215:7,11,14 217:18,23,
24,25 219:14,19 222:10 223:3 225:3,
5,9,11,12,14,17,18,21,22 226:1,2
228:11 229:4,16,25 230:7 234:20
236:13,25 241:6,20

**exercise** 131:10

**exercised** 129:5 130:1

**exhibit** 18:7 34:8 37:13 44:14,15
61:16 90:19 143:3 145:24 149:8 153:8
154:5,24 158:1 161:18 165:10 169:7,
24 179:1,7 180:7 181:23 186:21 188:5
202:16,20,21 203:15 209:24 210:2
214:8 218:12 221:24 232:1 242:12,13,
21 243:6,7 244:17

**exhibits** 202:24 239:12 244:15

**existed** 241:7

**exists** 241:17

**expect** 33:9 95:13,22

**expectation** 113:7,9,15

**expected** 104:2 125:8

**expecting** 171:22

**experience** 16:7,9,23 40:19,20 87:25
108:6 182:7

**experienced** 49:2 83:16

**expert** 25:18 140:23

**expertise** 45:23 68:23 95:23

**Experts** 6:25

**expire** 133:20

**explain** 136:18

**explaining** 104:3 107:17

**explicitly** 165:21

**extending** 215:6

**extent** 34:12 37:7 40:5 48:12 49:1
74:10 75:24 107:10 121:8 124:17,19
126:3 233:21

**external** 16:7

**extra** 139:12 141:8

**F**

**fabric** 47:6 48:10 161:13

**fact** 78:25 100:21 137:22

**factors** 137:15

**facts** 51:13,15,17 52:5,8

**factual** 63:24

**failed** 212:4

**fair** 50:18 63:7 82:9,11,18 83:1,7
139:24 164:24

**fairly** 45:18 76:19 101:13 124:2
132:16 188:14

**fake** 236:6

**fall** 123:4,11

**falls** 132:9,11

**false** 65:5 66:10,14,22 67:3

**falsification** 231:18 232:6,21 233:6,
10,12

**familiar** 20:7 28:5 29:15 34:19,23
37:23 38:8 44:24 57:10 59:12,14,16
62:14,17,19 84:5 107:14,16 109:14
133:6 146:17 162:6 174:1,2 183:11
187:2,8 196:24

**fan** 97:22

**farmed** 27:15

**fashion** 138:14

**fast** 171:21

**fast-forward** 237:9

**faster** 203:19

**favoritism** 93:2

**Feagins** 208:1,3

**February** 10:3 42:7

**federal** 138:12 238:16

**feedback** 25:18 193:13

**feel** 118:4 216:7

**feeling** 126:3,15

**Felicia** 201:9,12 218:18

**fell** 117:17 231:4

**felt** 93:22

**female** 120:17

**field** 217:9

**fight** 130:10

**figure** 19:22 235:18 244:17

**file** 102:19

**filed** 6:14 14:23,24 15:4 16:15 123:13, 15

**filing** 129:19

**fill** 139:21 140:20

**filled** 137:19 138:19 139:2 140:2,21

**filling** 141:2,3

**final** 151:15 161:18

**final-round** 219:16,18

**finalize** 217:22

**finalized** 217:24 218:4,5

**finalizing** 217:17 218:25 219:11

**finance** 146:19

**financial** 139:7 140:23 147:5

**find** 16:19 43:6 50:19 81:11 91:9 96:25 97:4 98:11 106:3,6,7 129:24 150:2 163:8 166:3 170:22 174:10 175:17 176:24 177:1 179:14 182:23

**fine** 81:19 167:24 244:5,19

**finished** 191:25

**fire** 110:9 163:12,15

**fired** 120:4 123:17 157:2,4 241:10,15

**firing** 24:20 130:18

**fiscal** 61:16

**fit** 70:20

**fits** 160:23

**flag** 111:5

**flux** 148:25

**flying** 123:9

**folks** 25:17

**follow-up** 240:10

**font** 183:14

**fonts** 183:15

**forget** 12:10

**forgot** 135:13 230:20

**form** 50:5 81:4,7,8 84:13 85:4,7,9,11, 17,19 86:15 87:13 90:3 94:8,10,25 95:10 96:2,13,19,22 97:3,13,20,25 98:3 104:22 106:16 110:3,4 112:8,11 114:5,14 119:2 124:10 129:10,20 130:5 131:6 132:8,13 136:25 137:4 152:12 153:16 163:20 169:6 176:20 177:8,21 240:19 241:3,14 242:2 243:25

**format** 31:19,24 82:13 125:20 183:17 243:12

**forms** 105:20 181:10

**formula** 13:22 14:2 15:17

**formulating** 193:18

**forward** 127:16 181:2 216:9

**forwarded** 173:21 180:24 181:4

**found** 19:16,17 37:20 106:1 119:15 123:24 134:7 232:11

**four-page** 228:5

**four-phase** 229:24

**Fox** 7:12 8:17,20,25 9:2,8,16 21:14, 20,23 34:11 37:7,15 40:11 45:25 46:7 50:4,7 63:16,21 87:13 90:3 94:8,10,25 95:10 96:2,19 102:14 110:3 112:8,11 114:5,14 119:2 124:10 129:9,20 131:6,15,18,22 132:8,13 136:25 152:11 153:16 163:20 237:25 238:4,6 240:2,5,19 241:3,14 242:2 243:21 244:6,13,21,23

**fractured** 12:19

**frame** 49:14 121:14 160:19

**Frank** 234:16

**frankly** 19:18 25:24 40:20 73:8

115:23 122:3 224:8

**free** 216:7

**frequently** 124:2

**friend** 240:14,17,25

**front** 38:14 60:23 76:10 133:6 137:16 168:7 185:20

**froze** 131:15,17,18

**frozen** 54:5

**fruition** 192:19

**full** 8:8 50:14

**fully** 11:6

**function** 146:15

**fund** 44:1 141:9

**funded** 138:10,19,23

**funding** 13:16,19,25 44:1 50:1 53:15, 16 54:14 160:21

**funds** 123:17,25 130:12 131:14 132:6 140:1 141:8 147:22 162:20

### G

**Gallman** 206:5,6

**game** 123:18

**Garcia** 128:2,3,11

**gave** 64:11 88:3,11 124:4 192:14

**gender** 15:15 109:6

**general** 25:16 29:2 44:22 49:21 81:1 83:17 92:23 101:7 103:22 109:2 111:14 125:20 130:5,14 139:14 181:3

**generalizations** 98:8

**generally** 24:7,22 25:4,21 26:15,22 33:4 38:22 44:22 48:10,15 49:24 64:20 82:13,14 84:17 85:17 91:5 98:11,13 103:8,16 104:13 106:9 110:6,14 111:8,20 126:8 127:20 133:22 149:22 150:24 151:12

**generated** 43:3,12 177:15

**Gentry** 121:1,17 124:9,12 125:23

**Gibbs** 214:21 215:5,10,21,24 216:4, 13,16 217:2,13

**gist** 71:17

**give** 19:21 40:16 48:17 54:20 68:14
85:18 89:5,25 94:5 120:12 139:17
167:7 175:9 192:12 223:20 224:21
227:10 244:1

**giving** 9:6 63:24 83:11 136:19

**glad** 231:14

**glancing** 209:25

**glitch** 53:9 54:3

**goal** 25:17 54:19 55:3,4,21 82:10

**good** 14:15 24:14 39:6 46:2,16 58:7
82:3 116:12 126:9 148:22 167:6,13
203:19 240:13,25

**gosh** 56:18 67:23 72:2 97:10 119:21
120:6,14,20 174:18 183:22 209:14

**Government** 6:5,8,11 162:23 187:1

**grab** 146:2

**grade** 231:18 232:5,20 233:6,10,12

**grade-falsification** 232:24

**graders/scorers** 83:2

**grades** 92:3

**graduate** 17:10 152:3

**grammatical** 32:1

**Granberry** 222:21

**grand** 147:10

**gray** 125:14,23 133:3

**green** 185:25

**Greensboro** 17:15,19

**grievance** 15:3 16:15

**grievances** 14:23,24 15:4

**Griffin** 69:16 70:17,21 71:4,6,8,13
72:16 73:11,14 74:23 79:25 80:14
194:18 195:16 222:6

**Griffin's** 69:24

**group** 30:23 91:24 137:18 144:22
169:21 222:20 224:11 236:13

**groups** 96:9

**guess** 20:6 63:23 64:17 107:4 114:20
116:24 117:5 118:16 150:8 177:24
217:11 220:19 236:21

**guidance** 161:14

**guide** 185:20

**guilty** 123:24

**guy** 125:10 171:12

**guys** 101:23

---

### H

**half** 43:2 64:10 76:5 80:21 129:22
187:18 240:21

**half-hour** 89:5

**halfway** 148:12

**Hammond** 199:12

**hand** 7:15 129:7

**handle** 26:13,18 28:21 173:1

**handled** 27:25 98:24 150:20,23 173:4

**handles** 27:4 28:13

**handling** 23:19

**handy** 114:13

**hang** 16:19 82:1,3,4 84:10,19 152:20

**Hank** 43:17 56:3 74:20 150:21 212:2
213:2

**Hanover** 10:14 11:10,16 16:23

**happen** 96:11 100:17 120:21 136:13

**happened** 25:5 42:8 45:19 87:1
115:20 118:6 124:2 129:1 133:21
174:12 189:5 232:8 233:13,15 241:19,
20

**happening** 95:22 104:8 125:2 223:21

**happy** 115:23

**Harbison** 7:10 77:6 159:8,22 166:20
167:4,9 169:23 170:24 171:8 179:8
180:6,11,13 181:22 186:23 188:4
199:1 200:19,23 201:1 202:19,23
203:7 210:1 213:23 214:1,7 218:11,14
221:22 226:6,12 231:25 232:3 237:23
242:11,14,17,21 243:1,4

**hard** 42:1,23 67:23 96:13 123:7 130:3
177:5 231:21 244:14

**Hayes** 20:24 116:3,16 161:2,7

**Hayes'** 20:25

**head** 128:21 184:21 191:6 221:2

**headphones** 235:11

**heads** 14:17

**health** 12:18,20

**hear** 8:23 19:6 24:16 35:25 51:5 81:19
82:1,19 83:5 142:15 158:22,25 159:1,
4,21 160:25 200:17 235:15,20 238:5,7
240:4

**heard** 54:1 65:9,10 116:13 119:18
122:17 133:21 188:8 238:23

**hearing** 142:23 160:16,19

**hearings** 133:6,11

**height** 99:4

**held** 6:17,21 142:17

**helped** 149:16 230:20

**helpful** 45:17 81:20

**helping** 63:25 76:12

**helps** 95:3

**Henry** 56:3

**Henson** 31:9 32:11 34:7

**hesitate** 31:25

**hesitated** 11:2

**hey** 47:25 101:23

**hierarchy** 173:11

**high** 13:2 41:23 71:1,3 89:20 91:11,
21,23 92:8,16 93:3 147:18 178:16
194:18 195:18 196:11 222:20 223:2,6,
25 224:11 231:19 232:6,21 233:4
234:20 239:25 241:24

