IN THE UNITED STATES DISTRICT COURT FOR TENNESSEE
FOR THE MIDDLE DISTRICT
NASHVILLE DIVISION

| | | |
|---|---|---|
| JENAI HAYES, | ) | No. 3:20-cv-01023 LEAD CASE |
| | ) | |
| DR. LILY MORENO LEFFLER, | ) | Judge Trauger |
| | ) | (CONSOLIDATED) |
| | ) | |
| and | ) | |
| | ) | |
| DR. JAMES BAILEY, | ) | |
| DR. PIPPA MERIWETHER, and | ) | |
| DR. DAMON CATHEY, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| METROPOLITAN GOVERNMENT | ) | |
| OF NASHVILLE AND DAVIDSON | ) | |
| COUNTY, TENNESSEE and | ) | |
| DR. ADRIENNE BATTLE, | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFFS' STATEMENT OF UNDISPUTED MATERIAL FACTS

1. Hayes was tenured from 2003- 2021 and is certificated. (Ex. 1, Hayes Decl. ¶ 4).

**RESPONSE:**

2. MNPS requested the School Board approve the elimination of Director of School Choice pursuant to Tenn. Code Ann. §49-5-511(b).

Central Office Reorganization Plan: Under Tenn. Code Ann. 49-5-511(b) requesting Board Approval to eliminate the following positions based on budget constraints: 1) Associate Superintendent, 2) Executive Officer of Schools and Academic Support, 3) Executive Officer of Organizational Development, 4)

Executive Director of Charter and Private Schools, 5) Executive Director of Federal Programs, and 6) Director of School Choice. These positions were not included in the budget presented on May 19, 2020. (Ex. 28).

**RESPONSE:**

3.  The minutes of the May 26, 2020 School Board meeting show the School Board did approve the above "Central Office Reorganization Plan" on the "Consent Agenda" at the May 26, 2020 School Board meeting. (Ex. 18; May 26, 2020 School Board Meeting Minutes, at 1-2).

**RESPONSE:**

4.  MNPS transferred Hayes into a classroom teaching position – a significant demotion in terms of both rank and pay. (Ex. 1, Hayes Decl. ¶ 55).

**RESPONSE:**

5.  Hayes would have made $123,750.36 per year if her job as Director of School Choice had not been eliminated. As a teacher she only made $ 75,116.12. Hayes suffered a decrease in her salary of 40% and went from a high position at MNPS to a teacher's position.

**RESPONSE:**

6.      This teacher's position was comparable to the job Hayes had when Hayes first started at MNPS and it was not comparable to her job as Director of School Choice. (Ex. 1, Hayes Decl. ¶ 55).

**RESPONSE:**

7.      Hayes always performed well in her evaluations. Her last evaluation before her position was eliminated was for the 2018-2019 school year. Hayes was then the Director of School Choice. The 12 areas were scored from 1 (Significantly Below Expectations) to 5 (Significantly Above Expectations).  Her scores averaged a 4. I received one 3 and one 5 and the remainder all 4s.  Hence, Hayes rated in the three (3) highest categories on her evaluation.   (Ex. 1, Hayes Decl. ¶ 56)(Ex. 56).

    **RESPONSE:**

8.      Hayes was not placed on a list for reemployment nor was she offered reemployment at a comparable position. (Ex. 1, Hayes Decl. ¶ 57)

    **RESPONSE:**

9.     Bailey began working for the Defendant in 2003 as a teacher and by 2012 he had been promoted to be the Executive Principal at Whites Creek High School and he remained in this position until June 30, 2020. (Ex. 2, Bailey Decl. ¶ 3).

**RESPONSE:**

10.     Bailey is tenured and has been tenured since approximately 2014-2015 school year. (Ex. 2, Bailey Decl. ¶ 4).

**RESPONSE:**

11.     Dr. Battle, Director of Schools, knew Dr. Bailey was tenured (Ex. 22; Depo. Battle p. 88).

**RESPONSE:**

12.     On May 1, 2020, Bailey was fired from his position as principal at Whites Creek High School. In a Zoom meeting, Dr. Chris Barnes, Chief of Human Resources, with Dr. Sharon Griffin, Chief of Innovation Schools, told Bailey he was being let go because what MNPS is "looking for is to make a change at Whites Creek for the upcoming school year." (Ex. 2, Bailey

Decl. ¶ 5).

