IN THE UNITED STATES DISTRICT COURT FOR TENNESSEE
FOR THE MIDDLE DISTRICT
NASHVILLE DIVISION

| | | |
|---|---|---|
| **JENAI HAYES** | ) | No. 3:20-cv-01023 LEAD CASE |
| | ) | |
| **DR. LILY MORENO LEFFLER,** | ) | **Judge Trauger** |
| | ) | **(CONSOLIDATED)** |
| | ) | |
| **and** | ) | |
| | ) | |
| **DR. JAMES BAILEY,** | ) | |
| **DR. PIPPA MERIWETHER, and** | ) | |
| **DR. DAMON CATHEY,** | ) | |
| | ) | |
|     **Plaintiffs,** | ) | |
| **v.** | ) | |
| | ) | |
| **METROPOLITAN GOVERNMENT** | ) | |
| **OF NASHVILLE AND DAVIDSON** | ) | |
| **COUNTY, TENNESSEE and** | ) | |
| **DR. ADRIENNE BATTLE,** | ) | |
| | ) | |
|     **Defendants.** | ) | |

## METRO'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

**I.    Open Meetings Act.**

To adopt Plaintiffs' approach would be to expand drastically the Open Meetings Act to impose its requirements on any discussion that involves a member of a governing body. Dr. Battle is not a member of the School Board. Nothing in the record supports Plaintiffs' speculation that the meetings between Dr. Battle and individual Board members crossed over into deliberations. There are no specifics about these conversations. There is no indication that impermissible deliberations occurred. Given the extensive discussions on the FY21 budget that occurred in open session, there is no violation of the Open Meetings Act. *Gray,* 2022 WL 1701961, *6 (Tenn. Ct. App. May 27, 2022)(granting summary judgment based on a lack of evidence that deliberations occurred and because there was a discussion during a public meeting.)

Plaintiffs do not cite any law that requires a school district or municipality to discuss the minutia of every budget or even every item of every agenda. MNPS's operating budget spans 34 pages and contains over 50 accounts. (FY 21 Budget, DE 146-3.) The Board did not discuss every position or every dollar in the budget. It did, however, extensively deliberate over the budget. (Board Mtgs. May 19, May 26, & June 30, 2020, Bobo Decl. ¶ 6, DE 145.) And it made its rationale for adopting the Central Office Reorganization plan clear. *Id.* Tennessee courts do not read into the Act a certain threshold of deliberation to ensure compliance. *Baltrip v. Norris*, 23 S.W.3d 336, 341 (Tenn. Ct. App. 2000)("Baltrip cites no authority, and we are not aware of any, that requires the members of a public body to verbalize or discuss a matter prior to a vote in order to comply with the Act.") The Act does not bar elected officials from speaking openly, candidly, and often with the administrators who manage the day-to-day operations. And it does not impose a requirement that every agenda item or line item on a budget be discussed to plaintiffs' satisfaction.[1]

## II. Ms. Hayes - Teacher Tenure Act & Due Process.

First, regarding the Teacher Tenure Act, Ms. Hayes was continuously employed by MNPS until her resignation in Dec. 2021; she was not fired.[2] (Hayes Dep., DE 144-3 at 62, 68.) Yet, she claims that Metro violated § 49-5-511(b) and § 49-5-510 when she was transferred as a part of a district reorganization in the spring 2020. (Pls' Resp., DE 180 at 21-29.)[3] Ms. Hayes's argument in response to Metro's motion is combined with Drs. Meriwether and Cathey's argument, so Metro

---

[1] Metro also adopts herein its arguments made in its Response to Plaintiffs' motion for summary judgment. (Doc. No. 176.)

[2] During the timeframe of this lawsuit, Ms. Hayes was not terminated. She claims she was informed on April 29, 2020, that she would be let go "effective the end of the school year." (Compl., DE 142 at ¶ 41.) But, according to her, her employment did not end on June 30, 2020, (*id.* at ¶ 55), and she continued with MNPS as a teacher. (Hayes Dep., DE 144-3 at 62.)

[3] Ms. Hayes failed to address claims related to §§ -511(a), -512, and -513. *Kinsey*, 2021 WL 1100494, *2 (6th Cir. 2021) ("A plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment.").

{N0493457.1}                                    2

incorporates by reference the arguments in Sec. IV below. In short, Ms. Hayes was not dismissed, so -511(b) does not apply. Further, the "right to remain on the preferred list for employment" which she asserts (DE 180 at 23), exists only for those individuals who are *dismissed* pursuant to -511(b). Thus Ms. Hayes's claims related to 511(b) must fail. As for -510, Ms. Hayes cites her arguments about Metro's ulterior motives, but, in this context, so long as valid programmatic grounds exist (which they do), such motives are irrelevant. *Hyde*, 1986 WL 6565 at *9; *Galyon,* 1998 WL 331300 at *7. Plaintiffs cite Dr. Barnes's testimony, but as discussed below in Sec. IV, his testimony about the reason for the reorganization agrees with (rather than contradicts) Dr. Battle's and Mr. Clay's testimony.

