# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

JENAI HAYES,

DR. LILY MORENO LEFFLER,

and

DR. JAMES BAILEY,
DR. PIPPA MERIWETHER, and
DR. DAMON CATHEY,

    Plaintiffs,

v.

METROPOLITAN GOVERNMENT
OF NASHVILLE AND DAVIDSON
COUNTY, TENNESSEE and
DR. ADRIENNE BATTLE,

    Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**Judge Aleta A. Trauger**

**No. 3:20-cv-01023 (LEAD CASE)**
No. 3:21-cv-00038 (Member Case)
No. 3:21-cv-00122 (Member Case)
(CONSOLIDATED)

## MEMORANDUM

Before the court are: (1) the Motion for Summary Judgment (Doc. No. 155) filed by defendant Metropolitan Government of Nashville and Davidson County, Tennessee ("Metro"); (2) the Motion for Summary Judgment (Doc. No. 156) filed by defendant Dr. Adrienne Battle; and (3) the Motion for Partial Summary Judgment filed collectively by plaintiffs Jenai Hayes, Dr. Lily Moreno Leffler, Dr. James Bailey, Dr. Pippa Meriwether, and Dr. Damon Cathey (Doc. No. 159).

For the reasons set forth herein, Metro's motion will be granted in part and denied in part; Battle's motion will be granted in its entirety; and the plaintiffs' motion will be denied. An appropriate Order is filed herewith.

# TABLE OF CONTENTS

I.    PROCEDURAL HISTORY ................................................................................. 3

II.    STANDARD OF REVIEW—RULE 56 ........................................................... 6

III.    TTTA AND TOMA ........................................................................................ 7

   A.    Facts Relevant to State Statutory Claims ................................................ 7

   B.    Tennessee Teacher Tenure Act Claims .................................................. 19

     1.    Hayes, Cathey, and Meriwether ........................................................ 21

     2.    Leffler ............................................................................................... 28

     3.    Bailey ................................................................................................ 33

     4.    Conclusion—TTTA Claims .............................................................. 39

   C.    TOMA Claims ...................................................................................... 39

     1.    The Tennessee Open Meetings Act .................................................. 40

     2.    The Budget and Finance Committee Meetings ................................. 42

     3.    Battle's One-on-One Meetings with Board Members ......................... 44

IV.    BAILEY'S INDIVIDUAL CLAIMS ............................................................. 48

   A.    Facts Relating to Bailey's Individual Claims .......................................... 48

   B.    Due Process Claim ............................................................................... 52

   C.    Bailey's Tennessee Public Protection Act Claim .................................... 57

     1.    Legal Standards ................................................................................. 57

     2.    Discussion .......................................................................................... 58

   D.    Bailey's First Amendment Claim ........................................................... 60

     1.    Legal Standard .................................................................................. 60

     2.    Discussion .......................................................................................... 60

   E.    Age Discrimination Claim ..................................................................... 67

V.    HAYES'S INDIVIDUAL CLAIMS ............................................................... 69

   A.    Facts Relating to Hayes's Individual Claims .......................................... 70

   B.    First Amendment Retaliation ................................................................ 72

     1.    Whether Hayes's Speech Was Protected by the First Amendment ........... 73

     2.    The Causal Connection ...................................................................... 76

   C.    Hayes' Title VII and THRA Discrimination Claims ................................ 88

     1.    Legal Standards ................................................................................. 88

     2.    Hayes's Prima Facie Case .................................................................. 90

     3.    Whether Hayes Can Establish Pretext ............................................... 91

   D.    Retaliation Claims under Title VI, Title VII, and the THRA .................. 92

      1.     Legal Standards ................................................................................ 92

      2.     Prima Facie Case ............................................................................. 93

VI.     LEFFLER'S INDIVIDUAL CLAIMS ........................................................ 94

   A.    Facts Relating to Leffler's Individual Claims ..................................... 95

   B.    Age and Sex Discrimination ........................................................... 101

   C.    Title VII Associational Retaliation ................................................. 104

      1.     Legal Standard .............................................................................. 104

      2.     Discussion .................................................................................... 105

VII.    MERIWETHER'S AND CATHEY'S AGE DISCRIMINATION CLAIMS ................ 106

   A.    Facts Relating to Meriwether's and Cathey's Age Discrimination Claims ................ 107

   B.    *Prima Facie* Case: Failure to Transfer to Comparable Position ................... 109

   C.    *Prima Facie* Case: Failure to Select for Executive Director Position........................ 111

   D.    Metro's Legitimate, Non-discriminatory Reasons for its Actions .............................. 112

   E.    Evidence of Pretext ....................................................................... 113

VIII.   CATHEY'S RETALIATION CLAIM .................................................... 115

IX.    CONCLUSION ............................................................................ 118

## I.    PROCEDURAL HISTORY

Plaintiff Hayes initiated her lawsuit against Metro and defendant Dr. Adrienne Battle in November 2020; Leffler filed a separate lawsuit asserting similar claims in January 2021, and Bailey, Meriwether, and Cathey (collectively, the "Bailey defendants") filed their own lawsuit (the "Bailey lawsuit") against the same two defendants asserting similar claims in February 2021. In December 2021, the parties to the Bailey lawsuit filed a Joint Motion to Consolidate all three lawsuits on the basis that the three cases "involve common issues of law and fact," as all of the plaintiffs worked for Metro; they all claim that they "lost their jobs and/or were demoted on May 4, 2020" for "discriminatory reasons"; and they "have sued for many of the same violations of law." *Bailey v. Metro. Nashville*, No. 3:21-cv-00122 (M.D. Tenn. Dec. 9, 2021) (Doc. No. 60). The court granted the motion and consolidated the three cases on December 13, 2021 for all

purposes, with all filings to be made in the lead case, *Hayes v. Metropolitan Government*, No. 3:20-cv-01023, as the earliest case filed. The operative pleadings in the case are now the Fifth Amended Complaint (Doc. No. 125) filed by the Bailey defendants, Leffler's Fourth Amended Complaint (Doc. No. 126), and Hayes's Fourth Amended Complaint (Doc. No. 142).

As relevant here, all of the plaintiffs assert claims against Metro only based on alleged violations of the Tennessee Teacher Tenure Act ("TTTA"), Tenn. Code Ann. §§ 49-5-510, -511(a), -511(b), -512, and/or -513; violations of the Tennessee Open Meetings Act ("TOMA"), Tenn. Code Ann. § 8-44-102; and violations of the Tennessee Human Rights Act ("THRA"), Tenn. Code Ann. § 4-21-101 *et. seq.*, § 4-21- 301 *et. seq.*, and Tenn. Code Ann. § 4-21-401 *et. seq*. The Bailey defendants and Leffler allege accompanying violations of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et. seq.*, while Leffler and Hayes state claims under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq*. Hayes brings a claim for violation of Title VI of the Civil Rights Act ("Title VI"), 42 U.S.C.A. § 2000d *et seq.*, and Bailey brings a claim under the Tennessee Public Protection Act ("TPPA"), Tenn. Code Ann. § 50-1-304.

In addition, all of the plaintiffs originally asserted claims against both Battle and Metro under 42 U.S.C. § 1983, based on a theory that violations of the TTTA also violated their right to due process. The court has granted the defendants' motions to dismiss these claims except as to one part of plaintiff Bailey's due process claim, which is based on the alleged termination of his employment. Finally, Bailey and Hayes also assert claims against both Metro and Battle under § 1983 for retaliation in violation of the First Amendment.

Metro's and Battle's Motions for Summary Judgment seek dismissal of all of the claims remaining against them. The plaintiffs filed joint Responses to Metro's and Battle's Motions for Summary Judgment (Doc. Nos. 180, 181), Responses to the defendants' Statements of Undisputed

Material Facts (Doc. Nos. 184, 182), and their own Statements of Additional Material Facts (Doc. Nos. 186, 183). Metro and Battle filed Replies (Doc. Nos. 206, 208) and Responses to the Statements of Additional Material Facts (Doc. Nos. 207, 209). The plaintiffs' Motion for Partial Summary Judgment seeks judgment in their favor on a part of Hayes's, Meriwether's, and Cathey's TOMA claims and on Leffler's and Bailey's TTTA claims. Metro opposes the motion (Doc. No. 176) and filed a Response to the plaintiff's Statement of Undisputed Material Facts (Doc. No. 175). The plaintiffs filed a Reply. (Doc. No. 200.)

The parties have also filed a substantial quantity of evidentiary material in support of their dueling versions of the facts, including audio files and links to YouTube broadcasts of various public meetings. The court rejects as entirely inappropriate both parties' implicit suggestions that the court should listen to the entirety of any Budget and Finance Committee meeting, School Board meeting, or Metro Council meeting for which thumb drives and internet links have been provided. The court also notes that providing embedded links in court filings rather than actual internet addresses for citations is not appropriate. At the same time, however, the court accepts that the links and thumb drives establish that recordings of these meetings exist and are accessible to the public. In addition, Metro has provided transcripts or partial transcripts for some of the referenced meetings, and both parties, on occasion, have provided references to specific time stamps in meetings. The court has considered these.[1]

---

[1] The court notes its general displeasure with both parties' practice of including and referencing many material facts in their briefing that are not enumerated in their Statements of Undisputed Fact, making the court's task of ascertaining what facts are actually disputed monumentally difficult. Moreover, despite the consolidation of these cases, a better practice likely would have been to file separate motions for summary judgment relating to the plaintiffs' individual claims, for which the relevant proof is quite different from that relating to the TTTA and TOMA claims.

## II.     STANDARD OF REVIEW—RULE 56

Summary judgment is appropriate where there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). In other words, even if genuine, a factual dispute that is irrelevant or unnecessary under applicable law is of no value in defeating a motion for summary judgment. On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine.'" *Id.*

"[A] fact is 'material' within the meaning of Rule 56(a) if the dispute over it might affect the outcome of the lawsuit under the governing law." *O'Donnell v. City of Cleveland*, 838 F.3d 718, 725 (6th Cir. 2016) (citing *Anderson*, 477 U.S. at 248). A dispute is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Peeples v. City of Detroit*, 891 F.3d 622, 630 (6th Cir. 2018).

The party bringing the summary judgment motion has the initial burden of identifying portions of the record—including, *inter alia*, depositions, documents, affidavits, or declarations—that it believes demonstrate the absence of a genuine dispute over material facts. *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 627–28 (6th Cir. 2018); Fed. R. Civ. P. 56(c)(1)(A). The non-moving party must set forth specific facts showing that there is a genuine issue for trial. *Pittman*, 901 F.3d at 628. The court must view the facts and draw all reasonable inferences in favor of the non-moving party. *Id.* Credibility judgments and weighing of evidence are improper. *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 852 (6th Cir. 2018).

### III.    TTTA AND TOMA

#### A.    Facts Relevant to State Statutory Claims[2]

Metro is the governmental entity that operates a school system—the Metro Nashville Public Schools ("MNPS")—in Nashville, Davidson County, Tennessee. (Doc. No. 142 ¶ 3.) The Metro Charter empowers the MNPS Board of Education ("Board" or "School Board") to hire a Director of Schools. Dr. Adrienne Battle was MNPS's Director of Schools at all times relevant to the plaintiffs' claims. She was appointed as interim director in April 2019 and permanent director in March 2020. (Doc. No. 149-1, Battle Dep. 9.) Each of the plaintiffs resides in Middle Tennessee and each is or was an administrator employed by MNPS. As set forth above, they all allege that they lost their jobs and/or were demoted effective June 30, 2020.

Metro attributes most of their job changes to a structural reorganization— what the parties refer to as the "Central Office Reorganization" or "Reorganization"—that was proposed and adopted as part of MNPS's Fiscal Year ("FY") 2021 budget (covering the 2020–2021 school year).

The plaintiffs' TOMA claims challenge the process by which MNPS (and Metro) adopted the FY 2021 budget and, more specifically, the Central Office Reorganization. As set forth in their pleadings, the TOMA claims are premised upon allegations that the Reorganization was discussed and accepted by Board members during sequential one-on-one meetings between Battle and individual members of the School Board and potentially during meetings of the Board's Budget and Finance Committee, prior to the Board's formal approval of the Central Office Reorganization

---

[2] The facts for which no citation is provided are undisputed and generally drawn from the plaintiffs' Responses to defendants' Statements of Undisputed Facts. Even though the plaintiffs seek summary judgment on some of their TOMA and TTTA claims, the court finds, as set forth herein, that Metro is entitled to summary judgment on the claims that are the subject of the plaintiffs' motion. Accordingly, the facts are at all times viewed in the light most favorable to the plaintiffs, without the court's ever reaching the merits of the plaintiffs' motion.

and the FY 2021 Budget. The plaintiffs assert that these meetings were subject to TOMA and violated its provisions, insofar as the meetings took place without notice to the public and were not open to the public, and no minutes of the meetings were maintained. Based on these assertions, the plaintiffs claim that the elimination of Hayes's, Meriwether's, and Cathey's positions as part of the Central Office Reorganization should be declared void and of no effect.

The Metropolitan Charter directs the School Board to "[h]old public hearings on the operational school budget prior to its approval by the board, and thereafter to submit to the mayor through the director of finance the budget for schools." Metropolitan Charter § 9.04. From there, Metro Council makes the final appropriations. *Id*. at § 2.04(3).

The evidence establishes that initial budget discussions for FY 2021 began on February 11, 2020 at a Budget and Finance Committee meeting at which, Metro claims, Battle "set forth her vision for a budget process that distinguished between a maintenance of effort/continuity of operations budget and aspirational requests." (Doc. No. 164 ¶ 4.) The Board held another Budget and Finance Committee meeting on February 25, 2020. No votes were taken at either February committee meeting. The Reorganization was not discussed at either of these meetings. The plaintiffs point out, in fact, that Metro's request that the MNPS make budget cuts that led to the Reorganization was not made until mid- to late-March 2020.

Regarding that request, Battle testified that, in mid- to late-March 2020, the "Mayor's Office and the finance team with Metro Government" asked her to look at cutting "about $100 million from [MNPS's] budget." (Doc. No. 149-1, Battle Dep. 228–29.) The Central Office Reorganization was a result of that request and the "budget crisis that we were in as a city." (*Id.* at 228.)

It is unclear when, exactly, the Reorganization plan was developed and how it was presented to Board members. Metro does not dispute the plaintiffs' assertion that Battle met with individual School Board members every month. (Doc. No. 175 ¶ 1 and Response.) Sean Braisted, MNPS Executive Officer for Communications and Community Engagement, testified that he worked with Battle during the spring of 2020 to develop a PowerPoint presentation for her to use to "highlight some proposed changes" in discussions with Board members. (Doc. No. 155-5, Braisted Dep. 102; Doc. No. 162-13, at 15.) Battle intended to go over the PowerPoint and to discuss the details about the Central Office Reorganization during one-on-one meetings with School Board members. (Doc. No. 175 ¶ 7 and Response.) The PowerPoint presentation describes the need to "streamlin[e] Central Office functions to create savings" by "[e]liminating or repurposing positions to better align with needs." (Doc. No. 162-13, at 17.)

The PowerPoint contains an organizational chart showing the then-current positions and the reporting structure of MNPS's upper management, a chart highlighting what positions would be eliminated as part of the proposed Central Office Reorganization, and a chart showing the proposed new titles and reporting structure of the Central Office after the proposed Reorganization. (*Id.* at 18–20.) It also lists the positions that would be removed, downgraded, or "repurposed" and those that would be added as part of the Reorganization, highlights an associated $1 million in savings, and notes that "All Executive Directors will reapply for the 2020–2021 school year." (*Id.* at 21.)

According to Braisted, Battle "regularly ha[d] one-on-one meetings with board members in order to go over information and in order to get feedback" and "ideas and suggestions from board members on how to improve something before it's presented to the public." (Doc. No. 155-5, Braisted Dep. 125; *see id.* at 126 ("[P]art of the reason for the one-on-one [meetings] is to sort

of have a dialogue and conversation with the individual board members and get feedback before a plan is finalized or put to the public.").) At a public meeting with the full Board, Battle "wouldn't be able to have those sort of one-on-one dialogues." (*Id.* at 127.) Braisted was not actually at the one-on-one meetings. (*Id.* at 127–28.)

Battle's Chief of Staff, Henry Clay, also testified that Battle had individual meetings with School Board members on a regular basis and that she told him she intended to meet with them about the Central Office Reorganization plan "to see if they had individual questions." (Doc. No. 149-2, Clay Dep. 66.) Her regular practice was to invite each Board member individually to a thirty-minute meeting, but he could not say whether they all accepted the invitation or what was said at the meetings, because he did not attend them. (*Id.* at 66, 67.) He noted that it would not have been appropriate for Battle to ask for any member's approval of her proposal, "because that would be an action by the board," but she "wanted to make sure that if they had questions that she was able to answer those." (*Id.* at 67.) It does not appear that Battle was asked about these meetings during her deposition, nor is the testimony of any Board member regarding such meetings in the record.

In any event, the Central Office Reorganization entailed, among other things, the elimination of the position of Director of School Choice and the creation of a new position, Executive Officer of Diversity, Equity, and Inclusion, which would incorporate the duties of the Director of School Choice but also include additional responsibilities. (Doc. No. 149-2, Clay Dep. 160.) In addition, the Reorganization called for the elimination of all four Associate Superintendent positions. At the time Battle became Director of Schools, there were thirteen Executive Directors. The Reorganization called for two new Executive Director positions, for a total of fifteen, but it also called for the termination of all sitting Executive Directors, though they were authorized to

reapply for an Executive Director position, and many of them were rehired into the same positions they held previously. The positions of four of the five plaintiffs were affected by the Reorganization: (1) Hayes held the position of Director of School Choice; (2) Meriwether and Cathey were two of the four Associate Superintendents; and (3) Leffler was an Executive Director.

Although Battle and MNPS attribute the Reorganization to the budget crisis facing the city in the spring of 2020, the plaintiffs point out that, regardless of whether Metro actually asked Battle to eliminate $100,000,000 from the MNPS budget, the FY 2021 Budget as finally approved actually represented an increase of $20,000,000 from the previous year, and MNPS actually saved money in FY 2020 as a result of a spending freeze that went into effect after the pandemic hit.

While Battle may have had private meetings with Board members about the budget and the Reorganization, the School Board continued discussing the FY 2021 Budget in public Budget and Finance Committee meetings, Board meetings, and Metro Council meetings on May 19, 2020, May 21, 2020, May 26, 2020, and June 30, 2020. Metro has not presented evidence suggesting that the Reorganization—or, more specifically, the elimination of the Associate Superintendent and Director of School Choice positions and the reconfiguring of the Executive Director positions—was discussed in any detail during those public meetings. It was discussed, or at least briefly described, in the May 12, 2020 Budget and Finance Committee meeting, however. In that meeting, MNPS Chief Operating Officer, Chris Henson, detailed the revised proposed budget, which incorporated $24.6 million in budget cuts—including a reduction of approximately $1 million associated with a "Central Office Reorganization."[3]

---

[3] Metro's statement of fact regarding the May 12 meeting (Doc. No. 164 ¶ 11) is supported only by a reference to the entirety of the audio recording of this meeting, to which the plaintiffs understandably object, as the citation does not comply with this court's Local Rules, which require that each fact asserted in a party's statement of undisputed facts be supported by a "specific citation to the record." L.R. 56.01(b). However, despite not adequately citing it, Metro provided a partial

As established by the partial transcript of the May 12 meeting, School Board member Gina Pupo-Walker opened the meeting by referencing the extraordinarily difficult year 2020 had already been and the challenges posed by the city's budget shortfall. (Doc. No. 155-1, at 3.) Battle then spoke briefly, referencing the "financial position that Metro Government and all of us are facing as a result of the Covid-19 pandemic and the shut-down of our . . . economic engine" and the "significant cuts" that they had identified in working with the MNPS Finance Team and Human Resources to try to "plug the deficit" between the "budget number identified by Metro Finance" and the "budget we truly need to maintain the status quo of the operations of MNPS." (*Id.* at 5.) She noted that these cuts "include a reorganization of our central office" that was expected to save $1 million, "improve lines of communication and chains of command, and restore our district's efforts to promote equity and diversity." (*Id.* at 5–6.) Chris Henson then made a presentation regarding the budget proposal, first noting that "the recommended funding level from the Mayor, with his budget being filed with the Council at $914.9 million, would require us to reduce our budget by approximately $24.6 million." (*Id.* at 14.) He discussed the efforts they were making to find reductions, referencing slides that do not appear to be in the court's record. (*See id.* at 8.) Henson went over the budget proposal in some detail and noted that they were "proposing a reorganization of the Central Office, and—and Dr. Battle may want to speak more to this later— at a savings of approximately $1 million." (*Id.* at 16.) Battle did not add any more comments at the meeting, and, while many of the Board members had questions, none of the questions concerned the Central Office Reorganization. No votes were taken during this meeting.

---

transcript for the meeting, and the plaintiffs helpfully provided a time stamp for relevant portions of the 52-minute meeting.

At a specially called meeting on May 19, 2020, the School Board approved three budgets for FY 2021: (1) the Nutrition Services Fund Budget; (2) the Federal Programs and Grants Fund Budget; and (3) the Operating Budget for FY 2020–2021. (*See* Doc. No. 145-1 (meeting agenda); Doc. No. 145-2 (meeting minutes); Doc. No. 155-2 (meeting transcript).) Regarding the latter, the MNPS administration presented the Board with two options: the first request was for a budget totaling $929.4 million, and the second aligned with the anticipated appropriation of $914.9 million. (Doc. No. 145-1, at 8, 9.) Both options included the Central Office Reorganization, which entailed the elimination of five positions and savings of $1 million. (*Id.*) The positions to be eliminated were not specifically identified during the meeting. The transcript of the meeting reflects several general references to personnel cuts at the Central Office as part of the Central Office Reorganization, but there were no specific discussions of what exactly the Central Office Reorganization would entail. (*See generally* Doc. No. 155-2.) After substantial discussion, the Board voted to approve an operating budget of $929,436,600 that included the Central Office Reorganization and the associated $1 million in cuts resulting from the elimination of several positions.

On May 21, 2020, Battle, Henson, and Board member Pupo-Walker presented the proposed MNPS Budget to Metro Council's Budget and Finance Committee, emphasizing that it had been approved unanimously by the School Board. Council Member Bradford asked: "What exactly was cut at Central Office to come up with $1 million in savings?" May 21, 2020 Metro Council Budget Hearing, https://www.youtube.com/watch?v=BfzrsVfXAYw, at 1:05:04.[4] Battle's response, which took just over 30 seconds and is difficult to understand, was that all of the positions cut were

---

[4] No transcript for this meeting was provided, but Metro provided a precise time stamp for the conversation, thus enabling the court to locate it.

at the "director level or higher," and included one director of a program, two executive officer positions, four associate superintendent positions, and several others. *Id.* at 1:05:31–1:06:04. The entire budget discussion lasted almost two hours, but this was apparently the only discussion addressed to the Central Office Reorganization.

At its May 26, 2020 meeting, the Board expressly approved the Central Office Reorganization plan, which was summarized as follows:

> **Central Office Reorganization Plan:** Under Tenn. Code Ann. § 49-5-511(b) requesting Board Approval to eliminate the following positions based on budget constraints: 1) Associate Superintendent, 2) Executive Officer of Schools and Academic Support, 3) Executive Officer of Organizational Development, 4) Executive Director of Charter and Private Schools, 5) Executive Director of Federal Programs, and 6) Director of School Choice. These positions were not included in the budget presented on May 19, 2020.

(Doc. No. 145-3, at 15.) This Central Office Reorganization was approved as part of the Consent Agenda, meaning the Board voted on it in a single vote along with all other items on the Consent Agenda without significant discussion. At some point before that vote, one member of the School Board, Freda Player-Peters, asked Battle to "discuss the Central Office reorganization," noting that there had "been concern about Central Office and the organization there." (Doc. No. 155-3, at 3.)

Battle responded:

> Yes, what you have on the consent agenda references back, actually, many conversations ago with regards to the reorg at Central Office, really solving for – during this budget crisis, solving for some deficiencies at Central Office.
>
> Of course, anytime you're . . . discussing positions or span of control at Central Office, it's – it's not an easy thing to accomplish. But given our budget crisis and solving for deficiencies in our operations, what you have before you is the – the Central Office reorganization.
>
> That reorganization, what you have in front of you includes the – the removal of a few positions at Central Office to allow for some restructuring to bring different departments together, and/or to shift roles and responsibilities.

(*Id.* at 3–4.) The Board members did not have further questions and voted to approve the entire

Consent Agenda.

Following its own debate, the Metro Council passed a budget for Metro Government on June 16, 2020 and appropriated $948,873,500 to MNPS for its own budget. The School Board met again on June 30, 2020, to approve a final operating budget. The documents presented to the Board at that meeting summarized the spending and job position changes and included a detailed line-item budget.

COO Henson testified that, if the Board had modified the budget to include the positions eliminated in the Central Office Reorganization, then it would have needed to find a million dollars in reductions elsewhere. (Doc. No. 149-10, Henson Dep. 97–98.) The plaintiffs point out that Barry Booker, MNPS Director of Budgeting and Financial Reporting and one of Henson's direct reports, agreed "based on [his] . . . experience in the budget office" that "typically if you want to find savings of a million dollars somewhere you typically can." (Doc. No. 190-4, Booker Dep. 99.) The plaintiffs also point out that, in the final FY 2021 budget approved on June 30, 2020, an additional $5 million in savings had been identified, denoted in the budget as "Central Office and District Provided Services Reductions." (Doc. No. 189-3, at 3.) When Booker was asked in his deposition whether the jobs that were eliminated in the Central Office Reorganization could have been saved if these funds had been identified earlier, he responded that it was probably possible. (Doc. No. 190-4, Booker Dep. 58–59.)[5]

---

[5] The plaintiffs characterize Booker's testimony as stating that it was "probable" that the jobs could have been saved. (*See* Doc. No. 184, Resp. to ¶ 31.) Booker's testimony was slightly more ambiguous. He was asked whether it was *possible* that the five jobs could have been saved if the $5 million in savings had been included on the May 19 proposed budget, to which he responded: "That is certainly probable. If that 5 million in savings had been identified, that is possible." (Doc. No. 190-4, Booker Dep. 58–59.)

Ultimately 60 positions were eliminated, including those eliminated as part of the Central Office Reorganization, including both certificated and non-certificated positions. At the same time, 86.75 new positions were added, for a net increase of 26.75 positions.

