# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | |
|---|---|
| JENAI HAYES, | ) |
| | ) |
| DR. LILY MORENO LEFFLER, | ) |
| | ) |
| and | ) |
| | ) |
| DR. JAMES BAILEY, | ) |
| DR. PIPPA MERIWETHER, and | ) |
| DR. DAMON CATHEY, | ) |
| | ) |
|    Plaintiffs, | ) |
| | ) |
| v. | )   **Judge Aleta A. Trauger** |
| | )   **No. 3:20-cv-01023 (LEAD CASE)** |
| METROPOLITAN GOVERNMENT | )         (CONSOLIDATED) |
| OF NASHVILLE AND DAVIDSON | ) |
| COUNTY, TENNESSEE and | ) |
| DR. ADRIENNE BATTLE, | ) |
| | ) |
|    Defendants. | ) |

## MEMORANDUM & ORDER

Before the court are two motions filed by defendants Metropolitan Government of Nashville and Davidson County, Tennessee and Dr. Adrienne Battle (collectively referred to herein as "Metro"): (1) Motion in Limine No. 9 to Exclude Expert Opinion of Dr. Ken Smith (Doc. No. 260); and (2) Motion in Limine No. 10 to Exclude Expert Opinion of Dr. Robin Lovgren (Doc. No. 261). The plaintiffs have filed Responses in opposition to both motions. (Doc. Nos. 276, 277.) For the reasons set forth herein, both motions will be granted in part and denied in part.

## I. LEGAL STANDARD

Under Federal Rule of Evidence 702, an expert's opinion is admissible, at the trial court's discretion, if: (1) the expert is qualified as such by knowledge, skill, experience, training, or

education; (2) the testimony is relevant, meaning that it will assist the trier of fact to understand the evidence or to determine a fact in issue; and (3) the testimony is reliable, meaning that it is based on sufficient facts or data, is the product of reliable principles and methods, and the witness has applied the principles and methods reliably to the facts of the case. *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 528–29 (6th Cir. 2008). In short: the expert must be qualified, and her testimony must be both relevant and reliable. *Id.* When an expert is challenged, "the proponent of the testimony . . . must establish its admissibility by a preponderance of proof." *Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 251 (6th Cir. 2001) (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592 n.10 (1993)); *see also Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 478 (6th Cir. 2008).

In *Daubert*, the Supreme Court held that, while the evaluation of expert testimony is generally left to juries, district courts must serve in a "gatekeeping" capacity, "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." 509 U.S. at 597–98. Generally, however, "rejection of expert testimony is the exception, rather than the rule." *Davis v. Sig Sauer, Inc.*, 126 F.4th 1213, 1224 (6th Cir. 2025) (quoting *In re Scrap Metal*, 527 F.3d at 530). Accordingly, "Rule 702 should be broadly interpreted on the basis of whether the use of expert testimony will assist the trier of fact." *Burgett v. Troy-Bilt LLC*, 579 F. App'x 372, 376 (6th Cir. 2014) (quoting *Morales v. Am. Honda Motor Co.*, 151 F.3d 500, 516 (6th Cir. 1998)). "A court should not use its gatekeeping function to impinge on the role of the jury or opposing counsel." *Id.* at 376–77. Instead, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

At the same time, trial courts enjoy "broad discretion . . . to determine the admissibility of [expert] testimony." *Pride v. BIC Corp.*, 218 F.3d 566, 578 (6th Cir. 2000) (citing *Daubert*, 509 U.S. at 593). In exercising that discretion, courts should be mindful of the risk that "[e]xpert evidence can be both powerful and quite misleading because of the difficulty in evaluating it." *Daubert*, 509 U.S. at 595 (citation omitted). "Because of this risk, the judge in weighing possible prejudice against probative force . . . exercises more control over experts than over lay witnesses." *Id.* (citation omitted).

An expert's proposed testimony may be excluded if it is not relevant. Under Rule 401, evidence is relevant if it has "any tendency to make a fact of consequence more or less probable than it would be without the evidence" and is "of consequence in determining the action." A fact is "of consequence" when it relates, directly or indirectly, to an element of a claim or defense. *United States v. D'Ambrosio*, No. 1:15-CR-003, 2016 WL 1385281, at *2 (M.D. Pa. Apr. 7, 2016) (granting motion to exclude sex trafficking expert), *aff'd and remanded sub nom. United States v. Delgado*, 677 F. App'x 84 (3d Cir. 2017). Relevant evidence is admissible; irrelevant evidence is not. Fed. R. Evid. 402. And relevant evidence may be excluded "if its probative value is substantially outweighed by a danger of," among other things, "unfair prejudice, confusing the issues, [or] misleading the jury." Fed. R. Evid. 403.