**High's** 91:18 96:25 97:6 104:16
105:2,11,19 195:22 223:16 231:1

**higher** 150:7 240:16

**higher-ups** 24:21

**highest** 87:9 89:25 90:5

**highlight** 184:18 185:2,6,7,8

**highlighted** 184:15,20,25 185:6,14
187:4,9,20,25

**highlighting** 185:25

**hire** 90:9 98:22 126:12 148:11 151:2,9

**hire/who** 98:22

**hired** 90:1 97:8 148:6,10 151:23
152:8 185:17 215:14

**hiring** 23:12 24:19 26:12 45:8 111:12, 17 149:18 151:13,14,15 183:14 212:5 229:1,5,9,12,17 230:7 238:9

**historical** 45:21 63:3 76:20 93:18

**hold** 46:3 211:3 242:22

**holding** 147:15

**holds** 228:12

**home** 12:5 123:10 220:11

**honest** 32:4,7,12,15 33:1,4,10,24 117:3 135:4

**hope** 95:4 183:22 212:3

**hopes** 73:1

**hospital** 231:2

**hospitalized** 174:13,15,17,21,24 175:3 230:19,21 231:10

**hostile** 128:5,6

**hour** 80:21

**hours** 238:8

**house** 11:5

**hover** 88:8

**how's** 127:14

**HR** 9:7 15:16,21,22 18:19 23:18 24:2 25:7 26:4,9 27:25 44:22 107:21 108:6, 8,12,18 109:3 173:11 175:13 225:4, 19,22 234:16 237:3

**Hughes** 151:2,19

**human** 10:9 11:13,22 19:4 22:5 24:18 26:11 33:23 37:19 39:16 42:24 107:21 108:10 128:17 129:24 173:8 226:2

**hundreds** 43:1

**Huntington's** 12:8

**hypothetical** 96:14

---

I

**idea** 216:22,25

**identification** 149:8

**illness** 12:4,7,14 174:11 231:12

**imagine** 98:15 150:5

**immediately** 85:15

**impact** 153:11,21 154:2,13 155:8

**implemented** 16:8

**implicates** 127:21

**importance** 93:20

**important** 83:4 99:13 113:5

**impossible** 88:12 90:23

**improper** 129:25

**in-person** 221:20

**inaccurate** 209:23

**Inadvertently** 105:22

**inaudible** 104:5 169:12 177:25

**incidence** 72:12

**incident** 173:2 232:7,24 233:16

**incidents** 26:22 27:2

**include** 20:3 73:4 156:14

**included** 39:24 74:22 112:22

**includes** 36:20 166:1

**including** 26:11 60:24

**inclusion** 52:19 149:15,24 151:11

**incompetence** 38:6

**increase** 162:10

**increased** 106:22 107:3

**increases** 16:14

**independent** 50:19,25 51:3 68:20

**index** 97:22 98:6,9,11,17,24

**individual** 23:23 43:4 51:10 88:2,3, 11,12 92:14 93:19 110:23 111:6 113:8 126:25

**individual's** 95:16

**individually** 85:18

**individuals** 89:25 91:7 117:1 211:8 219:22 222:10

**inefficiency** 38:6

**inextricably** 238:22

**Infectious** 174:23

**influence** 125:24

**inform** 32:24 72:21 123:22 157:2

**information** 19:17 25:14 63:17 83:2, 3 95:11 96:22 175:14 177:2 179:11 188:16,17 189:22 190:13,14,18 212:6

**initial** 40:25

**initially** 46:25 211:23

**innovation** 69:17,23,25 70:2,18,22

**input** 50:11,13 64:23 69:4 71:21 73:23 74:25 149:13 234:12,17

**instance** 30:12 91:10 110:5 130:6

**instances** 92:22

**instruction** 42:17

**insubordination** 38:7

**integrity** 127:21

**interact** 110:6

**interactions** 15:8 240:20

**interim** 101:11

**internet** 53:9 54:2

**interrupt** 46:1

**interview** 75:14 79:22 80:21 81:7 82:5,12,14 84:18 85:2,16,20 89:5 91:11,21,23,25 92:14 93:19 94:9 95:22 96:10,21 103:20 105:15,16 150:17,19,20 155:19 168:3,5,23 179:3 182:11,14 187:12 192:2,13 193:7,19 194:14,21,25 195:3,7,9,22 196:5,15, 16 197:6,8,15,21,25 198:7,11,12,18, 24 199:4,12,17,22 201:3,19 204:3,14, 23 205:2,3,12,16,20,23 206:5,12,18, 24 207:8,14,17,21 208:1,10,19 209:3 212:6 215:7,15 216:6 217:1,19 219:16,18,23 220:1,4,12,24 222:13,19 223:16 230:1 231:1,3,6,8

**interviewed** 79:19 83:20 85:24 86:4 91:13 92:9,10,16 99:17 106:14 150:11 178:16 182:6 195:18 196:20 211:19

**interviewee** 223:3

**interviewees** 194:22 224:12

**interviewer** 82:16

**interviewers** 80:23 82:5,11,19 83:8 96:7,8 103:6,19

**interviewing** 103:13 181:25 182:2 211:24 228:11

**interviews** 74:14 75:10 79:24 80:19 83:12 84:7,14 89:21 90:15 99:21,25 103:5,9 104:1,7,12,14 149:20,24 176:20 181:11 189:2 192:12,20 193:15,23 201:21 202:6 210:6 212:8 217:8 219:13 220:10 221:4,8 222:11

**intimate** 44:8

**introductory** 172:17

**invalid** 94:23 95:15,17,19 96:1,5,23

**investigate** 110:11 115:1,9

**investigates** 114:23

**investigating** 118:6

**investigation** 38:24 50:19 51:1,4,10 68:20 96:25 118:19 231:18 232:5,10, 20 234:1

**investments** 52:22

**invitation** 198:4 199:8

**invitations** 202:4

**invite** 194:20 196:19 197:3,15,25 198:11,12,14,20,23 199:11,21 200:13 201:3,8 204:2,11,19 206:1,4, 8,12,21,23 207:4,8,13,16,20 208:6,13, 18,22 209:2,7 210:8 211:18 221:6

**invited** 47:4 211:17 219:15,17,22 220:4,25

**invites** 194:7 202:9 203:20 209:23 210:5 221:3

**involve** 189:7 234:9

**involved** 14:10 72:24 115:21,25 173:19 188:20 189:1 193:18 219:5 232:20

**involvement** 76:7,23

**involving** 76:6

**isolation** 160:23

**issue** 14:18 25:1 28:15,19 30:3 39:1 45:1 48:6 115:16 232:11 233:13,15

**issued** 49:19

**issues** 9:14 12:20 26:23 27:14 28:14 29:23 35:13 37:20 72:10,11,13,19 75:8 77:23 78:1 83:18 86:12,13 95:4 108:18 111:23

**item** 179:23 235:5

**items** 177:6

**IX** 109:14 239:4

---

                    **J**

**James** 6:10 7:8 130:20,24 204:15,23 210:21,23 212:2 214:2

**Jane** 6:4 7:8 20:21 150:10 151:3,24 152:1 160:8,10 188:9 239:10

**January** 31:7 34:7

**Jenai** 20:24,25 116:3,16 150:15

**Jesse** 7:10 167:9

**job** 11:10,15,16,22 12:2,9 15:22,24,25 16:9,10,12,22,23 20:12 21:1 23:18,24 24:2 25:25 26:14 33:2,9,13 34:1 49:3 75:12,24 76:4,10,20 93:7 94:3 99:16, 20 104:20 125:20 126:12 139:13 149:17 150:2,8 153:15,20,25 155:19 156:20 157:17,21 158:4,7 160:11 161:11 162:25 163:7,23 164:3,7,16 165:20 166:1,2 168:24 169:16 172:19 193:16 210:25 211:1,3,4,7,24 213:16 219:19 225:16 241:8

**job-performance** 72:10

**jobs** 44:18 51:19 52:16 61:4,6 74:6,9 137:19 138:6,9,10 140:8 147:11,12 148:2,10,13,23 150:5,16 152:2,7 164:12 166:6 169:20 175:1 184:13 186:4 188:18 213:15 228:12

**join** 222:23

**joke** 11:4

**joking** 236:6

**judges** 133:7

**judgment** 122:6

**judgmental** 109:4

**July** 148:21 156:14 173:23 176:11 237:6

**July/august/september** 149:2

**jumps** 185:15

**June** 148:1,4,19,24 153:13 154:15 156:8,12 172:5 181:16 194:15 195:22 218:22 222:15 223:22 230:23,25 231:3,6,8 243:5

**justified** 112:21

---

                    **K**

**Karen** 206:5,6

**Karl** 6:22

**Ken** 80:1,14

**Kenneth** 195:9 222:5

**key** 139:10

**kin** 128:1,13

**kind** 12:15 41:12 46:1 133:12 192:17

**kinds** 76:1

**kinfolk** 128:13

**knew** 33:20 116:20,23,25 117:13,16 119:21 122:19 128:20,23 240:23 241:6,18,21

**knowing** 47:5 96:21 110:5

**knowledge** 44:8 77:2 89:23 93:18 118:22

**Kovach's** 198:12

---

                    **L**

**labeled** 203:13 227:3

**lack** 16:12

**laid** 30:24

**Landfall** 6:17

**Lane** 10:11

**language** 228:15

**lapsed** 135:9

**large** 58:7 97:22 137:23,25 163:3

**lasted** 86:21

**late** 194:1 217:4

**lateral** 136:16

**law** 30:15 35:11 36:18 38:13 39:3 40:10 108:8,12,21 136:24 238:16

**Lawrence** 182:1,11,15 209:4

**laws** 34:24 35:1,4,9,15 37:18,25 107:9,16 108:24,25 135:5 242:8

**lawsuit** 14:11 123:13 128:4 129:19

**lawyer** 133:5

**laying** 51:17

**lead** 30:18 195:21 196:14

**leaders** 76:7,12,24

**leads** 28:23 176:25

**learned** 63:22

**learning** 35:6

**leave** 12:2,9,12 235:11 242:12

**leaving** 11:10

**led** 238:25

**Leffler** 6:7 7:8 20:18 37:1 75:8 76:17,
22 83:19 85:23 86:17,20 87:4,7,15
88:14,23 89:15 128:1 129:13,18
142:17 155:11 156:18 157:10 164:4,
11 205:21 239:10,11 241:7