     **RESPONSE:**

13.     Bailey was never given any grounds for the termination of his position as Principal at Whites Creek. (Ex. 2, Bailey Decl. ¶ 6).

     **RESPONSE:**

14.     Bailey was never charged with, nor told by anyone at MNPS, that he was being fired for or was guilty of incompetence, inefficiency, neglect of duty, unprofessional conduct, and insubordination nor had he engaged in any of these activities. (Ex. 2, Bailey Decl. ¶ 7).

     **RESPONSE:**

15.     In fact, quite the opposite, in the Spring 2020 semester Bailey was told by his supervisor, Renita Perry, he was doing a great job and to keep doing what he was doing. (Ex. 2, Bailey Decl. ¶ 7).

     **RESPONSE:**

16.     Bailey was never provided any written charges specifically stating any offenses that were charged against him. (Ex. 2, Bailey Decl. ¶ 8).

**RESPONSE:**

17.     The Director of Schools never gave Bailey written notice of any decision of the board that any grounds against him were of such a nature to warrant his dismissal, nor was he given any copy of charges against him nor a copy of any form advising him as to his legal duties, rights, and recourse under the terms of the Teacher Tenure Act. (Ex. 2, Bailey Decl. ¶ 9).

**RESPONSE:**

18.     Dr. Battle testified that she was the ultimate decision maker in the Bailey matter and she non-renewed Bailey's contract. (Ex. 3, Battle Dep. 90-92, 93-94).

**RESPONSE:**

19.  Battle's testimony is determinative because she was the ultimate decisionmaker. (Ex. 3, Battle Dep. 93-94).

**RESPONSE:**




20.     A non-renewal is the same as a firing or termination. (Ex. 2; Bailey Decl. 65).

**RESPONSE:**









21.     Battle testified that "as the Director of Schools, it . . . [was her] . . . responsibility, but based upon the disciplinary action –excuse me, he was a non-renewal, so that was . . . [her] . . . ultimate decision." (Ex. 3, Battle Dep. 93-94).

**RESPONSE:**




22.     Battle testified Bailey's direct supervisor would have told him his position was being non-renewed. (Ex. 3, Battle Dep. 185-86).

**RESPONSE:**

23.     On June 15, 2020 at 9.58 p.m. Dr. Bailey sent to MNPS a formal complaint of retaliation, age and race discrimination. (Ex. 31).

**RESPONSE:**

24.     No where in this formal complaint of retaliation, age and race discrimination  is any form of the word resignation used. (Ex. 31).

**RESPONSE:**

25.     Defendant's Assignment / Transfer Policy provides that

> The director of schools shall assign personnel to the various schools or departments by June 15 preceding the school year for which such persons are employed while allowing each principal or immediate supervisor to assign more specific responsibilities within each school.. (Ex. 32).

**RESPONSE:**

26.     On June 15, 2020, no assignment of Bailey had been made. (Ex.2; Bailey Decl. 56).

**RESPONSE:**

27.     Because of the non-renewal of Bailey his employment with MNPS did end on June 30, 2020. Bailey knew his employment with MNPS was over because Dr. Battle was angry with him about the non-renewal of her brother and thus, she non-renewed Bailey. (Ex. 2; Bailey Decl. ¶¶'s 58, 66).

**RESPONSE:**

28.     On April 24, 2020,  Hayes called the principal of her son's school and complained about the use of her child in a video posted on a teacher's personal YouTube and public Twitter account without her permission. Hayes complained that this video was a violation of her child's FERPA rights. (Ex. 1, Hayes Decl. ¶ 23).

**RESPONSE:**

29.     Hayes  also complained to Sonya Dobbs, the Director of Special Education, and the special education teacher. (Ex. 1, Hayes Decl. ¶ 23).

**RESPONSE:**

30.     The video highlighted that Hayes' child was different and had a disability. The theme song was the same as the theme song to the Greatest Showman, which is about a man who takes misfits and gives them a purpose. Hayes told the principal it is not good to highlight any child's disability. (Ex. 1, Hayes Decl. ¶ 23).

**RESPONSE:**

31.     From February 4, 2020 through the week of February 10, 2020, Hayes had complained of the "Let's Make a Slave" lesson given at her son's school (Title VI violation). (Ex. 1, Hayes Decl. ¶ 7, 9, 12-16).