Finally, the claims by Plaintiffs' experts that there was room in the budget to continue funding an inefficient bureaucracy are irrelevant.[4] Ms. Hayes has not provided any expert testimony that the reorganization somehow resulted in a less efficient operation of the school system.[5] Because Ms. Hayes's transfer was done because the Director of School Choice position was eliminated and rolled into another job, with a different set of functions, she cannot carry her

---

[4] Metro hereby incorporates by reference the arguments made in Dr. Battle's reply in support of her summary judgment motion. With regard to the budget issues, in short, Plaintiffs cannot create questions of fact by second guessing every budget decision that was made at the very outset of the COVID crisis. Furthermore, they cannot do so by incorrectly assuming that federal funding such as CARES Act funding, which flowed through the Federal Grants budget, could also flow through the operating budget, or by referring to the money saved by the Central Office Reorganization as "only about $1 million." (DE 180 at 28.) If the Central Office Reorg had *not* occurred, then MNPS would have needed a million dollars in reductions elsewhere. (Henson Dep., DE 149-10 at 97-98.)

[5] Plaintiffs claim that Metro "produced no documentation regarding the alleged organizational needs for the Reorganization." (DE 180 at 24-25.) But it is Plaintiffs' burden "to prove the transfer was arbitrary and capricious." *Lawrence Cnty. Educ. Ass'n*, 244 S.W.3d at 315. Furthermore, Dr. Battle has "broad discretion" regarding the MNPS organization, therefore Plaintiffs' must overcome "the presumption the decision was made in good faith." *Geller v. Henry Cnty. Bd. of Ed.*, 602 S.W.3d 876, 894 (Tenn. 2020) (cleaned up).

burden of proving that the transfer was arbitrary and capricious, or that it was motivated by any retaliatory animus. Thus, her claims under -510 must fail.

Second, regarding Ms. Hayes's Due Process claims, as discussed above, Ms. Hayes did not lose her employment; she was continuously employed. (Hayes Dep., DE 144-3 at 62, 68.) In spite of the abundant caselaw which disagrees with her, *see Sharp*, 285 F.3d 479, 487 (6th Cir. 2002); *Coe*, 519 F.2d 10, 12 (6th Cir.1975); *Yoakum*, 297 S.W.2d 635, 640-41 (1956) (same) (collecting cases), Ms. Hayes claims that she has a property right *in a comparable position* under -511(b). But this claim ignores the fact that Ms. Hayes was not dismissed pursuant to -511(b), or any other section. It is undisputed that Ms. Hayes was transferred. (Hayes Dep., DE 144-3 at 39; Compl., DE 142, ¶ 55.) And her transfer does not give rise to a property interest. *Jane Doe (Jenai Hayes), et al.,* 2021 WL 6015491 (M.D. Tenn. 2021); *Curby,* 216 F.3d 549, 553 (6th Cir. 2000); *McKenna*, 574 S.W.2d at 534; *Coe*, 519 F.2d at 12.

### III.  Dr. Leffler -Teacher Tenure Act.

Dr. Leffler, an untenured employee, now claims that Metro is not allowed to non-renew her contract. (Pls' Resp., DE 180 at 29-30.) In support, Dr. Leffler mischaracterizes a new decision out of the Davidson County Circuit Court, *Shrader v. Metro Gov't*, Case No. 21C-278, which actually supports Metro's position.

As more fully described in Metro's response to Plaintiffs' partial motion for summary judgment (DE 176 at 8-9), the Circuit Court in *Shrader* found that, upon the conclusion of his purported one-year contract, the plaintiff, who (like Dr. Leffler) was a non-tenured Executive Director, was an at-will employee. Despite those findings, Dr. Leffler now reasons that *Shrader* means that any non-tenured employee who hold some type of certificate, but who is not employed

as a schoolteacher, can only be terminated for cause under § -511(a) or as a part of a reduction in force under -511(b). This argument has no merit.

Such a result would run counter to the purpose of the TTTA by making it *more difficult* for a teacher to obtain job security than other certificated (but still at-will) positions. This illogical result was not at all indicated by the court in *Shrader*. Moreover, the Tennessee Supreme Court recognizes that "the basic purpose of the Teacher Tenure Act […] is to afford a measure of job security to those educators who have attained tenure status." *Ryan*, 481 S.W.2d 371, 374 (Tenn. 1972). Thus, the TTTA incentivizes stability by rewarding a teacher's longevity within the district. *Id*. Claiming that such protections were also meant to apply immediately and permanently to all employees who hold some sort of certificate, whether or not they are schoolteachers, defies reason.