MNPS operated during FY 2020–2021 under the budget passed on June 30, 2020. The School Board then passed a budget for FY 2022 that governed operations through June 30, 2022. On June 28, 2022, the School Board passed the budget for FY 2023 that will govern expenditures until June 30, 2023. None of the positions included in the Central Office Reorganization are included in either budget approved after the expiration of the FY 2021 budget.

Full-length recordings of all MNPS Board meetings, including Budget and Finance Committee meetings, are maintained by MNPS and are accessible to the public through YouTube. (Doc. No. 145, Bobo Decl. ¶ 5.)[6]

On April 29, 2020, before approval of the FY 2021 Budget or official Board ratification of the Central Office Reorganization, plaintiffs Meriwether and Cathey, both tenured Associate Superintendents, were notified by Chris Barnes, then MNPS Chief of Human Resources, that their positions were being eliminated effective June 30, 2020. (Doc. No. 188-2, Meriwether Decl. ¶ 47; Doc. No. 188-3, Cathey Decl. ¶ 36.) They received written notice of the elimination of their positions on May 4, 2020. (Doc. Nos. 189-5, 189-7.) The same letters gave notice that they were eligible for rehire into any open position for which they applied and were selected and that, if they had not secured another position by June 15, 2020, they would be administratively transferred into

---

[6] The plaintiffs attempt to dispute this fact, citing COO Henson's testimony that minutes were not kept for Budget and Finance Committee meetings but that "[s]ome of them are televised." (Doc. No. 149-10, Henson Dep. 215–16.) This testimony does not establish Henson's knowledge about whether the meetings are videotaped and uploaded to YouTube, nor that it was his job to be aware of such facts. Moreover, the plaintiffs have not produced evidence of any Budget and Finance Committee meeting that took place during the spring of 2020 that was not recorded and posted on YouTube.

a classroom teaching position. Both were eventually offered and accepted positions as elementary school principals. (Doc. No. 188-2, Meriwether Decl. ¶ 54; Doc. No. 188-3, Cathey Decl. ¶¶ 45–46, 53.)

Plaintiff Hayes, then employed by MNPS as Director School Choice, was also notified on April 29, 2020 by Chris Barnes, then MNPS Chief of Human Resources, and Lisa Spencer, Director of HR Strategy and Employee Services, that her position was being eliminated effective June 30, 2020. She was told erroneously that her employment with MNPS would terminate if she did not secure another MNPS position before June 30. (Doc. No. 185-1, Hayes Decl. ¶¶ 24–25.) Five days later, and well before any change to her employment status took effect, she was notified that her employment with MNPS would not terminate, because she was tenured. (*Id.* ¶ 31.) She received a written notice informing her that she was free to apply for any open position, and, if she did not secure another job, she would be administratively transferred into a classroom teaching position. (Doc. No. 189-4.) Hayes did not secure another position, so she was reassigned as a classroom teacher. (Doc. No. 144-3, Hayes Dep. 62.)

In the spring of 2020, plaintiff Leffler was a non-tenured teacher with MNPS, employed in the position of Executive Director of School Support for elementary schools in the southeast quadrant. (Doc. No. 188-1, Leffler Decl. ¶ 8.) She was given written notice on May 4, 2020 that her position was being eliminated effective June 30, 2020, that she was eligible for rehire into any other open position for which she applied and was selected, but that, if she had not secured another position prior to June 30, 2020, her employment would terminate. (Doc. No. 189-6.) Leffler reapplied for the position of Executive Director but was not selected. Her employment with MNPS was not terminated, however, because she also applied and was selected for a position within MNPS as a school principal. (Doc. No. 144-4, Leffler Dep. 7.)

There is a dispute as to whether the Executive Director positions actually changed. According to Metro, thirteen Executive Director positions were either repurposed or eliminated, and fifteen new Executive Director positions were created. According to the plaintiffs, the job responsibilities for at least some of the Executive Director positions did not actually change. In any event, it is undisputed that all individuals holding Executive Director positions during the 2019–2020 school year were required to reapply for those positions. It is also undisputed that two new Executive Director positions were created as part of the Central Office Reorganization. (*See* Doc. No. 144-4, Leffler Dep. 54–55.)

Plaintiff Bailey's situation is different. In the spring of 2020, he was employed as the Principal of Whites Creek High School. He had tenure with MNPS. He was notified in a Zoom call on May 1 and by letter on May 4, 2020 that his appointment as Principal would terminate on June 30, 2020, that he was eligible for rehire into any open position for which he applied and was selected, and that, if he had not secured another position by June 15, 2020, he would be transferred into a classroom teaching position. (Doc. No. 189-8.) Bailey did not secure another position prior to June 15. On that date, he submitted a formal complaint to MNPS, stating that he had been targeted by discrimination and retaliation and that, due to the retaliatory actions, his "last day with the district [would] be June 30, 2020." (Doc. No. 189-9.)

Lisa Spencer testified that she learned at some point after the notice of the non-renewal of Bailey's appointment as principal had been sent that Bailey's teaching certificate had expired and that he could not be transferred to a teaching position unless his licensure was current. (Doc. No. 149-3, Spencer Dep. 146.) She told Chris Barnes, her supervisor, that Bailey's licensure was not current. (*Id.* at 147.) Asked whether Metro had no need "to look at transferring him into a teaching position, correct, because he couldn't do it legally," Spencer agreed that "[y]ou have to have an

active teaching license in order to be a teacher." (*Id.*) According to Spencer, Barnes said, "well, if he's not licensed, he can't be a teacher." (*Id.*) According to Barnes, however, a person could only be transferred to a position for which he was licensed or "licensable," and he agreed that Bailey, if transferred to a teaching position, would probably have been "provided an opportunity for how he can get relicensed," but he did not know the details. (Doc. No. 149-7, Barnes Dep. 134–36.)

Bailey claims that he knew the policy required that he be reassigned by June 15, but he was not reassigned by June 15. (Doc. No. 187-1, Bailey Decl. ¶ 58; *see also* Doc. No. 191-2, MNPS Assignment/Transfer Policy.)

### B.     Tennessee Teacher Tenure Act Claims

Each of the plaintiffs brings a claim for violation of various provisions of the Tennessee Teacher Tenure Act, though the focus of each of their claims differs slightly. Metro seeks summary judgment on all of the plaintiffs' TTTA claims; the plaintiffs' Motion for Partial Summary Judgment seeks judgment on behalf of Leffler and Bailey on their TTTA claims.

The TTTA defines the term "teacher" to include, not simply teachers, but also "supervisors, principals, director of schools and all other certificated personnel employed by any local board of education, for service in public, elementary and secondary schools in this state, supported in whole or in part by state or federal funds." Tenn. Code Ann. § 49-5-501(10). In light of the breadth of this definition, there is no question that all of the plaintiffs, for purposes of their TTTA claims, qualify as "teachers."

The TTTA authorizes any local director of schools, "when necessary to the efficient operation of the school system," to "transfer a teacher from one location to another within the school system, or from one type of work to another for which the teacher is qualified and licensed," as long as such transfers are "acted upon in accordance with board policy." Tenn. Code Ann. § 49-5-510. However, "[n]o teacher shall be dismissed or suspended except as provided by this part."

*Id.* § 49-5-511(a)(1). Section 49-5-511(a)(2) sets out the causes for which a teacher may be dismissed or suspended, and the remainder of § 49-5-511(a) outlines the procedures that must be followed whenever a teacher is suspended or charged with "offenses that would justify dismissal." *Id.* § 49-5-511(a)(5). The statute also outlines the procedures through which teachers subject to disciplinary charges may request a "full and complete hearing on the charges before an impartial hearing officer," *id.* § 49-5-512(a), and "petition for a writ of certiorari from the chancery court of the county where the teacher is employed," *id.* § 49-5-513(a).

Section 49-5-511(b) pertains to the dismissal of teachers "[w]hen it becomes necessary to reduce the number of teaching positions . . . in the system because of a decrease in enrollment or for other good reasons" and requires that such dismissals be "based on their level of effectiveness determined by the evaluation pursuant to § 49-1-302." *Id.* § 49-5-511(b)(1). A teacher who has highly positive evaluations but "has been dismissed because of abolition of a position shall be placed on a list for reemployment." *Id.* § 49-5-511(b)(3). The statute reaffirms, however, that nothing in this subsection should be "construed to deprive the director of schools of the power to determine the filling of such vacancy on the basis of the director of schools' evaluation of the teacher's competence, compatibility, and suitability to properly discharge the duties required for the vacant position considered in the light of the best interest of the students in the school where the vacancy exists." *Id.* § 49-5-511(b)(3). A teacher retains the right to remain on the preferred list for employment until he or she either "accepts a bona fide offer of reemployment for a comparable position" or rejects four such bona fide offers. *Id.* § 49-5-511(b)(4).

The plaintiffs now claim that the TTTA must be read "*in pari materia*" with the "Continuing Contract Law" or "CCL," Tenn. Code Ann. § 49-5-409. (Doc. No. 180, at 17.) The CCL provides, generally, that "a non-tenured teacher's contract for employment will be

automatically renewed for the ensuing school year unless she receives the required written notice of dismissal within five business days following the last instructional day of the current school year." *McAllister v. Lawrence Cty. Sch. Sys. Bd. of Educ.*, No. M2021-00082-COA-R3-CV, 2022 WL 776700, at *2 (Tenn. Ct. App. Mar. 15, 2022) (citing Tenn. Code Ann. § 49-5-409), *appeal denied* (July 13, 2022). The CCL does not apply to teachers who have tenure. Tenn. Code Ann. § 49-5-502(a).

### 1.    Hayes, Cathey, and Meriwether

As set forth above, Hayes was employed as the Director of School Choice when that position was eliminated; Cathey and Meriwether were employed as Associate Superintendents when those positions were eliminated. All three were tenured. All three received letters from Battle dated May 4, 2020, providing written notice of the elimination of their positions effective June 30, 2020. The letters state: "If you have not secured another position for which you have applied prior to June 15, 2020, you will be administratively transferred by the Director of Schools, pursuant to Tenn. Code Ann. § 49-5-510, for the efficient operation of the school system, into a classroom teaching position." (Doc. Nos. 189-4, 189-5, 189-7.) All three applied for other positions. Hayes did not receive any position for which she applied, and she was ultimately reassigned to a classroom teaching position. Cathey and Meriwether applied for, and were selected as, elementary school principals in the MNPS system. All of these assignments represented a substantial reduction in status and salary compared to the positions they previously held.

In her pleadings, Hayes alleges that the termination of her position and reassignment to a lower-paying teaching position (1) violated Tenn. Code Ann. § 49-5-511(a), because she did not engage in any conduct justifying dismissal and no charges that she had engaged in any such conduct were brought against her (Doc. No. 142 ¶¶ 88–90); (2) violated § 49-5-511(b), because the School Board did not make the decision to "fire" her or give her written notice of dismissal

fully explaining the "circumstances or conditions making the dismissal necessary" (Doc. No. 142 ¶ 92); and (3) violated Tenn. Code Ann. § 49-5-510, because her transfer was not in good faith and for the efficient operation of the school system, but instead was in retaliation for engaging in speech protected by the First Amendment (Doc. No. 142 ¶¶ 93, 99).

Meriwether and Cathey likewise assert that their transfers were not in good faith but based on improper motives, in violation of § 49-5-510. (Doc. No. 125 ¶ 176.) Whether they intended to state a claim for a violation of § 49-5-511(b) is somewhat unclear, but they assert that they were "transferred" as part of a "sham reduction in force to deprive them of their due process rights under Tenn. Code Ann. §49-5-511(b)." (Doc. No. 125 ¶ 178.) In their Response to Metro's Motion for Summary Judgment, they argue that their transfers violated § 49-5-511(b), because "[o]nce Metro eliminated those Plaintiffs' positions under Section 511(b), it had a statutory obligation to place or offer [them] reemployment in a comparable position," which it failed to do. (Doc. No. 180, at 22.)

Metro argues that it is entitled to summary judgment on these claims because: (1) § 49-5-511(a) governs disciplinary suspensions and dismissals for cause, which does not apply to any of the plaintiffs; (2) § 49-5-511(b) governs *dismissals* necessitated by a reduction in the number of positions in a district, which does not apply, both because none of these plaintiffs was actually dismissed and because Metro did not reduce the total number of positions available—it added and reorganized positions; and (3) the plaintiffs cannot establish a claim under § 49-5-510, because the plaintiffs cannot overcome the legal presumption that their transfers were in good faith. (Doc. No. 163, at 13, 20–23.)

The court finds, first, that it is clear that, insofar as the plaintiffs assert claims based on violations of § 49-5-511(a) (or § 49-5-512), Metro is entitled to summary judgment on such claims, as it is undisputed that none of these plaintiffs was subject to any kind of disciplinary action or

charged with an offense warranting suspension or dismissal.

Moreover, it is also undisputed that none of them was dismissed. Section 49-5-511(b) pertains to the "dismissal" of teachers "[w]hen it becomes necessary to reduce the number of teaching positions . . . in the system because of a decrease in enrollment or for other good reasons." Although the Central Office Reorganization as summarized in a School Board meeting agenda and approved by the Board referenced Tenn. Code Ann. § 49-5-511(b) and "request[ed] Board Approval to eliminate" several positions (Doc. No. 145-3, at 15), it is now undisputed that the number of teaching positions in the system was not actually reduced, and none of these plaintiffs— all of whom were tenured—actually lost their employment with MNPS. Moreover, importantly, § 49-5-511(b) says nothing about requiring Board approval to eliminate job titles or positions; it requires Board approval to *dismiss individuals* as a result of the elimination of any positions.

The Tennessee Supreme Court has explained that the statutory provisions governing transfer are "separate and distinct from those governing dismissal." *McKenna v. Sumner Cty. Bd. of Educ.*, 574 S.W.2d 527, 530 (Tenn. 1978); *see id.* ("[T]he term 'transfer' was not intended to be synonymous with the terms 'dismissal' and 'suspension.'"). Transfer is defined in the TTTA as "removal from one (1) position to another position under jurisdiction of the same board." Tenn. Code Ann. § 49-5-501(12). "The reassignment of a principal or assistant principal"— or any other certificated educator who qualifies as a "teacher"—"to a teaching position is a transfer, not a termination or demotion that would trigger formal notice and hearing requirements." *Geller v. Henry Cty. Bd. of Educ.*, 602 S.W.3d 876, 887 n.13 (Tenn. 2020). In other words, Hayes, Meriwether, and Cathey were all transferred under § 49-5-510. They were not "dismissed" under § 49-5-511(b). Because Hayes, Meriwether, and Cathey were transferred to new positions rather than dismissed, Metro is entitled to summary judgment on any claims they assert based on alleged

violations of § 49-5-511(b).

As for their claims under § 49-5-510, that provision requires that a tenured employee's transfer be "made in good faith [for the] efficient operation of the school system." *McKenna*, 574 S.W.2d at 533–34; *see also Geller*, 602 S.W.3d at 887–88 (noting that, prior to 1992, a "popularly elected superintendent of schools and the local board shared the authority for the placement of personnel," but that, after revisions to § 49-5-510 as part of the Educational Improvement Act passed in 1992, "local school boards no longer have to approve teacher transfers" (citing *Lawrence Cty. Educ. Ass'n v. Lawrence Cty. Bd. of Educ.*, 244 S.W.3d 302, 315 (Tenn. 2007))). The courts construing this provision of the TTTA have held that educators transferred pursuant to § 49-5-510 "are entitled to protection from arbitrary and capricious transfers, and from transfers actuated by political or other improper motives." *Guster v. Hamilton Cty. Dep't of Educ.*, No. 1:02-CV-145 2004 WL 1854181, at *35 (E.D. Tenn. 2004) (citations omitted). To protect this right, "[a] transferred teacher or principal may bring a direct action in the courts to obtain a judicial determination on the limited issue [of] whether the transfer was arbitrary and capricious, politically motivated, or otherwise done for an improper motive." *Id.* The scope of judicial review of a transfer decision is "limited, as it is "circumscribed by the broad discretion Tennessee statutes give to the directors/superintendents of public schools in personnel matters, and the inherently executive nature of decisions to transfer principals and teachers for the efficient operation of the school system." *Id.* at *36 (citations omitted). The plaintiff has "the burden of proof to establish by a preponderance of the evidence that [a § 49-5-510] transfer was arbitrary, capricious, or improperly motivated." *McKenna*, 574 S.W.2d at 534. "The determinative question is whether the transfer could be classified as for the 'efficient operation of the school system.'" *Lawrence Cty. Educ. Ass'n*, 244 S.W.3d at 315.

Courts "must presume that the actions of a board or superintendent are not arbitrary or capricious, but are reasonable and fair unless there is clear evidence to the contrary." *Mitchell v. Garrett*, 510 S.W.2d 894, 898 (Tenn. 1974); *see also Marion Cty. Bd. of Educ. v. Marion Cty. Educ. Ass'n*, 86 S.W.3d 202, 215 (Tenn. Ct. App. 2001) ("A court will not substitute its judgment for that of the superintendent, but will only inquire into whether the decision was arbitrary, capricious, or improperly motivated."). Importantly, the Tennessee courts have construed *McKenna* to mean that, "[i]f valid programmatic grounds exist that will justify finding that a challenged transfer was 'necessary for the efficient operation of the school system,' the reviewing courts should not invalidate the transfer because the evidence also suggests that some of the local officials who made the decision might have had ulterior motives." *State ex rel. Hyde v. Bills*, No. 86-8-II, 1986 WL 6565, at *9 (Tenn. Ct. App. June 11, 1986). The controlling question in cases where the plaintiff has evidence of improper motivations is "whether the local education officials had sufficient, demonstrable grounds upon which to base their decision that a transfer was necessary for the efficient operation of the school system." *Id.*; *accord Galyon v. Collins*, No. 03A01-9711-CH-00513, 1998 WL 331300, at *7 (Tenn. Ct. App. June 24, 1998).

Hayes alleges that her transfer was improperly motivated because her position was eliminated, not due to budget concerns, but in retaliation for her having reported violations of Title VI and the Family Educational Rights and Privacy Act (Doc. No. 142 ¶¶ 92, 99).[7] Meriwether and Cathey similarly allege that budget concerns did not justify the elimination of their positions or their transfer to lower-paying positions with less responsibility and that the transfers were not in good faith for the efficient operation of the school system. Meriwether asserts that her position

---

[7] The same allegations also support her First Amendment retaliation claim, which is addressed below.

was eliminated either in retaliation for her involvement in a disciplinary proceeding in 2018 involving Battle's brother, Carlton Battle, who was then employed as a basketball coach and assistant principal at Whites Creek High School or, alternatively, due to her age. Cathey likewise alleges that his transfer was in retaliation for his having opposed Battle's actions on several occasions before she was appointed Director of Schools and, alternatively, because of his age. (Doc. No. 125 ¶¶ 171–72, 174–76.)[8]

In support of its Motion for Summary Judgment, Metro argues that Hayes's transfer was necessitated by the elimination of the Director of School Choice position "for budgetary and organizational reasons" and that Hayes cannot carry her burden of proving that the transfer was arbitrary and capricious. (Doc. No. 163, at 14–15.) It argues that Meriwether's and Cathey's § 49-5-510 claims fail for the same reason—that these plaintiffs' transfers "cannot be uncoupled from the challenges facing MNPS in Spring of 2020," including a global pandemic and the fact that Metro asked MNPS during the last quarter of the fiscal year to attempt to cut $100 million from its budget. (Doc. No. 149-2, Clay Dep. 34–35.) It also points out that the Central Office Reorganization represented an "organizational overhaul" in which, not only Hayes's, Meriwether's, and Cathey's positions were eliminated, but all four Associate Superintendent positions and a number of other positions were eliminated or repurposed, including the positions of Executive Officer of Schools and Academic Support, Executive Officer of Organizational Development, Executive Director of Charter and Private Schools, and Executive Director of Federal Programs. In addition, thirteen then-denominated Executive Director positions were "repurposed or eliminated," and all of those Executive Directors were required to interview for the

---

[8] These plaintiffs' ADEA and THRA claims based on the same allegations are also addressed below.

new jobs. (Doc. No. 144-2, Cathey Dep. 16.) MNPS conducted panel interviews in order to place fifteen individuals into the fifteen new Executive Director positions. (Doc. No. 125 ¶ 103; Doc. No. 126 ¶¶ 20, 23, 25.) Various other administrative positions were also eliminated. (Doc. No. 144-4, Leffler Dep. 56–57.) Metro asserts that, "[i]n light of these sweeping changes in the central office organizational structure," the plaintiffs "cannot prove that the elimination of their positions was motivated by anything other than the furtherance of a district-wide reorganization." (Doc. No. 163, at 22.)

The court agrees. Under the circumstances presented here, even if the court accepts as true, for purposes of all three plaintiffs' § 49-5-510 claims, that the elimination of their positions was driven in part by improper motivations on the part of the decisionmakers (primarily Battle), the plaintiffs cannot overcome the presumption that the sweeping changes implemented as part of the Central Office Reorganization, which itself included significant changes to the MNPS chain of command and reporting structure and affected many jobs other than the plaintiffs', was in good faith for the efficient operation of the school system.

The plaintiffs' quibble with whether MNPS's financial situation actually justified the termination of their positions fails to acknowledge that the budgeting process is always as much about priorities—*how* to allocate funds—as it is about the existence of a certain level of funding. Regardless of whether MNPS *could* have continued to fund the plaintiffs' positions, this court is not in a position to second guess MNPS's and Battle's choices about how to allocate the funds in the budget, any more than it is in a position to second guess Battle's decision to comprehensively overhaul MNPS's chain of command and reporting structure. Moreover, a process that involved numerous Board and Committee meetings and meetings with Metro Council over a period of months in order to approve the budget as a whole, which incorporated the Central Office

Reorganization, cannot be considered arbitrary and capricious—even if the evidence supports a conclusion that there was little discussion at any public meeting about the scope and impact of the Reorganization.

Under the circumstances presented here, the court finds that, even assuming that MNPS could have funded their positions if it had chosen not to adopt the Central Office Reorganization and, thus, could have chosen not to eliminate their positions as part of the Reorganization, and even assuming that the termination of their specific jobs was motivated at least in part by improper considerations, the plaintiffs cannot carry their burden of establishing that the FY 2020–2021 budget as a whole, the implementation of the Central Office Reorganization, the termination of their positions, and their resulting transfers were arbitrary and capricious, for purposes of their claims that Metro violated § 49-5-510.

Metro is entitled to summary judgment on all of Hayes's, Meriwether's, and Cathey's TTTA claims.

### 2. Leffler

Leffler's situation is different, in that she was not tenured at the time she was notified that her position as Executive Director would be eliminated effective June 30, 2020. The letter notifying her of that fact confirmed that she was eligible for rehire into any other position for which she applied and was selected, but it also stated unambiguously that, if she had not secured another position prior to June 30, her employment with MNPS would terminate. (Doc. No. 162-5.)

According to Leffler, her Executive Director position was not actually eliminated, because MNPS actually kept the thirteen Executive Director positions that existed in the spring of 2020 and added two more Executive Director positions, for a total of fifteen. After being notified that her appointment as Executive Director would terminate at the end of that school year, she reapplied for the same job—which she had successfully performed for four years—but was not selected.

(Doc. No. 126 ¶¶ 11–14, 19–22; Doc. No. 162-2, Leffler Decl. ¶ 21.) Her employment with MNPS did not terminate, however, because she applied for, and was hired in, a position as a principal within the MNPS system. (Leffler Decl. ¶ 29.)

Leffler's TTTA claim is premised upon assertions that Metro violated Tenn. Code Ann. § 49-5-511(b) when she was "fired" due to the "sham" "elimination of [her] position." (Doc. No. 126 ¶¶ 57–58.) She contends that only the School Board is empowered to eliminate positions of certificated workers under § 49-5-511(b) and, further, that dismissals under that provision must be based on the affected employees' level of effectiveness as determined by the evaluations conducted in accordance with Tenn. Code Ann. § 49-1-302. (Doc. No. 126 ¶¶ 68–69, 52(a)–(c).[9]) She also asserts that her "termination" violated Tenn. Code Ann. § 49-5-511(a), because she was fired despite not having engaged in any of the misconduct identified in the statute as warranting dismissal, and she was not accorded the procedural rights guaranteed by that provision. (Doc. No. 126 ¶¶ 52(c)–(e).)[10]

In addition to responding to Metro's Motion for Summary Judgment, Leffler has filed her own Motion for Partial Summary Judgment, arguing that she is entitled to summary judgment on her TTTA claim, because, as a "certificated employee who worked in a non-teaching position," she could only be terminated if (1) she was terminated for cause in the manner provided under Tenn. Code Ann. § 49-5-511(a); or (2) her position was eliminated by the School Board under Tenn. Code Ann. § 49-5-511(b)." (Doc. No. 160, at 2.) She contends that her job was not subject to non-renewal under the Continuing Contract Law, Tenn. Code Ann. § 49-5-409, "because this law only apples to teachers who are teaching in the school system," not administrators. (*Id.*) She

---

[9] Paragraph 52(a) follows paragraph 69 in Leffler's Fourth Amended Complaint.

[10] Leffler does not claim that she was transferred in violation of § 49-5-510.

also states that she "did not have a contract with MNPS." (Doc. No. 188-1, Leffler Decl. ¶ 44.) Metro argues, in its Response to Leffler's motion and in its own Motion for Summary Judgment, that Leffler's non-renewal of her appointment is not the same as a termination for cause, under § 49-5-511(a), and that she herself admits that there was no reduction in force as required to implicate § 49-5-511(b).