## II. MOTION TO EXCLUDE EXPERT OPINION OF DR. KEN SMITH

The plaintiffs seek to introduce the opinions of Dr. Ken Smith that (1) the "elimination of the Central Office positions was discretionary and not mandated by the budget process"; and (2) the removal of these positions did not appear to follow the procedural and professional steps that commonly occur for budget-driven organizations." (Smith Report, Doc. No. 191-4 at 1.) Metro seeks to exclude Smith's opinions on the basis that they are irrelevant and unreliable, and therefore inadmissible, under Federal Rules of Evidence 401, 402, 403, and 702.

### A.    Relevance

Metro first argues that Smith's opinion that the Central Office reorganization at Metro Nashville Public Schools ("MNPS") was discretionary is irrelevant, because school budgeting always involves a certain amount of discretion, and Metro has never contended otherwise. (Doc. No. 260 at 2.) Rather, Metro states, it has always acknowledged that the fiscal year budget for fiscal year 2021 "reflected MNPS' business judgment and budgetary discretion." (*Id.* at 3.) It argues that the jury will not be called upon to decide whether the Central Office reorganization was mandated by law but, instead, whether the employment decisions were retaliatory or discriminatory. "So," it concludes, "an expert opinion that budgeting is discretionary and that reorganization was not required by law has no bearing on any fact of consequence in this case." (*Id.* (internal quotation marks and citation omitted).)

The plaintiffs argue in response that Metro has repeatedly claimed that the elimination of the plaintiffs' positions was justified by budgetary concerns. They contend that Smith's opinion that the budget did not require elimination of their positions will help the jury determine whether Metro's reliance on budgetary concerns to justify their elimination is "more or less probable." (Doc. No. 276 at 2.)

The record establishes both that Metro has relied on budgetary concerns to justify the elimination of positions in the Central Office reorganization and that Smith's opinion is relevant to refute that position. The Sixth Circuit, in reviewing this court's partial grant of summary judgment, addressed Metro's argument that it had eliminated plaintiff Hayes's position "because it needed to cut $100 million from its budget." *Hayes v. Metro. Gov't*, No. 23-5027, 2023 WL 8628935, at *5 (6th Cir. Dec. 13, 2023). The court pointed to evidence in the record showing that

> the District's budget increased after the reorganization. Further, when the District cuts its budget, it typically makes non-personnel cuts before dismissing employees. . . . Finally, looking at this and other evidence, a school-budgeting expert evaluated

the reorganization and determined that it didn't appear to be driven by budget concerns.

*Id.* The court concluded based on this evidence that "a jury could doubt that the District removed Hayes because of the budget." *Id.*

While there is no doubt that school budgetary decisions are largely discretionary, involving selections among many possible choices, Smith's Report suggests that Metro's purported budgetary concerns were grossly overstated, given MNPS's actual financial situation in 2020. The point of his opinion is that there were many other less controversial and more common areas within the budget from which Metro could have made up whatever deficit it believed it needed to cover, rather than taking the unusual step of cutting personnel first. In other words, insofar as Metro intends to continue arguing that it needed to eliminate positions because of budget pressures, Smith's proposed opinion is not irrelevant.

**B.     Reliability**

Next, Metro argues that Smith's opinion that the Central Office reorganization did not "'appear' to follow the correct steps" is not reliable because it amounts to nothing more than speculation based on Smith's "subjective notion about what should have or could have happened during [the] reorganization." (Doc. No. 260 at 3.) Metro further asserts that Smith did not engage in any analysis of the applicable state and local procedures, such as those set forth in Tenn. Code Ann. § 49-2-301(U)(i)(ii) [sic][1] and several Metro Charter provisions pertaining to the Metro School Board's and the Metro Council's responsibilities relating to the school budget, as a result

---

[1] This subsection does not exist. The court presumes that Metro intended to refer to Tenn. Code Ann. § 49-2-301(b)(1)(U)(i)–(ii), which requires local boards of education to assign to directors of schools the duty to, among other things, prepare an annual budget for submission to the school board for approval.

of which his opinions are not "actually based on any reasonable degree of certainty in his field or some other measure of reliability." (Doc. No. 260 at 4.).