**Leffler's** 67:4

**left** 9:20,25 11:5,24 12:11 19:22 42:23
43:10 66:7 176:21 215:13 225:4
236:17

**legal** 6:22,24 8:18 32:21 37:8,17
40:11 64:5 107:21 129:10

**legally** 131:8

**Lendozia** 206:25

**lesson** 115:16 116:17 117:7,20 118:3

**letter** 29:15 30:19 31:6,12,17,23 32:2
33:6,8 34:7 39:1 152:23 153:10,17
154:4,7,8 155:1,2 157:2,3 228:5,13
229:14 233:20

**letters** 30:5,21 239:9

**letting** 62:1 63:5

**level** 25:25 39:8 41:4,10 42:15 77:24
88:9 95:22 108:15 111:16 241:20,21

**levels** 41:9,10

**liaison** 125:10

**librarian** 58:25

**librarians** 58:16,21

**licensable** 134:20

**license** 18:11,15,17,18,20,23,25 19:1,
4,14 20:12 22:10 23:8,10 24:3 133:20,
24 134:6,18,24 135:9,18,23 136:12,
15,20,22

**licensed** 24:10 134:11,13

**licenses** 22:5,25 24:3

**licensure** 23:13 135:5,14 139:18

**LICSAL** 22:20

**Lily** 6:7 7:8 83:19 142:17 155:11
205:21

**lines** 50:7

**link** 181:12

**linked** 238:22

**Lisa** 80:3,4,15 104:3 146:22 147:6
173:4,6,12 180:24 181:15,19 189:10,
14,21 190:17 191:15 194:16 195:2
211:12 212:3 218:18,21 219:9 222:5,
18 223:8,12,25 224:6,8,11,12,16,19
243:5

**list** 84:6 111:12 146:25 175:22 183:6,
10,11,12,19 184:2,12 186:11 187:2,8,
12,13,15

**listed** 21:1 38:12 60:13 63:19 64:2,13
87:19 150:6

**listen** 158:20 159:19 160:1

**literacy** 58:21,25

**live** 10:10,18

**load** 170:3

**lobby** 171:12

**local** 36:23 138:12

**located** 10:15 13:6

**locations** 6:20

**locked** 84:11,19

**long** 9:2 80:19,22 99:25 167:17
171:13 238:19 244:14

**longer** 34:1 104:1 106:10 157:22
212:7

**looked** 12:22 31:21 45:6 97:2 98:10
100:3 106:4,5 113:7 124:7 169:5,6,9
176:23 177:4,5,6,7 179:9 193:9
196:10 200:1 203:10 210:6

**lose** 90:23 137:10 153:25

**losing** 34:1 153:14,20 161:11 164:12,
16 165:25 166:2,6

**lost** 33:2,9,13 49:25 91:4,6 163:7

**lot** 41:4 43:3 66:25 77:20 128:25
134:4 147:16 148:5 150:5 183:12
217:3

**loud** 133:18

**low** 87:7 88:23

**lower** 47:18 87:8 236:17 240:15

**lowering** 47:21

**lowest** 140:9

**loyal** 129:13,15,18,23

**luck** 84:21

**M**

**made** 15:6,14 24:21 32:1 38:17,23
39:17 41:8,24 42:22 43:14,25 49:12,
24 54:23 55:1 61:25 65:4 66:13 69:8
74:13,16 88:17 89:6,7 90:9 93:25 94:1
95:24 115:1 116:20 117:12,25 118:16,
17 120:23 122:17 130:15 134:2 151:2
174:25 175:4 201:23 219:21 220:6
230:5,15 233:25 234:5,13,18,23 241:2

**Madeline** 214:21 215:10

**madeline.gibbs@mnps.org**.
214:22

**main** 61:24,25 68:12 111:20

**maintained** 23:1,3,4

**make** 11:4 14:19 16:1 21:15 24:25
25:6,15,19 29:3,9 39:21 40:7,21,25
41:8 47:20 49:23 50:10,16 51:20
52:14 53:7,11 55:3,20,24 60:18 61:2
67:24 68:1 75:15 82:8 89:14,17 90:6,
13 93:5,12,15 94:12 95:6 102:12
104:25 109:22 110:2,11 112:20 114:6
115:16 125:24 134:15,18 140:10
143:17,20 153:8 156:22 169:23
179:23 180:7 181:22 182:17 185:1
186:21 188:4,25 202:15 203:14
209:16 210:1 214:7 218:11 221:22
229:12 230:11 231:25 237:10 242:5,
11 243:6,7 245:3

**makes** 27:24 28:9 29:10 115:4 116:15
147:5 148:8 160:24 165:17 166:5
175:6,7 211:21 213:18

**making** 24:19 25:18 39:13,14 40:2
48:5 50:14 109:12 117:19 130:8 151:9
170:12 193:2,3 219:11 237:20

**male** 120:19

**manager** 151:14,15

**managers** 111:12,17 151:13 238:9

**manner** 107:23 123:22 239:7

**manual** 64:13

**March** 42:7 189:6

**Marie** 208:1,3

**mark** 218:9

**marked** 18:7 34:7 44:14 61:16 90:18,
19 143:3 149:8 154:5,23 158:1 165:10

179:1 228:19 243:6

**married** 10:21 11:6

**Martin** 208:10

**Mary** 27:11 28:3

**master's** 17:13,23 150:1,7 151:20

**matched** 169:10

**materials** 14:1

**math** 140:18 141:7

**math-wise** 140:17

**matter** 6:4 13:14 30:17

**matters** 63:25

**Maultsby-springer** 205:12,13

**Mcgreal** 208:10

**Mcgruder** 31:7

**meaning** 24:8 92:17 104:19 105:8
117:19 216:17

**means** 29:22 85:6 109:5 157:5,7,10
239:19

**meant** 153:17 181:19

**media** 6:25 133:2

**meet** 56:8 126:22,23

**meeting** 47:4,6,7,10,20,25 50:9 51:14
52:14 53:11 55:8 56:2 63:9 99:2 117:1
145:2,12 190:16 220:15 221:20,21
236:11,24

**meetings** 51:14,20 53:7 55:11,15
63:2 125:7 141:16 221:13,17

**Melissa** 9:7 43:17 47:9

**member** 119:16,20 120:7,9,13 121:16
123:21 124:13,14,16 125:5,7,13
126:10 127:2,7,18,19

**members** 120:17 125:8,22 126:8,19,
22 127:13 190:3

**memory** 39:19 42:18 219:3

**Mercy** 181:16

**merge** 59:1

**merging** 58:18,23

**Meriwether** 6:10 7:9 21:6,12,13,17,
24 22:2 37:2 41:15 118:23 130:16,19,
22 164:15,18,23,24 207:9 227:4

**message** 71:16,17

**met** 43:24 116:23

**method** 47:21

**methods** 114:13

**Metro** 9:5,16,20,25 10:2 11:15,20,21
12:3,11,12,17 13:6,14,19 14:3,23
15:5,10,22 19:3,9,19 22:17 23:1,25
24:1 25:10 26:5 30:11,18 32:10,20,25
35:2,5 38:11,20 39:16 41:16 42:23
44:25 45:1 49:6 53:21 62:11 72:7,18
73:19 75:1 77:4,9 79:1,8 84:1 88:18
92:12,18 100:11 107:20,21 108:5
109:22 114:17 115:14 116:5 118:9,19
119:17 120:5 123:1,3,13,17 128:5,10
129:14,18,19 131:5 132:7 133:7
134:17 135:1 136:8 137:10,18 138:16,
17,20 139:4,13,24 140:10,11,19 143:9
147:13 155:9 156:20 157:13,18,23
162:15,20,21,22,23 163:7 164:25
165:12 166:2 170:10,12 183:3,17
186:25 188:21 225:13 241:11 244:7

**Metropolitan** 6:4,7,11 145:1

**MG000167** 145:3

**MG000181** 145:20

**MG000696** 144:3

**MG1478** 183:2 186:23

**MG1479** 186:25

**MG149** 188:5

**Michael's** 17:3,6

**Microsoft** 105:20 177:22,23 181:9
236:19

**mid-june** 174:19

**mid-step** 17:22

**middle** 6:15 11:25 41:23 148:4

**midway** 143:19

**million** 48:18,19,20,21 49:8,16 53:19,
22 54:14,18,25 55:3,13,18 56:5,9,11
58:5,7 60:3 65:5,7,12 139:25 140:13,
20 147:10,21 160:17,23 162:8,10,16,
21,22 165:1,3,4,13,17,19 166:3,5,17

**millions** 88:21

**mind** 45:5 62:3 102:13 113:22 114:3,
12 174:22 204:12

**mine** 81:18

**minimize** 231:21

**minor** 17:8

**minute** 167:19

**minutes** 9:4,17 86:21,22 99:22 100:4,
5,7,8 145:9 146:1 167:12 170:25
216:8 237:11,16,18

**misfortune** 118:24

**mishandling** 123:17,25 130:11
131:14 132:6

**missed** 200:25 227:22

**missing** 90:25 91:18 92:3 104:17
105:2 106:2 177:5 201:24 209:20
223:19

**misunderstood** 165:24

**MNPS** 179:11 208:1 213:9 224:17,20
225:1 230:13 233:7 236:23

**MNPS-RELATED** 181:7

**moment** 36:6

**Monday** 231:5

**money** 49:4 54:17,21,24 55:16,22
56:4 138:19,23 139:12,22 148:2
160:22

**monitor** 159:14 171:6 203:3,6 226:8,
11 245:8

**month** 106:10

**months** 45:19 118:14,15 135:8 139:2

**moral** 34:3

**Morena** 6:7

**morning** 11:5 222:21 223:21

**Morris** 80:17,18 194:17 195:14 222:6
236:17

**most-qualified** 230:14

**Motioning** 173:13

**motions** 159:5

**move** 12:20 13:2,4 23:21 35:21 36:2
186:19 203:19 217:8,9 225:5

**moved** 12:5 240:15

**moving** 23:16 24:20

**multiple** 6:20 43:23 112:17 202:10
218:6

**mute** 243:1

**muted**  159:22 240:5 243:14

---

**N**

**named**  14:25 101:12,16 122:15

**names**  183:11,12 184:4,14,18,19,24
185:21 186:3 187:2,4,5,8,19,22,25

**Nash-**  22:21

**Nashville**  6:5,8,12,15 12:25 13:7,11
14:4 15:5,10 19:9,19 37:23 79:8 92:12
108:5 109:22 114:17 119:17,24 127:6
155:9 225:13