**RESPONSE:**

32.     On April 24, 2020, Hayes complained of the FERPA violation due to the video of her son posted on a teacher's personal YouTube and public twitter account. (Ex. 1, Hayes Decl. ¶ 7, 9, 12-16, 23).

**RESPONSE:**

33.     On April 29, 2020, Hayes was fired when her position was eliminated and then when Defendant realized she was tenured she was transferred to a teaching position. (Ex. 1, Hayes Decl. ¶ 24-25, 31).

**RESPONSE:**

34.     On April 29, 2020,  Chris Barnes, MNPS's Chief of Human Resources, and Lisa Spencer, Director of HR Strategy and Employee Services, told Hayes that as of June 30, 2020, her job was being eliminated and she would no longer have a job, i.e. no longer be an employee of MNPS, if she did not secure another position at MNPS.  (Ex. 1, Hayes Decl. ¶ 24-25).

**RESPONSE:**

35.     Hayes replied back that this was done in retaliation for her complaints. (Ex. 1, Hayes Decl. ¶ 29).

**RESPONSE:**

36.     Approximately two hours after the call ended, Lisa Spencer called Hayes and Hayes told Spencer she was being retaliated against. Spencer told her, "I don't want you to hurt yourself down the road by making this personal because if you continue with she doesn't want me that is going to come out in places you don't want it to come out and is going to start to show".  Hayes knew that the "she" meant "Dr. Battle". (Ex. 1,  Hayes Decl. ¶ 30).

**RESPONSE:**

37.     Spencer in her deposition agreed she could see how Hayes thought Spencer had told her she better not make any more complaints of retaliation. (Ex. 23,  Spencer depo. p. 130).

**RESPONSE:**

38.     When the request to hire Hayes as a Restorative Practice Specialist was taken to Lisa Spencer for approval, Spencer's jaw dropped open, and she rolled her eyes in the back of her head and stated "You have to be kidding me. She has a lawsuit against the district." She then stated, "I do not know why they would want her." (Ex. 8, Johnson Decl. ¶ 9) (Ex. 23, Spencer Depo, p. 119).

**RESPONSE:**

39.     Hayes never got that job. (Ex. 1; Hayes Decl. ¶ 54).

**RESPONSE:**


40.     Spencer in her deposition testified that she knew Hayes had a "claim against the district". (Ex. 23, Spencer depo. p. 87).

**RESPONSE:**


41.     Johnson knew that the implication was that Spencer did not want Doe to be hired into this position. Johnson knew this was wrong. (Ex. 8, Johnson Decl. ¶¶ 10-13).

**RESPONSE:**


42.     Statistically for the Central Office there was only a 1 in a million chance that randomly all of the 6 employees who Dr. Battle knew had engaged in protected activity be affected by the reorganization. (Ex. 19).

**RESPONSE:**

44. The school budget increased $19,176,500.00 from the 2019-2020 school year to the 2020-2021 school year. (Ex. 11, Doc. #1; MG 000696).

**RESPONSE:**

45. One day after eliminating Plaintiff's position due to the budget Dr. Battle sent a "Private" e-mail discussing how MNPS had been able to save $52 million of the 2019-2020 school budget because of COVID closures and an additional $6.2 million. (Ex. 9; Private E-Mail) (Ex. 21; Booker Dep. 6, 89).

**RESPONSE:**

46. As of May 5, 2020, MNPS knew of the $52 million in savings. (Ex. 26; Braisted Dep. 54, 56).

**RESPONSE:**

47. MNPS also knew it would be receiving CARES Act money of $26,000,000.00 that was on page 6 of the posted agenda for May 19, 2020. (Ex. 34, Smith Report p. 5).

**RESPONSE:**

48. If MNPS was really having financial woes it should have discussed this with the Chief Financial Officer, Chris Henson. Henson was only old about the decision to eliminate the jobs after it had been made. (Ex. 27, Henson Dep. 39).

**RESPONSE:**




49.    The elimination of the Central Office positions in the Reorganization resulted in a savings of only about $1 million, representing approximately *1% of 1%* of the budget. (Ex. 27; Henson Dep. 39). Booker, who reported to Henson, testified that a person looking to find a savings of a million dollars in the budget can typically do so. (Ex. 21,  Booker Depo. p.  9, 99).