Furthermore, it is undisputed that, in May of 2020, Dr. Leffler was a non-tenured employee whose contract was not renewed after the 2019-2020 school year. *Jane Doe (Jenai Hayes), et al.*, 2021 WL 6052699 at \*6. Thus, Dr. Leffler was an at-will employee and could be terminated without cause. *Kerr*, 1986 WL 6611 (Tenn. Ct. App. 1986). Therefore, whether or not the protections of § 49-5-409 apply to Dr. Leffler, the decision not to rehire an at-will employee could not violate the TTTA. *Harney*, 784 S.W.2d 921, 922 (Tenn. 1990)(an at-will employee may be terminated without breach of contract for good reason, bad reason, or no reason at all.).

Yet, having concluded that she could not be nonrenewed, Dr. Leffler seeks to rely upon the protections of § 49-5-511(a). But this subsection governs only "for cause" dismissals, and it is undisputed that Metro did not "fire Dr. Leffler for one of the reasons set forth in Section 511(a)." (Pls' Resp.., DE 180 at 30.) Furthermore, the nonrenewal of a nontenured employee's contract at the end of the schoolyear is not the same as a dismissal for cause. *Cannon Cty. Bd. of Ed.*, 2008

WL 3069466, n.14 (Tenn. Ct. App. 2008).⁶ Therefore, her -511(a) claims must fail.

Dr. Leffler also claims that MNPS violated § -511(b) because MNPS did not eliminate her position. (DE 180 at 30.) But it is undisputed that there was no reduction in force and the number of positions in the system did not decrease. Thus -511(b) does not apply to Dr. Leffler's nonrenewal. Beyond that, Dr. Leffler's suggestion that Metro violated -511(b) because the reasons for her nonrenewal were not accurately stated in the letter sent by MNPS (DE 180 at 30) is unsupported by the law. Nothing in -511(b) guarantees an employee that they will receive a full and accurate description of the reasons for their nonrenewal. As stated above, Dr. Leffler was an at-will employee and her employment could have been terminated for a good reason, or even a bad reason, provided that it was not in violation of federal law. Therefore, Dr. Leffler's claims related to subsection -511(b) must fail.

## IV. Drs. Meriwether and Cathey -Teacher Tenure Act.

Drs. Meriwether and Cathey are currently employed by MNPS; they were not fired or dismissed. (Meriwether Dep., DE 144-5 at 18; Cathey Dep., DE 144-2 at 14, 15.) But they claim Metro violated -511(b) and -510 when they were transferred as a part of the reorganization in 2020. (Pls' Resp., DE 180 at 21-29.)⁷

As this Court has recognized, -511(b) only deals with *dismissals* due to a reduction in force. *Jane Doe (Jenai Hayes),* 2021 WL 6015491 at \*10. Now, Drs. Meriwether and Cathey point to their "right to remain on the preferred list for employment." (DE 180 at 23.) But this right only exists for employees who are *dismissed* pursuant to -511(b).

---

⁶ Moreover, the undisputed facts show that Dr. Leffler did not lose her employment at all. (Leffler Dep., DE 144-4 at 7:12-14.) After her contract as an executive director was not renewed, Dr. Leffler continued to be an employee of MNPS as a principal. *Id.*

⁷ Drs. Meriwether and Cathey did not address their claims related to §§ -511(a), -512, & -513, and so those claims are abandoned. *Kinsey*, 2021 WL 1100494, \*2 (6th Cir. 2021).

{N0493457.1}  6

With regard to -510, Drs. Meriwether and Cathey also argue that their transfers into other MNPS positions were not done in good faith. But, again, it is Plaintiffs' burden to show that the transfers were not made for efficient operation of the school system, *Lawrence Cty. Ed.. Ass'n*, 244 S.W.3d 302, 315 (Tenn. 2007), and, so long as valid programmatic grounds exist (which they do), such arguments are irrelevant. *Hyde*, 1986 WL 6565 at *9; *Galyon,* 1998 WL 331300 at *7

To support their argument, Plaintiffs claim that Dr. Barnes contradicted Metro's statement that the district needed an organizational overhaul, by saying "the only reason for the Reorganization was the budget" (Plaintiffs' words, not Dr. Barnes's). (DE 180 at 24.) But one page after Plaintiffs' cited selection, Dr. Barnes explains, "Our goal and Dr. Battle's stated goal is always to push as much money to the schools as possible. That number - I don't recall being needed to make the budget. That number was needed to provide as much opportunity for the schools as possible." (Barnes Dep., DE 149-7 at 55-56.) This testimony is consistent with Dr. Battle's and Mr. Clay's testimony about the budget and the need to find efficiencies.

Also, Plaintiffs' expert claims that the reorganization was "was discretionary and not mandated by the budget process." (DE 180 at 28, citing Smith Report, DE 191-4.) But, as discussed above in Sec. II, the determinative question here is "whether the transfer could be classified as for the 'efficient operation of the school system,'" *Lawrence Cty. Ed. Ass'n*, 244 S.W.3d at 315, not whether there was room in the budget to continue funding an inefficient bureaucracy.