The law supports Metro's arguments, and Leffler's position borders on the ludicrous, insofar as she is arguing that, despite her non-tenured status, she could *never* be terminated except for cause or in the event of a reduction in force under § 49-5-511 and in accordance with the procedural protections afforded tenured teachers elsewhere in the TTTA.[11] The first problem with that proposition is that "non-tenured teachers in Tennessee are generally 'employed by successive one-year contracts that are subject to renewal at the end of the school year.'" *Mosby v. Fayette Cty. Bd. of Educ.*, No. W2019-01851-COA-R3-CV, 2020 WL 4354905, at *4 (Tenn. Ct. App. July 29, 2020) (citing *Arnwine v. Union Cty. Bd. of Educ.*, 120 S.W.3d 804, 808–09 (Tenn. 2003)). There is no guarantee in the state statutory system that any non-tenured employee will be continually employed from year to year. Instead, upon termination of a contract, a public employee becomes an at-will employee unless and until they sign a contract for the succeeding year. *See Kerr v. Cross*, No. C/A 40, 1986 WL 6611, at *1 (Tenn. Ct. App. June 13, 1986) ("Public employees without tenure or statutory civil service protection are employees at will and erroneous reasons or lack of

---

[11] Certainly, if MNPS had sought to terminate Leffler in the middle of the school year, she would have been entitled to invoke the protections of common law governing breach of contract (if she had a contract) and, if the termination was alleged to be for cause, the protections of § 49-5-511(a) as well. She is correct that, on its face, this provision applies to both tenured and nontenured teachers, as that term is defined by § 49-5-501(10). *See Cannon Cty. Bd. of Educ.*, 2008 WL 3069466, at *10 (recognizing that, "absent specific circumstances such as a reduction in force or termination of employment based on cause," a non-tenured teacher is not entitled to the protections of the TTTA).

reasons for dismissal afford no basis for reinstatement." (citing *State ex rel. Martin v. City of Memphis*, 452 S.W.2d 346 (Tenn. 1970))). "The long standing rule in this State is that an employee-at-will may be discharged without breach of contract for good cause, bad cause or no cause at all, without being thereby guilty of legal wrong." *Keller v. Casteel*, 602 S.W.3d 351, 358 (Tenn. 2020) (quoting *Williams v. City of Burns*, 465 S.W.3d 96, 108 (Tenn. 2015)). Non-tenured employees do not have a reasonable expectation of continued employment beyond their contract terms. *Bailey v. Blount Cty. Bd. of Educ.*, 303 S.W.3d 216, 230, 239 (Tenn. 2010). Because Leffler alleges that she did not have a contract, she was apparently at all times an at-will employee, without even the protection offered by a contract.

Leffler's second hurdle is that the only protection accorded a non-tenured "teacher" under the CCL, as set forth above, is that she be provided written notice that her contract will not be renewed for the upcoming year "within five (5) business days following the last instructional day for the school year." *Mosby*, 2020 WL 4354905, at *4 (quoting Tenn. Code Ann. § 49-5-409(b)). If Leffler is correct that the CCL does not apply to her because she was not a classroom teacher and did not have a contract, that would likely mean that she would not be entitled to claim even the limited protection offered by the CCL.[12]

---

[12] Leffler's only support for her argument that the CCL applies to classroom teachers but not to administrators is a recent unreported state trial court opinion, *Shrader v. Metro Gov't*, No. 21C-278 (Davidson County Circuit Court, June 28, 2022) (Doc. No. 162-7). The Tennessee appellate courts do not appear to have addressed the issue, but at least one has presumed that the statutory definition of "teacher" in Tenn. Code Ann. § 49-5-501(10) also applies to challenges to non-renewals under Tenn. Code Ann. § 49-5-409. *See Mosby*, 2020 WL 4354905, at *1 & n.1 (applying the definition to a school guidance counselor). In any event, *Shrader* concluded that, because the plaintiff was not a "teacher" for purposes of the CCL, he was not entitled to relief under that provision. (*See* Doc. No. 162-7, at 9–11.)

In any event, Leffler does not claim that she was not provided timely notice of non-renewal. The Tennessee courts have repeatedly held that non-tenured teachers who receive timely notice of the non-renewal of their contracts, in accordance with Tenn. Code Ann. § 49-5-409(b)(1), have no cause of action under that provision to challenge the non-renewal. *See, e.g.*, *Mosby*, 2020 WL

Regardless, Leffler's reliance on § 49-5-511(a) is misplaced, simply because there is no evidence that she was dismissed or terminated for cause. "The non-renewal of an untenured teacher's contract is not equivalent to a failure to hire or otherwise the same as a termination or dismissal." *Cannon Cty. Bd. of Educ.*, 2008 WL 3069466, at *10 n.14. Instead, "[g]enerally applicable rules of contract law distinguish between a failure to renew a contract and a termination of that contract during its term, and those rules apply to employment contracts." *Id.* Leffler's claim under § 49-5-511(a) fails as a matter of law, based on the undisputed facts.

Likewise, § 49-5-511(b) is not applicable to her situation, because, as Metro points out, there was no actual reduction in force, and Leffler's employment with Metro never actually terminated. Leffler calls the termination of her position a "sham reduction in force," essentially conceding that there was no reduction in force. She also contends that her actual Executive Director position was not eliminated or restructured. The court accepts that there is a factual dispute as to that question, but there is no dispute that all Executive Directors were required to re-apply for their jobs between the 2019–2020 school year and the 2020–2021 school year and that two additional Executive Directors were hired. Some of the individuals who were employed as Executive Directors for the 2019–2020 school year were rehired in the same positions for 2020–2021, and some were not. Leffler, unfortunately, was one of those who was not. Regardless, she does not have a viable claim under § 49-5-511(b). She suffered a non-renewal of her appointment as Executive Director, not a termination based on a reduction in force. Because she was not tenured or, apparently, under contract, her employment could be terminated without cause. Moreover, she was rehired for the 2020–2021 school year, so her employment never terminated. Her § 49-5-

4354905, at *5; *Cannon Cty. Bd. of Educ. v. Wade*, No. M2006-02001-COA-R3-CV, 2008 WL 3069466, at *10 (Tenn. Ct. App. July 31, 2008).

511(b) claim is without merit.

Metro, not Leffler, is entitled to summary judgment on Leffler's TTTA claims.

        3.    *Bailey*

Bailey's TTTA claims are premised on allegations that Metro (1) violated §§ 49-5-511(a), -512, and -513 when it "ended [his] appointment" without "proper cause" and "without complying with any of the procedural safeguards" afforded by the TTTA (Doc. No. 125 ¶ 162); and (2) violated § 49-5-510, both "because it did not transfer Plaintiff Bailey into the type of work for which he was licensed" (Doc. No. 125 ¶ 161) and because any transfer was not in good faith. Bailey asserts that his termination was in retaliation for his involvement in the investigation and disciplinary charges brought in 2018 against Battle's brother, Carlton Battle, or, alternatively, constituted discrimination based on his age (Doc. No. 125 ¶¶ 173.)

In support of his Motion for Partial Summary Judgment, Bailey appears to abandon any claim based on § 49-5-510, as his position is that the undisputed facts show that MNPS never actually transferred him. He argues, instead, that Metro violated the TTTA when it fired him without cause. Metro agrees that it did not transfer him, though it points out that Bailey was offered a position as Dean of Students but declined it. Instead, Metro argues, "Bailey *believed* he would be transferred to a position for which he was not licensed," but, instead of waiting to see what MNPS actually did, he "voluntarily resigned." (Doc. No. 163, at 25.) It argues that, because he resigned, Bailey was no longer entitled to the protections of the TTTA.

The undisputed facts establish that Bailey was tenured when he received notice that his "appointment as Principal" of Whites Creek High School would "end effective June 30, 2020," that he was "eligible for rehire into any other open position with the district for which [he] appli[ed] and [was] selected," and that, if he did not secure another position for which he had applied prior to June 15, 2020 he would be "administratively transferred . . . into a classroom teaching position."

(Doc. No. 189-8.)

Although MNPS eventually learned that Bailey did not hold an active teaching license and therefore likely could not have been transferred to a classroom teaching position (s*ee* Doc. No. 149-3, Spencer Dep. 147 ("You have to have an active teaching license in order to be a teacher.")), there is no evidence that MNPS officials were aware of that fact when Bailey was given notice that he would be transferred. Moreover, the parties have not developed the factual record regarding what would have happened if Bailey had been transferred into a classroom teaching position. Chris Barnes speculated that there was likely a way to allow Bailey to obtain a provisional license or to have his licensure reactivated relatively quickly. (*See* Doc. No. 149-7, Barnes Dep. 134 ("There are different opportunities. There are ways to work against [sic] a license; there are ways to do what North Carolina calls lateral entry. So there are different proverbial opportunities, and I can't explain the complexities of it, but there are . . . ways to put someone in a position giving them time to obtain a license as well.").) Bailey speculates that his anticipated transfer to a classroom teaching position constituted a termination, because he was not licensed for such a position.

However, it is undisputed that no MNPS official ever told Bailey that his *employment* with MNPS was terminated. The plaintiffs now rely heavily on Battle's testimony that Bailey's contract was "non-renewed," and they argue that, by law, Battle could not "non-renew the contract of a tenured employee" (Doc. No. 160, at 18) and, therefore, that the non-renewal was equivalent to "firing" Bailey. But the plaintiffs take Battle's testimony out of context. She stated that Bailey was "non-renewed from his current position." (Doc. No. 149-1, Battle Dep. 91.) Bailey's contract for his appointment as Principal for the year 2019–2020 is in the record and specifically provides for a one-year term expiring on June 30, 2020. The contract states, in accordance with state law, that it "does not grant Principal tenure, as a principal or in any other position." (Doc. No. 192-3, at 1.)

The plaintiffs have not provided any legal basis to support a conclusion that MNPS was legally obligated to retain Bailey in his position as Principal beyond the expiration of his one-year contract or to provide cause for a decision not to renew his appointment as Principal. Instead, under § 49-5-510, the only limitations on Battle's ability to transfer Bailey upon the termination of his contract were (1) that he be transferred to a position for which he was "qualified and licensed" and (2) that any such transfer be in good faith, as discussed above. *See Geller v. Henry Cty. Bd. of Educ.*, 602 S.W.3d 876, 887 (Tenn. 2020) ("[The TTTA] gives tenure rights to principals . . . in their capacity as teachers, not school administrators."); Tenn. Code Ann. § 49-5-501(11)(C) ("No teacher, including administrative and supervisory personnel, who has acquired tenure status is entitled to any specific position[.]"). Bailey's self-serving assertion in his Declaration that a "non-renewal is the same as a firing or termination" (Doc. No. 187-1, Bailey Decl. ¶ 65) is simply an incorrect statement of the law and a misrepresentation of the facts. His appointment as a principal was non-renewed, but his employment with MNPS was not terminated as a result of that action.

After he received notice that his appointment as Principal of Whites Creek would not be renewed, Bailey applied for and was offered the job of Dean of Students, but he rejected it because it was a "much lower position in both pay and responsibility" than the position of principal. (*Id.* ¶ 53.) He applied for several open principal and assistant principal positions but was not selected for any of those positions. (*Id.* ¶ 54.) He applied for a position within the Montgomery County Schools, which he accepted, but he does not say when. (*Id.* ¶ 55.) He also states that, pursuant to MNPS Board Policy, the Director of Schools is to make assignments by June 15, 2020, but he had not received an assignment by June 15. He knew that he "did not have a teaching license and could not be transferred to a teaching position." (*Id.* ¶ 56.) He acknowledges sending a "formal complaint of retaliation" to MNPS on June 15, 2020 at 9:58 p.m., but he denies that this letter also constituted

a resignation letter. (*Id.* ¶ 58.) He states:

> I told MNPS of its retaliation and discrimination and that because of its actions my
> last day with the district would be June 30, 2020. Nowhere in this email do I resign.
> My last day was June 30, 2020 not because I resigned but because Defendant
> retaliated against me and this is what I expressed in this formal complaint.

(*Id.*)

The actual letter begins: "Please accept this written notice as my formal complaint of retaliation, age and race discrimination." (Doc. No. 149-4, at 153.) It goes on to explain Bailey's belief that he was the target of retaliation by Battle as a result of his participation in the disciplinary proceedings against, and termination of, her brother, Coach Battle, in 2018. (*Id.*) The letter references the May 4 termination letter and the statement that Bailey would be placed in a classroom teaching position if he had not secured another position by June 15, but it does not point out that he was not licensed for such a position. (*Id.* at 154.) Instead, it complains that he had not received an offer for any of the other positions for which he had applied and that, while Lisa Spencer had attempted to schedule him for another interview that very day, he had not responded in a timely fashion, because he was out on bereavement leave. He objected to the "lack of professional courtesy" in the scheduling of the interview and to any expectation that he would be able to respond in a timely fashion while on bereavement leave. (*Id.*) The letter concludes:

> Again, as soon as [Battle] was appointed as the Director of Schools on March 13,
> 2020, she wasted no time in retaliating against me for my involvement in her
> brother's investigation, and the district HR team allowed her to discriminate against
> me by appointing someone younger with less experience and not subjecting these
> white principals to the same humiliation because of the length of their assignments.
> As a result of these actions, my last day with the district will be June 30, 2020.

(*Id.* at 154.)

The court finds that no reasonable person could read this letter and fail to conclude that Bailey intended it either as a resignation letter or a pronouncement that he believed he was constructively discharged. It cannot be read any other way. The plaintiffs, too, apparently read it

that way as well, as they alleged in their Second Amended Complaint, filed on April 27, 2021, that MNPS "constructively discharged/fired" Bailey. (Case No. 3:31-cv-00122, Doc. No. 17.)

However, on January 7, 2021, several months before the filing of that Second Amended Complaint, the Tennessee Supreme Court held unequivocally that "constructive discharge is not applicable to wrongful termination claims" under the TTTA. *Lemon v. Williamson Cty. Sch.*, 618 S.W.3d 1, 8 (Tenn. 2021). In *Lemon*, the plaintiff, an elementary school teacher, alleged that she was the target of a "campaign of harassment" by school officials that was "intended to coerce her into resigning from her teaching position," despite the fact that she was well respected as a teacher, with excellent evaluations and no disciplinary history. *Id.* The harassment consisted of false accusations that she had caused a parent emotional distress and had illegally provided "student tee-shirt sizes for shirts purchased by a parent in support of a school-approved off-campus fundraiser," after which she received "unusually low evaluations." *Id.* The plaintiff believed that the low evaluations signaled that the termination of her employment was "imminent." *Id.* She reported her concerns to her union representative and an assistant superintendent but received unsatisfactory responses. After that, she was suspended without pay while school officials investigated child abuse allegations against her—allegations that were ultimately deemed unfounded. However, after she returned to her classroom following the suspension, school officials placed cameras in her classroom to monitor her performance and assigned a retired teacher to her classroom as an observer. She was subject to continued criticism and oversight, all of which she believed was unwarranted and intended to pressure her to quit. *Id.* She came to the conclusion that she "had no choice but to resign from her teaching position," so she did. *Id.* Shortly after resigning, she filed a lawsuit against the school system and various school officials asserting, among other claims, wrongful termination in violation of the TTTA. The trial court granted a motion to dismiss the

wrongful termination claim, and the Tennessee Supreme Court affirmed.

To reach that decision, the court considered at length the history of the doctrine of constructive discharge as well as the protections afforded by the TTTA and concluded that the former was not compatible with the latter, in light of the "panoply of procedural protections afforded tenured teachers who face dismissal." *Id.* at 16. Specifically, under the TTTA,

> [w]ritten charges must be given to the board of education for review. Once the board approves, the teacher is given notice and may demand a hearing. A demand for a hearing triggers many procedural safeguards, including the teacher's right to testimony under oath and a written record. After the hearing, the teacher gets written notice of the board's decision and may obtain judicial review.

*Id.* (citing *Thompson v. Memphis City Sch. Bd. of Educ.*, 395 S.W.3d 616, 623–24 (Tenn. 2012)). The court found that constructive discharge was "inconsistent with the comprehensive procedural framework in the Tenure Act," which is "intended to give tenured teachers ample opportunity to be heard and ensure that dismissal decisions are made with transparency and by consensus of school administrators." *Id.* at 18. Thus, "[r]egardless of the reason for the decision, a tenured teacher who quits and then sues on the basis of constructive discharge leapfrogs over those procedures and frustrates a major aim of the [TTTA]." *Id.*

The court concluded that the TTTA requires all parties to comply with its requirements. Consequently, only a teacher who has exhausted the "multi-layered procedures adopted in the Tenure Act" is "entitled to judicial review of the termination of employment." *Id.* at 18, 19 (citing *Thompson*, 395 S.W.3d at 624). A teacher who does not invoke those procedures is not entitled to rely on the statute's protections. The court ultimately held that, when the plaintiff resigned, her "status as a tenured teacher ended, and she was no longer entitled to the protections provided by the [TTTA] for tenured teachers who have been improperly dismissed." *Id.* at 20.

Apparently belatedly recognizing that a plaintiff claiming constructive discharge cannot assert a TTTA claim, the Third Amended Complaint filed by the Bailey defendants in June 2021 omitted any reference to constructive discharge. Bailey now characterizes his letter as a "formal complaint of retaliation, race and age discrimination" and asserts that his "last day was June 30, 2020 not because [he] resigned but because Defendant retaliated against me and this is what I expressed in this formal complaint." (Doc. No. 187-1 ¶ 58.) In other words, he claims that he was coerced to leave his employment by the defendant's retaliatory actions—but that is exactly what a constructive discharge is. *See Lemon*, 618 S.W.3d at 13 ("[C]onstructive discharge takes place when the conduct of an employer effectively forces an employee to resign.").

Again, the record is devoid of any evidence that MNPS fired Bailey or that it actually transferred him. However, because he gave notice of his resignation, MNPS was absolved of any obligation to find a post for him for which he was properly licensed or to facilitate the reactivation of his teaching license. Bailey's assumption that he *would* be fired by being placed into a position for which he was not properly licensed is simply speculation. He never brought the fact of his non-licensure to MNPS's attention or attempted to discuss the matter with anyone at HR. Instead, he resigned and accepted a job elsewhere. Upon his resignation, he lost the protections of the TTTA.

Bailey is not entitled to summary judgment on this claim, but Metro is.

### 4. Conclusion—TTTA Claims

As set forth herein, there are no material factual disputes, and Metro is entitled to summary judgment on all of the plaintiffs' various TTTA claims. Conversely, Leffler and Bailey are not entitled to summary judgment on their TTTA claims.

## C. TOMA Claims

The plaintiffs' TOMA claims are premised upon (1) Battle's one-on-one discussions with Board members, during which she presented the PowerPoint presentation explaining the Central

Office Reorganization plan and (2) alleged School Board Budget and Finance Committee meetings for which minutes were not maintained but during which the Board might have discussed the proposed Central Office Reorganization. (*See* Doc. No. 125 ¶¶ 109–17, 133–41; Doc. No. 126 ¶¶ 81–93; Doc. No. 142 ¶¶ 64–72, 121–32.) Although all plaintiffs bring TOMA claims, only Hayes, Meriwether, and Cathey seek summary judgment on their TOMA claims based on Battle's one-on-one meetings. Metro seeks summary judgment on all of the plaintiffs' TOMA claims, first, on the basis that none of the referenced meetings violated TOMA and, second, on the basis that, even if Battle's individual meetings with Board members could be construed as violating TOMA, the Reorganization was subsequently ratified in open meetings during which the budget and Reorganization were openly discussed. In addition, Metro contends that the plaintiff's request to "void" the FY 2021 budget has been mooted by the fact that the FY 2021 budget is no longer in effect, and two subsequent budgets (for FYs 2022 and 2023) have already been approved, governing personnel and expenditures through June 2023.

###### 1. The Tennessee Open Meetings Act

The policy and purpose of TOMA is set forth in Tenn. Code Ann. § 8-44-101(a): "The general assembly hereby declares it to be the policy of this state that the formation of public policy and decisions is public business and shall not be conducted in secret." *See also Gray v. Dickson Cty.*, No. M2021-00545-COA-R3-CV, 2022 WL 1701961, at *3 (Tenn. Ct. App. May 27, 2022) ("Public knowledge of the manner in which governmental decisions are made is an essential part of the democratic process." (quoting *Metro. Air Rsch. Testing Auth., Inc. v. Metro. Gov't*, 842 S.W.2d 611, 616 (Tenn. Ct. App. 1992))). To effectuate this purpose, TOMA requires that all meetings of any "governing body" be open to the public, Tenn. Code Ann. § 8-44-102(a); that "adequate public notice" be given of the regular and special meetings of such government bodies, *id.* § 8-44-103(a)–(b); and that minutes of meetings subject to the Act be "promptly and fully

recorded" and "open to public inspection," *id.* § 8-44-104(a). If a meeting is conducted in violation of the Act, actions taken at that meeting "shall be void and of no effect." Tenn. Code Ann. § 8-44-105. At the same time, however, the Tennessee courts interpreting the statute have held that it "should not be interpreted in such a way that, once a violation of the Open Meetings Act has occurred, the public body is thereafter foreclosed from acting on the measure that was the subject of the violation." *Johnston v. Metro. Gov't*, 320 S.W.3d 299, 309 (Tenn. Ct. App. 2009). Rather, "even if there has been a violation of the Act, the public body's action will not be voided if, after the violative conduct occurred, there was a 'new and substantial reconsideration of the issues involved' at which the public could be present." *Id.* at 310 (quoting *Neese v. Paris Special Sch. Dist.*, 813 S.W.2d 432, 436 (Tenn. Ct. App. 1990)).

TOMA defines "governing body" to include "[t]he members of any public body which consists of two (2) or more members, with the authority to make decisions for or recommendations to a public body on policy or administration." *Id.* § 8-44-102(b)(1)(A).[13] The term "meeting" is defined as "the convening of a governing body of a public body for which a quorum is required in order to make a decision or to deliberate toward a decision on any matter." Tenn. Code Ann. § 8-44-102(b)(2). In other words, "a meeting exists if a public body convenes for one of two purposes: (1) in order to make a decision or (2) in order to deliberate toward a decision." *Neese*, 813 S.W.2d at 435 (citing Tenn. Code Ann. § 8-44-102(c)). In addition, the statute indicates that "informal assemblages" of two of more members of a public body must not be "used to *decide or deliberate* public business in circumvention of the spirit or requirements of this part." *Id.* § 8-44-102(c). Based on this same provision, the Tennessee courts have held that *intent* to violate the Act is irrelevant,

---

[13] It is undisputed for purposes of Metro's motion that the School Board is a "governing body."

because "[a] violation of the Open Meetings Act can occur inadvertently if [a meeting] has the effect of circumventing 'the spirit or requirements' of the Act." *Johnston*, 320 S.W.3d at 312 (citing Tenn. Code Ann. § 8-44-102(c)).

The statute does not define "deliberate," but the court in *Neese* explained that "[t]o deliberate is 'to examine and consult in order to form an opinion. . . . [T]o weigh arguments for and against a proposed course of action.'" 813 S.W.2d at 435 (quoting *Black's Law Dictionary* 384 (5th ed. 1979)). Under this definition, the mere "provision of information" does not involve deliberation, unless it "extend[s] to substantive discussion of positions and attempts to develop a consensus." *Johnston*, 320 S.W.3d at 312.

The plaintiff has the ultimate burden of proving that a TOMA violation occurred. *Tenn. Commercial Roe Fishermen's Ass'n v. Tenn. Wildlife Res. Comm'n*, No. M2015-01944-COA-R3-CV, 2016 WL 4567198, at *13 (Tenn. Ct. App. Aug. 30, 2016).

## 2. The Budget and Finance Committee Meetings

The plaintiffs' argument that MNPS held Budget and Finance Committee meetings without keeping minutes, in violation of TOMA, is premised upon ambiguous testimony from Chris Henson from which the plaintiffs draw an illogical conclusion. Specifically, they point to Henson's testimony to the effect that the Reorganization "*could have been discussed* in some of our budget meetings" (Doc. No. 149-10, Henson Dep. 140 (emphasis added)) and his assertion that no minutes were kept for Budget and Finance Committee meetings but that "some of them are televised" and, if televised, they would also be on Metro's YouTube channel (*id.* at 216). The plaintiffs point out, correctly, that there are no minutes in the record for any meetings at which a substantive discussion of the Reorganization plan took place. From this evidence (or lack thereof), the plaintiffs conclude that there must have been Budget and Finance Committee meetings at which deliberations took place but for which no minutes were maintained, in violation of TOMA.

As an initial matter, there is no dispute that meetings of the Budget and Finance Committee, which, according to Henson, was made up of all of the members of the School Board but with a different chair, would constitute a governing body of a public body, such that its meetings would be subject to TOMA. The plaintiffs, however, bear the burden of proving that a TOMA violation occurred, and in this instance they cannot even establish that any "meeting" took place that would violate the statute. Henson's statement that the Reorganization *might* have been discussed is not actually proof that it *was* discussed at Committee meetings.

Moreover, Henson's statement that "minutes" of the Committee meetings were not maintained appears to be premised upon an assumption that the term "minutes" meant written minutes such as those maintained for Board meetings. And his statement that "some" of the meetings were on television did not speak to whether he was actually aware whether all of them were videotaped and posted on Metro's YouTube channel. Cameo Bobo, the Coordinator of Board Operations for MNPS, part of whose job is to maintain MNPS meeting minutes and to attend all Board and Committee meetings, attests that "Committee meetings and regular Board meetings are recorded by the Metropolitan Government's Metro Nashville Network ('MNN'), a division of Metropolitan Government's ITS Department, and are uploaded to YouTube by MNN." (Doc. No. 145, Bobo Decl. ¶ 5.) The same Declaration includes links to Budget and Finance Committee meetings and other meetings at which the FY 2021 budget was discussed. There is no evidence in the record that other meetings took place that were not recorded and made available on Metro's YouTube channel.

The statute does not define "minutes," but it provides that such minutes must include, at a minimum, "a record of persons present, all motions, proposals and resolutions offered, the results of any votes taken, and a record of individual votes in the event of roll call." Tenn. Code Ann. § 8-

44-104(a). Metro argues that the recordings of the meetings that are posted on Metro's YouTube channel "serve as the official minutes of the Budget and Finance committee because 1) the entire meeting is recorded which serves as the record of persons present, memorializes the motions, proposals, discussions, deliberations, and votes, and 2) it is available to the public." (Doc. No. 163, at 12.) The plaintiffs do not actually contest that proposition, and courts from other jurisdictions that have considered the issue appear to agree. *See, e.g.*, *White v. Clinton Cty. Bd. of Comm'rs*, 667 N.E.2d 1223, 1229 (Ohio 1996) (finding that "[a]udio- or videotape recordings, word-for-word transcripts, even abstracts of the discussions indicating the identity of the speakers and the chronology and substance of their statements, are all legitimate means of satisfying the requirements of [keeping minutes]").