In his Report, Smith details his education and experience. He has a PhD in Governmental Accounting and has worked as a Certified Public Accountant with local governments. (Doc. No. 191-4 at 1.) He states that, based on his own published research and his service on his local School Board, he has "specific expertise in public school district budgeting, accounting and financial management." (*Id.*)

He lists the documents he reviewed before forming his opinions in this case as including :

- Transcript of Deposition of Barry Booker, January 13, 2022
- Transcript of Deposition of Chris Henson, February 28, 2022
- NMPS Operating Budgets prepared in 2017 to 2021
- Audited Financial Statement for Metro Government, 2020
- Nashville.gov Internal Auditor Investigation Reports, 2018 to 2020
- NMPS Policies
- NMPS Procedures
- NMPS new District Organizational Structure (June 17, 2019)
- NMPS Minutes and Agendas, including May 19 and 26, 2020
- TN Code Title 49.5.5.49-5-511(b) - Position Reduction, Preferred List
- NPMS Board of Education Committees, 2020-21
- NPMS Organizational Structure (March 2021)

(Doc. No. 191-4 at 1–2.) Based on these documents, he observed that: (1) "[b]udget pressure at [MNPS] in 2020 was fairly similar to prior years"; (2) "[t]here were a large number of reasonable, routine & available options to address the budget pressure"; (3) "[m]ost budget options went through a substantive technical review process"; and (4) "[t]his change [*i.e.*, the elimination of Central Office positions] did not follow a substantive technical review process." (*Id.* at 2.) And, based on these observations (which he did not characterize as opinions), he reached the conclusion that " the removal of these positions did not appear to follow the procedural and professional steps that commonly occur for budget-driven reorganizations." (*Id.*) He explained how he reached this conclusion in more detail in other sections of his Report.

Expert testimony must be "based on sufficient facts or data," Fed. R. Evid. 702, including "facts or data in the case that the expert has been made aware of or personally observed," Fed. R. Evid. 703. It must be "supported by more than subjective belief and unsupported speculation and should be supported by good grounds, based on what is known. *Davi*, 126 F.4th at 1224–25. Here, Smith's opinion that the "Central Office Reorganization was not mandated nor necessitated by the budget process" (Doc. No. 191-4 at 11) is adequately supported and not based on mere speculation. Metro has not shown that it is unreliable, and defense counsel can explore its weaknesses through cross-examination.

### C. Whether the Central Office Reorganization Resulted in Cost Savings

Smith states in his Report that reorganizations like that undertaken by MNPS "sometimes result in actual cost savings, sometimes they are budget neutral and sometimes [they increase rather than decrease] the budget outflows." (*Id.* at 10.) In this case, he did not have access to and has not seen a budgeting analysis predicting cost savings based on the Central Office reorganization; nor has he seen a final accounting of the "total costs at the Central Office before and after the change." (*Id.*) Therefore, he "cannot conclude as to whether an actual cost savings was likely or achieved." (*Id.*) Based on this statement, Metro argues that Smith cannot offer an opinion as to whether MNPS sought or achieved any particular cost savings through the Central Office reorganization.

The plaintiffs do not address this argument, and it does not appear that Smith offers or intends to offer any such opinion, as he expressly disclaims knowledge of whether cost savings were either projected or achieved. Accordingly, Metro's request to exclude such an opinion is uncontested, and this small aspect of its motion will be granted.

Otherwise, Metro's motion to exclude Smith's expert opinions will be denied.

III.    MOTION TO EXCLUDE EXPERT OPINION OF DR. ROBIN LOVGREN

Dr. Lovgren, an Associate Professor of Mathematics at Belmont University with a background in statistical analyses and quantitative methods in business applications, was asked by the plaintiffs to "determine whether the employment decisions made in 2020 at [MNPS] show a pattern of discrimination based on engagement in protected activity." (Doc. No. 190-12 at 5.) To conduct this analysis, Lovgren was asked to "compare the number of employees who were known to have been engaged in protected activity (EPA) with the number of employees who were not known to have been engaged in protected activity (NEPA) and determine if there appears to be targeting based on EPA and NEPA status." (*Id.*) She conducted a statistical analysis, based on information and documentation provided to her by the plaintiffs that identified which employees were and were not known by defendant Battle to have engaged in protected activity. Based on the information she reviewed, Lovgren concluded that "in 2020 a disproportionately large number of employees engaged in protected activities were adversely affected by the reorganization of the Central Office." (*Id.*) She provided the statistical likelihood that this disproportionate number of adverse events would occur randomly. Her Report itemizes the information, documents, and data Lovgren used and relied upon to form her opinions, explains the statistical analysis methods used, and lays out her opinions in detail.