**national**  108:10

**nationally**  108:9

**natural**  46:1

**nature**  8:18 49:22 50:2 103:14

**natures**  9:22

**necessarily**  49:22 93:1 106:20
113:19 121:15

**needed**  13:20 22:9 23:23 29:7 35:12
45:12 55:19,23,24 59:3 62:21 68:22
113:13 161:2 189:22 201:5

**needle**  217:8

**neglect**  38:6

**net**  44:3

**newer**  44:1 97:3 105:24

**news**  115:18

**nickname**  206:15

**Nicole**  172:4,7 173:18,22,24 174:9
175:11,12,20 176:4 179:10

**nod**  14:16

**non-**  30:23

**non-contracted**  11:23

**non-eligible**  121:12,13

**non-licensed**  39:5

**non-renew**  29:11 110:18 121:18

**non-renewal**  29:22 30:8 77:14,18,24
78:3,15,22 79:6 112:20 113:18,22
137:14

**non-renewed**  29:17 31:15 78:10,11
110:22 111:14 114:2 121:11,24
123:23

**non-renewing**  34:23 110:25 111:6
112:25 113:6

**nonrenewals**  29:13 77:22 78:25

**normal**  23:11,20 61:22 94:17 102:10
138:9

**North**  6:19 10:16 17:18 18:12,14,19,
24,25 19:10 22:19 29:20 133:22,23
136:16

**note**  7:1 50:5 129:9 194:10

**notes**  42:20

**nother**  229:21

**notice**  11:24

**notification**  31:13

**number**  6:5,8,12 18:7 34:8 37:13 39:4
44:10 53:19,25 54:17 55:5,14,17,23,
24 57:10 60:12 61:17 65:9 74:24
75:19 79:3 90:19 96:4 97:24 106:21
107:3 113:4 137:20,23 138:1 140:3
141:6 143:3,12 147:18 148:23,24
149:8 154:5,24 158:1 179:7 191:5
216:8,9 224:22 227:13,15,16,18,19,
20,21,24 244:22

**numbered**  44:14 145:24 169:24
172:13 202:15,24 232:1

**numbers**  19:22 52:9 57:14 59:17
139:9 163:3 177:18

**numerous**  152:2,7

**nuts**  149:18

---

**O**

**oath**  131:3

**object**  34:11

**objection**  37:7,15 40:11 50:5 63:16
87:13 90:3 94:8,10,25 95:10 96:2,19
110:3 112:8,11 114:5,14 119:2 124:10
129:10,20 131:6 132:8,13 136:25
152:11 153:16 163:20 240:19 241:3,
14 242:2

**objective**  93:20,22 95:5

**obligation**  34:3

**observation**  72:14

**observed**  238:24

**obtain**  77:3 136:20

**occur**  133:14

**occurred**  51:24 79:15 86:8 105:15
128:8 233:6,17

**occurrence**  48:14 92:22

**occurring**  116:10

**October**  10:1 12:23

**odd**  101:8

**off-the-record**  54:10 70:9 203:4

**offense**  38:18 137:6

**offer**  37:13 145:23 213:14 219:19

**offered**  150:24 187:5 213:15 217:25

**offering**  163:17 213:17

**offers**  219:11

**office**  16:1 19:24,25 22:8,12 23:7 25:3
42:5 44:3,7 47:18,19 52:16 54:16
59:4,7,22 61:13 68:2 92:18,21 105:20
138:2 139:1 141:24 143:15 144:5,12
145:7,21 149:16 150:20,23 175:21
176:18 177:7,23 221:12,17 236:8

**officer**  56:13 57:20 60:14 61:3 80:7,
13 139:8 142:10 144:11 149:14
151:10 212:18,22 225:3,5,12,14,17,18
226:1

**officers**  56:18 100:25

**offices**  20:1,3

**official**  10:1 31:12 107:25

**officially**  101:17

**officials**  32:10

**offline**  103:7,24 216:6,14,18

**offset**  13:25

**Oftentimes**  78:21

**older**  105:25

**one-off**  100:14 173:2

**online**  85:7 91:2 104:21

**onus**  124:6

**open**  35:15 125:7 126:18,20 170:7,12
179:21

**opened**  85:4,9,11

**operate**  162:23 165:13

**operating**  161:22 162:8,13

**opinion** 50:17 62:23 71:24 76:21 95:2,18 96:11 99:23

**opportunities** 51:4,11,25 136:14,17

**opportunity** 55:25 74:11 95:20 136:1 215:6 244:2

**opposed** 75:12 82:20 83:2,9 107:17

**options** 51:4

**oral** 73:4

**orange** 177:24

**order** 54:16 87:23 114:9 210:15

**ordering** 102:14

**orders** 245:5

**org** 188:10,11,16,20 189:1,4,8,12,14, 22,25 190:2,11,12 225:13

**organizational** 56:14 57:21 61:3 142:11 144:12

**organized** 147:5 187:16 190:15

**organizer** 194:15 195:2 196:8

**orientation** 109:7

**original** 177:7 180:22 200:7

**osmosis** 116:13

**other's** 177:17

**outcome** 233:16 234:1

**outstanding** 37:21

**overage** 48:25 49:7 100:6

**overhead** 47:18 48:12

**oversee** 41:6

**owning** 126:6

---

**P**

**p.m.** 36:8 146:7 159:17 171:3 191:15 198:8,15 199:5 203:3,6 204:7,17,24 205:24 206:9 207:14,21 208:7,14,23 245:13

**pages** 57:9 152:25 153:2 172:1

**paid** 138:20

**pandemic** 42:8 99:4 101:15,16 104:9 123:10

**panel** 80:10 81:8 82:14,16 92:1,3 93:20 95:5 193:10,13 195:3,7,10

230:1

**panelist** 95:13

**panelists** 95:21 217:12 222:10

**panels** 79:21,23

**paper** 98:2

**para-pro** 59:1

**paragraph** 31:11 156:10 172:14,17 228:20

**parent** 116:1 118:1 123:18,24 132:7

**parse** 166:13

**part** 14:24 15:5 24:5 36:19 38:2,4,21 39:3 42:4 49:14 51:22 63:22 69:12 74:15 80:1 82:15,16 87:24 117:13 118:5 121:13 124:18,23 125:3 144:7 172:24 174:11 192:15 200:17 215:14 227:17,23 236:2

**participants** 6:20

**participate** 80:24

**participated** 149:17,19

**parties** 7:2

**parts** 43:20

**pass** 25:22 213:13

**passed** 203:13

**passing** 127:3,5,8,9,17,23

**passwords** 181:6

**past** 20:25 45:14 75:12 147:4 232:8 236:1

**patience** 171:14

**pattern** 164:20 165:7 184:20,24 185:12,13,15,16 186:1,5 193:11

**pause** 46:9 101:23 184:3 186:11 236:1

**pausing** 182:17

**pay** 138:6,9 140:9 141:1 156:14

**paycheck** 156:13

**payroll** 26:12 58:24

**payrolls** 139:15

**pays** 139:1,15

**PDF** 214:16 244:15,19

**pending** 38:24

**people** 14:16 15:24 16:10 20:11 22:8 26:3 30:3 43:19 55:8 68:24 74:17 85:15 88:3,12 91:24 93:18,21 96:4 111:2,13 112:19 125:17 131:9 148:22 156:1 178:12 185:16,22 187:22 211:13,21 236:13,15,16 239:15 240:23

**people's** 178:12

**per-pupil** 49:25

**percent** 44:23 72:5 143:4 147:17

**percentage** 241:25

**perform** 12:6

**performance** 26:14,23,25 28:15,19 29:25 72:13 75:8,13 77:23 78:1,7 88:5,10 99:17,20 229:3

**performance-based** 192:17

**performer** 164:4,7

**performing** 28:14 163:23

**period** 11:18 101:11 141:5 174:16 176:19 188:21 189:8

**periodically** 120:22 121:11,12 192:11,16

**perjury** 132:17

**permanent** 141:9

**Perry** 69:14,22 70:20,22 71:5,7 153:4 197:9

**Perry's** 69:21

**person** 9:15 24:22,23 47:2,14 51:17 61:22 78:9 80:25 89:1 92:23 93:6 94:4 111:18 112:5 114:2 115:4,6 116:23 120:8 121:22 123:22 124:4,5 130:8 132:21 139:5,19 148:10 151:14 157:12 177:9 179:25 180:4 187:24 189:20 190:8 220:13,15,19

**person's** 27:18 125:18

**personal** 9:21 13:25 15:8

**personality** 229:2

**personally** 15:1 120:8

**personnel** 36:22 39:22 45:8

**pertain** 37:20

**Ph.d.** 8:1

**philanthropic** 52:22

**phone** 99:1 124:9 126:15 161:13 217:13,15

**phrase** 157:9

**physically** 116:23

**pick** 14:18 89:10 101:19 113:22 116:13

**picked** 102:22 114:9

**picking** 100:25 115:15

**picture** 149:3

**piece** 98:2 177:4

**Pieces** 237:4

**Pippa** 6:10 7:9 130:19,22 207:8 227:4

**place** 7:2 34:2 48:13 49:4,23 80:20 93:1 100:16 122:25 133:1 189:2 193:23,25 195:22 197:11,22 198:7,15 199:5,17 202:6 205:7,16,23 206:8,20 207:5,14,21 208:7,14,23 209:6 219:4 220:8 221:9 222:23 231:8 237:4

**Plaintiff** 195:25 196:22 202:17 204:1 239:10 241:10

**plaintiffs** 21:16 165:25 210:2

**plan** 118:3 141:24 144:7 145:7,21,24 233:20

**planning** 141:4 213:15

**plans** 11:9

**plate** 128:25

**play** 139:9 148:21 235:15 237:15

**played** 160:4 235:19,22 236:3 237:12, 17

**pocket** 93:7 94:4,15 95:7 96:16 213:18

**pockets** 95:25

**point** 29:8 56:8 63:8 91:17 96:8 98:16 104:11 105:11,23 119:14 120:4 140:19 163:11 167:18 170:13

**policies** 34:2 37:24 38:14 115:7 132:19 133:1,10

**policy** 25:9,11 27:2 30:17,25 32:18,23 33:24 34:5 38:10,20 39:20 64:12,13, 18 72:3,8,12,19 79:16 98:23 109:18 126:18 136:7 137:8

**pool** 223:6,25

**portions** 74:9 134:1

**position** 10:7 18:20 19:2 23:16,25 24:9 39:18,24 40:10,18,25 42:14 47:3, 11,16 50:11 52:19,20,22 56:15 58:9 63:11,15 65:23 66:1 67:4,5,19,22 68:2,7,15,21 69:21 70:1 71:10 73:24 74:1,11 77:10,15 78:16,17,22 79:7,9, 17 89:5 92:16 93:6 94:5,16 95:7 96:17 97:8 98:22 100:10,20 101:10 105:5 108:4 113:17,23,25 118:13 126:10 128:7 134:11,13,19 135:16,19,24 136:11,19 139:1,18,20 140:12 141:9 149:15,25 150:11,14 151:5,10,24 154:14 155:8,12,23 156:4,7,11,19,24 157:8,10,11,12,14,16 158:11,14 163:17 182:1,6,12,15 189:3 193:20 196:17 212:19 215:7 218:1 219:14 223:3 225:5,7 239:20 241:10