**RESPONSE:**




50.  Plaintiff's School Budget Expert, Dr. Ken Smith, concluded that "the elimination of the Central Office positions was discretionary and not mandated by the budget process". (Ex. 34, Smith Report p. 1).

**RESPONSE:**




51.    Smith  found  the  Board  was  aware  of  the  substantial  increase  in  the  largely discretionary and new CARES Act money of 26 million that was on page 6 of the posted agenda

for May 19, 2020. This additional Federal revenue would substantially reduce the budget pressure for the upcoming 2020-21 fiscal year. (Ex. 34, Smith Report p. 5).

**RESPONSE:**

52.     Hayes and Hughes were interviewed on May 19, 2020. (Ex. 40, Clay Depo. p. 157).

**RESPONSE:**

53.     Yet, sometime in early to mid-April 2020, Clay asked Hughes if he would be interested in this position. (41, Hughes depo. p. 16).

**RESPONSE:**

54.     Sometime before May 19, 2020, Clay also called Chris Henson to tell him what the new structure was going to be and who was going to be in the various positions. The call was to let him know what the organizational changes were taking place so that he could have the budget reflect the changes. (Ex. 27, Henson Depo. 45-48).

**RESPONSE:**

55.     In this call Clay told him they would no longer have the associate superintendent positions. (Ex. 27, Henson Depo. p. 46).

**RESPONSE:**




56.     When asked if Clay told him that Hayes was being transferred to a teaching position Henson responded "I—I think that was a part of the discussion,…" (Ex. 27, Henson p. 46).

**RESPONSE:**



57.     Clay told Henson that Jenai Hayes' position was being eliminated and he said that "in relation to the hiring of a new position that would be over diversity, equity, et cetera. (Ex. 27, Henson p. 47).

**RESPONSE:**

58.     In this call before May 19, 2020, Clay told him that Ashford Hughes was the person who was going to get that job. These discussions would have been before May 19, 2020.  (Ex. 27, Henson depo. p. 45-48).

**RESPONSE:**

60.     The job description for this position states under **Education** (training/degree)**:** Required minimum: Master's degree from an accredited college or university preferred. (Ex. 58).

**RESPONSE:**

61.     Hayes has a Master's Degree and Master of Science in Curriculum Instruction from University of Tennessee in 1999 and an EDS in Instructional Leadership from Tennessee Tech University in 2010. (Ex. 1, Hayes Decl ¶2).

**RESPONSE:**

62.     Hughes does not have a Master's Degree. (Ex. 41, Hughes Depo. p. 47).

**RESPONSE:**

63.     While at college at TSU Hughes flunked several courses and was put on probation. (Ex. 41, Hughes Depo. 30-31).  His GPA in college was a 2.5 out of 4. (Ex. 41, Hughes Depo. p. 44).

**RESPONSE:**

64.     Unlike Hughes, Hayes undergraduate GPA was 3.10 and her Graduate-Masters GPA was 3.94 and her Graduate – Ed.S was a 4.0. (Ex. 1, Hayes Decl. 49).

**RESPONSE:**

65.     Giving testimony was outside the scope of Bailey's ordinary job duties. During his eight years as an Executive Principal and four years as Assistant Principal Bailey had only to testify in one other matter. (Ex. 2, Bailey Decl. ¶ 33).

**RESPONSE:**

66.     Bailey's contract of employment  sets forth his duties and responsibilities and it does not state he must testify.

> Duties and Responsibilities of Principal. The principal is responsible
> for the following: performing all duties assigned to principals by the
> State Education Laws and by the policies, procedures, and programs
> of the Board and the Metropolitan Nashville Public Schools;
> developing and administering the school budget; monitoring and
> approving expenditures; preparing financial forms and reports;
> supervising staff and evaluating their performance; making progress
> towards and/or achieving and exceeding the school district standards
> and objectives; and other such duties that may be assigned but not
> enumerated here.

(Ex. 53).

**RESPONSE:**

67.     In February 2020, Dr. Bailey was told by his supervisors, Sharon Griffin and Renita Perry, that he was doing a great job and to keep on doing what he was doing. (Ex. 2, Bailey Decl. ¶ 37).