### V.     Dr. Bailey -Teacher Tenure Act, Due Process, & TPPA.

First, as to the Teacher Tenure Act,[8] Dr. Bailey also claims that Metro violated §§ -511, -512, and -513 by "firing" him. (Pls' Resp., DE 180 at 30.) Plaintiffs cite Dr. Battle's statement that

---

[8]     Dr. Bailey failed to address claims related a "sham" reorganization and to § -510; thus he has abandoned those claims. *Kinsey*, 2021 WL 1100494, *2.

{N0493457.1}                                                      7

she "non-renewed Dr. Bailey's contract." But, in fact, Dr. Battle only decided that his contract for that principal *position* should not be renewed. (Battle Dep. DE 149-1 at 52-53, 91:19-22; Griffin Dep., DE 149-8 at 85-88, 99.) Dr. Bailey, himself testified that no one ever suggested that he was being fired. (Bailey Dep. DE 144-1 at 21.)[9] Furthermore, any plans to transfer Dr. Bailey were undone when he resigned. (Doc. No. 149-4, Page ID# 2645). But Plaintiff now denies that this was a resignation. Yet it was he, himself, who first categorized this action a resignation when he alleged that Metro constructively discharged him. (Pls' Sec. Am. Compl., DE 17 [Case 3:21-cv-00122] at ¶ 129.) Thus, Dr. Bailey cannot show that he was dismissed at all, let alone for cause or due to a reduction in force. For this reason, this Court has already indicated that subsections -511, -512, and -513 are irrelevant as to Dr. Bailey. *Jane Doe (Jenai Hayes),* 2021 WL 6015491 at *10.

Second, as to Dr. Bailey's Due Process Claim, he cites his own declaration for the proposition that "A non-renewal is the same as a firing." (DE 180 at 62.) But this is a legal conclusion about which Dr. Bailey is incompetent to testify. Fed. R. Evid. 701(c); *In re Dickson*, 655 F.3d 585, 592 n. 4 (6th Cir. 2011)(lay people cannot make legal conclusions.). He cannot advance any evidence that he was non-renewed from his job with MNPS, instead of just from his position as principal. Because Dr. Bailey voluntarily resigned his employment with MNPS,[10] he did not have a reasonable expectation of continued employment. *Rhoads*, 103 F. App'x 888, 894 (6th Cir. 2004). Thus, Dr. Bailey's due process claims must fail.

Third, as to Dr. Bailey's TPPA claims, his response does not address the fact that, by alleging multiple reasons for his alleged "firing," he cannot also maintain that his whistleblower

---

[9]   In fact, as mentioned in Metro's motion, Dr. Bailey he was offered the position of Dean of Students, which he rejected on June 5, 2020. (MG 003004, DE 147-2.) He does not dispute this fact, yet he fails to mention it when claiming that he was "fired."

[10]   "As [a] result of these actions, my last day with the district will be June 30, 2020." (Ex. 2 to Zander Dep., DE 149-4, PageID# 2645.)

{N0493457.1}                                        8

activity was the *sole* reason for his termination. Under the TPPA, it must be the *sole* reason. § 50-1-304(b); *Passmore*, 447 F. Supp. 3d at 671 (M.D. Tenn. 2017). Furthermore, as discussed above, he cannot show that he was discharged. The TPPA only applies to terminations. § -304(b); *Williams*, 2018 WL 6626528, *9 (W.D. Tenn. 2018). Accordingly, his TPPA claims must fail.

## VI. Ms. Hayes -First Amendment Retaliation.[11]

Ms. Hayes's complaint about the inappropriate slave trade lesson in Feb. 2020 *is* protected speech, but her complaint to administrators about the video of her son is not a matter of public concern and thus *is not* protected speech. *DeCrane*, 12 F.4th 586, 594 (6th Cir. 2021); *Marquardt*, 971 F.3d at 549.

Ms. Hayes claims retaliation because (1) she was "fired"; (2) she did not get the Executive Officer of Diversity, Equity, and Inclusion job; and (3) she was passed over for the Restorative Practices Specialist position job. (DE 180 at 50-51.) First, as discussed above, the record shows that she was not "fired," and that the elimination of her position was a legitimate part of a district-wide reorganization.[12] Second, as to EOD position, Ms. Hayes claims that she can show pretext

---

[11] Ms. Hayes claims that Metro did not address her First Amendment and Title VI retaliation claims related to the elimination of her position. However, she overlooks Metro's arguments regarding First Amendment and Title VI (Metro's Memo. in Supp., DE 163 at 30-34). And Metro's statements about how these events unfolded and the legitimate reasons for its decisions (*id.* 163 at 39-45) are the same regardless of what theory she advances.