In other words, it is clear that the plaintiffs are simply speculating that some meeting must have taken place for which minutes were not kept. Speculation is not proof, particularly when there is actual proof that the Committee meetings that took place during the spring of 2020 were recorded, and the recordings were made available to the public. The court finds, in sum, that (1) the videotapes of the Budget and Finance Committee meetings that are in the record and were posted on Metro's YouTube channel qualify as "minutes" for purposes of compliance with TOMA; and (2) the plaintiffs have failed to establish that any Budget and Finance Committee meetings took place for which no "minutes" were kept.

Metro is entitled to summary judgment on the plaintiffs' TOMA claim, insofar as it is premised upon an alleged failure to maintain minutes of Budget and Finance Committee meetings.

### 3. *Battle's One-on-One Meetings with Board Members*

Metro argues that it is entitled to summary judgment on the issue of whether Battle violated TOMA when she held one-on-one meetings with Board members because: (1) the plaintiffs' arguments are moot, insofar as the FY 2021 budget is no longer in effect, having been superseded

by two subsequently adopted budgets for FYs 2022 and 2023; (2) alternatively, meetings between Battle and individual Board members are not "meetings" under TOMA, because Battle is not a Board member and thus not a member of a "governing body"; (3) even if "meetings" took place in violation of TOMA, subsequent public meetings of the entire Board in which the FY 2021 budget was extensively discussed before being approved by the Board served to cure any potential TOMA violation; and (4) regardless, the plaintiff has no evidence that "deliberations" regarding the Reorganization took place at the "meetings" between Battle and individual Board members. In a footnote in its Response to the plaintiffs' Motion for Partial Summary Judgment, Metro adds that, because the number of teaching positions in the MNPS system was not actually reduced, Battle was not even required to obtain the Board's permission to implement the Reorganization. (Doc. No. 176, at 2 n.2.)

The plaintiff responds that (1) they do not seek to set aside the entire FY 2021 budget but only the Reorganization—and, more specifically, the elimination of their positions—which is not mooted by subsequent budgets; (2) even if technically moot, Tennessee courts have applied exceptions to the mootness doctrine with respect to TOMA claims where the matter is one of "great public interest" (Doc. No. 180, at 67 (citing *Fisher v. Rutherford Cty. Reg'l Planning Comm'n*, No. M2012-01397-COA-R3-CV, 2013 WL 2382300, at *3 (Tenn. Ct. App. May 29, 2013)); (3) even if Battle was not technically a member of the Board, her successive meetings with individual Board members for purposes of deliberating on the Reorganization Plan "circumvent[ed] the spirit" of the Act (Doc. No. 180, at 69); and (4) the undisputed purpose of Battle's meetings with Board members was to "deliberate towards a decision regarding the elimination of Plaintiffs' positions as part of the Reorganization" (*id.*).

The plaintiffs' latter argument is not actually supported by the factual record, and their failure to establish that "deliberations" took place obviates any need to consider the parties' other arguments. In reaching that conclusion, the court accepts as true the following: (1) Battle regularly had one-on-one meetings with Board members; (2) no public notice of these meetings was provided, and no minutes of the meetings were maintained; (3) Sean Braisted assisted Battle in preparing for meetings regarding the FY 2021 budget by creating a PowerPoint presentation that, among other things, included a substantial amount of detail about Battle's proposed Central Office Reorganization and contained slides showing what positions would be eliminated or restructured and the cost savings resulting from those eliminations; (4) according to Sean Braisted, the purpose of Battle's meetings with Board members was to provide information to them "in order to get feedback [and] ideas or suggestions from [them] on how to improve something before it's presented to the public" (Doc. No. 155-5, Braisted Dep. 125); (5) Henry Clay, Battle's Chief of Staff, testified that he believed Board members were able to ask questions during the one-on-one meetings and that it would be up to individuals regarding whether they expressed their opinions to Battle (Doc. No. 149-2, Clay Dep. 69–70); (6) Clay was aware that Battle intended to discuss the Reorganization Plan with Board members during one-on-one meetings (*id.* at 65), but neither Clay nor Braisted attended any of these meetings; and (7) the Board voted on May 26, 2020 to approve the elimination of the positions identified in the Central Office Reorganization plan, as summarized briefly in the agenda for the meeting.

From these facts, a reasonable factfinder could infer that Battle probably met with some or all of the Board members at some point during the spring of 2020 to present the PowerPoint presentation that Braisted helped create. From there, however, the plaintiffs' claim hinges entirely on speculation as to whether "deliberations" occurred during those meetings. But "[u]nless the

[meetings] went beyond the provision of information, and extended to substantive discussion of positions and attempts to develop a consensus, then [they] did not constitute a 'meeting,' did not involve 'deliberation,' and did not violate the Open Meetings Act." *Johnston*, 320 S.W.3d at 312. And the plaintiffs have the burden of proving that a violation occurred.

Notably, there is *no* testimony in the record from Battle or any Board member—that is, the people who attended the putative meetings—regarding what happened during these one-on-one meetings. Braisted and Clay could only testify that Battle regularly met with Board members and that they believed she intended to discuss the Reorganization Plan with them. Even assuming such meetings took place, however, the plaintiffs have no actual evidence regarding when Battle met with the Board members, for how long, what was discussed, or even with which Board members she actually met. Moreover, the fact that the Board voted to approve the Central Office Reorganization does not, as the plaintiffs presume, necessarily give rise to an inference that any significant "deliberation," as contemplated by TOMA, had already taken place in non-public meetings. *Accord Baltrip v. Norris*, 23 S.W.3d 336, 341 (Tenn. Ct. App. 2000) (" [R]eason does not dictate that we draw an inference of unlawful deliberations from the Board's lack of discussion before its vote to dismiss Baltrip. . . . [W]e are not aware of any [authority] that requires the members of a public body to verbalize or discuss a matter prior to a vote in order to comply with the Act. Accordingly, we decline to infer from the lack of discussion between the Board members at the open session that deliberations were undertaken in the Board's private meeting with its attorney."). In this case, it is equally reasonable to infer that the proposed Central Office Reorganization was met largely with indifference on the part of Board members to any detail aside from the fact that it would save $1 million. This inference is all the more likely given that Battle had the discretion, without Board approval, to structure the Central Office's reporting structure

and chain of command however she saw fit, as long as it did not result in the actual reduction of the total "number of teaching positions or nonlicensed positions in the system." Tenn. Code Ann. § 49-5-511(b).[14]

Because the plaintiffs lack evidence that any "deliberations" regarding the Reorganization plan took place during one-on-one meetings between Battle and Board members, Metro is entitled to summary judgment on this claim, and the plaintiffs are not.

## IV.    BAILEY'S INDIVIDUAL CLAIMS

Aside from alleged TOMA and TTTA violations, plaintiff Bailey asserts additional claims for (1) violation of the Tennessee Public Protection Act (against Metro only); (2) retaliation in violation of the First Amendment (against both Battle and Metro); (3) deprivation of his right to due process (only a portion of which was previously dismissed) (against both Battle and Metro); and (4) age discrimination (against Metro), in violation of the ADEA and THRA. Metro and Battle have both moved for summary judgment on Bailey's claims; Battle also claims that she is entitled to qualified immunity.

### A.    Facts Relating to Bailey's Individual Claims

In the Fifth Amended Complaint, Bailey alleges that MNPS "fired [him] by transferring him to a type of work for which he was not licensed." (Doc. No. 125 ¶ 188.) As set forth above, however, the evidence now elicited in this case conclusively establishes that Bailey was not actually transferred to a type of work for which he was not licensed; he simply speculated that he *would* be transferred to a type of work for which he was not licensed. (*See* Doc. No. 144-1, Bailey

---

[14] The fact that Battle retroactively requested that the Board authorize the elimination of positions under § 49-5-511(b) (*see* Doc. No. 145-3, at 15) is not dispositive. She apparently did so in an abundance of caution, as it is now undisputed that there was never a reduction in the total number of positions. Instead, there was an increase in the total number of positions, accompanied by a shuffling of titles, positions, and the individuals holding those titles and positions.

Dep. 104 ("Q. What position did they transfer you into? A. They didn't transfer me to a position. I had to actually – yes, they didn't transfer me to a position.").) Instead of awaiting such a transfer, he informed MNPS that, due to the retaliatory and discriminatory acts enumerated in his June 15, 2020 email (a list that, notably, does not include any reference to being transferred to a position for which he was not licensed), his "last day with the district [would] be June 30, 2020." (Doc. No. 189-9.)

Regarding Bailey's retaliation allegations, the evidence establishes that, in the spring of 2018, Adrienne Battle's brother, Carlton Battle, was employed as the basketball coach and Assistant Principal of Whites Creek High School, and Bailey was the Principal of Whites Creek High School and Coach Battle's direct supervisor. (Doc. No. 187-1, Bailey Decl. ¶ 6.) Adrienne Battle, at the time, was employed as a Community Superintendent with MNPS. Coach Battle was accused of physically assaulting a basketball player's parent after a basketball game, and there are allegations that Adrienne Battle improperly inserted herself into the incident and attempted to defend her brother's actions.

Bailey did not witness the altercation involving Coach Battle, but, in his role as Principal, he investigated the incident, interviewed players and witnesses, and ultimately referred the matter to Human Resources for further investigation and follow up. (*Id.* ¶¶ 12–17, 25.) Shortly after that, Bailey was made aware of a question about missing funds from a cookie dough sale fundraiser that Coach Battle oversaw. Bailey investigated those allegations as well, before requesting a formal audit of the funds. (*Id.* ¶¶ 18–22.) That audit confirmed that funds were missing from the fundraiser.

The Human Resources investigation found that Coach Battle had acted in a manner unbecoming as a professional. HR requested that Bailey make a recommendation of termination.

Bailey instead recommended suspension, but he subsequently recommended to the then-Director of Schools, Shawn Joseph, that Battle's contract be non-renewed for the 2018–2019 academic year, which Joseph accepted. Coach Battle's employment therefore terminated at the end of the 2017–2018 academic year.[15]

Meanwhile, however, Coach Battle appealed his suspension pursuant to the procedure set forth by Tennessee statute. A formal Administrative Hearing was held by an "impartial hearing officer appointed pursuant to T.C.A. § 49-5-512(a)(2)," Nashville attorney Stephen w. Elliott. (Doc. No. 152-1, at 1 ("Final Order").) The disciplinary suspension was affirmed on appeal. Bailey attended the hearing as "the representative for MNPS" (Doc. No. 152-1, at 2), and he was also subpoenaed by MNPS to testify, under oath, on behalf of MNPS. (Doc. No. 187-1, Bailey Decl. ¶ 32; Doc. No. 152-1, at 2.) Bailey attests that giving testimony pursuant to a subpoena is "outside the scope of [his] ordinary job duties" and that he testified as a fact witness rather than as "a Tenn. Rule Civil Procedure 30.02(6) designee." (Doc. No. 187-1, Bailey Decl. ¶ 33.)

While the investigation was still underway, sometime in the spring of 2020, Bailey met with the then-Chief of HR, Director of HR, the Chief of Schools, his supervisor Pippa Meriwether, and others to discuss the allegations against Coach Battle. During this meeting he expressed his fear of being involved because of "backlash from the community" and "retaliation from Adrienne Battle." (Doc. No. 187-1, Bailey Decl. ¶ 27.) His "complaint" was not investigated, and no protections were put into place to protect him from anticipated retaliation. (*Id.* ¶ 29.) Before the incident, Bailey considered Adrienne Battle a friend, but after Coach Battle's hearing, Adrienne Battle stopped speaking to Bailey or even acknowledging his presence at monthly principal

---

[15] It appears that Coach Battle was not tenured and had no basis for challenging his non-renewal.

meetings. (*Id.* ¶ 36.) When Adrienne Battle was appointed Director of Schools in March 2020, Bailey went to HR again to report his fear of retaliation, but "[n]othing was done." (*Id.* ¶ 38.)

According to Bailey, these events in 2018, and particularly his testifying against Coach Battle, led Adrienne Battle to retaliate against him: "Yes, I'm saying that I was retaliated against because I testified against her brother, Dr. Battle's brother, about him assaulting a parent and stealing money, and that's why I was retaliated against." (Doc. No. 144-1, Bailey Dep. 106.) This retaliation occurred when Battle notified him on May 1, 2020 that he would be removed from his post as principal effective June 30, 2020 and transferred to a classroom teaching position for the upcoming school year, unless he secured another position.

On May 1, 2020, as detailed above, Bailey was given notice that he would not be reappointed as principal of Whites Creek High School for the 2020–2021 school year. When he contacted his supervisor Renita Perry to ask if she knew what would happen, Perry assured him that she and Sharon Griffin were "trying to find the right school for [him] to go to as principal but they would have to get 'you know who' to agree," meaning Adrienne Battle. (Doc. No. 187-1, Bailey Decl. ¶ 45.) Perry provided Bailey a glowing recommendation letter extolling his talents. (*Id.* ¶ 47.)

Bailey was never reassigned as Principal or Assistant Principal of any other MNPS school or selected for the open positions for which he applied. He applied and interviewed for the job of Dean of Students. He was offered the job but declined it, because the pay was approximately half what he made as Principal. (*Id.* ¶ 53.) He "knew MNPS was retaliating against [him] and so [he] applied for [and accepted] a position as the adult education supervisor in Clarksville, Tennessee," with the Montgomery County Schools. (*Id.* ¶ 55.)

Sharon Griffin was previously MNPS Chief of Innovation and, in that role, responsible for "supporting high-priority or high-need schools. (Doc. No. 149-8, Griffin Dep. 23.) "Priority" schools were those that had "fallen into the bottom 5 percent of schools across the state." (*Id.*) According to Griffin, in 2018, Whites Creek High School was a "priority school" ranked last on the list of MNPS schools and had not made any gains for the preceding three years. (*Id.* at 84.) According to Bailey, Whites Creek did not become a priority school until the 2018–2019 school year, and, although it was merely one of 31 MNPS schools on priority status that year, Bailey was the only one removed from his position. (Doc. No. 187-1, Bailey Decl. ¶¶ 60, 62.) Bailey's supervisor, Renita Perry, told him during the spring 2020 semester that he was "doing a great job and to keep doing what [he] was doing." (Doc. No. 162-2, Bailey Decl. ¶ 7.) Moreover, there was no ranking data and no student testing performed in 2019–2020, because of the pandemic, so there was no way to know Whites Creek High School's standing for that year.

Bailey was forty-eight years old in the spring of 2020. (Doc. No. 187-1, Bailey Decl. ¶ 2.) After Bailey's appointment as principal was non-renewed, Brian Mells was appointed principal at Whites Creek for the 2020–2021 school year. Mells, born in 1984, was thirty-six years old at the time. (Doc. No. 192-6, Mells Dep. 22.)

### B. Due Process Claim

The court has previously dismissed the due process claims raised in the consolidated cases, insofar as the claims were based on alleged violations of the TTTA. Bailey's due process claim based on his employment allegedly having been terminated despite his tenured status remains in play, however.

In general, "[f]or a procedural due process claim, a plaintiff must establish a constitutionally protected liberty or property interest and show that [he was deprived of] such an interest . . . without appropriate process." *Midkiff v. Adams Cty. Reg'l Water Dist.*, 409 F.3d 758,

762 (6th Cir. 2005) (citing *Board of Regents v. Roth*, 408 U.S. 564, 569–70 (1972)). Courts assessing such a claim apply a two-part analysis: "First, the court must determine whether the interest at stake is a protected liberty or property right under the Fourteenth Amendment." *Id.* at 762–73 (quoting *Thomas v. Cohen*, 304 F.3d 563, 576 (6th Cir. 2002)). And second, assuming the plaintiff succeeds in identifying such a right, the court considers "whether the deprivation of that interest contravened notions of due process." *Id.* at 763.

Regarding the first element, as the Sixth Circuit and the Tennessee state courts have acknowledged, teachers—including principals and supervisors—have a "constitutionally protected property interest in continued employment," but they do not have a protected property interest in any particular position. *Finney v. Franklin Spec. Sch. Dist. Bd. of Educ.*, 576 S.W.3d 663, 682 (Tenn. Ct. App. 2018) (quoting *Thompson v. Memphis City Schs. Bd. of Educ.*, 395 S.W.2d 616, 627 (Tenn. 2012)); *see also Sharp v. Lindsey*, 285 F.3d 479, 487 (6th Cir. 2002) (finding that a school principal who was demoted in the middle of the school year did not have a protected property interest created by statute in his position as principal under the TTTA,[16] as the statute provided that a supervisor had tenure *as a teacher* but not "necessarily in the specific type of position in which [he] may be employed"); *Guster v. Hamilton Cty. Dep't of Educ.*, No. 1:02-CV-145, 2004 WL 1854181, at *16 (E.D. Tenn. 2004) ("Once [the plaintiff's] contract of employment as school principal . . . expired . . . , [the plaintiff] did not have a protected property

---

[16] The court did find that Sharp's year-long employment *contract* created a protected property interest that was violated when Sharp was terminated mid-year, prior to the expiration of the contract term. *Sharp*, 285 F.3d at 487 (finding that the plaintiff had "a protected property interest in his position as principal by reason of his principal employment contract"). However, the court also found that no due process protections attached to the plaintiff's right not to be terminated under that contract except for cause, aside from those provided by his ability to bring suit for breach of contract. *Id.* at 488–89 (citing *Ramsey v. Bd. of Educ.*, 844 F.2d 1268, 1273–74 (6th Cir. 1988)).

interest in his principal's post under either Tennessee statutes or the contract." (citing *Sharpe*, 285 F.3d at 477)).[17]

In denying the prior motion to dismiss Bailey's due process claim altogether, the court found that Bailey stated a colorable claim under 42 U.S.C. § 1983, because he alleges in the operative pleading that he was transferred to a teaching position and that, because he does not hold a current teaching license, this transfer constituted a termination of his employment with MNPS without cause and without adequate process. *Doe v. Metro. Gov't*, Civil No. 3:20-cv-01023, 2021 WL 6015491, at *9 (M.D. Tenn. Dec. 20, 2021). The court noted at the same time that the allegations supporting the claim were somewhat vague and that "[d]evelopment of the factual record in this case may well reveal that Bailey resigned from his position rather than being 'fired.'" *Id.*

The factual record has been somewhat clarified in the course of discovery, though Metro and Battle interpret the evidence differently. The defendants argue that the undisputed evidence shows that Bailey was not actually fired; rather, he resigned, as a result of which his expectation of continued employment terminated, and he was not deprived of any right to due process. Bailey, on the other hand, continues to argue that (1) Battle testified that she non-renewed Bailey's contract, and a non-renewal is the same thing as a firing; (2) it is a violation of the TTTA to non-renew a tenured teacher; (3) Metro admits now that it did not transfer Bailey; and (4) Bailey did not resign; rather, he gave notice of a formal complaint of retaliation and discrimination based on

---

[17] The TTTA now provides that "[n]o teacher, including administrative and supervisory personnel, who has acquired tenure status is entitled to any specific position." Tenn. Code Ann. § 49-5-501(11)(B)(ii) (2011). At the time both *Sharp* and *Guster* were issued, the statute stated: "Administrative and supervisory personnel shall have tenure as teachers and not necessarily tenure in the specific type of position in which they may be employed." Tenn. Code Ann. § 49-5-501(11)(A) (1975). This change effectively clarified that neither teachers nor supervisory personnel have a protected property interest in their specific positions.

race and age. (Doc. No. 180, at 61–62; Doc. No. 181, at 5–7.)

The plaintiffs' arguments regarding the alleged violations of the TTTA in connection with the due process claim, again, are beside the point, for the reasons stated in *Doe*, 2021 WL 6015491, at *8–9. In short, violation of the TTTA, *per se*, does not give rise to a due process claim. *Id.* Second, Bailey's assertion in his Declaration that a contract non-renewal is the same thing as a termination is not evidence, and the assertion is not supported by the actual evidence. Instead, the actual facts show that he was not terminated. His appointment as Principal at Whites Creek High School was not renewed, and he resigned before being transferred to a teaching position or any other position.

The Sixth Circuit has recognized that, "if a plaintiff resigns of her own free will, even as a result of the defendant's actions, then she voluntarily relinquishes her property interest in continued employment, and the defendant cannot be found to have deprived her of that interest without due process of law." *Rhoads v. Bd. of Educ.*, 103 F. App'x 888, 894 (6th Cir. 2004); *accord Murtha v. Rossford Exempted Vill. Sch.*, No. 21-3449, 2021 WL 4950238, at *3 (6th Cir. Oct. 25, 2021); *Spangler v. Lucas Cty.*, 477 F. App'x 301, 304 (6th Cir. 2012); *Nunn v. Lynch*, 113 F. App'x 55, 59 (6th Cir. 2004). While it is also true that "[a] constructive discharge may constitute a deprivation of property within the meaning of the Fourteenth Amendment," *Nunn*, 113 F. App'x at 59, the plaintiffs, as previously noted, removed the language referring to Bailey's termination as a "constructive discharge" from their pleading, between their Second Amended Complaint and Third Amended Complaint. Their Fourth and Fifth Amended Complaints likewise do not include any allegations that Bailey was constructively discharged. Instead, the plaintiffs continue to maintain that MNPS's and Battle's decision not to renew Bailey's appointment as Principal of Whites Creek High School constituted a termination of his employment. As set forth above, the

facts simply do not support that assertion.

Moreover, the facts as alleged would not support a constructive discharge claim either. In general, employee resignations are presumed to be voluntary. *Rhoads*, 103 F. App'x at 895. To overcome that presumption, the employee must produce evidence showing that his resignation "was so involuntary that it amounted to a constructive discharge." *Nunn*, 113 F. App'x at 59 (quoting *Parker v. Bd. of Regents*, 981 F.2d 1159, 1162 (10th Cir. 1992); *Stone v. Univ. of Md. Med. Sys. Corp.*, 855 F.2d 167, 173 (4th Cir. 1988)); *see also Rhoads*, 103 F. App'x at 894 ("A public employee with a property interest in continued employment is deprived of that interest . . . if the employer constructively discharges [the employee] by forcing her to resign involuntarily."). "There are two circumstances in which an employee's resignation will be deemed involuntary for due process purposes: 1) when the employer forces the resignation or retirement by coercion or duress, or 2) when the employer obtains the resignation or retirement by deceiving or misrepresenting a material fact to the employee." *Nunn*, 113 F. App'x at 60 (citations omitted). Typically, the former situation arises when an employee is forced to choose between resignation and termination, or when an employee is threatened with termination unless he resigns. *See, e.g.*, *Rhoads*, 103 F. App'x at 895 (finding jury question as to whether resignation was voluntary in that situation); *Spangler*, 477 F. App'x at 303–04 (where the plaintiff chose to resign "rather than subject herself to an investigation," had time to consult a lawyer, and determined the date of her resignation, finding that the plaintiff "failed to rebut the presumption that her resignation was voluntary," even where she resigned as a result of the defendant's actions).

Bailey asserts that Metro's and Battle's actions in terminating or non-renewing his appointment as principal were retaliatory and discriminatory, but he has not presented evidence that he was coerced to resign in order to avoid being fired. Again, Battle's May 4 letter to him

confirmed that he would be transferred to a classroom teaching position for the 2020–2021 school year if he had not secured another position by June 30, 2020. His email on June 15, 2020 made it clear that he was not continuing to seek a transfer to that or any other position. Although Bailey continues to argue that he was "fired" when he was removed from the Principal position, it is now clear that he resigned before MNPS had the opportunity to transfer him to a teaching position or any other position.[18]

In sum, Bailey was never notified that his employment was terminated or would be terminated. Under both Tennessee law and federal law, while he had a property interest in his employment with MNPS, he did not have a property interest in any particular position within the system, so his "non-renewal" as a principal did not violate his right to due process. Because the undisputed facts establish that Bailey resigned rather than being assigned to a classroom teaching position (or other position),[19] MNPS and Battle are entitled to summary judgment on Bailey's due process claim.

### C. Bailey's Tennessee Public Protection Act Claim

#### 1. Legal Standards

Under the Tennessee Public Protection Act ("TPPA"), "[n]o employee shall be discharged or terminated solely for refusing to participate in, or for refusing to remain silent about, illegal activities." Tenn. Code Ann. § 50-1-304(b). Thus, a TPPA claim has four elements:

---

[18] While transfer to a teaching position would have been a demotion in terms of both responsibilities and salary and benefits, the plaintiffs do not claim that it would have amounted to a constructive discharge, nor do they allege that such an appointment would have been sufficiently "unpleasant and unreasonable that a reasonable person in [Bailey's] shoes would have felt compelled to resign." *Nunn*, 113 F. App'x at 59 (quoting *Ford v. Gen. Motors Corp.*, 305 F.3d 545, 554 (6th Cir. 2002)).

[19] Again, Bailey was offered but declined the position of Dean of Students.

(1) the plaintiff was an employee of the defendant;

(2) the plaintiff refused to participate in or remain silent about illegal activity;

(3) the defendant employer discharged or terminated the plaintiff's employment; and

(4) the defendant terminated the plaintiff's employment solely for the plaintiff's refusal to participate in or remain silent about the illegal activity.

*Williams v. City of Burns*, 465 S.W.3d 96, 111 (Tenn. 2015) (quoting *Sykes v. Chattanooga Hous. Auth.*, 343 S.W.3d 18, 27 (Tenn. 2011)).

The Tennessee Supreme Court applies the *McDonnell Douglas* burden-shifting framework to TPPA claims, meaning that the plaintiff pursuing such a claim must first establish a *prima facie* case by demonstrating that "he engaged in conduct protected by the TPPA, that the protected conduct was known to the defendant, that the defendant thereafter discharged him, and that there was the requisite causal connection between the protected conduct and the discharge." *Id.* at 113 (citation omitted). "Establishing a *prima facie* case of [retaliatory discharge] creates a rebuttable presumption that the employer unlawfully [retaliated] against the employee," at which point the "burden shift[s] to the [defendant] to articulate a non-retaliatory reason for his discharge." *Id.* at 115 (citations omitted).

### 2. Discussion

Metro argues that it is entitled to summary judgment on Bailey's TPPA claim because (1) Bailey cannot establish that he reported "illegal activity" as opposed to mere suspicion of illegal activity; (2) he cannot establish that he reported illegal activity by his *employer*; and (3) Bailey cannot establish that he was actually discharged, as required for a TPPA claim, because he voluntarily resigned.