Metro seeks to exclude Lovgren's opinions as irrelevant and unreliable, citing Federal Rules of Evidence 401, 402, 403, and 702. (Doc. No. 261 at 1.)

A.    **Statistical Analyses Based on the Number of Central Office Employees Who Had Engaged in Protected Activity**

*1.    Reliability*

Metro argues that Lovgren's opinions are unreliable, because she failed to "support her opinions with sufficient facts or data to establish how many MNPS employees engaged in

protected activity, or how many were adversely affected by the reorganization." (*Id.* at 2.) In particular, Metro contends that Lovgren fails to define "or provide underlying data to support" her "Protected Activity" or "Adversely Affected" categories, and she "assumes without explanation that Dr. Battle is somehow competent to testify as to the definition of these terms." (*Id.* at 2–3.) Metro also takes issue with Lovgren's "assum[ing] without explanation that Dr. Battle was the only decisionmaker over all of the employment decisions which are included in the sample." (*Id.* at 3.)[2]

As already stated, expert testimony must be "based on sufficient facts or data," Fed. R. Evid. 702, including "facts or data in the case that the expert has been made aware of or personally observed," Fed. R. Evid. 703. "An expert's opinion, where based on assumed facts, must find some support for those assumptions in the record." Davis, 126 F.4th at 1224 (quoting *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 801 (6th Cir. 2000)). Here, Lovgren's opinion regarding which employees were and were not known to have engaged in protected activity was based on defendant Battle's deposition testimony.

Notably, Battle testified that she knew in the Spring of 2020 that "you can't retaliate against someone because they're related to a person who engaged in protected activity" and that you "cannot retaliate against someone who engages in protected activity." (Doc. No. 149-1, Battle Dep. 72–73.) She also confirmed that she was the final decisionmaker with respect to all of the relevant employment decisions at issue in this case. And she specifically agreed that she had no knowledge about whether Steve Ball, James Witty, Natalie Gibbs, Renita Perry, Lendozia Edwards, Chae

---

[2] Metro also points out that this court, at the summary judgment stage, discounted Lovgren's opinions. (*See* Doc. No. 261 at 2 (quoting Doc. No. 217 at 80).) It argues that the Lovgren Report has not been updated or its conclusions bolstered with additional evidence in the intervening three years and so remains flawed. However, as the plaintiffs note, the Sixth Circuit "largely reversed" this court's summary judgment ruling. (Doc. No. 277 at 4 n.2.)

Snorten, Craig Hammond, Carl Carter, David Kovach, Robin Shumate, Tracy McPherson, Susan Cochran, Chad High, Cecelia Conley, Karen Desouza Gallman, Shawn Lawrence, or Felicia Tuggle had engaged in protected activity. (*Id.* at 130–31.) These individuals are identified in Table 2 to the Lovgren Report as executive-level Central Office employees who were not known to have engaged in protected activity and who were not adversely affected by the Central Office reorganization. (*See* Doc. No. 190-12 at 23.)

The court finds it reasonable to assume that Battle, as Director of Schools, knew what "protected activity" referred to, and knew what she was saying when she agreed that she was not aware that any of the individuals referenced above had engaged in protected activity. Moreover, it is undisputed that she knew that the plaintiffs had engaged in protected activity. Lovgren's "failure" to define the term "protected activity" does not render her opinions unreliable. Likewise, as a matter of common knowledge, it is clear that being demoted, fired, or not rehired after a reorganization are "adverse" employment events, and Lovgren's failure to define "adversely affected" as used in her Report does not render her opinions unreliable.

Finally, Lovgren's "assumptions" regarding the individuals who had or had not engaged in protected activity and were or were not adversely affected by the Central Office reorganization are supported by sufficient evidence in the record, specifically including Battle's deposition testimony. Metro will have the ability to cross-examine Lovgren regarding the validity of her assumptions, and "mere weaknesses in the factual basis of an expert witness' opinion . . . bear on the *weight* of the evidence rather than on its *admissibility*." *Id.* (emphasis added) (quoting *In re Scrap Metal*, 527 F.3d at 530). Opposing counsel has the obligation to "inquire into the expert's factual basis." *Id.* (quoting *United States v. L.E. Cooke Co.*, 991 F.2d 336, 342 (6th Cir. 1993)). In other words,

Lovgren's opinions are "based on sufficient facts or data," Fed. R. Evid. 702, and the assumed facts on which she relies are supported by the record.