**positions** 12:22 20:4 34:21 39:5,11 41:3,6,16,20,21,22,25 42:12,16,18,21 43:8 44:1 45:14 46:22,24 47:3,12 48:7 49:22 51:20 52:7,17,23 53:1,9,12 56:12,16,21 57:11,17 58:3,20 59:1,2, 25 60:11,13,25 61:1,11,20 62:2,11,15, 21 64:22,24 65:2,20 66:2,5,9,11,19 67:11 68:10 75:11 79:10,17 89:3 90:11 100:10,13,23 106:25 107:1 112:17 117:2 139:13 140:1,4,6,21 142:4,16 143:14 144:5,16 147:1,18,22 148:5,18 152:9 155:25 187:6 239:14, 18 240:12,14,15 241:7,9,22

**positive** 106:12

**possibly** 105:19 190:16 222:22 237:2

**post** 212:5,6,8,17

**posted** 138:11 188:18 190:24

**posting** 212:18

**potential** 141:10 165:4

**power** 40:10

**practice** 24:7 25:16 29:2 38:22 73:8 101:7 103:9,22 111:15 125:19

**practices** 45:11

**pre-pandemic** 41:18

**precipitated** 12:20

**prefatory** 187:7

**preference** 229:3

**preferred** 150:4,7

**premise** 166:5

**present** 7:4 43:16 149:21 150:10 217:12 231:1

**presented** 65:16

**press** 115:15 235:15 237:15

**pressured** 126:15

**pretty** 122:3,23 125:20 126:8,9 203:19

**previous** 233:14 234:3

**primarily** 13:6 63:4

**principal** 21:3,5 28:20,21 58:24 69:1 71:10,16 72:20,21 108:11 110:8 118:25 119:6 130:14 148:14,18,20 153:12,15,20 172:19 182:7 222:20 228:12 229:21 232:10,13,16 239:24

**principals** 36:21 58:20 76:15,16 148:16,17 168:12 229:5,16

**prior** 15:19 16:6,9 35:13 71:1 95:21 119:19 182:5 233:7

**priorities** 88:6

**priority** 70:18,23 130:25

**privacy** 232:11

**private** 126:23

**privately** 127:11

**privileged** 63:17

**privy** 44:20 51:23

**probable** 237:2

**problem** 72:22 73:2 123:6 201:23

**problems** 26:13,18 73:11 83:12,16, 20 98:14

**procedural** 217:7

**procedure** 25:12 44:25 103:18 109:24 110:10 111:2 136:7

**procedures** 77:12 133:10

**proceed** 54:12 70:11 102:7 146:7 159:17 171:7

**process** 24:5 28:17 41:7 58:18 63:22 71:23 72:1 75:14,15 81:2 94:9 96:5 103:21 105:24 111:5 121:10,20,21 137:2 149:18 151:1 168:3,5,6 192:16 193:19 228:11 229:15,21,22,24,25

**processes** 229:4,19

**produced** 170:7 183:3,6,17 186:25

221:4

**producing** 184:16

**professional** 75:25 76:7,11,23 182:5

**professionalism** 95:23 133:1

**program** 29:25 30:9 178:1,3 181:10 236:22

**programmatic** 78:13

**programming** 78:3

**programs** 181:7

**progress** 12:4

**progressive** 72:23 73:15

**proper** 19:14

**proposed** 59:20 162:7

**protected** 110:1,13,21 111:10,19 112:5,23 113:3,14 115:5 117:8,18 118:20 132:7,21 238:11,16,17,20 239:2,3,4 240:13,24 241:23

**protected-activity** 241:25

**protocol** 94:17,18

**proverbial** 136:17

**provide** 18:7 25:13 30:16 39:1 55:25 75:25 76:23 98:17

**provided** 13:22 14:2 38:4 42:23 89:12 136:1

**providing** 25:20 160:21

**public** 15:5,10 37:24 126:20 132:22 145:1 155:10 172:9

**published** 237:6

**pull** 24:2 84:12 143:2 146:20 159:8 170:5 183:15

**pulled** 31:5 87:8 183:13

**pulls** 23:9

**purge** 29:19

**purposes** 149:9

**purview** 40:21

**push** 55:22

**put** 23:9 36:14 38:23 73:15 93:7 96:17 98:3 107:22 136:19 177:16,19 181:12 188:15,16 193:11

**puts** 216:9

**putting** 145:17 237:3

---

## Q

**qualified** 229:6,17

**question** 13:21 22:1 33:3 34:4 40:6 51:2,9 60:22 62:5 66:17,24 69:2 70:13 71:19 78:21 81:21 82:23 83:5 87:23, 25 88:7 93:24 103:6 105:1 114:7 121:9 129:25 130:3 131:9,20 132:16, 17,19 136:21 137:17 143:1 145:5 150:22 152:24 153:6 165:23,24 167:22 168:10 176:25 183:23 184:22 187:7 188:25 200:17,25 201:5,16,22 209:18 217:6,7 218:2 224:10 231:17 232:15 236:10

**questioned** 13:18 134:14

**questioning** 114:15 167:20 238:13 239:13

**questions** 8:18 13:24 21:13 50:7 65:22 73:22 77:7 81:24 83:8 86:19 87:5 88:16 112:3 158:22 166:19,20 167:14 168:3,8,24 169:9,15,19,21 193:9,14 217:3,11 225:2 237:24,25 238:9 239:9 240:3

**quick** 146:2 149:13

**quiet** 190:10

**quote** 192:1,2 229:2,3,9

---

## R

**R-A-W-S-O-N** 8:12

**race** 15:14

**raise** 7:14 224:25

**raised** 121:9

**ran** 212:8

**random** 101:5

**randomly** 122:16

**range** 53:4 219:7 224:21 225:15

**ranged** 100:7

**ranges** 66:25

**ranked** 81:5

**ranking** 81:6

**rare** 122:23 133:14

**rate** 81:3,8 140:9

**Rawson** 8:12

**re-purposed** 239:21

**re-stricture** 126:22

**reach** 55:6,15

**reached** 55:17 111:16 113:11 209:11

**read** 31:11,16 35:9,13 37:18 99:1 118:3 213:21,22 227:11,17

**readily** 114:2

**reading** 200:9

**reads** 215:1 216:12 223:1

**ready** 103:2 152:2 227:11

**real** 146:2 149:12

**realize** 87:6 104:16

**realized** 105:3

**reapply** 74:6 100:13,20 135:8 211:9

**reason** 16:16 30:16,24 33:8,13 39:7 54:20 68:6,14,17 76:17 78:18 86:23 87:17,21 88:4,18 90:1 91:8 104:3,10 109:12 113:20,21,24 114:1 135:10 137:14 183:19,23 191:21 195:24 209:22 212:14,16 216:18,21 223:10, 22

**reasonable** 112:21

**reasoning** 166:10

**reasons** 33:6 45:18 78:12,13 110:17 112:20 152:10

**recall** 19:11,12,15 20:25 22:18 23:15 27:20 28:6 30:24 42:25 44:11 47:1,13, 15 51:16 52:20,24 53:5,20 54:22,23, 25 55:5,23 56:10 59:10 61:12,14 63:14 64:9 67:19 68:18 71:16 72:4 80:9,25 83:14,23 85:14 86:13 87:3 88:2,20 89:7 90:8 91:9,20 92:2,8,13, 15 93:10,23 98:19 99:18 103:15 104:6 105:4 106:19 115:3,12,13,15 121:6 122:24 124:1 133:13 141:23 142:19, 21,22,25 145:9 149:25 153:22 155:11, 13 158:3,13,17 164:15 170:11 172:22 174:3,18,19 176:3,5 177:12 179:15, 16,19,23 181:21,25 182:20 187:24 189:7 191:18 193:17,22 201:21 202:1 209:12 210:20,22 212:12 216:13 217:16,22 220:23 223:5,10,15 224:16, 19,25 227:1 230:12 236:11 239:16

recalling 29:20

receive 21:7 156:13 181:13 219:18

received 9:9 162:22 181:5,12 211:23

receiving 176:3,5 212:12

recent 97:4 175:12 176:23

recess 36:9 46:14 102:4 146:5 159:15 171:4 226:9

recipients 215:2

recognize 57:2 84:4 147:19 183:12

recollect 68:5 219:24

recollection 16:17 47:4,24 48:3 67:6 93:4 120:10 169:17 175:8 182:4 184:9 202:5

recommend 244:5,6

recommendation 28:16 29:3,6 40:16 41:1 42:3 48:9 49:19 50:10,14, 16 53:4 89:14,17 130:8 153:3 234:5,7, 9,13,18,23

recommendations 16:1 24:25 29:9 40:14,21 41:8 49:20,23,24 51:1 89:12 90:6 111:13 220:6

recommended 18:21 19:8,11 25:6, 12

record 6:2 7:3,5 8:9 14:20 21:14 35:20 36:1,7,10 40:8 46:10,13,16 54:8,12 61:2 64:8 70:6,8,10 101:25 102:3,6,11,12 112:12 123:20 134:16 146:4,6 159:11,14,16 170:24 171:2,6, 9 178:25 202:13 203:1,3,6 226:5,8,11 243:13,22 244:12 245:6

recorded 99:6 188:9

recording 7:1 159:19 160:4 236:24 245:1

records 109:25 111:10,24 170:7,12, 19 172:9,24 173:1,5,25 177:3 179:22 180:3,22 181:4

recycle 106:2,8,9,11

red 111:5

redacted 168:15 244:23

reduce 39:4 41:5 42:5 48:12

reduced 41:5 42:16 57:11,18 58:16, 24 60:12 78:17

reducing 42:15

reduction 44:3 58:23 78:1,2

reelection 120:16

refer 67:14 71:20 193:2 212:17

reference 185:20 187:17

referenced 67:17 202:10 233:14

referred 64:18 72:2

referring 168:5 192:8 221:14 229:10 232:16

reframe 82:22

refresh 184:9 202:5 219:3

regard 33:25 45:17 63:9 89:15,17 109:23 113:5 114:15 115:8 117:18 134:8 241:5,16

regular 145:2

regularly 173:1

rehire 121:25 156:4

Reid 172:4,7 173:18,22,24 174:9 175:11,12

reinterview 74:10 76:2 100:23

related 43:6 122:20 125:6 172:17

relates 203:20

relations 26:11,15,21 27:1,5,12,14 28:10 112:2 114:22,25 225:23 228:10

relative 128:18 129:19 130:1 138:1 241:11

released 188:12

releasing 119:16,23

reliable 163:4

relicensed 136:2

relied 68:23 79:8

relying 62:25

remained 158:11

remains 242:3

remember 22:20 24:5 27:13,17 30:21 38:25 43:21 47:5 52:18 54:18 55:2,9 56:17 59:18,19 64:11,16 67:25 68:12 71:2 79:25 83:18,24 86:24 88:13 90:8 91:8 92:21 93:21 97:7,10 98:1,3,19 99:9 100:4,15 103:10,25 104:2,15,21, 22,24 105:3 106:19 115:23,24 116:14 117:14 119:22 120:6,21 121:5 124:14, 17 125:1 126:2,6,15,21 127:18 129:22 135:20 142:12 149:23,24 150:15,17 155:20 158:6 160:16,19,20 161:14 164:11,13,14,21 165:21 169:12 170:14,15 175:2 176:15,17 179:25 180:2 182:2,3,9,19 184:16 189:19 191:25 192:23 193:1,8,21 201:24 209:18,20 212:21 216:23 217:14,19, 20 218:3 219:7,20 220:10,11,12,14 221:12,16 223:4,19 224:22 228:1,5,6, 7 233:18 234:24 235:1,2,13 236:7 238:12