**RESPONSE:**

68.     Perry testified she could have made those statements because she saw great improvement at White's Creek. (Ex. 26, Perry Dep. 47-48).

**RESPONSE:**

69.     Perry gave Dr. Bailey one mid-year evaluation and he scored 3.2. The range of scores go up to 5 and 3 is average. For the 2018-2019 school year, Dr. Bailey's evaluation score was 3.81. Perry admitted that was a pretty good score. (Ex. 26, Perry Dep. 49).

**RESPONSE:**

70.     In the fall of that school year, Dr. Bailey was named Principal of the Year for Middle Tennessee. (Ex. 2, Bailey Decl. ¶ 37).

**RESPONSE:**

71.     No one asked Renita Perry her opinion about whether Bailey should be fired or non-renewed. If she had been asked she would have told them that he was a good performer and a good fit for White's Creek. (Ex. 26, Perry Dep.  49-50).

**RESPONSE:**

72.     The Community Superintendents met annually to discuss which principals may be removed. (Ex. 4, Meriwether Decl. ¶ 50). There was never any discussion on removing Dr. Bailey. (*Id.* at ¶ 50).

**RESPONSE:**



73.     MNPS kept a list of principals who may have performance issues. (*Id.* at ¶ 50). This was done so that Human Resources could check to make sure the appropriate documentation was in place and the principal had been on a plan of support. (*Id.* at ¶ 50). Dr. Bailey was never on that list nor discussed. (*Id.* at ¶ 50).

**RESPONSE:**



74.     Dr. Meriwether helped to oversee the schools, was kept abreast of the schools on priority status, and she knew the principals assigned to the schools. (*Id.* at ¶ 66). She also was privy to the discussions about which principals should be removed for performance reasons. (*Id.* at ¶ 66). She has never known of a priority school principal being non-renewed or fired because the school was on priority status. (*Id.* at ¶ 66).

**RESPONSE:**



75.     In fact, Celia Conley was the principal at Antioch Middle school for five years while it was priority status. (*Id.* at ¶ 66 ). Dr. Conley was promoted to one of the Executive Director positions in the 2020-2021 school year. (*Id.* at ¶ 66).

**RESPONSE:**

76.     Priority status was normal for MNPS schools. For the 2019-2020 school year, there were 31 priority schools. (Ex. 55, Priority School List; Ex. 2, Bailey Decl. ¶ 62).

**RESPONSE:**


77.     Two days after Bailey's termination, Bailey's supervisor wrote a recommendation letter for Dr. Bailey extolling his talents. (Ex. 18, Recommendation Letter).

**RESPONSE:**


78.     Metro's Assignment/Transfer Policy provides that

> The director of schools shall assign personnel to the various schools or departments by June 15 preceding the school year for which such persons are employed while allowing each principal or immediate supervisor to 3 assign more specific responsibilities within each school.

(Ex. 32).


**RESPONSE:**


79.     On June 15, 2020, no assignment of Dr. Bailey had been made. (Ex. 2, Bailey Decl. ¶ 56).

**RESPONSE:**

Respectfully Submitted,

/s/*Ann Buntin Steiner*

Ann Buntin Steiner, BPR No. 11697
STEINER & STEINER, LLC
613 Woodland Street
Nashville, TN 37206
(615) 244-5063
asteiner@steinerandsteiner.com

*Attorney for Plaintiffs, Dr. James Bailey, Dr. Pippa
Meriwether, Jenai Hayes & Dr. Lily Leffler*

/s/ Jesse Ford Harbison

Jesse Ford Harbison, BPR No. 032105
JESSE HARBISON LAW, PLLC
1109 N. 6th Street
Nashville, TN 37207
(615) 415-3285
jesse@jesseharbisonlaw.com

*Attorney for Plaintiff, Dr. Damon Cathey*

## CERTIFICATE OF SERVICE

I hereby certify that on August 29, 2022, a copy of the foregoing Plaintiffs' Statement of
Additional Material Facts was filed electronically. Notice of this filing will be sent by operation
of the Court's electronic filing system to all parties indicated on the electronic filing receipt as
follows: J. Brooks Fox, Department of Law, Metropolitan Courthouse, Suite 108, P.O. Box
196300, Nashville, Tennessee 37219. Parties may access this filing through the Court's electronic
filing system.

/s/ *Jesse Ford Harbison*

Jesse Ford Harbison