[12] Ms. Hayes cites Ms. Spencer's statements of concern to her as being evidence of retaliation. (DE 180 at 51.) But she mischaracterizes Ms. Spencer's testimony. Ms. Spencer's testimony actually shows that she and Dr. Barnes had been trying to explain to Ms. Hayes that she shouldn't take the elimination of her position personally, "[T]his is not about you - it's about resources and how we efficiently run the district." (Spencer Dep. DE 149-3 at 79.) "What I was trying to do was counsel her in the way that she was referring to it so that it - so that when she talked, people would think she was talking about her skills and her abilities and why people should hire her, not constantly saying, they did this to me. I was trying to help her." (Spencer Dep. DE 149-3 at 128.) Ms. Hayes's sensitivities about what she believed her employer's motives to be do not raise a question of fact. "Notably, the *Burlington* standard is objective: it measures retaliation from the standpoint of a *reasonable* employee, not one who is unusually sensitive." *Moore*, 780 F. Supp. 2d 600, 621 (S.D. Ohio 2011) (emphasis in the original).

due to "irregularities in the hiring process" and "the relative difference between Ms. Hayes and Mr. Hughes's backgrounds." As to "irregularities," all that Ms. Hayes can point to are Mr. Clay's efforts to recruit Mr. Hughes from the mayor's office, not out of retaliation for complaining about the inappropriate slave trade lesson,[13] but rather because he had worked on diversity issues on a large scale, having worked in the mayor's office performing diversity, equity, and inclusion work for the entire city and, also, having worked on diversity, equity, and inclusion issues for Michael Bloomberg's U.S. presidential campaign. (Clay Dep. DE 149-2 at 118.) Just because one candidate was being recruited or was preferred over another is not evidence of pretext. *Geiger v. Tower*, 579 F.3d 614, 625 (6th Cir. 2009)("[Employer's] preference for [a particular candidate] is not actionable unless it was motivated by discriminatory animus.")

As to "the relative difference between Ms. Hayes and Mr. Hughes's backgrounds," Ms. Hayes argues that she was better educated (with a masters[14]) and also had a background in diversity, but in the application process Ms. Hayes focused on her experience in school choice (her previous job) rather than diversity. (Clay Dep., DE 149-2 at 116-117.) And her argument about being "better qualified" does not create a question of fact on "pretext," especially for such a high level position. "An employer has even greater flexibility in choosing a management-level employee…because of the nature of such a position." *Wrenn*, 808 F.2d 493, 502 (6th Cir. 1987). At the "pretext" stage, "the divergence in qualifications [must be] so striking as to raise a fact issue on whether the [employer] lied." *Hopkins*, 477 F.App'x 349, 358 (6th Cir. 2012)(bracketed text added).[15]

---

[13] Which everyone agrees was inappropriate. (Hayes Dep. DE 144-3 at 21:11; Battle Dep DE 149-1 at 27:20.)
[14] The job description says that a master's degree was preferred, not required. (DE 192-7.)
[15] Ms. Hayes argues that she only needs to show that she was *as qualified* as Mr. Hughes, because there is "other probative evidence of discrimination." (DE 180 at 58, citing *Provenzano,*

Third, as to the Restorative Practices Specialist position, Ms. Hayes cannot rebut the fact that Mr. Hall (not Ms. Spencer[16]) was the person in charge of hiring for that position. (Hall Dep. DE 149-5 at 5, 10-12.) Nor can she rebut the fact that, just as Mr. Hall explained, he was unable to hire her because her salary was too high for that position. (*Id.*; Pls' Resp. to SOFs, DE 184, ¶ 81.) Also, she has not shown any evidence that Mr. Hall was aware of her earlier complaints. (Hall Dep. at 19:18-25, 20:1-3.)[17]

## VII. Dr. Bailey's -First Amendment Retaliation.

This claim is addressed in the simultaneously filed reply in support of Dr. Battle's motion for summary judgment, and that discussion is incorporated herein by reference.

---

663 F.3d 806, 815 (6th Cir. 2011).) She cites, "The fact that Mr. Clay made the decision to hire Mr. Hughes before he even interviewed Ms. Hayes and/or Mr. Hughes, and that he failed to ask Ms. Hayes her qualifications in diversity…" However, cases discussing "other probative evidence" speak of multiple discriminatory remarks, or multiple instances suggesting an atmosphere of discrimination in the workplace. *Antunes*, 2022 WL 3647801, *20 (E.D. Mich. Aug. 24, 2022). That situation does not present itself here.

[16] Ms. Hayes states (without any citation or support) that "HR approved all hiring decisions," (DE 180 at 53), but she offers no evidence that Ms. Spencer had any role in, or authority over, the decision to hire anyone for the Restorative Practices position.