Metro's first two arguments are misplaced. Regardless of whether Bailey witnessed the alleged assault and the mishandling of funds, he does not have to show that any laws or regulations

were violated or that he personally witnessed the violations. He only has to show that he had "reasonable cause to believe a law, regulation, or rule has been violated or will be violated, and in good faith report[ed] it." *Mason v. Seaton*, 942 S.W.2d 470, 472 (Tenn. 1997). Moreover, there is no question that assault and theft are crimes under Tennessee law, and Bailey had reason to believe that Coach Battle had engaged in both. Likewise, regardless of whether Bailey's participation in the disciplinary proceedings against Coach Battle *looks* like the type of reporting protected by the TPPA, particularly given that he was acting at the time in collaboration with the HR department and his direct supervisors, including then-Director of Schools Shawn Joseph, the Tennessee Supreme Court has recognized that the TPPA's protections extend to the reporting of illegal activities of fellow employees. *See Guy v. Mut. Of Omaha Ins. Co.*, 79 S.W. 3d 528, 535 n.1 (Tenn. 2002) ("Nowhere in the plain language of the statute is it specified that the *employer* must have committed the illegal activities about which the plaintiff reported. Indeed, to so limit the scope of the statute would frustrate the statute's purpose . . . .").

Bailey's claim nonetheless fails, because he cannot establish that he was discharged. The Tennessee courts have made it clear that the TPPA applies only to discharges and not to other types of adverse employment actions. *See Harman v. Univ. of Tenn.*, 353 S.W.3d 734, 735, 738 (Tenn. 2011) (holding that an "employee [who] was neither terminated nor discharged from his employment, only removed as department head," failed to state a TPPA claim, because the statute requires "complete severance of an employer-employee relationship" (citations omitted)).

Here, it is clear that Bailey would have been removed from his position as principal effective June 30, 2020, but he resigned before being actually demoted or terminated. As discussed above, the Fifth Amended Complaint does not assert that Bailey was constructively discharged, and, even if it did, it does not allege facts that would establish constructive discharge. Because

Bailey cannot show that MNPS terminated or discharged him, he cannot establish a TPPA claim. Metro is entitled to summary judgment on this claim.

### D. Bailey's First Amendment Claim

#### 1. Legal Standard

Both Bailey and Jenai Hayes bring claims of retaliation in violation of the First Amendment against Metro and Battle individually. To establish such a claim, a plaintiff must show that "(1) he engaged in constitutionally protected speech or conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from continuing to engage in that conduct; (3) there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by his protected conduct." *Kubala v. Smith*, 984 F.3d 1132, 1139 (6th Cir. 2021) (quoting *Dye v. Off. of the Racing Comm'n*, 702 F.3d 286, 294 (6th Cir. 2012)).

In addition, for a public employee to establish that his speech was protected, for First Amendment purposes, he must demonstrate that (1) he spoke as a private citizen rather than as an employee pursuant to his official duties; (2) he spoke on a matter of public concern; and (3) his speech interest outweighs "the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Mayhew v. Town of Smyrna*, 856 F.3d 456, 462 (6th Cir. 2017) (quoting *Evans-Marshall v. Bd. of Educ.*, 624 F.3d 332, 337 (6th Cir. 2010); *see also DeWyse v. Federspiel*, 831 F. App'x 759, 761 (6th Cir. 2020). Under Sixth Circuit precedent, the determination of whether an employee engaged in protected speech is a pure question of law. *Mayhew*, 856 F.3d at 464 (citing *Lane v. Franks*, 573 U.S. 228, 240 (2014)). Whether Bailey Testified as an Employee Pursuant to His Official Duties

#### 2. Discussion

Bailey's retaliation claim is based on allegations that he engaged in protected conduct when he testified and made "statements" against Coach Carlton Battle, Adrienne Battle's brother, in

connection with disciplinary proceedings against Coach Battle in 2018. (Doc. No. 125 ¶¶ 145, 171.) Metro and Battle both move for summary judgment on this claim on the basis that (1) Bailey did not engage in protected speech, because he spoke as part of his job as a high school principal rather than as a private citizen; and (2) he fails to establish a causal connection between his speech and his removal from his post. Battle also argues that she is entitled to qualified immunity. As set forth herein, the court finds that Bailey did not engage in protected speech.

Generally, "statements by public officials on matters of public concern must be accorded First Amendment protection." *Pickering v. Bd. of Educ.*, 391 U.S. 563, 574 (1968). At the same time, however, "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006). *Garcetti* involved an investigation by the plaintiff, a deputy district attorney, into potential inaccuracies in an affidavit used to support a search warrant. *Id.* at 413–14. Based on the results of his investigation, the plaintiff wrote a memorandum to his supervisors questioning the sufficiency of the affidavit and recommending that the case be dismissed. *Id.* He subsequently experienced several adverse employment actions, allegedly because he voiced dissent about the prosecution in the memorandum. *Id.* at 415. When he pursued a First Amendment retaliation claim against his supervisors, the claim failed. Because communicating with his supervisors about pending cases was considered to be an integral part of the plaintiff's official duties, the Supreme Court determined that he spoke pursuant to his role as deputy district attorney rather than as a private citizen, meaning that the speech was not accorded First Amendment protection. *Id.* at 421–22.

The Supreme Court later clarified that "[t]he critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Lane v. Franks*, 573 U.S. 228, 240 (2014). In *Lane*, a community college employee was compelled by subpoena to testify at a public corruption trial regarding information he learned on the job. *Id.* at 231–33. The plaintiff was later fired by the college. *Id.* at 233. Believing his termination was the result of his trial testimony, the plaintiff brought a First Amendment retaliation claim against his employer. *Id.* at 234. Unlike in *Garcetti*, however, the Court found that the plaintiff's speech was entitled to First Amendment protection. Although the speech "concern[ed] information learned in the course of public employment," the plaintiff's "official responsibilities," the Supreme Court explained, did not include testifying at a criminal trial involving charges of public corruption. *Id.* at 239.

Based on *Garcetti* and *Lane*, the Sixth Circuit has held that the inquiry into whether a public official speaks as a private citizen is a "practical one," *Mayhew*, 856 F.3d at 464 (quoting *Garcetti*, 547 U.S. at 424), requiring consideration of such factors as "the speech's impetus; its setting; its audience; and its general subject matter—'who, where, what, when, why, and how' considerations," *Haddad v. Gregg*, 910 F.3d 237, 247 (6th Cir. 2018) (quoting *Mayhew*, 856 F.3d at 464). Under *Garcetti*, the question of whether a public employee's speech "qualifies as government speech . . . hinges on whether the speech 'owes its existence to a public employee's professional responsibilities.'" *DeCrane v. Eckart*, 12 F.4th 586, 598 (6th Cir. 2021) (quoting *Garcetti*, 547 U.S. at 421).

In light of these considerations, the Sixth Circuit has held, for example, that a deputy sheriff who contacted the county Finance Director in the Controller's Officer about funds allegedly misappropriated from the Sheriff's Department did not speak as a private citizen on a matter of

public concern. In that case, the Sheriff himself had asked the plaintiff to "compile information for an annual report to the State of Michigan related to the Department's 2015 civil forfeiture activities" and to "communicate with the Controller's Office as needed." *DeWyse*, 831 F. App'x at 760. In considering whether the plaintiff spoke as a public employee, the court noted that it was required to "evaluate whether his communication about the allegedly mishandled funds was 'made pursuant to his job duties or whether [it] merely relayed information he learned while on the job in a way that did not affect his duties.'" *Id.* (quoting *Fledderjohann v. Celina City Sch. Bd. of Educ.*, 825 F. App'x 289, 294 (6th Cir. Aug. 27, 2020)).[20] It determined that the speech's "impetus" was the plaintiff's concern over his professional reputation, because he was "part of [the] process" in the removal of forfeited funds from the property room; the setting was "a meeting to discuss the County Sheriff's Department's financial practices"; and the audience was the County Finance Director, to whom he was instructed by the Sheriff to speak. And importantly, although preparing the report and speaking to the Finance Director were not among his regular duties, they were part of an *ad hoc* assignment, specifically delegated to him by the Sheriff.

The court found, therefore, that the speech was not protected by the First Amendment, distinguishing the situation from that in *Mertins v. City of Mount Clemens*, 817 F. App'x 126 (6th Cir. 2020), in which a city finance department employee discovered the city was overbilling residents for utilities and was subjected to harassment after she raised the issue with her supervisors. She then raised the same concerns with her union, local prosecutors, the FBI, and city commissioners, and continued to face discipline from her supervisors. The court reversed summary

---

[20] In *Fledderjohann*, the court held that a teacher's email to the state Department of Education claiming he had witnessed cheating in connection with a state-administered exam was not private speech, because the speech was made pursuant to the plaintiff's duty as a test proctor to uphold mandated security procedures and to report potential violations to the District Test Coordinator. 825 F. App'x at 295.

judgment for the defendants on the plaintiff's First Amendment retaliation claim, finding that the speech to the employee's union, local and federal law enforcement, and city commissioners was private speech.

In the present case, Bailey did not witness the incident during which Coach Battle got in a physical altercation with the parent of one of the basketball players, but, in his role as Principal, he investigated the incident and ultimately referred the matter to Human Resources for further investigation and follow up. (Doc. No. 187-1, Bailey Decl. ¶¶ 12–17, 25.) He later recommended suspension for Coach Battle, which then-Director of Schools, Shawn Joseph, accepted. Bailey further recommended that Coach Battle's contract be non-renewed for the 2018–2019 academic year, which Joseph also accepted. When Coach Battle appealed his suspension pursuant to the procedure set forth by Tennessee statute and invoked his right to a formal administrative hearing. Bailey attended the hearing as MNPS's representative, but he was also subpoenaed to testify as a witness at the hearing, under oath, on behalf of MNPS. (*Id.* ¶ 32.)

By statute, when a tenured teacher requests an administrative hearing after receiving a notice of disciplinary charges, the hearing must take place before an impartial hearing officer. Tenn. Code Ann. § 49-5-512(a). At the hearing,

> [a]ll parties shall have the right to be represented by counsel, the opportunity to call and subpoena witnesses, the opportunity to examine all witnesses, the right to require that all testimony be given under oath and the right to have evidence deemed relevant by the submitting party included in the record of the hearing, even if objected to by the opposing party[.]

Tenn. Code Ann. § 49-5-512(a)(4).

Metro and Battle argue that

> Dr. Bailey's holding Carlton Battle ("Coach Battle") accountable for his actions in a fight with a parent on school property and mismanagement of a school fundraiser were part of his regular job duties as a school principal. To hold certificated employees accountable, supervisors and principals may be required to participate in the hearing process set forth in the TTTA. Because Dr. Bailey's speech occurred

as part of his job as Executive Principal, he did not speak as a private citizen, and there was no constitutional violation.

(Doc. No. 163, at 34; *see also* Doc. No. 165, at 14–15.) The defendants argue that this case is more similar to *Mayhew* and *DeWyse*, and distinguishable from *Lane*, insofar as Bailey did not give testimony in a court of law but pursuant to his job duties as a school principal to recommend employee discipline and to "defend the recommendation." (Doc. No. 165, at 17.)

The court finds, first, that there is no question that most of Bailey's acts—including any related "statements"—were undertaken during the course and scope of his ordinary job duties, including (1) investigating or requesting an investigation into Coach Battle's allegedly unprofessional conduct—related both to the fight and the missing funds from the school fundraiser; (2) recommending disciplinary suspension for Coach Battle; and (3) recommending that Coach Battle's contract be non-renewed. *See* Tenn. Code Ann. § 49-2-303 (stating that school principals have the duty to "[s]upervise the operation and management of the personnel and facilities of the school or schools of which the principal is principal" and to "[s]ubmit recommendations to the director of schools regarding the appointment and dismissal of all personnel assigned to the school or schools under the principal's care"). Further, Bailey's appearance at the administrative hearing as the MNPS representative was clearly part of his job duties, even if it was an *ad hoc* duty and even if done voluntarily. Bailey was there as his employer's representative in connection with a disciplinary investigation that he initiated.

Whether Bailey spoke as a private citizen or as an employee pursuant to his official duties when he gave sworn testimony at the hearing pursuant to a subpoena presents a closer question. As Bailey points out in a Declaration, he was subpoenaed to testify as a fact witness (Doc. No. 187-1, Bailey Decl. ¶¶ 32–33, 35), and he was only one of ten witnesses identified in the hearing transcript (Doc. No. 154-1, at 3–4.) Some loose language in *Lane* suggests that sworn testimony

may *always* be private speech:

> Sworn testimony in judicial proceedings is a quintessential example of speech as a citizen for a simple reason: Anyone who testifies in court bears an obligation, to the court and society at large, to tell the truth. When the person testifying is a public employee, he may bear separate obligations to his employer—for example, an obligation not to show up to court dressed in an unprofessional manner. But any such obligations as an employee are distinct and independent from the obligation, as a citizen, to speak the truth. That independent obligation renders sworn testimony speech as a citizen and sets it apart from speech made purely in the capacity of an employee.

*Lane*, 573 U.S. 238–39 (internal citations omitted). *Lane*, however, involved a criminal public corruption trial, clearly a matter of public concern. Moreover, as Justice Thomas noted in his concurring opinion, the facts in *Lane* did not call on the Court to consider whether public employees who routinely testify in court—such as police officers, for example—speak as "citizens" when they testify "in the course of [their] ordinary job responsibilities." *Lane*, 573 U.S. at 247 (Thomas, J., concurring). Nor did the Court consider whether employees who testify "as the designated representatives of their employers" should be considered to be acting within the scope of their employment. *Id.*

This court finds that the factual distinctions between this situation and that in *Lane* take this case outside the broad holding in *Lane*. Bailey, notably, appeared at the hearing as MNPS's representative, and he was testified as a witness for MNPS pursuant to a subpoena *issued by MNPS* to defend a disciplinary recommendation made by Bailey himself. (*See* Doc. No. 152-1, at 2.) The hearing was simply a culmination of the disciplinary process, as a result of which Bailey's speech at the hearing "owed its existence to [his] professional responsibilities." *Garcetti*, 547 U.S. at 421. And, although Bailey attests that he had never before been called to testify at an administrative hearing and that doing so was "outside the scope of [his] ordinary job duties" (Doc. No. 187-1, Bailey Decl. ¶ 33), it is a foreseeable—and expected—result of the administrative procedure created by the TTTA that school principals who discipline (or recommend discipline) for

employees under their supervision will be called upon to defend those recommendations at hearings invoked by the employees under the TTTA. Bailey's job was not equivalent to that of a police officer whose job duties include testifying at criminal trials on a regular basis, but such testimony was nonetheless part of his responsibility as Coach Battle's supervisor and the person who recommended the disciplinary action that was the topic of Coach Battle's appeal.

The court finds, in sum, that Bailey spoke pursuant to his job duties and, therefore, as a public employee when he gave testimony at Carlton Battle's administrative hearing to appeal the disciplinary action against him. On this basis, Metro and Battle are both entitled to summary judgment on Bailey's First Amendment retaliation claim.[21]

### E.    Age Discrimination Claim

Bailey also claims that he was discriminated against on the basis of age, in violation of the ADEA and THRA, when his appointment as principal of Whites Creek High School was terminated and he was replaced by Brian Mells, a much younger individual.

The ADEA and the THRA make it unlawful to discriminate against an employee based on his age. 29 U.S.C. § 623(a)(1); Tenn. Code Ann. § 4-21-101 *et seq.* Age discrimination claims under the THRA are assessed "using the same analysis as those brought under the ADEA." *Pierson v. Quad/Graphics Printing Corp.*, 749 F.3d 530, 536 (6th Cir. 2014) (citation omitted).

---

[21] Even if the court had reached a contrary conclusion, Battle would be entitled to qualified immunity. An official who violates a plaintiff's constitutional right is entitled to such immunity, absent the existence of a "firmly established" rule that would have "immediately" alerted a "reasonable person" that Bailey's testimony at an administrative hearing to review a disciplinary decision pertaining to an employee under his supervision was in his "private capacity." *DeCrane v. Eckart*, 12 F.4th 586, 600 (6th Cir. 2021). The court has not located any appellate court decision from any United States Circuit Court of Appeals extending *Lane* to apply to testimony given under these circumstances at this type of administrative proceeding.

Age discrimination claims relying on indirect evidence are analyzed under the burden-shifting framework first articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Willard v. Huntington Ford, Inc.*, 952 F.3d 795, 807 (6th Cir. 2020). Under this structure, a plaintiff must first "produce evidence from which a reasonable jury could conclude that he or she established a *prima facie* case of discrimination. *Id.* Metro concedes for purposes of its Motion for Summary Judgment that Bailey can establish a *prima facie* case of discrimination, because he was over age forty at the time of the adverse action; he was qualified for his position; he suffered an adverse employment action when he was given notice that he would not be reappointed as principal of Whites Creek High School for the 2020–2021 school year and was not selected as principal of any other MNPS school for that year; and he was replaced at Whites Creek by an individual substantially younger than he. *Accord id.* at 808 (articulating elements of *prima facie* age discrimination case).

The burden, therefore, shifts to Metro to offer a legitimate, non-discriminatory reason for the adverse action. *Id.* at 807, 810. Metro has done this. Based on Battle's conversations in 2019 and 2020 with Sharon Griffin about the performance of Whites Creek—that it was a priority school, was last on the rankings list among MNPS schools, and had not made any gains in the past three years—and her own alleged concerns about Bailey's honesty, Battle made the decision to make a change of leadership at Whites Creek High School.

The question is whether Bailey can show that these reasons are pretext for age discrimination. "An employee may show that an employer's proffered reason for terminating him was pretext by demonstrating 'that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct.'" *Id.* at 810 (quoting *Pierson*, 749 F.3d at 539). At this stage, the court must "examine all

evidence that the plaintiff has put forth—evidence from the *prima facie* stage, 'evidence discrediting the defendant's proffered reason,' and 'any additional evidence the plaintiff chooses to put forth.'" *Id.* (quoting *Blair v. Henry Filters, Inc.*, 505 F.3d 517, 532 (6th Cir. 2007)). The court must consider all of this evidence in the light most favorable to the plaintiff. *Id.*

Bailey has attempted to establish pretext by pointing to questions about whether Battle had a legitimate basis for doubting Bailey's honesty and as to how long Whites Creek High School had actually been on the priority list. In the context of discussing causation to establish Bailey's First Amendment retaliation claim, Bailey has also relied heavily upon evidence of Battle's motive to retaliate against him for his involvement in the administrative proceedings against her brother and Bailey's documented fear of such retaliation. For purposes of his age discrimination claim, however, evidence of Battle's retaliatory motive is irrelevant, and Bailey has not actually shown that a genuine dispute exists as to the facts that he had been principal at Whites Creek for several years and that, while the school was under his watch, it had become a priority school and had fallen to the bottom of the ranking of MNPS schools. Although Bailey disputes some of the details of Griffin's recollection, the court finds that he has not shown that the proffered reasons for the termination of his appointment as Principal have no basis in fact or were insufficient to warrant the change in leadership. *Id.* at 810.

Metro is entitled to summary judgment on Bailey's ADEA and THRA claims.

## V.    HAYES'S INDIVIDUAL CLAIMS

Aside from the TTTA and TOMA claims, plaintiff Hayes asserts a claim under 42 U.S.C. § 1983 against both Battle and MNPS for retaliation in violation of the First Amendment and claims against Metro for only sex discrimination and retaliation in violation of Title VII and the THRA and for retaliation for engaging in activity protected by Title VI.

## A.      Facts Relating to Hayes's Individual Claims

As set forth in her Fourth Amended Complaint, Hayes was a tenured and certificated MNPS teacher[22] and also the parent of a disabled child formerly enrolled in an MNPS school. (Doc. No. 142 ¶¶ 6, 10.) In February 2020, Hayes's child was enrolled in the fourth grade, and Hayes was employed by MNPS as a Director. (*Id.* ¶¶ 8, 10.) Hayes and her child are African American. (*Id.* ¶¶ 6, 10.) Hayes's child has been diagnosed with autism. (Doc. No. 185-1, Hayes Decl. ¶ 5.)

In February 2020, the student teacher assigned to Hayes's child's class taught several lessons dealing with slavery that were generally inappropriate and particularly traumatizing for Hayes's child (the "Let's Make a Slave lessons"). As a result of these lessons, the plaintiff's child experienced bullying and teasing from other students, was afraid to return to school, and was afraid to sleep in his own bed. Hayes made numerous complaints to MNPS administration about the Let's Make a Slave lessons, including a text to the principal and an email to the principal, assistant principal, teacher, special education teacher, and the special education case manager for her child's class, complaining that the Let's Make a Slave lessons constituted "violations of Title VI due to the inappropriate and racially charged course instruction." (Doc. No. 142 ¶ 81.) She also spoke by telephone to the assistant principal and the principal, again voicing her objections to the lessons. She complained to Antoinette Williams, the Executive Officer of Middle Schools, and to the Community Superintendent. On February 6, 2020, Antoinette Williams told Hayes that she had notified Battle, in her role as Interim Director of Schools, of her complaints. The inappropriate lessons allegedly continued for another two weeks, while Hayes continued to complain and to

---

[22] She resigned effective January 3, 2022, while this lawsuit was underway. (Doc. No. 144-3, Hayes Dep. 69.)

request to meet with the teachers of the class, to no avail. The inappropriate Let's Make a Slave lessons eventually gave rise to significant local controversy and made national news. (Doc. No. 142 ¶ 35.) The plaintiff claims that she suffered retaliation arising from her Title VI complaints, because, she claims, MNPS blamed her for the fact that the controversial lessons became national news. (Doc. No. 144-3, Hayes Dep. 34.)

In addition, on April 24, 2020, Hayes called her school's principal to complain about the use of her child in a video posted on a teacher's personal YouTube and Twitter accounts without Hayes's permission. Hayes complained that the video violated her child's rights under the Family Educational Rights and Privacy Act ("FERPA"). The principal assured her that the videos would be taken down. (Doc. No. 144-3, Hayes Dep. 30–33.)

Five days later, on April 29, 2020, Hayes was given notice that, effective June 30, 2020, her job was being eliminated, and she would no longer have employment with MNPS if she did not secure another position before that date. (Doc. No. 142 ¶ 42.) Chris Barnes, MNPS's Chief of Human Resources, and Lisa Spencer, Director of HR Strategy and Employee Services, relayed this information to her during a telephone call and explained that the elimination of the plaintiff's job was due to budget concerns and a Central Office Reorganization. Five days later, on May 4, 2020, Spencer called the plaintiff back to tell her that she had not realized that Hayes was tenured when they spoke earlier and that, because Hayes was tenured, her employment would not be terminated. Instead, she could apply for any open positions and, "in the worst case scenario, she would be moved to a teaching position" if she did not secure another position. (*Id.* ¶ 55.)

After being notified that her position was being eliminated, Hayes applied but was not selected for the position of Executive Director of Diversity, Equity, and Inclusion ("EOD position"). She alleges that a less-qualified male candidate was hired into this position and paid

more. (*Id.* ¶¶ 59, 109.) She was instead transferred into a classroom teaching position, which resulted in a 30% reduction of her salary. MNPS then offered her the position of Restorative Practices Specialist ("RPS position") in September 2020 but subsequently withdrew the offer. She alleges that she suffered further retaliation when she applied, and was rejected, for thirty-seven other positions with MNPS for the 2020–2021 school year. (*Id.* ¶ 105(a).)

She also alleges that she filed an EEOC charge asserting sex discrimination on August 27, 2020. On November 4, 2020, she filed a Title VI lawsuit on behalf of her son, which "immediately made the news." (*Id.* ¶ 113.) On November 5, 2020, she was notified that she had not been selected for the RPS position, allegedly in retaliation for her EEOC charge and that lawsuit. (*Id.* ¶ 114.) She also applied for thirteen additional jobs after filing her EEOC charge and was not hired for any of them, allegedly in retaliation for the EEOC charge. (*Id.* ¶ 115.) She filed an EEOC charge of retaliation on January 4, 2020 and was issued a right to sue letter on August 12, 2021. (*Id.* ¶ 118.)

### B. First Amendment Retaliation

Battle and Metro seek summary judgment of Hayes's First Amendment claim on the grounds that (1) her complaints about the video of her son do not qualify as protected speech; and (2) there is no causal connection between her protected speech and the adverse employment actions. The court finds that, even assuming that the complaints about the video qualify as protected speech and that the temporal proximity between the speech and the adverse events, standing alone, is sufficient to give rise to an inference of a causal connection, for purposes of Hayes's *prima facie* case, the defendants' proffered explanations establish that the personnel decisions would have been made regardless of Hayes's protected speech.

### 1. *Whether Hayes's Speech Was Protected by the First Amendment*

For purposes of their motions, the defendants do not dispute that Hayes's complaints about the Let's Make a Slave lessons constituted protected speech. (Doc. No. 165, at 9 n.3; Doc. No. 163, at 31 n.18.) They contend, however, that her complaints about the video of her son are not protected speech.

Hayes states in a Declaration regarding this speech:

> I called the school principal and complained about the use of my child in a video posted on a teacher's personal YouTube and public Twitter account without my permission. The video included footage of my child dancing to a song about being "different." I also complained to Sonya Dobbs, the Director of Special Education, and the special education teacher. The teacher who posted the video did not even teach my child. I complained that this video was a violation of my child's FERPA[23] rights. The video highlighted that my child was different and had a disability. The theme song was the same as the theme song to the Greatest Showman, which is about a man who takes misfits and gives them purpose. I told the principal it is not good to highlight any child's disability.

(Doc. No. 185-1, Hayes Decl. ¶ 23.)

In her deposition, Hayes explained that she became aware of the video during her son's IEP meeting and complained about it because her "son was used and his disability was highlighted in a video without [her] permission." (Doc. No. 144-3, Hayes Dep. 30.) She testified that she was upset by the video because she felt that her child was "the only child made to look crazy." (*Id.*)

---

[23] "The purpose of FERPA is to 'assure parents of students [and students themselves] access to their education records and to protect such individuals 'right to privacy by limiting the transferability (and disclosure) of their records without their consent.'" *Doe v. Univ. of Tenn.*, No. 1:21-CV-00005-DCLC-SKL, 2021 WL 6327693, at *1 (E.D. Tenn. July 27, 2021): (quoting *Alig-Mielcarek v. Jackson*, 286 F.R.D. 521, 526 (N.D. Ga. 2012)). FERPA provides that financial sanctions may be imposed on schools that adopt policies or practices permitting the release of education records (or personally identifiable information contained therein) under certain circumstances. *See United States v. Miami Univ.*, 294 F.3d 797, 806 (6th Cir. 2002) ("The Act also provides that '[n]o funds shall be made available under any applicable program to any educational agency or institution which has a policy or practice of releasing, or providing access to, any personally identifiable information in education records,' except as permitted by the Act." (quoting 20 U.S.C. § 1232g(b)(2)).