              *2.*     *Relevance*

Metro argues that, because Lovgren's opinions based on the number of employees who were not known to have engaged in protected activity are not reliable, they do not "tend to show that any facts are more or less probable" and therefore must be excluded for lack of relevance. (Doc. No. 261 at 4 (citing Fed. R. Evid. 401.) Because the court finds the opinions reliable, this argument fails.

**B.    Statistical Analyses Based on the Number of Principals Who Had Engaged in Protected Activity**

Metro raises a separate argument regarding Dr. Lovgren's analysis of the relative numbers of school principals who did or did not suffer an adverse employment action and who were or were not known to have engaged in protected activity. Lovgren concedes that she did not have any information regarding school principals (other than plaintiff Bailey) who were known to have engaged in protected activity. In fact, Tables 7a, 7b, 8a, 8b, 9a, and 9b all note that Lovgren's analyses "Assume[] Dr. Bailey Was the Only Principal . . . Who Engaged in Protected Activity." (Doc. No. 190-12 at 36–41.) And in her explanation of the analyses regarding school principals, Lovgren states: "The number of principals who engaged in protected activity was not known for this analysis so 'what-if' analyses were performed. The [analyses assume that] Dr. Bailey was the only principal who engaged in protected activity." (*Id.* at 17, 18.) Metro is therefore correct that Lovgren's analysis of the proportion of adverse events affecting school principals who had engaged in protected activity, as compared to those who had not, is entirely speculative.

Lovgren also notes that it was known that "Dr. Bailey was the only principal who testified in the administrative hearing about Coach Battle's termination, so [her] analysis is appropriate for

considering this scenario as well." (*Id.*) While this may be true, Dr. Bailey's engaging in activity protected by the First Amendment is just one form of protected activity, and Lovgren concedes that she has no information regarding whether other principals had engaged in protected activity (or whether Dr. Battle was aware that they had engaged in protected activity).

Because Lovgren's assessments in Sections 8.4 and 8.5 of her Report, as illustrated by Tables 7a, 7b, 8a, 8b, 9a, and 9b, are admittedly based on "what-if" speculation that Dr. Bailey was the only school principal (or the only school principal at a Priority School) who had engaged in protected activity, her statistical analyses regarding the disproportionate number of school principals who had engaged in protected activity and then suffered an adverse employment action are not "based on sufficient facts or data," Fed. R. Evid. 702, including "facts or data in the case that the expert has been made aware of or personally observed," Fed. R. Evid. 703, to be reliable. As stated above, an expert opinion based on assumed facts "must find some support for those assumptions in the record." *Davis*, 126 F.4th at 1224. Because Lovgren admittedly cannot point to any facts in the record to support her assumption that Bailey was the only principal who was known to have engaged in protected activity, her statistical analysis relating to school principals in Sections 8.4 and 8.5 and Tables 7a, 7b, 8a, 8b, 9a, and 9b are not reliable and must be excluded.

## IV. CONCLUSION AND ORDER

For the reasons set forth herein, Metro's Motion in Limine No. 9 to Exclude Expert Opinion of Dr. Ken Smith (Doc. No. 260) and its Motion in Limine No. 10 to Exclude Expert Opinion of Dr. Robin Lovgren (Doc. No. 261) are both **GRANTED IN PART AND DENIED IN PART**.

More specifically, as set forth above, Motion in Limine No. 9 is **GRANTED IN PART**, insofar as Dr. Smith **shall not** offer an opinion as to whether MNPS sought or achieved any particular cost savings through the Central Office reorganization. Otherwise, the motion is **DENIED**.

Motion in Limine No. 10 is **GRANTED IN PART**, insofar as Dr. Lovgren **shall not** offer

the opinions stated in Sections 8.4 and 8.5 of her Report, as illustrated by Tables 7a, 7b, 8a, 8b,

9a, and 9b. Also excluded is the conclusion in Section 3 of the Report that, "if Dr. Bailey was one

of a small number of [principals] who engaged in protected activity, then the probability that he

was the only principal non-renewed is low as compared with all principals of priority schools and

as compared with all principals in MNPS." (Doc. No. 190-12 at 6.) Otherwise, this motion is

**DENIED**.

It is so **ORDERED**.

_____

ALETA A. TRAUGER
United States District Judge