remembering 131:1

remind 225:7

remote 116:22

remotely 13:9

removal 30:8

remove 69:5 121:17

removed 69:1 121:13 158:7

removing 71:15,22 121:10 142:9

render 94:6,22 95:14,17,19 96:1

renders 96:5

renewed 29:23 30:1,13,14,20 31:18

renews 133:24

Renfro 177:11 179:24

Renita 69:14,22 153:4 197:9

renowned 108:10

reorg 54:21,24 141:24 145:21,24 153:11,15,21 154:13 155:8 166:7

reorganization 51:23 55:12 59:23 74:12,18 145:7 154:1

reorganize 53:14 55:4,16

reorganizing 49:23 54:16 68:11

repeat 14:19 50:22 51:7 58:22 131:23 200:24

repeated 51:2

rephrase 119:4 161:9

replace 213:18

reported 71:4,6,7 173:9 232:23

reporter 6:23 7:6,14,19 18:8,9 34:9 35:22 37:14 44:15 61:18 70:5 81:15, 20 90:21 102:16 133:17 149:10 154:6, 25 158:2 159:10,20 169:25 179:2,7 180:8,12 181:24 186:22 188:7 190:7

198:25 200:16,20 201:14 202:18,21,
25 203:16 210:4 213:21,25 214:10
218:9,13 221:25 226:4 232:2,14 240:4
242:13,15,19,24 243:10,17 244:10,20
245:2

**reports** 115:19

**represent** 7:8,10,13 8:21,25 167:9

**representing** 6:24

**represents** 77:8

**reprimand** 233:20

**request** 9:10 170:8,12,19 172:24
173:25 175:14 177:3 179:22 180:22

**requested** 121:16

**requesting** 172:12 179:12

**requests** 21:9 172:9 173:2,5 181:4

**require** 20:12

**required** 13:25 18:20 19:1,4,11,16
30:16 32:23 41:10 49:2 65:18 150:1,6
194:16 195:5 196:9 197:18 198:3,17
199:7,14 201:11,17 204:9,20 205:5,14
206:17 207:2,11,23 208:4,16,25 209:9

**requirement** 29:7 32:21 122:4

**requirements** 30:25 150:3

**reread** 213:24 228:7

**rescheduled** 200:8

**researched** 19:15

**resign** 12:12

**resigned** 148:20

**resolution** 38:24

**resolved** 98:14

**resources** 10:9 11:14,22 19:4 22:5
24:18 33:23 37:19 39:16 42:24 107:21
108:10 129:24 173:8 226:2

**respond** 21:8 192:15

**responded** 174:5,7 175:16 176:6
179:10,12 181:15 213:2,11 228:4

**response** 50:22 51:7

**responses** 63:20 64:17

**responsibilities** 239:21

**responsible** 24:19 35:6 111:17 151:8

**responsive** 175:14 177:2 179:21

**rest** 88:7 145:12

**restate** 114:8

**restroom** 170:23

**restructuring** 47:17

**result** 53:18 229:5,17

**resulted** 229:25 233:19

**results** 178:5

**resume** 16:21 18:4,10

**resurrect** 136:4 177:7

**resurrecting** 135:3

**retains** 228:25 229:9

**retaliate** 114:3 115:6 117:19 128:17
129:4

**retaliated** 131:4 132:24

**retaliating** 118:20

**retaliation** 15:3 107:24 108:14
109:17,19 110:2 117:18 128:7,8,16
132:7 240:18 241:13 242:7

**retired** 139:19 241:9

**retirement** 137:11 141:10,11

**retract** 64:19

**return** 30:6 119:17,24 120:1,3

**returning** 29:24 226:13

**review** 41:7 184:3 186:11 190:19,22
191:12 193:10,15 227:25 243:23
244:8

**reviewed** 184:8 186:12

**reviewing** 147:16 172:22 210:19

**rid** 47:22

**right-hand** 143:19

**rights** 115:11 128:17 129:5 130:2
131:10 132:21 133:11

**River** 10:11

**Road** 10:17

**Roberge** 9:8,12 43:17 47:9 50:9 52:6
56:3 60:8 62:10 63:1,13 68:8 74:19
161:5

**Robin** 197:16

**role** 50:2 118:5 193:7

**rolled** 19:16

**Ron** 208:19

**room** 68:24 141:1 213:16

**roommate** 126:11

**round** 219:13 220:1,12

**rubric** 15:17 85:7

**rule** 44:22 92:23 103:4 109:2 125:15
130:14 139:8 163:17

**run** 23:11 45:14 53:21 170:23

**run-of-the-mill** 49:21

**running** 213:3 217:4

## S

**safety** 26:12 225:24

**Saint** 17:3,6

**salaries** 15:7,16,17,23,24 16:11 42:5
44:23 47:19,23 48:13,22 49:5,16 53:4
56:6 62:1 63:5

**salary** 14:25 15:18,25 52:9,11 53:3
139:20 224:17,19 225:6

**sat** 116:14 150:17 190:15 195:2,6

**satellite** 20:3

**save** 53:15 54:16,21,24 55:3,12,16,19
56:9 98:9

**saved** 56:11 57:23 58:3 92:11

**saving** 56:4,6 80:4

**savings** 60:3

**scenario** 190:20

**scenarios** 50:1

**schedule** 223:13

**scheduled** 100:5 196:15 221:5

**school** 11:25 13:2 17:1,13 23:21,22
28:7 29:24 30:1,2,4,7,8 31:15 32:8,12
39:11 40:3,17 41:5 48:11,16,17,24
57:6 59:1,3 67:20 68:15,22 69:23
70:23 77:24 79:13 109:19,20 110:25
125:10,13,15,22 130:14,24,25 138:8,
16 139:2 141:16,19,24 142:2,14,15,
23,24 143:9 148:7 154:14,17 155:23
158:12 161:23 162:13,16,17,23 165:5,
12,15 172:18 221:19 231:19 232:6,21
233:5 239:25

**Schoolemail** 242:19

**Schoolemails** 180:9

**schooling** 150:7

**schools** 9:6,16,20,25 10:2,14 11:10,
15,20,21 12:3,11,14 13:6,14,15,19,23
14:23 15:5,10 19:3 22:17 23:1 25:10
27:15 30:11 32:10,20,25 35:2,5 36:22
38:11,20 39:14,16,21 40:1,2,15 42:23
44:25 45:1 49:6,25 53:21 55:22,25
58:18,23,24 59:9 60:18 62:11 66:11
67:3,7,9 69:23 70:19,25 71:1,4 72:7
73:19 75:1 77:4,9 79:1,17 84:1 88:18
92:18 100:11 101:17 107:20 111:21,
22 115:14 116:5 118:9,19 120:5
123:1,3,13,17 125:6,16 128:5,10
129:14,18 131:5 133:7 134:17 135:1
136:8 137:10,18 138:20 139:4,13
147:13 155:10 156:20 157:13,18,23
162:15,20,22 163:7 164:25 165:12
166:2 184:13 187:12 192:14 194:14,
25 196:4 197:6 198:11,23 199:11,21
201:9 205:11,20 206:4,12,24 207:17
208:1,10,19 209:3 210:25 211:4,6
228:25 229:8 233:4 234:21 242:5,8

**schools'** 30:18 37:24 66:2 70:22,23

**Schoolsmails** 171:21,23 180:19
191:4 203:14 210:16 214:16 218:10
221:23 227:3 228:19

**Schunn** 198:1 234:19

**score** 84:16 85:18 87:6,7,8 88:23
90:23,25 91:3,4 92:4 95:3,16 100:2
106:15,19 178:18 181:12

**scored** 85:15 86:22 87:5,16 89:20
106:12,17 150:19

**scorer** 94:3,15 95:8 96:15

**scorers** 84:16 86:5 93:14,25 95:19,24

**scores** 84:2 87:18,19 88:2,12 89:9,
12,22 91:2,6,14,18,19 92:3 96:25
97:6,11,15 98:6 99:12,14 104:11,16
105:2,14,19 106:2 178:13,22 179:3
220:5

**scoring** 84:7 87:10,12 89:25 90:5,14,
23 93:22 95:21

**screen** 36:14 38:1 84:11 100:3
143:19 161:16 167:25 171:15,17
182:22 184:3 186:7 190:25 194:3
203:8,10,17,21 210:10,11 214:11,12
218:8,15 222:3 226:18,19 230:22
235:6,9 236:16 242:22 243:2

**scroll** 168:9,25 171:21 172:13 173:23
174:8 175:20 184:4,5 186:10,12 191:3
199:25 210:13 211:11 212:1 213:1,7
215:20 227:10

**scrolling** 173:16 227:2,6,12 228:18

**Sean** 181:25 182:11,15 209:3

**second-round** 219:23 220:4,24
221:4,8

**seconds** 54:7 237:16,19

**secretary** 27:19 58:20

**Section** 36:15

**secure** 157:7

**secured** 156:11 157:10

**security** 15:6,10

**selected** 104:20 156:5,19 157:11
187:23

**selection** 218:25 229:4,15,19,25

**send** 30:5,19 97:11,17 99:2 159:7

**sending** 179:15,16 191:18 217:16,19,
20

**sense** 96:14 116:15 148:8 160:24
185:1 211:21 213:18

**sentence** 229:7

**separate** 22:16 139:14

**separated** 156:12 157:8

**separately** 82:12 83:9

**series** 72:24

**services** 45:2,3,7,15 48:2,8,19,21,25
49:1,9,17 225:25

**serving** 63:17 64:4

**session** 107:22

**set** 15:16,17,24,25 54:18 55:3,5,14
90:22 109:24 110:10

**sets** 43:7

**setting** 15:23 222:21

**sex** 109:6

**sexual** 109:7

**sexually** 128:6

**share** 149:12 161:16 167:25 171:15
182:22 190:25 203:8,17 214:11 218:8
226:17 242:22

**shared** 176:24 194:3 203:21,22 220:5
235:8

**sharing** 230:22 235:6

**Sharon** 69:16 70:17 71:13 74:22
79:25 80:14 194:18 195:16 222:6

**sheet** 91:1 105:20

**Shelby** 13:15

**shift** 15:19 16:5 30:9

**shifted** 56:18 225:16

**shifts** 58:17

**short** 53:21 116:21 164:25 165:2
166:2,4,17

**show** 16:18 31:1 35:14 38:1 56:23
57:1,8 83:25 93:2 144:20 146:9
152:16 154:7 161:22 170:1,20 171:25
180:14 182:23 186:6 191:3 194:2
203:9 210:9 220:25 222:1 235:5