[17] Plaintiffs also rely heavily upon Dr. Lovgren's statistical analysis. (DE 180 at 16, 44, 59.) First, the statements by Dr. Lovgren are unverified and are not in any form that would be admissible at trial. Second, Dr. Lovgren assumes without explanation that Dr. Battle was the only decisionmaker over all of the employment decisions which are included in the sample (DE 190-12 at 10), and assumes without explanation that Dr. Battle is somehow competent to testify as to the definition of "protected activity" under each of the federal and state laws at-issue, First Amendment, Title VI, Title VII, & the THRA. (DE 190-12 at 6-8: where Dr. Lovgren repeatedly refers to "data tested" as someone "known by Dr. Battle" as having engaged in a protected activity.) Also, missing from the analysis is any data about the number of MNPS employees who engaged in protected activity who were not affected by the reorganization. And, there is no analysis of the other 65 positions that were eliminated in the budget. Therefore, the analysis is not anything that would be relevant or would somehow help the trier of fact. *Hiser*, 816 F. Supp. 2d 496, 504-05 (W.D. Mich. 2011), citing *Evans*, 131 F.3d 957, 963 (11th Cir.1997)("Statistics without an analytic foundation are 'virtually meaningless.'").

**VIII. Ms. Hayes -Sex Discrimination.**

The EOD position is discussed above under Sec. VI; that same analysis applies here. As for *being transferred into a teaching position*, Ms. Hayes concedes that Mr. Latimer is not similarly situated (DE 180 at 49), and so Metro is entitled to summary judgment on that claim.

**IX. Ms. Hayes -Retaliation (Title VII & THRA).**

The Restorative Practices position is discussed above under Sec. VI; that same analysis applies here. Also, as discussed in Metro's principal motion (DE 163 at 42), Ms. Hayes has not made any showing that Mr. Hall was aware of her August 2020 EEOC filing. As for the other jobs that Ms. Hayes applied for, she only touches on this claim in her response (DE 180 at 53, n. 28 and surrounding text), claiming without citation that Ms. Spencer had control over all employment decisions. But, as discussed in Metro's motion (DE 163 at 43, 45), Ms. Hayes cannot show whether any of the hiring managers listed for those jobs knew about her protected activities; and she cannot show which of those jobs she was qualified for. Just filling out the online app does not mean she met the qualifications for the position. (Perwer Decl. DE 147, ¶ 4.) *Thompson*, 2012 WL 3682914, *15 (M.D. Tenn. 2012)(not being selected for a position for which the person is not qualified is not an adverse action).

**X. Ms. Hayes -Retaliation (Title VI).**

The analyses in Sections VI, VIII, & IX above about the employment actions at-issue apply here as well.

**XI. Dr. Leffler - Sex and age discrimination (Title VII, ADEA, & THRA).**

As discussed in Metro's motion (DE 163 at 46-52), the demographics of the Executive Director positions should be analyzed on a broad base, showing the diversity of the *entire* group, because their assignments can change over time depending on the district's needs (Leffler Dep.

DE 144-4 at 10; Clay Dep., DE 149-2 at 110), but they are all Executive Directors reporting to the same supervisor. Fifteen people were selected into these fifteen positions. (Leffler Fourth Am. Compl., DE 126, ¶ 25.) However, if we were to assume a prima facie case for purposes of summary judgment, Plaintiffs still have no response for the fact that these Executive Director positions are high level positions, just two reports down from the director of schools (Clay Dep. DE 149-2 at 58), and that MNPS management had great flexibility in hiring the top level management that it wanted, for the good of the district's operations. "The court does not have a role in acting as a super personnel department, overseeing and second-guessing employers' business decisions. This is especially true for management positions, which, as supervisors and policy crafters, have a substantial impact on an organization's operations, efficiency, and culture." *Jones v. Wolf*, 2020 WL 7493105, *7 (E.D. Mich. Dec. 21, 2020)(collecting Sixth Circuit cases)(cleaned up, with citations omitted)("Thus, evidence that a rejected applicant was as qualified or marginally more qualified than the successful candidate is insufficient, in and of itself, to raise a genuine issue of fact that the employer's proffered legitimate, non-discriminatory rationale was pretextual.")

Here, the comparators' phase one interview scores were in the same range. (Battle Dep., Doc. 149-1 at 126:3-13.) Accordingly, when faced with the 2020 budget issues and the beginning of the COVID pandemic, Dr. Battle was free to select whom she wanted.