She "did not want him humiliated for his disability." (*Id.* at 32.) Hayes also stated that she had signed a form at the beginning of the year that required the school to obtain her permission before videotaping or photographing her child. (*Id.* at 31–32.) After Hayes complained, the video was removed from "all social media sites that [she] could find," and the school principal assured her that the video would be taken down. (*Id.* at 33.)

Metro and Battle argue that Hayes's speech regarding the video posted by a single teacher on her private YouTube and public Twitter accounts involved purely a matter of private concern rather than public concern. They argue that Hayes did not seek to inform the public that MNPS was not discharging its governmental responsibility to guard student privacy and did not seek to bring to light actual or potential wrongdoing by MNPS. Rather, Hayes was apparently motivated only by a desire to protect her son's welfare. Hayes argues in response that her motivation is not dispositive and that a complaint about a violation of the law—here, a purported FERPA violation—is always a matter of public concern. She argues that, just as complaints of Title VII violations are accorded First Amendment protections, so should complaints of FERPA violations.[24]

"Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick v. Myers*, 461 U.S. 138, 147–48 (1983). The most important of these factors is the content of the speech. *Johnson v. Poway Unified Sch. Dist.*, 658 F.3d 954, 965 (9th Cir. 2011) (citing *Rankin v. McPherson*, 483 U.S. 378, 386–87 (1987); *Givhan v. W. Line Consol. Sch. Dist.*, 439 U.S. 410, 414–16 (1979)); *see also Kirkland v. City of Maryville*, No. 21-5569, 2022 WL 17413720, at *3

---

[24] The court is not called upon to decide whether the posting of the video constituted a FERPA violation or the reasonableness of Hayes's assertion that it did.

(6th Cir. Dec. 5, 2022) ("[T]he key inquiry in this setting 'is not *why* [the plaintiff] spoke, but *what* [she] said.'" (quoting *Mayhew*, 856 F.3d at 467) (emphasis in original)).

"Speech involves a matter of public concern when it can be 'fairly considered as relating to any matter of political, social, or other concern to the community.'" *Marquardt v. Carlton*, 971 F.3d 546, 549 (6th Cir. 2020) (quoting *Connick*, 461 U.S. at 146 (1983)). The Sixth Circuit has held that "speech addresses a matter of public concern when it alleges corruption and misuse of public funds, failure to follow state law, major state policy decisions, or discrimination of some form." *Boulton v. Swanson*, 795 F.3d 526, 532 (6th Cir. 2015) (internal citations omitted). Generally, a public employee's speech "is a matter of public concern so long as its content is something the public has an interest in hearing, no matter the motivation for her speech." *Kirkland*, 2022 WL 17413720, at *3

The factual scenario at issue here presents a very close call as to whether the plaintiff's speech involved a matter of public concern. The plaintiff's motivation was indisputably to protect her son, and she complained privately to school officials about a single video posted without her permission.[25] She was upset about the video because it highlighted her son's disability and potentially subjected him to humiliation. At the same time, the content of the speech—what the plaintiff said—relates to a matter of indisputable public interest: a school's protection of its students' privacy rights and its obligation not to stigmatize children with disabilities. Although the school did not officially sanction the posting of the video, the video was apparently made at the

---

[25] The fact that the plaintiff complained privately to school officials is not dispositive. *See Givhan*, 439 U.S. at 415–16 (observing that First Amendment rights are not "lost to the public employee who arranges to communicate privately with his employer rather than to spread his views before the public."). But it may be relevant. *See Matulin v. Village of Lodi*, 862 F.2d 609, 613 (6th Cir. 1988) ("[The] finding of public concern is here strengthened by the fact that the plaintiff did not solicit the attention of the media, but simply responded to questions regarding an existing controversy").

school, and officials knew about it, because the video was brought to the plaintiff's attention by school officials during an IEP meeting. (Doc. No. 144-3, Hayes Dep. 33.) In addition, Hayes claims that she voiced her opinion that the posting of the video violated her son's rights under FERPA and highlighted his disability. It seems she potentially referred to other privacy rights as well, since she had not given the school permission to photograph or videotape her son in the first place.

Hayes was not airing a personal grievance about a personnel matter of the type that has been held to be of purely private concern. *See, e.g.*, *Boulton*, 795 F.3d at 532 (noting that "mere assertions of incompetence and poor management decision-making" are typically considered "run-of-the-mill employment disputes" that are not a matter of public concern (citations omitted)). Instead, Hayes pointed to an incident giving rise to a serious breach of privacy and protocol that had potential relevance to other children and parents and was capable of being repeated if not brought to the attention of school officials. For purposes of the defendants' Motions for Summary Judgment, at least, the court finds that the plaintiff's complaint about the posting of the video constituted speech about a matter of public concern.

### 2. The Causal Connection

Hayes points to three separate adverse actions that she claims were retaliatory: (1) the elimination of her job (Director of School Choice); (2) her non-selection for the EOD Position; and (3) her non-selection for the RPS Position. The defendants argue that the plaintiff cannot establish the requisite causal connection between her protected speech and any of these events.

Typically, in the First Amendment retaliation context, a plaintiff is required to prove that the adverse action against him was "motivated at least in part" by his engaging in protected activity. *Kubala v. Smith*, 984 F.3d 1132, 1139 (6th Cir. 2021). "A 'motivating factor' is essentially [a] but-for cause[.]" *Sensabaugh v. Halliburton*, 937 F.3d 621, 629 (6th Cir. 2019) (quoting *Leonard v. Robinson*, 477 F.3d 347, 355 (6th Cir. 2007)). "Because direct evidence of motive is

difficult to produce, claims involving proof of a defendant's intent seldom lend themselves to summary disposition[,] and circumstantial evidence may provide sufficient evidence of retaliatory intent to survive summary judgment." *Kennedy v. City of Villa Hills*, 635 F.3d 210, 218 (6th Cir. 2011) (internal quotation marks and citation omitted).

Once the plaintiff "raises an inference that the defendant's conduct was motivated in part by plaintiff's protected activity, the burden shifts" to the defendant to show by a preponderance of the evidence that he "would have taken the same action in the absence of the protected activity." *Id.* at 218–19 (citing *Bio-Ethical Reform, Inc. v. City of Springboro*, 477 F.3d 807, 821 (6th Cir. 2007)). "Once this shift occurs, summary judgment is warranted if, in light of the evidence viewed in the light most favorable to plaintiff, no reasonable juror could fail to return a verdict for the defendant." *Eckerman v. Tenn. Dept. of Safety*, 636 F.3d 202, 208 (6th Cir. 2010) (citation omitted). "Unlike in the *McDonnell Douglas* burden-shifting framework, the burden does not shift back to a plaintiff to show pretext in First Amendment retaliation claims." *Dye v. Office of the Racing Comm'n*, 702 F.3d 286, 294 (6th Cir. 2012).

The Sixth Circuit has recognized that close temporal proximity between protected conduct and an adverse action, standing alone, is "rarely, if ever, sufficient to establish causation" in the First Amendment retaliation context. *Sensabaugh*, 937 F.3d at 630 (citation omitted). At the same time, "[w]here an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a *prima facie* case of retaliation." *Dye*, 702 F.3d at 306 (quoting *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008)). Establishing a causal connection is, in some cases, "straightforward." *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019). "Indeed," as the Supreme Court has recognized, some First

Amendment retaliation cases "have simply taken the evidence of the motive and the discharge as sufficient for a circumstantial demonstration that the one caused the other, shifting the burden to the defendant to show he would have taken the challenged action even without the impermissible motive." *Id.* (internal quotation marks and citations omitted)).

<i>a)  The Elimination of the Director of School Choice Position</i>

The plaintiff claims that the elimination of the Director of School Choice position (part of the Central Office Reorganization) was in retaliation for her protected conduct. Hayes testified that, when she was told in a Teams online meeting with Chris Barnes and Lisa Spencer on April 29, 2020 that her "position was going away," Hayes immediately stated that she "felt [she] was being retaliated against." (Doc. No.144-3, Hayes Dep. 37; *see also* Doc. No. 185-1, Hayes Decl. ¶ 29 ("I was very upsent and told both Barnes and Spencer that this was done in retaliation for my complaints.").) She alleges that Chris Barnes told her that he would help her find something else, but that "never happened"; instead, "they just continued to retaliate against her." (Doc. No.144-3, Hayes Dep. 37.) She believed that she was retaliated against, because Barnes and Spencer "kept saying they were going to help [her] . . . and they didn't." (*Id.* at 37–38.)

In her Declaration, Hayes asserts that Lisa Spencer called her two hours after the initial April 29 call. During this call, Hayes reasserted her belief that she "was being retaliated against because of [her] complaints about [her] son." (Doc. No. 185-1, Hayes Decl. ¶ 30.) Hayes alleges that, in response, Spencer said to her: "I don't want you to hurt yourself down the road by making this personal because if you continue with she [*i.e.*, Battle] doesn't want me that is going to come out in places you don't want it to come out and is going to start to show." (*Id.*) The only other evidence that Hayes has in support of her claim that the elimination of her position was retaliatory is the temporal proximity between the instances of protected speech and the adverse action—less than eleven weeks between her complaints about the Let's Make a Slave lessons and five days

after she complained about the video about her son. (Doc. No. 181, at 10.)

The defendants argue that, irrespective of the timing of the events, the plaintiffs simply cannot dispute that the Director of School Choice position was eliminated as part of the Central Office Reorganization that went into effect as part of the budget approval process for the 2020–2021 school year. As part of that process, other high-level management positions were also eliminated, including those of the Associate Superintendents, Executive Officer of Schools and Academic Support, Executive Officer of Organizational Development, Executive Director of Charter and Private Schools, and Executive Director of Federal Programs. (Doc. No. 162-5, at 15.) The job duties for those positions were redistributed, and the funding for those positions removed or repurposed. Hank Clay, MNPS Chief of Staff, testified that he worked with Battle in developing the Central Office Reorganization plan and that they were "trying to streamline our reporting to make the supervision of the schools as efficient and effective as possible." (Doc. No. 149-2, Clay Dep. 54; *see also* Doc. No. 149-2, at 247.) The functions of the position of Director of School Choice were folded into the new, expanded role of Executive Officer of Diversity, Equity, and Inclusion, a higher-level position in the chain of command. (Doc. No. 149-1, Battle Dep. 147–48; Doc. No. 149-2, Clay Dep. 160.) Hayes was eligible, and applied, for that position.

Clay testified that the motivation for the organizational changes sprang from the economic impact of the very beginning of the COVID-19 pandemic and the fact that Metro was asking MNPS to find a $100 million worth of reductions out of its operating budget. (Doc. No. 149-2, Clay Dep. 35–36, 54.) The plaintiffs attempt to dispute this testimony, pointing out that MNPS never actually cut $100 million from the budget, that the Central Office Reorganization eliminated only approximately $1 million from the budget; the final MNPS budget for the 2020–2021 fiscal year actually increased from the budget for the 2019–2020 fiscal year; MNPS actually saved a

substantial amount of funds as a result of the pandemic and also knew that it would be receiving federal funds because of the pandemic; MNPS received additional funding in the range of $10–20 million for vacant positions not reflected in the budget; MNPS knew that it would be receiving additional funding because of the increase in property taxes; and MNPS's Chief Financial Officer testified that Metro Finance only asked MNPS to come up with reductions in the range of $50 million rather than $100 million for the 2019–2020 fiscal year.

The plaintiffs argue that the only reason given for the elimination of Hayes's position was the need to save money but that, based on the evidence referenced above, there is at least a material factual dispute as to whether the elimination of the Director of School Choice position was, as Metro claims, actually mandated by budgetary concerns, as the department "had enough funds to cover Ms. Hayes's salary." (Doc. No. 181, at 13.) They point specifically to an item in the budget for which excess funds were allocated and argue that those excess funds could have been used to fund her position. They also argue that, despite the purported budgetary concerns, MNPS "knew," as of the Spring of 2020, that "it would be awash with funding." (*Id.* at 14.) The plaintiffs also rely on opinion evidence offered by their expert statistician, Dr. Robin Lovgren, that a "disproportionately large number of employees engaged in protected activities were adversely affected" by the Central Office Reorganization plan. (*Id.* at 13 (citing Lovgren Report, Doc. No. 190-12, at 6–7).)

The court finds that Lovgren's report is flawed, insofar as it simply posits that "a disproportionately large number of employees engaged in protected activities were adversely affected by the reorganization of central office" (Doc. No. 190-12, at 6–7) but does not include or analyze data about the number of MNPS employees that engaged in protected activity but were not affected by the Central Office Reorganization. As a result Lovgren's report does not establish

a triable issue of fact for purposes of Hayes's First Amendment claim.

Moreover, even if the court accepts the premise that temporal proximity between Hayes's protected activity and receiving notice that her job was being eliminated—two and one-half months between the plaintiff's complaints about the Let's Make a Slave lessons and the notification (and less than that between Hayes's complaints and the formulation of the Central Office Reorganization plan) and only four days between Hayes's complaining about the video of her son and receiving that notice—is sufficiently short to give rise to an inference of causation, for purposes of her *prima facie* case, the plaintiffs' attempts to frame the Central Office Reorganization as part of a grand plan to retaliate against Hayes are unavailing.[26] No reasonable jury could find that the elimination of the plaintiff's position as part of the Central Office Reorganization was in retaliation for her having engaged in protected speech. Irrespective of their quibbles regarding MNPS's actual financial situation in the spring of 2020, the plaintiffs cannot refute the fact that MNPS had been asked to cut its budget by $100 million and that the COVID-19 pandemic caused significant upheaval, stress, and chaos at every level of city government, making its ultimate effect on MNPS's budget unpredictable. None of the evidence offered by the plaintiffs is sufficient to overcome the defendants' overwhelming evidence that they adopted the Central Office Reorganization as part of their response to COVID-19 and as part of the structuring of the budget for the upcoming school year in light of the requested budget cuts.

Finally, Lisa Spencer's alleged statement—"I don't want you to hurt yourself down the road by making this personal because if you continue with [Battle] doesn't want me that is going

---

[26] The plaintiff has not presented any evidence from which it might be inferred that Battle or any of the other people involved in formulating the Central Office Reorganization plan were aware of the plaintiff's complaints about the video featuring her son at the time they formulated the Reorganization plan or when they notified Hayes that her job was being eliminated.

to come out in places you don't want it to come out and is going to start to show."—does not constitute direct or indirect evidence of retaliation. Spencer was simply responding to the plaintiff's repeated assertions that the elimination of her position was retaliatory, and her suggestion that it might not be in the plaintiff's best interests to complain about retaliation was rank speculation on the part of Spencer.[27] Hayes's insistence that Battle was retaliating against her is likewise based on nothing but speculation.

Insofar as Hayes's First Amendment retaliation claim is premised upon the elimination of the Director of School Choice position, *per se*, the defendants are entitled to summary judgment as to that part of her claim, because no reasonable jury could conclude that the Reorganization itself had anything to do with Hayes's protected activity.

b)      *Hayes's Non-selection for the EOD Position*

Battle and Metro argue that they are entitled to summary judgment on Hayes's claim that her non-selection for the EOD Position was in retaliation for her protected speech. Apparently assuming that the temporal proximity between Hayes's protected speech and the adverse action is sufficiently close to give rise to an inference of causation, they argue that, because the evidence is clear that they would have taken the same action regardless of the protected activity, they are nonetheless entitled to summary judgment. *See Thaddeus-X v. Blatter*, 175 F.3d 378, 399 (6th Cir. 1999) ("If the defendant can show that he would have taken the same action in the absence of the protected activity, he is entitled to prevail on summary judgment." (quoted in Doc. No. 163, at 33)).

---

[27] Spencer testified that, in response to Hayes's repeated assertions that Battle must be "angry" with her, Spencer told her she had never heard Battle say she was angry with Hayes about anything. (Doc. No. 149-3, Spencer Dep. 83–84.) She also believed that she told Hayes, "if you think that there is a valid retaliation, you should go talk to Mary Ellen Zander in employee relations." (*Id.* at 80–81.)

They contend, first, that MNPS's Chief of Staff, Hank Clay, was the final decision maker for filling the EOD position, not Battle, and that Battle did not influence his decision. Clay testified that he reached out to Ashton Hughes to ask him to apply for the EOD position, that he discussed with Battle the type of qualifications they thought the person in this position should have and told her he had reached out to Hughes, and that no one ever told him not to hire Hayes for the position. (Doc. No. 149-2, Clay Dep. 120.) Battle likewise testified that Clay discussed Hughes's qualifications with her after the "recommendation was made," but that Clay, along with her other "chiefs," "lead their individual departments in their hiring process," meaning that she did not exercise control over who Clay chose to hire. (Doc. No. 149-1, Battle Dep. 149.)

The plaintiffs point out that Battle made the decision to reorganize the Central Office leadership positions in the first place and that, by law, the Director of Schools has ultimate hiring responsibility of all school personnel. Tenn. Code Ann. § 49-2-301(CC). In addition, Lisa Spencer, whom Battle had appointed as Executive Officer of HR, testified that Battle "chooses her leadership teams," including the executive officers. (Doc. No. 149-3, Spencer Dep. 38–39, 43, 46.) They argue that this evidence gives rise to a material factual dispute as to whether Battle influenced Clay's actual decision to hire Ashton Hughes. The court finds that this evidence is not sufficient to establish that Battle inserted herself into the decision to hire Hughes over Hayes and that the plaintiffs' assertion that Battle exercised control or influence over the decision is purely speculative.

The defendants assert that Clay selected Ashton Hughes for the EOD Position because he had worked on diversity issues on a large scale, including running Mayor Megan Berry's office's "diversity, equity and inclusion" program and working on the same issues on Michael Bloomberg's presidential campaign. (Doc. No. 149-2, Clay Dep. 118.) The plaintiffs generally

insist that Hayes was clearly the more qualified candidate. They point out that Hughes, unlike Hayes, did not have a master's degree and that he did not have a particularly stellar undergraduate record. The other non-selected candidate, however, had a doctorate degree.

The plaintiffs also dispute the suggestion that Hayes did not have experience in the diversity arena. Although Clay testified that, when he interviewed Hayes, she talked mostly about her experience as Director of School Choice but did not highlight the experience she had in the area of diversity (Doc. No. 149-2, Clay Dep. 161–62), Hayes states in her Declaration that she did highlight during her interview with Clay her experience in working on diversity issues, including being "part of the team that created part of the definition for diversity that the district uses," attending an out-of-state conference on diversity, being appointed to the district Diversity Task Force under Director of Schools Jesse Register and continuing that appointment under Director of Schools Shawn Joseph. (Doc. No. 185-1, Hayes Decl. ¶ 46.)

The plaintiffs also argue that "[t]here is evidence that the decision to hire Hughes as the Executive Officer of Diversity . . . was made before Hayes or Hughes even interviewed for the position" on May 19, 2020. (Doc. No. 182, Resp. to ¶ 15.) They point out that Clay testified that he contacted Hughes to ask him to interview for the position. (Doc. No. 149-2, Clay Dep. 120.) Hughes testified that Clay contacted him in early or mid-April 2020 (before Hayes complained about the video) to ask if he might be interested in this "position that might be upcoming." (Doc. No. 149-6, Hughes Dep. 16, 17.)[28] Chris Henson, MNPS Chief Financial Officer, testified that he believed that Clay told him sometime before May 19, 2020—in other words, before Clay interviewed the candidates—that Hughes would be filling the EOD position. (Doc. No. 149-10,

---

[28] The decisions to eliminate the plaintiff's position and to consider Hughes for the EOD position were apparently in the works before the plaintiff complained about the video depicting her son.

Henson Dep. 45–46, 47–48.) The plaintiffs argue, based on these facts, that the hiring of Ashton Hughes in the EOD position was apparently a foregone conclusion, even before either Hughes or Hayes had interviewed for the job. They argue "[b]ased on the irregularities in the hiring process and the relative difference between Ms. Hayes' and Mr. Hughes' backgrounds" that the defendants cannot establish that they had a "legitimate non-retaliatory reason for not hiring" her over Hughes or that "no reasonable juror could fail to return a verdict" in their favor. (Doc. No. 181, at 18.)

This evidence, however, suggests only that Clay had in mind whom he wanted for the position even before conducting interviews; it does not suggest retaliation. In sum, viewing all of the evidence in the light most favorable to the plaintiffs, the court finds that the defendants have satisfied their burden of establishing that the same decision would have been made in the absence of the protected activity. In light of Clay's testimony that he made the hiring decision and that he selected Hughes instead of Hayes because if his experience dealing with diversity issues on a larger scale, which the plaintiff has not effectively challenged, no reasonable jury could conclude that the decision was motivated even in part by a desire to retaliate against Hayes for engaging in protected conduct. *See Eckerman*, 636 F.3d at 208 ("[S]ummary judgment is warranted [only] if, in light of the evidence viewed in the light most favorable to plaintiff, no reasonable juror could fail to return a verdict for the defendant.").

### c) *Hayes's Non-Selection for the RPS Position*

Hayes attests in her Declaration that she applied for numerous other positions within MNPS during the spring and summer of 2020 but received only a handful of interviews. She filed an EEOC charge on August 27, 2020. (Doc. No. 185-1, Hayes Decl. ¶ 52.) She asserts that, on September 15, 2020, she was offered the Restorative Practice Specialist ("RPS") position and that the position came with a significantly higher salary than that of classroom teacher. (*Id.* ¶ 53.) She does not indicate what she believed that salary was. Anthony Hall, Coordinator of Restorative

Practices, purportedly told her she was hired. (*Id.*)

On September 17, 2020, Hall told her he had "sent everything to HR" and that the "ball [was] now in their court." (*Id.* ¶ 54.) Hayes was never told by MNPS that her salary requirements prevented her from being approved for the job. (*Id.*)

On November 5, 2020, she was sent a letter from MNPS's HR office telling her that she had not been selected for the RPS position. (*Id.* ¶ 56.) She remained in the classroom teaching position. (*Id.* ¶ 57.)

Anthony Hall's deposition testimony basically corroborates Hayes's version of events. He testified that he and other members of his team interviewed her and that he discussed with her what the salary range and responsibilities would be. (Doc. No. 149-5, Hall Dep. 9.) (He later denied that he had discussed the salary range with her. (*Id.* at 12.)) In any event, Hall recommended Hayes for the position and "sen[t] a request to HR to be allowed to hire" her. (*Id.* at 9.) He also recalled, however, that Hayes's "salary range," in light of her experience and education, exceeded $80,000, which was "definitely out of line in comparison with the other staff members [he] had," whose salaries ranged from $55,000 to 62,000. (*Id.* at 11.) Hall testified that he believed he had "probably" told Hayes that her salary would be "beyond what [his] budget allow[ed]." (*Id.* at 12.) The person he ultimately hired, Jekia Allen, was paid around $62,000. (*Id.*)

Hall explained that, if HR had approved it, he would have hired Hayes: "If they could have gotten the salary respectable. I would think that she was definitely a very, very high candidate." (*Id.* at 13.) The salary range he would have approved for her would have been $62,000. Hall testified that none of the other specialists in his department made more than $62,000. He did not have the authority to offer Hayes a salary higher than that. (*Id.*) Hall was somewhat vague about the process, but he recalled that when HR got back in touch with him regarding what Hayes's

salary range would be—"up around high seventies, eighties"—he "knew at that time that went beyond what we were able to pay out of our budget." (*Id.* at 15, 14.) He denied being told by anyone at HR that he could not hire Hayes because she had a lawsuit against the district. (*Id.* at 15.)[29]

Angela Johnson, who in the fall of 2020 was MNPS's Manager in Human Resources – Hiring & Placement, states in a Declaration that, during her employment, the HR office did not follow written policies and procedures and did not provide meaningful training on personnel policies. (Doc. No. 193-1, Johnson Decl. ¶¶ 3–4.) In the fall of 2020, she received a recommendation from Anthony Hall that Hayes be hired as Restorative Practices Specialist. (*Id.* ¶ 7.) Johnson discussed this recommendation with her supervisor, Lisa Spencer, "because [Hayes's] pay would have to have been in the top of the range for this position." (*Id.* ¶ 8.) According to Johnson, when she told Spencer that Hall wanted to hire Hayes for the RPS position,

> Ms. Spencer's jaw dropped open, and she rolled her eyes in the back of her head and stated "You have to be kidding me. She has a lawsuit against the district. . . . I do not know why they would want her." Ms. Spencer then went on to tell me that [Hayes's] son was a student in the "Let's Make a Slave" lesson . . . . I responded by trying to move the conversation back to the merits of hiring [Hayes].

(*Id.* ¶ 9.) Johnson understood from this behavior that "Spencer did not want [Hayes] to be hired into this position." (*Id.* ¶ 12.)[30]

The plaintiffs argue that Hayes can show a causal connection for her non-hire for the RPS position because it took place approximately nine months after her complaining about the Let's

---

[29] Hayes states that her salary as a teacher was $75,116. (Doc. No. 185-1, Hayes Decl. ¶ 57.) It is therefore unclear why she considered the RPS position to be a possible promotion. Hayes's assertion that the RPS position was associated with a salary higher than that of a classroom teacher is not corroborated by the record.

[30] Spencer categorically denied making any statement about not hiring Hayes because she had filed a lawsuit and stated: "You can't not hire somebody because they're suing the district." (Doc. No. 149-3, Spencer Dep. 87.)

Make a Slave lessons and six and one-half months after her complaints about the video. She argues that this length of time, in conjunction with Lisa Spencer's alleged statements to Johnson, are sufficient to establish causation. (Doc. No. 181, at 12.) The defendants respond that there is no evidence that *Battle* knew about or approved Spencer's statements, nor evidence (aside from the plaintiff's unsupported and conclusory assertions) that either Battle or Spencer had any input in the decision of whom to hire for the position. They also argue that none of the plaintiffs' evidence refutes the fact that Hall's budget for his department was the reason that Hayes was not hired for the position.