**showed** 65:21 92:4,6 142:6 187:10

**showing** 57:7 84:20 143:11 171:16

**shows** 57:11 148:16 162:3 190:3

**SHRM** 108:9,13

**Shumate** 197:16

**siblings** 120:24

**sic** 36:8 172:18 211:7

**side** 143:19

**sign** 86:17 243:24 244:8

**signature** 168:16 227:8 228:6,22
229:15 244:1

**signed** 38:19 144:18 165:14 227:7

**similar** 31:19 32:2 165:7 196:3

**simple** 139:6 166:12,16

**simply** 56:16 66:9 71:1 86:25 148:24
158:9 184:17 187:17 193:1 219:7

**simultaneous** 200:21

**single** 80:25 81:1 96:15 111:4

**sir** 11:3 184:6 238:14 244:3

**Siren** 167:7

**sit** 141:18 195:9 237:10

**site** 20:1 22:18,19,21,24

**sitting** 107:17

**situation** 9:24 16:10 50:13 51:14,17 69:10 100:21

**situations** 35:12 113:8

**skill** 81:18

**skip** 170:18

**Slave** 115:16

**slot** 216:7

**Slow** 190:6

**slower** 58:22 213:22

**slowly** 81:17

**small** 74:23

**smaller** 190:16

**Snorten** 206:13,14

**social** 133:1

**solution** 76:2

**solutions** 152:4

**solved** 98:15

**somebody's** 91:9

**someone's** 28:14 148:10

**son** 116:18 117:8,21,25 118:10,13

**Sonia** 198:24 199:1,2

**sooner** 12:21

**sort** 23:22 24:6,7 26:24 27:3,13,15 29:19 32:1 41:17 43:19 50:18 68:20 78:3 81:4 96:24 99:3 101:2 103:4 107:22 108:20 110:1,12,18 116:12 117:10,11 118:5,18 121:4,14 125:22 126:18 127:17 129:25 133:24 164:20 178:11 188:13 190:18,20

**sorts** 50:1

**sound** 140:17 147:14,24 174:1

**sounds** 147:16 174:2

**South** 10:12 12:25 13:10 18:12

**span** 172:1

**spans** 184:2 186:9

**spare** 213:17 216:8

**speak** 23:17 31:20 33:7 34:2 42:1,9 43:3 44:6 45:5 49:13 53:19 57:13 60:20 61:10 62:3 68:11,13 76:9,25 79:3 81:17 86:14 87:12 88:11 90:2 91:7 96:12,22 99:23 103:23,24 104:10

106:15 126:14 130:6 137:6 139:16 140:3 141:13 148:21 150:8 152:15 163:3 166:7,9 218:7 220:22 221:1 230:17 239:24

**speaking** 39:19 60:25 67:24 76:5 98:7 126:25 164:11 212:22

**specialist** 6:23 17:20 152:3

**specific** 30:2,24 35:7 42:9,19 43:20 45:11 51:17 63:23 76:8 88:13 91:10 93:23 96:4 97:7 104:10 108:7,12 109:1 110:5 113:4 130:6 134:3 161:14 177:19 219:8

**specifically** 21:8 23:17 24:5 38:18 43:7 44:6 58:15 64:11,25 67:2 77:1 103:11 108:21,22 121:7 142:1,12 148:13 150:9 176:5 228:19

**specifics** 182:3

**spectrum** 108:20

**speeding** 14:9

**Spencer** 80:3,4,15 104:3 146:22 173:4,6,12 180:25 181:2,15 189:11,15 191:15,19,22 193:4,5 194:16 195:2 211:12 212:3 218:18,21,24 219:9 222:5,19 223:24 224:1,6,19 243:5

**Spencer's** 224:16

**spend** 128:25

**spoke** 8:17 49:20 58:11 72:11 93:19 127:23 233:24

**spoken** 8:15 9:5,15,19 127:7

**spouse's** 10:25

**spreadsheet** 105:21 178:22

**spring** 42:10,11 116:8,18 232:8,9

**springs** 45:5

**square** 148:4

**stack** 98:12

**staff** 9:21 13:23 14:3 45:4 78:2 193:10

**stamp** 179:17 186:21 188:5 194:11 214:8

**stand** 8:11 42:19 120:22

**standard** 31:17 103:5,8,18 141:13,14

**standards** 110:19

**standing** 106:19

**Stark** 80:1,14 194:17 195:9 222:6

**Starkweather** 6:22

**start** 10:2 45:3 84:22 85:1,3,8 112:16 148:8 196:5 210:14 235:25

**started** 16:11 54:19 85:7,9 101:14 107:20 137:18 148:7 167:11

**starting** 102:21

**starts** 139:3

**state** 7:4 8:8 13:15 17:21 22:16 23:3, 4,5,8 32:12 58:17 70:12 77:25 129:21 132:22 138:13

**stated** 55:21 76:19

**statement** 50:18 52:15 54:24 64:19 66:13,22 93:12 94:13 115:5 139:25 149:6 153:25 237:20 245:3

**statements** 47:20 51:21

**States** 6:14

**stating** 29:16 38:18 39:2 212:3

**status** 219:9

**statutes** 32:23 34:20

**stay** 12:16 75:21 127:20

**stayed** 30:4 240:16

**Steel** 232:13,17,23 233:11,17,22,25 234:2,14

**Steel's** 233:9

**Steiner** 7:7 8:7 18:6,10 21:15,18 34:6, 10,17,18 35:22,23,24 36:5,12 37:12 44:13,16 45:24 46:5,18,19 61:15 63:19 64:2,14 70:14 81:16 90:17 102:10,12,18 103:1 131:19,22 145:23 146:8 149:7,11 154:4,23 157:25 159:12,18,23 160:5 166:15 218:3 238:8 239:8 240:9 242:10 243:14,15, 18 244:22

**stenographer** 46:11 200:25

**step** 16:2,13

**steps** 72:3

**Steve** 92:2 204:3 236:16

**Stewart** 198:24 199:1,2

**Stewart's** 199:4

**stood** 121:14

**stop** 14:16 45:24 56:22 149:12 151:1

169:3 244:24,25 245:2

**stopped** 83:21 113:1 160:4 230:22 235:19,22 236:3 237:12,17,18

**straight** 29:21

**Stratford** 231:19 232:6,21 233:4

**stream** 172:1

**Streaming** 236:20

**street** 157:17 228:3

**strict** 30:7

**strike** 101:4,7 132:2 166:17 179:9

**string** 171:17 210:14

**strokes** 109:8

**strong** 25:11

**structural** 217:7

**student** 88:5 115:25 116:1 131:13

**students** 34:21 137:3 141:2

**stuff** 116:13

**subject** 194:25 197:5 222:13

**submit** 81:8 85:19 100:2 141:18

**submitted** 81:10,11 84:16 86:15 89:9 97:5 141:24

**substance** 243:25

**substantial** 49:4

**substantive** 193:13

**substantively** 230:12

**substitute** 141:1

**substituted** 196:11

**sued** 21:11 241:11

**Suites** 6:18

**summaries** 59:12

**summary** 59:11 190:11

**summer** 220:16

**summons** 9:9 21:7

**superintendent** 11:13 18:16 39:13 40:22 41:18 42:13,21 43:8 46:21 52:7 60:14 100:22,24 101:1,13 125:9 130:23 142:4,10 144:11 241:19

**superintendents** 52:12 56:20 58:2 61:4 233:3 240:11

**superintendents'** 56:12

**supervise** 151:13

**supervised** 24:23 70:3 74:23 130:20, 24

**supervision** 76:8

**supervisor** 25:14 26:22,25 28:18,20 29:4,10,11 33:12,14 69:3,9,11,13,18, 19 70:15,16,21 72:15,20 79:9 109:24 125:18 130:17 150:25 151:5 225:15

**supervisor's** 28:18

**supervisors** 25:15 36:21 75:4 89:3 114:16

**supplies** 14:1

**support** 20:9,12 21:2 70:24 150:24 155:9 172:19

**supported** 130:17

**supposed** 134:10

**supposing** 23:25 138:15,25

**surplus** 140:20,22,25

**surprised** 135:11

**survey** 176:9,14 178:5 181:14

**suspended** 38:3,5,12

**suspension** 38:23

**swear** 7:6,15 68:17

**sworn** 8:2

**system** 39:5 45:8 48:16,17,24 72:23 75:2 90:22 91:2 135:14 138:8 147:6 183:14

**systems** 48:11

---

**T**

---

**table** 52:8

**tail** 147:11

**taking** 95:2 104:1,4 189:2

**talk** 9:2 51:23 52:25 88:16 95:20 103:6 127:2 139:7 161:2 171:10 192:4 194:8,10 216:18 226:14 243:20

**talked** 42:15 47:17 52:23 53:14 87:15 161:12 216:5 219:24 224:3,13 234:15

**talking** 44:17 45:13 56:4 60:6 61:2 67:15 89:3 127:19 147:9 164:15

170:19 173:24 229:10 236:12 238:25 245:2

**tape** 160:2,3

**task** 192:1,14,17

**tasked** 189:20

**taught** 115:17 116:18 117:7,20

**teach** 136:22

**teacher** 20:15,16 22:11 23:21 25:2 28:20,21 36:20 37:5 38:3,5,11,16,17 58:25 72:20,21 110:8,10,12 137:3 140:9 141:2 148:13 156:23,24 163:13

**teacher's** 140:12 141:4

**teachers** 13:24 34:20,22 36:19,21 37:6 58:16,21 76:12 78:19,20 110:25 141:3

**teaching** 39:4 133:20 134:6,23 135:9, 16,19,24 136:11 138:3 163:17

**team** 30:18 222:19

**Teams** 99:2,5,6,11 196:15 220:9,10, 13 221:9,20 237:1

**tedious** 202:8

**telling** 30:19 53:20 63:10 124:14 155:11 163:6 190:9

**tells** 33:12 175:21

**Tennessee** 6:15 18:22 19:1,2,10 22:16,21 29:18,19,21 30:15 31:13 34:20 35:11,16 36:14,18 38:2 40:10 126:17 128:17 133:25 135:5 136:24