**XII. Dr. Leffler - Retaliation (Title VII & THRA).**

As discussed in Metro's motion (DE 163 at 48), associational retaliation is "retaliation against someone so closely related or associated with the person exercising his statutory rights that it would discourage or prevent *that person* from pursuing those rights." *Rodriguez-Monguio,* 499 F.App'x 455, 464 (6th Cir. 2012)(emphasis added). Here, even we accept, *arguendo*, that there were statements made about Dr. Leffler's loyalty, the fact that all Executive Directors were

removed from their positions and the job was overhauled means that Dr. Leffler cannot show that she was singled out with retaliatory malice in order to "prevent *that person* [Dr. Garcia] from pursuing [her] rights." *Id*. No reasonable jury could believe that theory, especially when Dr. Garcia's claims were settled two months earlier,[18] and as discussed above (on the particular topics raised regarding pretext) she cannot advance any viable evidence of pretext on this claim.[19]

**XIII. Dr. Meriwether -Age discrimination (ADEA & THRA).**

As discussed in Metro's motion (DE 163 at 50), during MNPS's 2020 reorganization, all four Associate Superintendents were removed from their positions, regardless of age. (Meriwether Fifth Am. Compl., DE 125, ¶¶ 95-97.) Dr. Meriwether wishes to point out every younger person who was hired into various positions, but she cannot show that she was not allowed to apply for other positions within MNPS, and she cannot show that older employees were somehow not allowed to apply for the same positions that younger employees were allowed to. The other age discrimination issues are discussed above in Sec. XI and apply here as well. In short, these are all

---

[18] Plaintiff claims that "Dr. Battle testified that she did not think it would be inappropriate to question someone about Dr. Leffler's loyalty because of her relative's case." (DE 180 at 42-43.) However, it was a confusing question, and she obviously heard "inappropriate" as "appropriate," since she explained with the very next question that she knows that an employer cannot engage in associational retaliation. (Battle Dep. DE 149-1 at 73:1-13.)

[19] Throughout their Response, Plaintiffs point out ways in which they disagree with Dr. Battle's assessment of their abilities or MNPS's efforts to reorganize Central Office, but disagreeing about MNPS's decisions is not evidence of pretext, even if the decisions are later shown to be "mistaken, foolish, trivial, or baseless." "If an employer has an honest belief in the nondiscriminatory basis upon which it has made its employment decision (i.e. the adverse action), then the employee will not be able to establish pretext .... [W]hen an employer reasonably and honestly relies on particularized facts in making an employment decision, it is entitled to summary judgment on pretext even if its conclusion is later shown to be mistaken, foolish, trivial, or baseless." *Sublett*, 2022 WL 2798998, *5 (6th Cir. July 18, 2022), citing, *Tingle*, 692 F.3d 523, 530-31 (6th Cir. 2012) (citation omitted).

high level positions, and an employer has even greater flexibility in choosing management level employees. Dr. Battle was free to choose among qualified candidates.[20]

## XIV. Dr. Cathey -Age discrimination (ADEA & THRA).

Again, the analysis in Sec. XIII above about these same issues applies here as well. Dr. Battle was free to choose among qualified candidates for these high level positions. She testified that she had real concerns about Dr. Cathey's ability to perform well at this level. When she had worked as his supervisor earlier, she had had frequent conversations with him about not being pleased with his job performance. (Battle Dep. DE 149-1 at 62-65.) He would not read or make himself familiar with the district memos, and he was flippant about not reading them. She had to explain to him that they were important and that it was part of his job. (Battle Dep. DE 149-1 at 64.)[21]

## XV. Dr. Cathey -Retaliation (THRA).

As discussed in Metro's motion (DE 163 at 52), Dr. Cathey did not assert this THRA retaliation claim until May 5, 2022 when he filed his Fifth Amended Complaint. (DE 125, ¶ 217.) First, Dr. Cathey points out that Metro's counsel agreed to the amendment. (DE 180 at 45.) True, but Metro also answered the amended complaint by setting forth the defense of statute of

---

[20] Moreover, Dr. Meriwether's own perception of her abilities cannot create a question of fact *Jones v. Butler Metro. Hous.*, 40 F.App'x 131, 135 (6th Cir. 2002), especially when Dr. Battle had explained in some detail in her deposition that she had known Dr. Meriwether over the course of her career and had worked with her as a subordinate, a colleague, and a supervisor (Battle Dep., DE 149-1 at 55:1-5) and had frequent conversations with her about her level of follow-through and her job performance. (*Id*. at 63-67, 81-82, 292-93.)

[21] Dr. Cathey's wants to brush this aside as one occasion when he "did not read a memorandum" (DE 180 at 40); however, she testified that it was many conversations she had to have with him about his performance. As discussed above for the other Plaintiffs' situations, he cannot create a question of fact simply by saying he reviews his performance differently.

{N0493457.1}               15

limitations. (Answer, DE 131 at 9.)[22] Plaintiff has not cited any authority for the proposition that agreeing to an amendment means that the Defense has also agreed that the claim itself is viable. Second, this is not a situation like that in *Quinn-Hunt*, where the alleged facts could be easily interpreted as either supporting a § 1981 claim or a Title VII claim, and so it did not matter that the correct statute was not cited. By contrast, here, Dr. Cathey brought these allegations under the Teacher Tenure Act (DE 125, ¶ 172), and then brought them later as a THRA claim in May 2022, when there is no authority for third-party retaliation claims under the THRA,[23] and when the one-year limitations period had expired.