The court finds that Spencer's alleged statement to Johnson amounts to nothing more opinion. Moreover, in light of the absence of any evidence that Spencer or Battle had any input into the decision of whom to hire for the RPS position, no reasonable juror could find that there is a causal connection between the protected conduct on which the plaintiff's First Amendment claim is based—her protected speech in February and April 2020—and the decision not to hire her for the RPS position in the fall of 2020. The temporal relationship between these events is not sufficient, standing alone, to give rise to an inference of causation, and Hall's testimony that the plaintiff's salary range was outside what he could offer in his department is undisputed.

Both defendants are entitled to summary judgment on Hayes's First Amendment retaliation claim.

### C.    Hayes' Title VII and THRA Discrimination Claims

#### 1.    *Legal Standards*

THRA sex discrimination claims are analyzed basically identically to Title VII claims. *Bailey v. USF Holland, Inc.*, 526 F.3d 880, 885 n.1 (6th Cir. 2008). A plaintiff can characterize a Title VII discrimination claim as single-motive or mixed-motive—that is, that protected characteristics were a "motivating factor among other, legitimate factors." *Smith v. City of Toledo*,

13 F.4th 508, 514 (6th Cir. 2021) (citing *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 396 (6th Cir. 2008)).[31] If a discrimination claim is based on indirect evidence and the plaintiff alleges that sex discrimination was the sole motivating factor behind the adverse employment action, the claim is analyzed using the test articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973).

Under this familiar framework, the plaintiff must make out a *prima facie* case of discrimination. *Jackson v. VHS Detroit Receiving Hosp., Inc.*, 814 F.3d 769, 776 (6th Cir. 2016). Once she does, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its decision. *Id.* The burden then shifts back to the plaintiff to show that the reason the employer gave "was not its true reason, but merely a pretext for discrimination." *Id.* (quoting *White*, 533 F.3d at 391–92).

To make out a *prima facie* case of discrimination, the plaintiff must show that "(1) she is a member of a protected group; (2) she was subjected to an adverse employment decision; (3) she was qualified for the position; and (4) . . . similarly situated non-protected employees were treated more favorably." *Id.* (citation omitted). Generally, "[t]he plaintiff and the employee with whom the plaintiff seeks to compare himself or herself must be similar in all of the relevant aspects." *Smith*, 13 F.4th at 515 (quoting *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998)). The Sixth Circuit has further explained, however, that

> [t]o satisfy the fourth element of the *prima facie* case, the plaintiff need only show circumstances which give rise to an inference of discrimination. Our cases have drawn that inference in many ways, including from disparate treatment of similarly situated employees who lack the protected characteristic (known as comparators) or to some factual circumstances that raise reasonable suspicion of an employer's discriminatory motivation behind the adverse employment action[,] including: suspicious timing, inappropriate remarks, and comparative evidence of

---

[31] The plaintiff has the burden of "present[ing] [her] case to the district court as a mixed-motive case." *Smith*, 13 F.4th at 514 n.1. Hayes has not argued for a mixed-motive analysis here.

systematically more favorable treatment toward similarly-situated employees not sharing the protected characteristic. . . . In any case, [t]he key question is always whether, under the particular facts and context of the case at hand, the plaintiff has presented sufficient evidence that he or she suffered an adverse employment action under circumstances which give rise to an inference of unlawful discrimination.

*Barnard v. Powell Valley Elec. Coop.*, No. 21-5447, 2022 WL 1261831, at *7 (6th Cir. Apr. 28, 2022) (internal quotation marks and citations omitted).

Once the defendant offers a legitimate, non-discriminatory reason for its actions, "the presumption of discrimination is gone and the plaintiff must demonstrate that the employer's proffered nondiscriminatory reason was not the true reason for the employment decision, but rather a pretext for discrimination." *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 815 (6th Cir. 2011) (citation omitted). A plaintiff can refute the employer's reason for the adverse employment action "by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Id.* (quoting *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 576 (6th Cir. 2003) (en banc)). Where the plaintiff's pretext argument rests on her alleged superior qualifications compared to those who received a promotion, she must show either that: (1) she "was a plainly superior candidate, such that no reasonable employer would have chosen" the other candidates over her, or (2) she "was as qualified as if not better qualified than the successful applicant[s], and the record contains other probative evidence of discrimination." *Id.*, *quoted in Jones v. Pekoske*, No. 21-1061, 2021 WL 5782380, at *3 (6th Cir. Dec. 7, 2021).

### 2. Hayes's Prima Facie Case

Hayes's Title VII and THRA sex discrimination claims are premised upon two different adverse employment actions: (1) MNPS's failure to hire her in the EOD position, for which she was qualified and for which she applied; and (2) her transfer and demotion to a classroom teaching position. Metro concedes for purposes of its Motion for Summary Judgment that Hayes states a

*prima facie* case with respect to her non-selection for the EOD position (Doc. No. 163, at 38), and Hayes concedes that she cannot establish a *prima facie* case in connection with her transfer to a classroom teaching position. Metro is entitled to summary judgment on the discrimination claim relating to Hayes's transfer to a classroom teaching position. The remaining question is whether Metro is entitled to summary judgment in connection with Hayes's non-selection for the EOD position.

3.      *Whether Hayes Can Establish Pretext*

Regarding Hayes's non-selection for the EOD position, Metro's proffered reason for hiring Ashton Hughes is that he had experience working on diversity issues on a large scale, as discussed above. The plaintiff offers the same arguments in support of pretext as those discussed in connection with her First Amendment retaliation claim.

"[T]he jury's sole task is to determine whether an employer's selection of an applicant was motivated by discrimination, not to 'scrutinize the employer's judgment as to who is best qualified to fill the position' or to 'weigh the respective qualifications of the applicants.'" *Gee-Thomas v. Cingular Wireless*, 324 F. Supp. 2d 875, 887 (M.D. Tenn. 2004) (Trauger, J.) (quoting *Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1180 (7th Cir. 2002)) (granting summary judgment). Similarly, the Sixth Circuit has confirmed that, "[s]o long as its reasons are not discriminatory, an employer is free to choose among qualified candidates" and has "even greater flexibility in choosing a management-level employee . . . because of the nature of such a position." *Wrenn v. Gould*, 808 F.2d 493, 502 (6th Cir. 1987).

Hayes has not shown that Metro's assertion that Hughes was selected because of his experience in dealing with diversity issues on a larger scale had no basis in fact or was insufficient to motivate the decision. Insofar as she argues that she was clearly the more qualified candidate, pointing in particular to the fact that the job posting indicated that a master's degree was

"preferred" and that she had a master's degree and better grades than Hughes in college, she has not shown that the differences between her qualifications and Hughes's were so stark that "no reasonable employer would have chosen" Hughes over her. *Jones*, 2021 WL 5782380, at *3. Insofar as she has established that she "was as qualified as if not better qualified than" Hughes, she has not produced any other probative evidence of discrimination." *Id.* She has not shown that a material factual dispute exists on the issue of pretext.

Metro is entitled to summary judgment on Hayes's Title VII/THRA sex discrimination claims.

### D. Retaliation Claims under Title VI, Title VII, and the THRA

#### 1. Legal Standards

Title VII also "prohibits retaliatory conduct by an employer when an employee engages in protected activity." *Brown v. VHS of Mich., Inc.*, 545 F. App'x 368, 373 (6th Cir. 2013); *see also* 42 U.S.C. § 2000e-3. A Title VII retaliation claim is also subject to the *McDonnell Douglas* burden-shifting framework, though the *prima facie* elements differ slightly. A plaintiff must show that "(1) he or she engaged in protected activity, (2) the employer knew of the exercise of the protected right, (3) an adverse employment action was subsequently taken against the employee, and (4) there was a causal connection between the protected activity and the adverse employment action." *Dulaney v. Flex Films (USA), Inc.*, No. 20-6098, 2021 WL 3719358, at *6 (6th Cir. Aug. 23, 2021) (quoting *Niswander v. Cincinnati Ins. Co.*, 529 F.3d 714, 720 (6th Cir. 2008)).

Title VI provides that:

> No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

42 U.S.C. § 2000d. Unlike Title VII, it does not expressly prohibit retaliation for engaging in protected activity, but the Sixth Circuit has presumed that it does and that the *McDonnell Douglas*

burden-shifting framework applies to such claims. *See, e.g.*, *Ross v. Mich. State Univ. Bd. of Trustees*, No. 11-2278, 2012 WL 3240261, at *3 (6th Cir. June 20, 2012) (quoting *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 595 (6th Cir. 2007)).

Under either statute, "[t]o establish a causal connection, a plaintiff must proffer evidence sufficient to raise the inference that her protected activity was the likely reason for the adverse action." *Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir. 2007) (internal quotation marks and citations omitted). Under the *McDonnell Douglas* framework, if the plaintiff establishes a *prima facie* case of retaliation, as with discrimination claims, the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for its actions. If the defendant succeeds at that step, the plaintiff bears the burden of showing that the defendant's stated reasons are "merely a pretext for discrimination." *Mickey*, 516 F.3d at 526 (citation omitted).

### 2.     *Prima Facie Case*

For purposes of her Title VI claim, Hayes engaged in protected activity when she complained in February 2020 that the Let's Make a Slave lessons violated her child's rights under Title VI and when she filed a Title VI lawsuit on his behalf in November 2020. She alleges that she suffered adverse actions when (1) her position as Director of School Choice was eliminated; (2) she was non-selected for the EOD position; (3) she was not hired for the RPS position; and (4) MNPS "failed to hire her into one of 37 jobs for which she applied in the 2020-2021 School Year" (Doc. No. 142 ¶ 105(a)) and instead transferred her to a classroom teaching position.

For purposes of her Title VII/THRA claim, Hayes asserts that she engaged in protected activity when she filed an EEOC charge on August 27, 2020, that MNPS knew she had filed her EEOC charge, and that she suffered adverse employment actions when she was not selected for the RPS position and when she "applied for an additional 13 jobs after filing her EEOC charge and was not hired for any." (*Id.* ¶ 115.)

Regarding the unspecified other jobs for which the plaintiff allegedly applied but was not selected, no additional details about those jobs are in the record, and the court finds on that basis that the plaintiff fails to state a *prima facie* retaliation case relating to those jobs. As for the elimination of the Director of School Choice position and Hayes's non-selection for the EOD and RPS positions, Metro argues that the plaintiff cannot establish a causal connection between the protected activity and the adverse action. It also argues that the plaintiff cannot show that Metro's proffered reasons for its employment decisions are pretext for retaliation.

The court finds that, even assuming that the temporal proximity between Hayes's protected activity and the specifically identified adverse actions is sufficient to establish a *prima facie* case of causation, Hayes again cannot show that Metro's proffered reasons for its actions are pretextual, for the reasons already discussed: (1) the Director of Schools position was terminated as part of the larger Central Office Reorganization and FY 2021 budgeting process; (2) Clay selected Hughes instead of Hayes for the EOD position because Hughes had already worked on diversity issues on a large scale; and (3) Hayes was not selected for the RPS position because her salary range would have been too high, higher than that of any of the staff members in that office, and Anthony Hall did not have authority for such an amount in his budget. There is not sufficient evidence in the record from which a reasonable jury could conclude that Metro's reasons for any of the referenced employment actions were false or that the actions were instead in retaliation for the plaintiff's having engaged in activity protected by Title VI, Title VII, or the THRA.

Metro is entitled to summary judgment on Hayes's remaining retaliation claims.

## VI. LEFFLER'S INDIVIDUAL CLAIMS

Plaintiff Leffler asserts individual claims against Metro for age and sex discrimination, under Title VII, the ADEA, and the THRA and a claim of "associational retaliation" in violation of Title VII and the ADEA.

A. **Facts Relating to Leffler's Individual Claims**

Leffler began working for MNPS in 1994 as a teacher. (Doc. No. 188-1, Leffler Decl. ¶ 6.) She worked as a teacher in the MNPS system until 2001 and then in the Williamson County School system from 2002 through 2016 as an assistant principal and then principal. She returned to MNPS in 2016 as a "lead principal." The title for this position was changed for the 2017–2018 school year to "Executive Director." (*Id.* ¶¶ 6–7.) For the 2019–2020 school year, she was Executive Director of elementary schools in the southeast quadrant. (*Id.* ¶ 8.) This position was a certificated position directly below that of Associate Superintendent, and the Associate Superintendents reported to the Director of Schools. (*Id.* ¶¶ 8–9, 18.) Leffler successfully performed this job, without any complaints or counseling memos. (*Id.* ¶¶ 9, 10.) In 2020, Leffler was forty-nine years old. (Doc. No. 144-4, Leffler Dep. 10.)

After she was notified that her appointment as Executive Director would not be renewed for the 2020–2021 school year, Leffler reapplied for her position as Executive Director. According to Leffler, the new Executive Director position for which she applied had the same description and job title as the job she performed during the 2019–2020 school year. (Doc. No. 188-1, Leffler Decl. ¶ 20.)

Leffler was interviewed for the position virtually on the Teams platform. Chief of Staff Chris Barnes, one of the interviewers, was not able to connect to the meeting. During the thirty-minute interview, he disconnected and reconnected three times and remained disconnected for at least half of the interview. (*Id.* ¶ 23.) Because he was absent for much of the meeting, Barnes told her that he would need to connect with her the next day, a Saturday, to "conduct his interview." (*Id.* ¶ 24.) He did not call her back, however; Leffler finally texted him late Saturday afternoon to set up the interview. (*Id.* ¶ 24.) Barnes called her but did not ask her any interview questions. Instead, he "just told [her] about what was planned for the next year." (*Id.* ¶ 25.) The interviews

concluded on May 27, 2020.

Leffler was notified on June 1, 2020 that she had not been selected as an Executive Director. (*Id.* ¶ 26.) She alleges that Shawn Lawrence, a thirty-nine year old man (ten years younger than Leffler, was hired to do her Executive Director job: Executive Director of the southeast quadrant. (*Id.* ¶ 37.) Prior to being non-renewed, Leffler had held her position as Lead Principal/Executive Director for four years, and she supervised Shawn Lawrence during the 2019–2020 school year. Lawrence had a master's degree but not a doctorate.

Leffler has obtained the "scores" provided by the interviewers for each of the interviewees. The scores provided by the four interviewers for the Friday interview were 31, 34, 35, and 37. (*Id.* ¶ 27.) The average of these four scores was higher than the average scores of others who were ultimately placed in the Executive Director positions. (*Id.*) Although the scores were provided anonymously, Leffler was able to identify what scores Barnes gave her because they were dated. Even though he did not actually ask any questions, he gave her the lowest scores of any of the interviewers, bringing her average down. (*Id.* ¶ 28.)

Leffler alleges that, at the time she was told that her job was being eliminated, there were thirteen Executive Director positions, including hers, as follows:

1. Steve Ball, Executive Director of Elementary Support

2. Natalyn Gibbs, Executive Director of Elementary Support

3. James Witty, Executive Director of High School Support

4. Carl Carter, Executive Director of Student Support & Instruction

5. Susan Cochrane, Executive Director of Student Support & Instruction

6. Ledonzia Edwards, Executive Director of Student Support & Instruction

7. Craig Hammond, Executive Director of Student Support & Instruction

8. David Kovach, Executive Director of Student Support & Instruction

9. Lilly Leffler, Executive Director of Student Support & Instruction

10. Tracy McPherson, Executive Director of Student Support & Instruction

11. Renita Perry, Executive Director of Student Support & Instruction

12. Robin Shumate, Executive Director of Student Support & Instruction

13. Chaerea Snorten, Executive Director of Student Support & Instruction

(*Id.* ¶ 33.) Leffler does not provide the age or gender of these individuals, but, based on the names alone, it appears that five of them were men and eight were women.

MNPS created two additional Executive Director positions as part of the Central Office Reorganization. It is undisputed that "Executive Director" is a broad term used to describe an entire class of positions. Metro also maintains that the selection process was for the Executive Director positions in general, rather than for any particular assignment. However, it is clear that nine of the original thirteen were placed back in Executive Director positions for the 2020–2021 school year. The plaintiffs claim that all but two of those nine were placed "back into the exact same Executive Director position they were in for the 2019–2020 school year." (*Id.* ¶ 41.) The other two were placed in Executive Director positions supporting different schools. (*Id.*) Of the four who did not retain Executive Director Jobs, one retired (Cochrane), and another (McPherson) did not reapply for her job. Thus, Leffler and Robin Shumate were the only individuals who sought to be re-hired as Executive Directors but were not. (*Id.* ¶ 34.)

According to Leffler, the six new Executive Directors (in addition to the original nine who were rehired) and their ages were as follows:

1. Shawn Lawrence, age 39

2. Chad High, age 43

3. Felicia Everson-Tuggle, age 48

4. Celia Conley, age 39

5. Karen Gallman, age 46

6. Schunn Turner, age 50.

(*Id.* ¶ 40.)

According to Hank Clay, thirty-eight of the sixty-six employees at director-level or higher positions who kept their positions as part of the Reorganization were women, while twenty-eight were men. (Doc. No. 146, Clay Decl. ¶ 4; Doc. No. 146-1, MNPS Director 2020 director list.) In addition, eight of the fifteen people selected or re-selected for an Executive Director position for the 2020–2021 school year were female and seven were male. (Clay Decl. ¶ 5; Doc. No. 146-2, 2020–2021 Executive Director spreadsheet.) According to Clay's spreadsheet, the fifteen individuals and their gender and ages are as follows:

1. Stephen Ball, male, age 59

2. Carl Carter, male, age 38

3. Celia Conley, female, age 39

4. Karen Desouza, female, age 46

5. Ledonzia Edwards, female, age 51

6. Felicia Everson-Tuggle, female, age 48

7. Natalyn Gibbs, female, age 46

8. Craig Hammond, male, age 39

9. Chad High, male, age 43

10. David Kovach, male, age 49

11. Shawn Lawrence, male, age 39

12. Renita Perry, female, age 47

13. Chaerea Snorten, female, age 46

14. Schunn Turner, female, age 50

15. James Witty, male, age 40

(Doc. No. 146-2.)

Metro asserts that it conducted panel interviews of a number of candidates to select ("hire/promote/place") the fifteen individuals for the "new" Executive Director positions. The plaintiffs do not dispute that interviews took place, but, again, they deny that the positions were "new" and further deny that the interviews were legitimate. They contend that there were irregularities in the process and the promotion of unqualified individuals. Specifically, two of the candidates, Lawrence and Chad High, were interviewed after the interviews of candidates had supposedly concluded. (Doc. No. 191-5, Williams Dep. 47, 55, 58.) Chad High, in particular, received very low scores on his interview, at least from David Williams. (*Id.* at 55; *see also* Doc. No. 191-17, at 4 (text message from Williams stating "I very vividly remember scoring Chad [High] because my scores for him were not strong. And my qualitative remarks were about his limited scope of experiences and how that limited his perspective. It showed in his answers.").) According to Williams, the interviewing panel "all knew" some promise to High had been made and that the "interview was fake." (Doc. No. 191-17, at 5.) Williams allegedly told Leffler that he had interviewed Chad High and that High "could barely answer the questions and he gave him a low score." (Doc. No. 188-1, Leffler Decl. ¶ 43.)

In addition, although MNPS produced the electronically generated scores for the other Executive Director candidates, High's scores have apparently been lost. (*See* Doc. No. 190-3, at 51.) According to the plaintiffs, it was logistically impossible to have lost the electronically generated scores of a single candidate. (Doc. No. 191-16, at 5.).)

Leffler was told she had not been selected on June 1, 2020, the same day Hank Clay called Chad High (age 43) to encourage him to apply for the job. (Doc. No. 188-1, Leffler Decl. ¶ 26; Doc. No. 149-2, Clay Dep. 170; Doc. No. 191-7, High Dep. 28.)

Battle testified that she was looking for the "best candidate[s]" and "strong leaders" to fill the Executive Director positions. (Doc. No. 149-1, Battle Dep. 143, 286.) The plaintiffs deny that hiring was done based on performance during the interviews, for the reasons set forth above. Battle also testified that the hiring of Executive Directors was a phased process, and her past experience with particular candidates was a component of her decision regarding who made it to the phase two interviews with her, which took place after the panel interviews. (*Id.* at 292–93.) There is no dispute that Leffler had competently and successfully performed her job as Executive Director. Leffler, unlike either Shawn Lawrence or Chad High, has a doctorate degree.

In 2018, Vanessa Garcia, who is married to Leffler's first cousin, sued MNPS for sex discrimination and retaliation. (Doc. No. 188-1, Leffler Decl. ¶ 39.) Leffler's is a "close knit family." (*Id.*) Garcia's case terminated pursuant to a Rule 41 joint stipulation of dismissal with prejudice filed on February 28, 2020. (Doc. No. 155-6.) Leffler states that she believes that she was "fired and then not hired back" as an Executive Director because Garcia had "just sued MNPS for creating a sexually hostile work environment and retaliation." (Doc. No. 188-1, Leffler Decl. ¶ 42.) In support of this belief, she alleges that in 2019, after Garcia filed suit, Battle (then interim Director of Schools) repeatedly voiced doubts to then-Associate Superintendent Cathey (Leffler's direct supervisor) about Leffler's "loyalty" to MNPS, asking him whether Leffler could "separate her work" from Garcia's lawsuit and remain "loyal" despite Garcia's lawsuit. (Doc. No. 188-3, Cathey Decl. ¶¶ 19–24.) Cathey expressed no doubts about Leffler's "loyalty"; he responded that Leffler was "an excellent employee" and described her job performance as "stellar." (*Id.* ¶ 24.)

Battle testified that she was aware that Garcia had filed a lawsuit but was not Director of Schools at the time and did not know the details of Garcia's allegations. (Doc. No. 149-1, Battle Dep. 71–72.) She was aware that Garcia and Leffler were "related." (*Id.* at 70–71.) Battle denied

ever questioning anyone about Leffler's loyalty, confusingly answered "no" when asked whether it would be "inappropriate to question anyone about Dr. Leffler's loyalty because of her relative's case,"[32] and then confirmed that she knew that it is not appropriate to retaliate against someone who is related to someone who engaged in protected activity." (*Id.* at 72–73.)

### B. Age and Sex Discrimination

Leffler's sex and age discrimination claims, because they rely on circumstantial evidence, are both analyzed under the *McDonnell Douglas* framework. To establish a *prima facie* case for either, she must show that (1) she is a member of a protected class (at least forty years old, for purposes of her ADEA claim); (2) she was subjected to an adverse employment action; (3) she was qualified for the position; and (4) she was "either replaced by a person outside of the protected class or . . . that similarly situated, non-protected employees were treated more favorably." *Clayton v. Meijer, Inc.*, 281 F.3d 605, 610 (6th Cir. 2002) (Title VII); *Smith v. Wrigley Mfg. Co.*, 749 F. App'x 446, 448 (6th Cir. 2018) (ADEA). For purposes of the fourth element of a *prima facie* case of age discrimination, an allegation that the plaintiff was replaced by a younger individual supports an inference of discrimination only if the difference in age is "significant." *Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 283 (6th Cir. 2012). The Sixth Circuit has established a bright-line rule under which an age difference of ten or more years will always be significant, and an age difference of six years or less is not significant in the absence of direct evidence that the employer considered age to be significant, while an age difference falling between six and ten years must be considered on a case-by-case basis. *Id.* (citing *Grosjean v. First Energy Corp.*, 349 F.3d 332, 336, 340 (6th Cir. 2003).

---

[32] Metro speculates that Battle was confused as to whether she was asked if it was "inappropriate" or "appropriate" to ask about Leffler's loyalty because of her relative's lawsuit. (Doc. No. 207, Resp. to ¶ 27.)

There is no dispute that Leffler can satisfy the first three elements of *prima facie* cases of both age and sex discrimination. Metro argues that her claims fail at the fourth element, because both women and men were selected for the entire class of Executive Director positions and most of the people selected were close to her age or older than she. It contends that "the demographics of the Executive Director positions should be analyzed on a broad base, showing the diversity of the *entire* group, because their assignments can change over time depending on the district's needs [and they were] all Executive Directors reporting to the same supervisor." (Doc. No. 206, at 12–13.)

In response, the plaintiffs argue that Leffler's job was not actually eliminated and that she was replaced in her exact position by Shawn Lawrence, a thirty-nine year old man. Lawrence, according to Leffler, was assigned to oversee elementary schools in MNPS's southeast quadrant—the same schools previously overseen by Leffler. (Doc. No. 188-1, Leffler Decl. ¶ 37.)

Leffler's own testimony establishes, however, that, when she was in the Executive Director position, the job assignment and the schools to which she was assigned changed frequently, depending on MNPS's needs. Specifically, over the course of four years she "supervised or oversaw elementary, middle, and high schools." (Doc. No.144-4, Leffler Dep. 10.) During her first year, she supervised middle and high schools in several arenas, including academics, financial support, and professional development. (*Id.*) Her second year, she supervised seventeen elementary schools in the northeast, each with different needs; from there she moved to supervising fifteen schools in the southeast, which had a "very different population" from the schools in the northeast. (*Id.* at 10–11.) She does not claim to have been transferred from one Executive Director job to another during this time; she continued to hold the title of Executive Director—though the actual job title changed from "lead principal to Executive Director in the 2017–2018 school year.

(Doc. No. 188-1, Leffler Dec. ¶ 7.) So, while Leffler held the position of Executive Director for the southeast quadrant during 2019–2020, it does not seem to have been a permanent assignment or an essential part of her job. In other words, the posting and actual job duties of Executive Directors were fairly fluid, depending on the needs of the school system.

Thus, although there are questions of fact as to the degree to which the Executive Director positions—or at least some of them—actually changed and, in particular, as to whether the position Leffler held last changed substantively, there is no dispute that, as part of the Central Office Reorganization, all of the Executive Directors were terminated and had to reapply for Executive Director jobs, that the leadership and reporting structure of the jobs changed, such that all of them would now report to the same supervisor, and that fifteen Executive Directors were hired into fifteen Executive Director positions for the 2020–2021 school year. Leffler's claim that she was personally replaced by Shawn Lawrence is not supported by the record, and the court finds it appropriate to consider the demographics of the entire class of fifteen individuals hired into the Executive Director positions for the 2020–2021 school year rather than to simply compare Leffler with Lawrence.