**Tennessee's** 23:8

**tenor** 233:19 235:2

**tenure** 115:3 156:23 157:1

**tenured** 156:24 163:10,13

**term** 19:25 20:7,11 22:20 77:24 78:3 117:11

**terminable** 137:5

**terminate** 110:18

**terminated** 137:9 233:22

**termination** 133:8,11 137:14 234:10

**terms** 30:25 40:24 62:20 64:21 87:22 131:13 132:6 202:24

**territory** 148:3

**test** 89:21

**tested** 36:25

**testified** 8:3 14:8 62:8 98:20 131:2

**testifies** 86:17 87:15

**testify** 83:19 87:11 88:14 131:12
   231:13

**testimony** 40:8 131:25 132:1,5
   179:18 238:23

**testing** 93:16 94:6,23 95:14 96:1,18

**text** 71:16 164:21

**thanking** 215:5,6

**thing** 14:15 27:3 36:2 67:23 84:16
   94:21 95:17 101:5 117:15 120:18
   127:17 155:16 156:21 157:6 167:21
   186:9,13 187:21 188:14 196:2,24
   197:5,14,24 198:10 205:19

**things** 19:10 26:2,3 45:7,8 49:21,25
   58:15 72:25 78:6,8 98:13 104:8,15
   111:23 114:19 131:1 132:23 133:12
   137:15 138:22 139:22 172:10 177:18
   178:11 185:14 188:19 234:25 238:21

**third-grade** 110:10

**thought** 76:1 99:12 100:3 117:23
   127:23,24 129:17 130:22 231:3

**thoughtful** 182:18

**thousand** 138:8

**three-** 228:4

**three-phase** 229:22

**thresholds** 110:19

**threw** 98:15

**thumb** 92:24 109:2 125:15 139:8

**thumbs** 102:8

**Thursday** 195:22

**ticket** 14:9 177:14,16,19 179:23

**time** 6:2 11:18 12:18 28:25 29:8,9
   34:16 36:7,11 46:8,13,16 54:8,12
   57:15 62:8 63:8,18 70:8,11 74:23 77:4
   78:14 82:6,15 84:14,15,18,22,24 85:1,
   3,4,8 91:18 98:10,13,16 99:4 100:6,15
   101:12 102:3,6 104:9,12 105:6 115:18
   116:22 118:7 119:7,11 122:15 123:10
   125:1 127:24 129:1 130:13,21 133:9
   134:22 135:3 136:20 140:19 146:4,7
   148:24 150:16 159:14,17 163:24

**164**:4,8 166:19 171:2,6 174:15,16
   176:19 179:17 188:21 189:2,5,9,14
   190:8 192:24 200:10,12 203:3,6 211:1
   213:13 216:6 217:4,6,10 220:21 224:2
   225:1 226:8,11 229:24 231:2,21
   233:13 242:23 245:8

**timeline** 212:4

**times** 38:25 43:24 77:20 82:17 92:13
   96:4 114:8 138:21 202:11 220:17

**title** 27:25 28:5,6 41:19 109:13,14,15
   117:9 118:10,21 128:16,22 129:3,5
   130:2 132:9,10 173:7 183:5 225:16
   237:3 239:3,4,20 241:12

**titled** 183:9,18 194:13 196:4

**titles** 67:1

**TN** 135:12,14

**today** 6:23 8:16 9:6 34:8 40:8 52:2,4
   68:14 83:17 90:20 153:8 178:20
   179:18 238:25

**told** 30:10 33:15 47:10,15 49:15 54:2,
   13,15 88:23 100:12,19 116:15 121:6,
   20 122:13 158:4 160:10,11,16 161:1,
   6,9 164:24 165:25 166:16 171:12
   175:12 182:10 187:11,15 218:3

**tomorrow** 243:15

**tone** 233:18

**Tools** 177:23

**top** 57:17 128:21 161:21 168:16
   169:14 183:7 200:10 221:1 236:18
   241:18,19,20

**tornado** 42:8 101:15,16

**total** 52:9 147:11 162:7

**touch** 126:3

**track** 29:13

**tracking** 115:19

**train** 23:6

**trained** 35:1,4 107:8,13 108:4

**training** 35:7 75:25 107:12,22,25
   108:2,8,16

**transcript** 243:11,23

**transfer** 18:25 23:20 77:17

**transferred** 24:9 134:9,10,12,16,19
   135:16,19,24

**transferring** 34:21,22 77:11

**transfers** 23:14,19,21,22 134:8

**transitioned** 12:21,22

**trash** 106:3

**travel** 13:3

**treated** 113:17

**triangle** 143:18,22

**triggering** 113:19

**true** 18:4 33:16 62:7 91:5 107:4
   117:16,22 153:24 154:16 158:9
   163:21 216:19

**trumps** 229:3

**trust** 75:19

**truth** 7:16,17 132:18

**truthful** 141:14

**truthfully** 131:12

**Tuggle** 201:9

**turn** 148:2 243:2

**Turner** 198:1,6 234:20,22

**Turner's** 198:7

**two-minute** 170:22

**type** 17:7 94:22 95:14 133:14 145:11
   164:3,7 243:12

**typed** 145:14

**typical** 44:24,25

**typically** 100:1 106:7 125:15 192:11
   217:1 244:18

---

**U**

**Uh-huh** 17:16 26:1 117:4 134:22
   138:18 146:16 161:20 162:9 168:4
   172:2 175:15 176:13 179:8 180:20
   185:23 192:3,5 206:7 215:23 216:3

**ultimate** 42:2 89:10 98:21 228:25
   229:7 230:7 233:25

**ultimately** 56:5 161:19 166:3 185:18
   190:23 193:11 230:15

**unable** 106:6

**UNC** 17:19

**undergone** 35:7

**undergraduate** 17:2

**understand** 39:20 45:19 82:22 105:1
109:2 140:23 141:12 160:24 163:2
166:13 183:22 218:2 232:15

**understanding** 30:15 32:22 39:10,
12,20 48:15 49:14 65:14 73:23 79:15,
18 108:24,25 114:7 189:13

**understood** 48:10 104:25

**unethical** 125:22,25

**unfair** 93:12

**unfilled** 138:23 140:4,6

**unfortunate** 119:10

**United** 6:14

**universities** 128:12

**University** 17:18

**unlicensed** 137:3

**unnamed** 124:13

**unofficial** 108:1

**unpopular** 168:11

**unprofessional** 38:7

**unreasonable** 124:15

**unsubstantiated** 229:2

**untrue** 183:24

**unused** 140:1

**upcoming** 160:22 165:5

**update** 173:24

**updated** 188:13

---

**V**

**vacancies** 137:20,23,24 138:2,5
147:3

**vacancy** 146:14 148:2

**vacant** 137:19 139:13,18 146:25
147:11,22 148:17,18 149:4

**vacated** 148:6,19

**vacation** 156:14

**vague** 122:3

**Vaguely** 170:14

**valid** 96:18

**Vanessa** 128:2,3,11

**variables** 103:12 139:10

**verbiage** 31:20 228:14

**verify** 23:12 59:17

**Vermont** 17:4

**versus** 13:15 20:9 59:3 63:24 67:25
78:7 79:6 113:8 116:24

**VI** 27:25 28:6 109:13,15 117:9 118:10,
21 132:10 239:3

**video** 6:23 7:1 159:14 160:1 171:6
203:3,6 226:8,11 235:5,7,19,22 236:3,
4 237:12,16,17,18 243:7,11 245:8

**videotape** 102:16

**view** 44:5 78:7

**VII** 28:5 109:14 128:16,22 129:3,5
130:2 132:9 239:3 241:12

**violated** 72:12 115:11

**violation** 27:2 117:7 118:10 136:23

**violations** 241:12

**virtual** 220:18,20

**voice** 160:2,6,8 237:13,14,20

**vote** 127:19

---

**W**

**wait** 104:13

**waive** 244:1

**walked** 228:3

**walking** 157:17

**wanted** 22:10 36:18 62:4 74:10 101:1
150:4,25

**wanting** 23:21

**Waverly** 115:17

**ways** 44:21 136:15,19

**website** 22:15 23:9

**Wednesday** 172:4 196:5,6

**week** 104:4,7 125:21 174:11 192:13
219:1

**weekend** 212:4

**weeks** 80:21 194:1

**weird** 186:2

**Western** 18:2

**whatnot** 244:16

**whistleblower** 117:11 132:15

**whistleblower-type** 117:24

**Whites** 21:4 69:1 71:10 118:25 119:7
239:25

**wholesale** 35:13

**widespread** 95:1,18

**wife** 11:7 12:18,25

**wife's** 12:4,7,13,17

**wiggle** 213:16

**Williams** 80:9,11,14 194:17 195:12
222:6

**Wilmington** 6:18 10:16

**window** 23:20

**winnow** 98:14

**Witty** 204:15,23 210:21,23 212:2
213:2,12 214:2

**wonderful** 212:4

**Woodard** 208:20

**word** 25:11 140:25 241:15,16

**words** 20:15

**work** 10:19 11:7 12:15,17 18:19 19:14
24:1,22 25:7 35:2 55:20 70:24 73:19
76:12 107:14 108:11 119:25 120:1,3,9
123:9 124:3 128:5,6,24 136:15 157:13
175:13 222:22 223:13 235:7,12

**worked** 10:4 19:20,24 22:4,11 25:23
39:15 41:9 48:24 70:18 109:21 114:17
129:22 172:8 189:18 224:20

**worker** 25:2 32:19 77:11 109:23

**worker's** 23:9

**workers** 22:6 32:16 33:24 34:22 75:2

**working** 12:24 13:5,9 16:12 66:16
70:24,25 71:3 83:21 112:19 159:1
225:1

**workplace** 26:11 225:24

**works** 128:12 185:3 234:15 235:6

**world** 231:4

**worry** 94:2

**worrying** 129:1

**write** 228:13,16 242:17

**writing** 30:22 38:18 98:1 192:15

**written** 53:3 73:5 97:20,23,24 98:2
 156:25

**written-down** 122:4

**wrong** 33:13 73:7 77:21,22 202:19

**wrote** 98:3

———————————————
                    Y
———————————————

**year** 11:25 16:14 17:10 29:13 30:7
 31:15 32:22 43:2 58:19 61:16 64:10
 76:5 116:8 123:11 128:9 129:1,2,21
 148:8 160:18,22 161:23 162:4,13,16,
 17,24 165:5 187:17 232:8,9 240:21

**years** 10:5 34:15 108:7 169:20

**yellow** 184:25 185:14,21

**yesterday** 8:18 9:3,17 216:5,17

**you-all** 86:20 212:3 215:6

**Young** 234:16

———————————————
                    Z
———————————————

**Zander** 27:11 28:3,11

**Zoom-type-related** 83:17