## XVI. Dr. Bailey - Age discrimination (ADEA & THRA).

As discussed in Metro's motion (DE 163 at 53), Whites Creek was a priority school and was *last* on the list among MNPS schools and had not made any gains in the past three years. Sharon Griffin, then in charge of priority schools for MNPS explained in her deposition, "Looking at the data of Whites Creek, Whites Creek had not made any gains in any of the areas for the last three years, last three years."…"We've got to make some decisions, and we've got to do something differently here or the [state] is going to take this particular school." (Griffin Dep. DE 149-8 at 84:4-10.)

"The only way schools are not taken, you have to show different leadership."…"And the school that had the longest running leadership with the lowest data, ranked last in Metro, was Whites Creek." (Griffin Dep. Doc. 149-8 at 85-86.) Plaintiff has no response to the fact that his school had the longest running leadership with the lowest data, and was ranked last in Metro. And,

---

[22] *Ellison*, 2019 WL 280982, *4 (M.D. Tenn. 2019) (Trauger, J.) adopting R&R (defendant did not waive its affirmative defense where it was clearly stated in its answer).
[23] *See, generally, Goree v. UPS*, 490 S.W.3d 413, 453 (Tenn. Ct. App. 2015) (analyzing the types of "opposition" claims that may be brought under the THRA, "Only certain retaliatory conduct violates the THRA.").

it cannot be disputed that under new leadership with Dr. Mells, scores at Whites Creek have improved. (Mells Dep. Doc. No. 149-9 at 33:25.) To have it Plaintiff's way, the director of schools would never have the ability to reverse course quickly on a failing school – being bound to raise the issue with the principal in progressive steps and to obtain the immediate supervisor's approval before removing a principal.[24]

As discussed above, "The court does not have a role in acting as a super personnel department, overseeing and second-guessing employers' business decisions. This is especially true for management positions, which, as supervisors and policy crafters, have a substantial impact on an organization's operations, efficiency, and culture." *Jones*, 2020 WL 7493105, *7 (E.D. Mich. 2020) (collecting Sixth Cir. cases) (cleaned up, with citations omitted).

## Conclusion

Accordingly, for the reasons discussed above and for those set forth in Dr. Battle's simultaneously filed reply in support of summary judgment, Metro is entitled to summary judgment and a dismissal of these claims.

---

[24] Plaintiffs cannot create questions of fact by mischaracterizing deposition testimony. Dr. Bailey indicates that Renita Perry, Dr. Bailey's direct supervisor at Whites Creek, had only glowing recommendations of him (180 at 46), but that is a mischaracterization of her testimony. When asked if Dr. Bailey was one of the best principals she oversaw, she indicated "He was average." (Perry Dep. DE 149-11 at 45:12.) While Ms. Perry did not put Dr. Bailey on a performance plan, they did have "coaching conversations" where she reminded him "scores over time is a factor for any principal" and that they work at the will of the superintendent and need to produce results. (DE 149-11 at 52:8.) She went on to explain that her understanding of why he was no longer at Whites Creek was the "data over time, that the school was not performing in a rapid manner, like the student outcomes were not performing at a high rate. The previous year, there was zero percent of students who were mastered on the State standardized test." (Perry Dep. at 58:21.) Ms. Perry further explained that Whites Creek was not only the "longest-running school in priority" (Dep. at 52:21), but that it was also the "lowest performing school." (Dep. at 53:6.)

Respectfully submitted,

THE DEPARTMENT OF LAW OF THE
METROPOLITAN GOVERNMENT OF
NASHVILLE AND DAVIDSON COUNTY
WALLACE W. DIETZ (BPR #9949)
DIRECTOR OF LAW

*/s/ J. Brooks Fox*
J. Brooks Fox (BPR #16096)
Benjamin A. Puckett (BPR #40042)
Kelli F. Woodward (BPR #39538)
Metropolitan Courthouse, Suite 108
P.O. Box 196300
Nashville, Tennessee 37219
(615) 862-6375
brook.fox@nashville.gov
benjamin.puckett@nashville.gov
kelli.woodward@nashville.gov

COUNSEL FOR DEFENDANTS

### Certificate of Service

I hereby certify that a true and accurate copy of the forgoing has been served via CM/ECF to: Ann Buntin Steiner, Steiner & Steiner, LLC, 613 Woodland Street, Nashville, TN 37206, and Jesse Ford Harbison, Jesse Ford Harbison Law, PLLC, 1109 N. 6th Street, Nashville, TN 37207 on September 12, 2022

*/s/ J. Brooks Fox*
J. Brooks Fox

{N0493457.1}                    18

Case 3:20-cv-01023    Document 206    Filed 09/12/22    Page 18 of 18 PageID #: 6163