And of the entire class, as set forth above, eight were women and seven were men, obviating any inference of sex discrimination. Moreover, nine of the fifteen were older than Leffler or within three years of her age; one was six years younger; only one was eleven years younger, and four were between six and ten years younger than she. This range of ages does not give rise to an inference of age discrimination, particularly in the absence of any direct evidence suggesting that MNPS "considered age to be significant." *Blizzard*, 698 F.3d at 283. Moreover, although Leffler claims that it is inappropriate to compare her to all of the other Executive Directors who *were* rehired, it appears from comparing the two lists above that six of the nine who were rehired

were close to her age or older.

The court finds that the plaintiff has failed to establish that she was directly replaced by someone outside her protected class or that similarly situated, non-protected employees were treated more favorably than she was, for purposes of her *prima facie* case of either age or sex discrimination. Metro is entitled to summary judgment on this claim.

**C.    Title VII Associational Retaliation**

*1.    Legal Standard*

Title VII prohibits retaliation against someone so closely related or associated with the person exercising his statutory rights that it would discourage or prevent that person from pursuing those rights. *Thompson v. N. Am. Stainless, L.P.*, 562 U.S. 170, 174–75 (2011) (holding that an employee whose employment was terminated after his fiancée, a co-employee, filed a sex-discrimination charge with the EEOC had standing as an "aggrieved person," under a zone-of-interests test, to sue the employer under Title VII's antiretaliation provision). To state a *prima facie* retaliation case under this theory, the plaintiff must establish that (1) her close contact participated in protected activity; (2) the employer took a materially adverse action against the plaintiff that would deter a reasonable employee from making a charge of employment discrimination or otherwise engaging in protected activity; (3) there is a causal connection between the plaintiff's close contact's protected activity and the adverse employment action against the plaintiff. *Rodriguez-Monguio v. Ohio State Univ.*, 499 F. App'x 455, 464 (6th Cir. 2012) (citing *Spengler v. Worthington Cylinders*, 615 F.3d 481, 491–92 (6th Cir. 2010)). The Supreme Court expressly declined to define the type of relationship that will suffice to establish an associational retaliation claim, observing only that "firing a close family member will almost always" qualify, while "inflicting a milder reprisal on a mere acquaintance will almost never do so." *Thompson*, 562 U.S. at 175.

As with any Title VII retaliation claim, once a plaintiff establishes a *prima facie* case, the defendant then has the burden of articulating a legitimate, non-retaliatory reason for the employment action, at which point the plaintiff then has the burden of showing that the proffered reason is pretextual.

### 2.    *Discussion*

Leffler argues that she has established a *prima facie* case of retaliation, because there is no dispute that Garcia, Leffler's cousin by marriage, engaged in protected activity; MNPS knew about the activity and the close relationship between Leffler and Garcia; Leffler suffered adverse employment actions both when (1) her appointment as Executive Director was terminated and (2) she was not rehired into the same position; and there is a causal connection between her cousin's protected activity and the adverse employment actions against Leffler, based on Battle's allegedly expressing to Cathey that she questioned Leffler's loyalty and the temporal proximity between the resolution of Garcia's lawsuit and the adverse actions against Leffler.

Metro argues, first, that Leffler's associational retaliation claim fails because she cannot show that there is a causal connection between Garcia's lawsuit and the decision to restructure all of the Executive Director positions, to terminate all of the then existing Executive Directors' appointments, and to require all of them to reapply for their jobs for the 2020–2021 school year as part of the grander Central Office Reorganization, particularly given that Garcia's lawsuit had been voluntarily dismissed with prejudice in February 2020, but the plaintiff's job was not eliminated until May 2020. Second, Metro argues that there is no basis for finding that Metro's intention was to "cause harm to Dr. Garcia." (Doc. No. 163, at 48.)

As an initial matter, Metro misstates the standard. The question is whether a *reasonable worker* would be dissuaded from engaging in protected activity if she knew that, by doing so, her close relative would suffer retaliation. The court nonetheless finds that, even assuming (without

deciding) that Leffler has established a *prima facie* retaliation claim related to the termination of her appointment based on the timing of events, the plaintiff cannot show that the reasons behind the Central Office Reorganization as a whole—including the termination of all Executive Director appointments and requiring all of them to reapply for their jobs—were pretext for retaliation against the plaintiff. Metro is entitled to summary judgment on the portion of Leffler's retaliation claim that is premised upon the termination of her appointment as Executive Director.

Metro, however, does not directly acknowledge Leffler's claim insofar as it relates to her non-selection for the position of Executive Director after she was terminated and then reapplied for the position of Executive Director. Metro, accordingly, is not entitled to summary judgment on Leffler's claim that the failure to select her for the position of Executive Director for the 2020–2021 school year was a form of associational retaliation arising from Garcia's lawsuit.

Metro's Motion for Summary Judgment as to Leffler's discrimination claims will be granted, and its Motion for Summary Judgment as to Leffler's associational retaliation claim will be granted in part and denied in part.

## VII.  MERIWETHER'S AND CATHEY'S AGE DISCRIMINATION CLAIMS

Plaintiffs Pippa Meriwether and Damon Cathey both claim that Metro discriminated against them because of their age, in violation of both the ADEA and THRA, when, after eliminating the position of Associate Superintendent, it promoted the two youngest Associate Superintendents. [33] They claim that Metro then failed to select either Meriwether or Cathey for an Executive Director position, instead hiring five individuals who were substantially younger and much less qualified than Meriwether and Cathey and then demoting Meriwether and Cathey to

---

[33] Again, THRA age discrimination claims are analyzed identically to ADEA claims. *Pierson*, 749 F.3d at 536.

positions as elementary school principals. (Doc. No. 125, ¶¶ 95–107, 196–205, 207–16.)

### A. Facts Relating to Meriwether's and Cathey's Age Discrimination Claims

During the 2019–2020 school year, Meriwether and Cathey were two of four Associate Superintendents. They were both long-time, high-performing MNPS employees who had previously been in positions equivalent to that of Executive Director before being promoted to the position of Associate Superintendent. (*See* Doc. No. 188-2, Meriwether Decl. ¶¶ 5–6; Doc. No. 188-3, Cathey Decl. ¶¶ 9–10.) Executive Directors reported to Associate Superintendents. (*See* Doc. No. 162-13; Doc. No. 188-2, Meriwether Decl. ¶ 70.)

All four Associate Superintendent jobs were eliminated as part of the Central Office Reorganization. Meriwether was fifty-eight years old and Cathey was fifty-five years old at the time. (Doc. No. 188-2, Meriwether Decl. ¶ 56; Doc. No. 188-3, Cathey Decl. ¶ 2.) The two other Associate Superintendents were Schunn Turner (age fifty) and Michelle Maultsby-Springer (age forty). (Doc. No. 188-2, Meriwether Decl. ¶¶ 57, 60.)

Upon the elimination of the Associate Superintendent positions, Maultsby-Springer was appointed to the position of Chief of Student Services, which was a promotion that entailed more responsibility and a substantial increase in salary. (Doc. No. 188-2, Meriwether Decl. ¶¶ 58, 60; Doc. No. 193-1, Johnson Decl. ¶ 16.) The job was never posted as open (Doc. No. 193-1, Johnson Decl. ¶ 16), so Meriwether and Cathey were not given the opportunity to apply for it, despite being qualified (*see* Doc. No. 188-2, Meriwether Decl. ¶ 67; Doc. No. 188-3, Cathey Decl. ¶¶ 38–41). Schunn Turner, Meriwether, and Cathey all applied for the position of Executive Director. Turner was offered the job, but Meriwether and Cathey were not.

As set forth above, the ages of the individuals who were appointed to the position of Executive Director, including the nine who had previously been in the position prior to the Central Office Reorganization, were: 38, 39, 39, 39, 40, 43, 46, 46, 46, 47, 48, 49, 50, 51, 59. Thus, only

one was older than Meriwether; none of the others was within six years of her age; and the vast majority were more than ten years younger. Only one was older than Cathey; three others were within six years of his age. The six individuals newly hired into the Executive Director position were ages 39 (two of them), 43, 45, 48, and 50.

Battle testified that she had "concerns" about Meriwether's performance and her ability to perform at the Executive Director level, having worked with her over the years as a subordinate, colleague, and supervisor. (Doc. No. 149-1, Battle Dep. 54–55, 81.) Battle claimed to have had "several" conversations with Meriwether about her job performance during the year preceding the Central Office Reorganization. (*Id.* at 63–65.) Conversely, according to Meriwether, she was never told by Battle or anyone else that she had performance problems for any reason. (Doc. No. 188-2, Meriwether Decl. ¶ 62.) She had never been placed on an improvement plan, and she always had good evaluations. (*Id.* ¶¶ 62–63.) Shawn Joseph, who preceded Adrienne Battle as Director of Schools, testified that he believed that Meriwether was the strongest performer of all the Community Superintendents, when Battle and Meriwether were both in that position, and he believed that Meriwether, rather than Battle, should have been appointed Interim Director of Schools when Joseph left MNPS in 2019. (Doc. No. 193-3, Joseph Decl. ¶¶ 4–6.)

Battle also testified that she had "concerns" about Cathey's ability to perform at the Executive Director level and that, as his supervisor for the 2019–2020 school year, she had "several" meetings with him about job performance. (Doc. No. 149-1, Battle Dep. 63–64.) She recalled a particular occasion when that she was frustrated that Cathey was not familiar with information contained in a weekly district memo, and he responded to her that he did not read the memos; she explained that the memos were important and that reading them was part of his job. (*Id.* at 64.)

Cathey denies that Battle or anyone else had ever told him there was a problem with his job performance (Doc. No. 188-3, Cathey Decl. ¶ 16) and does not recall any incident involving district memos (*id.* ¶ 59). He was never placed on a performance improvement plan or formally disciplined, and he always received good evaluations. (*Id.* ¶¶ 15, 17.)

Battle's past experience with particular candidates informed her decision of whom to interview at the second "stage" of the process of hiring Executive Directors. (Doc. No. 149-1, Battle Dep. 292.)

As discussed above, the plaintiffs believe that the hiring procedure for the Executive Director positions was suspicious, because both Chad High and Shawn Lawrence were interviewed after the panel interviews had supposedly concluded; both had less experience than Meriwether and Cathey; both were substantially younger. Chad High's interview scores were "lost," and at least one of the interviewers gave him very low scores, based on High's lack of experience and inability to answer questions satisfactorily during the interview. Cathey received the fifth-highest score accorded during the panel interviews, higher than Lawrence. (Doc. No. 188-3, Cathey Decl. ¶¶ 49, 50.) Lawrence does not have a doctorate degree; but both Meriwether and Cathey have doctorate degrees. (*Id.* ¶ 6; Doc. No. 188-2, Meriwether Decl. ¶ 4) Cathey previously supervised High**.** (Doc. No. 188-3, Cathey Decl. ¶ 51.) Both Lawrence and High, however, were offered and accepted positions as Executive Director.

Meriwether and Cathey both eventually applied and were selected for positions within MPS as elementary school principals, which is a three-step demotion within MNPS's organizational structure and resulted in a substantial reduction in pay and level of responsibility for both of them. (Meriwether Decl. ¶¶ 54, 70; Cathey Decl. ¶ 53–55.)

### B.  *Prima Facie* Case: Failure to Transfer to Comparable Position

Meriwether's and Cathey's age discrimination claims are *not* premised on the proposition

that the decision to eliminate the Associate Superintendent positions, *per se*, was discriminatory. Instead, they allege that, although all four Associate Superintendent positions were eliminated, the other two Associate Superintendents, who were substantially younger than they, were promoted, while they were demoted. In particular, Michelle Maultsby-Springer, who at age forty was substantially younger than either Meriwether or Cathey, was given the opportunity to transfer to the position of Chief of Student Services. The plaintiffs have presented evidence that this reassignment was a promotion as the position entailed greater responsibility and a higher salary, that the job was never actually posted as open, and that neither Meriwether nor Cathey was given the opportunity to apply for it, despite being qualified for the job. In addition, the fourth Associate Superintendent, Schunn Turner, received a job as Executive Director. At age fifty, Turner was approximately nine years younger than Meriwether and five years younger than Cathey.

In the context of the elimination of a plaintiff's job due to a restructuring, the Sixth Circuit has recognized that the elements of a *prima facie* case of age discrimination under the ADEA are slightly modified:

> [T]o establish a prima facie case in a failure-to-transfer claim the plaintiff must demonstrate that: (1) he is a member of the protected class; (2) at the time of his termination he was qualified for other available positions within the corporation; (3) the employer did not offer such positions to the plaintiff; and (4) a similarly situated employee who is not a member of the protected class was offered the opportunity to transfer to an available position.

*Braithwaite v. Dep't of Homeland Sec.*, 473 F. App'x 405m, 412 (6th Cir. 2012); *see also Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 350 (6th Cir. 1998) (similar, but identifying the fourth element of the *prima facie* case as requiring a showing of "additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons," which a plaintiff could satisfy by demonstrating that a "comparable non-protected person was treated better" (citations omitted)).

Metro does not dispute the plaintiffs' ability to establish the first two elements of their *prima facie* case, but it argues that Meriwether and Cathey cannot establish either the third or fourth element under this standard, first, because "all four Associate Superintendents were removed from their positions, regardless of age," and second, because Meriwether and Cathey "cannot show that [they were] not allowed to apply for other positions within MNPS" or that "older employees were somehow not allowed to apply for the same positions that younger employees were allowed to." (Doc. No. 163, at 50.)

Metro's position is utterly baffling, as the whole point is that all four positions were eliminated, but the two younger Associate Superintendents were promoted while Meriwether and Cathey were demoted. Maultsby-Springer, in particular, was comparable to the plaintiffs but treated substantially better in that she was effectively hand-picked for a promotion that Meriwether and Cathey were not given the opportunity to apply for. Although she was forty at the time, she was also substantially younger than either Meriwether or Cathey. And Turner, although only five years younger than Cathey, was nine years younger than Meriwether but received a position as Executive Director. The court finds that Meriwether and Cathey have stated a *prima facie* case based on the disparate treatment they received compared to Maultsby-Springer and Turner upon the elimination of all of their positions.

C.    ***Prima Facie* Case: Failure to Select for Executive Director Position**

Meriwether and Cathey also assert age discrimination claims based on their non-selection for an Executive Director position. Without citing to any authority, Metro argues that they cannot state a *prima facie* case, because MNPS did hire other candidates who were either older than Meriwether and Cathey or close to their ages. But, as set forth above, only one was older than both

of them,[34] and only three others were remotely within Cathey's age range. No others were within six years of Meriwether's age. As the plaintiffs point out, of the six new hires, only one was within ten years of Meriwether's age. The court finds, under the particular circumstances here and in light of Metro's failure to present any substantive argument to the contrary, that Meriwether and Cathey have stated *prima facie* cases of age discrimination based on their non-selection for Executive Director positions.[35]

### D. Metro's Legitimate, Non-discriminatory Reasons for its Actions

If the plaintiff establishes a *prima facie* case of discrimination, "[t]he burden then shifts to the defendant to articulate a legitimate, non-discriminatory reason for its actions, supported by admissible evidence that 'if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action.'" *Briggs v. Univ. of Cincinnati*, 11 F.4th 498, 508 (6th Cir. 2021) (quoting *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 707 (6th Cir. 2006)). The employer has only a burden of production at this step, not a burden of persuasion. *Id.* at 509.

Metro has satisfied its minimal burden of articulating a legitimate reason for its actions: it asserts that that Meriwether and Cathey were not selected for Executive Director or other high-level administrative jobs that were open, because Battle and MNPS were looking for the best candidates with strong leadership skills to fill these positions. Battles states that, based on her prior

---

[34] According to the plaintiffs, this individual, Steven Ball, is not a proper comparator, because he was placed (both before and after the Reorganization) in a "school support" Executive Director role, which is a "managerial role that supports principals with tasks such as facility maintenance, attendance, and parent and community complaints" and, as such, has different duties than the "instructional Executive Director role" that Meriwether and Cathey sought. (Doc. No. 188-3, Cathey Decl. ¶ 52.)

[35] The court emphasizes that their situations are different from Leffler's simply because they are older than Leffler.

experience in working with both Meriwether and Cathey, she had concerns about their ability to function at the Executive Director level and had had conversations with both of them over the course of the preceding year concerning her dissatisfaction with their job performance.

### E.    Evidence of Pretext

At the third step of the *McDonnell Douglas* framework, the employee has the burden of producing evidence from which, if a jury believes it, would establish by a "preponderance of the evidence that the employer's proffered reasons were a mere pretext for discrimination." *Briggs*, 11 F.4th at 509. That means that the employee must "come forward with evidence that the defendant's reason for the employment action is false, but he need not present independent evidence that the proffered reason is pretext for . . . discrimination." *Id.* (internal quotation marks and citation omitted). "[A] plaintiff's *prima facie* case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Id.* (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000)); *see id.* at 513 ("A plaintiff's discrimination claim survives summary judgment when the record contains 'enough evidence to support a *prima facie* case and to rebut, but not to disprove, the defendant's proffered rationale." (quoting *Griffin v. Finkbeiner*, 689 F.3d 584, 593 (6th Cir. 2012)). The plaintiff's "burden is not heavy, though, as summary judgment is warranted only if no reasonable juror could conclude that the employer's offered reason was pretextual." *George v. Youngstown State Univ.*, 966 F.3d 446, 462 (6th Cir. 2020).

The plaintiffs here have presented sufficient evidence to call into question the veracity of Battle's stated reason for their non-selection for Executive Director jobs. Both Meriwether and Cathey deny that Battle ever counseled them about performance issues, and both have presented evidence that they had never been disciplined and that they both consistently received positive evaluations. In addition, although Battle claims she sought to hire the "best candidates" with strong

leadership skills, she leap-frogged over Meriwether and Cathey, who had worked their way up to positions *above* those of Executive Director, to promote individuals who had never held a leadership position higher than that of principal, one of whom Cathey had previously supervised. The previous Director of Schools testified that Meriwether was an extremely qualified leader who would have been his choice for Interim Director of Schools, and the plaintiffs have presented evidence that Cathey's scores from the panel interview were the fifth highest of all the candidates interviewed—higher than those of Shawn Lawrence and, based on David Williams's assessment, likely much higher than Chad High's, whose total scores mysteriously disappeared. These facts call into question Battle's veracity regarding her alleged concerns about Meriwether's and Cathey's job performance and her claim that she desired to hire individuals with strong leadership skills. As the Sixth Circuit has recognized, "subjective evaluations by the employer—at least where contested by the employee—require close examination because they have a greater susceptibility for being a smokescreen for pretext." *George*, 966 F.3d at 467. In addition, the plaintiffs point to irregularities in the hiring process, including that Lawrence and High were both presented for panel interviews after those interviews had supposedly concluded and that Metro somehow "lost" High's panel interview scores. Irregularities in the hiring process can "raise a genuine issue of fact as to whether an employer's asserted reason is pretextual." *Id.* at 466.

Metro essentially has no response to the plaintiffs' evidence that Battle's proffered reasons for the adverse employment actions are false, other than to argue that (1) the plaintiffs' subjective perception as to their abilities cannot create a question of fact; and (2) when it came to hiring upper-level management, Battle had essentially unfettered discretion to hire the people she felt were best suited to the jobs. Regarding the first argument, the court understands Metro to be arguing that the plaintiffs cannot offer their own subjective opinions to refute Battle's subjective

opinions. The plaintiffs, however, have not merely offered their subjective opinions; they dispute as a factual matter that Battle ever discussed dissatisfaction with their performance with them, and they have offered objective evidence that calls into question the validity of Battle's subjective assessment of their abilities.

As for Metro's second argument, while Battle did generally have the discretion to hire whomever she wanted, such discretion was limited by the prohibition against discrimination based on age and other protected characteristics. Moreover, "while federal courts cannot 'act as super personnel departments,' neither can they resolve disputed facts on motions for summary judgment." *George*, 966 F.3d at 463 (quoting *Lee v. City of Columbus*, 636 F.3d 245, 258 (6th Cir. 2011)). Because Meriwether and Cathey have presented evidence that casts doubt on Battle's asserted reasons for not selecting them as Executive Directors (or for another upper-level position, as Maultsby-Springer was), they have "created a genuine dispute of fact at the pretext stage of the *McDonnell Douglas* framework." *Id.*

Metro's Motion for Summary Judgment as to Meriwether's and Cathey's age discrimination claims under the ADEA and THRA will be denied.

## VIII.   CATHEY'S RETALIATION CLAIM

Cathey also asserts that he was retaliated against for his "refusal to support Dr. Battle's attempts to retaliate against Dr. Leffler because of her association with a former MNPS employee who sued MNPS, in violation of the THRA." (Doc. No. 125 ¶ 217.) The Bailey plaintiffs did not amend their pleading to assert a THRA retaliation claim on behalf of Cathey until they filed the Fifth Amended Complaint on May 5, 2022. Metro argues now that the claim is time-barred, because the events that gave rise to it occurred two years earlier, in 2020, and THRA claims are subject to the one-year statute of limitations in Tenn. Code Ann. § 4-21-311(d).

In response, the plaintiffs argue that the Fifth Amended Complaint did not add any new

factual allegations; instead, it simply added a new cause of action based on allegations that were in their pleading from the beginning. Citing *Quinn-Hunt v. Bennett Enterprises*, 122 F. App'x 205, 207 (6th Cir. 2005), the plaintiffs argue that, because factual allegations are what matters, and they did not include new factual allegations but simply a new cause of action based on the same facts they had previously pleaded, the claim is not time-barred. In its Reply, Metro contends that this situation is distinguishable from that in *Quinn-Hunt*, "where the alleged facts could be easily interpreted as either supporting a § 1981 claim or a Title VII claim, and so it did not matter that the correct statute was not cited." (Doc. No. 206, at 16.)

The Bailey plaintiffs' original Complaint (like all other iterations of it) includes the following factual allegations:

> 73. Dr. Leffler was closely related to a former MNPS employee who was fired by MNPS and who later sued MNPS based on violations of Title VII.

> 74. At this February 2020 meeting, Dr. Battle asked Dr. Cathey if Dr. Leffler could "separate her work" from the dismissal of her relative and questioned Dr. Leffler's "loyalty" to MNPS. Dr. Cathey refused to agree with Dr. Battle about Dr. Leffler and stated multiple times that Dr. Leffler was a professional who was doing an exceptional job.

> 75. This was not the first time that Dr. Battle discussed Dr. Leffler's lack of "loyalty" with Dr. Cathey, nor his first time in advocating for Dr. Leffler and refusing to side with Dr. Battle regarding Dr. Battle's allegations against Dr. Leffler.

> . . . .

> 135. Further, Plaintiff Cathey, who is tenured, had his position eliminated not due to the budget, but *due to retaliation* for reporting violations of Tennessee Code Annotated section 39-14-136, which prohibits falsification of educational documents; and/or *for refusing to support Dr. Battle's attempts to retaliate against Dr. Leffler because of her association with a former MNPS employee who sued MNPS based on violations of Title VII*; or, in the alternative, because of his age.

(Complaint, Case No. 3:21-cv-00122, Doc. No. 1 (emphasis added).)

The Fifth Amended Complaint contains all of the same allegations (*see* Doc. No. 125 ¶¶ 73–75, 172), but it includes a single new paragraph to assert the THRA retaliation claim:

> Furthermore, as described above, MNPS retaliated against Dr. Cathey for his refusal to support Dr. Battle's attempts to retaliate against Dr. Leffler because of her association with a former MNPS employee who sued MNPS, *in violation of the THRA*.

(*Id.* ¶ 217 (emphasis added).)

The Federal Rule of Civil Procedure governing the form of pleadings requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). In addition, "[p]leadings must be construed so as to do justice." Fed. R. Civ. P. 8(e). The Sixth Circuit has long recognized that Rule 8 is to be liberally construed and that "[t]he failure in a complaint to cite a statute, or to cite the correct one, in no way affects the merits of the claim. Factual allegations alone are what matters." *Quinn-Hunt*, 122 F. App'x at 207 (quoting *Albert v. Carovano*, 851 F.2d 561, 571, n.3 (2d Cir. 1988)). "The form of the complaint is not significant if it alleges facts on which relief can be granted, even if it fails to categorize correctly the legal theory giving rise to the claim." *Gean v. Hattaway*, 330 F.3d 758, 765 (6th Cir. 2003). Thus, where the facts as alleged support a violation of a particular statute, it is not necessary for the plaintiff to cite it in order to state a claim based on that statute.

Metro's attempt to distinguish *Quinn-Hunt* is premised upon an unspoken assumption that the Fifth Amended Complaint—like the four previous versions of the pleading—does not contain factual allegations sufficient to support a THRA retaliation claim. Regarding that assumption, the court notes that it is indeed unclear from the allegations in any of the iterations of the Bailey plaintiffs' pleading whether Cathey engaged in what could be construed as protected conduct under the THRA's definition thereof. *See* Tenn. Code Ann. § 4-21-301(a)(1) (prohibiting retaliation against an employee "because such person has opposed a practice declared discriminatory by this

chapter or because such person has made a charge, filed a complaint, testified, assisted or participated in any manner in any investigation, proceeding or hearing under this chapter."). Moreover, as Metro now mentions in its Reply, it is not clear that the THRA encompasses the type of third-party retaliation claim brought on behalf of Cathey. The problem with Metro's position, however, is that it has not actually presented a cogent argument or moved for judgment on the basis that the Fifth Amended Complaint fails to allege sufficient facts to state a claim for which relief may be granted.

Because the plaintiffs are correct that the Fifth Amended Complaint does not contain any new factual allegations and, instead, only incorporates a new cause of action premised upon previously pleaded facts, the court finds that the new cause of action is not time-barred. Whether it actually states a claim for which relief may be granted, however, remains an open question—one that has not been adequately briefed and that the court declines to undertake *sua sponte*. Metro's Motion for Summary Judgment as to this claim, therefore, will be denied at this juncture.

## IX. CONCLUSION

For the reasons set forth herein, the plaintiffs' Motion for Partial Summary Judgment will be denied in its entirety; Battle's Motion for Summary Judgment will be granted; and Metro's Motion for Summary Judgment will both be granted in part and denied in part. Specifically, the following claims against Metro survive summary judgment:

(1) Meriwether's and Cathey's ADEA and THRA age discrimination claims;

(2) Cathey's THRA retaliation claim; and

(3) Leffler's retaliation claim under Title VII and the THRA related to her non-selection for the position of Executive Director.

The defendants are entitled to summary judgment on all other claims. An appropriate Order is filed herewith.

ALETA A. TRAUGER
United States District Judge